**Case No. 14-3091**

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

**ARIE S. FRIEDMAN, M.D. and**
**the Illinois State Rifle Association**
**Plaintiffs-Appellants,**

**v.**

**CITY OF HIGHLAND PARK,**
**Defendant-Appellee.**

On Appeal from the United States District Court for the Northern
District of Illinois, Eastern Division
Case No. 1:13-cv-09073
The Honorable John W. Darrah, Judge Presiding

**APPELLANTS' OPENING BRIEF AND SHORT APPENDIX**

James B. Vogts
Andrew A. Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611
Telephone:  (312) 321-9100
Facsimile:   (312) 321-0990

**Attorneys for Plaintiffs-Appellants**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>14-3091</u>

Short Caption: <u>*Arie S. Friedman, et al.  v. City of Highland Park*</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):  Arie S. Friedman, M.D. and Illinois State Rifle Association.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: Swanson, Martin & Bell, LLP

(3) If the party or amicus is a corporation:

    i)      Identify all its parent corporations, if any; (None) and

    ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock: (None)

---

Attorney's Signature:  <u>*s/ James B. Vogts*</u>     Date: <u>November 3, 2014</u>

Attorney's Printed Name:  <u>James B. Vogts</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes**

Address:  330 N. Wabash, Suite 3300, Chicago IL 60611
Phone Number:  312-321-9100     Fax Number:  312-321-0990
E-Mail:  jvogts@smbtrials.com

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................................. ii

TABLE OF AUTHORITIES ........................................................................ v

JURISDICTIONAL STATEMENT ............................................................... 1

ISSUES PRESENTED FOR REVIEW ......................................................... 1

STATEMENT OF THE CASE...................................................................... 2

      A.      Procedural History ........................................................ 2

      B.      Factual Background ...................................................... 3

          1. Highland Park's Enactment of the Ordinance .................................... 3

          2. The Ordinance .................................................................. 4

          3. The Banned Firearms ........................................................... 5

          4. AR-type Semiautomatic Rifles ................................................. 6

          5. Banned Firearm Design Features ................................................ 10

               a. Telescoping, Folding and Thumbhole Stocks ........................ 10

               b. Pistol Grips .......................................................... 11

               c. Barrel Shrouds ....................................................... 12

               d. Protruding Grips...................................................... 12

               e. Muzzle Brakes and Compensators....................................... 13

          6. Banned Ammunition Magazines .................................................. 13

          7. Common Ownership of Banned Firearms and Magazines for
             Lawful Uses ................................................................. 14

               a. Ownership for Target Shooting........................................ 15

               b. Ownership for Hunting ............................................... 15

               c. Ownership for Home Defense........................................... 16

8. Criminal Use of Firearms and Ammunition Magazines Banned by Highland Park ................................................................ 19

a. Use of Banned Firearms in Crime ......................................... 19

b. Use of Banned Firearms in Police Shootings ........................ 20

c. Use of Banned Firearms and Magazines in Mass Shootings.................................................................................... 21

(i) Dr. Gary Kleck's Analysis of Mass Shootings ............ 21

d. The Effectiveness of Firearm Bans on the Incidence of Crime........................................................................................ 22

SUMMARY OF ARGUMENT ................................................................ 23

ARGUMENT ............................................................................................ 26

I.      Standard of Review ................................................................. 26

II.     Highland Park's Ban on a Class of Commonly Owned Firearms Violates the Second Amendment ............................................. 27

A. The Firearms Ban Is Categorically Unconstitutional .................... 27

B. Highland Park Has Not Met Its Burden of Demonstrating the Banned Firearms and Magazines Are Not Commonly Owned by Law Abiding Persons for Lawful Purposes ................... 33

1. Banned Firearms and Magazines Are Commonly Owned by Law Abiding Persons ............................................ 33

2. Banned Firearms and Magazines Are Owned for Lawful Purposes ................................................................... 37

C. Highland Park's Ban on Commonly Owned Firearms and Magazines Is Broadly Prohibitory and Should Not Be Subjected to Judicial Interest Balancing ......................................... 40

D. Highland Park's Ban Does Not Survive Any Level of Heightened Scrutiny ....................................................................... 44

CONCLUSION........................................................................................ 52

CERTIFICATE OF COMPLIANCE WITH RULE 32(a).......................... 53

CIRCUIT RULE 31(E) CERTIFICATION.................................................................53

CERTIFICATE OF SERVICE.................................................................................54

SHORT APPENDIX...............................................................................................56

CIRCUIT RULE 30(d) STATEMENT....................................................................56

## TABLE OF AUTHORITIES

Cases                                                        Page

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................passim

*Ezell v. City of Chicago*, 651 F.2d 684 (7th Cir. 2011).........................................passim

*Fyock v. City of Sunnyvale*, 2014 U.S. Dist. LEXIS 29722 (N.D.Cal. Mar. 5, 2014)........................................................................................................... 31, 37

*Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011)........................................................... 28, 33, 36, 46

*Heller v. District of Columbia*, 698 F.Supp. 2d 179 (D.D.C. 2010) ........................... 46

*Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410 (7th Cir. 1994) ................................................................................ 40

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).........................................passim

*McDowell v. Village of Lansing*, 763 F. 3d 762 (7th Cir. 2014) ................................ 26

*McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163 (7th Cir. 1987)................................................................................................................... 40

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2013)...............................................passim

*New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009)........... 38

*New York State Rifle & Pistol Association v. Cuomo*, 990 F.Supp.2d 349 (W.D.N.Y. 2013)..................................................................................................... 36

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ..................... 28, 29, 43

*Shew v. Malloy*, 994 F.Supp.2d 234 (D.Conn. 2014) .................................................. 36

*United States v. Miller*, 307 U.S. 174 (1939) ............................................................. 27

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ........................................ 42, 43

Rules

Fed. R. Civ. P. 65(a) ................................................................................... 2

Fed. R. Evid. 703..................................................................................... 49

Statutes and Regulations

Highland Park City Code § 136.001..............................................................1, 52

430 ILCS 65/13.1(c)..................................................................................... 3

26 U.S.C. § 5801..................................................................................... 46

28 U.S.C. § 1291..................................................................................... 1

28 U.S.C. § 1331..................................................................................... 1

28 U.S.C. § 1343..................................................................................... 1

42 U.S.C. § 1983..................................................................................... 1

27 CFR § 479..................................................................................... 46

Other Authorities

Bruce Kobayshi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons"*, 8 STAN. L. & POL'Y REV. 41 (1997) ........................................... 6

Congressional Research Service, *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy*, Mar. 18, 2013).................................................................................................. 21

Fox & DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, Vol. 18 Homicide Studies 125 (2014) ........................................................... 21

Sugarman, *Assault Weapons and Accessories in America*, Conclusion, Violence Policy Center 1988............................................................. 6, 46

Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and Research Agenda*, 56 UCLA L. REV. 1443 (2009) ..................................................................................................... 5

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants ("Plaintiffs") seek declaratory and injunctive relief under 42 U.S.C. § 1983 barring enforcement of Highland Park City Code section 136.001 *et seq.* (the "Ordinance") as unconstitutional under the Second Amendment to the United States Constitution. The United States District Court for the Northern District of Illinois had subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343.

On September 18, 2014, the District Court granted Defendant-Appellee Highland Park's ("Highland Park") motion for summary judgment and denied Plaintiffs' motion for summary judgment. Plaintiffs filed their notice of appeal on September 23, 2014. The Seventh Circuit has jurisdiction over this matter under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.     Whether Highland Park's ban on possession of semiautomatic rifles that are capable of accepting an ammunition magazine holding more than ten rounds of ammunition violates the Second Amendment right of law-abiding persons to keep commonly owned firearms in their homes for lawful purposes.

2.     Whether Highland Park's ban on possession of ammunition magazines with the capacity to hold more than ten rounds of ammunition violates the Second Amendment right of law-abiding persons to keep commonly owned firearms in their homes for lawful purposes.

# STATEMENT OF THE CASE

## A.     Procedural History.

On December 12, 2013, Plaintiffs filed their Verified Complaint in the Circuit Court for Lake County, Illinois. (Appellants' Appendix ("A.") 1) Highland Park removed the case to the United States District Court for the Northern District of Illinois on December 19, 2013. (Record on Appeal ("R.") Doc. 1-2) On December 24, 2013, Plaintiffs filed their motion for preliminary injunction to enjoin enforcement of the Ordinance until the merits of Plaintiffs' claims were decided. (R. Doc. 9) On February 27, 2014, the District Court held a hearing on Plaintiffs' motion for preliminary injunction, and consolidated the hearing with a trial on the merits under Federal Rule of Civil Procedure 65(a). (Short Appendix ("S.A.") 23)

On June 30, 2014, the parties filed cross-motions for summary judgment. (R. Docs. 40, 44)  On July 21, 2014, Plaintiffs filed a motion to strike certain Local Rule 56.1 statements of material fact submitted by Highland Park in support of its motion for summary judgment. (R. Doc. 51) On August 7, 2014, Plaintiffs filed a motion to strike Highland Park's responses to Plaintiffs' Local Rule 56.1 statements of material fact. (R. Doc. 61) On August 20, 2014, the District Court denied Plaintiffs' motion to strike Highland Park's responses to Plaintiffs' Local Rule 56.1 statements of material fact. (R. Doc. 64)

On September 12, 2014, the District Court denied Plaintiffs' motion for preliminary injunction as moot because the issues had been consolidated for trial. (R. Doc. 64) On September 18, 2014, the District Court granted Highland Park's motion

for summary judgment and denied Plaintiffs' motion for summary judgment, ruling that the Ordinance shall remain in full force and effect. (S.A.22)

In its September 18, 2014 Memorandum Opinion and Order, the District Court sustained Plaintiffs' objection to Highland Park's Local Rule 56.1 statement of material fact number 58, which was supported by information from a report on mass shootings prepared by Mayors Against Illegal Guns. (S.A.20) The District Court ruled that the statement was based on hearsay and would not be considered. (*Id.*)

Plaintiffs filed their notice of appeal on September 23, 2014. (R. Doc. 69)

## B.     Factual Background.

### 1.     Highland Park's Enactment of the Ordinance.

On May 31, 2013, the Illinois General Assembly approved House Bill 183, which contained a provision reserving regulation of "assault weapon" possession to the state. (A.10) Local laws regulating possession of such firearms were invalidated, unless the law was enacted on, before or within 10 days after House Bill 183 became law. 430 ILCS 65/13.1(c) (2013). Within the 10 day period, Highland Park adopted City Ordinance No. 68-13, codified as Chapter 136 of the Highland Park City Code. (A.11-14; A.376-382) The Ordinance bans possession of a class of firearms defined by Highland Park as "assault weapons" and ammunition magazines capable of accepting more than 10 rounds, defined by Highland Park as "large capacity magazines." (*Id.*)

As justification for the Ordinance, the Highland Park City Council found the banned firearms "are not traditionally used for self-defense" and "pose an undue threat to public safety." (A.10)   The City Council expressed its "concern" that a school

shooting similar to the Sandy Hook school shooting in Newtown, Connecticut could occur in Highland Park unless "proper public safety measures" were taken. (A.16 at ¶9)

Highland Park modeled the Ordinance on the Cook County "assault weapons" ban because the Cook County ban had "recently survived equal protection and vagueness challenges before the Illinois Supreme Court." (A.16 at ¶7) (Cook County Firearm's Dealer's License and Assault Weapons and Ammunition Ordinance (Cook County Ordinance No. 93-O-37 (approved Jan. 1, 1994)).)

> ### 2. The Ordinance.

The Ordinance prohibits possession firearms defined by Highland Park as "assault weapons." (A.380) "Assault weapons" include any "semiautomatic rifle that has the capacity to accept a large capacity magazine, detachable or otherwise, and has one or more" of the following features:

(1)     A pistol grip without a stock attached;

(2)     A feature capable of functioning as a protruding grip for the   non-trigger hand;

(3)     A folding, telescoping or thumbhole stock;

(4)     A shroud attached to the barrel that partially or completely encircles the barrel; or

(5)     A muzzle brake or compensator.

(A.376-77)

The Ordinance also prohibits possession of semiautomatic firearms specified by manufacturer, model or type, including a variety of AR-type rifles, together with

"copies or duplicates" of the firearms. (A.379) The Ordinance further prohibits possession of "parts" from which an "assault rifle" can be assembled. (A.377)

The Ordinance defines a "large capacity magazine" as any ammunition feeding device with the capacity to accept more than 10 rounds, except (1) a feeding device that has been permanently altered to accept 10 rounds or less; (2) a .22 caliber tube magazine; and (3) a tubular magazine used in a lever-action rifle. (A.380)[1]

### 3.     The Banned Firearms.

Although Highland Park defined the banned firearms as "assault weapons", true assault weapons are selective fire weapons that can be fired in a fully automatic mode, meaning they will continue to fire with a single pull of the trigger as long as the trigger is held back. (A.21 at ¶8) In contrast, the firearms banned under the Ordinance are semiautomatic firearms, which fire only one round with each pull of the trigger, as is the case with nearly all other firearms, including revolvers, bolt action, lever action, pump action and single shot firearms. (A.19 at ¶5)

The Bureau of Alcohol, Tobacco, Firearms and Explosives considers it "somewhat of a misnomer to refer to semiautomatic firearms as assault weapons." (A.282); *see* Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and Research Agenda*, 56 UCLA L. Rev. 1443, 1484 (2009) (Assault weapon bans "generally define assault weapons to be a set of semiautomatic weapons . . . that are little different from semiautomatic pistols and rifles that are

---

[1]     Plaintiffs do not challenge the constitutionality of Ordinance to the extent it prohibits possession of the semiautomatic pistols and shotguns listed by make or model in §§ 136.001(C)(3)) and 136.001(C)(4) & (5), respectively. (A.378-79)

commonly owned by tens of millions of law abiding citizens. 'Assault weapons' are no more 'high power' than many other pistols and rifles that are not covered by the bans."). Advocacy groups, however, have sown "the public's confusion over fully automatic machine guns versus semi-automatic assault weapons" to "increase the chance of public support for restrictions on these weapons." Josh Sugarman, *Assault Weapons and Accessories in America*, Conclusion, Violence Policy Center 1988 (available at [www.vpc.org/studies/awaconc.htm](www.vpc.org/studies/awaconc.htm)) (lasted visited Oct. 31, 2014)); *see* Bruce Kobayshi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons"*, 8 STAN. L. & POL'Y REV. 41, 43 (1997) (describing Sugarman's strategy as a "political swindle.")

The firearms banned by Highland Park are all semiautomatic firearms. (A.376-82) They cannot be fired as rapidly as a fully automatic firearm can be fired. (A.63 [Video Demonstration] at 00:02-00:42) The difference between fully automatic fire and semiautomatic fire is a substantial. (*Id.*) One of Highland Park's witnesses characterized the difference in rate of fire as "a major functional difference." (A.270 at 73:11-15) The difference can be seen in the "Video Demonstration" submitted in support of Plaintiffs' motion for summary judgment. (A.63 at 00:02-00:42)

### 4. AR-type Semiautomatic Rifles.

AR-type semiautomatic rifles are among the firearms banned by Highland Park. "AR" stands for ArmaLite, the company that developed the style of rifle in the 1950's. (A.65 at ¶3 n.1) Colt's Firearms first introduced a civilian version of the rifle

– the AR-15 Sporter – in the early 1960's and originally marketed the rifle for hunting use.  (A.66 at ¶4 n.3; A. 71) AR-type semi-automatic rifles are now produced by at least 50 manufacturers, including Colt's Firearms, Remington Arms, Smith & Wesson, Sig Sauer and Sturm, Ruger. (A.73) The rifles are owned by millions of law abiding persons in the United States. (A.66 at ¶4)

AR-type rifles and the other semiautomatic rifles banned under the Ordinance are not military firearms. (A.21 at ¶8) Military forces around the world since the end of World War II have primarily used selective-fire rifles as standard service firearms. (*Id*.) A selective fire rifle has the ability to fire fully automatic, meaning it will continue to fire as long as the trigger is held back, in a burst of multiple rounds with each trigger pull, or semiautomatic, meaning a separate pull of the rigger is required for each shot. (*Id*.)   The military version of the civilian semiautomatic AR-type rifle was the selective fire M-16 rifle, first used by U.S. armed forces in the early 1960's. (A.20 at ¶7)

The design goal behind a firearm intended for military use is the same as a firearm intended for civilian use: to safely, accurately and reliably discharge rounds. (A.20 at ¶7) And military firearms have, throughout history, been adapted for civilian use. (*Id*.; A.276 at 199:8-200:11; A.291 at 66:8-17) For example, the wood-stocked bolt-action rifle, used by hunters for generations, gained popularity among civilians following World War I. (A.20 at ¶7) After the U.S. military began using semiautomatic rifles during World War II, a wide range of semiautomatic rifles gained popularity among civilians. (*Id*.) The semiautomatic rifles banned under the

Ordinance, including AR-type rifles, represent the modern technological evolution of the basic purpose of all firearms – to reliably and safely deliver rounds at an intended target. (A.19 at ¶4)

AR-type semiautomatic rifles grew popular among civilian shooters, in part, because of their modular design. (A.32 at ¶3) They have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly and incorporates the stock and lower grip. (*Id*.) The two receivers allow for use of interchangeable barrels and different ammunition cartridges to suit different purposes. (*Id*.) Because of their adaptability, AR-type rifles are used for target shooting, hunting small and large game, and home defense. (*Id*.)

AR-type semiautomatic rifles are also popular because they are accurate, functionally reliable and easy to reload. (A.32 at ¶4) They are also generally lighter in weight, shorter in length and have less recoil than traditional appearing wooden-stock rifles. (*Id*.) A survey of 21,942 owners of AR-type and AK-type semiautomatic rifles (collectively referred to as "modern sporting rifles" in the survey) demonstrated that owners ranked accuracy and reliability as their most important reasons for purchasing their rifles. (A.66 at ¶6; A.67 at ¶7) The same survey showed that respondents paid an average price of $1,058 for their rifles. (A.67 at ¶7)

The market for AR-type rifles has been the fastest growing market segment in the firearms industry for a number of years. (A.33 at ¶5) Firearm industry analysts estimate that from 1990 to 2012, approximately 5,128,000 AR-type rifles were produced in the United Sates for domestic sale. (A.65 at ¶4; A.73) An additional

3,415,000 AR-type and AK-type rifles were imported. (*Id.*) Approximately 3,457,230 AR-type rifles were manufactured for domestic sale in the United States from 2008 to 2012 alone. (A.66 at ¶5; A.73) According to the Bureau of Alcohol, Tobacco, Firearms & Explosives, 30,433,751 firearms of all types were manufactured for domestic sale during those years. (A.66 at ¶5; A.75-79) Thus, approximately 11.4% of firearms manufactured in the United States from 2008 to 2012 were AR-type rifles. (A.66 at ¶5)  The number of AR-type rifles manufactured in the United States for domestic sale in the United States from 2008 to 2012 (3,457,230) outnumbered the number of revolvers manufactured (2,637,348) and nearly equaled the number of shotguns manufactured (3,938,198). (*Id.*)

A survey of retail firearms dealers conducted in 2012 revealed that 92.5% of those responding stocked AR-type rifles in their inventories. (A.68 at ¶8) The same retail dealers reported more than one of every five new firearms they sold in 2012 was a modern sporting rifle. (*Id.*)  In recent years, AR-type rifles have sold very quickly at the retail level, and retail dealers have had difficulty stocking enough rifles to meet buyer demand. (A.291 at 65:2-23)

Examples of AR-type semiautomatic rifles manufactured and sold for civilian use today include the Smith & Wesson M & P 10 rifle, the Remington Model R-15 Predator and Varmint, and the Bushmaster Hunter, Predator and Varminter rifles. (A.33 at ¶6; A.51-63) They are regularly used on firearm target ranges throughout Illinois. (A.33 at ¶5) A survey of randomly selected adult United States residents demonstrated that approximately 12 million persons participated in target shooting

with an AR-type rifle in 2012. (A.68 at ¶9; A.102) One of Highland Park's expert witnesses owns and uses an AR-type rifle for this purpose. (A.286 at 30:19-31:23) He is just one of the estimated 5 million owners of AR-type rifles in the United States, out of an estimated 57 million firearm owners. (A.66 at ¶4; A.333)

### 5. Banned Firearm Design Features.

The semiautomatic rifles banned by Highland Park typically have one or more of the five features prohibited by the Ordinance. (A.21 at ¶10; A.34 at ¶¶9-14) The presence of one of these features does not make a firearm more "dangerous" than a firearm without them. (A.34 at ¶9) Highland Park's firearms expert agrees: "I don't think any one of these individual features that are banned … if taken by themselves makes something more dangerous or less dangerous." (A.297-98 at 120:23-121:19) Rather, each of the features – pistol grips; folding, telescoping and thumbhole stocks; barrel shrouds; protruding grips; and muzzle brakes and compensators – are integral to accurate shooting and safe handling of the firearm. (A.34 at ¶9) Highland Park admits these design features may make a firearm safer to operate. (A.373 at ¶69)

A demonstration of the banned design features and their purposes can be seen in Plaintiffs' "Video Demonstration." (A.63 at 07:00-15:22)

### a. Telescoping, Folding and Thumbhole Stocks.

Telescoping stocks on an AR-type rifle are fairly common. (A.295 at 104:12-15) They enable the shooter to adjust the rifle's length to his or her stature. (A.21 at ¶10, A.35 at ¶10; A.63 [Video Demonstration] at 07:19-09:13) If a rifle's stock is too short,

a right handed shooter will tend to pull shots to the left. (A.35 at ¶10) If the stock is too long, shots will go low and to the left. (*Id.*)

The difference in the overall length of an AR-type rifle with its telescoping stock fully extended and its stock fully collapsed is typically just a few inches. (A.35 at ¶10) Collapsing the telescoping stock on a Smith & Wesson M & P 15 rifle changes the overall length of the rifle from 35 to 32 inches. (*Id.*) This change in length does not turn a difficult to conceal rifle into a concealable firearm for criminal purposes. (A.35 at ¶10; A.63 at 07:19-09:13)

Folding stocks on modern sporting rifles make them easier to carry when hiking or backpacking. (A.283) Thumbhole stocks are widely used by Olympic and other slow precision target shooting competitors. (A.22 at ¶10) They generally enhance accuracy, but like telescoping and folding stocks, have no effect on the basic function of a firearm. (*Id.*)

### b.    Pistol Grips.

AR-type rifles are designed on a straight line from the muzzle to the rear of the shoulder stock. (A.21 at ¶10; A.292 at 86:3-87:7) The straight line design reduces muzzle rise during recoil and permits the shooter to better acquire his or her target for a second shot. (*Id.*) A pistol grip for the trigger hand positioned below the rifle's stock is necessitated by the straight line design. (A.21 at ¶10; A.36 at ¶13)

If the trigger hand grip was made part of the stock of an AR-type rifle (as on a traditionally-styled rifle), the trigger hand would be in an unnatural position. (A.21 at ¶10) The location of the pistol grip on an AR-type rifle helps the shooter control

the rifle during aiming and recoil, and makes the rifle safer to handle. (A.21-22 at ¶10; A.293 at 94:18-95:9; A.63 [Video Demonstration] at 12:30-13:55)

### c.    Barrel Shrouds.

Nearly all rifles have some kind of fore end that fully or partially "shrouds" or encases the barrel. (A.22 at ¶10; A.35 at ¶11; A.63 at 09:13-11:04) A barrel shroud serves as a place for a shooter to support the rifle with his non-trigger hand and to protect his hand from barrel heat. (A.35 at ¶11; A.63 at 09:13-11:04) A barrel shroud on an AR-type rifle also serves as the place to attach a rail system on which accessories can be mounted, such as a telescopic sight, an optical sight or a flashlight. (A.35 at ¶11; A.63 at 09:13-11:04)) A barrel shroud on an AR-type rifle further serves to protect the rifle's aluminum gas tube, which carries powder gases back to work the rifle's semiautomatic action. (A.22 at ¶10)

### d.    Protruding Grips.

Protruding grips forward of the trigger guard give a shooter a more secure grip on the firearm, particularly on rifles with rail mounted accessories that make the barrel shroud more difficult to grasp firmly. (A.36 at ¶12; A.63 [Video Demonstration] at 11:04-12:30; A.294-95 at 99:8-102:19) Highland Park admits that a "protruding grip on an AR-type rifle provides the shooter with better stability, which aids in accuracy and provides better control during recoil." (A.374 at ¶88) Better control of a firearm means better accuracy, and better accuracy means better safety. (A.295 at 102:2-19)

### e.    Muzzle Brakes and Compensators.

Muzzle brakes and muzzle compensators are attached to the muzzle end of a firearm's barrel and re-channel the gases expelled from the muzzle. (A.36 at ¶14; A.63 at 13:55-14:42) They are found on a wide variety of firearms. (*Id.*) The purpose of a muzzle brake is to reduce the amount of recoil felt by the shooter. (*Id.*) A muzzle compensator redirects muzzle gases and keeps the muzzle down for better target acquisition in the event a second shot is taken. (*Id.*) The presence of a muzzle brake or a muzzle compensator does not make a rifle more dangerous. (A.300 at 129:8-13)

### 6.    Banned Ammunition Magazines.

Industry analysts estimate that 158 million pistol and rifle magazines have been possessed by U.S. consumers from 1990 to 2012. (A.68 at ¶10; A.104) Approximately 75 million or 46% of those magazines are capable of holding more than 10 rounds of ammunition. (*Id.*) Among persons surveyed who own "modern sporting rifles," 83% use magazines holding more than 10 rounds. (A.67 at ¶6) Magazines holding 30 rounds were the most popular among the persons surveyed. (*Id.*; A.89)

A firearm or ammunition magazine capable of accepting more than 10 rounds is not new or unusual. (A.23 at ¶11) Lewis and Clark took a 20-shot .46 caliber repeating rifle with them on their journey across the continent. (*Id.*) And pistols with capacities of 18 to 20 shots were available in the mid-19th century. (*Id.*) Lever action rifles that could fire 15 shots were used in the Civil War, and were widely popular in the late 19th and early 20th century and a 34-shot rifle enjoyed success in the 1870's.

(*Id*.) The Browning P35 semiautomatic pistol with a detachable 13-round magazine was introduced in 1935 and remains popular today. (*Id*.)

Sufficient ammunition capacity in any type of firearm allows the shooter to focus on the basic purpose of the gun – successive accurate shots – rather than reloading. (*Id*.) And sufficient ammunition may be critically important in a self-defense encounter, especially to a person who owns a firearm for self-defense but does not regularly practice shooting or reloading. (*Id*.) Sufficient ammunition also contributes to safety because firearms are more likely to be handled unsafely during reloading. (*Id*.)

AR-type rifles are sold with magazines of various capacities, typically 5, 10, 20 or 30 rounds. (A.33 at ¶6) For example, models of the Smith & Wesson M & P 15 rifle are sold with 5 and 10 round magazines, the Remington Model R-15 Predator and Varmint rifles are sold with 5 round magazines, and the Bushmaster Hunter, Predator and Varminter rifles are sold with 5 round magazines. (*Id*.; A.51-62)

### 7.    Common Ownership of Banned Firearms and Magazines for Lawful Uses.

Before the Ordinance was enacted, Plaintiff Dr. Arie S. Friedman kept an AR-type rifle and "large capacity magazines" in his Highland Park home for the defense of his family. (A.6 at ¶17). More than 5 million other persons in the United States own similar semiautomatic rifles. (A.66 at ¶4). They are used for lawful purposes, including target shooting, hunting and home defense. (A.6 at ¶17; A.19 at ¶3; A.32 at ¶3; A.33 at ¶5; A.34 at ¶¶7-8; A.63 [Video Demonstration] at 24:22-25:00; A.65 at ¶3; A.67 at ¶7; A.68 at ¶9)

### a.     Ownership for Target Shooting.

In 2012, the National Shooting Sports Foundation ("NSSF") conducted a survey of 8,335 randomly selected adults to determine national and regional participation rates in sport and target shooting. (A.68 at ¶9) The survey results were published in a report, titled "Sport Shooting Participation in the United States in 2012." (A.98-102) The survey revealed that an estimated 11,976,702 persons participated in target shooting with a modern sporting rifle in 2012. (A.68 at ¶9; A.102)

Highland Park's expert witness, James Yurgealitis, was one of those persons. (A.286 at 30:19-31:23) He owns a Colt Model 60-29 AR-type rifle, which he and his daughter use for target shooting. (*Id.*; A.287 at 34:17-35:15) His rifle is equipped with a telescoping stock, a pistol grip, a barrel shroud and a protruding grip, each of which is banned in Highland Park. (A.286 at 31:3-21; A.296 at 106:19-21) Yurgealitis owns a number of 20 and 30 round magazines for the rifle. (A.287 at 33:20-34:23) He finds his AR-type rifle to be accurate, reliable and easy to operate. (A.288 at 38:22-40:7)

### b.     Ownership for Hunting.

AR-type rifles are used for hunting small game because they are accurate, reliable and easy to operate. (A.34 at ¶8)    In Illinois, for example, it is legal to use AR-type rifles and "any type of large capacity semi-automatic rifle" to hunt coyotes. (*Id.*) (www.dnr.illinois.gov/hunting/documents/hunttrapdigest.pdf (last visited Oct. 31, 2014).) In other states, they are used for hunting varmints and small game of all types, including wild hogs. (A.34 at ¶8)

Highland Park's expert witness Mark D. Jones has hunted prairie dogs with an AR-15 rifle chambered for .223 ammunition and equipped with a 20 round magazine. (A.268-69 at 55:20-58:1) He considers the rifle "appropriate" and "suitable" for hunting. (A.268 at 56:16-20). Others with whom Jones hunted have also used AR-type rifles. (A.268-69 at 56:21-57:11) Jones currently owns a Norinco SKS Type 56 rifle (AK-type) with 30 round magazines. (A.268 at 54:11-55:1) The rifle is banned in Highland Park. (A.378)

### c.     Ownership for Home Defense.

An effective home defense firearm will reliably incapacitate a home intruder in a life threatening situation and stop him from continuing his actions. (A.32 at ¶4; A.63 [Video Demonstration] at 15:23-16:20; A.108 at ¶¶7-8) A home defense firearm should also minimize danger to innocent persons in the home. (*Id.*) Although there is no consensus on the ideal home defense firearm, many believe that an AR-type semiautomatic rifle chambered for .223 caliber ammunition is a good home defense firearm from the standpoint of both safety and effectiveness. (A.32 at ¶4; A.63 at 21:10-24:21; A.109 at ¶8)

The choice of a firearm and ammunition for civilian use in a possible home defense encounter should be based on the same criteria used by law enforcement: reliable incapacitation of the home intruder while minimizing danger to innocent bystanders. (A.106 at ¶3) The FBI and others with expertise in wound and terminal ballistics have concluded that well-designed .223 ammunition offers ideal

16

incapacitation characteristics with less risk of over penetration than typical handgun and shotgun ammunition. (A.107 at ¶5; A.108 at ¶7)

As many as three out of every four AR-type rifles are chambered for .223 caliber ammunition. (A.67 at ¶6) It is a relatively inexpensive rifle cartridge that has sufficient power to stop a home intruder. (A.32 at ¶4; A.108 at ¶7) But because .223 ammunition is lightweight, it loses velocity and momentum relatively quickly after passing through interior walls and other objects. (A.32 at ¶4; A.106 at ¶4) Heavier ammunition, such as most large caliber ammunition used in revolvers and pistols, retains greater momentum after penetrating interior walls, despite have slower velocities than .223 ammunition. (A.106 at ¶4)

Twelve gauge 00 buckshot fired from a shotgun will over penetrate an interior wall to virtually the same extent as large caliber handgun ammunition, and both will penetrate after passing through an interior wall more than twice as far as a .223 round. (*Id.*) Thus, from the standpoint of safety, use of .223 ammunition in a home defense firearm decreases the risk an errant shot inadvertently strikes a family member behind an interior wall. (A.32 at ¶4; A.109 at ¶7)

In 2012, the Department of Homeland Security issued specifications to purchase 7,000 AR-type rifles chambered for .223 caliber ammunition for use by agents as "personal defense weapons" in "close quarters." (A.108 at ¶6; A.146-160) The Chicago Police Department makes AR-type rifles chambered for .223 caliber ammunition available to "enhance officer safety" when officers "reasonably believe[]

that he or she may soon confront a threat that may require use of deadly force." (A.108 at ¶6; A.162-72)

From January 2013 through May 2014, 779 persons enrolled in Home Protection and Concealed Carry seminars and NRA Basic Pistol classes in northern Illinois were surveyed by their instructor and asked to identify the type of firearm they own for personal protection. (A.34 at ¶7) Of those completing the survey, 58.2% indicated they keep a semiautomatic rifle with a detachable magazine available for self-defense use. (*Id*.)

Ownership of semiautomatic rifles with detachable magazines for home defense purposes was also addressed in the Modern Sporting Rifle (MSR) Comprehensive Consumer Report, prepared by the National Shooting Sports Foundation ("NSSF"). (A.66 at ¶6; A.67 at ¶7) The purpose of the report was to gather consumer demographic information and data related to consumer purchasing decisions for use by NSSF member manufacturers, distributors and retailers in their businesses. (A.66 at ¶6)

The report communicated the results of an online survey directed at owners of "modern sporting rifles", defined as AR-type and AK-type rifles. (*Id*., A.82) Survey respondents were asked to rank their reasons for owning their modern sporting rifles. (A.67 at ¶7; A.90) The 21,942 persons responding to the survey ranked recreational target shooting highest among reasons for owning their rifles, followed closely by home defense. (*Id*.)

18

According to Federal Bureau of Investigation Supplementary Homicide Reports, an average of 430 burglary related homicides occurred each year between 2003 and 2007. (A.311)  The United States Department of Justice, Bureau of Justice Statistics ("BJS") reported an average of 266,560 persons were victims of violent crimes during the commission of a burglary each year from 2003 to 2007. (A.302)  An average of 22,278 persons were victims of sexual assault and an average of 48,269 were victims of aggravated assault each year. (A.310) The BJS reported that an average of 82,634 persons each year were confronted by an armed intruder during the commission of a burglary. (A.311)

### 8.    Criminal Use of Firearms and Ammunition Magazines Banned by Highland Park.

#### a.    Use of Banned Firearms in Crime.

Semiautomatic rifles are rarely used by criminals. (A.181 at ¶9; A.194 at ¶38) Highland Park admits that semiautomatic "assault weapons" make up a very small percentage of firearms used in armed assaults and homicides in Illinois and nationwide. (A.375) And Highland Park's expert witness acknowledges that an AR-type rifle is an "unusual weapon in the hands of criminals." (A.274 at 169:2-7)

Criminals overwhelmingly prefer and use handguns. (A.181 at ¶9; A.273 at 162:1-4) The rarity with which "assault weapons" are used in crime is attributable to a number of factors, including they are difficult to conceal and more expensive than handguns. (A.274 at 169:13-170:22) Even criminals who own "assault weapons" are strongly disinclined to carry them during the commission of crimes. (A.181 at ¶9)

Rifles and shotguns of all types are statistically less likely to be used in homicides and recovered by law enforcement than handguns. (A.273 at 161:11-24) According to Chicago Police Department data, just 22 of 2,215 firearm homicides (0.99%) in Chicago from 2006 to 2012 were committed with a rifle of some type. (A.315-24) Slightly more homicides (28) were committed with shotguns. (*Id.*) The overwhelming majority of homicides (98%) were committed with handguns. (*Id.*) A Chicago resident was nearly 10 times more likely to be bludgeoned to death than to die as the result of a rifle wound. (*Id.*)

An analysis of 38 studies on the use of "assault weapons" in crime indicates that 1.8% of crime guns are "assault weapons" of some type (assault pistols, assault shotguns and assault rifles). (A.194 at ¶38) Nine of the 38 studies addressed the use of "assault rifles" only. (A.195 at ¶38) The nine studies revealed that "assault rifles" accounted for 0.038% of crime guns on average. (*Id.*)

### b.    Use of Banned Firearms in Police Shootings.

"Assault rifles" are almost never used to kill police officers. (A.195 at ¶39) Just 3 of 276 police officer killings (1%) from January 1992 to May 1996 were committed with an AR-15 rifle or an AR-15 copy. (*Id.*) From 1980 through 1989, 33 (4%) of the 810 police officers killed in the United States and its territories were killed with "assault weapons" of some type (pistol, shotgun or rifle). (*Id.*) From 1986 through 1990, 19 (5%) of 350 officers killed were killed with "assault weapons" of some type. (*Id.*) From 1992 through 1996, there was an average of 4.5 killings of police officers

with "assault weapons" each year, and 7% of the total killings involved use of an "assault weapon" of some type. (*Id.*)

### c.    Use of Banned Firearms and Magazines in Mass Shootings.

Over the past several decades, mass shootings have not increased in number or overall death toll. Fox & DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, Vol. 18 Homicide Studies 125, 128-31 (2014). The actual counts of mass shootings have been randomly variable over the last several decades. (*Id.* at 128-29) While tragic and shocking, mass shootings account for few of the firearm murders occurring annually in the United States. Congressional Research Service, *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy*, at 2 (Mar. 18, 2013).

### (i)    Dr. Gary Kleck's Analysis of Mass Shootings.

Dr. Gary Kleck is a professor of Criminology and Criminal Justice at Florida State University, where he has been a faculty member since 1978. (A.176 at ¶1) During his academic career, his research has focused on the impact of firearms and gun control on violence. (*Id.*) He has authored numerous books on guns and violence in America, and has published scholarly research in the leading professional journals in his field. (*Id.*) Dr. Kleck has also taught graduate level courses on research design, causal inference and statistical techniques. (*Id.*, *see generally* A.236-58)

In 1997, Dr. Kleck published a study of every mass shooting that occurred in the United States from 1984 to 1993. (A.191 at ¶31; A.355-57 (Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997)) In 13 of the 15 incidents analyzed in the

study, the shooters possessed multiple firearms to commit their crimes. (A.191 at ¶31) In one of the two remaining incidents, the shooter was able to reload at least once. (*Id*.) Thus, the killers did not need large capacity magazines to fire large numbers of rounds or wound large numbers of victims – they either switched firearms or reloaded their firearms without interference from bystanders. (*Id*.)

Dr. Kleck updated his study of mass shootings in 2014 to include mass shootings that occurred between 1994 and 2013. (A.191 at ¶32; A.199-232) The updated study confirmed the results of his earlier analysis:  large capacity magazines were not needed for mass shooters to kill or injure their victims. (A.192 at ¶34) The shooter in each of the 81 mass shootings analyzed was either armed with multiple firearms, possessed multiple magazines, or was able to reload without interference during the incident. (*Id*.) Handguns were used most frequently by mass shooters by a considerable margin. (A.199-232)

Mass shooters were known to have used magazines holding more than 10 rounds in 21 of the 81 incidents analyzed. (A.192 at ¶34) In each of these 21 incidents, the shooter possessed either multiple guns (16 incidents) or multiple magazines (5 incidents). (*Id*.) Thus, if the shooters in these incidents had been limited to magazines holding 10 or fewer rounds, they would have been able to continue to fire with an alternative gun or by loading new magazines. (*Id*.) The study did not uncover a single mass shooting in which the shooter used a large capacity magazine, and was known to have possessed just one firearm and just one magazine. (*Id*.)

### d.    The Effectiveness of Firearm Bans on the Incidence of Crime.

Empirical analyses of the now expired federal "assault weapons" ban (1994 to 2004) indicate that it had no effect on crime rates, homicide rates, number of gunshot wounds per victim or the number of wounded victims per incident. (A.186 at ¶18) Empirical studies on the effect of state-level "assault weapon" bans suggest they have not reduced crime. (*Id.*) State level bans are likely undermined by the influx of legal firearms from other states. (A.186 at ¶19)

Highland Park is one of two municipalities in Lake County, Illinois that prohibits possession of "assault weapons" and "large capacity magazines." (A.186 at ¶20) The combined population of these two municipalities was 65,335, according to the 2010 census, which was 8.8% of Lake County's total population. (*Id.*) Thus, approximately, 91.2% of persons residing Lake County are free to possess "assault weapons" and "large capacity magazines." (*Id.*) Highland Park's local "assault weapon" ban is not likely to have an impact on firearms violence because of the ease with which banned firearms can be acquired nearby or an unbanned firearm can be substituted for a banned firearm. (A.187 at ¶21)

### SUMMARY OF ARGUMENT

The Second Amendment right of law-abiding persons to possess commonly owned firearms in their homes to defend themselves, their families and their property has been violated in Highland Park, where it is now a crime to possess a broad class of semiautomatic rifles that are among the most commonly owned firearms in the United States.  By enacting the Ordinance and prohibiting possession of these

firearms, Highland Park has violated the constitutional rights of Plaintiffs and all other law-abiding residents in the community.

Under the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), elected officials cannot impose their values in derogation of the constitutional right of law-abiding citizens to arm themselves in their homes with commonly owned firearms. It does not matter that Highland Park believes public safety requires law-abiding persons, like Dr. Friedman, to remove the firearms from their homes. *Heller* established that the Second Amendment right to keep commonly owned firearms for self-defense in the home cannot be bargained away in legislatures or diminished by courts.

In *Heller*, the Court made clear that an individual's right to keep and bear arms is a core constitutional right, and it provided an analytical framework – grounded in text and history – under which laws that affect Second Amendment rights are to be addressed by courts. Under *Heller*, an analysis of laws prohibiting firearms ownership by law abiding persons begins with the question: Does the law prohibit ownership of firearms commonly owned for lawful purposes, including home defense? If the answer is "yes," further inquiry is not required. The law prohibiting ownership of the commonly owned firearms is categorically unconstitutional.

Highland Park has the burden of proving that the banned firearms are not commonly owned for lawful purposes and thus not entitled to Second Amendment protection. It has not met its burden. The only evidence Highland Park presented on this threshold issue was an unreliable back-of-the-envelope estimate of the number

of "assault weapons" owned in the United States ten years ago, and the personal opinion of a witness that the number (more than 4.9 million firearms) does not demonstrate common ownership. The balance of the evidentiary record in the District Court consists of evidence presented by Plaintiffs. It establishes that firearms banned by Highland Park are commonly kept by law abiding persons in substantial numbers. Indeed, in 2012 more than one out of every five new firearms sold at the retail level was an AR-type rifle, just one of the many firearms banned under the Ordinance.

Highland Park also failed to meet its burden of proving that the banned firearms are not owned for lawful purposes. The only evidence it presented on this threshold issue were personal opinions of witnesses that the banned firearms are not "appropriate" for hunting or self-defense. These opinions are neither credible nor persuasive, but they miss the mark for a more basic reason:  the inquiry is not whether all agree with the purposes for which law abiding persons keep or use the banned firearms.  The inquiry under *Heller* is whether persons have chosen to keep the firearms for lawful purposes. Again, the evidence on this issue has been presented by Plaintiffs, and it overwhelming establishes that the firearms banned under the Ordinance are commonly kept by persons for target shooting, hunting and self-defense.

Thus, the Ordinance implicates Plaintiffs' Second Amendment rights. And because the Ordinance broadly prohibits possession of firearms commonly kept by law-abiding persons for self-defense use, as opposed to merely regulating their constitutional right to keep arms, further inquiry into public policy justifications for

the Ordinance is foreclosed under *Heller*. The Second Amendment "elevates above all other interests the right of law-abiding responsible citizens to use arms in defense of their hearth and homes." *Heller*, 554 U.S. at 634-35 ("The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really* worth insisting upon."); *see also McDonald v. City of Chicago*, 130 S.Ct. 3020, 3047 (2010) ("In *Heller* . . . we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing.")

Nevertheless, the evidence, when subjected to judicial scrutiny, does not justify Highland Park's violation of the constitutional rights of its residents. The banned firearms are no more dangerous than firearms that are not banned. And the banned firearms are rarely used by criminals. Under any level of heightened scrutiny, Highland Park cannot meet its burden to prove that public safety will be enhanced by making it a crime for law-abiding persons to keep the prohibited firearms and magazines in their homes for lawful purposes. Speculation that "the public *might* benefit on balance" from curtailment of the constitutional right of armed self-defense is not sufficient. *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2013).

## ARGUMENT

### I.    Standard of Review.

Appellate court review of a district court's decision to grant summary judgment is *de novo. McDowell v. Village of Lansing*, 763 F. 3d 762 (7th Cir. 2014). However, any factual questions bearing on the constitutionality of the Ordinance are not

questions for determination at trial. *Moore*, 702 F.3d at 942 (case remanded for entry of order declaring statute unconstitutional following appeal from order dismissing complaint). "Only adjudicative facts are determined at trials, and only legislative facts are relevant to the constitutionality" of the Ordinance. *Id*. Legislative facts "bear on the justification for the legislation, as distinct from facts concerning the conduct of the parties in a particular case," which are adjudicative facts. *Id*.; *see* Advisory Committee Note to Subdivision (a) of Proposed Rule of Evidence 201 ("Legislative facts . . . are those which have relevance to legal reasoning and the law making process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."). The constitutionality of the Ordinance should be decided by this Court based on the evidentiary record presented in the court below.

## II.     Highland Park's Ban on a Class of Commonly Owned Firearms Violates the Second Amendment.

### A.     The Firearms Ban Is Categorically Unconstitutional.

The "central component" of the Second Amendment right to keep and bear arms is the personal right of armed self-defense, most notably in the home. *Heller*, 554 U.S. at 595. The District of Columbia's ban on handgun possession was found unconstitutional in *Heller* because the ban "extend[ed] . . . to the home, where the need for defense of self, family and property is most acute." *Id*. at 628-29.  The constitutional right to possess firearms in the home for self-defense extends to types of firearms that are in "common use" for lawful purposes. *Id*. at 624 ("The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for

lawful purposes like self-defense.") (citing *United States v. Miller*, 307 U.S. 174 (1939) (firearms not typically possessed by law-abiding persons for lawful purposes, such as short-barreled shotguns, are not protected)). Because the Ordinance broadly prohibits possession of a class of firearms commonly owned for self-defense, target shooting and hunting, it is categorically unconstitutional. Any inquiry into the justification for the ban is foreclosed under *Heller*.

Highland Park cannot avoid *Heller* and justify its ban because its residents can lawfully possess other commonly owned firearms. *Heller* specifically rejected this argument. 554 U.S. at 630 ("[I]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as possession of other firearms (*i.e.* long guns) is allowed."); *see also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (argument that a ban of one type of firearm does not implicate the Second Amendment because "residents still have access to hundreds more" is "frivolous."). Banning one type of commonly owned firearms and not others,

> is a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right. Indeed, *Heller* itself specifically rejected this mode of reasoning.

*Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1289 (D.C. Cir. 2011) (Kavanagh J., dissenting).

Indeed, this Court has held it a "profoundly mistaken assumption" that harm to a constitutional right is to be measured by the extent the right can be exercised elsewhere or in a different way. *See Ezell v. City of Chicago*, 651 F.2d 684, 697 (7th Cir. 2011) (existence of firing ranges outside Chicago did not justify firing range ban

in Chicago); *see also Illinois Association of Firearms Retailers*, 961 F.Supp. 2d 928, 938-39 (N.D.Ill. 2014) (rejecting argument that ban on retail firearm sales within city limits was not an encroachment on Second Amendment rights because sales could occur elsewhere). If local governments are allowed to demonize and ban commonly owned firearms one subset at a time, the right described in *Heller* to possess commonly owned firearms will eventually disappear. *See Parker*, 478 F.3d at 400 ("It could be similarly contended that all firearms may be banned so long as sabers were permitted.")

And just because a Highland Park resident may not strictly *require* a banned firearm and magazine to defend himself and his family (or a 12 gauge shotgun or semi-automatic pistol for that matter) does not mean the government is free to ban them. The Second Amendment provides categorical protection for all types of firearms that are commonly owned for lawful purposes, not just those the government deems worthy of protection. *See Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."). The plain implication of *Heller* is that categorical protection of firearms ownership is not limited to handguns but extends to whatever types of firearms are commonly chosen by law abiding persons for lawful uses. *See Moore*, 702 F.3d at 935 (Nor can the court "ignore the implication of the [*Heller*] analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home.").

Whether the banned firearms and magazines are typically possessed by law-abiding citizens for lawful purposes focuses on the choices made by contemporary

29

citizens. *Heller*, 554 U.S. at 582 (rejecting as "bordering on the frivolous" the argument that only firearms in existence in the 18th century are protected). The choices commonly made by the people matter in deciding what firearms have Second Amendment protection under *Helle*r, not the choices made by legislative bodies. The Court in *McDonald* underscored this point by rejecting the argument made by Justice Breyer in his dissent that "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make," such as "[w]hat sort of guns are necessary for self-defense? Handguns? Rifles? Semi-automatic weapons?" *McDonald*, 130 S.Ct. at 3126 (Breyer, J., dissenting):

> Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion. [citation omitted] "The very enumeration of the right takes out of the hands of government – even the Third Branch of government – the power to decide in a case-by-case basis whether the right is *really worth* insisting upon."

130 S.Ct. at 3050 (citing *Heller*, 554 U.S. at 634-35 (emphasis in original)).

In striking down the District of Columbia's handgun ban, the Court in *Heller* identified handguns as the "most popular" firearm chosen by Americans for self-defense in the home, and gave several reasons why a citizen might prefer handguns for self-defense. *Heller*, 554 U.S. at 629. Importantly, however, the Court held that *"[w]hatever the reason"* for the choice of firearms, the choice was made by the American people, and a "complete prohibition" on the firearms that the people have

30

chosen to keep in their homes "is invalid." *Id*. (emphasis added.) The same reasoning applies here: "whatever the reason" persons chose to keep the now-banned rifles and magazines in their homes, they made the choice. Highland Park is not free to disagree with their decision.

Whether banned firearms and magazines are commonly owned is to be measured nationally, not by evaluating the local community in which they are prohibited. *See McDonald*, 130 S.Ct. at 3046 (rejecting argument that local governments should be permitted to enact gun control laws they deem reasonable because "conditions and problems differ from locality to locality and that citizens have divergent views on the issue of gun control."). On court reasoned:

> The Supreme Court did not define the common use test as a local test, but rather evaluated common use as a national test in its historical discussion. *Heller*, 554 U.S. at 621-28. Moreover, it cannot be that common use is measured on anything but a national scale—otherwise, the scope of individuals' Second Amendment rights as enshrined in the federal Constitution would vary based on location. This result would be wrong: the Second Amendment safeguards individual rights equally throughout the United States.

*Fyock v. City of Sunnyvale*, 2014 U.S. Dist. LEXIS 29722, *14 (N.D.Cal. Mar. 5, 2014).

Thus, Highland Park's attempt to justify the Ordinance based on a perceived "community standard" should be rejected. The Second Amendment right to keep and bear arms enjoys the same protection against governmental interference in Highland Park as it does elsewhere.

Regardless, Highland Park is not unique. Schools, parks, shopping centers and other public gathering places exist everywhere. If a community were able justify infringement of the Second Amendment rights of its residents merely because there

are places in the community where the public gathers, all communities could justify infringement of the right.

The Second Amendment right recognized in *Heller* is not unlimited. In *dictum*, the Court recognized that the constitutionality of "long standing prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" were not necessarily affected by recognition of an individual's right to keep and bear arms. 554 U.S. at 626. And the Court also recognized that the Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 625-26 (excluding "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."). But the Court clearly held that categorical protection extended firearms "in common use at the time" for lawful purposes, including self-defense. *Id*. at 627.

The District Court misinterpreted *Heller* to hold that ownership of "dangerous or unusual" firearms is not protected by the Second Amendment. (S.A.15)  First of all, the Court in *Heller* did not use the phrase "dangerous *or* unusual" at all. Rather, the Court used the phrase "dangerous *and* unusual" to describe not commonly owned firearms, which have historically been prohibited. 554 U.S. at 627. (emphasis added).

The difference between these two phrases is significant. "Dangerous *or* unusual" would arguably include every firearm because all firearms can rightly be characterized as "dangerous." But "dangerous *and* unusual" firearms is a more

narrow description, and would only include those that are not "in common use" (*i.e.* short-barreled shotguns). *Id*. at 625. Indeed, the context in which the Court in *Heller* used "dangerous and unusual" was as historical support for the "in common use" standard. *Id*. The Court did not create a second "not dangerous and unusual" standard. Such a standard would be in conflict with the "in common use" standard because, by definition, a firearm cannot be both "common" and "unusual."

> **B.    Highland Park Has Not Met Its Burden of Demonstrating the Banned Firearms and Magazines Are Not Commonly Owned by Law Abiding Persons for Lawful Purposes.**

Highland Park has the burden of establishing the banned firearms and magazines fall outside the scope of Second Amendment protection because they are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see also Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011) ("[I]f the government can establish that a challenged firearms law regulates activity outside the scope of the Second Amendment right . . . the regulated activity is categorically unprotected."). Highland Park has not met its burden.

> **1.    Banned Firearms and Magazines Are Commonly Owned by Law Abiding Persons.**

The popularity and common ownership of semiautomatic rifles among law-abiding citizens cannot be seriously contested. *See Heller II*, 670 F.3d 1244, 1261 (D.C.Cir.2011) (Kavanagh J., dissenting) (A "brief perusal of the website of a popular American gun seller underscores the point that semi-automatic rifles are quite common in the United States" and "are commonly used for self-defense in the home, hunting and target shooting."). From 2008 to 2012, approximately one out of every

ten firearms *of all types* produced for domestic sale was an AR-type rifle, just one of the many rifles Highland Park has banned. (A.66 at ¶5) In 2012, retail firearms dealers reported that more than one out of every five new firearms they sold was an AR-type rifle. (A.68 at ¶8) Nearly 3.5 million AR-type rifles were manufactured for domestic sale in the United States from 2008 to 2012 alone. (A.66 at ¶5) Production of AR-type rifles during these five years was substantially greater than revolver production and nearly equal to shotgun production. (*Id.*)

However, the District Court found the question of common use "far from settled." (S.A.15) The court found evidence reflecting the number of rifles manufactured not useful in answering the question, finding instead the number of rifles possessed "far more probative in determining common use." (*Id.*) The District Court was correct that, generally speaking, the number of goods purchased by consumers reflects the extent to which the goods are possessed by consumers. But the court did not take into account that consumer demand in nearly all circumstances dictates supplier output of goods. Here, there was evidence that firearm dealers "can't get enough" AR-type rifles in their inventories and "they sell very quickly." (A.290-91 at 64:8-65:7) Thus, there is evidence in the record establishing the number of rifles produced equals (or nearly equals) the number of rifles purchased and owned by consumers.

On the other hand, Highland Park attempted to meet its burden of proving the banned firearms are not "in common use at the time" through a back-of-the-envelope calculation that there are slightly more than 4.9 million "assault weapons" in the

United States. (R. Doc. 45 at p.10) First of all, the number does not reflect the number of "assault weapons" today, but in 2004. (A.331) And Highland Park fails to take into account that from 2004 to 2012 at least 5.6 million of just two types of banned firearms (AR and AK-type rifles) were produced or imported for domestic sale. (A.73) Thus, assuming that 4.9 million is a reliable estimate of the number of "assault weapons" in use in 2004, there would have been a minimum of 5.6 million more – or 10.5 million total – by 2012.

Regardless, Highland Park's estimate of 4.9 million firearms is not reliable. It is based on an estimate of the overall stock of civilian-owned firearms in 2004 (218 million) and a third party's estimate of the percentage of civilian owned firearms that are "assault weapons" (2.25%). (R. Doc. 45 at p.10) How the third party arrived at its estimate, what time period the estimate covered or what definition of "assault weapon" was used are not known. (R. Doc. 51 at pp.5-6) In any event, use of the overall civilian stock of firearms to calculate what types of firearms are currently "in use" is inappropriate. There is no evidence that all firearms in the civilian stock are actually "in use" today. Indeed, Highland Park's own evidence provides reason to believe that a great many of those firearms are not "in use" at all.

The study relied on by Highland Park for the estimate of 218 million firearms in the civilian stock concluded that each of the 57 million persons who owned firearms in 2004 owned an average of 6.6 guns. (A.333-34) Approximately 3% of firearm owners (1.7 million persons) owned an average of more 25 firearms. (A.334) Thus, conservatively, at least 42.5 million of the 218 million overall civilian stock were part

35

of large firearms collections (>25) owned by just 3% of all gun owners. An unknown number of firearms were no doubt part of smaller yet still sizeable collections. Certainly, the majority of firearms in these sizeable firearms collections were not, in a practical sense, kept available for use in a self-defense encounter.

A better measure of the number of banned firearms kept and in use today, is the percentage of firearm owners who own them. Adding Highland Park's 4.9 million estimate of "assault weapons" to the 5.6 million estimate of the number of just AR and AK-type firearms produced or imported for domestic sale from 2004 to 2012 results in a total of at least 10.5 million banned firearms owned in 2012. Assuming that the average owner of these rifles owns two, there would be at least 5.25 million persons who own them, or roughly 10% of the 57 million firearm owners in the United States. This estimate is consistent with evidence that AR-type rifles alone accounted for 11.4% of all firearms produced for domestic sale from 2008 to 2012. (A.66 at ¶5)

The overwhelming weight of evidence establishes that the firearms and magazines banned by Highland Park are "in common use" today. Other courts have had little difficulty reaching that conclusion. *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use' . . . ."); *Shew v. Malloy*, 994 F.Supp.2d 234, 245-46 (D.Conn. 2014) (the firearms and magazines at issue are in "common use" within the meaning of *Heller*); *New York State Rifle & Pistol Association v. Cuomo*, 990 F.Supp.2d 349, 365 (W.D.N.Y. 2013) ("[T]here can be little dispute that tens of thousands of Americans

36

own these guns for lawful purposes, such as hunting, target shooting and even self-defense."); *Fyock v. City of Sunnyvale*, 2014 U.S. Dist. LEXIS 29722, *13 (N.D. Cal. Mar. 5, 2014) (magazines having a capacity to accept more than ten rounds are in common use, and therefore not dangerous and unusual).

### 2. Banned Firearms and Magazines Are Owned for Lawful Purposes.

Evidence demonstrating that the banned firearms are owned by law abiding persons for lawful purposes, including target shooting, hunting and self-defense, is substantial. Highland Park did not come close to meeting its burden of proving otherwise.

Millions of persons each year use firearms banned in Highland Park for recreational target shooting, including one of Highland Park's firearms experts. (A.66 at ¶4; A.286 at 30:19-20)   His Colt AR-type rifle is not only banned by model designation in Highland Park, it is banned by virtue of its design features, which include a telescoping stock, pistol grip, protruding grip, barrel shroud and its ability to accept a "large capacity magazine." (A.286 at 31:3-21; A.296 at 106:19-21)

Banned firearms are also used for hunting both small and large game. (A.32 at ¶¶3, 8; A.268 at 56:16-20) Indeed, Highland Park's other firearms expert has used an AR-type rifle, chambered for .223 ammunition and equipped with a 20 round magazine, to hunt small game. (A.269 at 57:12-20) The witness believes the rifle is both "suitable" and "appropriate" for hunting. (A.286 at 56:16-20)

With regard to self-defense use, it is important to recognize the right identified in *Heller* was an individual right to *keep* arm*s* in defense of one's home and family.

The right to *keep* a firearm in the home exists regardless of whether the firearm is ever used or even removed from the closet, gun safe or bedside drawer where it is kept. However, the District Court, mistakenly shifting the burden to Plaintiffs, wanted evidence of an "assault weapon" actually used in self-defense. (S.A.17)

Although a handful of illustrative self-defense stories might have enlivened the record, matters of constitutional policy should not be decided on the basis of anecdotal evidence, regardless of whether the evidence is a law abiding citizen using an "assault weapon" to defend his home or a criminal using the same firearm to commit a violent crime. *See New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 560-61 (7th Cir. 2009) (preliminary injunction affirmed where government offered only "anecdotal justifications" for adult zoning regulation).

Highland Park attempted to meet it burden of proving that the banned firearms are not owned for self-defense purposes with opinion testimony that the firearms *are not appropriate* for that purpose. Setting aside that law enforcement agencies, whose officers carry and use firearms for self-defense purposes on a daily basis, largely disagree, Highland Park's evidence does not address the relevant question, which is: what type of firearms have the people chosen to keep in their homes to defend themselves and their families?  If the answer includes the types of firearms banned under the Ordinance, the Ordinance is unconstitutional. Highland Park is not free to override the peoples' decision without violating the Second Amendment.

There is no question there are different views on what type of firearm is best suited for home defense use. Some believe a large caliber revolver is best suited for home defense because it is simple to use and reliable. (A.63 [Video Demonstration] at 16:36-17:50) Others believe a pump action shotgun is the best home defense firearm because of its ability to incapacitate an intruder and intimidating appearance. (A.63 at 18:34-20:07) And there are many who believe that an AR-type rifle chambered for .223 ammunition is the best personal defense firearms because of its accuracy, reliability, effectiveness and relative safety. (A.63 at 21:10-24:21; A.32 at ¶4; A.109 at ¶8). But any question as to whether a revolver, shotgun or rifle is the right type of home defense firearm is irrelevant under *Heller* because for "whatever the reason", a great many persons who own AR-type rifles, keep them in their homes for self-defense use. *Heller*, 554 U.S. at 629. There is no evidence to the contrary.

Two surveys of firearm owners, conducted outside the context of litigation, confirmed that persons who own semiautomatic rifles keep them for self-defense use. In one survey, more than 20,000 owners of modern sporting rifles ranked home defense as the second most important reason for purchasing their rifles. (A.67 at ¶7; A.90) In the other survey, more than fifty percent of those responding indicated that they keep a semiautomatic rifle with a detachable magazine available for self-defense use. (A.34 at ¶7) Although the surveys were not designed to capture a representative sample of all firearm or semiautomatic rifle owners, the surveys' results are nevertheless probative evidence on why persons keep semiautomatic rifles in their homes.

Highland Park criticizes the surveys, but its criticisms go to the weight of the evidence, not its admissibility. *See McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1172 (7th Cir. 1987) (district court improperly disregarded survey results because survey flaws go to the weight of the evidence); *Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 416 (7th Cir. 1994) (not error to consider shopping mall survey although some questions were "a bit slanted"). And despite its criticisms, Highland Park has not shown how the survey results are biased or why any theoretical bias would be in the direction of overstating ownership of the rifles for self-defense use. Highland Park cannot meet its burden to prove the banned firearms are not commonly kept for self-defense use by merely diminishing the weight to be given to evidence presented by Plaintiffs.

> **C.    Highland Park's Ban on Commonly Owned Firearms and Magazines Is Broadly Prohibitory and Should Not Be Subjected to Judicial Interest Balancing.**

The District Court did not address Plaintiffs' argument that the Ordinance is categorically unconstitutional under *Heller*. Instead, the court interpreted *Heller* and this Court's Second Amendment decisions to require a means-end analysis of the Ordinance. The District Court settled on the "not quite strict scrutiny" standard articulated by this Court in *Ezell v. City of Chicago*, 651 F.3d 684, 708-09 (7th Cir. 2011). "Not quite strict scrutiny" requires a "close fit" between the challenged law and the "actual public interests it serves." *Id*.

However, the majority in *Heller* specifically held that the core constitutional right embodied in the Second Amendment – self-defense – is not to be subjected to an

"interest balancing" approach. *Heller*, 554 U.S. at 634. In *McDonald*, the Court confirmed that in *Heller* "an interest balancing test" was "specifically rejected." 130 S.Ct. at 3126. "The very enumeration of the right takes out of the hands of government – even the Third Branch of government – the power to decide in a case by case basis whether the right is really worth insisting upon." *Id*. at 3050.

The District Court nevertheless engaged in interest balancing to find the Ordinance constitutional. In doing so, the court implicitly disavowed the majority opinion in *Heller* and instead followed Justice Breyer's dissent, in which he proposed an "interest balancing inquiry" that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the salutary effects upon other important governmental interest." *Heller*, 554 U.S. at 689-90 (Breyer, J., dissenting).

This Court has refused to "repudiate" the "historical analysis" under which an individual's right to keep and bear arms was identified in *Heller*. *Moore v. Madigan*, 702 F.3d 933, 934 (7th Cir. 2012) (holding that the individual right identified in *Heller* encompasses a right to bear arms for self-defense outside the home). And it has recognized that some Second Amendment challenges are to be decided based on a "categorical" approach without considering evidence in justification of the challenged law, while in others, evidence demonstrating the government's justification for challenged law will be considered.

In *Ezell*, the Court recognized that "[b]roadly prohibitory laws restricting the core Second Amendment right – like the handgun ban at issue in [*Heller* and

41

*McDonald*], which prohibited handgun possession even in the home – are categorically unconstitutional." 651 F.3d at 703. For other cases, an "appropriate standard of review" must be chosen from "the heightened standards of scrutiny" applied to "governmental actions alleged to infringe enumerated constitutional rights." *Id*. In *Ezell*, the Court found the government's ban on firing ranges a "serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id*. at 708. Because the firing range ban in *Ezell* was not "broadly prohibitory" but just a "serious encroachment" on the "core right," the Court engaged in means-end scrutiny and held the ban could be sustained only if the government could establish a close fit between the ban and a strong public interest justification. *Id*. at 708-09.

Similarly, in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), the Court recognized that *Heller* sent the "message" that

> [S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusion of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court. *Heller* did not suggest that disqualifications would be effective only if the statute's benefits are first established by admissible evidence. Categorical limits on the possession of firearms would not be a constitutional anomaly.

614 F.3d at 641. *Heller* just as clearly sent the message that some *categorical qualifications* for firearms ownership exist, namely a law abiding person's ownership of common firearms for self-defense use in the home.

In *Skoien*, the Court addressed whether the Second Amendment rights of

42

persons who had been convicted of a misdemeanor crime of domestic violence were violated by a federal law prohibiting their possession of firearms. The government conceded it needed to make "some form of strong showing" that the statute was "substantially related to an important governmental objective." The Court found the government's concession "prudent" because "logic and data" established a substantial relationship between the statute and the governmental objective. *Id.* at 642.

But the Court in *Skoien* did not want to "get more deeply into the 'levels of scrutiny' quagmire." *Id.* at 641. And although the Court considered evidence demonstrating the relationship between public safety and keeping firearms out of the hands of persons convicted of domestic abuse, it left the door open to deciding some Second Amendment challenges without wading into the quagmire and searching for a relationship between the challenged law and a governmental interest under some level of scrutiny.

The Ordinance in this case is a broadly prohibitory law – like the handgun prohibition in *Heller*. It restricts the core Second Amendment rights of Highland Park residents to defend themselves, their families and their homes with a class of commonly owned firearms. As in *Heller*, "[i]t is no answer" for Highland Park to say that the Ordinance is not broadly prohibitory because it does not completely disarm its residents. 554 U.S. 570, 630. Such an argument as "frivolous." *Parker*, 478 F.3d at 400.

A categorical analysis of the constitutionality of the Ordinance is in line with *Heller* and this Court's decisions addressing Second Amendment challenges. And

because the evidence establishes that banned firearms are among those commonly kept by law abiding persons for self-defense, the Ordinance should be found categorically unconstitutional.

### D. Highland Park's Ban Does Not Survive Any Level of Heightened Scrutiny.

If this Court concludes that the Ordinance is not "broadly prohibitory" but only a "serious encroachment" of the core Second Amendment right, and subjects Highland Park's justification for the Ordinance to means-end scrutiny, the Ordinance should still be found unconstitutional. Highland Park has not met its burden of establishing a "close fit" between public safety and prohibiting possession of banned firearms and magazines in the homes of law abiding persons. *See Ezell*, 651 F.3d at 708-09.

In the District Court, Highland Park argued that the banned firearms are disproportionately represented in criminal activity and make up 8% of the firearms used in crime. But Highland Park's argument is misleading and contradicted by its own witness, who testified that semiautomatic "assault weapons" make up a very small percentage of firearms used in assaults and homicides in Illinois and nationwide. (A.272 at 160:15-24) Highland Park's witness also agreed that AR-type rifles are rarely used by criminals. (A.274 at 169:2-7)

Highland Park's 8% figure comes from an analysis of 38 studies performed by Dr. Kleck on the prevalence of "assault weapon" use by criminals. His analysis demonstrates that the median percentage of "assault weapons" of some type (pistols, shotguns and rifles) used in crime is just 1.8%. (A.194 at ¶8; A.343-48; A.360-62 (Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL, (1997)) Although one of the

38 studies estimated that up to 8% of the firearms used in crime were "assault weapons", that estimate was a notable outlier (only two estimates were over 4.3%) and unreliable because it was "neither an unselected population nor a representative sample of crime guns." (A.194 at ¶38; A.343)

Dr. Kleck's analysis further demonstrated that just 0.038% or 1 out of 2,632 firearms used in crime is an "assault rifle." (A.195 at ¶38) Yet, in the name of crime prevention, Highland Park prohibits law abiding persons from owning 49 different "assault rifles" by model designation, many more as "copies and duplicates" and others because they have a prohibited design feature (telescoping stock, barrel shroud, etc.). Highland Park has not explained how prohibiting ownership of a broad class of firearms that are almost never used in crime will enhance public safety. And the District Court avoided altogether the complete absence of evidence demonstrating that criminals prefer and use the banned firearms.

Instead, the court found "potential use" by criminals to be a sufficient basis to uphold the ban. (S.A.20) *But see Moore*, 702 F.3d at 940 (speculation that the public *might* benefit from curtailment of the constitutional right of armed self-defense is not sufficient). According to the court, the "potential" for criminal use exists because of the firearms' "military heritage." (S.A.19) The court accepted Highland Park's claim that the difference between a fully-automatic military firearm and a civilian semiautomatic firearm is "insubstantial." (S.A.19) But the difference is anything but insubstantial, as recognized by federal law and regulations, which impose completely different and significantly stricter requirements on the manufacture, importation,

45

ownership and registration of fully-automatic firearms. *See* 26 U.S.C. § 5801 *et seq.* (National Firearms Act); 27 C.F.R. § 479 *et seq.* (Machine Guns, Destructive Devices, and Certain Other Firearms). Highland Park's own witness agrees there is a "major functional difference" between the two types of rifles. (A.270 at 73:11-15) The difference should be obvious to anyone who has fired or simply witnessed the firing of both type of rifles. (A.63 [Video Demonstration] at 00:02-00:42)

The claim that a semiautomatic rifle will fire at nearly the same rate as a fully automatic firearm is a myth perpetuated by gun control advocates to advance gun ban agendas. *See* Sugarman, *Assault Weapons and Accessories in America*, *supra* at p. 5. The truth is that the trigger of a semiautomatic firearm must be pulled completely rearward for each round fired, as is the case with all non-fully-automatic firearms. (A.19 at ¶5) The trigger of a semiautomatic firearm must then be released forward and pulled again to fire a second round. (*Id.*) The rate at which a semi-automatic firearm can be fired is limited by the speed at which the shooter can make successive trigger pulls. (*See id.*)  *But see Heller v. District of Columbia (Heller II)* , 670 F.3d 1244, 1263 (D.C. Cir. 2011) (citing to testimony before the Washington D.C. Committee on Public Safety by Brian J. Siebel, litigation attorney with the Brady Center to Prevent Gun Violence, comparing semiautomatic to fully automatic rate of fire); *see Heller v. District of Columbia*, 698 F.Supp. 2d 179, 193 (D.D.C. 2010) (discussing Siebel's position with gun control advocacy group).

Regardless, a claim that the firearm and magazine ban will have a salutary effect on the incidence of gun crime in Highland Park or elsewhere not only ignores

the historical evidence, it ignores the substitution effect. (A.187 at ¶20)  Unbanned firearms with identical functional characteristics firing similarly lethal ammunition are easily substituted by criminals for banned firearms. (*Id.*) To conclude the Ordinance will have an effect on the incidence of firearm-related crimes, one would have to irrationally conclude that the one criminal out of 2,631 others who used an "assault rifle" would not have committed his crime if the rifle was banned and unavailable.

Highland Park's argument that "assault weapons" account for 16% of the firearms used to kill police officers is also misleading. Its argument is based on a 1997 study of police shootings that occurred between 1992 and 1996. (A.259 at ¶2) The percentage of police shootings known to have involved an "assault weapon" of some type (assault pistols, shotguns and rifles) in this five year period was 5.5%. (A.260 at ¶3)  Notably, "assault rifles" were known to have been used in just 3 out of the 276 shootings. (A.195 at ¶39) In 1994, there was an unusually high number of police shootings (76) and of those shootings in which the type of firearm was known, 9 shootings (or 12%) were found to have involved an "assault weapon" of some type. (A.259-60) The 16% figure claimed by Highland Park is not the percentage of all police shootings studied or even all police shootings in 1994, but the percentage of 1994 shootings in which the type of firearm was known. (A.260 at ¶4)

But the substitution effect again comes into play. It is irrational to assume the 3 police officers killed with "assault rifles" from 1992 to 1996 would not have been killed if possession of the rifles in the law abiding population had been prohibited. It

47

is rational to assume the killers would have used some other firearm to commit their crimes. The ability of a criminal to substitute a non-banned firearm for a banned firearm underscores the futility of partial firearm bans, as does the ability of a criminal to travel to a jurisdiction where there is no prohibition on acquiring or possessing banned firearms. The "fit" between (a) Highland Park's highly localized prohibition on ownership of a type of firearm and (b) likely criminal use of firearms in Highland Park is anything but "close."

Highland Park's argument that a mass shooting is less likely to occur in Highland Park because of the Ordinance is flawed for the same reason. The banned firearms are legally sold and available across most of Illinois and nearby states, and in nearly all of Lake County. (A.187 at ¶20) Unfortunately, a person determined to inflict mass casualties with an "assault weapon" in Highland Park would not be deterred simply because the Ordinance makes it illegal to possess one there. The firearm could easily be obtained elsewhere. And even if a determined mass shooter was unable to obtain an "assault weapon" elsewhere, there is no evidence suggesting that the shooting would not occur with another type of firearm. Many mass shootings resulting in the most significant numbers of casualties have involved use of ordinary handguns (*e.g.* Blacksburg, Virginia (Virginia Tech), Fort Hood, Texas; Tucson, Arizona; Oak Creek, Wisconsin) (A.213; A.220; A.223-24; A.230)), and shotguns (*e.g.* Washington D.C. Navy Yard) (R. Doc. 45-7 at p.7)). In fact, handguns are used most frequently by mass shooters by a considerable margin. (A.199-232; A.368-70)

In the District Court, Highland Park offered evidence that superficially suggests more casualties have been inflicted in mass shootings when "assault weapons" or "large capacity magazines" are used. Highland Park relied on a single study in support of its claim, *Analysis of Recent Mass Shootings*, prepared by Mayors Against Illegal Guns, a gun control advocacy group. Plaintiffs moved to strike Highland Park's reliance on the study because the expert witness who sponsored it could not testify the study was of the type on which experts would reasonably rely. *See* Fed. R. Evid. 703. Nor had he assessed the methodology used by the study's authors, reviewed the study's underlying data, or understood how the data was collected. (R.Doc. 51-3 at 233:12-24) The expert witness also had no expertise or experience on the occurrence or study of mass shootings. (R. Doc. 51-3 at 222:5-223:1) The District Court granted Plaintiffs' motion to strike, finding that in the absence of foundational testimony under Rule 703, the study was hearsay and inadmissible. (S.A.20 at n.11)

The Mayors Against Illegal Guns ("MAIG") report analyzed 93 "mass shootings" occurring between January 2009 and September 2013 (defined as incidents in which four or more persons were killed). (R. Doc. 45-7 at p.3) Handguns were used in 63 of the shootings, and shotguns were used in 12 of the shootings. (A.368-70) "Assault weapons" were present or used in 11 of the 93 shootings. (*Id.*) MAIG determined that "large capacity magazines" (referred to as "HCM") were used in six of the shootings. (*Id.*)

Seven the 11 incidents in which MAIG concluded "assault weapons" were present or used were not random, indiscriminate killings by a lone gunman in a public place. (R. Doc. 45-7 at pp. 7-36) They were gang retaliation shootings involving multiple gunmen and multiple firearms (Boston and Washington D.C.); spree killings involving multiple locations and multiple firearms (Santa Monica, Geneva County and East Oakland); and domestic killings of family members (Osage and Albuquerque). (*Id*.) Just four of the 93 shootings examined by MAIG were mass shootings of the kind that motivated Highland Park to pass the Ordinance – random, indiscriminate killing by a lone gunman in a public place in which an "assault weapon" was either one of the firearms used or present (Newtown, Aurora, Carson City and Mount Airy). (R. Doc. 45-7 at pp. 11-12, 14, 21, 31-32) In three of those four shootings, multiple firearms were present or used (Newtown, Aurora, and Carson City). (*Id*.)

The shooter possessed only an "assault weapon" in just one of the 93 mass shootings examined by MAIG (Mount Airy). (*Id*. at pp. 31-31) Nevertheless, MAIG examined the 14 shootings in which an "assault weapon" or a "large capacity magazine" was present or used and concluded that more persons were killed on average in those shootings than in the other 79 incidents. (R. Doc. 45-7 at p.4) MAIG found that in the 14 shootings an average of 7.8 deaths occurred compared to 4.8 deaths in the 79 other shootings. (*Id*.)

Dr. Kleck evaluated MAIG's finding. Because of the small sample size of just 14 incidents, the sample should have first been tested to assess how sensitive it was

to inclusion or exclusion of just a few cases. (A.189 at ¶¶26-27) To test a small sample for sensitivity, outliers should be removed and the results recalculated. (*Id*.) Dr. Kleck removed three notable outliers from the sample of 14 incidents involving the greatest number of deaths (Newtown (27), Binghamton (14), and Aurora (12)) and found the sample highly sensitive to slight changes in composition. (A.190 at ¶28) The outliers skewed the average to a significant degree.

When the three outliers were excluded, the average number of deaths in cases involving use of an "assault weapon" or a "large capacity magazine" dropped from 7.8 to 5.1, virtually the same as the average number of deaths in the remaining cases – 4.8. (A.190 at ¶27) Thus, MAIG's conclusion that death tolls are greater in cases involving use of "assault weapons" and "large capacity magazines" is not sufficiently robust to conclude they have an effect on the number of persons killed or injured in mass shootings. (A.190 at ¶28) MAIG's conclusion relied almost entirely on the inclusion of just three cases in the sample.

Indiscriminate, inexplicable mass shootings in public places – like the shooting in Newtown, Connecticut – remain rare events. (A.190 at ¶29) But when they occur the types of firearms and ammunition magazines used rarely dictate the outcome in terms of the number of persons killed or injured. (A.191 at ¶¶30-37) For example, although the shooter in Newtown inflicted all the casualties with an "assault weapon," he entered the school with two loaded semiautomatic handguns, 11 loaded handgun magazines and 191 rounds of 9mm and 10mm handgun ammunition. (A.363-67) Tragically, if the shooter did not have an "assault weapon" in the school

that morning, he would have been able to kill the same number of persons with one of the other firearms. The shooter's lethal intent was the reason so many innocent lives were lost, not his choice of one firearm over another.

Regardless, "the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms dependent on casualty counts." *Moore*, 702 F.3d at 939. And a "close fit" between Highland Park's prohibition on possession of "assault weapons" and "large capacity magazines" by law abiding persons in their homes and public safety requires evidence, not speculation. But there is no evidence on which to conclude that the firearms and magazines singled out and banned by Highland Park pose a risk to the public in the homes of law abiding persons. The Ordinance does not survive any level of heightened constitutional scrutiny.

### III.     Conclusion.

Plaintiffs respectfully request that the District Court be reversed and this case be remanded for entry of a declaration that Highland Park City Code § 136.001 *et seq.* is unconstitutional to the extent it prohibits the manufacture, sale, transfer, acquisition and possession of (a) semiautomatic rifles that are capable of accepting a magazine holding more than ten rounds of ammunition and (b) magazines capable of holding more than ten rounds of ammunition. Plaintiffs also request entry of a permanent injunction against enforcement of the unconstitutional Ordinance provisions.

November 3, 2014                 Respectfully submitted,

                                 */s/  James B. Vogts*
                                 James B. Vogts

Andrew A. Lothson
Swanson, Martin & Bell. LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 321-9100

***Attorneys for Plaintiffs-Appellants***

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

The undersigned certifies this brief complies with the type-volume requirements set forth in Federal Rules of Appellate Procedure, Rule 32(a)(7)(B) because the brief contains 13,863 words, excluding the parts of the brief exempted by Rule 32(a)(B)(7)(iii). I relied on my word processor to obtain the word count, and it is Microsoft Word. I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

The undersigned certifies this brief complies with the typeface requirements of Federal Rules of Appellate Procedure, Rule 32(a)(5) and the type style requirements of Federal Rules of Appellate Procedure, Rule 32(a)(6) as the brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 12 Century Schoolbook font.

*/s/  James B. Vogts*
James B. Vogts, one of the attorneys for
Plaintiffs-Appellants

## CIRCUIT RULE 31(E) CERTIFICATION

The undersigned hereby certifies that he electronically uploaded, pursuant to Circuit Rule 31(e), a version of the brief in non-scanned PDF format.

*/s/  James B. Vogts*
James B. Vogts, one of the attorneys for
Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system on the 3rd day of November, 2014.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system are the following:

> Christopher J. Murdoch
> Holland & Knight, LLP
> 131 South Dearborn Street
> 30th Floor
> Chicago, IL 60603
> (312) 263-3600
> Email: chris.murdoch@hklaw.com

Participants in the case who are not registered appellate CM/ECF users will be served by U.S. mail are the following:

> Christopher B. Wilson
> Perkins & Coie LLP
> 131 S. Dearborn Street
> Suite 1700
> Chicago, IL 60603
> (312) 324- 8400
> Email: cwilson@perkinscoie.com

> Hart M. Passman
> Holland and Knight, LLP
> 131 South Dearborn
> 30th Floor
> Chicago, IL 60603
> (312) 578-6634
> Email: hart.passman@hklaw.com

> Steven M. Elrod
> Holland & Knight, LLP
> 131 South Dearborn Street
> 30th Floor
> Chicago, IL 60603
> (312) 263-3600
> Email: steven.elrod@hklaw.com

/s/ *James B. Vogts*
**Attorney for Appellants**

# SHORT APPENDIX

## TABLE OF CONTENTS

Circuit Rule 30(d) Statement ...........................................................................i

Memorandum Opinion and Order...............................................................S.A. 1

Order................................................................................................S.A. 22

Notification of Docket Entry....................................................................S.A. 23

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) are included in the required Short Appendix. All materials required by Circuit Rule 30(b) are included in Appellant's Appendix pursuant to Circuit Rule 30(b)(7).

*/s/ James B. Vogts*
James B. Vogts

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and THE ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:13-cv-9073 |
| v. | ) ) | Judge John W. Darrah |
| THE CITY OF HIGHLAND PARK, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

On June 24, 2013, the City of Highland Park ("Highland Park") passed an ordinance, prohibiting the possession, sale, or manufacture of certain types of weapons and large capacity magazines. On December 12, 2013, two days before the ordinance became effective, Plaintiffs Dr. Arie S. Friedman and the Illinois State Rifle Association ("ISRA") (collectively, "Plaintiffs") brought this action, seeking a determination by the Court that the ordinance is unconstitutional and an injunction barring its enforcement. Plaintiffs filed a Motion for Preliminary Injunction that was consolidated for trial on the issue of the issuance of a permanent injunction, set for October 27, 2014, pursuant to Federal Rule of Civil Procedure 65(a)(2). The parties have also filed cross-motions for summary judgment and briefs in support of and in opposition thereto.

**BACKGROUND**

Highland Park is a municipal corporation located in Lake County, Illinois. (Dkt. No. 42 ¶ 4.) Within Highland Park are fifteen schools, including Highland Park High School and numerous elementary schools, four community centers, and three nursing homes. (Dkt. No. 45 ¶¶ 21-22.) Additionally, Highland Park features multiple locations where large numbers of people frequently congregate, like the Ravinia Festival; the Port Clinton retail and office

development; the Renaissance Place retail and residential development; and the Crossroads

Shopping Center.  (*Id.* ¶ 23.)  The City Council of Highland Park adopted Chapter 136 of the

Highland Park City Code (the "Ordinance") based on the belief that certain designated weapons

pose an undue threat to public safety.  (*Id.* ¶ 4.)  The Ordinance was particularly intended to

address the potential threat of mass shootings involving semi-automatic weapons like those in

Aurora, Colorado (12 killed, 58 injured); Newtown, Connecticut (28 killed); Casas Adobes,

Arizona (6 killed, 14 injured); and Santa Monica College in Santa Monica, California (6 killed, 2

injured).  (*Id.* ¶ 9; Dkt. No. 44 at 3-4.)

The Ordinance provides that "[n]o person shall manufacture, sell, offer or display for

sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity

Magazine, unless expressly exempted in Section 136.006 of this Chapter."  Highland Park, Ill.,

City Code § 136.005.[1]  The Ordinance defines Assault Weapons as any of the following:

> (1) A semiautomatic rifle that has the capacity to accept a Large Capacity
> Magazine detachable or otherwise and one or more of the following: (a) Only a
> pistol grip without a stock attached; (b) Any feature capable of functioning as a
> protruding grip that can be held by the non-trigger hand; (c) A folding,
> telescoping or thumbhole stock; (d) A shroud attached to the barrel, or that
> partially or completely encircles the barrel, allowing the bearer to hold the
> Firearm with the non-trigger hand without being burned, but excluding a slide that
> encloses the barrel; or (e) A Muzzle Brake or Muzzle Compensator;

---

[1] The Ordinance is nearly identical to a ban in neighboring Cook County, Cook County,
Ill. Ordinance No. 06-O-50 (2006), and similar to those passed by numerous other governments.
*See Colo. Outfitters Ass'n v. Hickenlooper*, Civil Action No. 13-cv-01300-MSK-MJW, 2014 WL
3058518, at *16 (D. Colo. June 26, 2014) ("According to Colorado, the General Assembly's
objective in passing [the LCMs ban] was to reduce the number and magnitude of injuries caused
by gun violence, specifically in mass shootings.") (emphasis added); *Kolbe v. O'Malley*, Civil
No. CCB-13-2841, 2014 WL 4243633, *15-18 (D. Md. Aug. 22, 2014); *Fyock v.
City of Sunnyvale*, Case No. C-13-5807-RMW, 2014 WL 984162, at *7 (N.D. Cal. Mar. 5,
2014); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011).

S.A. 2

(2) A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of Ammunition;

(3) A semiautomatic pistol that has the capacity to accept a Detachable Magazine and has one or more of the following:  (a) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (b) A folding, telescoping or thumbhole stock; (c) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; (d) A Muzzle Brake or Muzzle Compensator; or (e) The capacity to accept a Detachable Magazine at some location outside of the pistol grip;

(4) A semiautomatic shotgun that has one or more of the following:  (a) Only a pistol grip without a stock attached; (b) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (c) A folding, telescoping or thumbhole stock; (d) A fixed magazine capacity in excess of five rounds; or (e) An ability to accept a Detachable Magazine;

(5) Any shotgun with a revolving cylinder;

(6) Conversion kit, part or combination of parts, from which an Assault Weapon can be assembled if those parts are in the possession or under the control of the same person . . . .

*Id*. § 136.001(C)(1)-(6).[2]  Weapons made permanently inoperable and weapons "designed for Olympic target shooting events" are not Assault Weapons.  *Id*. § 136.001(C)(7).  The Ordinance goes on to define Large Capacity Magazines ("LCMs") as:

---

[2] The Ordinance also includes specific weapons in its definition of Assault Weapons: "(a) The following rifles or copies or duplicates thereof: (i) AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR; (ii) AR-10; (iii) AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR; (iv) AR70; (v) Calico Liberty; (vi) Dragunov SVD Sniper Rifle or Dragunov SVU; (vii) Fabrique National FN/FAL, FN/LAR, or FNC; (viii) Hi-Point Carbine; (ix) HK-91, HK-93, HK-94, or HK-PSG-1; (x) Kel-Tec Sub Rifle; (xi) Saiga; (xii) SAR-8, SAR-4800; (xiii) SKS with Detachable Magazine; (xiv) SLG 95; (xv) SLR 95 or 96; (xvi) Steyr AUG; (xvii) Sturm, Ruger Mini-14; (xviii) Tavor; (xix) Thompson 1927, Thompson M1, or Thompson 1927 Commando; or (xx) Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).  (b) The following pistols or copies or duplicates thereof: (i) Calico M-110; (ii) MAC-10, MAC-11, or MPA3; (iii) Olympic Arms OA; (iv) TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or (v) Uzi.  (c) The following shotguns or copies or duplicates thereof:  (i) Armscor 30 BG; (ii) SPAS 12 or LAW 12; (iii) Striker 12; or

3

> any Ammunition feeding device with the capacity to accept more than ten rounds,
> but shall not be construed to include the following:  (1) A feeding device that has
> been permanently altered so that it cannot accommodate more than ten rounds.
> (2) A 22 caliber tube Ammunition feeding device. (3) A tubular magazine that is
> contained in a lever-action Firearm.

*Id*. § 136.001(G).

Violation of any provision of the Ordinance "is a misdemeanor, punishable by not more than six months imprisonment or a fine of not less than $500 and not more than $1000, or both." *Id*. § 136.999.  Officers, agents, or employees of any municipality or state or the United States, members of the United States Armed Forces or state militias, and peace officers are exempt from the Ordinance to the extent such a person "is otherwise authorized to acquire or possess an Assault Weapon and/or Large Capacity Magazine and does so while acting within the scope of his or her duties."  *Id*. § 136.006(A).  "Qualified retired law enforcement officers"[3] are likewise exempt from the ban.  *Id*. § 136.006(B).

The Ordinance requires that any person who lawfully possessed any Assault Weapon or LCM is required within Sixty days of the effective date (December 14, 2013) to do one of the following:

> (A) Remove the Assault Weapon or Large Capacity Magazine from within the limits of the City;

> (B) Modify the Assault Weapon or Large Capacity Magazine either to render it permanently inoperable or to permanently make it a device no longer defined as an Assault Weapon or Large Capacity Magazine;

> (C) Surrender the Assault Weapon or Large Capacity Magazine to the Chief of Police or his or her designee for disposal as provided in Section 136.025 of this Chapter; or

---

(iv) Streetsweeper."  Highland Park, Ill., City Code § 136.001(C)(7).
    [3] As defined by 18 U.S.C. § 926C(c).

4

(D) Take the steps necessary to cause the Assault Weapon or Large Capacity Magazine to fall within one of the exemptions set forth in Section 136.006 of this Chapter.

*Id.* § 136.020.  The Chief of Police shall cause to be destroyed any Assault Weapon or LCM turned over to police or confiscated.  *Id.* § 136.025.

Dr. Friedman owns and possesses firearms in Highland Park that fall within the Ordinance's definition of Assault Weapons.  (Compl. ¶ 4.)  The IRSA has members who live in Highland Park and own firearms and magazines prohibited by the Ordinance.  (Compl. ¶ 5.)  Plaintiffs seek a declaration that the Ordinance is unconstitutional as an infringement of their Second Amendment rights.

## LEGAL STANDARD

Summary judgment is appropriate when there remains "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *See Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012).  The party seeking summary judgment must first identify those portions of the record that establish there is no genuine issue of material fact.  *U.S. v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  To survive such a showing, the nonmoving party must "present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial."  *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1030-31 (7th Cir. 2006) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995)).  Opposition to summary judgment requires more than a scintilla of evidence or some metaphysical doubt.  *Nat'l Inspection Repairs, Inc. v.*

*George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010) (citations omitted).  The evidence

must be such "that a reasonable jury could return a verdict for the nonmoving party."  *Wells v.*

*Coker*, 707 F.3d 756, 760 (7th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986)).

When considering a motion for summary judgment, the court must construe the evidence

in the light most favorable to the nonmoving party and draw all reasonable inferences in the

nonmoving party's favor.  *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010) (citations

omitted).  The court does not make credibility determinations or weigh conflicting evidence.

*George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (citations omitted).

Summary judgment is particularly appropriate when facts in dispute are "legislative," or

"tied to legal reasoning and the law making process," rather than "adjudicative," concerning the

conduct of the parties.  See Fed. R. Evid. 201(a) advisory committee's note.  Inasmuch as "[o]nly

adjudicative facts are determined in trials, and only legislative facts are relevant to the

constitutionality of . . . gun law[s]," the instant case is better suited for resolution through

summary judgment than proceeding to trial.  *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir.

2012); *Ill. Ass'n of Firearms Retailers v. City of Chi.*, 961 F. Supp. 2d 928, 932 (N.D. Ill. 2014).

Local Rule 56.1(a) requires the party moving for summary judgment to provide "a

statement of material facts as to which the moving party contends there is no genuine issue" and

to cite to the relevant admissible evidence supporting each fact.  Local Rule 56.1(b)(3)(B) then

requires the nonmoving party to admit or deny each factual statement proffered by the moving

party and to concisely designate any material facts that establish a genuine dispute for trial.

*Martin v. Gonzalez*, 526 F. App'x 681, 682 (7th Cir. 2013).  Under Local Rule 56.1(b)(3)(C), the

nonmoving party may file a statement of additional facts, and the moving party may submit a

concise reply under Local Rule 56.1(a)(3).  To the extent that a purported fact is merely a legal conclusion, it is disregarded.  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371 (7th Cir. 2008).

A litigant's failure to respond to a Rule 56.1 statement, or to dispute the statement without "specific references to the affidavits, parts of the record, and other supporting material," results in the court's admitting the uncontroverted statement as true.  *Banks v. Fuentes*, 545 F. App'x 518, 520 (7th Cir.2013).  Similarly, responses containing argumentative denials or extraneous information do not properly dispute a fact.  *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005).[4]

## ANALYSIS

Plaintiffs argue, as more fully discussed below, that firearms banned by the Ordinance are commonly used for lawful purposes and, therefore, are "categorically protected" by the Second Amendment to the United States Constitution and that any prohibition should be held unconstitutional without reaching further analysis.  (Pls.' Mot. for Summary Judgment ("Pls.' MSJ") at 14.)  Plaintiffs argue in the alternative that, if the Ordinance is subjected to further analysis, it does not survive this scrutiny.  (Pls.' MSJ at 21.)  Both of these arguments rely on interpretation of a body of law that is recently developing.  *See Ezell v. City of Chi.*, 651 F.3d 684, 690 (7th Cir. 2011) (noting Second Amendment litigation is "quite new").

---

[4] On August 7, 2014, Plaintiffs filed a Motion to Strike certain of Defendant's material facts.  (Dkt. No. 61.)  On August 20, 2014, that Motion was denied.  Provided, however, Plaintiffs' arguments regarding striking these facts are considered, discussed and resolved herein when necessary.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II.  This right is also "fully applicable to the States."  *McDonald v. City of Chi.*, 130 S.Ct. 3020, 3026 (2010).

In *District of Columbia v. Heller ("Heller I")* the Supreme Court determined that there is a guaranteed "individual right to possess and carry weapons in case of confrontation," based on the Second Amendment.  554 U.S. 570, 592, 635 (2008).  More particularly, *Heller I* held that a law banning handguns would fail at any level of constitutional scrutiny because it "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense] . . . [and] extends, moreover, to the home, where the need for defense of self, family, and property is most acute."  *Id*. at 628.  Thus, *Heller I* recognized Second Amendment protection against restrictions by the District of Columbia on use of "the quintessential self-defense weapon" for the "core lawful purpose of self-defense."  *Id*. at 629-630.

However, the Court made it clear that there are limitations on this right.  *See id.* at 626 (explaining that the holding should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.").  The protection afforded by the Second Amendment to a class of weapons as ubiquitous as handguns does not create "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.*  Indeed, the extensive possession of handguns among weapons used for self-defense distinguished them from "weapons not typically possessed by law-abiding citizens for lawful purposes, such as

short-barreled shotguns." *Id.* at 625.  In *McDonald*, the Court reiterated the primacy of the

individual right to possess handguns in the home.  130 S.Ct. at 3050.

The Seventh Circuit addressed Second Amendment Protection when it reversed the

district court's denial of a preliminary injunction against a City of Chicago ordinance

conditioning lawful gun ownership on completing one hour of firing range training, while

simultaneously banning firing ranges within Chicago city limits.  *Ezell v. City of Chi.*, 651 F.3d

684, 689, 711 (7th Cir. 2011).  Analyzing the ordinance required a two-part approach.  First, the

Seventh Circuit drew from *Heller I* and *McDonald* a "textual and historical inquiry" to determine

whether the restricted activity is protected by the Second Amendment.  *Id.* at 701-702 (citing

*Heller I*, 554 U.S. at 634-35; *McDonald*, 130 S.Ct. at 3047).  This inquiry is conducted in light of

the circumstances present for the ratification of the Second Amendment (1791) if a federal law is

at issue or the Fourteenth Amendment (1868) if a state law is at issue:

> Accordingly, if the government can establish that a challenged firearms law
> regulates activity falling outside the scope of the Second Amendment right as it
> was understood at the relevant historical moment—1791 or 1868—then the
> analysis can stop there; the regulated activity is categorically unprotected, and the
> law is not subject to further Second Amendment review.

*Ezell*, 651 F.3d  at 702-3.  The City of Chicago was unable to make such a showing, and the

Seventh Circuit proceeded to the second step of its analysis:  examination of the government's

justification for the restriction.  "[T]he rigor of this judicial review will depend on how close the

law comes to the core of the Second Amendment right and the severity of the law's burden on the

right."  *Id.*  The Seventh Circuit found range training to be "an important corollary to the

meaningful exercise of the core right to possess firearms for self-defense"; and, therefore, a

complete prohibition was subject to "not quite strict scrutiny."  *Id.* at 708 (internal quotation

marks omitted).  To meet its burden, the City of Chicago was required to "demonstrate that

civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified." *Id*. at 709. The City of Chicago presented no data or expert opinion supporting its ban and did "not come close to meeting this standard." *Id*.

This same analysis was present in the Seventh Circuit's consideration of a firearms ban after *Ezell*. In *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Seventh Circuit ruled an Illinois law unconstitutional that prohibited carrying ready-to-use firearms outside of a person's home, fixed place of business, or the property of another who had given permission because the right to bear arms in self-defense is "as important outside the home as inside." *Id*. at 942. The Court reached this conclusion after determining the historical evidence supporting a tradition of public carriage of firearms was more persuasive than evidence to the contrary. *Id*. at 939 ("In sum, the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law."). The Seventh Circuit then proceeded to analyze Illinois's justification for enacting the ban. In doing so, the Court again discussed the application of varying degrees of justification:

> A blanket prohibition on carrying gun[s] in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would. In contrast, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need.

*Id*. at 940 (emphasis in original). It is clear that once a restriction implicates Second Amendment rights, it requires "more than merely a rational basis." *Id*. at 942. In *Moore*, the Seventh Circuit

determined that Illinois needed to show much more to justify "the most restrictive gun law of any of the 50 states." *Id*. at 941.

Highland Park's Ordinance is, therefore, subject to the two-part inquiry established by *Ezell* and *Moore*. It is Highland Park's burden to show that regulated activity falls outside of the scope of the Second Amendment. If such a showing cannot be made, Highland Park must present evidence sufficient to demonstrate that the restriction is justified. The greater the burden to the core Second Amendment right to armed self-defense, the greater the burden on Highland Park to justify the restriction. If Highland Park cannot meet this burden, the Ordinance is unconstitutional.

*Second Amendment Protection*

First, it must be determined whether the Assault Weapons and LCMs, as they are defined in the Ordinance,[5] fall within the scope of Second Amendment protection. When a particular class of weapons is at issue, the threshold question is whether those weapons are commonly used for lawful purposes. *See Heller I*, 554 U.S. at 624-25, 627. If the answer is no, restricting the possession of such weapons is consistent with the "historical tradition of prohibiting the carrying of dangerous and unusual weapons," and the law should be considered valid. *Id*. at 627 (internal quotation marks and citations omitted). The parties agree that "common use" is determined on a national, not local, basis.

---

[5] Plaintiffs argue that the term "Assault Weapon" is not defined and, therefore, its use is "argumentative and misleading." (Dkt. No. 51 at 1-2.) Plaintiffs moved to strike all thirteen of Defendant's material facts that use the term. (*See* Dkt No. 64.) Although Plaintiffs have offered some support for this argument that Assault Weapons is a poor choice of words to describe the weapons at issue in this case, they fail to demonstrate how this is relevant to a determination of the Ordinance's constitutionality. As used in this opinion, Assault Weapons are those weapons defined by the Ordinance.

Plaintiffs argue that "the only limitation [*Heller I*] recognized on the type of firearm that can be possessed by a law-abiding person in the home for self-defense use is that the firearm be one that is in common use at the time." (Dkt. No. 52 at 7 (quotation marks and citations omitted).) Therefore, Plaintiffs assert the Ordinance represents a categorical ban like the ban in *Heller I* and should be held unconstitutional without further scrutiny.

Plaintiffs assert an "overwhelming popularity and common ownership of AR-type[6] rifles among law abiding citizens." (Dkt. No. 41 at 17.) According to the estimates of the National Shooting Sports Foundation ("NSSF"), between 1990 and 2012, approximately 5,128,000 AR-type rifles were manufactured domestically; and approximately 3,145,000 AR-type and AK-type rifles were imported into the United States. (*See* Dkt. No. 42, Ex. 6 ¶ 4.) From 2008 to 2012 alone, approximately 3,457,230 AR-type rifles were manufactured domestically for domestic consumption, accounting for 11.4 percent of all firearms manufactured in the United States for domestic sale in that time period. (*Id.* ¶ 5.) Finally, Plaintiffs assert that, based on a 2012 online survey of firearms dealers, 92.5 percent stocked AR-type rifles and 20.3 percent of all new firearms sold were AR-type rifles. (*Id.* ¶ 8.)

With respect to LCMs,[7] Plaintiffs contend that of approximately 158,000,000 magazines possessed by consumers in the United States, approximately 75,000,000 of those are capable of

---

[6] Without explanation, Plaintiffs initially confine their arguments of common use to a particular type of gun banned by the Ordinance: the "AR-type rifle." (Dkt. No. 41 at 5.) It is unclear whether Plaintiffs refer specifically to the two rifles in the Ordinance named AR (the AR-10 and the AR-15) or to any rifle with characteristics common to the named AR rifles, e.g., modular design. This confusion is compounded when Plaintiffs also include "AK-type rifles" in various statements of fact.

[7] Although Plaintiffs do mention LCMs in their argument, it is primarily only in conjunction with rifles. (*See, e.g.,* Dkt. No. 41 at 14 ("Whether the banned firearms *and magazines* are typically possessed by law-abiding citizens . . . .") (emphasis added).) However,

holding more than 10 rounds of ammunition. (*Id.* ¶ 10.) Of rifle owners responding to an NSSF survey regarding modern sporting rifles[8] ("MSR Survey"), 83 percent reported use of a magazine capable of holding in excess of 10 rounds. (*Id.* ¶ 6.) Based on these estimated manufacturing numbers and survey results, Plaintiffs argue that AR-type rifles and LCMs are in common use.

Plaintiffs argue that the popularity of AR-type rifles is evident among members of the firearms owners' community because the rifles are frequently used at firing ranges. (*Id.* Ex. 3 ¶ 5 ("I regularly observe [Aurora Sportsmen's Club] members on the range and the firearms they use; and modern sporting rifles, including AR-type rifles, have been the most commonly used rifles on the range over the past five to ten years.").) The MSR Survey respondents identified recreational target shooting as the "number one" reason to own a modern sporting rifle. (*Id.* Ex. 6 ¶ 7.) An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern sporting rifle. (*Id.* Ex. 6 ¶ 9.) Furthermore, "the fastest growing shooting sport in the country" features competitors using a pistol, shotgun, and AR-type rifle to shoot various targets. (*Id.* Ex. 3 ¶ 8.) AR-type rifles are also commonly used for small game hunting. (*Id.*)

Plaintiffs argue that Assault Weapons are predominantly used for these lawful purposes as criminals prefer to use concealable handguns in the commission of crimes. (*Id.* Ex. 10 ¶ 9.) Plaintiffs cite a nine-study composite that indicates Assault Weapons account for just .038 percent of guns used in the commission of crimes. (*Id.* Ex. 10 ¶ 38.) With specific regard to firearms-related homicides, rifles are infrequently used. (*Id.* Ex. 11 (Chicago Police Department

---

Plaintiffs have submitted some statements of fact in support of LCMs' common use; and they are considered here.

[8] Plaintiff asserts that AR-type rifles are among the category known as modern sporting rifles.

data reflecting that rifles were used in just 22 of 2,215 homicides in Chicago from 2006 through 2011 in which a firearm was involved); Ex. 4 at 160.)

As further discussed below, Highland Park disputes both of Plaintiffs' contentions: that Assault Weapons are commonly used and that they are used for lawful purposes. Preliminarily, Highland Park asserts that it is difficult to determine the number of Assault Weapons currently in the United States because gun manufacturers do not generally release their sales data. (Dkt. No. 45, Ex. C ¶35.) However, the NRA has estimated that semi-automatic firearms make up 15 percent of privately owned firearms in the United States and that Assault Weapons make up approximately 15 percent of all semi-automatic firearms. (*Id.* ¶ 36.) Based on these estimates, 4,905,000 out of 218,000,000 (or approximately 2.25 percent) privately owned firearms are Assault Weapons. (*Id.*) Additionally, Highland Park points out that accepting Plaintiffs' estimates that 5,128,000 AR-type rifles were manufactured between 1990 and 2012 and that 3,457,230 AR-type rifles were manufactured between 2008 and 2012 necessarily implies that an average of less than 100,000 AR-type rifles were manufactured domestically per year between 1990 and 2007. (Dkt. No. 53 at 5, 9.)

Highland Park next asserts that Assault Weapons are not designed for and, in fact, would be ineffective for self-defense in the home. (*Id.*) AR-type rifles are powerful and relatively large compared to other firearms, making their use in close quarters potentially difficult. (Dkt. No. 45, Ex. D ¶¶ 46, 48 ("To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous.").) In addition, responsible firearms owners will lock and store their firearms for safety. (*Id.* ¶ 47.) Properly storing a rifle typically requires using a gun safe built for that purpose, which renders the rifle not immediately accessible in the event of a need to defend oneself in a threatening emergency. (*Id.* ("Safes require time to unlock

14

and open, obviating the rifle as the [best self-defense firearm].")  With respect to LCMs, Highland Park asserts that ten rounds are typically sufficient for self-defense.  (*Id*. ¶ 40 ("In police involved shootings[,] the number of shots fired is [on average, less than four]").)

Finally, Highland Park argues that Assault Weapons and LCMs are the types of "dangerous and unusual weapons" specifically excepted from Second Amendment protection. Primarily, this argument is based on the AR-type rifle's similarity to – and even derivation from – military-grade weapons with offensive purposes.  Accordingly, Assault Weapons typically have features that allow a user to shoot multiple targets in a short period of time.  (Dkt. No. 45, Ex. B ¶ 20.)

The evidence submitted by the parties does not resolve the question of whether Assault Weapons and LCMs are "commonly used for lawful purposes."  The facts submitted by both parties show, at best, only how many AR-type rifles were *manufactured* over a given period of time; and even these numbers are highly disputed.  But knowing how many *people possess* an Assault Weapon, rather than how many *Assault Weapons* are in use, is far more probative in determining common use.  Highland Park argues that these numbers are difficult to ascertain because, as mentioned above, gun manufacturers typically do not release sales data.  Rather, the vast majority of the parties' data is made up of approximations and surveys.  Further, Highland Park persuasively argues that the Assault Weapon is not appropriate for home defense. The features of an Assault Weapon, as set out in the Ordinance, appear to be more valuable in an offensive capacity than a defensive one.  Therefore, it is apparent that the question of common use is far from settled.  Moreover, *Heller I* made clear that "dangerous or unusual" weapons are also unprotected.  Therefore, the Ordinance implicates consideration of Plaintiffs' Second Amendment rights and must be subjected to further analysis.

*Level of Scrutiny*

As mentioned, the Seventh Circuit has prescribed a sliding-scale approach to levels of

scrutiny within the Second Amendment context:

> First, a severe burden on the core Second Amendment right of armed self-defense
> will require an extremely strong public-interest justification and a close fit
> between the government's means and its end. Second, laws restricting activity
> lying closer to the margins of the Second Amendment right, laws that merely
> regulate rather than restrict, and modest burdens on the right may be more easily
> justified. How much more easily depends on the relative severity of the burden
> and its proximity to the core of the right.

*Ezell*, 651 F.3d at 708.[9]  In arriving at this approach, the Seventh Circuit drew upon the levels of

scrutiny associated with claims of infringements on the right of free speech.  *Ezell*, 651 F.3d at

---

[9] Other Circuit Courts have generally agreed with this analysis, albeit employing a less
stringent standard.  *See, e.g., Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012)
("[W]e believe that applying less than strict scrutiny when the regulation does not burden the
"core" protection of self-defense in the home makes eminent sense in this context and is in line
with the approach taken by our sister circuits."); *Heller II*, 670 F.3d at 1262 (applying
intermediate scrutiny, noting, "Although we cannot be confident the prohibitions impinge at all
upon the core right protected by the Second Amendment, we are reasonably certain the
prohibitions do not impose a substantial burden upon that right."); *United States v. Marzzarella*,
614 F.3d 85, 97 (3rd Cir. 2010) (applying intermediate scrutiny after finding that the law at issue
did "not severely limit the possession of firearms."); *Peruta v. Cnty. of San Diego*, 742 F.3d
1144, 1167-68 (9th Cir. 2014) ("[S]evere restrictions on the 'core' right have been thought to
trigger a kind of strict scrutiny, while less severe burdens have been reviewed under some lesser
form of heightened scrutiny.")  No case has been found that applied a standard other than
intermediate scrutiny to a case involving restrictions of Assault Weapons or LCMs.  *See Kolbe v.
O'Malley*, Civil No. CCB-13-2841, 2014 WL 4243633 (D. Md. Aug. 22, 2014) (finding
"intermediate scrutiny is appropriate for assessing the constitutionality of Maryland's [Assault
Weapons and LCMs] ban because it does not seriously impact a person's ability to defend
himself in the home, the Second Amendment's core protection."); *Colo. Outfitters Ass'n*, 2014
WL 3058518, at *15 (holding of an LCMs ban that "the burden is not severe . . . [a]s a result, the
Court will examine the statute under the intermediate scrutiny test."); *Fyock*, 2014 WL 984162,
at *7 ("Considering both how close the [LCMs ban] comes to the core of the Second
Amendment right and the law's burden on that right, the court finds that intermediate scrutiny is
appropriate."); *S.F. Veteran Police Officers Ass'n v. City and Cnty. of S.F.*, No. C 13-05351
WHA, 2014 WL 644395, at *5 (N.D. Cal. Feb. 19, 2014) (holding an LCMs ban "does not
'destroy' the right to self-defense; it 'merely burdens' it. . . In turn, the degree of scrutiny
required is less severe."); *Shew v. Malloy*, (intermediate scrutiny held appropriate because "[t]he

16

707 (explaining content-based speech regulations are presumptively invalid, while speech lying farther from the core free speech rights, like commercial speech, need only be reasonably justified); *see also, United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("Categorical limits on the possession of firearms would not be a constitutional anomaly.  Think of the First Amendment, which has long had categorical limits:  obscenity, defamation, incitement to crime, and others.").

Plaintiffs argue that any analysis of the constitutionality of the Ordinance by analogy to the First Amendment should be undertaken by analogy to the standard of strict scrutiny imposed when considering content-based speech.  (Dkt. No. 52 at 9.)  However, *Heller I* did not simply recognize a right to possess commonly owned firearms, but to do so in furtherance of "the *core* lawful purpose of self-defense."  554 U.S. at 630 (emphasis added).  "It is not a property right . . . ."  *Moore*, 702 F.3d at 937.  Therefore, to require strict scrutiny, the Ordinance must be shown to severely burden the right to armed self-defense.

Based on the evidence presented by the parties, as discussed above, a severe burden on the right to armed self-defense has not been demonstrated.  Plaintiffs have not provided a single instance of an Assault Weapon used in self-defense.  Nor have they submitted evidence that a prohibition on the banned weapons and magazines limits, in any meaningful way, Highland Park residents' ability to defend themselves.  Indeed, the only evidence that even arguably shows Assault Weapons possess defensive capabilities greater than other, permitted firearms is the

---

challenged legislation provides alternate access to similar firearms and does not categorically ban a universally recognized class of firearms."); *Heller II*, 670 F.3d at 1262 (applying intermediate scrutiny because the Assault Weapons and LCMs ban at issue did "not effectively disarm individuals or substantially affect their ability to defend themselves.").

claim by a majority of survey respondents, stating self-defense as a reason for owning AR-type rifles.

Although the Ordinance provides a marginal burden upon the Second Amendment core right to armed self-defense, it does not severely burden the right. The Ordinance allows residents of Highland Park to keep an exceedingly large number of types of weapons (including the handguns at issue in *Heller I*, "overwhelmingly chosen by American society for that lawful purpose") and an unlimited number of magazines, holding 10 rounds or less, for self-defense. The Ordinance, therefore, need not be subject to strict scrutiny.

The "not quite strict scrutiny" standard requires Highland Park to "establish a close fit between the [Ordinance] and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." *Ezell*, 651 F.3d at 708-09. That is, Highland Park must show that otherwise lawful ownership of Assault Weapons and LCMs increases the risk to the public to a degree that prohibiting them is justified. *Id.* at 709.

Highland Park asserts an "important, if not compelling[,] interest[] in the public safety of its citizens and police officers alike." (Dkt. No. 44 at 13.) Specifically, Highland Park passed the Ordinance "to address the potential threat of mass shootings involving a semi-automatic assault weapon." (Dkt. No. 45 ¶ 9; *see* Dkt. No. 45, Ex. C ¶ 9.) There can be little doubt that any government's interest in public safety is important,[10] and Plaintiffs do not dispute this contention. Instead, Plaintiffs argue that Highland Park has not shown that the Ordinance is related to public safety.

---

[10] *See, e.g., Schenk v. Pro-Choice Network of Western New York*, 519 U.S. 357, 375-76 (1997); *McCullen v. Coakley*, 134 S. Ct. 2518, 2535, 189 L. Ed. 2d 502 (2014).

However, the evidence discussed demonstrates that Assault Weapons have a military heritage that makes them particularly effective for combat situations.  (Dkt. No. 45 ¶ 27; *see* Dkt. No. 45, Ex. C ¶¶ 15-23.)  Indeed, the particular features banned by the Ordinance were developed for or by militaries to increase lethality.  (*See* Dkt. No. 45, Ex. C ¶ 33; ("Protruding foregrips allow increased stability . . . thus increasing the hit probability of successive shots . . . . [I]t was not until . . . acceptance by the U.S. Military . . . that foregrips for semiautomatic rifles have grown in popularity."); ("Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space.  [They] also facilitate[] easier . . . firing from positions other than the shoulder . . . .  Military origins for this type of stock can be found on the M1 carbine in W[orld War II] when modified for paratrooper use."); ("The M1 'Garand' Rifle utilized by the U.S. Military . . . [featured] . . . a wooden handguard . . . to steady and control the rifle during rapid, repeat firing without getting burned by the hot barrel."); ("A muzzle brake . . . allow[s] the operator to control the rifle during rapid, repeat firing without taking time to reacquire the target.").)  Likewise, LCMs were developed to serve military goals. (Dkt. No. 45, Ex. C ¶ 33 ("Less time required to reload can equate to more time spent acquiring targets or shooting.").)  The military weapons from which consumer Assault Weapons derive have a decidedly offensive function.  (*Id*. ¶ 53; *see* Dkt. No. 45, Ex. D ¶ 39 ("Ultimately, the purpose of military assault rifles and submachine guns (the analog for a civilian assault pistol) is offensive - to facilitate the assault and capture of a military objective.").)

The record also demonstrates that these shared components are not simply historical. Many Assault Weapons differ from their military counterparts only in their lack of a setting that allows a user to fire more than one round with a single pull of the trigger.  (*Id*. ¶ 32.)  Because of the insubstantial differences between the military and consumer versions, Assault Weapons may

be converted to the functional equivalent of a military weapon, and many such illegally converted weapons are recovered annually in the United States. (Dkt. No. 45 ¶ 48.) Even without conversion, a semi-automatic AR-15 will fire at nearly the same rate of speed as a fully automatic rifle. (*Id.* ¶ 49.)[11] As the District of Columbia Circuit noted in *Heller II*, the 30-round magazine of an UZI submachine gun "was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semi-automatic." 670 F.3d at 1263.

The record is clear that the features of the prohibited firearms, including LCMs, derive from military weapons with the decidedly offensive purpose of quickly acquiring multiple targets and firing at those targets without a frequent need to reload. Highland Park maintains a strong interest in protecting the public against this potential use. Therefore, Highland Park has established a close fit between the Ordinance and its stated objective of providing for the protection and safety of its inhabitants. The Ordinance does not violate Plaintiffs' Second Amendment rights.

---

[11] Highland Park has also submitted evidence demonstrating how assault weapons are used in mass shootings. Between January 2009 and September 2013, 93 mass shootings occurred. (Dkt. No. 45 ¶ 58.) In the 14 of these events in which the shooter used a semi-automatic or fully automatic Assault Weapon, 151 percent more casualties and 63 percent more deaths occurred. (*Id.*; Dkt. No. 45, Ex. G at 3.) Relative to the period between 2000 and 2008, "active shooter events" (defined as "an individual actively engaged in killing or attempting to kill people in a confined and populated area, typically through use of a firearm") have doubled in the period from 2009 to 2013. (Dkt. No. 45 ¶ 61.) However, these statements were properly objected to by Plaintiffs as inadmissible hearsay and will not be considered.

**CONCLUSION**

For the reasons discussed above, Highland Park's Motion for Summary Judgment [43] is granted and Plaintiffs' Motion for Summary Judgment [40] is denied.  Highland Park City Code Section 136 shall remain in full force and effect.

Date:    _September 18, 2014_    _____
                                  JOHN W. DARRAH
                                  United States District Court Judge

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| | ) | |
| Arie S Friedman et al | ) | Case No: 13 C 9073 |
| | ) | |
| v. | ) | Judge: John W. Darrah |
| | ) | |
| City of Highland Park | ) | |
| | ) | |

### ORDER

Status hearing and ruling on motion hearing held. For the reasons stated in the attached memorandum opinion and order, Highland Park's Motion for Summary Judgment [43] is granted and Plaintiffs' Motion for Summary Judgment [40] is denied. Highland Park City Code Section 136 shall remain in full force and effect. Enter Memorandum Opinion and Order. The issue of permanent injunction having been resolved by summary judgment, the pretrial conference set for 10/23/14 and jury trial set for 10/27/14 is vacated. Civil case closed.

(T:) 00:10

Date:  9/18/14                                   /s/ Judge John W. Darrah

S.A. 22

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6,1**
**Eastern Division**

Arie S Friedman, et al.

                              Plaintiff,

v.                                                Case No.: 1:13−cv−09073
                                                  Honorable John W. Darrah

City of Highland Park

                              Defendant.

---

### NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, February 27, 2014:

        MINUTE entry before the Honorable John W. Darrah: To assist the Court, the preliminary injunction hearing commenced on February 27, 2014, is hereby consolidated with trial, pursuant to Fed. R. Civ. Pro. 65(a)(2). Status hearing set for March 20, 2014, at 9:30 a.m. for scheduling. Mailed notice(maf)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.