**Case No. 14-3091**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

**ARIE S. FRIEDMAN, M.D. and
the Illinois State Rifle Association
Plaintiffs-Appellants,**

**v.**

**CITY OF HIGHLAND PARK,
Defendant-Appellee.**

---

On Appeal from the United States District Court for the Northern
District of Illinois, Eastern Division
Case No. 1:13-cv-09073
The Honorable John W. Darrah, Judge Presiding

---

**APPELLANTS' APPENDIX**

---

James B. Vogts
Andrew A. Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611
Telephone:  (312) 321-9100
Facsimile:   (312) 321-0990

**Attorneys for Plaintiffs-Appellants**

---

# TABLE OF CONTENTS

Verified Complaint for Declaratory Judgment and
Injunctive Relief ……………………………………………………… …. A. 1

Ordinance No. 68-13…………………………………………………… A. 10

Declaration of Nancy Rotering…………………………………… A. 15

Affidavit of James W. Supica, Jr………………………………….. A. 18

Affidavit of David A. Lombardo…………………………………… A. 31

Affidavit of James Curcuruto……………………………………… A. 64

Affidavit of Dr. Gary Roberts…………………………………… A. 105

Affidavit of Gary Kleck…………………………………………… A. 176

Supplemental Affidavit of Gary Kleck……………………… A. 259

Mark D. Jones Deposition Excerpts
(Highland Park Expert Witness)……………………………… A. 266

Report and Recommendation of the ATF Working Group………… A. 281

James C. Yurgealitis Deposition Excerpts
(Highland Park Expert Witness)……………………………… A. 284

U.S. Department of Justice, BJS, *Victimization During
Household Burglary*……………………………………………… A. 302

Excerpts from Chicago Police Department,
Chicago Murder Analysis Reports, 2006-2012……………………… A. 315

Excerpts from Koper, *An Updated Assessment of the Federal
Assault Weapons Ban: Impacts on Gun Markets and
Gun Violence, 1994-2003*……………………………………… A. 325

Hepburn, Miller, Azrael, and Hemenway, *The U.S.
Gun Stock: Results from the 2004 National Firearms Survey* ....... A. 331

Excerpts from Kleck, TARGETING GUNS (1997) .......................... A. 338

Excerpts from State of Connecticut, Department of
Public Safety Report .................................................................. A. 363

Mayors Against Illegal Guns, Mass Shooting Report Data ........... A. 368

Defendant's Response to Plaintiffs' Rule 56.1
Statement of Material Facts ..................................................... A. 371

Chapter 136: Assault Weapons .................................................. A. 376

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in Appellant's Appendix.

*/s/ James B. Vogts*
James B. Vogts

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS**

| | |
|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITY OF HIGHLAND PARK | ) ) |
| Defendant. | ) |

**F I L E D**

DEC 12 20..

*Keith Brin*
CIRCUIT CLERK

No: **13 CH 3414**

**VERIFIED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

NOW COME the Plaintiffs, Dr. Arie S. Friedman and the Illinois State Rifle Association, by their attorneys, and for their Verified Complaint for Declaratory Judgment and Injunctive Relief against the Defendant City of Highland Park state that the Defendant has by City Code §136.001 *et seq.* unconstitutionally infringed the fundamental right of law-abiding citizens under the Second Amendment of the United States Constitution to keep and bear arms for lawful purposes, including the defense of his home and family.

**THE PARTIES**

1.      Dr. Arie S. Friedman ("Dr. Friedman") is an adult resident of Highland Park, Illinois. He is a law-abiding citizen, who is lawfully entitled to own and possess firearms under all applicable Federal and State laws and regulations. Plaintiff owns and possesses firearms in Highland Park for lawful purposes, including the defense of his home and family. Neither Plaintiff nor his firearms pose a threat to the community.

A. 1

2.    The Illinois State Rifle Association ("ISRA") is a non-profit educational foundation incorporated under the laws of Illinois, with its principal place of business in Chatsworth, Illinois. ISRA has more than 30,000 members residing throughout the State of Illinois, including Highland Park. The purposes of the ISRA include the protection of the rights of citizens to keep and bear arms for the lawful defense of their families, persons and property, and to promote public safety and law and order.

3.    Highland Park is a municipal corporation located in Lake County, Illinois. Defendant is governed by a Mayor and an elected six-member City Council, which, among other things, is empowered to enact Ordinances under its home rule authority.

## STANDING

4.    Dr. Friedman owns and possesses firearms in Highland Park that are banned under the Highland Park City Code §136.001 *et seq.* ("Ordinance"). Plaintiff must take certain actions by December 14, 2014 to be in compliance with the Ordinance, including removing the firearms from Highland Park, rendering them inoperable or surrendering them to the Chief of Police. The actions required of Plaintiff under the Ordinance constitute continuing harm to his constitutional right to keep and bear arms under the Second Amendment to the United States Constitution.

5.    ISRA brings this action on behalf of its members residing in Highland Park, who own firearms and ammunition magazines prohibited by the Ordinance, desire to acquire prohibited for lawful purposes and would otherwise have standing to bring this action in their own right. The claims made in this action and the interests this action advances are germane to ISRA's organizational purpose. The relief requested in this action does not require participation of individual ISRA members

A. 2

## THE ORDINANCE

6.     On June 24, 2013, the Highland Park City Council passed an ordinance titled,
"Assault Weapons", which in part provided:

> No person shall manufacture, sell, offer or display for sale, give, lend, transfer
> ownership of, acquire or possess any Assault Weapon or Large Capacity
> Magazine, unless expressly exempted in Section 136.0006 of this Chapter.

City Code §136.010.

7.     An "Assault Weapon" is defined under the Ordinance to include certain specific
models of semiautomatic rifles, shotguns and pistols and duplicates thereof; and semiautomatic
firearms having certain features, including a pistol grip without an attached stock; a protruding
grip; a folding, telescoping or thumbhole stock; a barrel shroud; a muzzle brake; and a muzzle
compensator. City Code §136.001(C).

8.     A "Large Capacity Magazine" is defined under the Ordinance as an ammunition
feeding device with the capacity to accept more than ten rounds. City Code §136.001(G).

9.     Effective December 14, 2103, any person in possession of an "Assault Weapon or
Large Capacity Magazine" is required by the Ordinance to (a) "remove" it from "the limits of the
City;" (b) "modify" it to make them "permanently inoperable;" (c) "surrender" it to the Chief of
Police of his designee for "disposal;" or (d) "take the steps necessary" to cause it to fall within
one of the exemptions set forth in Section 136.006. City Code §136.020.

10.     Failure to take any of the above actions by December 14, 2013 shall constitute a
"misdemeanor, punishable by not more than six months in prison or a fine of not less than $500
and not more than $1,000, or both." City Code §136.999.

## COMMON OWNERSHP OF FIREARMS
## AND MAGAZINES BANNED UNDER THE ORDINANCE.

11.    Some of the most commonly owned firearms in the United States are among the firearms banned under the "Assault Weapons" Ordinance.    Between 1990 and 2012 approximately 4.8 million semiautomatic rifles built on the AR-style platform have been produced in the United States for commercial sale to law-abiding citizens. Additionally, approximately 3.4 million AR-style and AK-style firearms have been imported into the United States for commercial sale and civilian use.  AR-style firearms are manufactured by 37 federally-licensed firearms manufacturers in the United States, including Smith & Wesson, Colt's, Remington, Sig Sauer and Sturm, Ruger.  AR-style semiautomatic rifles are sold by nearly every federally-licensed retail seller in the United States, and more than one out of every five firearms sold today is an AR-style semiautomatic rifle.  Referred to by many as modern sporting rifles, AR-style rifles are sold today in greater numbers than traditionally-styled rifles.   Modern sporting rifles are owned by more than 4.8 million persons in the United States.

12.    The common ownership and popularity of modern sporting rifles is based on their ready adaptability for different lawful uses, including home defense, hunting and target shooting. They are also lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden stock rifles, making them easier to handle and shoot. AR-style semiautomatic rifles are also very accurate and reliable, and typically have greater ammunition capacity than more traditionally-styled rifles. Most are sold with ammunition capacities of greater than ten rounds.

13.    Most AR-style rifles and many of the other firearms banned by Defendant by model designation or type have features prohibited by the Ordinance.  None of the prohibited features make the firearm a dangerous and unusual weapon.  A "pistol grip without a stock

4

A. 4

attached" is the by-product of the raised butt-stock design of AR-style rifles, which serves to reduce muzzle flip during recoil, allowing the shooter to have better control of the firearm and achieve better accuracy. A "protruding grip that can be held by the non-trigger hand" also serves to enhance control of the firearm and improve accuracy. A "folding stock" simply makes a gun more compact for storage or transport. A "telescoping stock" permits the firearm to be adjusted to fit persons of different stature. A "thumbhole stock", which is present on many target competition firearms, merely allows for a more comfortable grip and better control of the firearm. A "barrel shroud" is present in most firearms to protect the non-trigger hand from heat build-up in the firearm's barrel. A "muzzle break" redirects muzzle gas to reduce recoil. A "muzzle compensator" also redirects muzzle gas but does so to keep the muzzle down and provide better control of the firearm for successive shots. Each of these features contributes to the accuracy and safety of the firearm for use in situations where safety and accuracy are paramount concerns, including a home defense situation.

14.     Most AR-style rifles are chambered for .223 ammunition, a relatively inexpensive cartridge that is particularly well-suited for home defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Although most pistol rounds have less muzzle velocity than a .223 round, they have greater mass, maintain velocity after passing through walls and other objects and pose substantially greater risk to unintended targets in the home. There is a consensus among those with expertise in home defense and ballistics that an AR-15 rifle chambered for .223 ammunition is an optimal firearm to rely on in a home defense encounter.

15.     A survey of more than 20,000 owners of AR-style and AK-style firearms across the country revealed that recreational target shooting was the number one ranked reason for owning a modern sporting rifle, followed closely by home defense.  A survey of firearm owners in Northern Illinois revealed that more than 50% of those surveyed owned a semiautomatic rifle with a detachable magazine for the purpose of personal protection.

16.     Encounters with criminal intruders in the home are not uncommon.  The United States Department of Justice, Bureau of Justice Statistics reported that approximately 1 million residential burglaries occur each year while a household member is present.    Household members became victims of violent crimes in 266,560 of those home invasions.  Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms defend themselves or their property.

### OWNERSHIP AND POSSESSION OF
### PROHIBITED FIREARMS AND MAGAZINES

17.     Dr. Friedman owns and keeps in Highland Park certain semiautomatic firearms and ammunition magazines that are subject to the prohibition set forth in the Ordinance, including a Smith & Wesson M & P 15 rifle,  a Springfield M1A rifle and multiple magazines capable of holding more than ten rounds of ammunition.  Dr. Friedman's Smith & Wesson M & P 15 rifle is an AR-style rifle, and has a pistol grip without a stock attached, a barrel shroud and a collapsible, telescoping stock.  Dr. Friedman's Springfield M1A rifle has a barrel shroud and a muzzle brake.

18.     Dr. Friedman keeps and maintains the firearms and ammunition magazines described above for lawful purposes, including recreational target shooting and defense of his home and family.  Plaintiff is trained on their use and stores them safely.  He keeps the Smith & Wesson M & P 15 rifle available for defense of his home and family should the need arise.

A. 6

## COUNT I – DECLARATORY JUDGMENT

19.    The allegations set forth in paragraphs 1 through 18 are re-alleged as though fully set forth herein.

20.    Ownership of firearms that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home against a criminal intruder, is a fundamental right under the Second Amendment to the United States Constitution.

21.    Defendant has infringed the fundamental Second Amendment right of Plaintiff Friedman and Plaintiff ISRA members to keep and bear arms by prohibiting his ownership and of possession of firearms in his home that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

22.    Defendant does not have a compelling governmental interest in depriving Plaintiff of his Second Amendment right to own and possess firearms that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

WHEREFORE, Plaintiffs respectfully request that City of Highland Park City Code §136.001 *et seq.* be declared unconstitutional and that judgment be entered in their favor and against the Defendant, including an award of costs.

## COUNT II – INJUNCTIVE RELIEF

23.    The allegations set forth in paragraphs 1 through 22 are re-alleged as though fully set forth herein.

24.    Plaintiffs have a clear and ascertainable right to own and possess firearms in their homes that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

25.    Plaintiffs will suffer irreparable harm if Defendant is not enjoined from enforcing City Code §136.001 *et seq.* and they are prohibited from owning and possessing firearms in their home that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

26.    Plaintiffs have no adequate remedy at law for Defendant's infringement of their fundamental right under the Second Amendment to the United States Constitution.

WHEREFORE, Plaintiffs respectfully request that an order be entered permanently enjoining the Defendant from enforcing City of Highland Park City Code §136.001 *et seq.* and that judgment be entered in their favor and against the Defendant, including an award of costs.

by: _____
One of Plaintiffs' Attorneys


James B. Vogts / ARDC 6188442
Swanson, Martin & Bell, LLP
330 N. Wabash Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com


Brett M. Henne / ARDC 6276545
Swanson, Martin & Bell, LLP
1860 West Winchester Road
Libertyville, Illinois 60048
(847) 949-0057
bhenne@smbtrials.com


Victor D. Quilici / ARDC 3123067
P.O. Box 428
River Grove, Illinois 60171
(847) 298-2566
victorq@ameritech.net

A. 8

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Verified Complaint for Declaratory and Injunctive Relief are true and correct.

DR. ARIE S. FRIEDMAN

A. 9

ORDINANCE NO. 68-13

## AN ORDINANCE AMENDING CHAPTER 134 OF "THE HIGHLAND PARK CODE OF 1968," AS AMENDED, REGARDING ASSAULT WEAPONS

**WHEREAS,** Chapter 134 of "The Highland Park Code of 1968," as amended (*"City Code"*), regulates the manufacture, sale, and possession of firearms in the City; and

**WHEREAS,** the Constitution of the United States of America and the Constitution of the State of Illinois afford certain protections related to the ownership of firearms; and

**WHEREAS,** in *District of Columbia v. Heller,* the United States Supreme Court recognized that the Constitutional protections related to firearm ownership is not unlimited, and can be subject to certain types of governmental regulations; and

**WHEREAS,** in its *Heller* decision, the United States Supreme Court specifically acknowledged that the protections afforded by the Second Amendment to the Constitution of the United States does not extend to all types of firearms; and

**WHEREAS,** many courts throughout the nation have upheld local regulations restricting or prohibiting the ownership or possession of assault weapons, including, without limitation, the State of Illinois Appellate Court, the United States District Court for the District of Columbia, and the Court of Appeals for the State of California; and

**WHEREAS,** recent incidents in Aurora, Colorado; Newtown, Connecticut; Tucson, Arizona; and Santa Monica, California demonstrate that gun violence is not limited to urban settings, but is also, tragically, a reality in many suburban and small town locations as well; and

**WHEREAS,** the City Council has determined that assault weapons are not traditionally used for self-defense in the City of Highland Park, and that such weapons pose an undue threat to public safety to residents, property owners, and visitors within the City of Highland Park; and

**WHEREAS,** the City has previously encouraged the Governor and the Illinois General Assembly to enact statewide legislation banning the sale and possession of assault weapons; and

**WHEREAS,** to date, the State has failed to enact a statewide ban on the sale or possession of assault weapons; and

**WHEREAS,** on May 31, 2013, the Illinois General Assembly approved House Bill 183, as amended, which Bill contains a provision that would preempt the home rule authority of the City to regulate the possession or ownership of assault weapons, unless the City adopts such a regulation not later than 10 days after House Bill 183 becomes law; and

**WHEREAS,** pursuant to the home rule powers of the City, and in order to protect both the home rule authority of the City and the public safety and welfare, the City Council desires to amend Chapter 134 of the City Code to prohibit the manufacture, sale, ownership, acquisition, or possession of assault weapons within the City; and

**WHEREAS,** the City Council has determined that it will serve and be in the best interest of the City and its residents to amend the City Code pursuant to this Ordinance;

**NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF HIGHLAND PARK, LAKE COUNTY, STATE OF ILLINOIS,** as follows:

**SECTION ONE:**    **RECITALS.**  The foregoing recitals are incorporated into, and made a part of, this Ordinance as the findings of the City Council.

**SECTION TWO:**    **FIREARMS CONTROL.**  Chapter 134, entitled "Handgun Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby re-titled "Firearms Control".

**SECTION THREE:   ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES.**  Chapter 134, entitled "Firearms Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby amended to add a new Section 134.010, which Section 134.010 hereafter reads as follows:

"Sec. 134.010  Assault Weapons and Large Capacity Magazines.

(A)     Whenever the following words and phrases are used, they shall, for purposes of this Section 134.010, have the meanings ascribed to them in this Section 134.010(A), except when the context otherwise indicates.

(1)     "Assault Weapon" means

(a)     A semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise and one or more of the following:

(i)     Only a pistol grip without a stock attached;

(ii)     Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii)     A folding, telescoping or thumbhole stock;

(iv)     A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

(v)     A muzzle brake or muzzle compensator;

(b)     A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of ammunition;

(c)     A semiautomatic pistol that has the capacity to accept a detachable magazine and has one or more of the following:

(i)     Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(ii)     A folding, telescoping or thumbhole stock;

(iii)     A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

(iv)     A muzzle brake or muzzle compensator; or

(v)     The capacity to accept a detachable magazine at some location outside of the pistol grip;

(d)     A semiautomatic shotgun that has one or more of the following:

(i)     Only a pistol grip without a stock attached;

(ii)     Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii)     A folding, telescoping or thumbhole stock;

A. 11

    (iv)     A fixed magazine capacity in excess of five rounds; or

    (v)     An ability to accept a detachable magazine;

    (e)     Any shotgun with a revolving cylinder;

    (f)     Conversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person;

    (g)     Shall include, but not be limited to, the assault weapons models identified as follows:

    (i)     The following rifles or copies or duplicates thereof:

    (A)     AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR;

    (B)     AR-10;

    (C)     AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR;

    (D)     AR70;

    (E)     Calico Liberty;

    (F)     Dragunov SVD Sniper Rifle or Dragunov SVU;

    (G)     Fabrique National FN/FAL, FN/LAR, or FNC;

    (H)     Hi-Point Carbine;

    (I)     HK-91, HK-93, HK-94, or HK-PSG-1;

    (J)     Kel-Tec Sub Rifle;

    (K)     Saiga;

    (L)     SAR-8, SAR-4800;

    (M)     SKS with detachable magazine;

    (N)     SLG 95;

    (O)     SLR 95 or 96;

    (P)     Steyr AUG;

    (Q)     Sturm, Ruger Mini-14;

    (R)     Tavor;

    (S)     Thompson 1927, Thompson M1, or Thompson 1927 Commando; or

    (T)     Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).

    (ii)      The following pistols or copies or duplicates thereof:

        (A)    Calico M-110;

        (B)    MAC-10, MAC-11, or MPA3;

        (C)    Olympic Arms OA;

        (D)    TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or

        (E)    Uzi.

    (iii)     The following shotguns or copies or duplicates thereof:

        (A)    Armscor 30 BG;

        (B)    SPAS 12 or LAW 12;

        (C)    Striker 12; or

        (D)    Streetsweeper.

"Assault weapon" does not include any firearm that has been made permanently inoperable, or satisfies the definition of "antique firearm," stated in Section 134.001 of this Chapter, or weapons designed for Olympic target shooting events.

    (2)    "Detachable Magazine" means any ammunition feeding device, the function of which is to deliver one or more ammunition cartridges into the firing chamber, which can be removed from the firearm without the use of any tool, including a bullet or ammunition cartridge.

    (3)    "Large Capacity Magazine" means any ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

        (a)    A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

        (b)    A 22 caliber tube ammunition feeding device.

        (c)    A tubular magazine that is contained in a lever-action firearm.

    (4)    "Muzzle Brake" means a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil.

    (5)    "Muzzle Compensator" means a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement.

    (B)    No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine. This Section 134.010(B) shall not apply to:

    (1)    The sale or transfer to, or possession by any officer, agent, or employee of the City or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state; or peace officers, to the extent that any such person named in this Section 134.010(B)(1) is otherwise authorized to acquire or possess an assault weapon and/or large capacity magazine and does so while acting within the scope of his or her duties; or

A. 13

(2)    Transportation of assault weapons or large capacity magazine if such weapons are broken down and in a nonfunctioning state and are not immediately accessible to any person.

(C)    Any assault weapon or large capacity magazine possessed, sold or transferred in violation of Section 134.010(B) of this Chapter is hereby declared to be contraband and shall be seized and destroyed of in accordance with the provisions of Section 134.010(E) of this Chapter.

(D)    Any person who, prior to the effective date of this Section 134.010, was legally in possession of an assault weapon or large capacity magazine prohibited by this Section 134.010 shall have 90 days from the effective date of this Section 134.010 to do any of the following without being subject to prosecution hereunder:

(1)    To remove the assault weapon or large capacity magazine from within the limits of the City;

(2)    To modify the assault weapon or large capacity magazine either to render it permanently inoperable or to permanently make it a device no longer defined as an assault weapon or large capacity magazine; or

(3)    To surrender the assault weapon or large capacity magazine to the Chief of Police or his or her designee for disposal as provided in Section 134.010(E) of this Chapter.

(E)    The Chief of Police shall cause to be destroyed each assault weapon or large capacity magazine surrendered or confiscated pursuant to this Section 134.010; provided, however, that no firearm or large capacity magazine shall be destroyed until such time as the Chief of Police determines that the firearm or large capacity magazine is not needed as evidence in any matter. The Chief of Police shall cause to be kept a record of the date and method of destruction of each Firearm or Large Capacity Magazine destroyed pursuant to this Chapter.

(F)    The violation of any provision of this Section 134.010 is a misdemeanor, punishable by not more than six months imprisonment or a fine of not less than $500 and not more than $1000, or both."

**SECTION FOUR: PUBLICATION.**   The City Clerk shall be, and is hereby, directed to publish this Ordinance in pamphlet form pursuant to the Statutes of the State of Illinois.

**SECTION FIVE: EFFECTIVE DATE.**   This Ordinance shall be in full force and effect from and after its passage, approval, and publication in the manner provided by law.

AYES:             Mayor Rotering, Councilman Stone, Kaufman, Frank, Blumberg, Knobel

NAYS:             Councilman Naftzger

ABSENT:           None

PASSED:           June 24, 2013

APPROVED:         June 24, 2013

PUBLISHED IN PAMPHLET FORM: June 25, 2013

ORDINANCE NO.: 68-13

ATTEST:

_Nancy R. Rotering_
Nancy R. Rotering, Mayor

_Ghida S. Neukirch_
Ghida S. Neukirch, City Clerk

#23629981_v4

5                                                                                A. 14

## DECLARATION OF NANCY ROTERING

I, Nancy Rotering, under penalty of perjury as set forth in 28 U.S.C. § 1746 declare as follows:

1.    I serve as the Mayor of the City of Highland Park, Illinois ("*City*"). I have served the City as Mayor since May 2011. Prior to being elected as Mayor, I served as a member of the City Council from May 2009 until May 2011.

2.    I have personal knowledge of the matters set forth in this Affidavit and can testify competently to such matters.

3.    I was born in the City of Cincinnati, Ohio in 1961 and have lived in Highland Park for all but 18-years of my life.

4.    As the legislative body for the City, the City Council is responsible for making policy and enacting laws that protect and preserve the public health, safety, and welfare of City residents, businesses, and visitors. Specifically, the City Council has the duty to prevent, to the greatest extent practicable, the commission of violent crimes within the City.

5.    On June 24, 2013, the City Council adopted City Ordinance No. 68-13, prohibiting the manufacture, sale and possession of assault weapons and large capacity magazines within the City ("*Ordinance*"). A true and correct copy of the Ordinance, which bears my signature, is attached to this Affidavit as Exhibit A.

6.    The City modeled its Ordinance after Cook County's assault weapon ban; with only minor non-substantive exceptions, the City's Ordinance is identical to the County's.

A. 15

7.      The City deliberately chose Cook County's ordinance as a model because it has recently survived equal protection and vagueness challenges before the Illinois Supreme Court.

8.      As set forth in the Ordinance, the City Council believes that assault weapons pose an undue threat to public safety for the residents, property owners and visitors to the City.

9.      The City Council also expressed its concern that the recent mass shooting tragedies in Aurora, Colorado, Newtown, Connecticut, Tucson, Arizona and Santa Monica, California, could occur in Highland Park, unless proper public safety measures are taken. As Mayor, and as a mother of four, I am particularly concerned about preventing a school shooting similar to the massacre at Sandy Hook Elementary School in Newtown. That is what was on my mind throughout our consideration of the Ordinance: how unlikely an assault weapon massacre was in Newtown and how similar our communities are. I could not shake the thought that we could just as easily be those panicked and grief-stricken parents. In a similar vein, I wrote a letter to the Mayor of Aurora, Colorado, in the wake of their gun-related tragedy, empathizing with the agony his community was experiencing. Lastly, the tragedy that occurred when Laurie Dann attempted to ignite an incendiary device at one of our Highland Park elementary schools, then went on a shooting rampage at another school in nearby Winnetka was also on my mind. My concern for how vulnerable our schools and schoolchildren are played into our need to pass the Ordinance.

A. 16

10.    The City Council believes that the City is not immune to gun violence, particularly gun violence involving assault weapons, and that the weapons pose a dangerous threat in the City and other suburban areas.

Nancy Rotering
Mayor
City of Highland Park

#27507543_v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | |
| the Illinois State Rifle Association | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No:    13-cv-9073 |
| v. | ) | |
| | ) | |
| CITY OF HIGHLAND PARK, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF JAMES W. SUPICA, JR.**

If sworn as a witness, I could competently testify to the following:

1.      I offer this Affidavit based on my expertise on the historical development and function of semi-automatic firearms and more specifically semi-automatic rifles.

2.      I am employed as the Director of NRA Museums.  The museums I direct and manage are the National Firearms Museum in Fairfax, Virginia and the NRA National Sporting Arms Museum in Springfield, Missouri.  The museums attract 40,000 to 45,000 visitors per month and conserve a collection of around 7,000 guns. My responsibilities include management of the museum and its collections. I have authored or co-authored numerous books relating firearms history including, *Illustrated History of Firearms; Standard Catalog of Smith & Wesson; Handguns; Shotguns; Guns*; and *Treasures of the NRA National Firearms Museum*;. I served as a contributing editor to *American Rifleman* magazine from 1996 to 2009 and the *Standard Catalog of Firearms* from 1999 to 2010.  A full description of my qualifications is set

1

A. 18

forth on my *Curriculum Vitae*, a true and correct copy of which is attached to this Affidavit as Exhibit 1.

3.    I have reviewed City of Highland Park City Code section 136.001 *et seq*.  In my opinion, the firearms that Highland Park has chosen to ban by model, type and design feature are not dangerous and unusual firearms. Many of the firearms banned under the ordinance are among the most safe and commonly owned firearms in the United States, and are widely used for a variety of lawful purposes including target shooting, hunting and personal defense.

4.    Semi-automatic firearms have been manufactured and commonly used for lawful civilian purposes for well over a century.  Their development and continued refinement over the years reflects technological advancement in firearms design and function, with the primary goals of improving reliability, accuracy, ergonomics, ease of use, operation, including reliable repeated shot placement with minimum disruption to the shooter, and safety. Almost all of the firearms banned under the Highland Park ordinance simply represent the technological evolution of the basic purpose of a firearm – to more reliably and safely perform as designed and intended by delivering rounds on an intended target.

5.    As the name indicates, semi-automatic firearms are in no way fully automatic firearms, which are commonly referred to as "machine guns."  Semi-automatic firearms use some of the energy of the fired cartridge to move a fresh cartridge into firing position.  Thus, the semi-automatic nature of these firearms is actually in reference to their self-loading capability and has nothing to do with the manner in which they are fired.  The one common feature inherent in all semi-automatic firearms is they are expressly designed to not fire automatically. Semi-automatic firearms will fire only one round when the trigger is pulled, as is the case with bolt-action, lever action, pump or slide action, single-shot firearms and revolvers.

A. 19

6.    The origin of semi-automatic firearms dates back to the late 19th century, when Ferdinand Ritter von Mannlicher and John Moses Browning developed experimental self-loading rifles in the 1880s, and some types of semi-auto firearms gained commercial acceptance before the turn of the century.  In 1903 and 1905, Winchester Repeating Arms Company introduced the first semi-automatic rifles designed specifically for the civilian market. In 1906, Remington Arms introduced the "Remington Auto-loading Repeating Rifle" for civilian sporting purposes. The rifle was renamed the Model 8 in 1911 and was widely popular and commonly owned by civilians and law enforcement agencies, who valued its semi-automatic action and relatively powerful rifle cartridges.  Other manufacturers also introduced semi-automatic rifles for civilian use in the early 20th century.

7.    Firearm development goals have largely been the same for civilian, military and law enforcement firearms from the earliest period of firearms design and construction until today – to safely, accurately and reliably discharge rounds with the greatest ease of operation possible. Improvements made in military firearms have been rapidly adopted for civilian firearms and vice versa. For example, the wood-stocked bolt-action rifle, used by hunters for generations, gained popularity following World War I, where it was the standard battlefield rifle. It represented a step forward in handling, reliability and accuracy. Soon after the U.S. military began using the semi-automatic rifle in World War II, a wide range of semi-automatic rifles gained increased popularity among civilians. Modern sporting rifles based on the AR-platform were introduced for the civilian market in the early 1960's during the time the M16 military rifle was introduced for use by the U.S. military. The AR having as its primary distinction that it was internally redesigned as a completely different gun from the M-16 to limit its performance to semi-automatic only.  Modern sporting rifles, like most of the firearms banned under the Highland

3

Park ordinance, are simply modern state-of-the-art firearms, just as their precursors once were generations ago.

8.    Any suggestion that the firearms banned under the Highland Park ordinance are all "military grade weapons" is incorrect.  First of all, descriptions of firearms as "military grade" are used for political purposes. "Military grade" is used to describe explosives; it is not a classification of a type of firearm. Nevertheless, military forces around the world since the end of World War II have primarily used selective-fire rifles as standard service rifles, not purely semi-automatic rifles.  A selective-fire rifle has the ability to fire automatically as a machinegun, meaning it continues to fire with a single pull of the trigger as long as the trigger is held back, or fires a burst of multiple rounds with each pull of the trigger, as well as semi-automatic, meaning a separate pull of the trigger is required for each shot.

9.    Historically, there is no such thing as a "semi-automatic assault weapon." Application of the "assault weapon" label to civilian semi-automatic firearms has, in my opinion, served as a political device for those seeking to restrict firearms ownership.  Public confusion over the actual function of semi-automatic firearms has been fostered for political purposes and has resulted in nonsensical prohibitions on firearms ownership based on a firearm's appearance rather than function.

10.    For example, the firearm features prohibited under the Highland Park ordinance do not have an effect on the fundamental action of a semi-automatic firearm – to discharge one round with each pull of the trigger.  The pistol grip configuration of a typical AR-style rifle is the by-product of designs that raised the butt-stock of rifles to be more in-line with the barrel in order to redirect recoil more directly into the shooter's shoulder, thereby reducing "muzzle rise" during recoil and thus improving reliability, controllability, accuracy and down range safety.  If

4

the pistol grip remained integral with the raised butt-stock, the hand holding the grip would be in unnatural position. The solution was to place the pistol grip below and separate from the butt-stock. Contrary to the politicized myth, pistol grips make it more difficult, not less difficult, to fire a rifle "from the hip." The angle of grip on a straight stock rifle does not change when the gun is lowered from the shoulder and fired where a pistol grip actually forces the arm to contort and increases recoil and lack of controllability when fired from the hip. Pistol grips also greatly enhance the ability to control and retain a firearm in a self defense situation. Folding and telescoping stocks have been in use for over a century as a means to make firearms easier to fit to the shooter, transport and store.  Most adjustable stocks on AR-style rifles shorten the stock by just a few inches and do not in any sense make the rifle "concealable."  Adjustable stocks are used to adapt the firearm to a shooter's stature, enhancing accuracy and safety, and allowing persons of smaller stature, including many women to use and control the firearm. They do not affect a semi-automatic firearm's basic function of delivering one round with each trigger pull. Thumbhole stocks are widely used by Olympic and other slow precision shooting competitors. They generally enhance accuracy, but do not have an effect on the basic function of a semi-automatic firearm.  Barrel shrouds also do not affect a firearm's basic function.  Moreover, nearly all rifles have some sort of fore end that "shrouds" or encases the barrel, fully or partially. Although a purpose of a fore end or shroud is to allow the shooter to have a secure grasp of his firearm, on an AR-style rifle it also protects the aluminum gas tube, which carries powder gasses back to work the rifle's action. Muzzle brakes and compensators simply serve to redirect recoil, causing it to press back into the shooter's shoulder or hand rather than raising the barrel.  This feature enhances practical accuracy for repeat shots, reduces danger to unintended targets and

A. 22

can be especially helpful to small-statured persons. Muzzle brakes and compensators do not affect the basic function of semi-automatic firearms.

11.    The ordinance's characterization of a magazine capable of accepting more than ten rounds as a "large capacity magazine" is, in my opinion, wholly arbitrary, disregards firearms history and the practical implications of having too little ammunition in a self-defense encounter. A firearm capable of accepting more than ten rounds is not new or unusual. Lewis and Clark took a 20-shot .46 caliber repeating air rifle with them on their journey across the continent. A 12-shot flintlock was designed around the same time. Pistols with capacities of 18 to 21 shots were available in the mid-19th Century. Lever action rifles that could fire 15 shots were used in the Civil War, and widely popular in the late 19th and early 20th Centuries, and a 34-shot rifle enjoyed success in the 1870's. The Browning P35 semi-automatic pistol with a detachable 13-round magazine was introduced in 1935 and continues to be popular today.

12.    Sufficient ammunition capacity in any type of firearm allows the shooter to focus on the core purpose of the gun, successive accurate shots rather than on reloading the firearm. This can be critically important in a self-defense encounter, and contributes to safety, in that firearms are more likely to be handled unsafely during reloading. The availability of sufficient rounds may be especially important to a person who owns a firearm for self-defense but does not practice regularly and does not practice reloading.

13.    In summary, the Highland Park "Assault Weapons" ordinance, in my opinion, bans a category of commonly owned firearms, which are not dangerous and unusual from either a historical or functional perspective.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 13, 2014.

A. 23

James W. Supica, Jr.

A. 24

# Exhibit A

# James W. Supica, Jr.  (Jim)
**Curriculum Vitae**


## EMPLOYMENT

**NATIONAL RIFLE ASSOCIATION OF AMERICA (NRA)**
**Director of NRA Museums**, 2008 to present.
Title changed from Director of National Firearms Museum and Gun Collector Programs in 2013.

Direction and management of the NRA National Firearms Museum in Fairfax VA, which is recognized as one of the leading firearms museums in the world.  The Museum attracts around 50,000 visitors annually and conserves a collection of approximately 7,000 guns.

Direction, installation and thematic design of the NRA National Sporting Arms Museum, in Springfield MO, opened August 2013, with a projected annual visitation of around 400,000.

Direction and management of the NRA Museum's media outreach which includes regular and special guest participation in various educational television programs, magazine articles, and book publication.  Electronic media outreach includes the NRAmuseum.com website which tallies over 2.6 million page views per year and ranks #1 on Google for both "Gun Museum" and "Firearms Museum," NFMcurator YouTube channel with over six million views of over 340 videos, and the Museum's Facebook page with an annual total of daily reaches of over 6 million.


**Old Town Station, Ltd.**
**Owner and President, national level antique and collectable firearms retailer,** 1992 to 2008

As a federally licensed firearms dealer, sold antique and collectable firearms via mail order catalog, website and live auctions. Wrote and published 54 issues of Old Town Station Dispatch, which combined photo illustrated listings of old firearms for sale with historical gun information and tips for collectors.  Developed and managed ArmchairGunShow.com website, which combined firearms information with listing of collectable firearms for sale.  When the website was sold in 2008, Google rankings were:  #1 for Gun Collector, Old Firearms, Antique Pistol; #2 for Gun Values, Old Guns, Historic Firearms;  #3 for Collectable Guns, Collectable Firearms;  #4 for Antique Firearms;  #14 for Gun Info;  #17 for Gun Safety;  and #26 for Guns.


**Kull & Supica Firearms Auction**
**Principal and auctioneer for national level firearms specialty auction house**, 2001 to 2008.

Conducted national level cataloged firearms auctions.  Produced the catalogs including firearms research and description, worked as co-auctioneer, and developed and managed the Armsbid.com website, which Google regularly ranked #1 on the internet for "Live gun auction" and "Live firearms auction."


**United Construction Co., Inc.**
**Vice President and Counsel for heavy and highway construction company,** 1980 to 1992.


**Headquarters, Inc.**
**Director of Crisis Center,** 1975 to 1977.

Managed United Way service agency providing 24/7 telephone hotline, walk-in, and outreach crisis intervention and suicide prevention services, along with drug abuse programs.

1

## EDUCATION

University of Kansas School of Law, Juris Doctorate, 1980
University of Kanas, B.A. Psychology, 1977

## PUBLICATIONS

### Books

- Treasures of the NRA National Firearms Museum by Jim Supica, Doug Wicklund and Philip Schreier, 2013, Chartwell Books, Inc.
- Illustrated History of Firearms by Jim Supica, Doug Wicklund and Philip Schreier, 2011, Chartwell Books, Inc.
- Standard Catalog of Smith & Wesson by Jim Supica and Richard Nahas; 1997, 2001, and 2006. Gun Digest Books.
- Handguns by Jim Supica, 2010, Thunder Bay Press
- Rifles by Jim Supica and Doug Wicklund, 2010, Thunder Bay Press
- Shotguns by Jim Supica and Philip Schreier, 2010, Thunder Bay Press
- Guns introduction by Jim Supica, 2005, TAJ Books, Ltd.
- NRA Museums Firearms of the Old West, publication scheduled for 2014
- NRA National Sporting Arms Museum – Hunting, Conservation, and Freedom, publication scheduled for 2014

### Columns

- "I Have This Old Gun," American Rifleman – monthly column, in rotation with other writers, 2005 to 2008
- "Ask the Gun Guy," Shotgun News – monthly column, 2000 to 2008

### Contributing Editor

- American Rifleman, 1996 to 2009
- Standard Catalog of Firearms, 9th through 20th Editions, 1999 through 2010.

### Articles and Chapters

- "Cuban New Model Number Threes," Smith & Wesson Journal, 1991
- "Three Lives of a Schofield," CADA Gun Journal, 1992
- "Quincy 1992," Smith & Wesson Journal, 1992
- "Antique or Not Antique," CADA Gun Journal, Dec. 1993
- "SWCA 1993 Annual Meeting," Smith & Wesson Journal, 1993
- "Condition Condition Condition Baloney!," CADA Gun Journal, Jan. 1994
- "The Brady Crunch," CADA Gun Journal, Jan, 1994
- "Insights with Jim Supica," CADA Gun Journal, March 1994
- "In my Experience – Affordable Collectables," American Rifleman, Feb. 1994

2

- "Baby Hammerless Revolvers," <u>Man at Arms</u>, Jan/Feb. 1994
- "Living with Brady," <u>Blue Book of Gun Values, 15th Ed.</u> 1994
- "A Brady Retrospective," <u>CADA Gun Journal</u>, Nov. 2005
- "Pieces of History – A Proposed Rating System for Historically Attributed Firearms," <u>Blue Book of Gun Values, 16th & 17th Ed's.</u>, 1995 & 1996
- "Collecting S&W," with Richard Nahas, <u>American Rifleman</u>, 1996
- "Guns on the Auction Block," <u>Blue Book of Gun Values, 18th Ed.</u>, 1997
- "Firearms Engraving," <u>Insights</u>, March 1998
- "Fake!" <u>Blue Book of Gun Values, 19th Ed.</u>, 1998
- "The Last Twenty Years in Gun Collecting," <u>Blue Book of Gun Values, 20th Ed.</u>, 1999
- Preface, <u>History of Smith & Wesson Firearms</u> by Dean Boors, 2002
- "Is a Collectors License for You?," <u>2002 through 2005 Standard Catalog of Firearms</u>
- "The State of Collecting," <u>2004 Standard Catalog of Firearms</u>
- "Collecting S&W Model 3 Revolvers," <u>2005 Standard Catalog of Firearms</u>
- "Gun Auction Buying Tips," <u>2006 Standard Catalog of Firearms</u>
- "How to Ship Guns and Ammo," <u>2006 Standard Catalog of Firearms</u>
- Foreword, <u>Smith & Wesson American Model</u> by Charles Pate, 2006
- "100 Years of the M1911," <u>American Rifleman</u>, Nov. 2011
- "National Firearms Museum," <u>Blue Book of Gun Values, 32nd Ed.</u>, 2012
- "Your NRA National Firearms Museum," <u>The Texas Gun Collector</u>, Fall 2012
- "NRA National Sporting Arms Museum," <u>Soldier of Fortune</u>, Feb. 2014
- "When old attitudes shoot down new innovations in U.S. weaponry," <u>Washington Times</u>, Feb. 28, 2014

**Acknowledged Contributor**
- <u>Blue Book of Gun Values</u> by S.P. Fjestad, annual editions, 1992 through present.
- <u>Flayderman's Guide to Antique American Firearms and their Values</u> by Norm Flayderman, 6th, 7th, 8th, & 9th Editions; 1994 through 2007.
- <u>Complete Guide to United States Military Combat Shotguns</u> by Bruce N. Canfield, 2007
- <u>S&W Sixguns of the Old West</u> by David Chicoine, 2004
- <u>Old Guns and Whispering Ghosts</u> by Jesse Wolf Hardin, 2006
- <u>331 Tips and Tricks – a How-to Guide for the Gun Collector</u> by Stuart C. Mowbray, 2006.

**Recorded media**
- Featured lecturer, American Gunsmithing Institute Certified Firearms Appraiser Course, CD & DVD, 2012.

**Publisher and writer**
- <u>Old Town Station Dispatch</u>, issues #1 through 54, 1991-2008.

A. 28

## TELEVISION

**Co-Host**:

- "NRA's Gun Gurus," Outdoors Channel, 2014 season.
- "Guns and Gold," Sportsman Channel, 2012 & 2013 seasons.

**Regular guest expert:**

- "Gun Stories," Outdoors Channel, 2011, 2012 & 2013
- "American Rifleman Television," "I have this old gun" segment, Outdoors Channel, 2006 to present
- "NRA News," "Curator's Corner" segment, Sportsman Channel, 2013.  Same segment on Cam & Co. webcast and Sirius radio, 2008 to present
- "Cowboys," Outdoors Channel, 2009

**Single episode appearances:**

- "After Newtown – Guns in America," PBS, 2013
- "Triggers," The Military Channel, 2013
- "101 Weapons that Changed the World," the History Channel, 2013
- "American Artifacts," CSPAN3, two episodes, March 9 & 16, 2014
- Network affiliate broadcast programs in Washington DC, Kansas City, Tulsa, Tucson, Springfield MO and others.
- "Mysteries at the Museum," Travel Channel, scheduled for 2014
- "Hunt for History – Guns that Shaped America," History Channel, scheduled for 2014

## OTHER FIREARMS RELATED ACTIVITIES

**Training**

- NRA Certified Instructor – "Pistol" and "Personal Protection in the Home," 2004-present.
- Kansas Concealed Carry Instructor, 2007-2010.
- Defensive shooting training:  Chapman Academy (Ray Chapman), Lethal Force Institute (Masad Ayoob), Jim Cirillo.
- Reserve Police Officer, Shawnee KS, early 1980's.

**Gun show participation** – Attended half a dozen to a dozen or more gun shows every year for the past 25 years, usually as an exhibitor, and prior to 2008 as a commercial dealer.  Educational exhibits have won numerous awards.

- First person to be awarded both of the highest educational awards offered by NRA, the Gun Collectors Committee Trophy (1996), and the Andrew E. Mowbray Educational Trophy (1997).
- S&W Collectors Association Calhoun Norton Award
- Missouri Valley Arms Collectors Association Best of Show (1992)
- Texas Gun Collectors Association First Place (1993)
- Indian Territory Gun Collectors Association First Place.

4

A. 29

**Guest speaker** – Guest speaker on firearms and gun collecting topics for numerous events and groups since the early 1990's, including:

- NRA National Gun Collector Leadership Seminars
- NRA National Gun Show & Conference
- Smith & Wesson Collectors Association Annual Meeting
- Dallas Arms Collectors Association Meeting
- Texas Gun Collectors Association Annual Banquets
- Ohio Gun Collectors Association Annual Banquets
- Missouri Valley Arms Collectors Association Meetings

## MEMBERSHIPS

National Rifle Association of America – Board of Directors, 2001-2008.
- Vice Chairman Gun Collector Committee, 2007-2008
- Chairman, Publications Policy Committee, 2008
- Benefactor Member.
S&W Collectors Association – President 2003-2005.  Board of Directors. Life Member.
Missouri Valley Gun Collector Association – President 1993 & 1995.  First Honorary Life Member.
Colt Collectors Association – Board of Directors, 2001-2003
American Society of Arms Collectors – Member
Kansas State Rifle Association -- Life Member
Single Action Shooting Society – Life Member
National Congress of Old West Shooters -- Life Member

**Other gun collecting memberships, current or past** – Smith and Wesson Historical Foundation, Buffalo Bill Historic Center, Ohio Gun Collectors Assoc., Colorado Gun Collectors Association, Winchester Collectors Association, Remington Society, Texas Gun Collectors Association, Indian Territory Gun Collectors Association, Remington Society, Parker Gun Collectors Association.

**Professional and other memberships, current or past** – American Alliance of Museums, Collector Arms Dealers Association, American Auctioneer Association, Kansas Auctioneer Association, Kansas Bar Association, American Bar Association, Kansas Chamber of Commerce and Industry (Board of Directors), Mensa, International Society for Philosophical Inquiry.

A. 30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | | |
|---|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | | |
| the Illinois State Rifle Association | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | No: | 13-cv-9073 |
| v. | ) | | |
| | ) | | |
| CITY OF HIGHLAND PARK, | ) | | |
| | ) | | |
| Defendant. | ) | | |

### AFFIDAVIT OF DAVID A. LOMBARDO

If sworn as a witness, I could competently testify to the following:

1.      I offer this Affidavit based on my expertise and experience in firearms training, safety and use.

2.      I am the founder and President of Safer USA, an organization dedicated to providing knowledge and training on the safe and responsible use of firearms for self-defense and recreation by law-abiding citizens.  I am also an Illinois Certified Firearms Instructor, an NRA Law Enforcement Instructor and an NRA Training Counselor on pistols, rifles, shotguns, home firearms safety, personal protection in the home and personal protection outside the home. I also serve as the Executive Director of the Clyde Howell NRA Youth Shooting Sports Camp and the President of the Aurora Sportsmen's Club.  I have personally taught firearms safety and firearms use to both experienced and novice shooters and have interacted with the gun owning public in a variety of ways for 25 years.  I am qualified to testify on the types of firearms that are commonly and appropriately owned for lawful purposes, including home defense, hunting and

1

A. 31

recreational shooting. My qualifications are further described in my resume, attached to this Affidavit as Exhibit A.

3.      I have reviewed City of Highland Park City Code section 136.001 *et seq*. Many of the firearms banned under the ordinance are commonly owned by residents of Illinois and elsewhere for lawful purposes, including home defense, hunting and recreational target shooting. For example, one of the most popular and commonly owned firearms today are rifles built on an AR-platform. The popularity of these rifles is based, in part, on their modular in design. They have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly and onto which the butt stock and lower grip are mounted. The two receivers can be disconnected easily, allowing the shooter to mount a different upper receiver and barrel and thus use a wide variety of rifle cartridges and change the length and weight of the barrel to suit the shooter's needs. Because of its adaptability, a single AR-type rifle can be used for target matches, home defense, and small and large game hunting.

4.      The popularity of AR-platform rifles is based not only on their ready adaptability for different uses. They are also generally lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden stock semi-automatic rifles, making them easier to handle and shoot. They are also very accurate and reliable. Most AR-type rifles are chambered for .223 ammunition, a relatively inexpensive rifle cartridge that is particularly well-suited for home defense purposes. Although the .223 round has sufficient stopping power in the event a home intruder is encountered, the round loses velocity relatively quickly after passing through walls and other objects, thus decreasing the chance that errant shot inadvertently strikes an unintended target in a home defense situation. Although the right home defense firearm is the firearm with which an individual homeowner has most familiarity, AR-type rifles are an excellent and

commonly made choice, and I instruct my students on their virtues and recommend their use for personal defense.

5.  My opinion that many of the firearms banned under the ordinance are commonly owned by law-abiding citizens in Illinois and elsewhere is based, in part, on my extensive interaction with firearms owners. Since 2006, Safer USA has trained almost 6,000 persons to select and safely use firearms. I am also the President of the Aurora Sportsmen's Club, which currently has more than 1,500 members. I regularly observe members on the range and the firearms they use, and modern sporting rifles, including AR-type rifles, have been the most commonly used rifles on the range over the past five to ten years. I also regularly attend firearms industry trade shows where products are displayed and have observed that the civilian marketplace for modern sporting rifles are without question the fastest growing firearms market.

6.  The essential characteristic of the AR-type rifles banned under the ordinance is that they have gas operated semi-automatic actions. Rifles falling into this category of firearms are sold with magazines having a variety of capacities – typically 5, 10, 20 or 30 rounds - and many are sold without "large capacity magazines." For example, models of the Smith & Wesson M & P 10 (an AR-type rifle) are sold with 5 and 10 round magazines. (*See* Exhibit B, Smith & Wesson 2014 Product Catalog, p. 16). The Remington Model R-15 Predator and Varmint (AR-type rifles) are sold with 5 round magazines. (*See* Exhibit C, Remington 2104 Shot Show Featured Products, pp. 17 & 44). The Bushmaster Hunter, Predator and Varminter rifles (AR-type rifles) are each sold with 5 round magazines. (*See* Exhibit D, Bushmaster Firearms Product Catalog 2104, p. 28 - 31). Other examples of AR-type rifles sold with magazines with capacities of 10 rounds or less can be referenced. But the point is that the common characteristic of the

semi-automatic rifles banned in Highland Park is decidedly not their large capacity magazines but their semi-automatic actions.

7.      I have personally surveyed 779 students in the firearm classes I taught in 2013 through May 5, 2014 to determine what type of firearm they choose to keep in their homes for self-defense purposes.  Most of the persons I surveyed were enrolled in Safer USA's Home Protection and Concealed Carry Seminar and the NRA Basic Pistol class. Of those I surveyed, 58.2% keep a semi-automatic rifle with a detachable magazine available in the event it was needed defend them, their family of their property. If the person completing the survey did not choose to keep a firearm available for personal defense in his or her home, they had the option to answer "none of the above." Of those surveyed, 25% provided that answer.

8.      AR-type rifles are also appropriately and commonly used for small game hunting for many of the same reasons - they are accurate, reliable and easy to handle. In Illinois, it is legal to use "any type of legal rifle including large capacity semi-automatic rifles" to hunt coyotes. (www.dnr.illinois.gov/hunting/documents/hunttrapdigest.pdf). In many other states, they are used for hunting varmints and small game of various kinds, as well as wild boar. These rifles are also used in the very popular "3 Gun" shooting competitions, the fastest growing shooting sport in the country, in which shooters use a pistol, a shotgun and an AR-type rifle to move through different stages and engage different targets from a variety of positions.

9.      The firearm design features that Highland Park has chosen to ban, including pistol grips; protruding grips; folding, telescoping and thumbhole stocks; so-called "barrel shrouds;" and muzzle breaks and muzzle compensators,  are typically integral to safe handling of the firearm and enable the shooter to accurately and reliably use his gun. The presence on a firearm

4

of one or more of the features that Highland Park has chosen to ban and criminalize do not make the firearm any more lethal or dangerous if it is misused than a firearm without them.

10.    A "telescoping stock" allows the operator to adjust the stock's length to fit his or her physical stature and "length of pull." If the stock is too short, a right handed shooter will tend to pull shots to the right. If the stock is too long, shots will tend to go low and to the left. Thus, the purpose of an adjustable stock on a modern sporting rifle is to assist in the safe and accurate handling of the firearm. It is worth noting that the typical difference between a fully extended adjustable stock and one that is fully collapsed is only a few inches. For example, the telescoping stock on the Smith & Wesson M&P 15 rifle can change the overall length of the rifle just three inches – from 32 inches to 35 inches. (*See* Exhibit B, p. 20). This change in overall length does not in any sense turn a firearm that is difficult to carry in a concealed manner into a "concealable" firearm.

11.    A "barrel shroud" under the Highland Park ordinance "partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand." This feature is present on nearly every type of rifle, whether semi-automatic, lever action, bolt-action or single shot. They serve as a place for the operator to support the firearm with the non-trigger hand for control and accuracy. They also serve to protect the operator's hand from barrel heat build-up. Barrel shrouds on AR-type rifles typically encircle the entire barrel (unlike forestocks on traditionally styled rifles that serve as a bed for the barrel) and also serve as the place to include a rail system on which accessories can be mounted, such as a telescopic sight, an optical sight or a flashlight.

12.     A "protruding grip" forward of the trigger guard is sometimes present on AR-type rifles. They permit the operator to have a more secure grip on the firearm, particularly rifles with rail-mounted mounted accessories that the make the barrel shroud more difficult to grasp firmly.

13.     A "pistol grip" for the trigger hand is necessary on an AR-type rifle because the rifle's straight-line design does not permit the grip to be integral to the stock, as it is on traditionally-styled rifles. The straight-line design is an important feature of AR-type rifles because it serves to reduce muzzle rise associated with recoil. Some have wrongly suggested that the pistol grip makes it easier to fire an AR-type rifle "from the hip." However, virtually any firearm can be fired from the hip with or without a pistol grip. More importantly, nobody who is serious about hitting a target would choose to shoot from the hip. It is a grossly inaccurate way to aim and shoot a firearm.

14.     Both "muzzle brakes" and "muzzle compensators" serve to re-channel the gases expelled from the muzzle of a firearm. A muzzle brake will reduce the amount of recoil felt by the operator. A muzzle compensator will redirect muzzle gases and keep the muzzle down for better acquisition of a target in the event a second shot is taken.  Muzzle brakes and compensators are found on a wide variety of firearms.

15.     Attached to this Affidavit as Exhibit E is video in which I provide demonstrative support for the opinions I have in this case. The video demonstrates, among other things, live firing of firearms both banned and not banned under the Highland Park ordinance and visual explanations of the prohibited firearm features.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 17, 2014.

David A. Lombardo

6

A. 36