# Exhibit C

Section C                                                          HSCEMS-12-R-00011

## PART 1 – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

### 1.0 SCOPE

The scope of this contract is to provide a total of up to 7,000 5.56x45mm North Atlantic Treaty Organization (NATO) personal defense weapons (PDW) throughout the life of this contract to numerous Department of Homeland Security components. This Statement of Work delineates performance criteria and testing to be used for the evaluation of the firearm.

### 2.0 APPLICABLE DOCUMENTS

2.1   Underline General. This Statement of Work lists all performance requirements for the acquisition of a DHS 5.56x45mm NATO personal defense weapon.

2.2   Government Documents. The following documents form a part of this document to the extent specified herein:

**MIL-STD-810G:** Department of Defense Test Method Standard for Environmental Engineering Considerations and Laboratory Tests

**MIL-STD-1913:** Dimensioning of Accessory Mounting Rail for Small Arms Weapons

2.3   Non-Government publications. The following documents form a part of this document to the extent specified herein:

**ANSI/SAAMI Z299.4-1992: Voluntary Industry Performance Standards for Pressure & Velocity of Centerfire Rifle Sporting Ammunition for the Use of Commercial Manufacturers**
Sporting Arms and Ammunition Manufacturer's Institute (SAAMI)
555 Danbury Road
Wilton, CT 06897

**ANSI/ASQ Z1.4-2008: Sampling Procedures and Tables for Inspection by Attributes**
American Society for Quality
600 North Plankinton Avenue
Milwaukee, Wisconsin 53203

**ISO 9001:2008, Quality Management Systems Requirements**
International Organization for Standardization
1, rue de Varembe, Case postale 56
CH-1211 Geneva 20, Switzerland

(Non-Governmental standards and other publications arc normally available from the organizations that prepare or distribute the documents. These documents may also be available in or through libraries, Internet search, or other informational services).

2.4   Order of Precedence. In the event of a conflict between the text of this Statement of Work and the references cited herein, this solicitation/contract takes precedence.



EXHIBIT
C

A. 146

Section C                                                    HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

### 3.0 REQUIREMENTS AND TESTING STANDARDS

3.1 <u>General.</u> DHS and its components have a requirement for a 5.56x45mm NATO, select-fire firearm suitable for personal defense use in close quarters and/or when maximum concealment is required. Only one specific nomenclature firearm from each Contractor shall be submitted for solicitation testing and considered for contract award.

3.2 <u>Testing.</u> The specifications that are subject to testing under this contract are set forth in Table I, Requirements Verification Test Matrix on page 4. The National Firearms and Tactical Training Unit (NFTTU) will conduct all testing; however, NFTTU reserves the right to use an outside laboratory to conduct performance verification if it deems necessary.

The awardee or awardees of the subject contract agrees to allow DHS to release testing data of their firearm samples to Federal agencies, Military, and law enforcement. Release of this data will be on a case-by-case basis and will only be forwarded after receipt of a request on official agency or department letterhead. Requests to DHS will state that the "Information is requested for official use only and will not be disseminated outside the requesting agency (i.e. Federal agencies, etc.) or department.

3.2.1 <u>Solicitation Test.</u> The solicitation testing will verify that initial firearm samples supplied by each competing Contractor meet the minimum requirements of this SOW. Contractor's samples will then be rated on their ability to surpass all performance parameters in Table I, Requirements Verification Test Matrix, on page 4. Those performance characteristics listed under Basic Compliance criteria shall be certified by the Contractor, and/or evaluated by Non-Destructive Inspection (NDI) conducted by the NFTTU. Major performance characteristics are requirements that will be ascertained by functional testing of the firearms. Testing may be halted for any sample (and the associated samples rejected) if a firearm fails any Basic Compliance or Major requirement (as determined by NFTTU). Testing will be halted for any sample (and the associated samples rejected) if a firearm from that Contractor exhibits hazardous and/or unsafe attributes (as determined by NFTTU). All solicitation samples from awardee of the subject contract will become property of DHS/ICE NFTTU upon receipt and will not be returned. Samples from the unsuccessful offerors will be returned.

3.2.2 <u>First Article Test (FAT).</u> The specifications annotated for FAT in Table I will be verified for First Article samples received under the contract. All FAT samples must meet the requirements set forth in this solicitation and exhibit performance that is comparable to what was demonstrated during solicitation testing for all requirements during FAT. The Government reserves the right to decrease the amount of testing it performs under the FAT regime. All samples submitted pursuant to FAT will become property of DHS/ICE NFTTU upon receipt and will not be returned. The Government may invoke its right to demand the Contractor conduct a FAT for the following conditions:

    a. First twelve production samples after solicitation.

    b. Design change of the firearm or components.

    c. Design change of manufacturer's production process and/or equipment.

    d. Relocation of manufacturer's production facility.

    e. Major firearm quality defects, recalls, and/or any other substandard performance issues.

Section C                                                                 HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

f. Manufacturer changes supplier of critical components (barrel, receiver, internal mechanism parts that affect firing).

g. A production lapse of six months or more.

The Government will be responsible for conducting a FAT if it is invoked for condition "a". The Contractor will be responsible (under Government supervision) for conducting the FAT for all other conditions and will be responsible for all associated expenses to include testing, shipping costs, administrative/processing costs, and any other expenses associated with FAT and/or firearm quality issues.

3.2.3    Limited Technical Inspection (LTI). The specifications annotated for LTI in Table I will be verified for each production sample received during the duration of the contract. All contract production samples must meet the requirements set forth in this solicitation and exhibit performance that is comparable to what was exhibited during solicitation testing for all requirements during LTI. The Government reserves the right to increase the amount of testing it performs under the LTI regime up to the full amount of testing set forth in the "Solicitation" column. The Government also reserves the right to decrease the amount of testing it performs under the LTI regime. Firearms will be inspected in their entirety for general compliance.

3.2.4    Retest FAT. Any retest of FAT requested by the Contractor will be at the Contractor's expense. ICE reserves the right to send representatives to observe the retest if testing is performed at the Contractor's location.

C-3

Section C                                                                    HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK
### Table I:  Requirements Verification Test Matrix

| | Performance Characteristic | Requirement Paragraph | Test Method | Solicitation | FAT | LTI |
|---|---|---|---|---|---|---|
| | Quality System | 3.3 | 4.2 | X | X | |
| | Sample Size | 3.5 | 4.3 | X | X | |
| | Documentation | 3.6 | 4.4 | X | X | |
| | Supplemental Items | 3.7 | 4.5 | X | X | |
| | Action/Mechanism | 3.9 | 4.6 | X | X | X |
| | Fire Control Selector | 3.10 | 4.7 | X | X | X |
| | Trigger | 3.11 | 4.8 | X | X | |
| | Overall Length | 3.12 | 4.9 | X | X | |
| Basic Compliance | Weight | 3.13 | 4.10 | X | X | |
| | Barrel | 3.14 | 4.11 | X | X | |
| | Caliber | 3.15 | 4.12 | X | X | X |
| | Pistol Grip | 3.16 | 4.13 | X | X | X |
| | Buttstock | 3.17 | 4.14 | X | X | X |
| | Forend | 3.18 | 4.15 | X | X | X |
| | Sling Attachments | 3.19 | 4.16 | X | X | X |
| | Finish | 3.20 | 4.17 | X | X | X |
| | Magazine | 3.21 | 4.18 | X | X | X |
| | Sights | 3.22 | 4.19 | X | X | X |
| | Reliability | 3.24 | 4.20 | X | X | |
| | Durability | 3.25 | 4.21 | X | X | |
| | High Temperature | 3.26 | 4.22 | X | X | |
| | Low Temperature | 3.27 | 4.23 | X | X | |
| Major | Salt Water Immersion | 3.28 | 4.24 | X | X | |
| | Sand & Dust | 3.29 | 4.25 | X | X | |
| | Parts Interchange | 3.30 | 4.26 | X | X | |
| | Drop Test | 3.31 | 4.27 | X | X | |
| | Accuracy | 3.32 | 4.28 | X | X | |

3.3   Quality Management System (QMS).  The manufacturer shall have a QMS in place that enables the organization to identify, measure, control and improve key manufacturing processes.

    3.3.1 Quality Control (QC)/Quality Assurance (QA).  The Contractor shall provide a current QC/QA process synopsis including examples of their quality plans for the manufacturing of DHS firearms with their solicitation sample.  Submission of a complete copy of the manufacturer's Quality Manual or a copy of the manufacturer's  ISO certification would fulfill this requirement.

3.4   Warranty.

    3.4.1 The Contractor shall warrant the firearm for at least one (1) year from the date of delivery of the firearm to the Government.  The manufacturer shall repair or replace firearms due to defects in material or workmanship.

    3.4.2 During the period of the warranty, the Government will ship defective item (s) back to the manufacturer's facility for repair or replacement.  The Contractor shall be responsible for all return shipping charges.

3.5   Sample Size.

    3.5.1 Solicitation Test.  The sample size for the solicitation submittal shall be twelve (12) firearms and ten (10) magazines per firearm.

Section C                                                     HSCEMS-12-R-00011

PART I – THE SCHEDULE
SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

3.5.2 First Article Test (FAT). The sample size for the FAT submittal shall be twelve (12) firearms and ten (10) magazines per firearm.

NOTE: Samples shall be delivered to: NFTTU, 320 East Chestnut Avenue, Altoona, Pennsylvania 16601.

3.6   Documentation. The following documentation shall be supplied with each firearm model submitted for solicitation (unless otherwise noted):
- Technical proposal containing the following (supplied with solicitation only):
  - Company profile for the Contractor
  - Description of manufacturing facilities and capabilities of the manufacturer
  - Description of proposed firearm (product data sheet)
- Operators/User's Manual (one per firearm)
- Technical Package
  - Parts list detailing all firearms components nomenclature
  - An exploded view drawing detailing the assembly of the firearm parts.
  - Engineering drawing package for all firearm components. The drawing package of awardee of the subject contract will be retained by the Government for source control through the contract period of performance and returned to the Contractor at the conclusion of the contract. Drawings submitted by unsuccessful offerors will be returned with the solicitation firearm samples. All engineering drawing package material will be treated as confidential and proprietary items. Drawing package shall be submitted as an electronic copy on disc.
- Maintenance procedures detailing a preventative maintenance regiment for replacement or adjustment of parts and recommended solvents and lubricants. This will be the basis for the Contractor to determine the quantity of spare parts to supply with the firearm samples and will be adhered to during solicitation reliability/durability function fire testing.
- Armorer's Overhaul/Rebuild Manual (supplied with FAT only). Six printed copies and one electronic copy on disc shall be provided. The manual shall detail all procedures and gaging requirements necessary for overhaul/repair of the firearm.
- Copy of manufacturer's QC/QA process synopsis, Quality Manual, or ISO certificate as detailed in Section 3.3.1.
- Certificate of Conformance (C of C) stating that the firearm samples meet all Statement of Work Basic Compliance requirements.
- Certificate of Conformance (C of C) stating that the Contractor has function fired a minimum of 7,500 rounds of 5.56mm through a PDW sample with no Class 4 malfunctions (see Table II). The Contractor's test firearm shall be the same model as the solicitation sample submission.
- Repair Parts Price List as detailed in Section 3.23.

NOTE: All Certificate of Conformance (C of C) shall be signed by a designated company official authorized to bind the company.

NOTE: All solicitation sample packaging and documentation sent with the samples shall clearly be identified with the Contractor's name and solicitation number.

C-5

A. 150

Section C                                                                    HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

3.7  Supplemental Items. The following items shall be supplied with each firearm model submitted for solicitation and FAT testing:

- All potential spare parts (excluding trigger assembly, barrel, bolt, bolt carrier assembly, and receiver) needed to support reliability/durability testing outlined in Sections 3.23/3.24. The quantity of spare parts supplied by the Contractor should be based on the Contractor's recommended maintenance intervals for a 7,500 round test.

- Two (2) sets of special tools, if needed, for complete disassemble/reassemble of the firearm.

3.8  Training. The Contractor shall provide armorer training within thirty days of contract award. Training shall be provided to no less than twelve (12) designated armorers, on-site at the NFTTU Altoona, PA location. Training duration shall be up to five (5) days in length and will cover all aspects of maintenance, repair, and overhaul/rebuild of the firearm. Training will include firearm design, operation, assembly/disassembly, maintenance, malfunctions, and gaging. The Contractor shall provide two (2) cut-away models of the firearm at the time of on-site training and these will become the property of the NFTTU.

3.9  Action/Mechanism.

3.9.1.  The firearm shall be able to be operated by a left or right-handed user without permanent modification.

3.9.2  The action shall be select-fire (capable of semi-automatic and automatic fire).

3.9.3  The action shall fire from a closed bolt.

3.9.4  The action shall be gas operated.

3.9.5  The action shall have a bolt catch that automatically locks the bolt to the rear upon firing the last round in the magazine. The operator shall be able to manually use the bolt catch to lock the bolt to the rear with the magazine removed from the firearm. When the bolt catch is depressed the bolt shall return to battery position.

3.9.6  The magazine catch shall securely retain the magazine in the magazine well. The magazine release shall be spring loaded and be designed to prevent inadvertent activation. The magazine release, when depressed, shall disengage the magazine catch and permit the magazine to fall free from the magazine well.

3.9.7  The action shall possess a firing pin designed to prevent accidental discharges if the firearm is dropped.

3.9.8  The firearm shall be designed in such a way that the operator can clear a malfunction using immediate action without the use of special tools.

3.9.9  The firearm shall be able to be safely operated by a shooter wearing gloves.

3.9.10  The action shall be capable of accepting all standard NATO STANAG 20 and 30 round M16 magazines (NSN 1005-00-921-5004) and Magpul 30 round PMAG (NSN 1005-01-576-5159). The magazine well shall be designed to allow easy insertion of a magazine.

3.9.11  The receiver top shall be equipped with an integral MIL-STD-1913 Picatinny rail for mounting sights and other accessories.

3.9.12  The firearm shall be capable of being field stripped without the use of special tools.

Section C                                                         HSCEMS-12-R-00011

PART I – THE SCHEDULE
SECTION C -- DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

3.9.13 The firearm shall be designed so that components cannot be readily assembled incorrectly or in reverse, thus rendering the firearm inoperable.

3.10 Fire Control Selector.

3.10.1 The fire control selector shall have three positions; safe, semi-automatic, and automatic. The selector shall have positions which are clearly labeled for the mode of fire.

3.10.2 The selector shall operate manually without binding from one position to another when the hammer is cocked.

3.10.3 The selector shall remain in place in each position under spring detent.

3.10.4 The selector shall be capable of being checked for position both visually and by feel.

3.10.5 The selector shall be movable between the mode of fire positions by the operator without moving the firing hand from the shooting position.

3.10.6 The selector shall be designed to allow for operation by left and right handed shooters with no parts changes or modification.

3.11 Trigger

3.11.1 The trigger shall return to its normal forward position under spring action after partial or complete trigger pull.

3.11.2 The trigger pull shall not be less than 5.5 pounds and not exceed 9.5 pounds.

3.12 Overall Length.

3.12.1 The overall length of the firearm shall not exceed 30 inches with the stock fully extended.

3.12.2 The overall length of the firearm shall not exceed 20 inches with the stock fully retracted and/or folded.

3.13 Weight. The unloaded weight of the firearm (without magazine) shall not exceed 7 pounds.

3.14 Barrel.

3.14.1 The barrel shall have a rifling twist rate of 1 in 7 inches.

3.14.2 The barrel bore and chamber shall have a corrosion resistant and wear resistant coating or treatment that is equal to or better than chrome plating.

3.14.3 The barrel shall be equipped with a flash suppressor and/or muzzle brake. The muzzle device will be rated on its ability to reduce muzzle signature. It is desired that the muzzle devise effectively reduces muzzle rise during firing.

3.14.4 A minimum barrel length is not specified. It is desired that the barrel length be as long as possible while maintaining the overall length requirements of Section 3.12.

3.15 Caliber. The firearm shall be chambered for 5.56x45mm NATO.

3.16 Pistol Grip.

3.16.1 The pistol grip shall be a fixed, vertical pistol grip constructed of a durable material.

3.16.2 The pistol grip shall be designed for use by right or left handed shooters.

C-7

Section C                                                                HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

3.17 Buttstock.

    3.17.1  The buttstock shall be easily adjustable for length of pull.

    3.17.2  The buttstock shall be either collapsible or folding.

    3.17.3  The firearm shall be fully operational with the buttstock either fully extended and/or collapsed/folded.

    3.17.4  The buttstock, if a folding design, shall not readily move from the folded position.

    3.17.5  The buttstock, whether collapsible or folding design, shall be able to be deployed using the non-firing hand without removing the firing hand from the pistol grip.

    3.17.5  The butt plate shall either be serrated, checkered, or be manufactured from a non-slip material.

3.18 Forend.

    3.18.1  The front forend shall incorporate MIL-STD 1913 Picatinny rails on the top, bottom, and both sides to accommodate the attachment of optics or accessories.

    3.18.2  It is desired that the forend Picatinny rail sections be capable of being removed or added.  If rail sections are removable, the sections shall be designed/constructed to not readily loosen.

    3.18.3  The forend shall be constructed of durable, heat resistant material.

    3.18.4  A one-piece monolithic forend/upper receiver is acceptable.

3.19 Sling Attachments.

    3.19.1  The buttstock shall have slots capable of accepting a 1 ¼" wide sling and/or have the capability to mount a removable sling attachment.

3.20 Finish.

    3.20.1  The external finish shall be a non-reflective black, dark grey, or dark earth color.

    3.20.2  The firearm exterior and interior shall be protected with a durable corrosion resistant coating or made from durable corrosion resistant material.

    3.20.3  The coating and materials shall be abrasive, impact, and chemical resistant equal to or greater than phosphated steel or anodized aluminum.

    3.20.4  The interior and exterior surfaces shall be free of rough surfaces, voids, cracks or other manufacturing defects.

3.21 Magazine.

    3.21.1  Magazines shall be compatible with standard NATO STANAG M16 design.

    3.21.2  The magazine shall have a capacity to hold thirty (30) 5.56x45mm NATO rounds.

    3.21.3  Two (2) magazines shall be supplied with each firearm shipped under contract.

A. 153

Section C                                                          HSCEMS-12-R-00011

PART I – THE SCHEDULE
SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

3.22 Sights.

 3.22.1 Front Sight Assembly.

  The front sight shall have a black or dark gray non-reflective finish. The front sight shall be capable of being removed and/or be a fold down design. The front sight post shall be protected.

 3.22.2 Backup Rear Sight Assembly.

  The rear sight shall have a black or dark gray non-reflective finish. The rear sight shall have at least one aperture of no less than 0.20 inches diameter. The rear sight shall be capable of being removed and/or be a fold down design. The rear sight shall be mounted at the rear of the receiver. The rear sight shall not interfere with the mounting of optics. The rear sight shall be adjustable for windage and from at least 100 to 300 yards/meters elevation.

3.23 Repair Parts.

 3.23.1 The Contractor shall provide a price list (by nomenclature description) of all firearms components and assemblies to be used by DHS for repair and maintenance of the firearm throughout its anticipated service life. Pricing shall be good for a five (5) year period.

 3.23.2 The awardee or awardees of the subject contract shall provide notice of design changes to any component and a First Article Test (FAT) will be required as outlined in Section 3.2.2.

3.24 Reliability.

 3.24.1 Samples shall be tested with 4,000 rounds (per firearm). The firearms shall collectively exhibit no more than twenty (20) Class 1, nine (9) Class 2, or two (2) Class 3 malfunctions (see Table II). The firearms shall exhibit no Class 4 malfunctions. If any firearm experiences a Class 4 malfunction, testing of that Contractor's samples will be discontinued. The number/type of firearm attributed malfunctions and parts breakages shall be recorded and used to rate performance. Malfunction classes are listed in Table II. The Contractor shall supply a minimum of six (6) trained shooters to participate in solicitation reliability testing. A Contractor's representative shall be available during testing to assist NFTTU personnel with maintenance and firearm repairs (using supplied replacement parts). The headspace of each firearm shall be monitored throughout reliability testing. The bolt shall not fully close on the "field max" 1.4730 inch headspace gage (NSN 5220-00-070-7814). Testing shall be discontinued for a firearm if replacement parts are not available.

 3.24.2 Cycles Completed - Reliability. Each firearm will be rated for its ability to complete 250 round firing cycles without repair or replacement of parts.

3.25 Durability.

 3.25.1 Three (3) samples used during reliability shall be tested with an additional 3,500 rounds (per firearm). The firearms shall collectively exhibit no more than fifteen (15) Class 1, six (6) Class 2, or one (1) Class 3 malfunctions (see Table II). The firearms shall exhibit no Class 4 malfunctions. If any firearm experiences a Class 4 malfunction, testing of that Contractor's samples will be discontinued. The number/type of firearm attributed malfunctions and parts breakages shall be recorded and used to rate performance. The Contractor shall supply a minimum of three (3) trained shooters to participate in solicitation durability testing. A

Section C                                                                HSCEMS-12-R-00011

PART I – THE SCHEDULE
SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

Contractors' representative can bc available during testing to assist NFTTU personnel with
maintenance and firearm repairs (using supplied replacement parts). The headspace of each
firearm shall be monitored throughout durability testing. The bolt shall not fully close on the
"field max" 1.4730 inch headspace gage (NSN 5220-00-070-7814). Testing shall be
discontinued for a firearm if replacement parts are not available.

3.25.2 Cycles Completed - Durability. Each firearm will be rated for its ability to complete 250 round
firing cycles without repair or replacement of parts. Rating will be cumulative based on the
total of 30 cycles from reliability and durability.

NOTE: Contractor supplied shooters shall be familiar with the firearm's function and safety
features as well as standard range safety practices.

NOTE: The total duration of the firearm reliability/durability testing will be a minimum of 5
weekdays. NFTTU will coordinate with each Contractor regarding testing schedule and
location.

Table II:  Malfunction and Type Allowance

| Class | Type |
|---|---|
| 1 | Malfunction can be cleared by the operator within 10 seconds. |
| 2 | Malfunction that cannot be cleared by operator within 10 seconds; but can be cleared by operator with equipment immediately available to a law enforcement officer in the field (i.e., Leatherman-type tool or pocketknife). |
| 3* | Malfunction not correctable by operator and requires a higher level of maintenance. This may include the replacement or repair of a part other than the barrel, bolt, action assembly, or receiver. |
| 4 | Catastrophic malfunction that requires replacement of the barrel, bolt, receiver, and/or anything that affects safe operation. |

*Parts replacement(s) in accordance with the manufacturer's recommendation for preventative maintenance does not constitute a
Class 3 malfunction.

3.26 High Temperature. Samples shall be tested with 60 rounds (per firearm), after temperature soaking of
the firearm for 8 hours at 125°F. The number/type of firearm attributed malfunctions and parts
breakages shall be recorded and used to rate performance. The firearm shall not exhibit any Class 4
malfunctions.

3.27 Low Temperature. Samples shall be tested with 60 rounds (per firearm), after temperature soaking of
the firearm for 8 hours at −45°F. The number/type of firearm attributed malfunctions and parts
breakages shall be recorded and used to rate performance. The firearm shall not exhibit any Class 4
malfunctions.

3.28 Salt Water Immersion. Samples shall be tested with 60 rounds (per firearm), after immersion in a 5%
saline solution at a depth of 6 inches for one minute followed by 24 hours in an environmental
chamber at 70°F and 70% humidity. The number/type of firearm attributed malfunctions and parts
breakages shall be recorded and used to rate performance. The firearm shall not exhibit any Class 4
malfunctions.

3.29 Sand & Dust. Samples shall be tested with 60 rounds (per firearm), after being subjected to a blowing
sand and dust environment in accordance with MIL-STD-810G. The number/type of firearm
attributed malfunctions and parts breakages shall be recorded and used to rate performance. The
firearm shall not exhibit any Class 4 malfunctions.

3.30 Parts Interchange. All firearm components subjected to disassembly shall be 100% interchangeable
between firearms without additional fitting or alternation (excluding the bolt/barrel). Upon
reassembly, the firearm shall be fully functional.

Section C                                                      HSCEMS-12-R-00011

PART I – THE SCHEDULE
SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

3.31  <u>Drop Test.</u>  The firearm shall be equipped with a discharge control mechanism that is designed to prevent the firearm from firing as a result of an impact, while the hammer is in the cocked position, with the safety off.  Additionally, the firearm shall be serviceable and exhibit no major damage as the result of being dropped on a concrete pad from a height of three feet in the following orientations:

a.  Muzzle facing the concrete pad.

b.  Butt of stock down facing the concrete pad.

c.  Top of the receiver and barrel facing the concrete pad.

NOTE: Major damage is defined as damage that would result in the gun being unsafe to fire, discharging during testing, or malfunctioning during firing.

3.32  Accuracy.

3.32.1  Accuracy.  Each firearm will be rated for its initial accuracy at 50 yards.  The average extreme spread of five 5-shot groups shall be no greater than 2.5 inches.

## 4. 0 VERIFICATION

4.1  Performance verification.  Table I details all performance criteria.  Except as otherwise specified, the Government reserves the right to perform any of the inspections and tests set forth in this Statement of Work, throughout the duration of the contract, where such inspections and tests are necessary to ensure that supplies and services conform to prescribed requirements.

4.2  Quality Management System.  The Government will analyze the manufacturer's quality management system for basic compliance.  If the Contractor is ISO 9001:2008 certified, they shall submit written proof of ISO certification from an accredited agency.  NOTE: ISO certification is not required, but will suffice for compliance with 3.3.  Additionally, Government personnel or a third-party representative may perform a QC system audit after contract award.  If conducted, the audit will be performed at the Contractor's manufacturing facility.

4.3  Sample Size.  All samples submitted will be visually inspected.

4.4  Documentation.  All required documentation as listed in Section 3.6 shall accompany the sample and will be examined to verify compliance.

4.5  Supplemental Items.  All items will be inspected to verify compliance.

4.6  Action/Mechanism.  All samples submitted will be visually and physically examined to verify compliance.

4.7  Fire Control Selector.  All samples submitted will be visually and physically examined to verify compliance.  The safety mechanism of all samples submitted will be tested for compliance by actuating and checking for function every 250 rounds during the reliability/durability test phase.

4.8  Trigger.  The trigger pull of all samples submitted will have the trigger pull measured by a calibrated Dvorak TriggerScan trigger pull tester.  Initial and post reliability/durability trigger pull shall be measured and recorded on all samples.  The average of three (3) trigger pulls per sample will be used to verify compliance.

4.9  Overall Length.  All samples submitted will have the overall length measured with a steel ruler to verify compliance.

C-11

Section C                                                                                    HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

4.10 <u>Weight.</u> All samples submitted will be weighed using an electronic scale to verify compliance.

4.11 <u>Barrel.</u> All samples submitted will have the barrel verified by physical inspection and the use of a bore scope. Barrel length will be measured from the face of the closed bolt to the barrel muzzle. A Phantom v7 high-speed camera will be utilized to detect visible muzzle flash emitted from the muzzle while firing. Five rounds of Lake City M855 5.56mm will be fired in a darkened range with the firearm mounted in a rest.

4.12 <u>Caliber.</u> All samples submitted will have the chamber dimensions verified by physical inspection and the use of certified headspace gages. Initial and post reliability/durability headspace shall be measured and recorded on all samples. The gage shall be inserted in the cleaned chamber and the bolt returned to the battery position. Only finger pressure shall be used to close the bolt. Maximum headspace: bolt shall not fully close.

4.13 <u>Pistol Grip.</u> All samples submitted will be visually and physically examined to verify compliance.

4.14 <u>Buttstock.</u> All samples submitted will be visually and physically examined to verify compliance.

4.15 <u>Forend.</u> All samples submitted will be visually and physically examined to verify compliance.

4.16 <u>Sling Attachments.</u> All samples submitted will be visually and physically examined to verify compliance.

4.17 <u>Finish.</u> All samples submitted will be visually and physically examined to verify compliance.

4.18 <u>Magazine.</u> All samples submitted will be visually and physically examined to verify compliance. The magazine shall be capable of holding thirty (30) 5.56x45mm NATO rounds.

4.19 <u>Sights.</u> All samples submitted will be visually and physically examined to verify compliance.

4.20 <u>Reliability.</u> Six (6) samples will undergo a 4,000 round (per firearm) reliability test in multiples of 250 round firing cycles. The following ammunition types will be utilized: Speer 24450 64 grain .223 Remington, Speer XM223SP1 62 grain .223 Remington, Federal XM223T3 62 grain .223 Remington, and Lake City M855 5.56mm. Ammunition will be supplied by DHS. The firing cycle shall be 60% automatic mode and 40% semi-automatic mode. Sustained rate of fire will be maintained throughout each cycle and each 250 round cycle will be fired within 5 minutes. The firearms will be cooled and cleaned after each firing cycle. A detailed inspection will be performed after every forth (4th) firing cycle. All recommended maintenance procedures will be adhered to and parts will be changed at the Contractor recommended maintenance interval (using supplied replacement parts). All malfunctions will be analyzed by two (2) NFTTU armorers to determine the malfunction type/cause and malfunctions attributed to the firearm(s) will be recorded. Firearms experiencing a Class 3 malfunction will be repaired (using Contractor supplied replacement parts) and will continue testing. Non-destructive testing will be conducted on each firearm after completion of the reliability test. The key firearm components (barrel, bolt, and receiver) shall be free of cracks, seams and other defects. The headspace shall be measured using certified headspace gages.

4.21 <u>Durability.</u> Three (3) randomly selected samples used in the reliability test will undergo an additional 3,500 round (per firearm) durability test in multiples of 250 round firing cycles. The following ammunition types will be utilized: Speer 24450 64 grain .223 Remington, Speer XM223SP1 62 grain .223 Remington, Federal XM223T3 62 grain .223 Remington, and Lake City M855 5.56mm. The firing cycle shall be 60% automatic mode and 40% semi-automatic mode. Sustained rate of fire will be maintained throughout each cycle and each 250 round cycle will be fired within 5 minutes. All

Section C                                                           HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

firing shall be from the shoulder. The firearms will be cooled and cleaned after each firing cycle. A detailed inspection will be performed after every second (2nd) firing cycle. All recommended maintenance procedures will be adhered to and parts will be changed at the Contractor's recommended maintenance interval (using supplied replacement parts). All malfunctions will be analyzed by two (2) NFTTU armorers to determine the malfunction type/cause and malfunctions attributed to the firearm(s) will be recorded. Firearms experiencing a Class 3 malfunction will be repaired (using supplied replacement parts) and will continue testing. Testing shall be discontinued for a firearm if replacement parts are not available. If any firearm experiences a Class 4 malfunction, testing of that Contractor's samples will be discontinued. Non-destructive testing will be conducted on each firearm after completion of the durability test. The key firearm components (barrel, bolt, and receiver) shall be free of cracks, seams and other defects. The headspace shall be measured using certified headspace gages.

4.22 <u>High Temperature.</u> Three (3) randomly selected samples will be temperature conditioned in an environmental chamber at 125 $\pm 5^{o}$F and 0% humidity for 8 hours. After 8 hours of temperature conditioning each firearm will be used to fire 60 rounds of ammunition within 2 minutes after removal from the environmental chamber. The ammunition used will also be temperature conditioned at $125^{o}$F for 8 hours. Any malfunction will be recorded and analyzed by NFTTU armorers.

4.23 <u>Low Temperature.</u> Three (3) randomly selected samples will be temperature conditioned in an environmental chamber at -45 $\pm 5^{o}$F and 0% humidity for 8 hours. After 8 hours of temperature conditioning each firearm will be used to fire 60 rounds of ammunition within 2 minutes after removal from the environmental chamber. The ammunition used will also be temperature conditioned at $-45^{o}$F for 8 hours. Any malfunction will be recorded and analyzed by NFTTU armorers.

4.24 <u>Salt Water Immersion.</u> Three (3) randomly selected samples will be immersed in 5% (by weight) saline solution at a depth of 6 inches for one minute. Upon removal from the saline solution, the firearms will be subjected to environmental conditioning at 70 $\pm 5^{o}$F and 70% humidity for 24 hours in an environmental conditioning chamber. After environmental conditioning, each firearm will be used to fire 60 rounds of ammunition within 2 minutes after removal from the environmental chamber. Any malfunction observed will be recorded and analyzed by NFTTU armorers.

4.25 <u>Sand & Dust.</u> Three (3) randomly selected samples will be subjected to blowing sand and dust per Method 510.5 detailed in MIL-STD-810G . After sand and dust conditioning, each firearm will be used to fire 60 rounds of ammunition. Any malfunction observed will be recorded and analyzed by NFTTU armorers.

4.26 <u>Parts Interchange.</u> Prior to reliability testing, an NFTTU armorer will disassemble all samples. All parts and assemblies, excluding barrels and bolts, will be sorted and placed in individual bins. All parts and assemblies will be inspected for burrs, sharp edges and workmanship. A second NFTTU armorer will reassemble the firearms using randomly selected components. Any components found not to be interchangeable and the need for any tools needed to disassemble/reassemble the firearm will be noted. A Contractors' representative can be available during parts interchange testing to assist NFTTU personnel with disassembly and assembly.

4.27 <u>Drop Test.</u> Three (3) randomly selected samples will undergo 3-foot drop testing onto a concrete pad. One firearm will be oriented to drop so as to land on the muzzle, one firearm will be oriented to drop so as to land on the butt of the firearm stock, and one firearm will be oriented to drop so as to land on the top of the barrel/receiver. Each firearm will contain a magazine loaded with dummy ammunition.

C-13

A. 158

Section C                                                HSCEMS-12-R-00011

**PART I – THE SCHEDULE**
**SECTION C – DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK**

A cartridge case containing a live primer will be in the chamber during the drop test. After drop testing, the firearms will undergo a LTI by NFTTU armorers and 5 rounds of ammunition will be fired in each firearm. Any discharges during drop testing and malfunctions during subsequent firing will be recorded and analyzed by NFTTU armorers.

4.28  Accuracy.  Three (3) randomly selected samples will be subjected to initial accuracy testing. Accuracy will be evaluated at 50 yards by shooting five (5) 5-shot groups. The ammunition used for accuracy testing will be Speer 24450 64 grain .223 Remington. The firearm will be accuracy tested mounted in a machine rest that is designed to securely clamps the receiver top of Colt M4 type carbines. If the sample firearm is of such a design that the NFTTU machine rest cannot be utilized, the Contractor will be notified and will have an opportunity to supply one of their own design for use in accuracy testing. An Oehler optical target or equivalent system will be used to record the groups.

**5.0 REPORTING REQUIREMENTS**

The Contractor shall submit a monthly report providing the Contracting Officer (CO) and Contracting Officer's Representative (COR) status of all orders placed under the respective contracts by all DHS components to include; delivery order number; delivery order date, quantity for each Contract Line Item Number (CLIN); total delivery order obligation amount; and delivery order due date.

C-14

A. 159

Section C                                                    HSCEMS-12-R-00011

## PART I – THE SCHEDULE
## SECTION C -- DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

### Definitions

**American National Standards Institute (ANSI)** – Organization that oversees the development of voluntary consensus standards for products, services, processes, systems, and personnel in the United States.

**Certificate of Conformance (C of C)** – Contractor's assurance that the equipment provided meets the contract's specifications.

**National Firearms Tactical Training Unit (NFTTU)** – Organization responsible for the facilitation and execution of ICE law enforcement responsibilities by providing personnel with firearms, intermediate force weapons, protective equipment, training, logistical support and guidance that will testing to ensure that firearms, body armor, and ammunition carried by ICE agents -- and officers and agents at other DHS components meet or exceed the highest level of standards.

**Personal Defense Weapon (PDW)** - 5.56x45mm NATO, select-fire firearm suitable for personal defense use in close quarters and/or when maximum concealment is required.

**Quality Management System** -- Organizational structure, procedures, processes and resources needed to ensure the product manufactured meets the needs of the customer.

**Sporting Arms and Ammunition Manufacturers Institute Inc. (SAAMI)** – Organization of the United States leading manufacturers of firearms, and ammunition. Reponsible for creating and publishing industry standars for safety, interchangeability, reliability, and quality.

# Exhibit D

Police Carbine Operator Program                                      Page 1 of 11



| Chicago Police Department | **Uniform and Property U04-02-05** |
|---|---|
| **POLICE CARBINE OPERATOR PROGRAM** | |

| **ISSUE DATE:** | 14 June 2012 | **EFFECTIVE DATE:** | 14 June 2012 |
|---|---|---|---|
| **RESCINDS:** | U04-02-02 version dated 13 August 2008 | | |
| **INDEX CATEGORY:** | Uniform and Personal Equipment | | |

I.    PURPOSE

    This directive:

      A.    continues the:

          1.   Police Carbine Operator Program .

          2.   Carbine Operator Course .

          3.   Carbine Operator Requalification Course .

          4.   Carbine Familiarization Course .

          5.   Personal Carbine Operator Zeroing Course .

      B.    provides specifications for:

          1.   Department-issued carbines .

          2.   personally owned duty carbines.

          3.   ammunition.

          4.   optional accessories.

      C.    delineates responsibilities and procedures for the training, maintenance, transport, security, and use of Department-approved carbines.

      D.    defines certain terms relative to this directive.

II.   POLICY

      A.    The Police Carbine Operator Program is provided to enhance the Department's ability to protect the lives, property, and rights of all people, to maintain order, and to enforce the laws impartially. Additionally, the program enhances officer safety in high-threat confrontations involving heavily armed or multiple offenders, active shooting incidents, and violent offenders who are utilizing body armor, shielding, or distances beyond reasonable pistol range.

      B.    Police carbine operators may arm themselves with a carbine when:

          1.   the operator reasonably believes that he or she is confronting or may soon confront a threat that may require the use of deadly force; and

**EXHIBIT**
**D**

A. 162

Police Carbine Operator Program

2.  consistent with the carbine operator's training, the carbine is the appropriate firearm for the situation.

NOTE:   The nature of the assignment or situation can be enough to warrant the operator's actions.

### III.  GENERAL INFORMATION

A.  The Police Carbine Operator Program authorizes qualified members to deploy and arm themselves with either a Department-issued carbine or a personal duty carbine while on routine patrol.

B.  The program is open to all sworn members who meet the requirements established in this directive.

C.  The Carbine Operator Course , Carbine Familiarization Course , and Carbine Requalification Course , are in-service training programs.

D.  After successfully completing the Carbine Operator Course, members must complete the Carbine Operator Requalification Course every six months, by the last day of the sixth month, to maintain their qualification status.

E.  Members are expected to exercise the same high level of judgment as they would with their handguns and be mindful of public perception.

F.  Members are not required to complete any documentation solely for arming themselves with a carbine.

G.  Sergeants and lieutenants are encouraged to attend training to be qualified as police carbine operators . However, supervisors are not required to be carbine-operator qualified to supervise and enforce compliance with this directive.

H.  Upon written authorization of the Chief, Bureau of Patrol, Department members assigned to SWAT will not be limited by any provisions of this directive.

### IV.  CARBINE FAMILIARIZATION COURSE

To ensure compliance with the Police Carbine Operator Program , Bureau of Patrol exempt members will ensure that any members within their command whose duties include handling carbines attend the Carbine Familiarization Course .

### V.  PROGRAM QUALIFICATIONS

To qualify for the Police Carbine Operator program , sworn members must be in full-duty nonprobationary status.

### VI.  APPROVED CARBINES AND AMMUNITION - SPECIFICATIONS

A.  Department-issued carbines will conform to the following specifications:

1.  AR-15/M-4 type, semiautomatic carbine chambered in 5.56 mm;

2.  A minimum 16-inch barrel, not to exceed 20 inches, with a 1/7 to 1/9 twist;

3.  Single-stage triggers with a minimum 5-pound trigger pull;

4.  Telescoping or fixed stock;

Police Carbine Operator Program                                    Page 3 of 11

5.      Adjustable tactical sling ;

6.      Iron sights;

        NOTE:       Department-issued carbines will have iron sights only, with a
                    secure effective zero for any Department member issued the
                    carbine.

7.      Ambidextrous safeties may be installed to support left and right side operation;

8.      Two magazines (20 or 30 round capacity);

9.      Approved (optional) magazine carrier.

10.     No modifications or adjustments will be made to the carbines other than those
        completed by a member of the Firearms Training Unit, Education and
        Training Division.

11.     Attached flash suppressor.

B.    Personally Owned Duty Carbines
      Personally owned duty carbines will conform to the following specifications:

      1.      An AR-15/M-4 type, semiautomatic carbine, primarily black in color,
              chambered in 5.56 mm.

      2.      Complete rifles manufactured by one of the following:

              a.      Colt

              b.      Smith & Wesson

              c.      Bushmaster

              d.      Defense Procurement Manufacturing Services (DPMS)

              e.      Rock River

              f.      Lewis Machine & Tool

              g.      DS Arms

              h.      Armalite

              i.      L.W.R.C.

              j.      LaRue Tactical

              k.      Ruger

              l.      Saber Defense

              m.      Stag Arms

Police Carbine Operator Program

        n.    Daniel Defense

        o.    CMMG

        p.    Spike's Tactical.

3.    A minimum 16-inch barrel, not to exceed 20 inches, with a 1/7 to 1/9 twist;

4.    Single-stage triggers with a minimum 5-pound trigger pull;

5.    Telescoping or fixed stock;

6.    Adjustable tactical sling;

7.    Two magazines (20 or 30 round capacity) as follows:

        a.    polymer, aluminum, or stainless steel

        b.    self-leveling followers.

8.    One ChamberSafe .

9.    The component parts on the personal carbines **must** be of such size as to be securable in the Department's vehicle gun locks.

10.    Iron sights

        a.    At the members' discretion, carbines may be equipped with an optical sighting system , but the carbine must also be equipped with a fixed or flip-up rear iron sight that has the same effective zero as the optical sighting system and can be utilized quickly if the optical sighting system fails.

        b.    Members must zero their carbines at a Department range under instructor supervision for both iron sights and, if applicable, optical sighting systems.

11.    **Before any personally owned duty carbine is authorized for on-duty use, the carbine must be registered as a duty weapon and zeroed in the presence of a Chicago Police Department carbine instructor consistent with the Personal Carbine Operator's Zeroing Course.**

12.    Attached flash suppressor.

13.    The use or addition of a compensator is prohibited.

C.    Optional accessories for personally owned duty carbines

    1.    Optical sighting systems

        a.    The following optical sighting systems (without magnification):

            (1)    Aimpoint Comp M, Comp ML, Pro, and Micro series

            (2)    EOTech HWS Series / "Bushnell's" EOTech

A. 165

Police Carbine Operator Program                                    Page 5 of 11

    (3)      Trijicon

    (4)      C-More Systems

    (5)      Meprolight Mepro21

    (6)      Leopold Tactical Prismatic.

    (7)      Elcan SpecterRD

b.    The following optical sighting system with magnification power of 1.50 or less: Trijicon.

    **NOTE:**    Optical sighting systems with magnification of 1.50 power or less must be mounted in such a way that they can be easily removed, without tools, if an optical sighting system fails.

2.    D-fender D-Ring for extractor enhancement;

3.    Ambidextrous selector lever;

4.    A mounted department approved flashlight;

5.    A mounter vertical foregrip

6.    Any other accessories must be approved by the Deputy Chief, Education and Training Division, or their designee. **Subsequent modifications to the carbine require a recertification of the carbine.**

7.    Lasers, bipods, or competition muzzle breaks **are not** authorized on any Department-approved duty carbines.

8.    For any articulable reason regarding safety, the Deputy Chief, Education and Training Division, (or designee), has the authority to deny authorization of any personally owned carbine.

D.    Authorized Ammunition

1.    Department members will load only the following Department-approved ammunition :

a.    55 grain full metal jacket manufactured by one of the following:

    (1)      Remington/UMC

    (2)      Winchester

    (3)      Federal/Lake City Arsenal

    (4)      Hornady

    (5)      CCI-Speer.

b.    64 grain Winchester Power-Point

A. 166

Police Carbine Operator Program                                    Page 6 of 11

> NOTE:     Tungsten, steel, or frangible ammunition is not approved.

    2.    Department members will be issued the appropriate amount of duty ammunition to load two Department-approved magazines upon qualification and once each year thereafter.

**VII.    CARBINE REGISTRATION PROCEDURES**

A.    Prior to registering personally owned duty <u>carbines</u> , members will:

    1.    present a completed Firearms Registration Application (CPD-31.562) to the member's station supervisor for approval.

    2.    submit the Firearms Registration Application in accordance with the Department directive entitled "<u>Department Approved Weapons and Ammunition</u>."

> NOTE:     Members will not carry or deploy their carbine until after the Police Carbine Operator Program has been completed.

    3.    submit a To-From-Subject report to the Commanding Officer, Gun Registration Unit, detailing the:

        a.    successful completion of the forty-hour <u>Carbine Operator Course</u> session dates,

        b.    Police Carbine Operator <u>Personal Carbine Zeroing Course</u> date, and

        c.    lead instructor's name.

B.    The Gun Registration Unit, Records Services Division, will:

    1.    upon receiving a Firearms Registration Application for a personally owned duty carbine, designate the carbine as "registration pending."

    2.    upon confirmation from the Firearms Training Unit, Education and Training Division, that the requesting member is a qualified <u>police carbine operator</u> and the carbine has been <u>zeroed</u> , designate the carbine as "registered."

> NOTE:     Upon successful completion as a qualified carbine operator, the weapon will be classified as a duty weapon.

**VIII.    TRAINING**

A.    The Deputy Chief, Education and Training Division, will ensure continuous and regular schedules are maintained for the in-service:

    1.    <u>Police Carbine Operator Course</u>

    2.    <u>Carbine Familiarization Course</u>

    3.    <u>Police Carbine Operator Requalification Course</u>

    4.    <u>Police Carbine Operator Personal Carbine Zeroing Course</u> .

Police Carbine Operator Program

B. The Deputy Chief, Education and Training Division, or the authorized designee will determine which members assigned to field duties have priority in attending the Police Carbine Operator Course.

> **NOTE:**      All requests will require station supervisor approval.

C. Course registration

1. Members seeking to register for the Carbine Operator Course or the Carbine Operator Requalification Course will use the In-Service Training module of the CLEAR application.

2. Members seeking to register for the Carbine Operator Familiarization Course or the Personal Carbine Operator Zeroing Course will use the eLearning module under Training Resources.

D. Members will be notified of scheduled training via the automated notification system.

IX.    **RESPONSIBILITIES AND PROCEDURES**

A. Requirements

1. Members who successfully complete the Police Carbine Operator Program are required to deploy with either a Department-issued carbine or a personally owned duty carbine during regular field duties.

2. Supervisors will not prevent qualified members from deploying with a carbine unless the:

   a. nature of the assignment clearly indicates that it is inappropriate to do so (e.g., a parade detail).

   b. member is displaying unsafe or inappropriate carbine-handling skills.

   > **NOTE:**      The supervisor will document this on a To-From-Subject report addressed, through the chain of command, to the Deputy Chief, Education and Training Division.

   c. unit does not have a vehicle with an operational gun lock available.

   > **NOTE:**      Station supervisors will make every effort to match qualified officers wishing to deploy a carbine with a vehicle that has a gun lock.

   d. member is assigned to participate in the execution of a search warrant. In this case, the search team supervisor will have final authority in determining who, if anyone, will be equipped with a carbine.

   > **NOTE:**      Search Team supervisors will consult with a SWAT supervisor when high-risk entries are anticipated.

B. Securing and Issuing Department-Owned Carbines

1. Department-owned carbines and magazines will be stored in locked racks in the secure location designated by the district/unit commander.

2.      The ChamberSafe will remain in the carbine with the bolt eased forward.

3.      The selector lever will be on safe and a magazine loaded two rounds short of full capacity.

4.      At the start of each tour of duty, a station supervisor or their designee will issue a carbine and two magazines to members qualified as carbine operators.

   a.      Department vehicles will have one gunlock; only one carbine per vehicle will be authorized for routine field duties.

   b.      If two or more officers assigned to a vehicle are qualified, either officer may be armed with the carbine.

         NOTE:     If a personal carbine has been placed in the vehicle's gunlock, only the owner will arm that carbine unless exigent circumstances exist. If exigent circumstances exist, either qualified member assigned to the vehicle may be armed with the carbine.

   c.      The station supervisor has final authority to determine which member will deploy with a carbine should there be two officers on the same beat with personally owned carbines.

5.      Members issued carbines will sign out the carbine using the Personal Equipment Log (CPD-21.919).

C.    Department Vehicle Storage

   1.      The carbine will be secured in the designated vehicle gunlock installed in the Department vehicle.

   2.      Carbines will not be left in Department vehicles between watches or overnight.

D.    Securing Personally Owned Duty Carbines

   1.      Personally owned duty carbines will be transported to and from duty assignments or secured in an assigned unit locker as follows:

   a.      the selector lever on safe;

   b.      a ChamberSafe inserted;

   c.      the magazine well empty; and

   d.      secured in a plain black padded nylon bag or hard case.

   2.      Members transporting carbines to and from duty assignments are responsible for its security. Members are prohibited from leaving carbines unattended in their personal vehicles.

   3.      Members are responsible for securing their duty carbines at home in the same manner as their duty handguns as delineated in the Department directive entitled, "Department Approved Weapons and Ammunition," and are required to exercise sound judgment and caution to prevent unauthorized access to firearms.

Police Carbine Operator Program

E.   Issuance of Carbines

1.   Carbines will be issued with **no round in the chamber**, a ChamberSafe **device** placed in the chamber and visible from the ejection port, and one loaded magazine remaining in the magazine well.

2.   All police carbines, whether Department-issued or personally owned, will have a minimum of two magazines (20 or 30 round capacity), each loaded two rounds short of capacity.

   NOTE:   Magazines are loaded two rounds short of full capacity to ensure proper seating of the magazine.

3.   Unless authorized by a supervisor, carbines will be properly secured in the gunlock located in the Department vehicle.

   NOTE:   Station supervisors will ensure that police carbine operators are given priority assignment to Department vehicles equipped with gunlocks.

4.   Whenever possible, members will notify the dispatcher when they are assigned to citizen-dress field operations and are arming themselves with carbines.

F.   Carbine Arming

1.   When arming a carbine, members will:

   a.   unlock the gunlock and remove the carbine;

   b.   remove the ChamberSafe; and

   c.   chamber a round while pointing the carbine in a safe direction with the finger off the trigger.

2.   The carbine will remain on safe and the finger off the trigger until the operator has made the decision to fire.

3.   Members will utilize a tactical sling whenever carrying a carbine.

4.   Members will make every reasonable effort to avoid making physical contact with an offender while carrying a carbine. Members carrying carbines will act in a cover-officer capacity whenever possible.

5.   Members assigned to citizen-dress field operations will have clearly visible identification, utilizing a warrant team vest or other appropriate Department-approved specialized personal garment.

6.   Upon termination of the event in which the carbine was armed, the operator will:

   a.   when clearing the weapon, relocate to a safe and discrete location minimizing the likelihood of personal injury or property damage in the event of an unintentional discharge.

   b.   inspect the unchambered round and remove it from service if damage or defects are observed.

A. 170

Police Carbine Operator Program

G.   Carbine Accessibility

1.   Members may carry an armed carbine in the passenger compartment of a vehicle, with the selector in the "safe" position, when:

   a.   assigned to a directed mission, **and**

   b.   the assigned mission consists of two or more vehicles, **and**

   c.   the member is under the direct supervision of a member the rank of sergeant or higher.

   **NOTE:**      The supervisor assigned to the directed mission will determine which members are authorized to carry the armed carbine in the passenger compartment of a vehicle, consistent with that on-scene supervisor's training.

2.   Members traveling to and from the location where a search warrant is to be executed may transport an armed carbine in the passenger compartment of a vehicle, with the selector in the "safe" position.

H.   Care and Maintenance

1.   Members are responsible for the care and maintenance of their personally owned duty carbines.

2.   All qualified members are responsible for the care and maintenance of Department carbines within their control, including cleaning them after firing.

3.   All other maintenance will be the responsibility of the Firearms Training Unit, Education and Training Division.

   **NOTE:**      The Firearms Training Unit, Education and Training Division, will be responsible for the routine inspection and repair of Department-owned carbines except those assigned to SWAT.

I.   Recertification
   Department members certified as police carbine operators are responsible for keeping their certification current.

Garry F. McCarthy
Superintendent of Police

10-072 JAB

**GLOSSARY TERMS:**

1.   Police Carbine Operator Program - The overall program developed by the Department for the approval, procurement, training, security, issuance, use, and maintenance of Department-approved carbines.

2.   Carbine Operator Course - A voluntary five-day course members must initially pass to be qualified to participate in the Police Carbine Operator Program.

Police Carbine Operator Program

3.   Carbine Operator Requalification Course - A block of training required for members in the Police Carbine Operator Program. This course is taken subsequent to the Carbine Operator Course and must be completed to maintain qualification.

4.   Carbine Familiarization Course - A block of instruction relative to the safe handling, loading, and unloading of the carbine as well as placement and removal from gun racks and locks.

5.   Personal Carbine Operator Zeroing Course - A block of instruction required for police carbine operators who own personal carbines that must be zeroed before approval for duty use.

6.   Carbine - A short-barreled, lightweight semiautomatic rifle.

7.   Police Carbine Operator - A member trained by the Department to be armed with a carbine while assigned to routine field duties.

8.   Arm/Arming - Removing a carbine from a Department vehicle and chambering a round.

9.   Deployment - The act of issuing / placing a carbine into a Department vehicle gun lock for duty.

10.   Tactical Sling - A device used to carry the rifle in a hung position in front of the body.

11.   Zero/Zeroed - At a prescribed distance, the point of aim is aligned with the point of bullet impact.

12.   ChamberSafe® - A high-visibility device, normally orange in color, used to readily identify, from a distance, that a rifle chamber is empty and safe.

13.   Personal Carbine - A duty carbine purchased, registered, and owned by a member participating in the Police Operator Carbine Program.

14.   Optical Sighting System - A device mounted or attached to a rifle that assists a shooter with quick target acquisition. An optical sighting system is **NOT a laser sight**.

# Exhibit E

# CITY OF
# HIGHLAND PARK
# ILLINOIS



## PROPOSED ANNUAL BUDGET
## CALENDAR FISCAL YEAR 2014

JANUARY 1, 2014 TO DECEMBER 31, 2014



EXHIBIT

E

- The City Manager's Office will pursue a minimum of two intergovernmental agreements to share resources, reduce expenses and/or improve efficiencies among the City and partner organizations.

**Finance Department**

- The Finance Department will outsource additional payment processing through a bank lockbox and an ACH receivership product, which will allow the City to receive additional payments electronically.
- An Electronic Document Management System will be selected to centralize storage for all City Departments, starting with the Clerk's Office and the Building Division.

**Police Department**

- The Police Department will evaluate the findings of Phase 2 of the police and fire dispatch consolidation study and support elected officials in making decisions on consolidation.
- The department will install an electronic crash reporting system from New World Systems which will integrate with the Illinois Department of Transportation.
- The Police Department will replace current pistol caliber patrol carbines with rifle caliber carbines for use by officers in emergent and/or active shooter situations. All personnel will be trained in use of the new weapons using an outdoor range facility in Bristol, Wisconsin. Range upgrades are proposed in 2015 to accommodate the new caliber carbines.

**Fire Department**

- The Fire Department will manage the beginning stages of the replacement of the current Fire Station #32 located at 692 Burton Avenue.
- The Fire Department has restructured their staff to reclassify the existing Fire Marshall to an inspector, yielding savings. The additional inspector will help department to attain its goal of conducting life safety inspections of structures considered to be high hazard occupancies annually and all other structures every two years, beginning with the 2014 budget year.

**Community Development**

- Increases in building permit activity have strained the Building Division given that staff levels were reduced by attrition during the economic downturn. In order to provide services at a lower cost with limited impact to budget, a part-time plumbing inspector is included in the 2014 Proposed Budget.

**Public Works**

- The Public Works Department will evaluate the feasibility of sharing a corporation yard with the Park District and School Districts.
- The Facilities Division will work cooperatively with the Library to reduce costs and gain efficiencies by combining capital and maintenance projects whenever possible.

Five-Year Capital Improvement Program

This section serves as a management tool to promote advanced planning and provide adequate lead-time for project design. Additionally, this section is helpful in forecasting future revenue requirements. Each plan is formulated to be comprehensive, policy-driven, coordinated, and mindful of its impact on the operational budget.

A. 175

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | | |
| the Illinois State Rifle Association | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | No: | 13-cv-9073 |
| v. | ) | | |
| | ) | | |
| CITY OF HIGHLAND PARK, | ) | | |
| | ) | | |
| Defendant. | ) | | |

### AFFIDAVIT OF GARY KLECK

If sworn as a witness, I could competently testify to the following:

1.     I am a Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology. I am currently the David J. Bordua Professor of Criminology at Florida State University, where I have been on the faculty since 1978. My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime"

I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which informs and serves as part of the basis of my opinions. I am the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology." More recently, I

A. 176

authored *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001).

I have also published scholarly research in all of the leading professional journals in my field. Specifically, my articles have been published in the *American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and Delinquency, Journal of Quantitative Criminology, Law & Contemporary Problems, Law and Human Behavior, Law & Policy Quarterly, Violence and Victims, Journal of the American Medical Association,* and other scholarly journals.

I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force, and, most recently, as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

Finally, I teach doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology. A complete list of my scholarly publications and a full description of my qualifications are set forth on my *Curriculum Vitae*, a true and correct copy of which is attached to this Affidavit as Exhibit A.

2.      I have reviewed Highland Park City Code section 136.001 et seq. and have been asked to provide my opinion on whether Highland Park's ban on ownership and possession of

"assault weapons" and magazines with the capacity to accept more than ten rounds of ammunition is likely to have an impact on the frequency and lethality of firearms violence. In my opinion, Highland Park's ban will have no impact on criminal firearms violence and is a symbolic political gesture at best. More problematically, the ban may leave some crime victims less able to protect themselves, their property and their families.

3.       According to publicly available FBI Uniform Crime Reports, Highland Park has a very low incidence of violent crime. Statistics for 2010 indicate that Highland Park experienced just 17 incidents of violent crime (defined as murder and non-negligent manslaughter, forcible rape, robbery and aggravated assault). None of these incidents were murders. In fact, publicly available data indicates that no murder has been committed in Highland Park since 2003, and thus no murders were committed with "assault weapons" or firearms equipped with larger capacity magazines. Thus, Highland Park is responding to a "problem" that currently does not exist. The same data reveal that residents of Highland Park are substantially more likely to be victims of property crimes, including residential burglaries, larceny and vehicle theft. According to a United States Department of Justice, Bureau of Justice Statistics report, *Victimization during Household Burglary*, dated September 2010, a household member is present during the commission of approximately 1 million burglaries in the United States each year and became victims of violent crimes in 266,560 of those burglaries.

4.       The firearms that Highland Park has chosen to ban are all semi-automatic firearms, which in most instances are mechanically identical to, though cosmetically different from, countless non-banned firearms. All semi-automatic firearms, including those that Highland Park has not banned, are capable of firing, one shot at a time, as fast as the shooter can make successive trigger pulls. Although I cannot say why Highland Park chose to prohibit law-abiding citizens

3

from owning the firearms it defined as "assault weapons," other advocates of restrictions on these types of firearms typically propose four rationales for their claim that these firearms are especially dangerous or useful for criminal purposes: (1) the allegedly greater lethality, shot for shot, of the guns or ammunition they use; (2) the supposed ease with which the firearms can be converted to fully automatic fire; (3) the high rate of fire of the firearms in their semi-automatic mode; and (4) their ability to accept large capacity detachable magazines, and to therefore fire many times without reloading. None of these rationales are supported by empirical evidence.

5.     The firearms banned by Highland Park are not more lethal, shot for shot, than firearms that are not banned. This is true because the cartridges most commonly used in "assault rifles" have smaller, pointed bullets which do not flatten out and expand when they hit human flesh. They therefore tend to produce smaller wounds, which are correspondingly less lethal.

6.     The claim that some of the banned firearms are easily converted to fully automatic fire is not true. No semi-automatic firearm available for sale in the United States since 1989 is readily converted to fully automatic fire. Technical experts with the Bureau of Alcohol, Tobacco, Firearms and Explosives disassemble, test and examine samples of all semi-automatic firearms marketed in the United States to make a formal determination on whether they can be readily converted. Any model found to be readily converted to fully automatic fire is declared illegal and cannot be sold. Therefore, none of firearms banned under the Highland Park ordinance are readily convertible to fully automatic fire.

7.     The total number of rounds that some of the banned firearms are capable of firing without reloading is not an attribute of the firearm but of its ammunition magazine. Many of the banned firearms are capable of accepting many different magazine sizes, containing three rounds or thirty or more. However, it is unlikely that large capacity magazines (LCMs) (defined by

4

Highland Park as capable of accepting more than ten rounds) are relevant to the outcome of violent incidents because very few incidents involve large numbers of shots fired. Firearm assaults usually involve no shots fired or only a few shots fired, typically fewer than the six rounds ordinary revolvers hold. For example, Reedy and Koper (2003) found that less than 3% of crimes in which handguns were fired involved over 10 rounds fired (p. 154, Table 1). And since only 12.6% of handgun crime incidents involve the offender shooting at the victim (the rest involve only threats with the gun; Rand 1990, p. 5), this means that less than 4/10ths of one percent (.03 x .126=.0037 or 0.37 of 1%) of handgun crimes involve over ten rounds being fired. Consequently, in 99.63% of handgun crimes, the offender would not need a magazine with a capacity in excess of 10 rounds to fire the number of rounds that are actually fired in ordinary gun crimes.

8.    Even in mass shootings, where large numbers of rounds are fired, it is extraordinarily rare that the presence of a large capacity magazine had any impact on the number of victims injured or killed. I have reviewed media accounts of 81 mass shootings (defined as incidents in which more than six persons were shot, fatally or nonfatally) that occurred in the United States between 1994 and 2013, the largest number ever studied to my knowledge. I found that the shooters in these incidents were known to have used magazines with a capacity over 10 rounds in only 21 of these incidents (26% of mass shootings) - about one incident per year in the entire nation. And in these 21 incidents, the shooters were known to have possessed either multiple guns or multiple magazines in every single case, meaning that even if limited to magazines holding only 10 or fewer rounds, all of the shooters could have continued firing with either no interruption at all in the 16 incidents in which the shooters possessed multiple guns, or with only the 2-4 second delay needed to change a detachable magazine in the remaining five incidents in which the shooter possessed multiple magazines but only one gun. Further, in 23 of the 81 mass shootings, the

shooter was able to reload because no one was willing and able to prevent them from doing so. In such incidents the shooter would have been able to continue shooting even if equipped only with smaller-capacity magazines.   In sum, mass shooters do not need an LCM to fire large numbers of rounds because either (a) the shooter possessed multiple firearms, (b) the shooter possessed multiple magazines, or (c) the shooter reloaded without interference from others.

Of the 81 mass shootings, there were only one, or possibly two, incidents in which the presence of an LCM arguably affected the number of casualties.  This was due to the fact that the shooter was (or might have been) tackled by bystanders while trying to change detachable magazines.  This scenario probably transpired in the incident in Tucson AZ on January 8, 2011 in which a man tried to kill Congresswoman Gabrielle Giffords, and *may* have occurred in a school shooting in Springfield, Oregon on May 21, 1998, though in the latter case some witnesses said the shooter was still shooting when he was tackled.

9.     Empirical research has revealed that criminals do not "prefer" to use "assault weapons."  Criminals overwhelmingly prefer and use more concealable handguns in commission of crimes. Research has also revealed that drug dealers and juvenile gang members virtually never use "assault weapons."  A survey of a representative national sample of state prison inmates provided information on the guns that criminals owned in the month before the arrest that lead to their imprisonment, as well as the guns they actually *used* in their crimes.  Of those who owned a handgun of any kind in the preceding month, 71% were armed with a handgun when they committed the crime that got them sent to prison.  However, of those who possessed a "military-type" gun, only 16.7% were armed with such a gun when they committed their crimes (computed from U.S. Bureau of Justice Statistics 1993).  Thus, compared to their availability, AWs were *under*represented among the guns these felons actually used to commit crimes.  These results were

confirmed specifically with respect to "assault rifles" by surveys of inmates in Virginia prisons in 1992-93, which revealed that although 20% of the offenders had previously possessed "assault rifles," none had carried or fired one in their latest crime . Thus, criminals not only did not "prefer" military-style guns, they were strongly disinclined to carry them during commission of their crimes, even when they owned one. In sum, under any meaningful interpretation of "preference," criminals do not prefer assault weapons.

10. Banning a category of firearms that are rarely used in crime for the ostensible purpose of protecting the public from criminal firearms violence in not only illogical, it may actually put the public at greater risk. In 1993, I conducted a survey addressing defensive gun use. A large nationally representative sample covering all adults age 18 and over were asked, among other questions, whether the respondent or a family member had used a firearm, even if it was not fired, for self-protection or for the protection of property at home, at work or elsewhere during the past five years. Based on this question and follow-up questions, I determined that there were about 2.2 to 2.5 million defensive gun uses by civilians in the United States in 1992 (Kleck and Gertz 1995). This number dwarfs the number of violent crimes that occurred that year in which the offender possessed a firearm. According to the National Crime Victimization Survey, 847,652 such violent crimes occurred in 1992, the peak year for gun crime.

11. Prohibitionist measures, like the Highland Park ban, are aimed at disarming criminals and non-criminals alike. These measures therefore discourage and presumably decrease the frequency of defensive use of "assault weapons" and LCMs among non-criminal crime victims because even minimally effective gun bans disarm some law-abiding citizens. In my opinion, reducing the availability of firearms among law-abiding citizens also reduces defensive gun uses

that would otherwise save lives, prevent injuries, thwart rape attempts, drive off burglars and help victims retain their property.

12.    Defensive use of guns by crime victims reduces the likelihood that the victim will be injured or lose property.  I base this conclusion on a series of studies that analyzed the outcomes of crimes reported in the National Crime Victimization Survey, a large-scale survey conducted by the U.S. Census Bureau.  Incorporating statistical controls for other factors that might influence whether victims are injured or lose property, these studies have consistently indicated that victims who used gun to protect themselves were less likely to be injured or lose property than otherwise similar crime victims who adopted any other self-protection strategy (Tark and Kleck 2004; Southwick 2000; Kleck and DeLone 1993; Tark and Kleck 2014; see also Kleck 1988).  Consequently, denying firearms to crime victims reduces their ability to effectively defend themselves against criminal aggressors.

13.    Some defensive gun uses (DGUs) are likely to require large numbers of rounds being fired either because (a) the crime victim faces multiple offender adversaries who will not stop their aggression unless shot or fired upon, and/or because (b) the victim will, under the stressful conditions of a crime victimization, miss with most of his or her shots.

Regarding the first point, the 2008 National Crime Victimization survey indicated that 17.4% of violent crimes in the United States involved two or more offenders, and that nearly 800,000 violent crimes occurred in 2008 in which the victim faced multiple offenders.  In 247,388 violent incidents, victims faced four or more offenders (U.S. Bureau of Justice Statistics 2013, Table 37).  Thus, crime victims would often need to fire large numbers of rounds to protect themselves because they would face multiple criminal adversaries.

Regarding the second point, a reasonable upper limit on the marksmanship of crime victims using guns for self-defense can be inferred from a review of the many detailed studies that have been done of shootings by police officers in which the officers were trying to shoot criminal adversaries. In many of these shootings, the officers fired large numbers of rounds. Yet, in 63% of the incidents, the officers failed to hit even a single offender with even a single round (Geller and Scott 1993). Police officers have the experience, training, and temperament to handle stressful, dangerous situations far better than the average civilian, so it is reasonable to assume that marksmanship among civilians using guns for self-protection will be still lower than the 37% "hit rate" of police. ("Hit rate" here means the percentage of incidents in which the police officer achieved at least one hit. "Hit rate" is not used in the sense of what percentage of shots fired hit the criminal.) A victim who faced just four offenders, and was able to hit one with every three shots fired, would therefore need 12 rounds to shoot all four adversaries – more than could be fired using only a magazine limited to 10 rounds.

14.     Although we do not know the number of DGUs by crime victims that involved use of LCMs or the firing of more than 10 rounds, the number is almost certain to be larger than the number of *crimes* in which LCM use caused a larger number of victims to be injured or killed, for two reasons. First, the number of criminal uses fitting this latter description is, as previously noted, extremely small. Indeed, in a typical year it may well be zero in the entire United States (see Opinion 8 and supporting evidence). Second, the *total* number of defensive uses of guns by crime victims, without regard to number of rounds fired or use of LCMs, is far larger (perhaps five times larger) that the total number of crimes committed by offenders using guns. The most detailed survey of DGUs, based on the largest sample of U.S. adults (n=4,977), was conducted in 1993. The researchers found that 1.32% of U.S. adults (age 18+) had used a gun defensively, either firing

the gun at, or threatening, a criminal offender in the preceding 12 months. Multiplying this times the size of the adult population yielded an estimate of 2.55 million DGUs in the preceding year in which a person used a gun, even if it was not fired, for self-protection or for protection of property at home, work or elsewhere. (Kleck and Gertz 1995). This estimate was consistent with estimates derived from many other, smaller scale, surveys (Kleck 2001). Criticism of this estimate has been uninformative due to an exclusive one-sided focus on errors tending to make the estimate too large, while ignoring well-known factors discouraging the reporting of crimes in general, and possession or use of guns in particular (Kleck 2001). In that same year, there were no more than 554,000 crimes committed in which offenders fired a gun or used it to threaten a victim (Kleck and Gertz 1995, pp. 169-170), indicating there were about _five_ times as many DGUs as there were crimes in which offenders used guns.

15.     Some law-abiding citizens, like many criminals, might acquire multiple smaller capacity magazines as a substitute for banned larger capacity magazines. This development that would to some extent defeat the purpose of the magazine capacity limit. Some crime victims, however, will not be able to make effective use of multiple magazines. Under the intense emotional stress of a crime victimization, when the victim's hands are likely to be shaking violently, it will often be impossible for victims to eject the expended magazine and insert a new one quickly enough to make effective use of the second magazine. Further, elderly or physically handicapped persons may find it physically impossible for them to quickly change magazines.

16.     By definition, criminals obey laws at a lower rate than noncriminals, so violation of legal limits on magazine capacity are likely to occur at a higher rate among criminals than among noncriminals. That is, such a law will reduce possession of LCMs more among law-abiding

citizens than among criminals, and thus more among noncriminal victims and prospective victims than among criminal offenders.

17.     Opinions (15) and (16) in combination logically lead to the conclusion that a law limiting the capacity of magazines to no more than 10 rounds will reduce (a) DGUs by victims who needed to fire over 10 rounds to effectively defend themselves more than it will reduce (b) criminal attacks in which offenders need LCMs to injure or kill large numbers of victims.

18.     Empirical analyses of the impact of previous "assault weapon" (AW) bans indicate that they have no effect on crime rates, homicide rates, the number of gunshot wounds per victim or the number of wounded victims per incident (Koper 2001; Koper 2004).  Koper (2001) found that state-level assault weapon bans had no significant effect on gun homicide rates (Table II, p. 52; see Koper 2004, p. 81, footnote 95 for his interpretation of these results as indicating that they "suggest that state-level AW bans have not reduced crime").  Likewise, Koper's evaluation of the federal AW ban indicated that it had no effect on the gun homicide rate, the fraction of gun crimes resulting in death or injury, the number of victims per incident, or the number of gunshot wounds per victim (Koper 2004, pp. 92-96).

19.     Highland Park's local ban on AWs and LCMs is even less likely to have an impact on violence than the federal and state AW bans that have been found to be ineffective, due to the ease with which the banned firearms and magazines can be acquired in bordering areas.  Koper noted that state-level AW bans were likely to be undercut "by the influx of AWs from other states" (2004, p. 81, footnote 95).  This observation applies with even greater force to bans that apply only to a single municipality, since it is even easier for the banned items to be acquired.

20.     Highland Park is a part of Lake County, Illinois, which had a population of 703,462 according to the 2010 Census.  Highland Park's 29,763 residents in 2010 therefore claimed only

4.2% of Lake County's population. The only other jurisdiction within Lake County to enact an AW ban is North Chicago, which had a population of 32,572 in 2010, claiming just 4.6% of Lake County's population. Thus, only 8.8% of Lake County's population are subject to an AW ban, while the remaining 91.2% of the area's population are free to purchase and possess AWs or LCMs. This means that the residents of Highland Park are surrounded by a huge population free to possess the items that Highland Park seeks to deny to its residents. Likewise, the two Lake County towns that banned AWs claimed only 20 square miles of land area, out of 1,268.5 square miles in the entire county. Thus, only 1.6% of the county's area is in a jurisdiction subject to an AW ban. A criminal in Highland Park would have little difficulty in obtaining an AW or LCM, since they would only need to drive a few minutes at most to contact a private source or get to a gun store willing to supply firearms or magazines.

21.     It is in any case largely irrelevant whether the specific firearms banned by the Highland Park ordinance are available, since other, unbanned, firearms can be substituted for them, with no effect on the lethality of the weapons or their utility for committing either ordinary crimes or the very rare mass shootings. The ordinance did not ban all semiautomatic firearms nor all firearms capable of accepting large capacity magazines, nor did it ban firearms capable of firing at a high rate, or guns that fired ammunition that is more likely to produce death in a wounded victim. Instead, the ordinance bans some guns with these properties and not others. Consequently, the ordinance leaves firearms available for Highland Park residents to legally acquire and possess that fire just as fast, are just as capable of accepting larger capacity magazines, and are just as lethal as the banned weapons. Therefore, even if the Highland Park ordinance did somehow deny the banned firearms and magazines to prospective criminals, despite the ease with which they

A. 187

could be obtained from nearby jurisdictions, there is no logical reason to expect that this would decrease the number or lethality of gun crimes.

22.    I have reviewed the Declaration of Mark D. Jones submitted by the City of Highland Park. Jones states in paragraph 11 of his Declaration that "[t]he City of Highland Park enacted the Ordinance to address the potential threat of mass shootings involving a semi-automatic assault weapon." He thereafter offers the view, without any analysis, that "[s]uch events are demonstrably more catastrophic when the assailant uses a semi-automatic assault weapon than when other firearms are used." Jones relies exclusively on a September 2013 report prepared by Mayors Against Illegal Guns (MAIG), *Analysis of Recent Mass Shootings*.

23.    The MAIG report ignores the central methodological difficulty of assessing the impact of assault weapons and large capacity magazines on the outcomes of shootings. The central difficulty is determining whether associations found in the report reflect an actual causal effect of assault weapons/large capacity magazine use on the number of persons killed and injured, or whether they are spurious, *non*causal associations, and merely reflect the common impact of the shooter's lethality of intentions on both (1) the outcomes of shootings, and (2) the weapons and magazines that shooters choose to use in their crimes.

24.    I know of no one who questions that shooters who want to shoot more people are, on average, more likely to actually do so.  That is, the stronger the person's intention to hurt many victims, the more victims they will hurt. Yet given the extensive planning that goes into the more serious mass shootings, one would expect that these same intentions to shoot more people would also cause the shooter to prepare to do so by selecting weaponry and magazines they believed (correctly or not) were better suited to the task. I know of no one who has studied these issues who denies that criminals planning to hurt many people are more likely to choose weapons and

13

magazines that they believe will be suited to doing so.

25.    These propositions imply, in short, that the lethality of a shooter's intentions has a positive causal effect on (a) use of assault weapons and large capacity magazines, and (b) the number of victims hurt in shootings.  This means that lethality of intent will create a spurious positive association between (a) use of assault weapons or large capacity magazines and (b) the number of victims killed or injured.  Unless an analyst statistically controls for lethality of intent, he will fail to detect the spurious character of the association between (a) and (b), and will erroneously conclude, as MAIG apparently did, that the association instead reflected an actual causal effect of (a) on (b).  The MAIG analysis never controlled for lethality of the shooter's intent, and thus did nothing to rule out the possibility that the association between (a) and (b) is entirely spurious.

26.    The MAIG report compares a tiny sample of 14 assault weapon or large capacity magazine incidents (in which at least four people were killed) with 79 non-assault weapon or large capacity magazine incidents occurring between January 2009 and September 2013.  (Jones erroneously states that the 14 incidents involved semi-automatic or fully automatic assault weapons.  Actually, just 11 of the incidents involved assault weapons.  Handguns with magazine capacities larger than 10 rounds were used in three of the incidents.)  Careful analysts are aware that when very small samples are used, results may be extremely sensitive to the inclusion or exclusion of just a few cases.  A prudent step to take in response to this probability is to re-estimate results with a few outliers deleted, to see if results are substantially affected by this modest change in the composition of the sample.  MAIG did not do this.

27.    I tested how sensitive the MAIG conclusions about assault weapon/large capacity magazine use and death toll in mass shootings are to the exclusion of just three incidents from the

sample. The MAIG conclusion was that there were on average of 7.8 deaths per assault weapon/large capacity magazine incident, compared to just 4.8 deaths in non-assault weapon/large capacity magazine incidents – a ratio of 1.63. When the Newtown, CT shooting by Adam Lanza (27 deaths), the Binghamton, NY shooting by Jiverly Wong (14 deaths) and the Aurora, Colorado shooting by James Holmes (12 deaths) are excluded, the average number of deaths per assault weapon/large capacity magazine incident drops to 5.1, virtually the same as the non-assault weapon/large capacity magazine average of 4.8 deaths per incident. The ratio drops from 1.63 to just 1.1 when these three incidents are excluded.

28.    The MAIG conclusion that the death toll in assault weapon involved shootings is substantially larger than the death toll in non-assault weapon incidents relies almost entirely on the inclusion of these three cases. Had MAIG chosen to do an analysis of incidents occurring between May 2009 and June 2012, these three incidents would not even have been included. The point is not that it was wrong to include them, but rather that they could have easily been absent from the sample examined by MAIG, and had they been absent, support for MAIG's case for a substantial difference in death tolls would have collapsed. Thus, MAIG's claim is highly sensitive to slight changes in sample composition and should not be considered robust enough to draw conclusions about the effect of assault weapon use in mass shootings.

29.    Mass shootings are fortunately quite rare in absolute terms. For the 20-year period from 1994 through 2013, I know of just 81 incidents with more than six persons shot, or about four per year (see Appendix). Further, mass shootings account for only a tiny share of all homicides in the U.S. For the 2003-2012 period, mass shootings resulted in the murder of 233 persons (see Appendix), while FBI data indicate there were a total of 159,927 murders and non-negligent manslaughters committed in the U.S. over the same time period. Thus, mass shootings were

15

responsible for just 1/7[th] of 1% of the nation's criminal homicides, whether committed with a gun or not. Even as a share of gun homicides, mass shootings account for well under 1% of the killings.

30.    Even in the extremely rare mass shootings in which large numbers of victims were shot, the shooters virtually never needed large capacity magazines to injure or kill as many victim as they did, because they either (a) possessed multiple guns, (b) possessed multiple magazines, or (c) had ample time and opportunity to reload, using smaller magazines.    Therefore, even the hypothetical potential for reducing harm or improving public safety by limiting magazine capacity to no more than 10 rounds can be fairly described as being limited to no more than a very small subset of already very rare events.

31.    I did a study of every mass shooting (more than six victims wounded or killed) that occurred in the U.S. over a ten year period (1984-1993 inclusive) and found that offenders possessed multiple guns in thirteen of the fifteen incidents (about 87%), and in one of the two remaining cases (the Colin Ferguson case in New York in 1993) the offender reloaded at least once. Thus, the killers in mass shootings did not need large capacity magazines to quickly fire large numbers of rounds or wound large numbers of victims – they either just switched loaded guns or reloaded their guns without interference from bystanders. (Kleck 1997, pp. 124-126, 144).

32.    I have updated the analysis of mass shootings beyond this published analysis covering 1984-1993. All shooting incidents involving more than six victims shot (fatally or non-fatally, not including the offenders) for the period 1994 through July 2103 were examined based on news media accounts, and occasionally official reports. The incidents were confined to those involving more than six victims because the proposition that the use of a large capacity magazine affects the number of people killed or wounded is most likely to be supported in incidents with many victims. The cut-off of six victims was chosen because it would be virtually impossible to

16

shoot more than six victims using a typical 6-shot revolver without reloading.

33.    I supplemented my list of mass shootings with a list of mass shootings that involved use of large capacity magazines compiled by the Violence Policy Center (VPC), an advocacy organization that favors strong gun control laws and specifically supports bans on large capacity magazines. I used this list to supplement my list because VPC was well-motivated to locate every mass shooting involving use of a large capacity magazine, as they clearly favor the notion that the use of a large capacity magazine leads to a larger death toll in mass shootings. Thus, I sought to compile as comprehensive a list of such incidents as possible.

34.    The updated results (see Appendix) confirmed the conclusions of the 1984-1993 analysis - large capacity magazines were not needed for mass shooters to kill or injure as many victims as they did. The killer in every single mass shooting was either armed with multiple guns, had multiple magazines, or actually reloaded during the incident. I was able to identify a total of 81 mass shootings in the U.S. in 1994-2013. The shooters were known to have used one or more magazines with a capacity of more than 10 rounds in 21 of those incidents. Of the 21 mass shootings in which such magazines were used, the shooter possessed multiple guns in 16 incidents and therefore could continue firing large numbers of rounds simply by switching guns, even if they had not possessed a large capacity magazine (see Appendix). In the remaining 5 incidents, the shooter possessed multiple magazines. Thus, in 100% of mass shootings in which magazines holding more than 10 rounds were used, the shooter had either multiple guns or multiple magazines, and could therefore continue firing large numbers of rounds simply by switching guns or magazines. *There was not a single mass shooting in which the offender used a large capacity magazine, and was known to have possessed just one gun and just one magazine in his immediate possession.* Thus, even if large capacity magazines had not been available, all of the shooters

17

A. 192

could have quickly fired large numbers of rounds simply by firing multiple guns or using a single gun but changing smaller capacity magazines.

35.    One circumstance in which the use of a large capacity magazine could affect the number of casualties even if the shooter possessed multiple guns or multiple magazines is if there were bystanders willing to tackle the shooter during his attempt to change magazines or firearms. The use of a large capacity magazine prior to that time could affect the number of victims shot, since the killer could have fired more rounds before needing to reload or switch guns. The only mass shooting in this 20-year period in which this definitely occurred was the Tucson, AZ incident in which Gabrielle Giffords was wounded by a man named Jared Loughner. In this single case, the shooter's possession of a large capacity magazine may have affected the number of casualties because he was able to fire more rounds before needing to reload, and there were bystanders willing and able to intervene when he did try to reload. Thus, merely having multiple smaller capacity magazines would not have been, in this incident, a complete substitute for a large capacity magazine, since the casualty count was a function of the capacity of the magazine before the bystanders stopped the shooter. One other case that *may* have fit this description was the Springfield, Oregon shooting on May 21, 1998, in which the shooter (Kip Kinkel) used a large capacity magazine, but was tackled by bystanders. Some accounts indicate this occurred while he was trying to change magazines which others indicate that he was still shooting when he was tackled.

36.    Even in connection with the Tucson shooting in which Rep. Gabrielle Giffords was wounded, it is not certain whether the shooter was tackled by bystanders while he was reloading. In this incident, a large capacity magazine that the shooter attempted to use failed due to a broken spring (*New York Times* January 10, 2011, p. A1). Since magazines of any size can malfunction,

banning large capacity magazines and leaving smaller ones available to be substituted would not increase the rate at which such a malfunction occurred and consequently save lives. Thus, the Tucson shooting serves to support a large capacity magazine ban only if the shooter was reloading when tackled, rather than struggling with a malfunctioning magazine. The evidence available from news accounts of this incident does not allow us to tell whether bystanders were able to tackle the shooter because he was reloading, or because he was struggling with a defective magazine. Besides the Tucson and Springfield, Oregon incidents, there are no other mass shootings known to me in this 20-year period in which a shooter using semiautomatic guns was disrupted by bystanders while attempting to switch detachable magazines.

37.    In sum, use of large capacity magazines arguably affected the number of persons killed or injured in just one, or possibly two, of the 81 mass shootings occurring in the United States in 1994-2013. Synopses of the mass shootings for 1994-2013, and the sources relied upon can be found in the Appendix.

38.    Mark Jones asserts in paragraph 14 of his Declaration that assault weapons were used in 1 to 8% of crimes in 1994 but he misinterprets the data on which he relies. Christopher Koper merely referenced the numerous studies examining the use of assault weapons in crime and stated that "depending on the specific AW definition and data source used" assault weapons accounted for "up to 8% of guns used in crime." Jones fails to note that Koper thereafter stated that a "compilation of 38 sources indicated that AWs accounted for 2% of crime guns on average." More specifically, the compilation of data revealed that "less than 2% of crime guns are 'assault weapons' (the median is 1.8%) and well under 1% are 'assault rifles.'" (Kleck, Gary. 1997, p. 112). Jones also fails to mention that only *two* of the 38 estimates of the percentage of assault weapons used in crime were over 4.3% and the 8% estimate was unreliable because the sample

A. 194

was "neither an unselected population nor a representative sample of crime guns and not comparable to other estimates." (Id. at p. 142). Of the nine studies addressing the use of assault rifles only (as opposed to assault pistols and assault shotguns), assault rifles accounted for just .038% of crime guns on average. (Id.) Firearms traces by ATF of guns recovered by law enforcement and reported as "assault weapons" between 1991 and 2002 were overwhelmingly assault pistols rather than assault rifles, by a nearly 3 to 1 margin.

39.    Jones also misinterprets source data in addressing the percentage of police officers killed with assault weapons. Assault weapons are almost never used to kill police officers. For the period 1980 -1989, 33 (4%) of the 810 police officers feloniously killed in the U.S. and its territories were killed by assault weapons of some type (pistols or rifles).  For 1986-1990, 19 (5%) of the 350 officers killed were killed with assault weapons. For the period 1992-1996, there were 4.5 assault weapon killings of police officers per year, and 7% of the total were committed with assault weapons of some type (pistols or rifles). (Kleck 1997, pp. 126-127).  Roth and Koper (1997, p. 99) reported that just 3 of 276 killings of police officers in the period from January 1992 through May 1996 (approximately 1%) were committed with an AR-15 rifle or an AR-15 copy.

**References**

Geller, Wiliam A., and Michael S. Scott. 1992. *Deadly Force: What We Know*. Washington, D.C.:

Police Executive Research Forum.

Kleck, Gary. 1988.  Crime control through the private use of armed force. *Social Problems*

35(1):1-2

Kleck, Gary. 2001. The frequency of defensive gun use: evidence and

disinformation. Chapter 6 in Armed, by Gary Kleck and Don B. Kates. NY:

Prometheus Books.

Kleck, Gary, and Miriam DeLone. 1993.  Victim resistance and offender weapon effects in

robbery. *Journal of Quantitative Criminology* 9:55-82.

A. 196

Kleck, Gary, and Marc Gertz. 1995. "Armed resistance to crime: the .prevalence and nature of self- defense with a gun." *Journal of Criminal Law and Criminology* 86:150-187.

Kleck, Gary. 1997. *Targeting Guns.* NY: Aldine.

Kleck, Gary, and Don B. Kates, Jr. 1997. *The Great American Gun Debate.* San Francisco: Pacific Research Institute for Public Policy.

Kleck, Gary, and Don B. Kates, Jr. 2001. *Armed.* N.Y.:    Prometheus Books.

Koper, Christopher. 2001.  The impact of the 1994 federal assault weapon ban on gun violence outcomes. *Journal of Quantitative Criminology* 17:33-74.

Koper, Christopher. 2004. <u>An Updated Assessment of the Federal Assault Weapons Ban</u>. Report to the National Institute of Justice. Philadelphia: Jerry Lee Center of Criminology. Available at <u>https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf</u>.

Mayors Against Illegal Guns. 2013. Analysis of Recent Mass Shootings. (September, 2013). Available    at    <u>http://www.demandaction.org/detail/2013-09-updated-analysis-of-recent-mass-shootings</u>.

Rand, Michael. 1990.  *Handgun Crime Victims*.  Bureau of Justice Statistics Special Report. Washington, D. C.: U.S. Governmental Printing Office.

Reedy, D. C., and C. S. Koper. 2003.  Impact of handgun types on gun assault outcomes. *Injury Prevention* 9:151-155.

Roth, Jeffrey A., and Christopher S. Koper. 1997. *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994.*  Washington, D.C.: Urban Institute.

Southwick, Lawrence. 2000.  Self-defense with guns: the consequences. *Journal of Criminal Justice* 28:351-370.

A. 197

Tark, Jongyeon, and Gary Kleck. 2004. Resisting crime: the effects of victim action on the outcomes of crimes. *Criminology* 42(4):861-909.

Tark, Jongyeon, and Gary Kleck. 2014. Resisting rape: the effects of victim self-protection on rape completion and injury. *Violence Against Women* 23: 270-292.

U.S. Bureau of Justice Statistics, 2013. Data from the 2008 National Crime Victimization Survey, at http://bjs.gov/content/pub/pdf/cvus08.pdf, Table 37.

A. 198