STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF C O O K     )
    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
        COUNTY DEPARTMENT - CHANCERY DIVISION
MATTHEW D. WILSON, TORY EDHLUND  )
and JOSEPH MESSINCO,             )
        Plaintiffs,              )
     vs.                         )No. 07 CH 4848
COOK COUNTY, a public body       )
and corporate, TONI PRECKWINKLE, )
Board President, in her official )
capacity and its Board of        )
Commissioners in their official  )
capacities; namely:  EARLEAN     )
COLLINS, ROBERT STEELE, JERRY    )
BUTLER, WILLIAM M. BEAVERS,      )
DEBORAH SIMS, JOAN PATRICIA      )
MURPHY, BRIDGET GAINER, JESUS    )
G. GARCIA, PETER N. SILVESTRI,   )
JOHN P. DALEY, LARRY SUFFREDIN,  )
GREGG GOSLIN, JOHN A. FRITCHEY,  )
TIMOTHY O. SCHNEIDER, JEFFREY    )
TOBOLSKI, EDWIN REYES, ELIZABETH )
ANN DOODY GORMAN and THOMAS DART, )
Sheriff of Cook County, in his   )
official capacity,               )
        Defendants.              )
        The discovery deposition of MARK DOUGLAS
JONES, taken in the above-entitled cause, before
MARLENE L. KING, a notary public of Cook County,
Illinois, on April 30, 2014 at 330 North Wabash
Avenue, Suite 3300, Chicago, Illinois, pursuant
to notice.
        START TIME: 9:32 a.m. END TIME: 4:57 p.m.

1

---

1       IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4    ARIE S. FRIEDMAN, M.D.    )
5    and the Illinois State    )
6    Rifle Association,        )
7          Plaintiffs,         )
8      vs.                     ) NO. 13-CV-9073
9    CITY OF HIGHLAND PARK,    )
10         Defendant.          )
11
12      The deposition of MARK DOUGLAS JONES,
13   called for examination pursuant to the Rules of
14   Civil Procedure for the United States District
15   Courts pertaining to the taking of depositions,
16   taken before MARLENE L. KING, a notary public
17   within and for the County of Cook and State of
18   Illinois, at 330 North Wabash Avenue, Suite
19   3300, Chicago, Illinois, on April 30, 2014,
20   at the hour of 9:32 a.m.
21
22
23      REPORTED BY:  MARLENE L. KING, C.S.R.
24      LICENSE NO.: 084-003326.

2

---

1    APPEARANCES:
2
3    SWANSON, MARTIN & BELL, LLP,
4    BY:  MR. JAMES B. VOGTS,
5    330 North Wabash Avenue,
6    Suite 3300,
7    Chicago, Illinois  60611
8    (312) 321-9100
9    jvogts@smbtrials.com
10       and
11   MR. VICTOR D. QUILICI,
12   P.O. Box 428,
13   River Grove, Illinois  60171
14   (847) 298-2566
15       Representing the Plaintiffs;
16
17   PERKINS COIE, LLP,
18   BY:  MR. CHRISTOPHER B. WILSON,
19   131 South Dearborn Street,
20   Suite 1700,
21   Chicago, Illinois  60603
22   (312) 324-8603
23   cwilson@perkinscoie.com
24       Representing City of Highland Park;

3

---

1    APPEARANCES (Continued):
2
3    STATE'S ATTORNEY OF
4    COOK COUNTY, ILLINOIS,
5    BY:  MR. JAMES C. PULLOS,
6         Assistant State's Attorney,
7         Supervisor,
8         Labor and Employment Section,
9         and
10        MS. MARILYN F. SCHLESINGER,
11        Assistant State's Attorney,
12        Civil Actions Bureau,
13   RICHARD J. DALEY CENTER,
14   50 West Washington Street,
15   Room 500,
16   Chicago, Illinois  60602
17   (312) 603-5105
18   (312) 603-2355
19   james.pullos@cookcountyil.gov
20   marilyn.schlesinger@cookcountyil.gov
21       Representing the Defendants.
22
23
24

4

---

1  (Pages  1  to  4)

|     |            I N D E X        |                |
| --- | --- | --- |
| 1   |                            |                |
| 2   | WITNESS                    | EXAMINATION    |
| 3   | MARK DOUGLAS JONES         |                |
| 4   | By Mr. Vogts               | 8              |
| 5   |        E X H I B I T S      |                |
| 6   | NUMBER                     | REFERRED TO    |
| 7   | Deposition Exhibit         |                |
| 8   | No. 1                      | 7              |
| 9   | No. 2                      | 7              |
| 10  | No. 3                      | 14             |
| 11  | No. 4                      | 61             |
| 12  | No. 5                      | 61             |
| 13  | No. 6                      | 68             |
| 14  | No. 7                      | 68             |
| 15  | No. 8                      | 66             |
| 16  | No. 9                      | 119            |
| 17  | No. 10                     | 124            |
| 18  | No. 11                     | 130            |
| 19  | No. 12                     | 136            |
| 20  | No. 13                     | 144            |
| 21  | No. 14                     | 159            |
| 22  | No. 15                     | 171            |
| 23  | No. 16                     | 175            |
| 24  | No. 17                     | 178            |

5

|     |        E X H I B I T S      |                |
| --- | --- | --- |
| 1   |                            |                |
| 2   | NUMBER                     | REFERRED TO    |
| 3   | Deposition Exhibit         |                |
| 4   | No. 18                     | 209            |
| 5   | No. 19                     | 216            |
| 6   | No. 20                     | 225            |
| 7   | No. 21                     | 228            |
| 8   | No. 22                     | 237            |
| 9   | No. 23                     | 243            |
| 10  | No. 24                     | 246            |
| 11  | No. 25                     | 250            |
| 12  | No. 26                     | 271            |
| 13  |                            |                |
| 14  |                            |                |
| 15  |                            |                |
| 16  |                            |                |
| 17  |                            |                |
| 18  |                            |                |
| 19  |                            |                |
| 20  |                            |                |
| 21  |                            |                |
| 22  |                            |                |
| 23  |                            |                |
| 24  |                            |                |

6

1  MR. VOGTS: Would you swear in the witness,
2  please.
3          (WHEREUPON, the witness was
4          duly sworn.)
5  MR. VOGTS: This is the discovery deposition
6  of Mark D. Jones taken in the case of Wilson
7  versus Cook County and also the deposition of
8  Mark D. Jones taken in the case of Friedman
9  versus the City of Highland Park.
10         Good morning, Mr. Jones.
11  THE WITNESS: Good morning.
12  MR. VOGTS: I'm going to show you, make as
13  part of the record here, Exhibit 1 and Exhibit
14  2, which are the notices for the deposition in
15  the two cases.
16         And for the record in each of those
17  deposition notice a request was made pursuant to
18  Federal Rule of Civil Procedure 34 or Illinois
19  Supreme Court Rule 214 that the witness bring
20  to the deposition today all reports, studies,
21  data, articles, treatises and other documents
22  that support the opinions stated in his February
23  7, 2014 declaration and his November 25, 2013
24  report. It's my understanding the witness has

7

1  not brought those materials with him today.
2  MARK DOUGLAS JONES,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6          EXAMINATION
7  BY MR. VOGTS:
8      Q.  Is that a correct statement, Mr. Jones?
9      A.  That's correct. I do not have those
10  materials with me at the moment.
11  MR. VOGTS: The plaintiffs in both cases will
12  reserve their right to reconvene this deposition
13  at a later date should that be necessary.
14  BY MR. VOGTS:
15      Q.  Will you please state your name for the
16  record?
17      A.  My name is Mark Douglas Jones.
18      Q.  What is your age?
19      A.  I'm 56.
20      Q.  Where do you live?
21      A.  Chicago, Illinois.
22      Q.  What is your residence address?
23      A.  7622 North Rogers Avenue, R-o-g-e-r-s,
24  Chicago.

8

C O N F I D E N T I A L

```
 1        (WHEREUPON, the record was read
 2        by the reporter as requested.)
 3   BY MR. VOGTS:
 4        Q.  I'll repeat that question.  What
 5   firearms do you own, Mr. Jones?
 6        MR. WILSON:  And we're going to mark this as
 7   confidential.
 8        MR. VOGTS:  We are.  I think you were out
 9   of the room.  I told Marlene that what would be
10   easiest for her and all of us is to temporarily
11   mark the entire transcript as confidential, and
12   then once we receive the transcript, we can
13   agree to mark those pages and lines that the
14   witness would like to keep under wraps.  By
15   "under wraps" I mean within the confines of the
16   attorneys' expert witnesses and the Court, the
17   typical parameters of a confidentiality order.
18        MR. WILSON:  Understood.
19        THE WITNESS:  May I ask a question about
20   that?
21   BY MR. VOGTS:
22        Q.  Sure.
23        A.  I'm only concerned about where -- will
24   this list come out in open court at any time?
```

                                                    53

```
 1        Q.  It's distinctly possible, but I can't
 2   say that it will.
 3        A.  Okay.  Well, I don't have any standing
 4   to do this, but I'm going to object to answering
 5   that question because I have security concerns
 6   for myself.
 7        Based on my long career there are quite
 8   a number of people I think that would like
 9   to see me dead, so I have a threat concern.
10   But beyond that I'll answer your question.
11        So I own a Glock Model 26 nine
12   millimeter semi-automatic pistol, a Glock 19
13   nine millimeter semi-automatic pistol, a
14   Smith & Wesson Model 13 .357-caliber revolver,
15   a Smith & Wesson Model 48 22 magnum revolver,
16   a Remington Model 848 Automaster 12-gauge
17   shotgun, a Savage-Stevens Model I think it's
18   30112-gauge double barrel shotgun, a Winchester
19   Model 94 lever action rifle in 44 magnum,
20   and a Norinco Model -- Model 56, Type 56,
21   semi-automatic rifle.
22        Q.  Is the Norinco Type 56 in the AK
23   platform?
24        A.  Yes.  I have forgotten one.  I'm sorry.
```

                                                    54

```
 1   Ruger 10/22, .22-caliber semi-automatic rifle.
 2        Q.  What magazine capacity does your I
 3   believe two Glock semi-automatic pistols have?
 4        A.  The Model 26 is a 10 round capacity.
 5   Model 19 is a 15 round capacity.
 6        Q.  Do you own magazines for the Norinco
 7   Type 56 rifle?
 8        A.  I do.
 9        Q.  What magazines do you own?
10        A.  I own 30 round capacity magazines.
11        Q.  The Ruger 10/22 semi-automatic rifle
12   is equipped with a 10 round rotary magazine,
13   is that correct?
14        A.  That's correct.
15        Q.  Is that the only magazine you own for
16   that gun?
17        A.  Yes.
18        Q.  Do you hunt?
19        A.  Yes.
20        Q.  What type of hunting do you do?
21        A.  I hunt pheasants and quail
22   occasionally.
23        Q.  You use shotguns for that purpose?
24        A.  I use my Remington 848 for that
```

                                                    55

```
 1   purpose, yes, and I have in the past hunted
 2   prairie dogs.
 3        Q.  What firearm did you use for that type
 4   of hunting?
 5        A.  I used an AR-15 very custom with a
 6   heavy barrel and custom trigger and four and a
 7   half by 14 optics.
 8        Q.  Was that a firearm that you at one time
 9   owned?
10        A.  Yes.
11        Q.  Who manufactured that AR-15?
12        A.  It's a Colt lower and I think it's
13   i-Gun upper.
14        Q.  Is it chambered at .223?
15        A.  Yes.
16        Q.  Did you find that AR-15 appropriate for
17   prairie dog hunting?
18        A.  Yes.
19        Q.  Suitable for prairie dog hunting?
20        A.  Yes, I did.
21        Q.  Did you prairie dog hunt with others
22   or -- typically or by yourself?
23        A.  Others.
24        Q.  Kind of a group activity, isn't it,
```

                                                    56

                                    14 (Pages 53 to 56)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

| | |
|---|---|
| 1   prairie dog hunting? | 1      Q.  Have you ever had occasion to access |
| 2      A.  Yes. | 2   that firearm because of a perceived threat? |
| 3      Q.  Flushing them out of their holes? | 3      A.  No. |
| 4      A.  It's a group activity for us, yes. | 4      Q.  Is your wife trained in the use of |
| 5      Q.  Okay.  Were others in your group | 5   any firearm you keep in your home? |
| 6   equipped with AR type rifles as well for that | 6      A.  Yes. |
| 7   purpose? | 7      Q.  Please describe the extent of her |
| 8      A.  Some, some not.  Some used a bolt | 8   training. |
| 9   action rifle.  And I initially started doing | 9      A.  I have -- we actually met on a range, |
| 10   that with a Remington Sendero in .223, bolt | 10   on an ATF range.  And I had trained her myself |
| 11   action rifle. | 11   to some extent that she's able to function the |
| 12      Q.  When you prairie dog hunted with the | 12   revolver reliably under what I would consider |
| 13   AR-15, what magazine capacity were you equipped | 13   to be adverse circumstances.  Or at least that's |
| 14   with? | 14   the hope.  You never know until you get there. |
| 15      A.  10 and 20. | 15      Q.  Have you trained her on the use of a |
| 16      Q.  Why 20? | 16   Glock Model 19 as well? |
| 17      A.  I shoot prone a lot.  The 30 round | 17      A.  She's shot it, but I wouldn't be as |
| 18   magazine tends to interfere with the prone | 18   confident with her using that gun as I would |
| 19   position, so I shoot from a 10 or 20 round | 19   using the revolver, so that's why I keep the |
| 20   magazine. | 20   revolver in the house. |
| 21      Q.  Well, why would you choose a 20 instead | 21      Q.  Do you keep the Glock Model 19 loaded |
| 22   of a 10 for that purpose? | 22   in the safe? |
| 23      A.  The volume of prairie dogs is such | 23      A.  I keep it with the magazine in the gun |
| 24   that sometimes it's just more convenient not to | 24   but no rounds in the chamber. |
| 57 | 59 |
| 1   change magazines quite so often. | 1      Q.  Is the magazine fully loaded with |
| 2      Q.  Do you keep a firearm available in | 2   15 rounds? |
| 3   your home if it's needed for self-defense? | 3      A.  Yes. |
| 4      A.  Yes. | 4      Q.  Okay.  Does the Glock Model 19 have an |
| 5      Q.  What firearm do you keep available for | 5   external manual safety? |
| 6   that purpose? | 6      A.  Yes. |
| 7      A.  The Smith & Wesson Model 13 and the | 7      Q.  Do you have any sort of -- strike that. |
| 8   Glock Model 19. | 8         Do you have an opinion as to whether |
| 9      Q.  And the Glock Model 19 is a firearm | 9   it's appropriate or inappropriate for a civilian |
| 10   that's equipped with a 15 round magazine, is | 10   without any law enforcement background to keep |
| 11   that right? | 11   a firearm available in his or her home for |
| 12      A.  That's right. | 12   possible self-defense use? |
| 13      Q.  Do you keep that Glock Model 19 under | 13      A.  Yes. |
| 14   lock and key? | 14      Q.  What is your opinion? |
| 15      A.  Yes. | 15      A.  My opinion is that if an individual |
| 16      Q.  Okay.  Is it a safe that's readily | 16   wants to have a firearm, they should be able |
| 17   accessible? | 17   to have a firearm in their home for defense. |
| 18      A.  Yes. | 18      Q.  Can we agree -- I guess going forward, |
| 19      Q.  Combination or a biometric device? | 19   I should have done this earlier, but that as to |
| 20      A.  Combination.  I actually have several. | 20   some basic nomenclature, would you agree that in |
| 21   The one that it's in now is a combination with | 21   the most fundamental way there are two types of |
| 22   sort of a Simplex lock arrangement, if you | 22   handguns, there are revolvers with cylinders, |
| 23   understand what I'm talking about.  Couple of | 23   and there are pistols with magazines?  Would you |
| 24   buttons, and it opens with a flywheel. | 24   agree with that description of handguns? |
| 58 | 60 |

15 (Pages 57 to 60)

A. 269

| | |
|---|---|
| 1   they do not. | 1   activator." |
| 2   Q. Would you agree that the difference | 2   A. Yes. |
| 3   between a fully automatic rifle and a | 3   Q. Did I read that correctly? |
| 4   semi-automatic rifle is a major functional | 4   A. Yes, you did. |
| 5   difference between those two firearms? | 5   Q. Okay. Have you ever used a |
| 6   A. Certainly a major legal difference | 6   commercially available "bump fire" trigger |
| 7   between the two. Possession of one is a felony | 7   activator? |
| 8   without proper registration. Possession of the | 8   A. Yes. |
| 9   other in this case is a violation of the assault | 9   Q. Why is that? |
| 10   weapons ban. | 10   A. To test it to see how it functioned. |
| 11   Q. Would you agree that the ability to | 11   Q. Test it in an official capacity or just |
| 12   fire fully automatic is a major functional | 12   more private curiosity? |
| 13   difference from a rifle that can only fire | 13   A. No, in official capacity. |
| 14   semi-automatic? | 14   Q. And what did you experience? |
| 15   A. Yes. | 15   A. I experienced a firearm that fired |
| 16   Q. At Page 8 of your Declaration in | 16   at a very high cyclic rate. AR-15 emptied the |
| 17   the Friedman case did you write that, "The | 17   magazine very, very quickly. |
| 18   functional differences between AR rifles | 18   Q. When using that "bump fire" trigger |
| 19   used for military purposes and civilian | 19   activator, did you fire from the shoulder, |
| 20   semi-automatic rifles are minimal"? | 20   from your hip? Where did you fire from? |
| 21   A. Yes, they are minimal. | 21   A. Many of them you have to fire from the |
| 22   Q. Okay. Explain that to me, please. | 22   hip. There is another one on the market now |
| 23   A. They function exactly -- in exactly the | 23   that is a stock activator that functions the |
| 24   same fashion with the exception that selected | 24   same way, and you can fire it from the shoulder. |
| 73 | 75 |
| 1   fire has a selector switch that can be moved | 1   Q. When you yourself fired that fire, what |
| 2   from semi-automatic to fully automatic and | 2   kind of firearm did you fire from the hip with |
| 3   allows for them to fire fully automatic. | 3   that "bump fire" activator? |
| 4   Other than that, the rifles fire | 4   A. It was some sort of an AR-15 copy. |
| 5   exactly the same, civilian AR-15 or military | 5   I don't recall the exact model or make. |
| 6   M-4. The controls are the same. The stocks are | 6   Q. How did that activator work? |
| 7   the same. The ammunition magazines are the | 7   A. I can't tell you the science on it |
| 8   same. If you can function one, you can function | 8   other than the recoil causes the sear not to |
| 9   the other. | 9   fully engage and allows the weapon to fire fully |
| 10   Q. Okay. Except for the major functional | 10   automatic. Beyond that, it was attached to the |
| 11   difference that one can fire in fully automatic | 11   trigger. You pull the trigger. It fired. |
| 12   mode, and the other can only fire in a | 12   Fired fully automatic. |
| 13   semi-automatic mode, correct? | 13   Q. Is that device legal under Federal law? |
| 14   A. Yes. | 14   A. Yes. |
| 15   Q. At Page 9 of your Declaration -- refer | 15   Q. ATF has looked at it and decided that |
| 16   to mine. | 16   it was a legal device. |
| 17   A. Try to smooth things up. | 17   A. Yes. That's correct. |
| 18   Q. Paragraph 16 -- | 18   Q. Do you know what the basis of ATF's |
| 19   A. Yep. | 19   determination was that that was a legal device? |
| 20   Q. -- you wrote that, "The AR-15 family | 20   A. No. |
| 21   of rifles may be fired at virtually the same | 21   Q. It's generally, however, not legal to |
| 22   cyclical rate of fire as a fully automatic | 22   convert a semi-automatic firearm into a fully |
| 23   machine gun by installing a commercially | 23   automatic firearm, is it? |
| 24   manufactured so-called "bump fire" trigger | 24   A. That's correct. It's illegal. |
| 74 | 76 |

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1    Q.   You have received what I'll
2  characterize as extensive firearms training in
3  your career?
4    A.   That's correct.
5    Q.   Have you ever been taught in any of
6  those training sessions to fire a firearm from
7  your hip?
8    A.   Yes.  Actually, I have been.
9    Q.   Under what circumstance would you fire
10  a firearm from your hip?
11    A.   I myself would not fire a firearm from
12  my hip.
13    Q.   Why not?
14    A.   It's not as accurate as firing from the
15  shoulder.  If you're holding a long gun, it's
16  meant to be mounted to the shoulder and fired,
17  and that's how I would fire it.
18       Except for really extreme emergency
19  where you needed to deploy the firearm
20  immediately and the target was close enough that
21  I felt that I was capable of hitting it from the
22  hip like that, I would normally not do that.
23    Q.   You've also spent a considerable amount
24  of time instructing others on firearms use and

77

1  safety?
2    A.   Yes.
3    Q.   Have you ever instructed any of your
4  agents, officers, pupils, whatever you call
5  them, to fire a firearm from the hip?
6    A.   No, have not.
7    Q.   For the same reasons?
8    A.   Yes.  Let me say that we have
9  demonstrated it and demonstrated the differences
10  in accuracy between firing from the hip.  I
11  think at the Federal Law Enforcement Training
12  Center there is still a curriculum where they
13  train you to fire from the hip position, and
14  they trained all Federal agencies to go through
15  the basic criminal investigator course, how to
16  fire a firearm from the hip, but I have not
17  trained anyone to fire.
18    Q.   Would that technique if in fact it
19  was trained as you have described be limited
20  to situations in which there was a need to lay
21  suppressive fire down to protect a colleague
22  in the field?
23    A.   The short answer is no.  I was taught
24  that technique and have only been shown it in

78

1  the context of using a shotgun, which typically
2  doesn't contain enough ammunition to put
3  suppressive fire down in the context that I
4  understand suppressive firearm.  So no.
5    Q.   What circumstance was it that
6  contemplated where you might need to fire from
7  the hip?
8    A.   Mr. Vogts, I don't know the policy, why
9  they were trying to teach that.  They taught it,
10  I learned it, I took the test I was supposed to
11  take and passed it and moved on and have never
12  fired a firearm from the hip.
13    Q.   Are you aware of any circumstance in
14  which a criminal has used a "bump fire" trigger
15  activator in the commission of a firearms crime?
16    A.   I am not aware of one of those
17  circumstances, although there are many,
18  many circumstances that I'm not aware of.
19    Q.   But you're not aware of one.
20    A.   No, I am not personally aware of one of
21  those, no.
22    Q.   You also wrote at Paragraph 16 of
23  Exhibit 5 that, "The AR-15 family of rifles may
24  be fired at virtually the same cyclical rate of

79

1  fire as a fully automatic machine gun," and I'm
2  going to skip some language, "by merely firing
3  from the hip holding the barrel shroud with one
4  hand and pressing the trigger with the other."
5    A.   Um-um.
6    Q.   Could you explain that to me, please?
7  I don't understand how merely firing from the
8  hip and holding the barrel shroud with one hand
9  and pressing the trigger can achieve fully
10  automatic fire?
11    A.   With a bump fire activator.
12    Q.   Okay.  So I just misunderstand your
13  syntax there.
14    A.   Could very well be, sir, yes.
15    Q.   So what you're saying in that sentence
16  is with a "bump fire" trigger activator you can
17  achieve a cyclical rate of fire similar to that
18  of a fully automatic gun.
19    A.   That's correct.
20    Q.   Page 9 of Exhibit 5, Paragraph 17,
21  you discuss there that, "parts and plans for
22  conversion of semi-automatic firearms into
23  a machine gun are widely available on the
24  Internet," is that correct?

80

20  (Pages 77 to 80)

A. 271

| 1 | section at the bottom called Highlights, right |
| 2 | column, first bullet pointed paragraph -- |
| 3 | A. Yes. |
| 4 | Q. -- "About 12 percent of all households |
| 5 | violently burglarized while someone was at home |
| 6 | faced an offender armed with a firearm," is that |
| 7 | correct? |
| 8 | A. Yes. That's what it says. |
| 9 | Q. And that's 12 percent of the |
| 10 | one million figure, is that correct? |
| 11 | A. I think so. If I read this correctly, |
| 12 | I think that's right. |
| 13 | Q. Referring you back to Exhibit 5, |
| 14 | Page 6, you have a brief discussion of United |
| 15 | States Supreme Court's decision in the Heller |
| 16 | versus District of Columbia case, is that |
| 17 | correct? |
| 18 | A. Yes. |
| 19 | Q. Did you write that paragraph? |
| 20 | A. Yes, I did. |
| 21 | Q. Okay. Did you write that paragraph |
| 22 | based upon your reading, personal reading, |
| 23 | of the Heller decision? |
| 24 | A. Yes. |

157

| 1 | Q. And based on your reading of the Heller |
| 2 | decision, you believe the Court concluded the |
| 3 | Second Amendment right to keep and bear arms |
| 4 | does not include the right to possess |
| 5 | unusually dangerous firearms. |
| 6 | A. That's correct. |
| 7 | Q. Isn't it true that in fact the Supreme |
| 8 | Court referred to the historical tradition of |
| 9 | prohibiting the carrying of dangerous and |
| 10 | unusual weapons, that it used language different |
| 11 | from what you wrote in your report? |
| 12 | MR. WILSON: Objection. Calls for a legal |
| 13 | conclusion. |
| 14 | THE WITNESS: That's what it says in the |
| 15 | Heller decision. |
| 16 | BY MR. VOGTS: |
| 17 | Q. And I just handed you a copy of the |
| 18 | Heller decision. |
| 19 | A. Yes. I am reading the Heller decision |
| 20 | you just gave me, and it says dangerous and |
| 21 | unusual weapons. |
| 22 | Q. Grammatically speaking, is there a |
| 23 | difference between a firearm that is unusually |
| 24 | dangerous and a firearm that is unusual and |

158

| 1 | dangerous? |
| 2 | A. Yes. |
| 3 | Q. What is that difference? |
| 4 | A. Well, I think all firearms are |
| 5 | dangerous. They are all inherently dangerous, |
| 6 | much like any other tool is -- has an inherent |
| 7 | danger and needs to be used correctly. |
| 8 | Unusually dangerous to me says |
| 9 | something like short barrel shotgun or hand |
| 10 | grenade or assault weapon. And unusual and |
| 11 | dangerous says to me something like cigarette |
| 12 | lighter gun or cell phone gun or a cane gun, |
| 13 | something that isn't -- |
| 14 | Q. That you don't see very often. |
| 15 | A. That you don't see very often except |
| 16 | in the NRA museum or occasional gun show. |
| 17 | Q. But like all guns, it's nevertheless |
| 18 | dangerous in the wrong hands. |
| 19 | A. Even in the right hands it's dangerous. |
| 20 | Q. I'm going to show you what has been |
| 21 | marked as Exhibit 14. Is this the Declaration |
| 22 | that you signed under oath in the Heller versus |
| 23 | District of Columbia case on September 22, 2013? |
| 24 | A. Certainly looks like it to me, yes. |

159

| 1 | Q. Referring you to Paragraph 13. |
| 2 | A. Page? |
| 3 | Q. 5. |
| 4 | A. Page 5. Okay. Paragraph 13. |
| 5 | Q. In the second sentence you express the |
| 6 | following opinion, and I'm going to ask you |
| 7 | whether that's an opinion you still have, quote, |
| 8 | "All firearms, be they rifles, shotguns or |
| 9 | handguns, pose a similar threat to public safety |
| 10 | in the wrong hands, and, in my opinion, should |
| 11 | be regulated similarly." |
| 12 | A. Yes. I stand by that statement. |
| 13 | Q. Exhibit 5, Page 9, Paragraph 18 -- |
| 14 | A. Okay. |
| 15 | Q. -- one of the opinions you have |
| 16 | expressed in this case is that, "Semi-automatic |
| 17 | assault weapons and civilian sporting arms, |
| 18 | firearms, e.g., hunting rifles and shotguns, |
| 19 | make up a very small percentage of firearms used |
| 20 | in armed assaults, homicides and suicides in |
| 21 | Illinois and nationwide," is that correct? |
| 22 | A. Yes. |
| 23 | Q. That is your opinion? |
| 24 | A. Yes. |

160

40 (Pages 157 to 160)

A. 272

| | |
|---|---|
| 1   Q.  And it is backed up by data? | 1   is in fact one of the largest problems that |
| 2   A.  Yes. | 2   those communities face. |
| 3   Q.  And I believe you referred to the | 3        Less long guns mean less guns stolen |
| 4   Uniform Crime Reports that are published by the | 4   in burglaries for -- to be then put under the |
| 5   FBI on an annual basis? | 5   secondary market and potentially used by |
| 6   A.  Yes. | 6   criminals, first. |
| 7   Q.  There's some lag time in those reports; | 7   Q.  So by banning a subclass of long guns, |
| 8   you don't get them for a year or so after the | 8   in this instance those guns classified as |
| 9   period that's reported on them? | 9   assault rifles or assault shotguns, firearms |
| 10  A.  That's my understanding, yes. | 10  related crime will reduce because fewer of those |
| 11  Q.  Exhibit 4, Page 20 you essentially | 11  guns will be stolen in related burglaries. |
| 12  express the same opinion at the top when you | 12  A.  Well, that's certainly one aspect.  And |
| 13  wrote, "Statistically rifles and shotguns known | 13  another and I think even more important is when |
| 14  collectively in the vernacular as, quote, long | 14  they are banned and not available to be used |
| 15  guns, closed quote, are less likely to be used | 15  by people who shouldn't be using them for the |
| 16  in homicides or recovered by law enforcement | 16  purpose that they want, people like the kid in |
| 17  authorities than other crimes," is that correct? | 17  Colorado at the movie theater or any of the |
| 18  A.  That's correct. | 18  other -- or the guy at the Fed Ex facility in |
| 19  Q.  And in support of that statement you | 19  Kennesaw, Georgia yesterday where they have a |
| 20  cited a Bureau of Justice Statistics report, | 20  law that says everyone has to have a gun, he |
| 21  did you not? | 21  used a long gun. |
| 22  A.  Look what I cited.  I'll tell you. | 22       If they're not available, they can't be |
| 23  Bureau of Justice Statistics, Firearms and | 23  used.  They're not appropriate for self-defense |
| 24  Violence 1993 through 2011. | 24  in the home.  They are just not -- they're not |
| 161 | 163 |

| | |
|---|---|
| 1   Q.  You agree that criminals by an | 1   the best weapon for home defense.  If they're |
| 2   overwhelming majority prefer handguns, is that | 2   not there, you can't use them in a mass |
| 3   correct? | 3   shooting, you can't use them in a suicide, |
| 4   A.  Yes. | 4   you can't use them for any bad purpose. |
| 5   Q.  And data from just about every source | 5        And in my opinion the City of Highland |
| 6   and Federal organization looks at these kinds | 6   Park has made the decision that they don't want |
| 7   of things has drawn that conclusion, correct? | 7   those firearms in their political subdivision. |
| 8   A.  That's right. | 8   The town of Highland Park doesn't want assault |
| 9   Q.  Elsewhere in Exhibit 5, specifically | 9   weapons. |
| 10  Paragraph -- or Page 6 you indicate in Paragraph | 10       I think their rationale is good.  They |
| 11  9 that the ordinance serves -- strike that. | 11  don't want them there so they can't be used, and |
| 12       You indicate in Paragraph 9 that one | 12  they're doing it prophylactically so they're not |
| 13  of the goals the ordinance serves is reducing | 13  available to be used, stolen in burglaries or |
| 14  firearms related crime, is that correct? | 14  used in a mass shooting at the big temple that's |
| 15  A.  Yes. | 15  just across Lake Cook Road from Highland Park |
| 16  Q.  How do you square that opinion with the | 16  or at the shopping mall or in any of the places |
| 17  fact that the data shows that long guns, rifles | 17  that people come to gather. |
| 18  and shotguns are rarely if ever used by | 18  Q.  Let's put mass shootings for the moment |
| 19  criminals in committing their crimes? | 19  off, off to the side here, and just address, |
| 20  A.  Rarely, but sometimes.  And as a former | 20  you know, the more commonly occurring firearms |
| 21  public safety officer in Glencoe and having | 21  related crimes that occur in the United States. |
| 22  worked with the Highland Park Police Department | 22       Do you believe that reducing the |
| 23  and all of the departments along that North | 23  availability of these subclasses of rifles and |
| 24  Shore area, I recognize that household burglary | 24  shotguns will reduce the occurrence of firearms |
| 162 | 164 |

41 (Pages 161 to 164)

A. 273

| | |
|---|---|
| 1  with an AR-15. | 1      Are you familiar with Chicago Police |
| 2      Q.  Setting aside mass shootings for the | 2  Department Chicago Murder Analyses?  Have you |
| 3  purposes of this question, isn't it true that | 3  seen those before? |
| 4  AR-15 type rifles are rarely if ever used by | 4      A.  I may have seen them online.  I've not |
| 5  criminals committing firearms related crimes? | 5  seen any of those documents. |
| 6      A.  Yes.  It's an unusual weapon in the | 6      Q.  I will show you one in its complete |
| 7  hands of criminals. | 7  form here for the year 2010.  Just quickly look |
| 8      Q.  And why is that? | 8  it over, and then I'll ask you some questions. |
| 9      A.  I don't know.  No one knows.  We're | 9      MR. PULLOS:  Do you have a copy? |
| 10  still struggling with that research, and we just | 10      MR. VOGTS:  I'm going to ask questions off |
| 11  don't know.  We don't know why they don't choose | 11  of that.  Exhibit 15. |
| 12  assault rifles instead of handguns. | 12      I have some specific pages that I'll |
| 13      Q.  Isn't it true that research has shown, | 13  refer you to once you're done. |
| 14  as we have already discussed, that criminals | 14          (WHEREUPON, there was a short |
| 15  prefer handguns because they're concealable? | 15          pause.) |
| 16      A.  That's true.  That's my belief.  I | 16      THE WITNESS:  Okay.  We can start. |
| 17  believe they generally prefer them because | 17  BY MR. VOGTS: |
| 18  they're easier to conceal and easier to move | 18      Q.  Marked as Exhibit 15, some selected |
| 19  around and shoot from a car and things like | 19  pages from the separate Chicago Police |
| 20  that. | 20  Department Murder Analyses prepared for the |
| 21      Q.  And an AR-15 type rifle, given the fact | 21  years 2006 through 2011. |
| 22  that it's a rifle and a long gun, cannot be as | 22      Referring to the second page of Exhibit |
| 23  easily concealed as a handgun. | 23  15, based on Chicago Police Department data, |
| 24      A.  That's true. | 24  there were a total of 362 firearms related |
| 169 | 171 |
| 1      Q.  AR-15 type rifles are generally more | 1  murders in the city that year, correct? |
| 2  expensive than the average handgun, is that | 2      A.  That's what it says, yes. |
| 3  correct? | 3      Q.  And just one was committed with a |
| 4      A.  That's true. | 4  rifle. |
| 5      Q.  Could that be another reason why | 5      A.  Yes. |
| 6  criminals rarely if ever use AR-15 type rifles | 6      Q.  And the type of rifle that one murder |
| 7  in firearms related crimes? | 7  was committed with is not described, is that |
| 8      MR. WILSON:  Objection.  Calls for | 8  right? |
| 9  speculation. | 9      A.  That's correct. |
| 10      THE WITNESS:  I suppose that -- as I said, | 10      Q.  So it could be a rifle of the type |
| 11  trying to get into a criminal's head, not so | 11  banned under the ordinance or it could be of |
| 12  easy. | 12  a rifle not banned under the ordinance. |
| 13  BY MR. VOGTS: | 13      A.  Correct. |
| 14      Q.  But you have spent 30 years doing that, | 14      Q.  Two pages later in 2010 of the 353 |
| 15  didn't you? | 15  firearms murders committed in that year, just |
| 16      A.  I've spent a lot of time with | 16  four were committed with a rifle, is that |
| 17  criminals, and I've spent a lot of time talking | 17  correct? |
| 18  to them.  Understanding their motivation is | 18      A.  Yes. |
| 19  something that really eludes me to this day. | 19      Q.  And the numbers there confirm that |
| 20      It's possible that price point makes | 20  at least in a murder scenario criminals |
| 21  a difference in what they choose to use in their | 21  overwhelmingly use handguns in the City of |
| 22  crimes.  It's possible. | 22  Chicago. |
| 23      Q.  You cited in your work -- strike that. | 23      A.  That's correct. |
| 24  Let me go back a second. | 24      Q.  And "overwhelming" might be an |
| 170 | 172 |

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

| | |
|---|---|
| 1  understatement given these numbers, is that | 1  particular event.  I know what you do about it |
| 2  correct? | 2  from the news. |
| 3     A.  Vastly overrepresented. | 3     Q.  You did refer to it in your |
| 4     Q.  Two pages later for year 2009 of the | 4  Declaration, did you not, on the Friedman case? |
| 5  378 firearms related murders in that year, just | 5     A.  Yes. |
| 6  six were committed with a rifle of some type, | 6     Q.  And where did you gather the |
| 7  correct? | 7  information? |
| 8     A.  Yes. | 8     A.  From public media sources. |
| 9     Q.  And again, we don't know whether that | 9     Q.  But you didn't acquire a greater depth |
| 10  rifle was of the type banned under the ordinance | 10  of knowledge about that incident other than what |
| 11  or not. | 11  you provided in the Declaration. |
| 12     A.  That's correct. | 12     A.  No, sir. |
| 13     Q.  We could go on with additional pages, | 13     Q.  Who is Christopher Koper? |
| 14  but essentially these numbers confirm that | 14     A.  He is a researcher. |
| 15  rifles, whether they be banned under the | 15     Q.  You cited to one of Mr. Koper's |
| 16  ordinance or not, are rarely used by criminals | 16  reports, have you not? |
| 17  to commit firearms related crimes, correct? | 17     A.  I believe I did, yes. |
| 18     MR. PULLOS:  I'll object to the form. | 18     MR. VOGTS:  K-o-p-e-r. |
| 19     You could answer. | 19  BY MR. VOGTS: |
| 20     THE WITNESS:  And I would answer by saying | 20     Q.  And the report I've cited to you I've |
| 21  they're rarely used in these statistics to | 21  marked as Exhibit 16, which is titled Updated |
| 22  commit firearms related murder.  I am aware of | 22  Assessment of the Federal Assault Weapons Ban: |
| 23  at least one incident last year where 13 people | 23  Impacts on Gun Markets and Gun Violence, 1994 to |
| 24  were shot with a Kalashnikov copy outside a park | 24  2003.  Is that correct? |
| 173 | 175 |
| 1  here in Chicago. | 1     A.  Yes.  That's correct. |
| 2  BY MR. VOGTS: | 2     Q.  And specifically your citation to |
| 3     Q.  Let's talk about that since you bring | 3  Mr. Koper's report shows up in Paragraph 14 |
| 4  it up.  I guess that's kind of the shorthand way | 4  to Exhibit 5, the Friedman Declaration, correct? |
| 5  to refer to as the Cornell Square Park shooting? | 5     A.  Page 14? |
| 6     A.  I think that's right. | 6     Q.  Page 8, Paragraph 14. |
| 7     Q.  And how many shooters were involved in | 7     A.  Gotcha.  Yes. |
| 8  that event? | 8     Q.  And you write in that paragraph, |
| 9     A.  My recollection is two, but I'm not | 9  "Although assault weapons represented between |
| 10  100 percent sure of that. | 10  one and eight percent of guns used in crime in |
| 11     Q.  How many guns were fired in that event? | 11  1994, they accounted for 16 percent of gun |
| 12     A.  I don't know. | 12  murders of police officers." |
| 13     Q.  Would it surprise you to learn there | 13     A.  That's what I wrote. |
| 14  were two guns fired in that event? | 14     Q.  Referring you to Page 15 of the Koper |
| 15     A.  If you say so, I agree with you.  If | 15  report.  Is this the page of the Koper report |
| 16  you have that knowledge, I'll defer. | 16  from which you pulled the statistics cited by |
| 17     Q.  Rifle was one of them? | 17  you in Paragraph 14 of Exhibit 5?  Footnote |
| 18     A.  Yes. | 18  refers to Pages 14 through 15, Footnote 12. |
| 19     Q.  Handgun was the other. | 19     A.  Well, it's certainly what I referred |
| 20     A.  Um-um. | 20  to for the eight percent of guns used in crime. |
| 21     Q.  You don't know that, though, do you? | 21  I don't find the 16 percent -- |
| 22     A.  I guess I do remember hearing that, | 22     Q.  Look to Footnote 12, please. |
| 23  yes, on the news.  I don't have any specific | 23     A.  Okay.  Thank you.  As many as 16 |
| 24  special like insider knowledge of that | 24  percent of gun owners are police officers in |
| 174 | 176 |

44 (Pages 173 to 176)

A. 275

1    Q.   Muzzle brakes and muzzle compensators.
2    A.   Yes.
3    Q.   How does the presence of a muzzle brake
4    or a muzzle compensator make the firearm more
5    dangerous than one without them?
6    A.   Both of those devices' primary purpose
7    is to reduce felt recoil and control muzzle
8    climb, those two things.  In an AK -- or I'm
9    sorry, a Kalashnikov design, for instance,
10   the early ones, the muzzle brake was designed
11   in such a way as to use gases venting from the
12   bullets that you fire to keep the gun from
13   climbing up into the right as much as it would
14   under rapid firing conditions, in other words,
15   allowing you to put second and subsequent
16   followup shots more accurately on the targets
17   you have selected.  Just makes it easier to
18   control it in rapid firing.
19   Q.   It makes it easier to control it in
20   just nonrapid subsequent firing, too, correct?
21   A.   Sure.
22   Q.   So if you were to target range with
23   a rifle with a muzzle compensator on it, and
24   you were seeking to reacquire the target more

197

1    readily for your second shot, the muzzle
2    compensator would help you do that.
3    A.   Yes.  Although I would say, frankly,
4    that when you're talking about target shooting,
5    you're typically talking about a firearm with
6    a scope.
7    Very few competitive shooting sports
8    have time components that require you to have
9    that sort of quick, rapid followup acquisition
10   of a target.
11   The final analysis, the reason that
12   Kalashnikov designed that rifle with a
13   compensator the way he did was so that it could
14   be used to deliver really accurate -- more
15   accurate fire in volume on military targets.
16   Q.   Do any of the firearms you personally
17   own have muzzle brakes or muzzle compensators on
18   them?
19   A.   The type 56 rifle has one.  It's a
20   Kalashnikov design.
21   Q.   Muzzle brakes and muzzle compensators
22   are also available on semi-automatic pistols,
23   correct?
24   A.   Some, yes.  They are typically

198

1    aftermarket, but yes, they do exist.
2    MR. VOGTS:  Why don't we take a short break
3    here.  Maybe we'll come back and talk more
4    slowly.
5    (WHEREUPON, a short recess
6    was taken.)
7    BY MR. VOGTS:
8    Q.   Mr. Jones, earlier you mentioned in
9    discussing the five features that are banned
10   under the ordinance if present on a semi-
11   automatic rifle capable of accepting a large
12   capacity magazine developed out of military uses
13   of those firearms, correct?
14   A.   Yes.  That's right.
15   Q.   Isn't it generally true that most
16   developments in firearm technology over
17   the years have come out of the military?
18   A.   That's my belief, yes.
19   Q.   Bolt action rifles, for example, in
20   World War II, correct?
21   A.   Yes.  That's right.
22   Q.   Grand style rifles coming out of --
23   bolt action coming out of World War I?
24   A.   Yes.

199

1    Q.   Grand rifles coming out of World War
2    II?
3    A.   Yes, both things.
4    Q.   AR-15 type rifles for civilian use
5    evolving out of the use of similar fully
6    automatic rifles in the Viet Nam War?
7    A.   Yes.
8    Q.   Isn't it also true that developments of
9    other forms of technology have frequently come
10   out of the military over the years?
11   A.   Yes.
12   Q.   Referring you back to the Koper report,
13   Exhibit 16, Page 3, based on Mr. Koper's
14   analysis of the impact of the Federal Assault
15   Weapons Ban, he determined that should the ban
16   be renewed, the ban's effects on gun violence
17   are likely to be small at best and perhaps too
18   small for reliable measurement, is that correct?
19   A.   That's what Mr. Koper opines.  That's
20   correct.
21   Q.   Do you have any reason to dispute
22   Mr. Koper's opinion on that subject?
23   A.   No.
24   Q.   Mr. Koper went on to say that assault

200

50 (Pages 197 to 200)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

| | |
|---|---|
| 1  stricter.  I would characterize it as filling | 1      Q.  I believe you earlier stated that in |
| 2  gaps that are in our current firearms laws. | 2  14 of the 93 incidents described in the MAIG |
| 3      Q.  Have they publicly taken positions to | 3  report assault weapons were used, is that |
| 4  your knowledge on any other firearms law related | 4  correct? |
| 5  issues? | 5      A.  Yes. |
| 6      A.  Well, they've taken a position against | 6      Q.  If you look at that report, isn't it |
| 7  assault weapons.  They've taken a position | 7  correct that the 14 number reflects the number |
| 8  against high capacity magazines or large | 8  of incidents in which assault weapons for large |
| 9  capacity magazines, yes. | 9  capacity magazines were used? |
| 10      Q.  Any others? | 10      A.  I don't think that's correct.  I think |
| 11      A.  May have.  I don't know. | 11  it's 14 incidents of assault weapons or 14 |
| 12      Q.  Have you personally reviewed any of | 12  incidents where an assault weapon was |
| 13  the data on which MAIG relied at arriving on | 13  identified.  There could be more.  They weren't |
| 14  percentages or numbers or values in its report? | 14  able to identify it. |
| 15      A.  No. | 15      Q.  In Page 3 of the report there is a bar |
| 16      Q.  So you have not seen data in any | 16  graph at the bottom of the page titled Assault |
| 17  form, whether it be on a spreadsheet or | 17  Weapons or High-Capacity Magazines.  Do you see |
| 18  otherwise. | 18  that? |
| 19      A.  If it were on their website, I have | 19      A.  I do.  I see that, yes. |
| 20  seen it, but I don't recall specifically.  I | 20      Q.  That's actually at the beginning of the |
| 21  certainly have not looked at anything that | 21  sentence that reads, "Assault Weapons or High- |
| 22  relates to their methodology and how they | 22  Capacity Magazines were used in at least 14 |
| 23  collect numbers and what they include and what | 23  incidents." |
| 24  they do not include in any of their studies. | 24      A.  Yes. |
| 233 | 235 |
| 1      Q.  At the end of their report they have | 1      Q.  So that's a combination of assault |
| 2  a summary or synopsis of each of the 93 mass | 2  weapons and large capacity magazines, not just |
| 3  shooting events that have occurred during the | 3  assault weapons. |
| 4  years, what is it, 2009 through 2013. | 4      A.  That's what it says here. |
| 5      A.  Yes.  I think that's right. | 5      Q.  For example, the shooting of people in |
| 6      Q.  Have you read those? | 6  Tucson, including Gabrielle Giffords, was used |
| 7      A.  Yes, many of them, and it's been some | 7  in -- the shooter used a large capacity magazine |
| 8  time.  But yes, I have. | 8  but did not use an assault pistol or an assault |
| 9      Q.  Have you in any instance or with regard | 9  rifle, correct? |
| 10  to any of those 93 incidents gone beyond what's | 10      A.  That's correct. |
| 11  reported by MAIG in the report in order to | 11      Q.  All right.  So of the 93 mass shooting |
| 12  develop greater knowledge about what transpired | 12  events described by MAIG in its report, 79 |
| 13  in any of those incidents? | 13  involved the use of firearms that were neither |
| 14      A.  Only the more recent ones that have | 14  assault weapons or that had large capacity |
| 15  publicly available sources. | 15  magazines, correct? |
| 16      Q.  Newtown being one? | 16      A.  Yes.  I think that's a good |
| 17      A.  Newtown.  I looked at some news | 17  characterization. |
| 18  reporting on Aurora.  I looked at some news | 18      Q.  And in those 79 events the shooters |
| 19  reporting on the Navy Yard shooting, some things | 19  were able to inflict mass casualties without |
| 20  like that. | 20  assault weapons and without large capacity |
| 21      But to get to the heart of your | 21  magazines, correct? |
| 22  question, no, I don't think I have based on what | 22      A.  Yes. |
| 23  you have asked.  I don't think I have done what | 23      Q.  I think I know the answer to this |
| 24  you asked. | 24  question, but I'm going ask it, anyway, for |
| 234 | 236 |

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1  four of them the shooter possessed a handgun,
2  an assault weapon, and another type of firearm.
3      A.  Yes.
4      Q.  Okay.
5      A.  And just for whatever it's worth to
6  you, I think the Fort Hood shooting should be --
7  while it was a handgun, it should be classified
8  as an assault weapon based on the fact that it
9  was manufactured to be the companion to the I
10  think it's the FN-90, personal defense weapon.
11  That's a military weapon.
12      I don't know what kind of ammo he was
13  using, but you are only supposed to be able to
14  use the practice ammunition in this country.
15  They were never supposed to be able to sell
16  the actual military ammo.
17      But the entire firearm was developed
18  specifically as a military weapon.  It was never
19  meant for civilian -- to be in civilian hands.
20      Q.  But you don't know what type of
21  ammunition he used in his gun.
22      A.  I don't.  He may have used the military
23  practice ammo or he used the military -- the
24  real, the business ammo, if you will.

245

1      Q.  But the FN-57 is a typically -- typical
2  operating semi-automatic pistol like the Glock.
3      A.  That's true.
4      Q.  It's just capable of handling more
5  high powered, high velocity ammunition.
6      A.  It shoots a rifle cartridge, small
7  rifle cartridge, yes.  Anyway, just for what
8  it's worth, dancing on the head of a pin here.
9      Q.  Exhibit 24 is MAIG data sorted by
10  column title Killed, k-i-l-l-e-d.  Do you see
11  that?
12      A.  Okay.
13      Q.  And we see among the top ten mass
14  shooting events as defined by the number of
15  people killed, it goes down to number of
16  eight --
17      A.  Yes.
18      Q.  -- in three of those incidents assault
19  weapons were used, correct?
20      A.  Yes.
21      Q.  And in seven of those instances the
22  criminal was able to inflict the casualties on
23  his victims without an assault weapon, correct?
24      A.  Yes.

246

1      Q.  And if we look at the next ten highest
2  mass event shootings defined by the number of
3  persons killed, in none of them was an assault
4  weapon used by the shooter, correct?
5      A.  That's correct.
6      Q.  And if we look at the next ten, only
7  one of those incidents was an event in which an
8  assault weapon was used.
9      A.  Yes.
10      Q.  So if you look at these mass shooting
11  events described in the MAIG report of the
12  30 events defined by number of persons killed,
13  just four of the top 30 involve the use of
14  assault weapons, correct?
15      A.  Yes, qualified by when you go through
16  the incidents, many of them say unknown as
17  to the type of weapon used.  So this is all
18  speculative.  We know what they reported, but
19  there were many that were unknown.  So you can't
20  I think draw too strong of a conclusion on that.
21      Q.  Well, if the MAIG data is correct as
22  reflected on Exhibit 24, isn't it true that
23  there is only one of the 30 incidents as defined
24  by number of persons killed in which the type of

247

1  firearm used was unknown, and that's the
2  Wilmington, California shooting, correct?
3      A.  Yes.
4      Q.  The type of firearm known was known in
5  each of the other 29 events on the first page of
6  Exhibit 24.
7      A.  That's correct.
8      Q.  Are you able to explain how the mass
9  shooter in any of those top 30 events in which
10  assault weapons were not used was able to
11  inflict the number of deaths that he did without
12  the use of assault weapon?
13      A.  No.  He had -- he had a firearm, in
14  many cases with a high-capacity magazine, and
15  he was able to inflict casualties.  I don't
16  really understand -- it's really self-evident,
17  Mr. Vogts.
18      Q.  Well, were there events among these
19  30 in which the shooter did not possess either
20  assault weapon or a high-capacity magazine?
21      A.  I'm sure that's true.  Yes.
22      Q.  Isn't it true there are circumstances
23  under which mass shooters have acted and killed
24  and shot many persons without the benefit of an

248

62 (Pages 245 to 248)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1    assault weapon or high-capacity magazine?
2        A.   Yes.
3        Q.   And they do so by simply bringing
4    sufficient guns or sufficient ammunition for
5    those guns to the place of the shooting,
6    correct?
7        A.   Some of them have done that, yes,
8    that's correct.
9        Q.   And they're able to do that because
10   during the time they shoot, nobody has
11   effectively intervened to stop them from
12   shooting and reloading as necessary.
13       MR. WILSON:  Objection to speculation.
14       THE WITNESS:  I don't know the answer to
15   that.  I don't know why they were able to do
16   that.
17   BY MR. VOGTS:
18       Q.   Is it logical to you from a law
19   enforcement perspective that a person who is not
20   interfered with, whose intention is to kill as
21   many persons as possible in a mass shooting
22   event, will simply bring sufficient ammunition
23   with him to do so regardless of the gun he has
24   in his hand?

                                        249

1        A.   You're asking me to ascribe logic and
2    reason to crazy people.  I can't do that.
3        Q.   You yourself has said that in your
4    career as a law enforcement officer you have
5    worked to get into the heads of criminals.
6        A.   Criminals, not insane people.  There
7    is a very big difference between someone who
8    burglarized a house or does a gang shooting
9    than any of these people who were distraught,
10   mentally ill or whatever their particular mental
11   issue was.
12       Q.   Exhibit 25 is MAIG data sorted by total
13   shot, last column on the right.
14       A.   Okay.  Total shot, not including
15   shooter.
16       Q.   The first incident on that list is
17   the Aurora, Colorado movie theater shooting,
18   correct?
19       A.   Yes, sir.
20       Q.   And the MAIG data reflects what we have
21   already discussed, that the shooter in that
22   incident had, according to this, two handguns,
23   one assault weapon and one other type of
24   firearm, correct?

                                        250

1        A.   Yes.
2        Q.   He inflicted 70 casualties in that
3    shooting, correct?
4        A.   That's correct.
5        Q.   Next on the list with 43 casualties,
6    is the Fort Hood shooting in which the shooter
7    had a semi-automatic pistol, is that right?
8        A.   Yes.
9        Q.   And he was able to shoot 43 people with
10   that, right?
11       A.   Yes.
12       Q.   Newtown is next.  We'll get to Newtown
13   in greater detail.
14           The next four incidents, Tucson,
15   Binghamton, New York, Washington, DC and
16   Carthage, North Carolina all involved use of
17   handguns without involvement of assault weapons,
18   correct?
19       A.   Yes.
20       Q.   Going back to Exhibit 23, the data
21   sorted by assault weapon --
22       A.   Yes.
23       Q.   -- the incident at the top of that
24   list is Carson City, Nevada, an incident that

                                        251

1    occurred on September 6, 2011, is that correct?
2        A.   Yes.
3        Q.   Do you have the MAIG report in front of
4    you?
5        A.   I will in a second.  Yes, I do.
6        Q.   MAIG's summary of that incident appears
7    on Page 20 of the report.  Refer you to that
8    page.
9        A.   I have it.
10       Q.   The shooter in that incident had a
11   handgun with him and two assault weapons,
12   correct?
13       A.   Yes.
14       Q.   He killed four people in that shooting,
15   didn't injure any -- I'm not saying death isn't
16   an injury, but he killed four people.  There
17   were no other people injured in that incident.
18       A.   Yes.
19       Q.   Do you have basis on which to state
20   that the shooter's use of an assault weapon in
21   that incident dictated the outcome, namely, that
22   four people were killed?
23       A.   I really don't understand your
24   question.

                                        252

                        63 (Pages 249 to 252)

C O N F I D E N T I A L

1   STATE OF ILLINOIS    )
2                        ) SS:
3   COUNTY OF C O O K    )
4       I, MARLENE L. KING, a notary public
5   within and for the County of Cook County and
6   State of Illinois, do hereby certify that
7   heretofore, to-wit, on April 30, 2014,
8   personally appeared before me, at 330 North
9   Wabash Avenue, Suite 3300, Chicago, Illinois,
10  MARK DOUGLAS JONES, in a cause now pending and
11  undetermined in the Circuit Court of Cook
12  County, Illinois, wherein MATTHEW D. WILSON,
13  et al., are the Plaintiffs, and COOK COUNTY,
14  a public body and corporate, et al., are the
15  Defendants.
16      I further certify that the said MARK
17  DOUGLAS JONES was first duly sworn to testify
18  the truth, the whole truth and nothing but the
19  truth in the cause aforesaid; that the testimony
20  then given by said witness was reported
21  stenographically by me in the presence of the
22  said witness, and afterwards reduced to
23  typewriting by Computer-Aided Transcription, and
24  the foregoing is a true and correct transcript

281

1   McCORKLE LITIGATION SERVICES, INC.
2       200 N. LaSalle Street Suite 2900
        Chicago, Illinois 60601-1014
3
4   DATE:  May 11, 2014
5   MR. CHRISTOPHER B. WILSON,
    PERKINS COIE, LLP,
6   131 South Dearborn Street,
    Suite 1700,
7   Chicago, Illinois  60603

8   IN RE:  Wilson vs. Cook County
    COURT NUMBER:  07 CH 4848
9   DATE TAKEN:  April 30, 2014
    DEPONENT:  Mark Douglas Jones
10  Dear Mr. Wilson:
11  Enclosed is the deposition transcript for the
    aforementioned deponent in the above-entitled
12  cause.  Also enclosed are additional signature
    pages, if applicable, and errata sheets.
13
    Per your agreement to secure signature, please
14  submit the transcript to the deponent for review
    and signature.  All changes or corrections must
15  be made on the errata sheets, not on the
    transcript itself.  All errata sheets should be
16  signed and all signature pages need to be signed
    and notarized.
17
    After the deponent has completed the above,
18  please return all signature pages and errata
    sheets to me at the above address, and I will
19  handle distribution to the respective parties.
20  If you have any questions, please call me at the
    phone number below.
21
    Sincerely,
22
    Margaret Setina     Court Reporter Present:
23  Signature Department     MARLENE L. KING
24  cc:  Mr. Vogts, Mr. Pullos, Ms. Schlesinger.

283

1   of the testimony so given by said witness as
2   aforesaid.
3       I further certify that the signature to
4   the foregoing deposition was reserved by counsel
5   for the respective parties and that there were
6   present at the deposition the attorneys
7   hereinbefore mentioned.
8       I further certify that I am not counsel
9   for nor in any way related to the parties to
10  this suit, nor am I in any way interested in the
11  outcome thereof.
12      IN TESTIMONY WHEREOF:  I have hereunto
13  set my hand and affixed my notarial seal this
14  11th day of May, 2014.
15
16
17
18
19      Marlene L. King
20  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21
22
23
24

282

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

JUL 06 1989

MEMORANDUM T0:     Director

        FROM:     Associate Director (Compliance Operations)

   SUBJECT:     Report and Recommendation on the
                Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*
Daniel Black

Attachment

Approved: *Stephen E. Higgins 7/6/89*

Disapprove: _____

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in Gilbert Equipment Company, Inc. v. Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

## ANALYSIS

A. Defining the type of weapon under review.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

> This subsection gives the Secretary authority to permit the importation of ammunition and certain types of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, et seq.) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

   a. Ability to accept a detachable magazine. Virtually all modern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

   b. Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

   c. Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

   d. Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

Page 6

**Report and Recommendation on the Importability of Certain Semiautomatic Rifles**

**Page 1**

```
STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K    )
    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
       COUNTY DEPARTMENT - CHANCERY DIVISION
MATTHEW D. WILSON, TORY    )
EDHLUND, and JOSEPH        )
MESSINCO,                  )
         Plaintiffs,       )
    vs.                    ) No. 07 CH 4848
COOK COUNTY, A PUBLIC      )
BODY AND CORPORATE, TONI   )
PRECKWINKLE, BOARD         )
PRESIDENT, IN HER          )
OFFICIAL CAPACITY AND      )
ITS BOARD OF               )
COMMISSIONERS IN THEIR     )
OFFICIAL CAPACITIES,       )
NAMELY: EARLEAN COLLINS,   )
ROBERT STEELE, JERRY       )
BUTLER, WILLIAM M.         )
BEAVERS, DEBORAH SIMS,     )
JOAN PATRICIA MURPHY,      )
BRIDGET GAINER, JESUS G.   )
GARCIA, PETER N.           )
SILVESTRI, JOHN P.         )
DALEY, LARRY SUFFREDIN,    )
GREGG GOSLIN, JOHN A.      )
FRITCHEY, TIMOTHY O.       )
SCHNEIDER, JEFFREY         )
TOBOLSKI, EDWIN REYES,     )
ELIZABETH ANN DOODY        )
GORMAN, and THOMAS DART,   )
SHERIFF OF COOK COUNTY,    )
IN HIS OFFICIAL            )
CAPACITY,                  )
         Defendants.       )
```

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 EASTERN DIVISION
 4   ARIE S. FRIEDMAN, M.D.   )
 5   and The Illinois State   )
 6   Rifle Association,       )
 7          Plaintiffs,       )
 8      vs.                   ) No. 13-cv-9073
 9   CITY OF HIGHLAND PARK,   )
10          Defendant.        )
11
12       The discovery deposition of
13   JAMES YURGEALITIS, taken in the above-entitled
14   causes, before Rebecca Feeman, an Illinois
15   Shorthand Reporter, on May 8, 2014 at 330 North
16   Wabash Avenue, Suite 3300, Chicago, Illinois,
17   pursuant to notice.
18
19
20
21
22
23   Rebecca Feeman, CSR, RPR
24   License No.: 084-004726
```

**Page 3**

```
 1   APPEARANCES:
 2   SWANSON, MARTIN & BELL
 3   BY:  MR. JAMES VOGTS
 4   330 North Wabash Avenue, Suite 3300
 5   Chicago, Illinois  60611
 6   (312) 321-9100
 7   jvogts@smbtrials.com
 8        and
 9   VICTOR D. QUILICI, ATTORNEY AND
10   COUNSELOR AT LAW
11   BY:  MR. VICTOR D. QUILICI
12   P/O Box 428
13   River Grove, Illinois  60171
14   (847) 298-2566
15        Representing the Plaintiffs;
16
17   PERKINS COIE, LLP
18   BY:  MR. CHRISTOPHER B. WILSON
19   131 South Dearborn Street, 17th Floor
20   Chicago, Illinois  60603
21   (312) 324-8603
22   cwilson@perkinscoie.com
23        Representing City of Highland Park;
24
```

**Page 4**

```
 1   APPEARANCES (Continued):
 2   STATE'S ATTORNEY OF
 3   COOK COUNTY, ILLINOIS
 4   BY:  MR. JAMES C. PULLOS
 5   50 West Washington Street, Room 500
 6   Chicago, Illinois  60602
 7   (312) 603-5105
 8   james.pullos@cookcountyil.gov
 9        Representing the Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

1  operations that were not regular ATF-issued
2  firearms.
3      I believe when I first came on to ATF,
4  there were some Walther PPKs in 380, and I
5  believe that was it, but for my purposes, there
6  were other specialized units that were issued
7  other firearms. However, in my classification,
8  those were the only firearms that were issued to
9  me.
10     Q.  What magazines were available to you to
11  use with the Colt AR-15?
12     A.  They were standard -- the standard
13  issue for the AR-15 type rifles were 30-round
14  magazines.
15     Q.  Were you trained on the use of the Colt
16  AR-15 rifle?
17     A.  Yes.
18     Q.  When was that?
19     A.  I would say the conversion -- we had to
20  take approximately at least a week's worth of
21  familiarization and conversion training, so I
22  would say that was probably -- that was not long
23  before I left the field to go to the laboratory
24  and that was probably 2001 I would say

25

1  approximately.  I don't recall exactly but --
2      Q.  What did that training consist of?
3      A.  Initially it was disassembling
4  component parts, how to properly maintain the
5  firearm, and then a considerable amount of
6  shooting with that that was static shooting and
7  then dynamic shooting or on the move or tactical
8  situational type of range time.
9      Q.  Do you personally own any firearms?
10     A.  Yes.
11     Q.  What firearms do you personally own
12  today?
13     A.  Let's see.  I have -- well, initially I
14  have some issue with providing a list of which
15  firearms I currently own only because I'm not --
16  I would object to that only because my home
17  address is listed, and having a listing of which
18  firearms I have and where I might keep those is
19  something that I object to.
20     MR. WILSON:  Can we mark it as confidential?
21     MR. VOGTS:  Yeah, we can mark the pages of
22  this transcript that addresses your personal
23  ownership of firearms as confidential so it
24  would be kept in the confines of this case.

26

1  BY MR. VOGTS:
2      Q.  Subject to that stipulation, can you
3  identify to me the firearms that you personally
4  own?
5      A.  Certainly.
6      MR. WILSON:  Before we do, I want to make
7  sure.  Are you comfortable with that?
8      THE WITNESS:  My concern was that all of a
9  sudden the transcript of this shows up online
10  somewhere and there's my home address, and as
11  any firearm owner would not -- you know, would
12  not like to see that and that's my concerns, but
13  if there is some way that that can be
14  guaranteed, I have no objection to providing you
15  with a listing of that.
16  BY MR. VOGTS:
17     Q.  Okay.  Can you answer the question?
18     A.  Certainly.  I have handguns, a Colt
19  Delta Elite semiautomatic pistol chambered in 10
20  millimeter.  I have a Browning Hi Power
21  semiautomatic pistol, which is initially
22  chambered in 9 millimeter Parabellum, but I also
23  have a second slide and barrel assembly for it
24  which is chambered in .40 Smith & Wesson.

27

1      I have a World War II vintage Colt
2  1911A1 in .45 ACP.  I have a Marlin bolt-action
3  rifle in 22 Long Rifle.  I have a Colt -- I
4  believe it's a 6920 semiautomatic rifle in .223,
5  and I have a Springfield Armory M1 Garand
6  semiautomatic rifle in 30.06 caliber.
7      Q.  Over the course of your lifetime, have
8  you owned other firearms?
9      A.  Yes.
10     Q.  Do you recall the makes and models of
11  those firearms?
12     A.  I had a -- let's see.  What else have I
13  had that I no longer have?  I had an Inglis
14  Hi-Power pistol in 9 millimeter caliber.  Oh, I
15  also have a Browning Citori shotgun, over and
16  under double-barreled shotgun in 12 gauge.
17      Previously I've had a Winchester Model
18  12 shotgun, pump-action shotgun in 12 gauge.
19     Q.  Any others that you can remember?
20     A.  A Remington 870 in 12 gauge.  That I've
21  personally owned, I think that should be the
22  extent of it.
23     Q.  Do you hunt?
24     A.  No.

28

7 (Pages 25 to 28)

1    Q.   Have you hunted?
2    A.   No.
3    Q.   Why do you own the firearms that you
4  currently own?
5    A.   My daughter and I and my father and I
6  have done a lot of target shooting.  I also have
7  firearms for home defense.
8    Q.   What firearm or firearms do you keep
9  available to you for home defense purposes?
10    A.   Any one of the semiautomatic pistols
11  that I listed as being currently owned.
12    Q.   Which would include the Colt, Delta,
13  the Browning Hi-Power, the Colt 1911; is that
14  right?
15    A.   Correct.  I would not -- you know,
16  unless it was, you know, some sort of exigent
17  circumstance, I probably would not avail myself
18  of the World War II vintage pistol for a home
19  defense situation.
20    Q.   Why not?
21    A.   Just it's older.  I don't shoot it as
22  much and don't really care to potentially
23  diminish the value of it.
24    Q.   What's the magazine capacity for the

29

1  Colt Delta Elite pistol?
2    A.   Seven rounds.
3    Q.   And what is the magazine capacity for
4  the Browning Hi-Power pistol?
5    A.   I believe when it's in .40 caliber it's
6  only 10, and it's 13 in 9 millimeter.
7    Q.   You currently own -- I believe you
8  listed seven firearms that you currently own.
9  Do you -- or strike that.
10        Have you used all seven of those
11  firearms in the past three years?
12    A.   Not all of them, no.
13    Q.   How many of the seven have you used
14  over the past three years for any purpose?
15    A.   I would say primarily four.
16    Q.   Which four of those?
17    A.   The Marlin, the Browning Hi-Power, the
18  Delta Elite, the Colt 6920, and the M1 Garand.
19    Q.   What did you use the Colt 6920 for?
20    A.   Target shooting.
21    Q.   Do you belong to a range or -- do you
22  belong to a range?
23    A.   I did.  Actually my membership recently
24  expired.  So when I have gone out shooting, it

30

1  has been at other people's ranges or out on
2  their property.
3    Q.   Okay.  Throughout your reports and your
4  declaration in this case, you referred to the
5  military configuration rifles.  Does your
6  Colt 6920 have a military configuration?
7    A.   Well, it has the -- if those -- it has
8  the features on it that are referred to in my
9  report.  It's as it came from the factory.
10    Q.   And what features are those?
11    A.   Gas operated, semiautomatic, flash
12  hider, a barrel shroud.  I'm trying to think if
13  it has -- if it comes from the factory with a
14  bayonet lug.  I think it does.
15    Q.   Still grip?
16    A.   Yes, detachable magazine, and it also
17  has -- I have it configured exactly as our ATF
18  issued M4s were configured.
19    Q.   Does it have a protruding grip forward
20  of the trigger guard?
21    A.   Yes.
22    Q.   Do you have a rail system on that gun?
23    A.   Yes.
24    Q.   And what do you have on the rail

31

1  system?
2    A.   The only thing I -- well, the foregrip
3  is a SureFire Foregrip with an integrated
4  SureFire flashlight on it.
5    Q.   Why do you have a flashlight on that?
6    A.   I have it configured the exact same way
7  that we had it configured on the firearms that
8  were available to us at ATF.
9    Q.   Why have you chosen to configure your
10  personally owned firearm in the same manner as
11  which the ATF-issued firearm was configured?
12    A.   That was my familiarization with that
13  weapon system, so I had it configured exactly --
14  or I configured it exactly as the issued weapons
15  that we had at ATF.
16        We qualify four times a year with that
17  firearm.  That was the most comfortable
18  configuration due to the amount of time I spent
19  with that over the years.  So I said if this is
20  what I'm familiar with and I've been trained on
21  it extensively, this is the way I would like to
22  configure my own.
23    Q.   Why did ATF have a flashlight mounted
24  on the rail system?

32

8 (Pages 29 to 32)
A. 286

1    MR. WILSON: Objection. Lack of foundation.
2    MR. VOGTS: You can answer if you know.
3    THE WITNESS: I mean, other than for
4    illumination, I don't know.
5    BY MR. VOGTS:
6    Q.   That's the obvious answer, right?
7    A.   (Nonverbal response).
8    Q.   For use in darkened environments?
9    A.   Certainly.
10   Q.   In a close combat quarter situation
11   perhaps?
12   A.   Well, either close combat quarter or
13   distances.
14   Q.   The flashlight is capable of
15   illuminating a distant situation?
16   A.   Well, define distance.
17   Q.   Sure, it's a relative concept. I'll
18   move on. It's not probably worth our time.
19   A.   Okay.
20   Q.   What is the magazine capacity you have
21   with your Colt 6920?
22   A.   I have a number of 30-round magazines
23   and a number of 20-round magazines.
24   Q.   Do you have any 10-round magazines?

33

1    A.   Yes.
2    Q.   Do you have any 5-round magazines for
3    that rifle?
4    A.   No.
5    Q.   Do you know if there are 5-round
6    magazines available for that rifle?
7    A.   I know that there are smaller capacity
8    magazines manufactured for competition matches.
9    However, I'm not exactly sure what those are. I
10   don't know if there's a 5 round manufactured for
11   that.
12   Q.   Under what circumstances do you use a
13   30-round magazine in your Colt rifle as opposed
14   to a 10-round magazine?
15   A.   Whatever I take to the range is usually
16   what I bring.
17   Q.   What do you typically take to the
18   range?
19   A.   Well, it would all depend because my
20   daughter likes to shoot the Colt with a bipod on
21   the front of it, and she can't do that from a
22   bench situation with a 30-round magazine. It's
23   too long, so I have shorter magazines for that.
24   Q.   Because the longer magazine gets in the

34

1    way of the bench?
2    A.   Uh-huh, yes.
3    Q.   How old is your daughter?
4    A.   21.
5    Q.   Has she shot most of her adult life?
6    She hasn't been an adult long, but did she shoot
7    as a child?
8    A.   Yes, she did.
9    Q.   And you taught her to shoot?
10   A.   Yes.
11   Q.   How long has she been shooting a
12   Colt 6920 rifle?
13   A.   As long as I owned it, approximately
14   eight or nine -- I've probably had it seven or
15   eight years would be my guess.
16   Q.   So she's been shooting since roughly
17   age 13?
18   A.   13 to 15, somewhere in there.
19   Q.   Do you enjoy shooting that rifle?
20   A.   Yes.
21   Q.   What do you enjoy about that rifle?
22   A.   I like the ease of operation and the
23   reliability, and the way that I have it
24   configured, it's somewhat sentimental I suppose

35

1    because it's configured the exact same way that
2    it was -- that the issued ones were for us at
3    ATF.
4    Q.   When you say ease of operation, what do
5    you mean?
6    A.   Well, I think once you learn a firearm
7    system and you've had as much time on it as I've
8    had, it's natural for me because, again,
9    qualifying on it four times a year over numerous
10   years, for me it's easy to operate because I was
11   constantly revisiting or refreshing my training
12   on it.
13   Q.   Do you believe that that rifle was easy
14   for your daughter to operate at age 13 after she
15   got instruction from you?
16   A.   Initially, no, but the more -- again,
17   the more time she spent training and -- well,
18   not training but shooting it and the more
19   proficient she became with it.
20   Q.   How would you compare the, I guess,
21   ease of operation of the Colt rifle with, say,
22   your Colt Delta Elite pistol? Are they similar?
23   A.   I don't know if -- that's sort of hard
24   to quantify, and I don't really know what ease

36

9 (Pages 33 to 36)

A. 287

1  of operation would mean in that regard. Comfort
2  level perhaps? I'm comfortable with either one.
3      Q. They're both semiautomatic firearms,
4  correct?
5      A. Yes.
6      Q. They both accept detachable magazines,
7  correct?
8      A. Yes.
9      Q. They both have external manual
10  safeties?
11      A. Yes.
12      Q. One has a charging handle in order to
13  load around from the magazine into the chamber,
14  correct?
15      A. Correct.
16      Q. That would be the Colt rifle?
17      A. Yes.
18      Q. The Colt pistol has a slide that you
19  retract in order to load a round for the
20  magazine into the chamber, correct?
21      A. Correct.
22      Q. Those are all similarities that those
23  guns have, correct?
24      A. Correct.

37

1      Q. Based upon those features of those two
2  guns, can you say that one is any more easy to
3  operate than the other, or are they largely the
4  same?
5      A. Well, I think if you break it down in
6  terms of those systems, they're probably both
7  similar in the learning curve once you learn
8  them, but the first time -- you know, the first
9  time I ever picked up an AR without any
10  familiarization, I wasn't comfortable with it as
11  I was with any other firearm that had a
12  dissimilar operating system than what I was used
13  to.
14      There are similarities between them,
15  correct, but I don't know that one is
16  necessarily easier than the other or that you
17  can relatively say that the ease of operation is
18  the same. I suppose the learning curve on those
19  and the comfort level is somewhat subjective.
20      Q. To the person?
21      A. Yes.
22      Q. All right. You indicated that you feel
23  the Colt 6911 rifle is reliable. What did you
24  mean by reliable?

38

1      A. Well, the 6920 --
2      Q. I'm sorry.
3      A. No, when it's properly maintained it
4  is. If it's not properly cleaned, there's
5  always some issues with it, and we had that with
6  guns in the field and I haven't really
7  experienced that with my personally owned one
8  because after we go out shooting, we clean it
9  immediately afterwards.
10      But ease of operation for me is, again,
11  not just a general principle, but it's relevant
12  to the comfort level and the amount of
13  experience I've had with a particular firearm.
14  So for me there's an ease of operation because
15  my familiarity with it.
16      Q. But when you say reliable, I guess
17  what, mechanically speaking, are you referring
18  to when you say a firearm is reliable?
19      A. Oh, in general reliability means if you
20  load it and you pull the trigger, it's going to
21  function as it's designed to be. I have not had
22  an issue with an AR rifle unless it wasn't
23  properly maintained or properly cleaned. That
24  to me would be the definition of reliability.

39

1  When you need to use it, it works.
2      Q. And you would refer to your Colt Model
3  6920 rifle as an AR type rifle, correct?
4      A. Yes.
5      Q. Do you find your Colt rifle to be
6  accurate?
7      A. Yes.
8      Q. Do you find your Colt rifle has
9  relatively minimal recoil compared to, say, your
10  Springfield M1 Garand or any of the shotguns you
11  own?
12      A. It's significantly less recoil than the
13  Garand, yes.
14      Q. Did your daughter when she was a young
15  teenager ever shoot the Springfield M1 Garand?
16      A. Yes.
17      Q. Does she prefer the Colt 6920?
18      A. She likes shooting the Garand actually
19  more. She likes the kick.
20      Q. But the Colt rifle has significantly
21  less kick?
22      A. It has significantly less felt recoil.
23      Q. Is the Colt 6920 rifle easy to reload?
24      A. Yes.

40

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1  where it might have some application to forensic
2  firearm and tool mark examiners, like, for
3  instance, the way a bolt face was machined so
4  that it left a certain type of marking that
5  might have been unique to that firearm where it
6  would leave it on the base of an expended
7  cartridge case.
8      Q.  Okay.  Did you attend the SHOT Show in
9  2012, which was your last year of employment?
10     A.  No.
11     Q.  2011?
12     A.  2011 or 2010 may have been the last
13 time that I went.  I believe it was 2011.
14     Q.  And did you attend your first SHOT Show
15 in 2003 or 2004?
16     A.  Approximately.
17     Q.  And you said one of the purposes you
18 had in attending the SHOT Show was to see
19 basically new products being offered?
20     A.  Correct.
21     Q.  What, if any, assessment did you make
22 in terms of new products being offered between
23 2003 or '4 and 2010?  Are there any notable
24 differences in those shows?

57

1      A.  Well, there's always unique and
2  individual things that are released every year.
3  I mean, it's a marketing -- it's an exposition
4  of new products and -- well, and past products
5  as well.
6          Notable in what sense I guess is --
7      Q.  Well, let me ask you this:  If I were
8  to use the phrase black guns, do you know what
9  I'm speaking of?
10     A.  Yes.
11     Q.  And what do you know a black gun to be,
12 euphemistically I guess?
13     A.  An AR type semiautomatic rifle.
14     Q.  Some people might call them tactical
15 rifles?
16     A.  There's a number of interchangeable
17 terms.  Tactical rifles, assault rifles.
18     Q.  Modern sporting rifles, have you heard
19 that?
20     A.  I have but not until fairly recently.
21     Q.  Okay.  Did you notice between 2003 and
22 2010 at the SHOT Show that there was a
23 substantially greater presentation of AR type
24 rifles from product manufacturers?

58

1      A.  Yes, I think every time I went there
2  there was another manufacturer stepping into
3  that market.
4      Q.  Exhibit 8, paragraph 14, in that
5  paragraph you indicate that you relied on the
6  Merriam-Webster Dictionary to define the term
7  assault rifle; correct?
8      A.  In that paragraph, yes, I did.
9      Q.  Why did you resort to the
10 Merriam-Webster Dictionary for the definition of
11 assault rifle rather than any of the number of
12 firearms books you personally owned for a
13 definition?
14     A.  Well, why did I quote that one
15 specifically?
16     Q.  Uh-huh.
17     A.  Only because it's a generally
18 acceptable reference for laypeople, so to speak,
19 or people unfamiliar with firearms.  There were
20 numerous other definitions that were similar in
21 the reference books I utilized in
22 preparation for the report.
23     Q.  So a layperson or a person not familiar
24 with firearms would understand an assault rifle

59

1  to be as any of the various automatic or
2  semiautomatic rifles with large capacity
3  magazines designed for military use, is that
4  correct?
5      A.  Well, I think that they would
6  understand that although it's not a
7  firearm-specific publication, the
8  Merriam-Webster Dictionary is a generally
9  accepted reference for the definition of an
10 item, whether it's an assault rifle or some
11 other item.
12     Q.  Do persons knowledgeable on the subject
13 of firearms to your knowledge define assault
14 rifles in the same manner?
15     A.  I'm sorry.  Could you repeat that?
16     Q.  I'll restate it.  To your knowledge do
17 persons knowledgeable on the subject of firearms
18 define assault rifles as it's found in
19 Merriam-Webster's Dictionary?
20     A.  I believe to one degree or another, not
21 verbatim perhaps.  However, I'm sure there are
22 variations on a theme, but they may all contain
23 certain similarities.
24     Q.  Is that how you would define an assault

60

15 (Pages 57 to 60)

A. 289

1    rifle?
2        A.   In general, yes.
3        Q.   Is that how the ATF defines an assault
4    rifle?
5        A.   I do not know.
6             (Whereupon, Yurgealitis
7             Deposition Exhibit No. 12 was
8             marked for identification.)
9    BY MR. VOGTS:
10       Q.   I'll show you a copy of a document I've
11   marked as Exhibit 12 titled Report and
12   Recommendation of the ATF Working Group on the
13   Importability of Certain Semiautomatic Rifles.
14   Have you seen this document before,
15   Mr. Yurgealitis?
16       A.   I have seen it.  I don't recall when,
17   but it is quite dated so I may have seen it
18   years ago.  However, I'm not -- if you're asking
19   me -- if you're going to ask me to recall the
20   content of it, I don't.  I wouldn't be able to
21   do that without rereading it.
22       Q.   But you do believe you've seen it
23   before and you recognize it as an ATF document,
24   correct?

61

1        A.   Yes, but back from -- what's it dated,
2    July of 1989?
3        Q.   Yes, that's correct.  I refer you to
4    page 5 of Exhibit 12.  At the very bottom of the
5    page, isn't it correct that the ATF in this
6    document wrote true assault rifles are selective
7    fire weapons that will fire in a fully automatic
8    mode?
9        A.   Well, let me just read it out loud
10   because I'm a little bit confused by your
11   question and perhaps if --
12       Q.   Well, my question is, is that what the
13   ATF wrote in this document?  Did I read that
14   correctly?
15       MR. WILSON:  I'll object to selecting a
16   single sentence out of this whole paragraph.
17       THE WITNESS:  If the reporter could please
18   read back your question because I'm not certain
19   as to what exact part of that you quoted.
20       MR. VOGTS:  I'll restate it.
21       THE WITNESS:  Well, if she could --
22       MR. VOGTS:  I'll restate it to make it
23   easier.
24

62

1    BY MR. VOGTS:
2        Q.   Did the ATF write in this document that
3    true assault rifles are selected fire weapons
4    that will fire in a fully automatic mode?
5        A.   That's what the document says, yes.
6        Q.   Did ATF also state in Exhibit 12 that
7    it is somewhat of a misnomer to refer to
8    semiautomatic rifles as assault rifles?
9        A.   Where on the page is that?
10       Q.   (Indicating).
11       A.   Thank you.  That's what the document
12   says, correct.
13       Q.   Do you agree or disagree that it's
14   somewhat of a misnomer to refer to a
15   semiautomatic rifle as an assault rifle?
16       A.   Personally I don't agree with that
17   assessment, with the ATF's assessment, no.
18       Q.   Okay.  Referring back --
19       A.   I'm getting a little filled up here
20   with exhibits.
21       Q.   We'll just keep stacking them up here
22   and we will manage.
23            Referring you back to Exhibit 8, your
24   declaration, paragraph 13, you wrote that in

63

1    recent years, there has been an increase in the
2    popularity and availability of semiautomatic
3    rifles, pistols, and shotguns with features
4    initially designed, paren, or patterned after
5    those designed, close paren, for a military
6    purpose; is that correct?
7        A.   Correct.
8        Q.   What is your basis for saying that in
9    recent years there has been an increase in the
10   popularity of those firearms?
11       A.   Well, based on as we had stated before
12   at the SHOT Show, every year I went there it
13   seemed as though there was another major
14   manufacturer who had decided to produce a model
15   or a line of AR type rifles where they had
16   really no history of doing it before then.
17            The number of available options and
18   aftermarket accessories for AR type rifles, I
19   believe Brownells might even have their own
20   catalog that's fully devoted to AR accessories
21   that's a few hundred pages.  That and if you
22   walk into a local gun store and see what they
23   stock or ask them what they sell or they sell a
24   large quantity of or a large number of and

64

16  (Pages 61 to 64)

1   that's what I would base that opinion on.
2       Q.  So if you walk into a local gun store
3   and ask them, what response do you believe you
4   receive?
5       A.  Well, they're very popular.  AR type
6   rifles are very popular.  They either can't get
7   enough of them or they sell very quickly.
8       Q.  Why do you believe AR type rifles are
9   very popular?
10      A.  I would say for some of the reasons
11  that I spoke earlier of when I was describing
12  what it is on my own personal AR type rifle that
13  I find attractive, or, you know, functionality
14  or reliability.  I think a lot of people enjoy
15  the fact these days that you can accessorize
16  them with almost anything.  With the
17  introduction of rail attachment systems, there's
18  a multitude of accessories you can mount on
19  them.
20      Q.  Any other reasons for their popularity?
21      A.  I mean, in general speaking from a
22  professional perspective, that would encompass a
23  lot.
24      Q.  In paragraph 13 you note that these

65

1   firearms and their features were initially
2   designed or patterned after those designed for a
3   military purpose.  When you say initially
4   designed, are you referring to -- I think it's
5   perhaps obvious -- the origin of those features
6   and the design historically?
7       A.  Yes.
8       Q.  Would you agree that historically a
9   great many civilian firearms and their features
10  had their origin in military and military use?
11      A.  A great number?  I mean, there are
12  other firearms other than AR types that have
13  features that are -- were originally designed
14  for a military purpose.
15      Q.  And that are now or at some point were
16  used commonly by law abiding civilians?
17      A.  Yes.
18      Q.  Can you give me an example of a firearm
19  or a feature that fits that description other
20  than the AR type rifle?
21      A.  A Colt 1911 model or a variant thereof
22  is obviously a military design or a firearm
23  designed for a military purpose that is very --
24  immensely popular.

66

1       Q.  Even going back farther, isn't it true
2   that the basic concept of a revolver was
3   designed for military use?
4       A.  I don't know that Colt invented the
5   revolver precisely for military applications,
6   but it found widespread popularity.  Without
7   looking back at some of my reference material, I
8   don't know that it was designed by Colt in
9   direct response to a military --
10      Q.  Need or desire?
11      A.  Need or request for -- you know,
12  request for production.
13      Q.  Are you familiar with the Colt Walker
14  model revolver?
15      A.  Yes.
16      Q.  Do you know whether or not that
17  revolver was designed for use in the war with
18  Mexico in the 1840s?
19      A.  I believe it was.  Although, I can't --
20  I don't have that memorized.  However, what I
21  was referring to is that Samuel Colt's initial
22  idea to invent the revolver was not, to my
23  knowledge, the direct response to a request by
24  the military to produce that.

67

1       Q.  Okay.  How about the double action
2   revolver?  What historical origin did the double
3   action revolver have?
4       A.  That's a good question.  Off the top of
5   my head, I do not know.
6       Q.  If I were to suggest to you that its
7   origin may have lied in Britain's military use
8   of the Webley revolver, does that refresh your
9   recollection at all?
10      A.  I would not be surprised if that were
11  the derivation.  I have no reason to doubt that
12  that's what it is, but I don't have it off the
13  top of my head.
14      Q.  Bolt-action rifles are and have been
15  immensely popular in the United States for
16  civilian use, is that correct?
17      A.  Correct.
18      Q.  Did the bolt-action rifle have its
19  origin in military use?
20      A.  Yes.
21      Q.  When was that?
22      A.  Late 1860s, if I'm not mistaken, early
23  1870s.
24      Q.  And the single -- the bolt-action rifle

68

17 (Pages 65 to 68)

A. 291

1  receiver or the mechanism and the -- as opposed
2  to a Monte -- where there may be more
3  considerable offset between the shooter's
4  shoulder and his eye level and the barrel?
5      Q.   Well, I'll get to my understanding of
6  what straight-line design means, I guess, in a
7  second, but as you sit here today, do you have
8  any understanding as to what is meant by the
9  straight-line design of an AR type rifle?
10     A.   I believe I do.  However, I don't know
11 exactly what your definition of that may be.
12     Q.   Well, let's see if we can get on the
13 same page here.  I'm showing you --
14     A.   Here, I'll hand you back the Ruger
15 catalog.
16     MR. WILSON:  Just put it in the pile.
17         (Whereupon, Yurgealitis
18         Deposition Exhibit No. 14 was
19         marked for identification.)
20 BY MR. VOGTS:
21     Q.   Showing you the Remington 2012 product
22 catalog that I'll mark as Exhibit 14,
23 specifically pages 40 and 41 that depict the
24 Remington Model R-15 AR type rifle; is that

85

1  correct?
2      A.   That's what it shows, yes.
3      Q.   Now, tell me if you understand
4  straight-line design to be the following:  That
5  the rifle itself from its muzzle to its
6  buttstock is designed on a straight line through
7  the action as opposed to a more traditionally
8  styled firearm in which from the muzzle to the
9  buttstock there is an absence of that straight
10 line?
11     A.   Yes, yeah, and I believe that when I
12 had a moment to think about it while you were
13 retrieving the catalog I presumed what you were
14 going to refer to.
15     Q.   And you had the same challenge
16 articulating that as I did, correct?
17     A.   Correct.
18     Q.   Do you know what benefit or advantage
19 comes from there being a straight-line design to
20 an AR type rifle?
21     A.   I would say from my perspective, less
22 rise to the muzzle after firing.
23     Q.   Is it also served to direct recoil
24 directly back into the shoulder of the shooter?

86

1      A.   It will, yes.
2      Q.   As opposed to a more traditionally
3  style rifle?
4      A.   Yes.
5      Q.   So the straight-line design has that
6  functional purpose, correct?
7      A.   It has that functional difference, yes.
8      Q.   A number of -- strike that.
9         In the ordinance there are features,
10 specific features that are banned, may not be
11 present in a semiautomatic rifle capable of
12 accepting a detachable -- large capacity
13 detachable magazine; is that right?
14     MR. WILSON:  I'll object, but it's really
15 just clarification.  You're referring to the
16 ordinance and I think we're probably better off
17 picking one or the other --
18     MR. VOGTS:  Well, subject to the proviso --
19 off the record here for a second.
20         (Whereupon, a discussion was had
21         off the record.)
22 BY MR. VOGTS:
23     Q.   You discuss those features on page 16,
24 paragraph 33 of Exhibit 8; is that right?

87

1      A.   Yes.
2      Q.   Among those banned features are only a
3  pistol grip without a stock attached?
4      A.   Yes.
5      Q.   Referring you back to the Remington
6  catalog and the page that depicts the Remington
7  R-15 and its pistol grip configuration, is your
8  interpretation of a pistol grip under the
9  ordinance the pistol grip we see on this
10 Remington R-15?
11     A.   In a general sense of the design, yes,
12 not perhaps completely identical to the one in
13 the picture.
14     Q.   So the language only a pistol grip
15 without a stock attached does not necessarily
16 mean a rifle without a stock in your
17 interpretation, is that right?
18     A.   I'm sorry.  Can you repeat that?
19     Q.   The language of the ordinance, only a
20 pistol grip without a stock attached --
21     A.   Which section are you referring to
22 there?  Oh, so you're looking at my report right
23 now?
24     Q.   Right.

88

1    guess in answer to your -- in response to your
2    question, what I'm saying is you're equating the
3    second sentence that you just read with the
4    Remington R 5, and I'm just saying that you're
5    making that jump.  I'm not making that jump.
6    It's not specifically cited in there.
7        Q.  Can't you make that jump though?
8        A.  Well, I can say that the Remington R 5
9    is a straight-line design as most AR type rifles
10   are.  However, I'm just trying to qualify my
11   answer a little bit by saying that, yes, the
12   Remington R 5 has pistol grip and they mentioned
13   use or the purpose of a pistol grip in a
14   straight-line design rifle.
15       Q.  And that type of pistol grip is
16   necessitated because the rifle has a
17   straight-line design, correct?
18       A.  It says in most cases, the
19   straight-line design of the military weapon
20   dictates a grip of this type.
21       Q.  And you cannot incorporate a pistol
22   grip into the wrist of a firearm stock as they
23   are in more typical traditionally styled rifles,
24   can you?

93

1        A.  I don't see how you could, but I mean,
2    there are other variations.  Just to make note
3    that there were thumbhole stocks, which I
4    believe are not allowed either, but I'm just
5    saying that that's not the only -- that's not
6    the only way to skin that cat, but I understand
7    that that's -- the design of the rifle
8    necessitates a pistol grip.  I agree, but I
9    wasn't -- I'm trying to give you a technical --
10   a technically sound answer to something without
11   making an assumption.
12       Q.  I appreciate that.  What function does
13   the pistol grip serve on a rifle?
14       A.  According to me or according to the ATF
15   report?
16       Q.  According to you.  You can put that
17   aside.  I'm done with that.
18           According to you, what function does a
19   pistol grip -- whether it be in the wrist of a
20   traditionally styled firearm or protruding
21   beneath the stock?
22       A.  Well, to aid in controlling -- for the
23   operator to control the firearm or operate the
24   firearm.

94

1        Q.  Why is that important?
2        A.  Why is controlling the firearm
3    important?
4        Q.  Yes.
5        A.  To aid in aiming or to control it
6    during recoil.
7        Q.  And is the control in aiming in part a
8    safety consideration?
9        A.  Well, certainly, yes.
10       Q.  Is a rifle with a pistol grip
11   configuration as we see it on typical AR type
12   rifles any more dangerous in the hand of a
13   criminal than a rifle with a more traditional
14   pistol grip configuration in the wrist of the
15   stock?
16       MR. WILSON:  Can you read that question back?
17           (Whereupon, the record was read
18           as requested.)
19       MR. WILSON:  Object to the term dangerous in
20   that question.  It's vague.
21       MR. PULLOS:  I object to form.
22       THE WITNESS:  I wouldn't -- the way that you
23   stated with a more traditional pistol grip
24   incorporated into the wrist of the stock I

95

1    believe is what you just said?
2        MR. VOGTS:  I did.
3        THE WITNESS:  I don't consider a traditional
4    rifle stock to incorporate a pistol grip in the
5    stock.  If we look -- do we have the Ruger
6    catalog?
7        MR. VOGTS:  Yeah, or the Remington might
8    be --
9        THE WITNESS:  The Ruger.
10       MR. VOGTS:  Both would work.
11       THE WITNESS:  This is fine.  In Exhibit 13 as
12   we looked at before on page 87 and 88, the
13   Mini-14 Ranch Rifle and the Mini-14 Ranch Rifle
14   with black stainless finish have traditional
15   rifle stocks, but the way that you asked that
16   question was is a rifle with a pistol grip or a
17   protruding pistol grip any more dangerous than
18   in the hand of a criminal -- and I'm summarizing
19   here -- than a rifle with a pistol grip
20   incorporated into the stock.  That's not a
21   pistol grip.
22   BY MR. VOGTS:
23       Q.  Fair enough.  Let me restate the
24   question.  Is a rifle with a pistol grip as we

96

24  (Pages 93 to 96)

1  see it in a typical AR configuration any more
2  dangerous in the hands of a criminal than a
3  rifle with a more traditional grip for the
4  trigger hand as we see it on the Mini-14?
5      A.   Well, dangerous is a relative term.  Is
6  it more easily fired from a position other than
7  the shoulder?  Yes.  I don't know if that
8  equates to dangerousness necessarily directly.
9  Is it easier to -- I find that I would not shoot
10 my Marlin 22 bolt-action rifle from the hip.
11     Q.   But you could?
12     A.   In an exigent circumstance and with the
13 result in degradation in aiming, but you could
14 if you had to, certainly.
15     Q.   And you could fire the Ruger Mini-14
16 from the hip with the grip it has in the wrist
17 of the stock, correct?
18     A.   Certainly, but I believe it's easier
19 for me to fire an AR type rifle from the hip
20 than it would be for a more traditionally
21 stocked firearm.  Let's put it that way.
22     MR. WILSON:  Off the record.
23         (Whereupon, a discussion was had
24         off the record.)

97

1  charge of so I had the opportunity to shoot a
2  number of different firearms from the hip.
3      Q.   A Thompson Submachine Gun perhaps?
4      A.   Thompsons, STEN submachine guns, a
5  number of different types of military firearms
6  with vertical foregrips that were intended to be
7  utilized in that way.
8      Q.   Okay.  Let's move to the vertical
9  foregrip or as the ordinance refers to them as
10 the protruding grip.  Your Colt Model 6920 rifle
11 has a protruding grip, is that correct?
12     A.   Yes, it has a vertical foregrip
13 attached to the rail -- the rail system over the
14 barrel.
15     Q.   And that's a grip that you hold with
16 your non-trigger hand, is that right?
17     A.   Correct.
18     Q.   In your report or in your declaration I
19 should say, Exhibit 8, you state that the
20 protruding grip allows increased stability of
21 the firearm by the operator; is that right?
22     A.   That is my thought, but I just wanted
23 to get to exactly what page we're on here.
24     Q.   (Indicating).

99

1  BY MR. VOGTS:
2      Q.   Mr. Yurgealitis, have you ever fired
3  your Colt 6920 rifle from the hip?
4      A.   I don't know if I've fired mine, but I
5  have fired an AR-15 type rifle from the hip.
6      Q.   And you talk about degradation and
7  accuracy.  What did you mean by that?
8      A.   Well, you're not sighting down the
9  barrel and utilizing the sights on the firearm
10 to adjust your aim point or to, you know, aim
11 the rifle incorrectly.
12     Q.   So if your goal was to actually hit a
13 target, shooting from the hip is not the
14 technique to use; would you agree with that?
15     A.   Not if you want to deliver accurate
16 fire.
17     Q.   Have you ever in the course of your
18 training on the use of an AR type rifle been
19 trained to shoot from the hip?
20     A.   I don't believe that part of our
21 conversion training covered firing from the hip.
22 However, I've fired numerous firearms from the
23 hip at the ATF Laboratory.  We had quite an
24 extensive reference collection that I was in

98

1      A.   Thank you.
2      Q.   Why is increased stability an important
3  concept in shooting?
4      A.   Well, as it says in the next sentence,
5  it says they, referencing protruding foregrips,
6  allow the operator to better control recoil and
7  muzzle climb, thus increasing the hit
8  probability of successive shots.
9      Q.   So it has a functional relation to
10 accuracy, correct?
11     A.   Yes.
12     Q.   And accuracy has a relationship to
13 safety, is that right?
14     A.   Amongst other factors, yes.
15     Q.   You also note that it's a feature seen
16 on a great many firearms that have rail
17 attachment systems?
18     A.   Yes.
19     Q.   Why does a gun that has a rail
20 attachment system also sometimes have a
21 protruding grip?  What is the relationship
22 between the two?
23     A.   Well, there are many manufactured rail
24 attachment systems and many manufactured

100

25  (Pages 97 to 100)

1  vertical foregrips that are available and that
2  will meet up with each other or mate. In other
3  words, amongst a number of -- hundreds of
4  accessories that you can put on a rail
5  attachment system, whether it's on an AR type
6  rifle or other type of firearm, are vertical
7  foregrips.
8      Q.  Does a light sometimes necessitate the
9  presence of a protruding grip?
10     A.  If it's of certain types, yes.
11     Q.  Why is that?
12     A.  Well, because the rail design is -- has
13 sharp -- a Picatinny rail has --
14     THE WITNESS:  If you would like me to spell
15 it, P-i-c-a-t-i-n-n-y.  It has sharp edges or
16 sharply-machined edges, and to utilize, say, a
17 bear hand as a non-trigger or hand aiming or
18 support for the rifle, it's not a comfortable
19 fit.
20 BY MR. VOGTS:
21     Q.  So in the presence of a Picatinny rail,
22 at times you cannot use your non-trigger hand to
23 support the rifle at the forend as you otherwise
24 would?

101

1      A.  You could.  I mean, you can, but it's
2  not designed to be held with a bear hand.  In
3  that case, you would be better off leaving, say
4  for instance, a factory AR style shroud or
5  foregrip on the weapon if you weren't going to
6  use a vertical foregrip with a Picatinny rail.
7      Q.  And if you had a Picatinny rail with a
8  protruding grip forward of the trigger guard,
9  you would arguably have better control over that
10 firearm; is that correct?
11     A.  Yes.
12     Q.  And better control means better
13 accuracy, correct?
14     A.  Yes.
15     Q.  Better accuracy means better safety,
16 correct?
17     A.  Well, better accuracy means a number of
18 things.  Amongst those, more safe operation of a
19 firearm.
20     Q.  And by more safe operation of a
21 firearm, that inaccurate shots will not hit
22 targets not intended to be hit?
23     A.  I'm sorry.  Can you --
24     Q.  Strike that then.  In terms of safety,

102

1  a protruding grip allows for more accuracy
2  because inaccuracy can lead to targets being hit
3  that are not intended; correct?
4      MR. WILSON:  I'll object as vague.  It's
5  unclear in the question whether you're talking
6  about AR type weapons or all weapons.
7      THE WITNESS:  I think it's almost as if you
8  just asked a question based on a separate
9  sentence.  Amongst safety considerations with
10 any firearm is a concern about hitting
11 unintended targets, period.  A vertical foregrip
12 potentially increases safety by allowing more
13 accurate fire from a firearm, period.  I think
14 it's just trying to -- the way it was
15 structured, I was having a hard time following.
16     MR. VOGTS:  That's fine.  That's fine.
17     THE WITNESS:  But that's amongst -- vertical
18 foregrip allows that, but it also allows other
19 things.
20 BY MR. VOGTS:
21     Q.  Okay.  Moving on to folding telescoping
22 and thumbhole stocks, what is a folding stock?
23     A.  A folding stock is a portion of the
24 firearm stock that can be folded or it's hinged

103

1  or constructed that it can be shortened or moved
2  out of the way to reduce the overall length of
3  the firearm.
4      Q.  In your trips to the SHOT Show and to
5  local gun stores, you don't see many, if any,
6  firearms on the shelves with the folding stock
7  you've just described; do you?
8      A.  As originally manufactured?
9      Q.  New firearms.
10     A.  They're not -- they're not common.  I
11 would say that.
12     Q.  Right.  However, telescoping stocks on
13 AR type rifles are fairly common; is that
14 correct?
15     A.  Yes.
16     Q.  What is the purpose of a telescoping
17 stock on an AR rifle?
18     A.  The same as with a folding stock, to
19 reduce the overall length of the firearm to
20 allow for -- well, to reduce or increase the
21 overall length of the firearm for it to --
22 individuals of different physical stature, to
23 utilize the firearm, also to conceal it and, you
24 know, reduce the overall length and make it more

104

26 (Pages 101 to 104)

1 maneuverable in a more confined area, or
2 more -- I don't know if maneuverable is the
3 correct use. Make it -- I'll put it in
4 layman's terms. Less big in a small place.
5     Q.   What is length of pull?
6     A.   Length of pull is the distance
7 between -- well, it's the -- it's relative to
8 the length of the stock and the distance from
9 the butt end of the stock to a certain point on
10 the stock.
11     Q.   Why is length of pull, proper length of
12 pull important in shooting?
13     MR. WILSON:   Objection.  Lack of foundation.
14     THE WITNESS:   Why is proper length of pull
15 important -- again, if you could repeat that.
16 I'm sorry.
17 BY MR. VOGTS:
18     Q.   Why is a proper length of pull an
19 important consideration in rifle shooting?
20     A.   It has an impact on the -- or it's a --
21 I would say it impacts the accuracy and the
22 ability to aim or recover from a fired shot, et
23 cetera.  Basically the stock -- a properly
24 fitted firearm is easier to or more comfortable

105

1 to operate.  Let's put it that way.
2     Q.   And to shoot accurately, correct?
3     A.   Yes.
4     MR. WILSON:   Are you almost done with this
5 line of questioning?
6     MR. VOGTS:   Let me finish this feature and
7 we'll break.  Just five more minutes or so.
8 BY MR. VOGTS:
9     Q.   Does a telescoping stock on an AR type
10 rifle allow the operator to achieve a proper
11 length of pull?
12     A.   Yes, it does.  Amongst other functions,
13 yes.  The adjustability allows you to -- I don't
14 know if you ask the average shooter if they
15 would know what the term length of pull meant.
16 It allows it to be adjusted so that, you know,
17 an individual can find a more comfortable length
18 or length of pull actually.
19     Q.   Does your Colt Model 6920 have a
20 telescoping stock?
21     A.   Yes.
22     Q.   And I imagine when you shoot that
23 firearm, you adjust the stock from the position
24 it's in after your daughter has shot the

106

1 firearm?
2     A.   Yes, usually, yes.
3     Q.   You're about six two or so, six three?
4     A.   Six four.
5     Q.   And how tall is she?
6     A.   Five six.
7     Q.   Without that adjustable telescoping
8 stock, would one of you have a more difficult
9 time firing that gun accurately because it
10 didn't fit you well?
11     A.   I would have to ask my daughter because
12 there is times where she has actually taken it
13 after I've shot it and not adjusted it and shot
14 it.  Whether she's that sensitive to it or not,
15 I don't know.
16     At least as far as my training went
17 with the M4s from ATF, we would -- I would not
18 necessarily have that stock adjusted at the same
19 length when I was in a tactical situation that I
20 would have when I was shooting it at the range
21 due to body armor, et cetera that we wore on
22 tactical operations.
23     So it did -- it does allow for
24 adjustability, but I think you could shoot it

107

1 either way and not have a substantial
2 degradation in accuracy.
3     Q.   But you don't disagree with the general
4 concept that a properly fitted rifle to a
5 person's stature is a desired feature of that
6 rifle, correct?
7     MR. WILSON:   Objection to the term properly
8 fitted.
9     THE WITNESS:   And the double negative, don't
10 disagree.
11 BY MR. VOGTS:
12     Q.   Do you disagree with the proposition
13 that a properly fitted rifle to a person's
14 stature is an important consideration in
15 selecting the rifle?
16     MR. WILSON:   Again, same objection.
17     THE WITNESS:   I would say that it would be a
18 consideration in selecting a rifle.
19 BY MR. VOGTS:
20     Q.   I believe you testified that
21 telescoping stock permits the rifle to be
22 concealed more readily?
23     A.   Yes, amongst other capabilities that
24 that provides to a firearm.

108

27 (Pages 105 to 108)

A. 296

1    immediately because there's a burglar, and I
2    don't think that the same types of firearms or
3    the same tactics or the same mentality should be
4    applied when you're talking about a homeowner
5    addressing a home burglary as you would with law
6    enforcement.
7        Additionally, there's a vast difference
8    in training.  I wouldn't -- you know, if I was
9    as a police officer or a law enforcement officer
10   responding to a home of an accountant, I would
11   know more do my own accounting than I should do
12   his own law enforcement.
13       Unless it's a life or death situation,
14   there's no cause for somebody to go down the
15   stairs and try to confront that individual, and
16   that's when you start talking about, you know,
17   assault weapons or AR-15 type weapons or
18   semiautomatic rifles for home defense and
19   maneuverability, and there are many other
20   firearms that are more maneuverable than an
21   AR-15.
22       Q.  And many firearms less maneuverable?
23       A.  Exactly, exactly, but what I'm saying
24   is to start equating those two -- and I'm not

117

1    that are civilians that are extremely well
2    trained and extremely well versed and shoot on a
3    regular basis and are incredibly proficient with
4    firearms, and I have seen people at a range
5    where I felt like I couldn't get my head to the
6    ground low enough because they're turning around
7    with a firearm.
8        You know, there's different levels of
9    capability based on how much time and effort
10   either an agency or an organization or an
11   individual is willing to expend on somebody to
12   train them to use it safely and properly.
13       Q.  But you do allow for the fact that
14   there are a great number of civilians who are
15   well trained to use and operate firearms?
16       A.  Oh, there are well trained civilians.
17   There are poorly trained civilians.
18       Q.  And there's well trained police
19   officers and poorly trained police officers?
20       A.  Yes.
21       Q.  Moving on, a thumbhole stock.  I don't
22   believe in Exhibit 8 -- oh, yes, you do.  You
23   write thumbhole stocks have traditionally been
24   utilized on firearms for sport and target

119

1    trying to qualify my answers other than to say
2    okay, there's a difference -- people carry
3    different things for different reasons because
4    they have different missions, and a homeowner
5    doesn't necessarily need to fend off a squad of
6    enemy soldiers on a frontal assault and worry
7    about a flanking maneuver by another squad.  He
8    may need to worry about one individual.
9        The military mission is going to differ
10   from a civilian mission.  The law enforcement
11   mission is going to differ from the civilian
12   situation.  So that's where I was just trying to
13   say, hey, let's step back for a second and look
14   at this, and I wanted to interject that.
15       But to get back to your original
16   question, yes, a telescoping stock for a
17   civilian would make it more maneuverable in
18   tight quarters.
19       Q.  Okay.  You made reference in your
20   answer to a vast difference in training.  Were
21   you referring to training in tactical situations
22   or training on how to use and operate a firearm
23   or both?
24       A.  Both.  I think that I have seen people

118

1    shooting, correct?
2        A.  Yes.
3        Q.  What value does a thumbhole stock bring
4    to sport and target shooting?
5        A.  Well, traditionally you didn't see a
6    lot of manufacturers -- a large number of
7    manufacturers utilize those until the Federal
8    Assault Weapons Ban, but I mean, in general,
9    they're for stability just as any other -- just
10   as a pistol grip would be in other type of
11   stock.
12       Q.  And we see such a thumbhole stock in
13   the Ruger catalog, Exhibit 13 at page 90; do we
14   not?
15       A.  Yes.
16       Q.  And I believe Ruger promotes the
17   thumbhole stock as assisting in what?  Will you
18   read that please?
19       A.  Easy holding or resting at the bench.
20       Q.  For target shooting, competitive or
21   otherwise?
22       A.  (Nonverbal response.)
23       Q.  Does the presence of a thumbhole stock
24   in a semiautomatic rifle make that rifle more

120

30 (Pages 117 to 120)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1  dangerous?
2      A.  I don't think -- again, I'm going to
3  step back just a little bit and say I don't
4  think any one of these individual features that
5  are banned by either one of these ordinances if
6  taken by themselves makes something more
7  dangerous or less dangerous.  I believe that
8  once you have a combination of the features,
9  then that's -- the potential for that increases.
10     It's almost like, you know, you go out
11  on the water.  Well, high waves aren't
12  necessarily bad until you combine them with high
13  winds and what have you.  Either one of those
14  two things might not be intrinsically dangerous
15  or make a situation more dangerous or more
16  deadly.  However, if you -- once you start
17  combining and looking things in the totality of
18  it, I think that's what the intent of the
19  ordinance was, not --
20     Q.  Hold that thought.  I'll be right back
21  or think about other things if you like.
22          (Whereupon, a discussion was had
23          off the record.)
24

                                            121

1  BY MR. VOGTS:
2      Q.  In Exhibit 8, page 11 -- or 17, I'm
3  sorry, you talk about barrel shrouds, and there
4  we have a difference between the two ordinances.
5  If you pull out 4 and 5 from the stack in front
6  of you, the Cook County ordinance, Exhibit 5,
7  has a definition of barrel shroud at page 4.  Do
8  you see that?
9      MR. WILSON:  Page 4 of Cook County?
10     MR. VOGTS:  Yes.
11     THE WITNESS:  Yes.
12  BY MR. VOGTS:
13     Q.  I'm interested in your interpretation
14  of the difference between the barrel shroud
15  provisions in these two ordinances, and I'd like
16  you to tell me if you agree with my
17  interpretation under the Cook County ordinance.
18     An extension of the stock along the
19  bottom of the barrel which does not completely
20  or substantially encircle the barrel is not a
21  barrel shroud, is that correct?
22     A.  According to the verbiage in the
23  ordinance, yes.
24     Q.  So that kind of describes what would

                                            122

1  typically be a forend on a traditionally styled
2  rifle onto which the barrel sits.  Do you agree
3  with that?
4      A.  Yeah, in a general sense, yes.
5      Q.  However, in Highland Park, a barrel
6  shroud is one that partially or completely
7  encircles the barrel; is that right?
8      MR. WILSON:  Sorry.  So we're clear, are you
9  talking about A1, A4?
10     MR. VOGTS:  Correct, yes.
11     THE WITNESS:  Well, I think the difference is
12  it says that the -- in the Highland Park
13  ordinance, it states that the shroud is attached
14  to the barrel as opposed to in Highland Park, it
15  is attached to or partially or completely
16  encircles the barrel.
17  BY MR. VOGTS:
18     Q.  Actually I think that language is
19  identical?
20     A.  No, you're right.  It is.  I'm sorry.
21  So basically this does not mention -- this does
22  not differentiate, say for instance, a
23  traditional stock with the groove cut in it for
24  the barrel to be seated in or embedded in.

                                            123

1      Q.  Right.  In Highland Park under the
2  language of its ordinance, that type of shroud
3  or forend that doesn't completely encircle the
4  barrel but partially encircles the barrel is a
5  band feature; correct?
6      A.  I mean, that's the way that it reads,
7  but it would have to be -- it would have to be
8  attached to the barrel, and that doesn't
9  disqualify a standard -- I mean, that wouldn't
10  necessarily disqualify a standard rifle stock if
11  it's not -- if there's no barrel attachment
12  point if it attaches to the receiver or --
13     Q.  Well, it says attached to the barrel or
14  partially or completely encircles.  So it
15  needn't be attached to the barrel in Highland
16  Park, correct?
17     A.  Apparently by the verbiage under that
18  section, yeah.
19     Q.  Well, a barrel shroud under either
20  definition serves numerous purposes.  Would you
21  agree with that?
22     A.  Numerous purposes but primarily
23  protecting the operator from a hot barrel.
24     Q.  So in a sense, a handguard?

                                            124

                          31 (Pages 121 to 124)

1    A.  (Nonverbal response).
2    Q.  And wouldn't a forend on a
3  traditionally styled rifle serve that same
4  purpose, correct?
5    A.  Well, yeah, a grip point, if you will,
6  or a hand hold or --
7    Q.  In your report, Exhibit 8, you make
8  reference to the fact that in a modern
9  gas-operated semiautomatic military rifle, it
10  serves to protect the gas tube/piston
11  mechanism --
12    MR. WILSON: Sorry, Jim. If I could, I think
13  he's looking at his declaration. Are you
14  reading from the report?
15    MR. VOGTS: I'm sorry. I meant to say the
16  declaration. If I said report, I'm sorry, yeah.
17    MR. WILSON: Okay.
18  BY MR. VOGTS:
19    Q.  In your declaration on page 17, you
20  state that in a modern gas-operated
21  semiautomatic military rifle, it serves to
22  protect the gas tube/piston mechanism from
23  inadvertent damage. I read that correctly,
24  correct?

125

1    A.  Sure. I mean for like an AR, for, say,
2  an AR platform.
3    Q.  Military or otherwise, the same gas
4  tube mechanism is present; correct?
5    A.  Yes.
6    Q.  And it serves to protect that
7  mechanism?
8    A.  That's one of its design intents.
9    Q.  It also provides additional grip space
10  for the operator to steady and control the rifle
11  during rapid repeat firing without getting
12  burned by the hot barrel, correct?
13    A.  Correct.
14    Q.  You also mention that -- strike that.
15    Does it also serve as a place to mount
16  rail attachment systems for scopes and optical
17  sites?
18    A.  Yes.
19    Q.  Does the presence of a barrel shroud on
20  a firearm under either ordinances's definition
21  make that firearm more dangerous?
22    A.  Well, I will qualify my answer by
23  saying the same thing I did before. In and of
24  itself as a stand-alone object, if that were the

126

1  only banned feature, I would see how it would
2  not make that more dangerous or have it even
3  banned in the first place, but again, I believe
4  the intent of the ordinance is the combination
5  of these features, but I don't believe that a
6  handguard in and of itself makes a firearm more
7  dangerous. It allows more control by the
8  operator.
9    Q.  Okay. However, both ordinances ban
10  civilian possession of semiautomatic rifles
11  capable of accepting detachable magazines that
12  have the presence of just one of these features;
13  isn't that right?
14    A.  Yes, one or more of the following. I
15  just wanted to make sure I wasn't --
16    Q.  So such a rifle with just a barrel
17  shroud is banned under the ordinance?
18    A.  Yes, theoretically.
19    Q.  Okay. Muzzle brakes and muzzle
20  compensators. What is a muzzle brake?
21    A.  A muzzle brake is a device at the end
22  of a barrel that directs escaping gases from
23  firing to either reduce recoil or prevent a --
24  or to help control the muzzle of the firearm.

127

1    Q.  How does a muzzle brake differ from a
2  muzzle compensator?
3    A.  Well, here's the fun part, is that a
4  lot of people use those terms interchangeably.
5  A muzzle brake may just direct gases in one
6  direction to control. Like, say for instance,
7  on some of the AK models, it was initially
8  placed on the firearm in order to control the
9  rifle's tendency to climb in one direction.
10    Q.  During fully automatic fire?
11    A.  Well, fully automatic fire or
12  semiautomatic fire.
13    Q.  Is it a more valuable feature to have
14  on a rifle of this type, whether it be an AR
15  type or an AK type rifle, when that rifle is
16  used in fully automatic fire as opposed to
17  semiautomatic fire?
18    MR. PULLOS: Object to form.
19    THE WITNESS: I don't know that it -- from
20  personal experience, and that's what I'll speak
21  from, I have never felt that there was a major
22  difference in my ability to control, say, an AK
23  with a muzzle brake on it in fully automatic
24  fire versus an AK in fully automatic

128

32 (Pages 125 to 128)

1  without one.
2  BY MR. VOGTS:
3      Q.  Does your Colt rifle have a muzzle
4  brake or a muzzle compensator on it?
5      A.  It has a flash hider on it.
6      Q.  Which is a standard mechanism, correct?
7      A.  Correct.
8      Q.  Does the presence of a muzzle brake or
9  muzzle compensator on a semiautomatic rifle make
10  that rifle more dangerous?
11      A.  Again -- and you'll get the same
12  answer -- in and of itself, I don't believe that
13  it makes it more or less dangerous.
14      Q.  Do you agree that there are a number of
15  semiautomatic rifles capable of accepting
16  detachable magazines that are designed and sold
17  for hunting?
18      A.  Yes.
19      Q.  You yourself have never hunted with
20  such a firearm, have you?
21      A.  No, I've never been a hunter.
22      Q.  Do you know people who hunt with those
23  types of firearms?
24      A.  Give me a specific example and I'll

129

1  tell you if I know anybody who hunts with one.
2      Q.  With an AR type rifle.
3      A.  I know of people but I mean, close
4  friends or people that are -- no.
5      Q.  But you know of people who have?
6      A.  Certainly.
7      Q.  Do you agree that those types of rifles
8  are suitably used for hunting?
9      MR. PULLOS:  Object to the form.
10      THE WITNESS:  I couldn't speak because I
11  can't give you my personal opinion because I'm
12  not a hunter.
13  BY MR. VOGTS:
14      Q.  Okay.  Turn to page 37 of exhibit --
15  paragraph 37 of Exhibit 8.  In paragraph 37 you
16  wrote it is worth noting that in Illinois,
17  amongst other states, .223/5.56 is too small a
18  caliber to be legal for hunting; is that
19  correct?
20      A.  I know that it is in Illinois.  I
21  cannot recall the other states that it is -- I
22  mean, off the top of my head, I can't recall the
23  other states that it is not allowed -- an
24  allowable hunting caliber.

130

1      Q.  Do you know whether or not it's an
2  allowable hunting caliber in your home state of
3  Pennsylvania?
4      A.  I don't know.
5      Q.  Do you know in what states it is or is
6  not an allowable hunting caliber?
7      A.  I know in Illinois it is not.
8      Q.  How did you come to learn that it is
9  not an allowable hunting caliber in Illinois?
10      A.  I believe it was on the Illinois State
11  Police website.
12          (Whereupon, Yurgealitis
13           Deposition Exhibit No. 17 was
14           marked for identification.)
15  BY MR. VOGTS:
16      Q.  I'm going to show you what I believe is
17  going to be marked as Exhibit 17 and ask you to
18  turn to page 28, under box coyote hunting in
19  Illinois?
20      A.  Yes, I see that.
21      Q.  Within the Illinois Digest of Hunting
22  and Trapping Regulations produced by the
23  Illinois Department of Natural Resources, read
24  the third bullet point to yourself if you would.

131

1      A.  So this is specific to coyote hunting?
2      Q.  Right.  Isn't it true based on what you
3  read there that in Illinois, it's lawful to hunt
4  coyote with any type of legal rifle including
5  large capacity semiautomatic rifles and shotguns
6  using any type of shell except for slugs?
7      A.  Yes.
8      Q.  And although, as you write in your
9  report, these kinds of rifles were not
10  originally designed for hunting purposes, you
11  are certainly aware they are frequently used
12  today for hunting purposes; is that right?
13      MR. WILSON:  Objection to frequently used.
14      THE WITNESS:  Well, I would say that I now
15  know they are legal for coyote hunting in
16  Illinois.
17  BY MR. VOGTS:
18      Q.  And you know they're legal for hunting
19  elsewhere but you don't know specifically where
20  by what state, correct?
21      A.  Correct.
22      Q.  Paragraph 38 of your declaration where
23  you begin discussing in greater detail home
24  defense and personal protection, do you

132

33  (Pages 129 to 132)

A. 300

1 primarily?
2     A.   Sure, the powder charge and the barrel
3 length, et cetera.
4     Q.   Do you believe that in selecting a
5 firearm and the ammunition for use in that
6 firearm for home defense purposes should in part
7 be dependent upon the amount of recoil that that
8 firearm and ammunition presents and the amount
9 of noise that that firearm and ammunition
10 presents to the homeowner?
11     A.   I wouldn't say that the noise should
12 necessarily be a consideration.  I think the
13 overall -- look at it more -- I have to look at
14 it more on a -- like the sum of its parts again.
15 The comfort level of the operator and their
16 level of training and their ability to
17 accurately place a shot is a combination of a
18 lot of -- a lot of criteria.
19         If it's a deadly force situation, your
20 hearing will come back.  Noise, if it upsets you
21 or you're shocked by it, then perhaps you need
22 to look at a different type of firearm if it's
23 that much of a criteria, but it all comes down
24 to familiarity, ease of operation in a high

153

1 but that doesn't mean everybody takes my opinion
2 for gospel, but as I stated that in the report,
3 I would not -- I have an AR type rifle.  That
4 wouldn't be the first thing I grabbed.
5     Q.   Why not?
6     A.   Because I don't particularly think
7 that -- I would feel too encumbered by utilizing
8 a shoulder weapon in a home defense situation.
9 The maneuverability and ease of operation is
10 more important to me.  I'm not -- I mean, if I
11 take my Browning Hi-Power or if I take the Colt
12 Delta Elite that I have and I have to manipulate
13 safety, I don't have a problem with that
14 personally because I'm comfortable with that.
15 My daughter doesn't have a problem with it
16 because she knows how to shoot it and doesn't
17 have an issue with shooting it either.
18         It's just I had a Remington 870.  I
19 believe we went through that earlier.  I have an
20 AR type rifle, and if somebody was breaking into
21 my residence, I just value the maneuverability.
22 I feel too -- I just can't move as easily.
23     Q.   Yet you have recommended pump-action
24 shotguns to persons, correct?

155

1 stress situation, for me at least, and the
2 ability to, you know, put that little piece of
3 metal that comes out of the end of the barrel in
4 the right spot on a bad person when they're
5 coming after you when you pull the curved piece
6 of metal underneath the receiver, and if you can
7 do that reliably and accurately and easily in a
8 high stress situation, that combination to me is
9 the perfect home defense weapon.
10     Q.   If a person came to you and said I own
11 two guns, one is a Mossberg 12 gauge Model 500
12 shotgun for which I have double ought buckshot,
13 the other is a Smith & Wesson M&P15 AR type
14 rifle chambered in .223 ammunition, and he has a
15 ten-round magazine for that again, and he told
16 you that he was comfortable with both guns and
17 was familiar with both guns' operational
18 characteristics, and he wanted your
19 recommendation on which of those two guns you
20 felt was better suited for his use as a home
21 defense firearm in which a home in which he
22 lives with his wife and his two children.  What
23 firearm would you recommend to him?
24     A.   I would still recommend a Mossberg 500,

154

1     A.   If they had a preference for a shoulder
2 weapon, not as choice number one.
3     Q.   Well, in the hypothetical I gave you,
4 this person owned two guns only and they were
5 both shoulder weapons, and in the hypothetical I
6 gave you, you would recommend the Mossberg
7 Model 500?
8     A.   Yes, for the reasons I enumerated in
9 the report.
10     Q.   Both guns are less maneuverable than
11 your Browning or your Colt Delta Elite, correct?
12     A.   Certainly.
13     Q.   What specific advantage does the
14 Mossberg Model 500 have over the Smith & Wesson
15 M&P15?
16     A.   I would suggest that a shotgun is a
17 more effective home defense weapon than the
18 rifle would be because of really the incredible
19 stopping power of double ought buck.
20     Q.   Anything else?
21     A.   That's probably job number one.
22 Secondly, if it was set up in the quote/unquote
23 box condition that I mentioned in the report
24 where the safety was off, there was no round in

156

39 (Pages 153 to 156)

U.S. Department of Justice
Office of Justice Programs
*Bureau of Justice Statistics*



# Bureau of Justice Statistics
# Special Report

September 2010, NCJ 227379

*National Crime Victimization Survey*

# Victimization During Household Burglary

Shannan Catalano, Ph.D.,
*BJS Statistician*

An estimated 3.7 million household burglaries occurred each year on average from 2003 to 2007. In about 28% of these burglaries, a household member was present during the burglary. In 7% of all household burglaries, a household member experienced some form of violent victimization (figure 1).

These estimates of burglary are based on a revised definition of burglary from the standard classification in the National Crime Victimization Survey (NCVS). Historically, burglary is classified as a property crime except when someone is home during the burglary and a household member is attacked or threatened. When someone is home during a burglary and experiences violence, NCVS classification rules categorize the victimization as a personal (rape/sexual assault, robbery, and aggravated and simple assault) rather than a property crime (household burglary, theft, and motor vehicle theft). In this report, the definition of household burglary includes burglaries in which a household member was a victim of a violent crime (see *Methodology*).

**Figure 1.**

Number and percent distribution of household burglaries, 2003–2007



**Highlights**

- An estimated 3.7 million burglaries occurred each year on average from 2003 to 2007.

- A household member was present in roughly 1 million burglaries and became victims of violent crimes in 266,560 burglaries.

- Simple assault (15%) was the most common form of violence when a resident was home and violence occurred. Robbery (7%) and rape (3%) were less likely to occur when a household member was present and violence occurred.

- Offenders were known to their victims in 65% of violent burglaries; offenders were strangers in 28%.

- Overall, 61% of offenders were unarmed when violence occurred during a burglary while a resident was present. About 12% of all households violently burglarized while someone was home faced an offender armed with a firearm.

- Households residing in single family units and higher density structures of 10 or more units were least likely to be burglarized (8 per 1,000 households) while a household member was present.

- Serious injury accounted for 9% and minor injury accounted for 36% of injuries sustained by household members who were home and experienced violence during a completed burglary.

For a list of publications in this series go to http://bjs.ojp.usdoj.gov/index.cfm?ty=dcdetail&iid=245

A. 302

# "Home invasion" has been used widely to describe an array of victimizations

"Home invasion" has been used broadly to describe any crime committed by an individual unlawfully entering a residence while someone is home. More narrowly, home invasion has been used to describe a situation where an offender forcibly enters an occupied residence with the specific intent of robbing or violently harming those inside.

The limited numbers of states incorporating the term "home invasion" into their state statutes include the intent on the part of the offender in their definition. In part, these statutes have defined intent as—

• A person enters or remains unlawfully in a dwelling with the intent of committing a violent crime;

• A person knowingly enters the dwelling place of another with the knowledge or expectation that someone (one or more persons) is present;

• The unauthorized entering of any inhabited dwelling or other structure belonging to another with the intent to use force or violence upon the person of another.

## Public perception and media reports of home invasion do not necessarily include intent

Public perception and media reports of home invasion do not necessarily include intent on the part of the offender. Situations reported by the media as home invasion include—

• An offender forcibly enters a home to rob the household of specific items, including cash, drugs, or other items— *specific households or residents may become a target either to "settle a score" or because residents are perceived as vulnerable, such as persons with disabilities and the elderly.*

• An offender enters a residence falsely believing no one is home and a confrontation occurs between the resident and the offender.

• A household member returns home while a burglary is in progress and a confrontation occurs between the household member and the offender.

## National Crime Victimization Survey (NCVS) estimates of nonfatal crimes and the consequences to victims do not include offender motivation

The NCVS provides estimates of nonfatal violent and property crime and the consequences to victims. If a victim suffers violence during a burglary, NCVS classification rules categorize the victimization as a personal rather than a property crime. Some of these burglaries measured by the survey may fall under the broad definition of home invasion.

Between 2003 and 2007—

• A household member was home in 28% of the 3.7 million average annual burglaries that occurred between 2003 and 2007 (table 1).

• In nonviolent burglaries, household members knew the offender in 30% of the burglaries taking place while someone was home; the offender was a stranger in 24%. The identity of the offender was unknown in 46% of burglaries.

• On average, household members became victims of violent crimes in about 266,560 burglaries annually. Offenders known to their victims accounted for 65% of these burglaries; strangers accounted for 28%.

Because the NCVS does not determine offender motivation for entering an occupied household, the survey cannot address the more stringent application of the term "home invasion" that includes offender intent. Additionally, the NCVS does not distinguish between a household member who is present when the offender gains entry and one who arrived home unexpectedly while the burglary was in progress.

## Table 1.

### Household burglaries, by type, 2003–2007

| Type of burglary | Average annual number of burglaries | Percent of burglaries | |
| --- | --- | --- | --- |
| | | Household member present | Household member experienced violence |
| Household burglary | 3,713,000 | 27.6 % | 7.2 % |
| Completed | 3,083,750 | 26.7 % | 8.0 % |
| Forcible entry | 1,134,230 | 15.5 | 4.9 |
| Unlawful entry | 1,949,520 | 33.3 | 9.7 |
| Attempted forcible entry | 629,250 | 32.0 % | 3.4 % |

Note: Percent present is calculated as the number of households in which someone was home during a burglary (N=1,025,520) divided by the number of household burglaries (N=3,713,000). Percent experiencing violence is calculated as the number of households experiencing violence (N=266,560) divided by the number of household burglaries (N=3,713,000).

A. 303

## Findings include household characteristics of burglaries of both occupied and unoccupied residences

The findings on household burglary in this report are presented in three parts. *Household characteristics* of burglaries of both occupied (household member present) and unoccupied (household member not present) residences are examined in Tables 1 through 4. *Burglary characteristics of occupied households*, such as method of entry and type of damage, are examined in Tables 5 through 14. *Characteristics of violence* during household burglaries that took place while someone was home are examined in Tables 15 through 20.

## Violence during household burglaries remained stable from 2000 to 2007

Between 2000 and 2007 the rate of household burglary of unoccupied households declined from 25.8 to 21.2 victimizations per 1,000 households (figure 2). In contrast, the rate of household burglary when someone was home remained stable between 2000 (8.5 per 1,000 households) and 2007 (8.3 per 1,000 households). The percentage of these burglaries that included violence remained stable between 2000 (6.3%) and 2005 (5.7%). Between 2005 and 2007, however, there is some indication of an increase in the percentage of violent burglaries from 5.7% to 7.7%.

## Households composed of single females with children had the highest rates of burglary while someone was present

Households composed of married couples without children experienced the lowest rates of both types of burglary—when no one was home (14 per 1,000 households) and while a household member was present (4 per 1,000 households) (table 2). Households composed of single males were more likely than those composed of single females to experience a burglary while no one was home. However, households composed of single males and single females were equally likely to experience a burglary while the residence was occupied.

Single heads of households—male (59 per 1,000 households) and female (54 per 1,000 households)—living with children experienced the highest rates of burglary while no household member was present. Households composed of single females with children had the highest rate of burglary while someone was home (22 per 1,000 households). There was no consistent pattern in the risk of being present during a



**Figure 2.**

**Household burglary, 2000-2007**

*See *Criminal Victimization, 2006—Technical Notes*, BJS Web, 12 December 2007.

**Table 2.**

**Average annual household burglary, by household composition and head of household characteristics, 2003–2007**

| Characteristics | Average annual number of households | Rate per 1,000 households | |
| --- | --- | --- | --- |
| | | Household member not present | Household member present |
| **Household composition** | | | |
| Households without children | 58,104,000 | 17.3 | 5.8 |
| Married couples | 26,018,350 | 13.5 | 3.7 |
| Single male | 14,219,630 | 24.6 | 6.9 |
| Single female | 17,866,020 | 17.1 | 8.0 |
| Households with children | 29,405,670 | 28.2 | 10.5 |
| Two-parent | 22,395,420 | 19.9 | 7.2 |
| Single male | 1,041,190 | 58.7 | 13.7 |
| Single female | 5,969,060 | 54.1 | 22.3 |
| Other[a] | 29,365,170 | 29.0 | 12.9 |
| **Race of head of household[b]** | 116,874,850 | 23.0 | 8.8 |
| White | 96,089,150 | 21.6 | 8.5 |
| Black | 14,556,460 | 32.5 | 10.3 |
| American Indian/Alaska Native | 671,650 | 57.0 | 19.6 |
| Asian Pacific Islander | 4,546,100 | 12.6 | 5.2 |
| More than one race | 1,011,500 | 45.4 | 18.1 |
| **Hispanic/Latino origin head of household** | 116,248,780 | 23.0 | 8.8 |
| Hispanic or Latino | 12,335,710 | 26.4 | 11.9 |
| Non-Hispanic or Latino | 103,913,070 | 22.6 | 8.4 |
| **Age of head of household** | 116,874,850 | 23.0 | 8.8 |
| 12-19 | 1,085,100 | 58.8 | 26.9 |
| 20-34 | 26,609,020 | 30.2 | 11.2 |
| 35-49 | 36,445,680 | 32.4 | 12.9 |
| 50-64 | 29,341,680 | 19.9 | 7.0 |
| 65 or older | 23,393,370 | 12.2 | 4.8 |

[a]Includes a combination of children, adult relatives, and other adults not related to household members living together. The NCVS is unable to disentangle these more complex household structures involving common law marriages, domestic partnerships, and alternative familial living arrangements.

[b]Head of household is a classification defining one and only one person residing in each housing unit as the head. It implies that the person is either the homeowner (or in the process of buying the unit) or the person responsible for renting the unit. The head of household must be age 18 or older with two exceptions: all household members are under age 18 or the head of household is under age 18 and married to someone age 18 or older.

burglary between households composed of single males with children and other household compositions.

## Table 3.

**Average annual household burglary, by household income and ownership, 2003–2007**

| | | Rate per 1,000 households | |
| --- | --- | --- | --- |
| Characteristics | Average annual number of households | Household member not present | Household member present |
| **Household income** | | | |
| Less than $7,500 | 4,992,420 | 47.2 | 18.5 |
| $7,500 to $14,999 | 8,294,260 | 34.3 | 15.9 |
| $15,000 to $24,999 | 11,407,660 | 29.4 | 11.7 |
| $25,000 to $34,999 | 11,074,270 | 23.8 | 10.0 |
| $35,000 to $49,999 | 14,045,700 | 23.9 | 9.0 |
| $50,000 to $74,999 | 15,364,730 | 18.6 | 7.0 |
| $75,000 or more | 21,336,190 | 16.8 | 5.7 |
| **Home ownership** | | | |
| Own | 80,230,680 | 18.9 | 6.7 |
| Rent | 35,012,820 | 33.5 | 13.9 |

## Table 4.

**Average annual household burglary, by type of housing and number of units in the structure, 2003–2007**

| | | Rate per 1,000 households | |
| --- | --- | --- | --- |
| Housing structure | Average annual number of households | Household member not present | Household member present |
| **Type of housing** | | | |
| House or apartment | 110,403,770 | 22.1 | 8.5 |
| Hotel, motel, or rooming house | 127,160 | 36.5 ^ | 3.1^ |
| Mobile home | 5,656,090 | 32.4 | 11.1 |
| Student quarters | 453,450 | 4.3 | 1.3 ^ |
| Other units[a] | 234,380 | 3.6 | 2.9 |
| **Number of units[b]** | | | |
| 1 | 79,766,660 | 22.1 | 7.9 |
| 2 | 5,638,510 | 31.3 | 13.0 |
| 3 | 1,602,980 | 26.0 | 15.8 |
| 4 | 3,462,380 | 28.7 | 13.5 |
| 5-9 | 5,950,620 | 25.1 | 10.4 |
| 10 or more | 14,415,580 | 19.7 | 8.3 |
| Group quarters unit | 408,570 | 41.4 | 29.3 |

^Based on 10 or fewer sample cases.

[a]Includes residences that are temporarily unoccupied, quarters that are not a house such as a condo or duplex, temporary living quarters, and general quarters.

[b]A housing unit is a group of rooms or a single room occupied as separate living quarters or intended for occupancy as separate living quarters. To be considered separate living quarters, the occupant must live and eat separately from all other persons on the property and have direct access to their living quarters from the outside or through a common hall or lobby.

### Residences with an American Indian or Alaska Native head of household experienced higher rates of burglary

Households having an American Indian or Alaska Native head of household (57 per 1,000 households) experienced higher rates of burglary when no one was home than any other race.

A slightly different pattern in the likelihood of experiencing a burglary was observed for households victimized while occupied. Residences having an American Indian, Alaska Native, or a person of more than one race as the head of household were equally likely to be home during a burglary.

Households with a white head of household were somewhat less likely than those with a black head of household to experience a burglary while a household member was present. Asian and Pacific Islander head of households were the least likely to be present during a burglary.

### Households with a head of household ages 12 to 19 had the highest rates of burglary; ages 65 or older had the lowest rates

Burglary rates declined for households with heads of households in older age groups. Households with a head of household age 65 or older had the lowest rates of burglary—12 per 1,000 households while no one was home and 5 per 1,000 households while the residence was occupied. Households with a head of household age 12 to 19 had the highest rates of burglary—59 per 1,000 households when no one was present and 27 per 1,000 households while the residence was occupied.

### Higher income households experienced lower rates of burglary

Rates of household burglary were generally lower for higher income households than lower income households (table 3).

Across all categories, the risk of burglary was higher for households living in rental properties. Households living in rental properties experienced higher rates of burglary when no one was home and while the residence was occupied than those who owned or were in the process of buying their homes.

### Single-unit housing and housing with 10 or more units were least likely to be burglarized while someone was home

Household members living in mobile homes (32 per 1,000 households) were more likely than those living in any other type of housing to experience a burglary while no one was home, with one exception—hotels, motels, and rooming houses. Households living in mobile homes were equally likely as those staying in a hotel, motel, or rooming house to experience a burglary while no one was present (table 4).

Households residing in houses or apartment complexes (9 per 1,000 households) were somewhat less likely than those living in mobile homes (11 per 1,000 households) to be burglarized while someone was home.

There was no consistent pattern in the risk of experiencing a burglary based on the number of units in a housing structure. However, a pattern was observed when a household member was home. Households residing in single-family units and households residing in higher density structures consisting of 10 or more units (8 per 1,000 households) generally had lower rates of household burglary while a household member was present.

### Damaging or removing a door was the most common type of entry in forcible and attempted forcible entry burglaries

Removing or damaging a window screen during a forcible entry was equally likely to occur whether the residence was occupied (11%) or unoccupied (9%) (table 5). In comparison, tampering with a door handle was less likely to occur while a household member was present (20%) than when no one was home (26%).

Attempted forcible entry burglaries differed somewhat from forcible burglaries. Damaging or removing window screens were an equally likely method of an attempted entry by an offender to occupied (22%) or unoccupied (18%) residences (table 6). However, burglars were more likely to attempt to enter a household by tampering with door handles or locks when household members were not in the residence (30%) than while the residence was occupied (19%).

### Table 5.

**Method of entry and type of damage in completed household burglary involving forcible entry, 2003–2007**

| Method of entry and type of damage | Household member not present | | Household member present | |
|---|---|---|---|---|
| | Average annual number | Percent | Average annual number | Percent |
| Window | 462,430 | 48.8 % | 80,670 | 47.0 % |
| Pane damaged or removed | 284,340 | 30.0 | 47,360 | 27.6 |
| Screen damaged or removed | 83,250 | 8.8 | 19,380 | 11.3 |
| Lock damaged or unlocked | 71,720 | 7.6 | 9,780 | 5.7 |
| Other damage* | 23,120 | 2.4 | 4,150 | 2.4 ^ |
| Door | 696,290 | 73.4 % | 120,800 | 70.4 % |
| Damaged or removed | 412,860 | 43.5 | 76,050 | 44.3 |
| Screen damaged or removed | 15,800 | 1.7 | 6,970 | 4.1 |
| Handle/lock removed or tampered | 242,660 | 25.6 | 33,700 | 19.6 |
| Other damage* | 24,970 | 2.6 | 4,080 | 2.4 ^ |
| Other entry* | 13,060 | 1.4 % | 4,420 | 2.6 %^ |

Note: Forcible entry is a completed burglary in which force, such as breaking a window or slashing a door screen, is used to gain entry to a residence. Percentages will not add to 100 because households may report more than one type of damage.
^Based on 10 or fewer sample cases.
*Other unspecified entry or damage.

### Table 6.

**Method of entry and type of damage in attempted household burglary involving forcible entry, 2003–2007**

| Method of entry and type of damage | Household member not present | | Household member present | |
|---|---|---|---|---|
| | Average annual number | Percent | Average annual number | Percent |
| Window | 187,800 | 44.1 % | 105,550 | 56.1 % |
| Pane damaged, broken, removed, or cracked | 85,920 | 20.2 | 46,650 | 24.8 |
| Screen damaged or removed | 75,440 | 17.7 | 40,460 | 21.5 |
| Lock damaged or tampered | 17,090 | 4.0 | 7,940 | 4.2 |
| Other damage* | 9,350 | 2.2 | 10,500 | 5.6 |
| Door | 316,890 | 74.5 % | 108,080 | 57.5 % |
| Damaged or removed | 159,810 | 37.6 | 56,270 | 29.9 |
| Screen damaged or removed | 16,450 | 3.9 | 9,570 | 5.1 |
| Handle/lock removed or tampered | 125,550 | 29.5 | 35,340 | 18.8 |
| Other damage* | 15,080 | 3.5 | 6,900 | 3.7 |
| Other entry* | 5,100 | 1.2 %^ | 3,340 | 1.8 %^ |

Note: Attempted forcible entry is a burglary in which force was used in an unsuccessful attempt to gain entry to a residence. Percentages will not add to 100 because households may report more than one type of damage.
^Based on 10 or fewer sample cases.
*Other unspecified entry or damage.

A. 306

## Table 7.

**Method of entry in household burglary involving unlawful entry, by presence of household member, 2003–2007**

| Method of entry | Household member not present | | Household member present | |
|---|---|---|---|---|
| | Average annual number | Percent | Average annual number | Percent |
| Total | 1,217,030 | 100.0 % | 623,520 | 100.0 % |
| Someone let the offender in | 19,960 | 1.6 % | 109,810 | 17.6 % |
| Offender pushed way inside | 2,750 | 0.2 ^ | 73,790 | 11.8 |
| Open door or window | 209,430 | 17.2 | 168,560 | 27.0 |
| Unlocked door or window | 481,230 | 39.5 | 174,760 | 28.0 |
| Had key | 95,740 | 7.9 | 22,490 | 3.6 |
| Picked lock or window | 49,600 | 4.1 | 14,020 | 2.2 |
| Unknown means through locked door or window | 64,340 | 5.3 | 10,720 | 1.7 |
| By other means | 260,870 | 21.4 | 38,890 | 6.2 |
| Don't know | 33,110 | 2.7 | 10,480 | 1.7 |

Note: Unlawful entry is a completed burglary committed by someone having no legal right to be on the premises even though no force was used to gain entry. An offender may gain access to a residence when household members are not present by being let in by an individual not living in the household, such as a visiting guest, housekeeper, or repair person. Totals may not add to 100% due to rounding.
^Based on 10 or fewer sample cases.

## Table 8.

**Victim activity during household burglaries, by presence of household member, 2003–2007**

| Type of activity | Household member not present | | Household member present | |
|---|---|---|---|---|
| | Average annual number | Percent | Average annual number | Percent |
| Total | 2,612,060 | 100.0 % | 1,024,230 | 100.0 % |
| Working or on duty | 656,180 | 25.1 % | 38,470 | 3.8 % |
| On the way to or from work | 38,460 | 1.5 | 14,160 | 1.4 |
| On the way to or from school | 36,840 | 1.4 | 1,630 | 0.2 |
| On the way to or from other place | 53,990 | 2.1 | 9,000 | 0.9 |
| Shopping/errands | 176,280 | 6.7 | 16,980 | 1.7 |
| Attending school | 39,860 | 1.5 | 1,560 | 0.2 |
| Leisure activity away from home | 607,640 | 23.3 | 48,120 | 4.7 |
| Sleeping | 144,370 | 5.5 | 389,880 | 38.1 |
| Activities at home | 80,190 | 3.1 | 450,910 | 44.0 |
| Other activity* | 167,380 | 6.4 | 26,590 | 2.6 |
| Don't know | 610,870 | 23.4 | 26,920 | 2.6 |

Note: Respondents may report at home activities when someone other than a household member is in the residence at the time of the burglary. Totals may not add to 100% due to rounding.
*The other activity category is specified when it is not clear what the respondent was doing or where the respondent was at the time of the victimization. Examples include the respondent was in the hospital or taking care of a sick friend.

## Table 9.

**Time of occurrence of household burglaries, by presence of household member, 2003–2007**

| Time of day | Household member not present | | Household member present | |
|---|---|---|---|---|
| | Average annual number | Percent | Average annual number | Percent |
| Total | 2,683,270 | 100.0 % | 1,021,430 | 100.0 % |
| Daytime (6 am - 6 pm) | 1,159,450 | 43.2 % | 336,340 | 32.9 % |
| Nighttime (6 pm - 6 am) | 697,940 | 26.0 | 626,150 | 61.3 |
| Don't know time of day | 825,880 | 30.8 | 58,940 | 5.8 |

### Offenders used an open door or window to gain unlawful entry in 17% of unoccupied residences

In 40% of unlawful entries to unoccupied residences, offenders gained access through an unlocked door or window (table 7). A smaller percentage (5%) of unlawful entries while no one was home was through a locked door or window by unknown means; 8% of offenders used a key to the residence to gain access.

For households occupied at the time of the burglary, offenders were equally likely to gain unlawful entry through an open (27%) or unlocked (28%) door or window. Respondents in 18% of burglaries of occupied residences stated that someone inside the home let the offender in; 12% stated that someone inside opened the door and the offender pushed their way in. Nearly 4% stated that the offender had a key to the residence and used the key to gain access.

### Household members were at work during a quarter of burglaries that took place while no one was home

In households in which no one was home about a quarter stated that household members were at work when the burglary occurred (table 8). A similar percentage (23%) of households were away from their residences and engaged in leisure activities when the burglary took place.

Victims in 38% of households burglarized while someone was home were asleep at the time of the burglary while 44% of households stated that household members were engaged in other activities in the home when the offender gained entry to the residence.

Households burglaries that occurred when no one was home were more likely to occur between the daytime hours of 6 am and 6 pm (43%) than between the hours of 6 pm to 6 am (26%) (table 9). Conversely, a household member was more likely to be present during a nighttime burglary (61%) than during one that occurred between the daytime hours of 6 am and 6 pm (33%).

A. 307

**With the exception cash, items were more likely to be stolen when residents were not home at the time of a burglary**

Purses, wallets, credit cards (29%), electronics (33%), and personal items (31%) made up a larger percentage of items stolen curing a burglary that occurred when no one was home compared to burglaries that took place when a household member was present (table 10). Firearms were stolen in 4% of burglaries of unoccupied households. Cash was equally likely to be stolen regardless of whether a household was occupied or unoccupied during the household burglary. Fifty-five percent of households burglarized while a resident was home, stated that no items were taken during the burglary compared to 25% of households burglarized while no one was home.

**Households burglarized while no one was home were more likely to suffer greater economic losses**

Households burglarized while no one was home were more likely to suffer greater economic losses than those burglarized while occupied (table 11). Thirty percent of households burglarized while no one was home had stolen items valued at more than $1,000; 17% of burglaries with household members present experienced thefts of $1,000 or greater. Households burglarized while a household member was present were more likely to suffer losses of less than $250, compared to other categories.

**About three-quarters of all household burglaries by forcible entry while no one was home were reported to the police**

The percentages of burglaries reported to the police, forcible, unlawful, and attempted forcible entry burglaries were equally likely to be reported regardless of whether a household member was home at the time of the burglary (table 12). However, differences were observed among forcible entry, unlawful entry, and attempted forcible entry in the percentages of burglaries by household members being present and household members not being present.

For households burglarized while no one was home, forcible entry burglaries (73%) were more likely to be reported to the police than unlawful (41%) or attempted forcible (41%) entry burglaries. More than three-quarters (78%) of households with members present during a forcible burglary reported the crime, 52% reported unlawful burglary, and 62% reported attempted forcible entry. These differences were not statistically significant.

## Table 10.

### Type of items taken, 2003–2007

| Type of item | Household member not present | | Household member present | |
| --- | --- | --- | --- | --- |
| | Average annual number | Percent | Average annual number | Percent |
| No items taken | 676,360 | 25.2 % | 566,300 | 55.2 % |
| Cash | 147,410 | 5.5 | 58,590 | 5.7 |
| Purse, wallet, credit cards | 774,610 | 28.8 | 106,700 | 10.4 |
| Electronics | 876,650 | 32.6 | 131,460 | 12.8 |
| Jewelry, watches, keys | 355,430 | 13.2 | 54,080 | 5.3 |
| Personal items[a] | 823,890 | 30.7 | 164,190 | 16.0 |
| Household items[b] | 597,890 | 22.2 | 86,340 | 8.4 |
| Firearms | 94,960 | 3.5 | 7,630 | 0.7 |
| Food/liquor | 92,460 | 3.4 | 14,330 | 1.4 |
| Other items taken | 178,260 | 6.6 | 31,770 | 3.1 |

Note: Totals may exceed 100% because households may report more than one item stolen.

[a]Includes stamps, coin collections, recreational equipment, clothing, luggage, bicycles or bicycle parts, and animals or livestock.

[b]Includes silver, china, tools, machinery, and farm or garden produce.

## Table 11.

### Economic loss in household burglaries where property was stolen, 2003-2007

| Property value | Household member not present | | Household member present | |
| --- | --- | --- | --- | --- |
| | Average annual number | Percent | Average annual number | Percent |
| Total | 2,011,130 | 100.0 % | 459,230 | 100.0 % |
| No property loss | 20,700 | 1.0% | 6,690 | 1.5 % |
| Less than $10 | 26,520 | 1.3 | 8,720 | 1.9 |
| $10 to $49 | 145,130 | 7.2 | 53,720 | 11.7 |
| $50 to $249 | 496,530 | 24.7 | 140,610 | 30.6 |
| $250 to $999 | 535,110 | 26.6 | 114,370 | 24.9 |
| $1,000 or more | 601,860 | 29.9 | 79,570 | 17.3. |
| Monetary value not Known | 185,280 | 9.2 | 55,540 | 12.1 |

Note: Includes cash and non-cash property. Households may report both cash and non-cash losses. Totals may not add to 100% due to rounding.

## Table 12.

### Household burglary reported to police, by type of entry, 2003–2007

| Type of burglary | Percent of household burglaries while— | |
| --- | --- | --- |
| | Member not present | Member present |
| All burglary | 52.4 % | 58.6 % |
| Completed burglary | 54.5 % | 57.8 % |
| Forcible entry | 73.1 | 78.2 |
| Unlawful entry | 40.8 | 52.2 |
| Attempted forcible entry | 40.8 % | 62.2 % |

A. 308

## Table 13.

**Reasons for not reporting household burglary to police, by presence of household member, 2003–2007**

| Reason | Percent of reasons for not reporting when— | |
|---|---|---|
| | Member not present | Member present |
| **Not important enough to report** | | |
| Minor crime | 29.5 | 28.6 |
| Not clear a crime occurred | 4.4 | 5.9 |
| Inconvenient | 5.3 | 4.5 |
| Private or personal matter | 7.5 | 17.6 |
| **Police could not help** | | |
| Could not identify offender/lack of proof | 17.9 | 14.6 |
| No insurance, loss less than deductible | 4.3 | 3.1 |
| Could not recover or identify property | 8.5 | 4.1 |
| **Police would not help** | | |
| Police ineffectiveness | 6.8 | 4.6 |
| Police biased | 1.5 | 2.6 |
| Police would not bother | 14.6 | 13.1 |
| Crime was discovered too late | 10.1 | 6.4 |
| **Reasons related to the offender** | | |
| Child offender | 1.8 | 2.7 |
| Protect offender | 2.3 | 4.5 |
| Afraid of reprisal | 0.9 | 6.1 |
| Offender was a police officer | 0.1 ^ | -- |
| **Other reasons** | | |
| Don't know why I did not report it | 1.5 | 1.4 |
| Other reason given | 0.1 ^ | 0.3 ^ |
| Other reason not listed | 11.5 | 12.1 |
| **Total not reported** | 1,181,990 | 396,170 |

Note: Percent may exceed 100% because households may report more than one reason for not reporting to the police.
--No cases were present for this category.
^Based on 10 or fewer sample cases. Totals may not add to 100% due to rounding.

## Table 14.

**Household burglary of occupied residences, by victim-offender relationship, 2003–2007**

| Relationship | All burglary | Type of burglary | |
|---|---|---|---|
| | | Completed[a] | Attempted forcible entry |
| Total | 1,025,520 | 824,320 | 201,200 |
| **Offender known to the victim** | 29.5 % | 33.5 % | 13.1 % |
| Intimates (current or former) | 10.6 | 11.9 | 5.0 |
| Relatives/known acquaintances | 18.9 | 21.6 | 8.0 |
| Strangers | 24.2 | 24.1 | 24.5 |
| Unknown offender[b] | 46.3 | 42.4 | 62.4 |

Note: Totals may exceed 100% because estimates include multiple offenders. Percentages are calculated as the number of households victimized by each victim offender category divided by the number of households burglaries in which someone was present.

[a]Includes forcible entry and unlawful entry without force.

[b]Survey respondents may not have been able to provide information on the offender because the respondents were not the household members present during the burglary, or the respondents may not have been able to see the offender clearly because of dim lighting (darkness), concealed identity, or other reasons.

For households burglarized while residents were not present, the most common reasons for not reporting the victimization to the police were that the burglary was considered a minor crime (30%), the resident could not identify the offender or the resident lacked proof (18%), the police would not bother investigating the crime (15%), or that the crime was discovered too late (10%) (table 13).

### Offenders were known to their victims in a third of households burglarized when a household member was present

Offenders were known to their victims in about a third of the 1 million average annual burglaries from 2003 to 2007 that took place with a household member present (table 14). About a quarter of households with a member present during a completed rather than an attempted burglary stated that the offender was a stranger; 42% stated that the offender was unknown.

Households were less likely to know the offender in attempted forcible entry burglaries. The offender was known to household members in about 13% of households that experienced an attempted forcible entry; the relationship to the offender was unknown in 62% of these entries.

### Violence during the course of a burglary may be examined by two different means

The general risk of violence may be examined as a percentage of all household burglaries of residences that were occupied (household member present) and unoccupied (household member not present) during the burglary. The specific risk of violence may be examined as a percentage of the number of burglaries with a household member present during the course of the burglary (see *Methodology*).

A. 309

An assault occurred in 5% off all household burglaries

In 7% of all household burglaries, someone was home at the time and experienced a violent victimization (figure 1, table 15). This translates to about 266,560 household burglaries out of about 3.7 million taking place each year on average.

**Simple assault (15%) was the most common form of violence during a completed burglary when a resident was home**

A household member was present in roughly 1 million burglaries from 2003 to 2007. Of these households, 26% (or 266,560) experienced some form of a violent victimization during the burglary (figure 1, table 16).

The type of violence against household members present at the time of a burglary varied by burglary category. Simple assault was the most common form of violence experienced by household members present during completed (15%) and attempted (6%) burglaries. Robbery was more likely to occur when a burglary was completed rather than attempted. A robbery occurred in 7% of completed burglaries, compared to 1% of attempted forcible entries. An aggravated assault against a household member was equally likely to occur during a completed or an attempted burglary. A rape or sexual assault occurred in about 3% of households experiencing a completed burglary.

**Residents present during a burglary were equally likely to be victimized by an intimate partner (current or former) as they were by a stranger**

One or more household members knew the offenders in some manner in 65% of the 266,560 burglaries that took place while someone was present and experienced violence (table 17). Overall, household members knew approximately a third of these offenders as intimates (current or former) (31%), or relatives,

## Table 15.

**Type of violence that occurred during household burglaries, by type of burglary, 2003–2007**

| Type of violence | All burglary | Type and percent of burglaries | |
| | | Completed* | Attempted forcible entry |
|---|---|---|---|
| Total | 7.2 % | 8.0 % | 3.4 % |
| Rape/sexual assault | 0.6 % | 0.7 % | – % |
| Robbery | 1.6 % | 1.9 % | 0.3 % |
| Assault | 5.0 % | 5.3 % | 3.1 % |
|    Aggravated assault | 1.3 | 1.3 | 1.1 |
|    Simple assault | 3.7 | 4.0 | 2.0 |
| Average annual number of burglaries | 3,713,000 | 3,083,750 | 629,250 |

Note: Estimates may not add to total due to rounding. Percentages are calculated as the number of households in which someone experienced a violent crime during a household burglary divided by the number of household burglaries.

--No cases were present for this category.

*Includes forcible entry and unlawful entry without force.

## Table 16.

**Type of violence that occurred during household burglaries when someone was home, by type of burglary, 2003–2007**

| Type of violence | All burglary | Type of burglary | |
| | | Completed* | Attempted forcible entry |
|---|---|---|---|
| Total | 26.0 % | 29.7 % | 10.6 % |
| Rape/sexual assault | 2.2 % | 2.7 % | – % |
| Robbery | 5.8 % | 7.0 % | 0.9 % |
| Assault | 18.0 % | 20.0 % | 9.7 % |
|    Aggravated assault | 4.6 | 4.9 | 3.4 |
|    Simple assault | 13.3 | 15.1 | 6.3 |
| Total average annual number of burglaries of occupied residences | 1,025,520 | 824,320 | 201,200 |

Note: Percentages are calculated as the number of households that experienced a violent crime divided by the number of burglaries in which households were occupied.

--No cases were present for this category.

*Includes forcible entry and unlawful entry without force.

## Table 17.

**Victim-offender relationship in violent household burglary, 2003–2007**

| Relationship | All burglary | Type of burglary | |
| | | Completed[a] | Attempted forcible entry |
|---|---|---|---|
| Victim knew offender | 65.1 % | 66.2 % | 51.7 % |
|    Intimates (current or former) | 31.1 | 31.5 | 26.3 |
|    Relatives/known acquaintances | 34.0 | 34.7 | 25.5 |
|    Strangers | 27.5 | 26.5 | 39.7 |
| Unknown offender[b] | 7.4 | 7.3 | 8.5 |
| Total average number of burglaries where someone experienced violence | 266,560 | 245,180 | 21,380 |

Note: Percentages are calculated as the number of households victimized by each victim offender relationship category divided by the number of violent household burglaries.

[a]Includes forcible entry and unlawful entry without force.

[b]Survey respondents may not have been able to provide information on the offender because the respondents were not the household members present during the burglary.

well-known individuals, or household acquaintances (34%). A stranger perpetrated the violence in 28% of households burglarized while someone was home and violence occurred.

Findings for completed burglaries were similar to those for all burglaries. Household members

**Table 18.**

Presence of weapon in violent household burglary, by type of burglary, 2003–2007

| Type of weapon | All burglary | Type of burglary | |
| | | Completed* | Attempted forcible entry |
|---|---|---|---|
| No weapon present | 60.5 % | 62.6 % | 37.6 % |
| Weapon present | 30.1 % | 29.5 % | 37.7 % |
|   Firearm | 12.4 | 12.5 | 10.8 ^ |
|   Sharp weapon | 10.6 | 10.1 | 16.3 ^ |
|   Other weapon type | 7.2 | 6.8 ^ | 10.6 ^ |
| Do not know if offender had weapon | 9.3 % | 8.0 % | 24.7 %^ |
| Total average number of burglaries where someone experienced violence | 266,560 | 245,180 | 21,380 |

^Based on 10 or fewer sample cases.
*Includes forcible entry and unlawful entry without force.

**Table 19.**

Presence of weapons in violent household burglary committed by a stranger, by type of burglary, 2003–2007

| Type of weapon | All burglary | Type of burglary | |
| | | Completed* | Attempted forcible entry |
|---|---|---|---|
| No weapon present | 40.2 % | 40.2 % | 40.2 % |
| Weapon present | 45.5 % | 46.6 % | 37.4 %^ |
|   Firearm | 23.3 | 25.5 | 6.2 ^ |
|   Sharp weapon | 15.8 | 13.8 | 31.2 ^ |
|   Other weapon type | 6.5 * | 7.3 ^ | -- |
| Do not know if offender had weapon | 14.2 % | 13.2 %* | 22.3 %^ |
| Total | 73,360 | 64,860 | 8,500 |

^Based on 10 or fewer sample cases.
--No cases were present for this category.
*Includes forcible entry and unlawful entry without force.

**Table 20.**

Injury in violent household burglary, by type of burglary, 2003–2007

| Type of injury | All burglary | Type of burglary | |
| | | Completed* | Attempted forcible entry |
|---|---|---|---|
| Not injured | 55.7 % | 52.5 % | 92.3 % |
| Injured | 44.3 % | 47.5 % | 7.7 % |
|   Serious injury | 8.5 | 9.2 | -- |
|   Minor injury | 33.4 | 35.6 | 7.7 ^ |
|   Rape/sexual assault without other injuries | 2.4 ^ | 2.6 ^ | -- |
| Total | 266,160 | 244,780 | 21,380 |

--No cases were present for this category.
^Based on 10 or fewer sample cases.
*Includes forcible entry and unlawful entry without force.

knew offenders in some manner in two-thirds of completed burglaries involving violence. Despite the apparent differences between victim-offender relationships, when violence occurred during a completed household burglary, individuals present were equally likely to be victimized by an intimate partner (current or former) (32%) as they were by a stranger (27%).

Victims in violent burglaries were equally likely to report knowing the offender in some manner in an attempted forcible burglary as they were to report the offender as a stranger.

**Thirty percent of individuals experiencing violence during a completed burglary faced an armed offender**

Overall, 61% of offenders were unarmed when burglarizing a home while residents were present and violence occurred (table 18). Household members faced an offender with a firearm in about 12% of all households burglarized while someone was home and violence occurred.

Household members present during a completed burglary were less likely to face an armed offender (30%) than an unarmed offender (63%). Those present and violently victimized during an attempted forcible entry were equally likely to face an armed or an unarmed offender (38%). Offenders were armed with a firearm in 23% of burglaries in households (73,000 on average) burglarized by a stranger where violence occurred (table 19).

---

**Federal Bureau of Investigation, Supplementary Homicide Reports, 2003-2007**

According to the FBI's Supplementary Homicide Reports, 430 burglary-related homicides occurred between 2003 and 2007 on average annually. This number translates to less than 1% of all homicides during that period.

Between 2003 and 2007, approximately 2.1 million household burglaries were reported to the FBI each year on average. Household burglaries ending in homicide made up 0.004% of all burglaries during that period.

---

### Household members were injured in almost half of all completed burglaries involving violence

Household members were more likely to be injured during a completed burglary (48%) than an attempted forcible entry burglary (8%) when a household member was present and violence occurred (table 20). Serious injury accounted for 9% and minor injury accounted for 36% of injuries sustained by household members who were home and experienced a violent crime during a completed burglary. Most household members who were present during a violent burglary (92%) were not injured.

### Methodology

#### Data sources

The National Crime Victimization Survey (NCVS) gathers data on crimes against persons ages 12 or older and their households, reported and not reported to the police, from a nationally representative sample of U.S. households. The survey provides information about victims (age, gender, race, Hispanic origin, marital status, income, and education level), offenders (genders, race, approximate age, and victim-offender relationship), and the nature of the crime (time and place of occurrence, use of weapons, nature of injury, and economic consequences). Between 2003 and 2007, 40,320 households were interviewed annually on average with a 91% household response rate.

Except for data on homicides, all estimates presented in this report were generated from the NCVS. For more information on NCVS *Methodology*, see the *Methodology* section of Criminal Victimization Statistical Tables on the BJS Web site. Homicide data are from the Supplementary Homicide Reports (SHR) to the Uniform Crime Reporting Program (UCR), which are collected by the Federal Bureau of Investigation (FBI).

#### Definition of household burglary in the NCVS

The legal definition for "household burglary" may vary among jurisdictions. For the NCVS, household burglary is defined as the entry or attempted entry to a residence or adjacent structure when a person has no right to be there. This crime usually, but not always, involves theft.

Forcible entry is a completed burglary in which force, such as breaking a window or slashing a door screen, was used to gain entry to the residence. Unlawful entry is a completed burglary committed by someone having no legal right to be on the premises even though no force was used to gain entry. Attempted forcible entry is a burglary in which force was used in an unsuccessful attempt to gain entry.

#### Missing data in the National Crime Victimization Survey

As with any data collection, in the NCVS missing data vary by survey item. The impact of missing data depends on the specific survey item under examination. In *Victimization During Household Burglary*, there was no missing data associated with any of the burglary or violent crime estimates that occurred when residents were present in the household. In contrast, the variable 'Household Income' is consistently characterized by high levels of missing data due to reluctance on the part of survey respondents to disclose their income. In this report, 22% of income data was missing for households victimized while no one was home and 20% for households that were victimized while someone was present in the household.

### Appendix Table 1.

**Standard errors and confidence intervals for key estimates in victimization during household burglary.**

| Characteristic | Estimate | One standard error | 95%-confidence interval Lower | Upper |
|---|---|---|---|---|
| Household member present | 27.6 % | 1.72 % | 24.23 % | 30.97 % |
| Percent violent of all household burglary | 7.2 | 0.94 | 5.37 | 9.03 |
| Percent violent of occupied household burglary | 26.0 | 2.98 | 20.17 | 31.83 |

Note: Standard errors were calculated using programs developed by the Census Bureau to calculate NCVS general variance parameters.

This report, *Victimization During Household Burglary,* differs from other NCVS reports in that a different coding approach was constructed to combine burglaries where a household member was present and experienced a violent crime with burglaries that took place while no one was home. Presenting the analyses in this manner allows for a comparison of the characteristics of present and non-present burglaries and the examination of the co-occurrence of a resident's presence and subsequent victimization. As a result, estimates presented in this report are not comparable to victimization estimates of burglary or personal crime contained in other NCVS reports. This approach was used previously in *Household Burglary, 1985* (NCJ 96021).

*Household member* is defined as a household member if the individual is using the sample address as his or her usual place of residence at the time of the interview or is staying temporarily at the sample address at the time of the interview and does not have a usual place of residence elsewhere.

*Household burglary with household member not present* is defined as any household burglary (as classified in this report) that is committed while a residence is not occupied by any household members.

*Household burglary with a household member present* is defined as any household burglary committed while one or more household members are present in the household.

*Violent household burglary* is defined as any household burglary committed while one or more household members are present and violence occurs between the offender and household members.

### General and specific risk

The estimates of risk in this report use measures that may include multiple victimizations per household, and as such do not represent a true risk measure based on the prevalence of victimizations in the population. However, the two estimates are close.

For example, in 2005, approximately 2.5% of households experienced a household burglary victimization (http://bjs.ojp.usdoj.gov/content/pub/pdf/cnh05.pdf) while the current report estimates a rate of 3.2 household burglaries per 100 households (32 per 1,000 households), including ones in which violence occurred.

### Standard error computations

Comparisons of percentages and rates were tested to determine if observed differences were statistically significant. Differences described as higher, lower, or different passed a test at the 0.05 level of statistical significance (95%-confidence level). Differences described as somewhat, lightly, or marginally passed a test at the 0.10 level of statistical significance (90%-confidence level). Caution is required when comparing estimates not explicitly discussed in the report. Estimates based on 10 or fewer cases have high relative standard errors. Care should be taken when comparing these estimates to other estimates, especially when both are based on 10 or fewer sample cases.

**U.S. Department of Justice**
Office of Justice Programs
Bureau of Justice Statistics

Washington, DC 20531

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/BJS
Permit No. G-91

Official Business
Penalty for Private Use $300

The Bureau of Justice Statistics is the statistical agency of
the U.S. Department of Justice. James P. Lynch is director.

This Special Report was written by Shannan Catalano,
Ph.D. Alexia Cooper verified the report.

Georgette Walsh and Jill Duncan edited the report, Tina
Dorsey produced the report, and Jayne Robinson prepared
the report for final printing under the supervision of Doris
J. James.

September 2010, NCJ 227379

This report in portable document format and in ASCII and its
related statistical data and tables are available at the BJS World
Wide Web Internet site: <http://bjs.ojp.usdoj.gov/
index.cfm?ty=pbdetail&iid=2172>.

**Office of Justice Programs**
*Innovation • Partnerships • Safer Neighborhoods*
http://www.ojp.usdoj.gov

A. 314



2011

Chicago
MURDER
Analysis

### TABLE 12: WEAPONS USED TO COMMIT MURDERS, 2011*

| Injury | Weapon | Total |
|---|---|---|
| **SHOT** | Handgun | 351 |
| | Rifle | 1 |
| | Shotgun | 5 |
| | Unknown/Other | 5 |
| | | **362** |
| **STABBED** | Knife | 17 |
| | Other Stabbing/Cutting | 3 |
| | Pocket Knife | 1 |
| | Unknown | 10 |
| | | **31** |
| **ASSAULT** | Baseball Bat | 1 |
| | Hands/Feet/Fists | 13 |
| | Other Bludgeon Type | 2 |
| | Unknown | 8 |
| | Unknown Bludgeon | 4 |
| | | **28** |
| **STRANGULATION** | Hands/Feet | 1 |
| | Unknown | 3 |
| | | **4** |
| **BLUNT FORCE INJURY** | Automobile | 3 |
| | Hands/Feet/Fists | 1 |
| | Unknown | 1 |
| | | **5** |



Chicago Police Department                                    Research and Development Division



2010

Chicago
MURDER
Analysis

## TABLE 12: WEAPONS USED TO COMMIT MURDERS, 2010*

| Injury | Weapon | Total |
|---|---|---|
| **SHOT** | Handgun | 348 |
| | Rifle | 4 |
| | Shotgun | 1 |
| | | **353** |
| **STABBED** | Knife | 19 |
| | Kitchen Knife | 3 |
| | Other Stabbing/cutting | 1 |
| | Unknown Instrument | 6 |
| | | **29** |
| **ASSAULT** | Hands/Fists/Feet | 9 |
| | Other Bludgeon Type | 13 |
| | Baseball Bat | 2 |
| | Table Leg | 1 |
| | Wooden Board | 1 |
| | Cut/Stab Instrument | 1 |
| | Others | 3 |
| | Unknown | 6 |
| | | **36** |
| **STRANGULATION** | Hands/Feet | 4 |
| | Rope/Cordage | 1 |
| | Unknown Ligature | 2 |
| | Unkown | 3 |
| | | **10** |
| **BLUNT FORCE INJURY** | Automobile | 2 |
| | Unknown | 1 |
| | | **3** |



A. 319

## TABLE 12: WEAPONS USED TO COMMIT MURDERS, 2009*

| Injury | Weapon | Total |
|--------|--------|-------|
| **SHOT** | Handgun | 356 |
| | Rifle | 6 |
| | Shotgun | 8 |
| | Unknown/Other | 8 |
| | | **378** |
| **STABBING** | Knife | 25 |
| | Other Stabbing/Cutting | 4 |
| | Pocket Knife | 1 |
| | Unknown | 5 |
| | | **35** |
| **ASSAULT** | Hands/Fists/Feet | 7 |
| | Other Bludgeon Type | 6 |
| | Baseball Bat | 3 |
| | Concrete Block/Brick | 1 |
| | Unknown | 5 |
| | | **22** |
| **STRANGULATION** | Hands/Fists/Feet | 1 |
| | Rope/Cordage | 6 |
| | Clothing | 1 |
| | Unknown | 3 |
| | | **11** |
| **BLUNT FORCE INJURY** | Automobile | 3 |
| | Other Bludgeon Type | 2 |
| | Unknown | 2 |
| | | **7** |



2008 Murder Analysis Report                                                    22

## TABLE 13: WEAPONS USED TO COMMIT MURDERS IN 2008

| Injury | Weapon | 2008 |
|---|---|---|
| **SHOT** | Handgun | 402 |
| | Rifle | 3 |
| | Shotgun | 1 |
| | Unknown/Other | 6 |
| | | **412** |
| **STABBING** | Knife | 31 |
| | Other Stabbing/Cutting | 4 |
| | Pocket Knife | 0 |
| | Unknown | 10 |
| | | **45** |
| **ASSAULT** | Hands/Feet | 10 |
| | Other Bludgeon Type | 7 |
| | Baseball Bat | 2 |
| | Pipe | 0 |
| | Hammer | 0 |
| | Unknown | 17 |
| | | **36** |
| **STRANGULATION** | Hands/Feet | 1 |
| | Rope/Cordage | 0 |
| | Electrical/Phone Cord | 0 |
| | Clothing | 1 |
| | Unknown | 5 |
| | Other | 1 |
| | | **8** |
| **BLUNT FORCE INJURY** | Unknown | 1 |
| **ASPHYXIATION** | Unknown | 1 |
| **OTHER** | Gasoline (Burning) | 1 |
| | Matches (Burning) | 0 |
| | Unknown | 7 |
| | | **8** |
| **TOTAL** | | **511** |

**2006 - 2007 Murder Analysis** in Chicago

## TABLE 12: WEAPONS USED TO COMMIT 2006 AND 2007 MURDERS

| Method | Weapon | 2006 | 2007 |
|---|---|---|---|
| SHOT | *Firearm* | | |
| | Handgun | 373 | 316 |
| | Rifle | 4 | 4 |
| | Shotgun | 7 | 6 |
| | | 384 | 326 |
| | | | |
| STABBING | *Stabbing/Cutting Instrument* | | |
| | Knife | 29 | 33 |
| | Other Stabbing/Cutting | 1 | 5 |
| | Pocket Knife | 0 | 1 |
| | Unknown | 14 | 13 |
| | | 44 | 52 |
| | | | |
| ASSAULT | *Bludgeon/Club* | | |
| | Hands/Feet | 10 | 11 |
| | Other Bludgeon Type | 4 | 5 |
| | Baseball Bat | 4 | 2 |
| | Pipe | 0 | 2 |
| | Hammer | 0 | 4 |
| | Unknown | 13 | 11 |
| | Other | 2 | 6 |
| | | 33 | 41 |
| STRANGULATION | *Ligature* | | |
| | Hands/Feet | 2 | 3 |
| | Rope/Cordage | 0 | 2 |
| | Electrical/Phone Cord | 0 | 1 |
| | Unknown | 3 | 5 |
| | Other | 1 | 5 |
| | | 6 | 16 |
| | | | |
| BLUNT FORCE | *Other* | 1 | 1 |
| | | 1 | 1 |
| | | | |
| ASPHYXIATION | *Other* | | |
| | Unknown | 3 | 1 |
| | | | |
| OTHER | *Burning* | | |
| | Matches | 0 | 1 |
| | Other | 0 | 4 |
| | Unknown | 0 | 3 |
| | | 0 | 8 |
| | | | |
| TOTAL | | 471 | 445 |

A. 324

# An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets and Gun Violence, 1994-2003

## Report to the National Institute of Justice, United States Department of Justice

By

**Christopher S. Koper**
(Principal Investigator)

With

Daniel J. Woods and Jeffrey A. Roth

**June 2004**

Jerry Lee Center of Criminology
University of Pennsylvania
3814 Walnut Street
Philadelphia, PA 19104



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## PREFACE

Gun violence continues to be one of America's most serious crime problems. In 2000, over 10,000 persons were murdered with firearms and almost 49,000 more were shot in the course of over 340,000 assaults and robberies with guns (see the Federal Bureau of Investigation's annual *Uniform Crime Reports* and Simon et al., 2002). The total costs of gun violence in the United States – including medical, criminal justice, and other government and private costs – are on the order of at least $6 to $12 billion per year and, by more controversial estimates, could be as high as $80 billion per year (Cook and Ludwig, 2000).

However, there has been good news in recent years. Police statistics and national victimization surveys show that since the early 1990s, gun crime has plummeted to some of the lowest levels in decades (see the *Uniform Crime Reports* and Rennison, 2001). Have gun controls contributed to this decline, and, if so, which ones?

During the last decade, the federal government has undertaken a number of initiatives to suppress gun crime. These include, among others, the establishment of a national background check system for gun buyers (through the Brady Act), reforms of the licensing system for firearms dealers, a ban on juvenile handgun possession, and Project Safe Neighborhoods, a collaborative effort between U.S. Attorneys and local authorities to attack local gun crime problems and enhance punishment for gun offenders.

Perhaps the most controversial of these federal initiatives was the ban on semiautomatic assault weapons and large capacity ammunition magazines enacted as Title XI, Subtitle A of the *Violent Crime Control and Law Enforcement Act of 1994*. This law prohibits a relatively small group of weapons considered by ban advocates to be particularly dangerous and attractive for criminal purposes. In this report, we investigate the ban's impacts on gun crime through the late 1990s and beyond. This study updates a prior report on the short-term effects of the ban (1994-1996) that members of this research team prepared for the U.S. Department of Justice and the U.S. Congress (Roth and Koper, 1997; 1999).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

A. 326

## ACKNOWLEDGMENTS

This research was supported by National Institute of Justice (U.S. Department of Justice) grants 2003-IJ-CX-1029 to the University of Pennsylvania and 98-IJ-CX-0039 to the Urban Institute. The Jerry Lee Center of Criminology, University of Pennsylvania provided additional support. The views expressed are those of the author. They do not reflect official positions of the United States Department of Justice and should not be attributed to the trustees of the University of Pennsylvania, the Urban Institute, or any of the other persons or organizations listed below.

The author wishes to thank several people and organizations that assisted this effort in numerous ways. Daniel Woods assisted with data analysis. Jeffrey Roth, who directed our first study of the assault weapons ban, provided advice and editorial input. Additional research assistance was provided by the following former employees of the Urban Institute: Gretchen Moore, David Huffer, Erica Dinger, Darin Reedy, Kate Bunting, Katie Gorie, and Michele Waul. The following persons and organizations provided databases, information, or other resources utilized for this report: Glenn Pierce (Northeastern University), Pamela Shaw and Edward Koch (Baltimore Police Department), Robert Shem (Alaska State Police), Bill McGill and Mallory O'Brien (currently or formerly of the Firearm Injury Center, Medical College of Wisconsin), Rick Ruddell (California State University, Chico), Scott Doyle (Kentucky State Police), Terrence Austin and Joe Vince (currently or formerly of the Bureau of Alcohol, Tobacco, Firearms, and Explosives), Carlos Alvarez and Alan Lynn (Metro-Dade Police Department), Charles Branas (Firearm and Injury Center, University of Pennsylvania), Caroline Harlow (Bureau of Justice Statistics), and Rebecca Knox (Brady Center to Prevent Handgun Violence). Robert Burrows (Bureau of Alcohol, Tobacco, Firearms, and Explosives) and Wain Roberts (Wain Roberts Firearms) shared technical expertise on firearms. Anonymous reviewers for the National Institute of Justice provided thorough and helpful comments on earlier versions of this report, as did Terrence Austin and Robert Burrows of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Finally, I thank Lois Mock, our National Institute of Justice grant monitor, for her advice and encouragement throughout all of the research that my colleagues and I have conducted on the assault weapons ban.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

A. 327

estimates, which correspond to particularly rare events such mass murders and police murders, are no higher than 13%. Note also that the majority of AWs used in crime are assault pistols (APs) rather than assault rifles (ARs). Among AWs reported by police to ATF during 1992 and 1993, for example, APs outnumbered ARs by a ratio of 3 to 1 (see Chapter 6).

The relative rarity of AW use in crime can be attributed to a number of factors. Many AWs are long guns, which are used in crime much less often than handguns. Moreover, a number of the banned AWs are foreign weapons that were banned from importation into the U.S. in 1989. Also, AWs are more expensive (see Table 2-1) and more difficult to conceal than the types of handguns that are used most frequently in crime.

### 3.1.1. A Note on Survey Studies and Assault Weapons

The studies and statistics discussed above were based primarily on police information. Some survey studies have given a different impression, suggesting substantial levels of AW ownership among criminals and otherwise high-risk juvenile and adult populations, particularly urban gang members (Knox et al., 1994; Sheley and Wright, 1993a). A general problem with these studies, however, is that respondents themselves had to define terms like "military-style" and "assault rifle." Consequently, the figures from these studies may lack comparability with those from studies with police data. Further, the figures reported in some studies prompt concerns about exaggeration of AW ownership (perhaps linked to publicity over the AW issue during the early 1990s when a number of these studies were conducted), particularly among juvenile offenders, who have reported ownership levels as high as 35% just for ARs (Sheley and Wright, 1993a).[14]

Even so, most survey evidence on the actual use of AWs suggests that offenders rarely use AWs in crime. In a 1991 national survey of adult state prisoners, for example, 8% of the inmates reported possessing a "military-type" firearm at some point in the past (Beck et al., 1993, p. 19). Yet only 2% of offenders who used a firearm during their conviction offense reported using an AW for that offense (calculated from pp. 18, 33), a figure consistent with the police statistics cited above. Similarly, while 10% of adult inmates and 20% of juvenile inmates in a Virginia survey reported having owned an AR, none of the adult inmates and only 1% of the juvenile inmates reported having carried them at crime scenes (reported in Zawitz, 1995, p. 6). In contrast, 4% to 20% of inmates surveyed in eight jails across rural and urban areas of Illinois and Iowa reported having used an AR in committing crimes (Knox et al., 1994, p. 17). Nevertheless, even assuming the accuracy and honesty of the respondents' reports, it is not clear what

---

[14] As one example of possible exaggeration of AW ownership, a survey of incarcerated juveniles in New Mexico found that 6% reported having used a "military-style rifle" against others and 2.6% reported that someone else used such a rifle against them. However, less than 1% of guns recovered in a sample of juvenile firearms cases were "military" style guns (New Mexico Criminal Justice Statistical Analysis Center, 1998, pp. 17-19; also see Ruddell and Mays, 2003).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6-1.  Annual Percentage Changes in Gun Murders and Police Requests to ATF for Traces of Assault Weapons and Other Firearms, 1991-2002 (Number of Traces in Parentheses)**

| Year | Gun Murders (1) | All Traces (2) | AW Traces* (3) | AP Traces (4) | AR Traces (5) | AW and AW Substitute Traces (6) | Violent Crime Traces (7) | AW Violent Crime Traces (8) | LCMM Rifle Traces** (9) |
|---|---|---|---|---|---|---|---|---|---|
| 1991 | 9% | 14% (42281) | 14% (2378) | 24% (1775) | -6% (603) | 14% (2378) | 19% (6394) | 20% (344) | -- |
| 1992 | -1% | 6% (44992) | 1% (2398) | 4% (1838) | -7% (560) | 1% (2398) | 3% (6558) | 7% (367) | -- |
| 1993 | 5% | 20% (54189) | 25% (2994) | 20% (2199) | 42% (795) | 25% (2994) | 26% (8248) | 41% (516) | 252% (183) |
| 1994 | -4% | 53% (82791) | 11% (3337) | 23% (2706) | -21% (631) | 11% (3337) | 22% (10083) | -18% (424) | 223% (592) |
| 1995 | -10% | -6% (77503) | -19% (2730) | -24% (2051) | 8% (679) | -18% (2747) | 23% (12439) | -15% (362) | -10% (530) |
| 1996 | -9% | 66% (128653) | 12% (3059) | 13% (2309) | 10% (750) | 17% (3214) | 67% (20816) | 27% (459) | 40% (743) |
| 1997 | -7% | 42% (183225) | 31% (4019) | 31% (3017) | 34% (1002) | 36% (4362) | 11% (23147) | 13% (519) | 24% (925) |
| 1998 | -11% | 5% (192115) | 0% (4014) | -9% (2751) | 26% (1263) | 7% (4681) | 3% (23844) | -22% (404) | 33% (1227) |
| 1999 | -8% | -2% (188296) | -11% (3581) | -12% (2414) | -8% (1167) | -6% (4406) | 3% (24663) | 0% (404) | -18% (1003) |
| 2000 | 1% | -3% (182961) | -11% (3196) | -16% (2027) | 0% (1169) | -6% (4143) | -13% (21465) | -25% (305) | -14% (859) |
| 2001 | -1% | 18% (215282) | 1% (3238) | 5% (2138) | -6% (1100) | 3% (4273) | 20% (25822) | 6% (322) | -3% (833) |
| 2002 | 6% | 7% (229525) | 19% (3839) | 4% (2214) | 48% (1625) | 12% (4765) | 20% (30985) | 65% (531) | 4% (865) |

* Based on Intratec group, SWD group, AR-15 group, and Calico and Feather models.
** Foreign semiautomatic rifles accepting large capacity military magazines (banned by executive order in 1998).  (Data are not shown for 1991 and 1992 because very few of these guns were traced in those years.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

A. 329

obscured, by the wider effects of LCM use, which themselves are likely to be small at best, as we argue below.[95]

Because offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns.[96] But by forcing AW and LCM offenders to substitute non-AWs with small magazines, the ban might reduce the number of shots fired per gun attack, thereby reducing both victims shot per gunfire incident and gunshot victims sustaining multiple wounds. In the following sections, we consider the evidence linking high-capacity semiautomatics and AWs to gun violence and briefly examine recent trends in lethal and injurious gun violence.

### 9.1. The Spread of Semiautomatic Weaponry and Trends in Lethal and Injurious Gun Violence Prior to the Ban

Nationally, semiautomatic handguns grew from 28% of handgun production in 1973 to 80% in 1993 (Zawitz, 1995, p. 3). Most of this growth occurred from the late 1980s onward, during which time the gun industry also increased marketing and production of semiautomatics with LCMs (Wintemute, 1996). Likewise, semiautomatics grew as a percentage of crime guns (Koper, 1995; 1997), implying an increase in the average firing rate and ammunition capacity of guns used in crime.[97]

---

[95] On a related note, a few studies suggest that state-level AW bans have not reduced crime (Koper and Roth, 2001a; Lott, 2003). This could be construed as evidence that the federal AW ban will not reduce gunshot victimizations without reducing LCM use because the state bans tested in those studies, as written at the time, either lacked LCM bans or had LCM provisions that were less restrictive than that of the federal ban. (New Jersey's 1990 AW ban prohibited magazines holding more than 15 rounds. AP bans passed by Maryland and Hawaii prohibited magazines holding more than 20 rounds and pistol magazines holding more than 10 rounds, respectively, but these provisions did not take effect until just a few months prior to the federal ban.) However, it is hard to draw definitive conclusions from these studies for a number of reasons, perhaps the most salient of which are the following: there is little evidence on how state AW bans affect the availability and use of AWs (the impact of these laws is likely undermined to some degree by the influx of AWs from other states, a problem that was probably more pronounced prior to the federal ban when the state laws were most relevant); studies have not always examined the effects of these laws on gun homicides and shootings, the crimes that are arguably most likely to be affected by AW bans (see discussion in the main text); and the state AW bans that were passed prior to the federal ban (those in California, New Jersey, Hawaii, Connecticut, and Maryland) were in effect for only three months to five years (two years or less in most cases) before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more difficult to predict and estimate.

[96] One might hypothesize that the firepower provided by AWs and other semiautomatics with LCMs emboldens some offenders to engage in aggressive behaviors that prompt more shooting incidents. On the other hand, these weapons might also prevent some acts of violence by intimidating adversaries, thus discouraging attacks or resistance. We suspect that firepower does influence perceptions, considering that many police departments have upgraded their weaponry in recent years – often adopting semiautomatics with LCMs – because their officers felt outgunned by offenders. However, hypotheses about gun types and offender behavior are very speculative, and, pending additional research on such issues, it seems prudent to focus on indicators with stronger theoretical and empirical foundations.

[97] Revolvers, the most common type of non-semiautomatic handgun, typically hold only 5 or 6 rounds (and sometimes up to 9). Semiautomatic pistols, in contrast, hold ammunition in detachable magazines that, prior to the ban, typically held 5 to 17 bullets and sometimes upwards of 30 (Murtz et al., 1994).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

81

A. 330

# INJURY PREVENTION

**Current TOC | Instructions for authors**

Inj Prev. Feb 2007; 13(1): 15–19.                                                           PMCID: PMC2610545
doi: 10.1136/ip.2006.013607

## The US gun stock: results from the 2004 national firearms survey

L Hepburn, M Miller, D Azrael, and D Hemenway

**L Hepburn, M Miller, D Azrael, D Hemenway**, Department of Health Policy and Management, Harvard School of Public Health, Boston, Massachusetts, USA
Correspondence to: Dr D Hemenway
Department of Health Policy and Management, Harvard School of Public Health, 677 Huntington Avenue, Boston, Massachusetts, USA; hemenway@hsph.harvard.edu

Accepted October 4, 2006.

Copyright ©2007 BMJ Publishing Group.

This article has been cited by other articles in PMC.

## Abstract                                                                                    Go to:

### Objectives

To examine the size and composition of the privately held firearm stock in the US; and to describe demographic patterns of firearm ownership and motivations for ownership.

### Design, setting and participants

A nationally representative household telephone survey of 2770 adults aged ⩾18 years living in the US, conducted in the spring of 2004.

### Main outcome measure

Responses to questions regarding firearm ownership, the number and types of guns owned, and motivations for ownership.

### Results

38% of households and 26% of individuals reported owning at least one firearm. This corresponds to 42 million US households with firearms, and 57 million adult gun owners. 64% of gun owners or 16% of American adults reported owning at least one handgun. Long guns represent 60% of the privately held gun stock. Almost half (48%) of all individual gun owners reported owning ⩾4 firearms. Men more often reported firearm ownership, with 45% stating that they personally owned at least one firearm, compared with 11% for women.

### Conclusions

The US population continues to contain at least one firearm for every adult, and ownership is becoming increasingly concentrated. Long guns are the most prevalent type of gun in the US but handgun ownership is widespread. Ownership demographic patterns support findings of previous studies.

The General Social Survey, a biannual survey of the US civilian population, has tracked household and personal firearm ownership over the past two and a half decades.[1] This survey reports the percentage of households with firearms and

A. 331

7/17/2014                    Case: 1:13-cv-09073 Document #: 49-6 Filed: 07/21/14 Page 3 of 8 PageID #:1824

personal firearm ownership for the nation as a whole and for the nine major census regions. Over the past 47 years, information from the General Social Survey has been supplemented by information on household gun ownership at the state level from the National Behavioral Risk Factor Surveillance System.[2] A clear pattern that has emerged over the past several decades from these surveys is a persistent decline in household gun ownership. Although these surveys describe the demographic patterns of gun ownership in the US, they provide almost no information about the characteristics of or changes in the nation's gun stock.

We conducted a nationally representative household telephone survey in 2004 to explore the characteristics of privately owned firearms in the US. The last study to examine detailed questions like these, such as the types and numbers of working firearms in private homes, was conducted in 1994 by Cook and Ludwig.[3] In their comprehensive report, they found that 35% of households and 25% of individuals owned firearms, and estimated that there were 192 million working firearms in the US in private hands. In addition to describing demographic characteristics of firearm owners, they were able to determine that the ownership of private firearms was highly concentrated among a small percentage of owners. They also clearly identified a difference in the number of household firearms reported by married men and women, who, in theory, should report similar rates of household firearm ownership. Their findings, however, that married men reported a rate of 49% household firearm ownership compared with 36% reported by married women suggested that women were either unaware of their spouse's firearm ownership or were reluctant to report it. These results led the authors to believe that more complete survey responses would come from individuals who personally owned a firearm rather than the household responses.

All of these findings helped identify patterns of private firearm ownership in the US and provided health professionals, researchers and policy makers with information about the private gun stock that was previously unknown. Through our survey, we wished to investigate possible changes in the privately owned gun stock between 1994 and 2004 and provide additional information about firearm ownership patterns in the US.

## Methods                                                                                           Go to:

The institutional review board at the Harvard School of Public Health approved this study in 2004. The random-digit-dial telephone sample (conducted by the survey research firm Fact Finders, St Louis, Missouri, USA) comprised 2770 randomly selected adults aged ≥18 years living in the 50 states and including the District of Columbia. The number of interviews designated for each of the states was proportional to that state's population relative to the total population of the US as given by the 2000 census. The methods used in composing this sample assured that each household with a telephone had an equal probability of being selected for inclusion in the sampling frame. One adult from each household was randomly selected to participate.

Interviews were completed between 17 March and 28 June 2004. Once a telephone number had been randomly selected for inclusion in the survey sample, as many as 10 repeat phone calls were made until a final disposition was assigned. Of the 31 302 telephone numbers called, 13 117 (42%) were non-responses, 11 065 (35%) were not eligible and eligibility was unknown for 4338 (14%). In total, 41% of the numbers were not residential, not in service or were for households in states where the interview quota had been reached. In addition, 39% of interviews could not be completed because the maximum number of calls had been made without an eligible respondent answering the phone. Only 19% (5421) of the non-interviews were refusals. According to calculations based on formulas from the American Association for Public Opinion Research,[4] our minimum response rate was 14%, assuming that all unknowns were eligible and counting partial interviews as respondents; and our maximum response rate was 18%, assuming that all unknowns were ineligible.

Demographic characteristics including age, sex, education, marital status, race, presence of children in the home, whether the area was urban or rural, and household size of our sample were compared with those from the 2000 census.[5] Although the demographic characteristics of our sample seemed similar overall to that of the census, our respondents had slightly higher educational levels (92% *v* total US 85% had at least a high-school diploma) and single-family households,

A. 332

were fewer (19% v 14.5%0). Our sample also underrepresented adult men aged 18-34 years. For that reason, post-stratification weightings were applied to the data to reflect the age and sex distribution of the US population. Adjustments for the likelihood of selection on the basis of the number of adults in the household were also included in the weightings.

Our study included 40 active duty military personnel, who represented 1.4% of the total study population. Eleven reported owning firearms; however, only one reported owning the firearm primarily for work. We therefore chose to keep all of the respondents in the sample.

Respondents were asked several questions regarding firearm ownership and use. In particular, they were asked, "Do you or anyone you live with currently have any guns in your home or motor vehicles? Not including toys, models, air guns or starter pistols." If the response was affirmative, the respondent was then asked, "In total, how many guns do you and anyone you live with currently have in your home or motor vehicle?" All respondents who replied that there were guns in their household were asked how many of each type of firearm was in their home (ie, revolvers, shotguns) and if they were in working order. To determine the proportion of adults who personally owned firearms, we asked those respondents who had replied that there were guns in their home, "Do any guns in your home belong to you personally?"

### Statistical analyses

Descriptive and bivariate analyses were used to explore the relationships between firearm ownership, demographics, concentration and motivations for ownership. As previously mentioned, research suggests that individuals who personally own firearms report firearm ownership more accurately than non-owners who live in households with firearms.[6,7,8] All of our reported analyses are therefore based on responses from individual gun owners rather than respondents living in households with guns, unless specifically noted that the calculation was performed using household responses.

To produce national estimates of the number of firearms in the US, we used population figures from the US census[9] to determine the number of adults aged ≥18 years and the number of households in the US. We then calculated the percentage of respondents in our survey who reported personally owning a firearm. This number was applied to the US population to create national estimates of the number of adults who owned firearms. To estimate the number of firearms in private hands, we multiplied the number of firearm owners by the average number of firearms reported by respondents in our survey. As firearm ownership is not normally distributed and our survey included some extreme outliers in terms of the number of firearms owned, we performed calculations excluding the outliers. As a sensitivity analysis, similar calculations were performed using household reports of firearm ownership. We also conducted comparative analyses among men and women, and among respondents who lived alone and those living in multi-person households.

## Results                                                                                               Go to:

Firearm owners reported that 60% of the firearms owned in the US in 2004 were long guns, primarily rifles and shotguns (fig 1); the remaining 40% were handguns. Among all firearms, rifles were the most common, representing 33% of the gun stock. Revolvers were the most common type of handgun. A small percentage of respondents (5%) reported owning other handguns, including derringers and antique handguns. Other long guns, which include muzzle loaders and antique long guns, represented 6%.



**Figure 1**   Types of firearms owned in the US.

According to our survey, 38% of households reported at least one firearm in the home and 26% of adults reported owning at least one gun. This corresponds to 42 million households with firearms and 57 million adult gun owners. We found that 64% of gun owners or 16% of adults reported owning at least one handgun; 80% of gun owners or 20% of all

## Ownership demographics

Firearm ownership was more prevalent among middle-aged and older adults than among young adults aged 18–24 years (table 1). Ownership of any firearm was more common among men, those who were married or living with a partner, and respondents living in rural areas or the South. Ownership was strongly associated with whether the respondent grew up with guns in the home. Among gun-owning households in our survey, 46% had ≥1 adult gun owner.

 **Table 1    Demographic characteristics of firearm owners**

## Reasons for ownership

When respondents were asked, "What is the one most important reason that you own a handgun/long gun?" the most common response among those who owned a handgun was for self-defense (46%), followed by sport shooting (hunting or target shooting) or collecting (25%). Owners of long guns overwhelmingly reported sport shooting as the "most important" reason to own a long gun (77%; data not shown).

## Concentration of ownership

Almost half (48%) of all individual gun owners, corresponding to 13% of the US adult population, reported owning ≥4 firearms. Household ownership followed a similar pattern, with 41% of firearm-owning households reporting ownership of ≥4 firearms (table 2). The 20% of gun owners who owned the most guns possessed about 65% of the nation's guns.

 **Table 2    Distribution of firearm ownership in the US population**

## Number of guns

The actual number of guns reported in our survey varied depending on how the question was asked and who answered the question. Individual firearm owners (n= 702) reported owning an average of 6.6 (95% confidence interval (CI) 5.2 to 7.9, median 3) working firearms. On further examination, it seemed that individuals who owned ≥4 firearms (with an average of 12 firearms per person) were greatly affecting the mean. When outliers representing the top 3% of gun owners (those owning >25 guns) were removed, the average number of working firearms per owner was 5.0 (95% CI 4.6 to 5.4). On the basis of estimates of 26% of adults in the US owning at least one firearm, we estimated that 57 million adults owned 283 million firearms (95% CI 260 to 305 million).

Estimates based on the number of household firearms were lower. We estimated that 42 million households in the US possessed at least one firearm in 2004, with an average of 5.2 (95% CI 4.9 to 5.6) guns per household, with outliers of >25 guns removed. The number of privately owned firearms in the US based on these estimates would be 218 million (95% CI 206 to 235 million).

## Reporting differences

Overall, men and women reported different rates of household firearm ownership. Among married respondents who lived in two-adult households, married men reported a household firearm ownership rate of 54% and an average of 8 firearms per household compared with a 40% ownership rate and an average of 4.6 guns as reported by married women (table 3 ).

A. 334

**Table 3    Rates of household firearm ownership, median and average number of guns per household for men and women**

## Discussion

Go to:

In general, our survey results are consistent with previous reports of firearm ownership demographics.[1,3,10] Firearms are most likely to be owned by white men who live in a rural areas, those who are middle-aged or older, with a middle to higher income, who grew up with guns in the home and who live in the southern or mid-western regions of the country. Long guns continue to be the most prevalent type of gun in the US. Our survey, however, reports a slightly higher percentage of firearms that are handguns than that reported in 1994[3] (40% v 34%). This shift to a greater proportion of handguns may be reflective of the decline in hunting and indicate a change in motivations and use of firearm ownership.[10] Similar to previous surveys,[3,10] handgun owners were most likely to report owning their handguns for self-protection, whereas owners of long guns reported owning their guns for sporting purposes. Individuals who own only handguns are just as likely to live in an urban environment as a rural one and are demographically more diverse compared with owners of only long guns who are more likely to be men and live in a rural area.

Our findings diverge from those of previous studies on firearm ownership regarding the increase in the average number of guns per gun owner. Although the rate of individual (26%) and household (38%) ownership is similar to that in that in other recent surveys,[1,2,3,11] the number of guns reported per person is higher. When including outliers, gun owners reported an average of 6.9 guns per owner compared with 4.1 reported in 1994 (J Ludwig, personal communication, 12 January 2005). The higher average number of guns in our survey is attributable to the higher number of guns owned by those who owned ≥4 guns, as the percentage of gun owners in each category of gun ownership (those owning 1–3 or ≥4 guns) has stayed almost the same.

Cook and Ludwig[3] reported an estimate of 192 million working firearms in circulation in 1994. Although the population increased 11% between 1994 and 2004, population growth alone does not explain the differences in the number of guns reported. A recent report by the National Research Council, using national data on firearms manufactured, imported and exported, estimated that 258 million firearms were available in the US as of 1999.[12] This estimate does not account for firearm loss, breakage or those destroyed. When we calculated the number of guns in the same manner as in the National Research Council report, adding all available years, we calculated that about 275 million guns were manufactured or imported for private sale in the US by the end of 2003. As the US does not require firearms to be registered (although some individual states do), it is impossible to determine the exact number of privately owned firearms in this country.

Our estimates of 283 million firearms in the US may be higher than those that Cook and Ludwig established in 1994, even with the population growth kept in context, for many possible reasons. Our sample may have, by chance, captured more affluent firearm owners who own many guns. We adjusted for age and sex, but were unable to adjust for income because our income-related questions were not comparable with a standard such as the US census. Alternatively, respondents may have overestimated the number of guns they owned. Given that we are extrapolating from a survey of 2770 respondents to millions of Americans, small changes in the number of reported firearms results in a large difference in the national estimates.

The General Social Survey indicates that household gun ownership has been declining over time, from about 50% in the early 1970s to current estimates of 34%.[1] Although the exact number of firearms in the US may be debatable as a result of inclusion or exclusion of outliers, or whether individual or household responses are used, it seems that although the proportion of households with firearms is declining, the number of working firearms in the US is increasing, not decreasing, and increasing most among those who already own firearms.

We also found evidence to support earlier research showing that women report lower levels of household firearm ownership, and in particular report fewer guns per household than men.[6,7,8] Married women in our study reported an

A. 335

average of 3.4 fewer household guns than unmarried men and a difference in ownership of 14% (54% in men, 40% in women). These findings reinforce earlier recommendations for surveys of firearm ownership and behavior,[6] to seek information from individual firearm owners rather than any person living in a household with a firearm.

### Limitations

We have considered some of the challenges faced when conducting telephone surveys, in particular those related to asking household members to respond to questions about topics, in this case firearm ownership, which may pertain to other members of the household. This self-reported data may also be subject to potential inaccuracies due to recall bias or the tendency to report socially desirably responses.[13] For example, when we asked respondents two different questions to determine how many firearms were in their households, one asking for the total number of guns in the home and one asking specifically how many of each type of gun were owned, we often received two different numbers. Given that this was a telephone survey, we were limited to adults with access to a working telephone. If households without telephones were more or less likely to own a firearm, then our findings could be biased in the respective directions. Finally, non-response can affect the validity of our findings if those choosing not to answer a question differed systematically from those who did.[14] The low response rate in this survey is similar to other random-digit-dial telephone surveys[15]; however, it still allows for potential bias if those who participated in the survey differed in terms of firearm ownership from those who did not.

---

**Key points**

- Firearm ownership in the US is very common, with about one third of all households owning at least one firearm.
- Long guns are the most prevalent type of gun in the US, but 40% of the gun stock is handguns.
- Firearm ownership is highly concentrated, with a small number of adults owning a large proportion of the nation's firearms.
- Married men and women report different rates of household firearm ownership, supporting the proposal that researchers should seek information about firearm ownership from individual firearm owners.

---

## Conclusions

Go to:

### Implications for prevention

In the US, about one in four adults owns at least one firearm. Although some other developed countries have similar rates of personal firearm ownership, what is unique in the US is the number of firearms privately owned. Researchers have estimated about 25 guns per 100 people in countries such as Canada, New Zealand, Germany, France and Sweden.[16] On the basis of current estimates from our survey, the US has 93 guns per 100 people.

The National Academy of Sciences recently issued a report on firearms and violence in which they called for improved data on firearm ownership and use to advance the empirical evaluations of programs and policies to reduce gun violence.[12] Our findings describe the current motivations for firearm ownership and also provide information on the similarities and differences among owners of different types of guns. This information can assist in designing a more appropriate firearm injury policy as well as understanding the denominator of exposure when evaluating injury prevention interventions.

## Acknowledgements

Go to:

We thank Renee Johnson for her help in determining the response rate for this survey.

## Footnotes

Go to:

Funding: This research was supported in part by grants from the Joyce Foundation, the Robert Wood Johnson Foundation and

A-336

Competing interests: None.

## References

Go to:

1. National Opinion Research Center General Social Survey. 2004. http://www.norc.uchicago.edu/projects/gensoc.asp (accessed 2 Nov 2006)

2. Centers for Disease Control and Prevention Behavioral Risk Factor Surveillance System Survey Data. Atlanta: CDC, 2002

3. Cook P J, Ludwig J. Guns in America: results of a comprehensive national survey on firearms ownership and use. Washington, DC: Police Foundation, 1997

4. American Association for Public Opinion Research Standard definitions: final dispositions of case codes and outcome rates for surveys. Ann Arbor, MI: American Association for Public Opinion Research, 2000

5. US Bureau of the Census Statistical abstract of the United States. http://www.census.gov/compendia/statab (accessed 2 Nov 2006)

6. Ludwig J, Cook P J, Smith T W. The gender gap in reporting household gun ownership. Am J Public Health 1998. 891715–1718.1718 [PMC free article] [PubMed]

7. Azrael D, Miller M, Hemenway D. Are household firearms stored safely? It depends on whom you ask. Pediatrics 2000. 10631 [PubMed]

8. Coyne-Beasley T, Baccaglini L, Johnson R. et al Do partners with children know about firearms in their home? Evidence of a gender gap and implications for practitioners. Pediatrics 2005. 115e662–e667.e667 [PubMed]

9. Bureau of Labor Statistics Current population survey. Washington, DC: Bureau of Labor Statistics, 2004

10. Smith T W. 2001 National Gun Policy Survey of the National Opinion Research Center: research findings. Chicago: National Opinion Research Center, University of Chicago, 2001

11. Okoro C, Nelson D E, Mercy J A. et al Prevalence of household firearms and firearm-storage practices in the 50 states and the District of Columbia: findings from the Behavioral Risk Factor Surveillance System, 2002. Pediatrics 2005. 116370–376.376 [PubMed]

12. National Research Council Firearms and violence: a critical review. Washington, DC: National Academics Press, 2004

13. Aday L. Designing and conducting health surveys. San Francisco: Jossey-Bass, 1989

14. Frey J. Survey research by telephone. 2nd edn. Newbury Park, CA: Sage, 1989

15. Johnson T, Owens L. Survey response rate reporting in the professional literature. American Association for Public Opinion Research—Section on Survey Research Methods, Chicago, Illinois: 2004. 127–133.133

16. Graduate Institutes of International Studies Small Arms Survey: profiling the problem. Geneva: Oxford University Press, 2001

Articles from Injury Prevention are provided here courtesy of **BMJ Group**

A. 337