# FIREARMS AND THEIR CONTROL

## Gary Kleck

A. 338

Second printing 2006

Copyright © 1997 by Transaction Publishers, New Brunswick, New Jersey.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without prior permission in writing from the publisher. All inquiries should be addressed to AldineTransaction, A Division of Transaction Publishers, Rutgers—The State University, 35 Berrue Circle, Piscataway, New Jersey 08854-8042. www.transactionpub.com

This book is printed on acid-free paper that meets the American National Standard for Permanence of Paper for Printed Library Materials.

Library of Congress Catalog Number: 97-35884
ISBN: 0-202-30569-4
Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Kleck, Gary, 1951-
    Targeting guns : firearms and their control / Gary Kleck.
        p. cm.—(Social institutions and social change)
    Includes bibliographical references (p.   ) and index.
    ISBN 0-202-30569-4 (pbk. : alk. paper)
    1. Gun control—United States.  I. Title.  II. Series.

HV7436.K54   1997
363.3'3'0973—dc21                                        97-35884
                                                        CIP

**AUTHOR'S VOLUNTARY DISCLOSURE NOTICE**

The author is a member of the American Civil Liberties Union,
Amnesty International USA, Independent Action, Democrats 2000,
and Common Cause, among other politically liberal organizations. He
is a lifelong registered Democrat, as well as a contributor to liberal
Democratic candidates. He is not now, nor has he ever been, a member
of, or contributor to, the National Rifle Association, Handgun Control,
Inc. nor any other advocacy organization, nor has he received funding
for research from any such organization.

Case: 1:13-cv-09073 Document #: 49-7 Filed: 07/21/14 Page 5 of 26 PageID #:1834
Case: 14-3091    Document: 13-8    Filed: 11/03/2014    Pages: 47

As Mr. Conroy's remark suggested, some law enforcement personnel believe that incidents of "grandma and the kiddies" or other innocent bystanders being killed by automatic fire are commonplace, especially in shootings related to drug trafficking. This belief is inaccurate. Killings of innocent bystanders, under any circumstances, constitute less than 1% of homicides, even in big cities and even in the 1980s, when their frequency reportedly increased (Sherman, Steele, Laufersweiler, Hoffer, and Julian 1989). A large share of these, though not necessarily a majority, might well be related to drug trafficking (ibid.:312), but there is no evidence that any significant share involves fully automatic guns. Even in the peak homicide year of 1980, in Dade (Miami) County, Florida, probably the drug-trafficking capital of the United States at the time, there was only one case of an innocent bystander being accidentally killed in a drug-related shooting (of 569 homicides, about 112 of them allegedly drug related), and that case did not involve a machine gun (based on the homicide summaries in Wilbanks 1984). Ordinarily the people killed in drug-related incidents are involved in drug-trafficking themselves, are killed intentionally, and thus are neither "innocent" nor bystanders.

## ASSAULT RIFLES AND ASSAULT WEAPONS

Efforts to control semiautomatic firearms with large-capacity magazines date back at least as far as 1934 (Sherrill 1973:58–64), though the term "assault weapon" seems to be an invention of gun control advocates dating no farther back than 1985 (its first public appearance in print may have been a *Newsweek* cover story, 14 October 1985, p. 49). This term has no precise technical definition in firearms reference works, but usually refers to semiautomatic firearms with "military-style" cosmetic features. This amorphous category can encompass semiautomatic pistols, "assault rifles," and even some shotguns. Since most firearms, no matter what their current uses, derive directly or indirectly from firearms originally designed for the military, "military-style" probably more narrowly signifies a modern or contemporary military appearance. For example, plastic stocks are supposedly more "military" in appearance than wood stocks, a loop for a lanyard is military-style, having a nonreflective surface is more military than a shiny one, and so on. Likewise a gun that is shaped like a military machine gun or submachine gun is more "military-style" in appearance even if it cannot actually fire fully automatically.

Legislators and other policymakers have experienced serious difficulties defining "assault weapons" or "assault rifles," because they were

trying to develop a definition that simultaneously satisfied two conflicting requirements: (1) it identified the attributes that supposedly make the restricted guns more dangerous than other semiautomatic guns, and (2) it was sufficiently limited so as to not restrict gun models popular among large numbers of voters. The main attributes that are supposed to make AWs more dangerous than other guns are their semiautomatic capability, which provides a somewhat higher rate of fire than other guns (and allegedly makes it easy to convert the guns to a fully automatic capability), and their ability to accept large-capacity magazines. However, if a law restricted all guns with such attributes, millions of voters would be affected. About 300,000–400,000 semiautomatic center-fire rifles and about 400,000–800,000 semiautomatic pistols were sold each year in the United States in the 1970s and 1980s (U.S. Bureau of the Census 1989; Thurman 1994), and by the peak year of 1994, over two million semiautomatic pistols were produced or imported into the United States, less exports (Thurman 1996). A December 1989 national survey indicated that 27% of U.S. gun owners reported ownership of at least one semiautomatic gun (Quinley 1990:3), which would imply that about 13% of all U.S. households own such guns. Most of these semiautomatic firearms can accept large-capacity magazines.

As a way out of this dilemma, lawmakers have thrown up their hands and declined to identify the dangerous attributes of AWs. Instead, laws passed in California, New Jersey, and Connecticut and at the federal level included long lists of specific makes and models of banned guns that have little in common beyond (almost always) a semiautomatic loading mechanism and (usually) an arguably "military" appearance. Typical of such efforts was the Connecticut AW law, which listed no fewer than sixty-seven different banned models or series of guns. The list lumped together handguns, rifles, and shotguns, both those usually sold with large magazines and those sold with small ones, large caliber and small caliber, foreign-made and domestic. Although the guns on the list were almost all semiautomatic, so were a much larger number of guns left off the list, such as the very popular Colt Model 1911A1 .45-caliber pistol and the Beretta Model 92 9-mm pistol (Connecticut 1993). Other laws passed in California and New Jersey and at the federal level defined the restricted weapon category using similarly heterogeneous, but limited lists of specific gun models (Cox Newspapers 1989; U.S. Congressional Research Service 1992).

The difficulties with this political compromise are obvious. If semiautomatic fire and the ability to accept large magazines are not important in crime, there is little reason to focus regulations on AWs. On the other hand, if these *are* important crime-aggravating attributes, then it makes little crime control sense (though ample political sense) to systematically

112

Search for "Bad" Guns

exclude from restriction the most widely owned models that have these attributes, since this severely limits the impact of regulation by allowing an ample supply of legally available semiautomatic models to be substituted for the handful of banned models.

## The Prevalence of AWs as Crime Weapons

It was commonplace for news sources in the late 1980s and 1990s to refer to either "assault weapons" or "assault rifles" as the "favored" weapon of criminals, or, more narrowly, of drug dealers and youth gangs (e.g., *New York Times*, 21 February 1989; *Newsweek*, 14 October 1985, p. 48). This claim was not true, either for criminals in general or for these specific types of criminals. This claim was largely based on guns the police agencies asked BATF to trace. In 1986–1990, 8.2% of BATF-traced guns were classified as "assault weapons" (reported in U.S. Congressional Research Service 1992:10). Unfortunately, the guns traced by BATF are not representative of guns used in crime, nor does BATF claim they are. Crime guns are rarely traced, and the few that are traced are not selected in a way that would ensure they are representative of all crime guns. In 1994, only 1.8% of homicides, robberies, and aggravated assaults known to the police and committed with a gun resulted in a BATF gun trace (computed from data in U.S. BATF 1995:43; U.S. FBI 1995:18, 29, 32, 58). As the Congressional Research Service noted, "the firearms selected for tracing do not constitute a random sample and cannot be considered representative of the larger universe of all firearms used by criminals, or of any subset of that universe" (U.S. Congressional Research Service 1992: 65).

Table 4.1 summarizes the available evidence on the share of crime guns that are AWs. These studies are mostly analyses of guns recovered by police from criminals, and typically cover *all* of the guns recovered in a given period, rather than some small, unrepresentative subset. The findings indicate that less than 2% of crime guns are "assault weapons" (the median was about 1.8%) and well under 1% are "assault rifles." Only two estimates, of forty-seven total, were over 4.3%. The estimate based on guns traced by BATF was double that of the next highest one, and over four times the typical figure obtained in studies of complete populations of guns recovered by police, indicating that trace data grossly overstate AW involvement in crime. Since about 14% of violent crimes are committed with guns (U.S. Bureau of Justice Statistics 1994a:83), this means that only about 1 in 400 (1.8% × 14% = 0.25%) violent crimes are committed with AWs.

One can artificially increase the share of crime guns that are "AWs"

for "Bad" Guns

hat have these
n by allowing
s to be substi-

and 1990s to
le "favored"
youth gangs
1985, p. 48).
hese specific
police agen-
l guns were
al Research
: not repre-
are. Crime
lected in a
ns. In 1994,
own to the
computed
8). As the
or tracing
presenta-
ls, or of
rice 1992:

ime guns
vered by
ered in a
he find-
ns" (the
nly two
ased on
nd over
lations
verstate
ommit-
ns that
mitted

AWs"

simply by expanding the definition of an AW. A New York bill proposed by then-governor Mario Cuomo defined AW as any center-fire semi-automatic rifle or shotgun capable of holding six or more rounds in its magazine, or any semiautomatic pistol capable of holding ten or more rounds (New York State 1994). This definition would probably encom-pass most of the new handguns sold in the United States since 1987 and a large share of rifles and shotguns. It would not, however, correspond to the meaning of the term in either common usage or in any existing state or federal statutory definitions. Use of this expansive definition allowed the authors of a New York State report to claim that 16% of New York City gun homicides in 1993 involved "assault weapons" (New York State 1994), a claim uncritically repeated in a U.S. Justice Department report (Zawitz 1995:6).

In the face of such consistently negative evidence, even a spokesman for Handgun Control, which advocated tighter restrictions on AWs, conceded in 1989 that assault weapons "play a small role in overall violent crime," while emphasizing that they could become a problem in the future (Philip McGuire, quoted in the *New York Times*, 7 April 1989, p. A15).

This spokesman's use of the term "overall violent crime" may have been intended to hint that "ARs" or AWs might be commonly used by special criminal subgroups such as drug dealers and gang members. For example, a spokesman for the U.S. Drug Enforcement Administration asserted that "you can count on coming across them on every single narcotics raid" (*Los Angeles Herald Examiner*, 23 January 1989, p. A-1). The available evidence contradicts the claim that "assault weapons" are fa-vored by drug dealers. Records of a Chicago-area narcotics unit indicated that only 6 of 375 guns seized in drug raids, or 1.6%, were AWs (Mericle 1989). Likewise, only 2.9% of a statewide California sample of guns recov-ered from drug dealers were AWs (Table 4.1, note g).

In Los Angeles, beginning in 1983, police and newspapers reported an epidemic of so-called "drive-by" shootings allegedly involving youth gang members using "assault weapons" to fight over control of drug trafficking. However, when queried about the guns seized from gang members, the head of the city's largest police gang detail admitted that (as of 1985) the unit had not confiscated *any* AWs: "We've seized only shotguns and handguns, but I have heard about the purchase of Uzis and military assault rifles" (*Crime Control Digest*, 13 May 1985, p. 2). A later study of "drive-by shootings" of juveniles in Los Angeles indicated that AW use was documented in only 1 of 583 incidents (Hutson et al. 1994). Presumably AW use was even less common among gang members in cities lacking the vocal concern over gang use of AWs and "ARs" that characterized Los Angeles. Thus, AWs are virtually never used by drug dealers or juvenile gang members, just as is true of criminals in general.

114

Search for "Bad" Guns

The 1994 federal ban on the possession, manufacture, and sale of "assault weapons" (Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994) covered only about nineteen specific named models or series of guns, though among the more than seventy models included in the California, New Jersey, and Connecticut AW bans, the federal ban covered most of the models that were relatively more frequently used in crime (for the models, see *Congressional Record*, 21 August 1994, Senate, p. 8826; for their relative prevalence among traced guns, see U.S. Congressional Research Service 1992:10). The ban did not prohibit possession of AWs legally owned at the time of the law's effective date, so owners of existing guns could continue to own and transfer all they possessed as of September 1994.

How large a share of crime guns were covered by the ban? The two most extensive samples of all guns recovered by police are statewide samples from Connecticut, covering 1988–1993, and Pennsylvania, covering 1989–1994. Of the 24,252 crime guns in these samples, 337, or 1.39%, were models covered by the federal AW ban (author's computations based on data in Laroche 1993; Pennsylvania State Police 1994; see Table 4.1, notes j, B).

At the time this bill was passed, there were at least 387 distinct models of semiautomatic firearms being legally sold as newly manufactured guns (Warner 1993:282–310, 337–41, 371–75, 389–93, 417–20), most of them capable of accepting large-capacity magazines, in addition to hundreds of no-longer-manufactured models still circulating in the used-gun market. Thus, there was an enormous supply of semiautomatic guns capable of accepting large-capacity magazines that could serve as easily acquired substitutes for the nineteen banned models. It is hard to imagine how the federal AW ban could even hypothetically prevent a death or injury by banning further sales and manufacture of just nineteen models of semiautomatic guns that accounted for less than 1.4% of guns used by criminals and that possessed no violence-relevant attributes to distinguish them from over 380 semiautomatic models not banned.

The most likely effect of the federal AW ban—or, more properly, the public debate and related publicity preceding passage of the ban—was a huge short-term increase in the number of AWs and other semiautomatic guns in the civilian stock. From 1986, when media attention to these guns began to grow, through 1989, when the first state AW ban was passed in California, to 1994 when the federal ban was passed, a previously ailing U.S. gun industry got a new lease on life due to sales of semiautomatic guns that either were to be banned or that gun buyers thought *might* be banned. After steady declines from 5.6 million guns produced in 1980 to a trough of 3.0 million in 1986, U.S. gun production reached one temporary peak of 4.4 million in 1989, and then another peak while the federal ban

Search for "Bad" Guns    *Assault Rifles and Assault Weapons*    115

ıanufacture, and sale of "as-
ılent Crime Control and Law
ıut nineteen specific named
more than seventy models
Connecticut AW bans, the
t were relatively more fre-
*gressional Record*, 21 August
nce among traced guns, see
. The ban did not prohibit
f the law's effective date, so
ıwn and transfer all they

ered by the ban? The two
l by police are statewide
and Pennsylvania, cover-
se samples, 337, or 1.39%,
ı (author's computations
ate Police 1994; see Table

least 387 distinct models
ewly manufactured guns
417–20), most of them
addition to hundreds of
in the used-gun market.
tomatic guns capable of
erve as easily acquired
ıard to imagine how the
nt a death or injury by
ıeteen models of semi-
of guns used by crimi-
tributes to distinguish
nned.

or, more properly, the
age of the ban—was a
l other semiautomatic
ıttention to these guns
W ban was passed in
d, a previously ailing
les of semiautomatic
ers thought *might* be
ıroduced in 1980 to a
ıched one temporary
vhile the federal ban

was being debated, with a total of 5.0 million guns produced in 1993 and
5.2 million in 1994 (Thurman 1996). The biggest production increases
were in the category of semiautomatic pistols, which increased 228% from
1986 to 1993. The 1993 handgun production of 2.7 million was the highest
in the recorded history of the U.S. firearms industry. The gun industry's
trade magazine, *Shooting Industry*, described the 1993 experience as a
"buying frenzy" and attributed it to the "threat of gun bans" (Thurman
1994; for further evidence of production increases, see Roth and Koper
1997:66–67).

Of course, the AW ban was intended to produce a long-term reduction
in the stock of AWs, but it is doubtful whether this will ever be achieved.
The law expires after ten years, in September 2004 and thus will not be in
effect for the "long term" unless it is reenacted. Further, even if the law is
renewed, if future prospective gun buyers simply buy mechanically
equivalent unbanned semiautomatic guns instead of the few banned
models, there will be no long-term reduction in availability of semi-
automatic guns. In this case, the only lasting effects of the ban will be
whatever consequences follow from the "excess" millions of semiautoma-
tic guns that were added to the civilian stock in 1986–1994 in anticipation
of AW bans.

It has been claimed that criminals "prefer" AWs in some sense, one
source asserting that the fraction of traced guns that were AWs exceeded
a rough guess from BATF that only 2% of all U.S. guns were AWs (Cox
Newspapers 1989:4; for a source treating this claim as factual, see Roth
and Koper 1997:17). Producing a meaningful estimate of this sort would
require having gun ownership data by model. BATF does not gather gun
data by model. Indeed, its data do not even distinguish semiautomatic
rifles and shotguns from other types of rifles and shotguns, or, among
imported handguns, semiautomatic pistols from other types of handguns.
Consequently, their data cannot supply meaningful estimates of the num-
ber of AWs or "AR"s in the hands of the American public. Note, however,
that if the BATF guess were even slightly too high, and the actual figure
were just 1.8%, this would be identical to the median share of crime guns
classified as AWs (Table 4.1), contradicting the claim that AWs are espe-
cially likely to be used in crime.

There are data on domestic production of semiautomatic pistols as a
general category, though not the subset defined as AWs. Since 85% of the
handguns added to the private U.S. stock in 1984–1993 were domestically
manufactured (U.S. BATF 1994:14–15), the domestic production data pro-
vide a good picture of the handguns recently added to the national gun
supply. Zimring (1976) showed that the majority of guns used by crimi-
nals are relatively recently manufactured guns, so these would be the
appropriate set of guns to use in the comparison.

Do criminals "prefer" semiautomatic pistols in the sense that their share of crime guns is greater than their share of the general stock of handguns recently manufactured in the United States? Among all handguns produced in the United States in the preceding ten years, less exports, 68.6% were semiautomatic pistols U.S. BATF 1994:14. Among handguns traced by BATF in 1994, 66.8% were semiautomatic pistols (U.S. BATF 1995a). Thus, semiautomatic pistols were actually slightly *less* common among traced guns than they were among handguns being distributed to the general population.

As noted, however, trace requests are misleading for judging the types of guns generally used by criminals. Unfortunately, no other national source covers all guns seized by police or a representative sample of seized guns. However, one can examine a large local police sample of all seized guns and compare it with guns recently added to the general U.S. gun stock. In a sample of guns seized in the first three months of 1989 by the Los Angeles Police Department, 49.8% of the handguns were semiautomatic pistols (Los Angeles Police Department 1989). Among the 7,438,603 handguns produced by U.S. manufacturers from 1984 to 1988, less exports, 3,993,517 were semiautomatic pistols (U.S. BATF 1994:15). [1] Thus, 53.7% of the domestically produced handguns bought by the general, largely noncriminal public were semiautomatic pistols, while 49.8% of those seized from criminals fell into this category. Los Angeles criminals in 1989 did not "prefer" semiautomatic weapons in the sense of going out of their way to obtain them in numbers disproportionate to their share of the recently sold handgun stock. Rather, criminals were just using the same kinds of handguns as recent noncriminal gun buyers had been obtaining.

Further, while 31% of the handguns used in juvenile "drive-by" shooting incidents in Los Angeles in 1991 were semiautomatic pistols (Hutson et al. 1994:326), 62% of the handguns produced by U.S. manufacturers in the preceding five years were semiautomatic pistols (Thurman 1994). Violent gang members in Los Angeles were only half as likely to use semiautomatic pistols as one would expect based on recent handgun production, and in this sense seemed to actually "disprefer" the semiautomatic pistols. If the higher rate of fire and larger magazines of these weapons were important to criminals, they were no more important, and perhaps even less so, to them than to noncriminal gun buyers.

A survey of a representative national sample of state prison inmates provided information on the guns that criminals owned in the month before the arrest that led to their imprisonment, as well as the guns they actually used in their crimes. Of those who owned a handgun of any kind in the preceding month, 71% were armed with a handgun when they committed the crime that got them sent to prison. However, of those who

possessed a "military-type" gun, only 16.7% were armed with such a gun when they committed their crimes (computed from U.S. Bureau of Justice Statistics 1993b:18–19, 33). Thus, compared to their availability, AWs were *under*represented among these felons' crime guns. These results were confirmed with respect to "assault rifles" by surveys of inmates in Virginia prisons in 1992–1993, which revealed that although 20% of the offenders had previously possessed "assault rifles," *none* had carried or fired one at their latest crime (Virginia 1994:63). Thus, criminals not only did not "prefer" military-style guns, they were strongly *dis*inclined to carry them during commission of their crimes, even when they owned one. In sum, under any meaningful interpretation of "preference," criminals do not prefer assault weapons.

"Assault rifles" are clearly much larger than the handguns criminals really do favor, and even "assault weapon" handguns such as Uzis are generally larger than other handguns. Since criminals say they favor more concealable handguns (Wright and Rossi 1986:163), this may largely explain why so few criminals use assault weapons.

## "Assault Weapon" Trends

There is nothing new about either semiautomatic firearms in general or "assault rifles" or "assault weapons" in particular. Semiautomatic firearms were produced in large numbers beginning in the late nineteenth century, and true assault rifles were introduced into military use during World War II (Ezell 1983:17, 514–15). Semiautomatic "assault rifles" became more popular among civilians during the 1980s—gun catalogs indicate a substantial increase in the number of models of "paramilitary" rifles shown between 1973 and 1988 [compare Koumjian (1973) with Warner (1988)]. However, this was less significant regarding violence than it appears, because it reflects little more than a demand for guns with military-style cosmetic details, rather than a violence-relevant shift to mechanically different gun types. Mechanically, "assault rifles" are semiautomatic center-fire rifles. Trends in sales of semiautomatic center-fire rifles were basically flat in the period from 1982 to 1987, and were substantially lower in the 1980s than in the 1970s (*PB*:95). The major trend in recent years has not been a shift to mechanically different types of rifles, but rather a shift in consumer preferences regarding rifles' appearance, along with a substantial shift away from domestic sources to foreign sources of semiautomatic rifles. In light of this latter trend, President George Bush's move in 1989 to ban imports of foreign "assault rifles" made more sense as trade protectionism than as gun control.

In contrast, among handguns, there was a dramatic move away from

118                                                    Search for "Bad" Guns

*Assault Rifles and Assault We*

revolvers and toward semiautomatic pistols beginning in the late 1970s. In 1978, just 25% of handguns produced by U.S. manufacturers were semiautomatic pistols, compared to 80% in 1993 (Thurman 1994). This trend was characteristic of the general flow of guns into the general population's stock of guns, implying increases in the average magazine capacity of handguns.

A similar trend toward semiautomatic pistols probably occurred among criminals, though the trend was apparently no stronger among criminals than among noncriminals, and little of it involved the gun models defined as AWs. We know little about crime gun trends before 1985, but scattered data paint a fairly complicated picture of trends in the 1985–1990 period. BATF data on gun traces indicated an increase in the AW share from 1986 to 1988, followed by a decline from 1988 to 1990, back down to its 1986 level (U.S. Congressional Research Service 1992:8). Similarly, the AW share of killings of police officers increased from 1986 to 1988, then declined in the following two years (ibid.:11). Baltimore experienced increased police recoveries of AWs from 1985 to 1988, a decline in 1989 (ibid.:16) and then a return to the 1988 level in 1990 (Baltimore Police Department 1991). Oakland police confiscations of AWs increased from 1985 to 1988, then declined from 1988 to 1990 (U.S. Congressional Research Service 1992:20). Low-quality data from surveys of Florida police departments indicated that AW use in crime for increased in the period 1986 to 1989 (ibid.:15), and that Miami police recoveries of AWs increased from 1986 to 1988, then declined in 1989 and leveled off in 1990 (ibid.:19). On the other hand, a study of bullets removed from gunshot victims at a Newark hospital indicated no shift toward ammunition commonly used in "assault rifles" from 1981 to 1989 (*Newark Star-Ledger*, 16 May 1990, p. 15). Likewise, an informal 1990 survey of all seven firearms examiners in Dade County (Miami), Florida, yielded the unanimous opinion that AW use in shootings had been slowly and steadily declining since 1981 (Florida 1990:156–57). The general picture is that AW use in crime, always low, increased from 1985 to about 1988 in at least some locations, and then declined thereafter.

## Trends in Number and Lethality of Gunshot Wounds

What were the consequences of the 1980s trend toward larger-capacity semiautomatic guns? In Washington, D.C., the number of wounds inflicted per GSW victim increased from 1985 to 1990 (Webster, Champion, Gainer, and Sykes 1992:696). There is no direct evidence that this increase was due to the increasing popularity of semiautomatic guns during the same period, and at least some of the increase in wounds per victim was

attributable to the changi
enormous increase in the
nals involved in the crac
noted, drug enforcers are
kill their victims by shoo
the reasons for the increa
consistent increase in th
during the period studie
21% in 1985, 18% in 1986
in 1990 (ibid.:696, Figur
stantial increase over 19
which beginning base o
erratic patterns are not
use, which increased co

Why did the increase
fatality rate? Part of th
used in the Webster st
percentage of GSW vic
hospital. Most victims
before reaching the ho
cides, not just gun hom
(U.S. National Center
homicide victims, this
in-hospital mortality ra
immediately, an outco
wounded seriously e
associated with *more*
death" with an uncert

Further, if multipl
idly, it would comm
vital area, additional
the recoil from one sl
rapid succession. In s
the likelihood that th
of the body are almo

A study from Ph
other than changes in
fired per gun incide
both the number of
involving semiautor
ever, their data also
increased *within* gu
example, among rev

or "Bad" Guns

ne late 1970s.
cturers were
n 1994). This
the general
ge magazine

ly occurred
nger among
ne gun mod-
before 1985,
n the 1985–
in the AW
1990, back
992:8). Sim-
om 1986 to
nore experi-
 decline in
nore Police
ased from
sional Re-
rida police
the period
increased
(ibid.:19).
ctims at a
only used
May 1990,
xaminers
nion that
ince 1981
crime, al-
ocations,

capacity
ls inflic-
ampion,
ncrease
ring the
im was

attributable to the changing nature of violence in this city: there was an enormous increase in the share of violence that was committed by criminals involved in the crack cocaine trade. As Webster and his colleagues noted, drug enforcers are likely to be "more deliberate in their efforts to kill their victims by shooting them multiple times" (p. 698). Regardless of the reasons for the increase in wounds per patient, it did not result in any consistent increase in the in-hospital GSW fatality rate in Washington during the period studied. The rate was about 18% in 1983, 26% in 1984, 21% in 1985, 18% in 1986, 14% in 1987, 23% in 1988, 21% in 1989, and 24% in 1990 (ibid.:696, Figure 4). Thus, the 1990 rate represents either a substantial increase over 1983 or a slight decrease over 1984, depending on which beginning base one chooses to focus on. In any case, these highly erratic patterns are not very consistent with trends in semiautomatic gun use, which increased continuously throughout the 1983–1990 period.

Why did the increased number of wounds not cause an increase in the fatality rate? Part of the explanation lies in the peculiar fatality measure used in the Webster study. The in-hospital mortality rate measures the percentage of GSW victims who die, of those who survived to reach the hospital. Most victims who die from gunshot wounds, however, do so before reaching the hospital. For example, even if one examines all homicides, not just gun homicides, only 41.8% of the victims died in the hospital (U.S. National Center for Health Statistics 1996a:379); among just gun homicide victims, this fraction would probably be substantially lower. The in-hospital mortality rate reflects the number of victims who were not killed immediately, an outcome associated with *less* lethal guns, yet who were wounded seriously enough that they did eventually die, an outcome associated with *more* lethal guns. Thus, this is a measure of "lingering death" with an uncertain relationship with the overall GSW mortality rate.

Further, if multiple-wound cases typically involve shooters firing rapidly, it would commonly mean that although one wound might be in a vital area, additional wounds are likely to be in nonvital areas, because the recoil from one shot throws off the aim of the next shot if it is fired in rapid succession. In such cases, the additional wounds would add little to the likelihood that the victim would die, since wounds in peripheral areas of the body are almost never fatal (Ordog et al. 1987:1274).

A study from Philadelphia provides solid evidence that something other than changes in gun choices caused increases in the number of shots fired per gun incident. McGonigal and his colleagues (1993) found that both the number of shots fired per gun incident and the share of incidents involving semiautomatic guns increased in the 1985–1990 period. However, their data also indicated that the number of shots fired per incident increased *within* gun type categories, i.e., controlling for gun type. For example, among revolver shootings, the number of shots fired increased

120                                           Search for "Bad" Guns

*Assault Rifles and Assault Weapo...*

63%, from 1.30 in 1985 to 2.12 in 1990, and among semiautomatic pistol incidents, it increased 69%, from 1.62 to 2.74 (ibid.:534). These data directly support the hypothesis that the average "lethal-mindedness" of Philadelphia gun attackers, as reflected in the number of shots they fired at their victims, increased during this period, independent of changes in handgun types used. Further, the assumption of a huge difference in shots fired between revolvers and pistols was not supported. For 1985 and 1990 combined, shots per victim was 2.04 for revolvers and 2.53 for pistols. Whether the gun type changes themselves increased fatalities, independent of changes in types of attackers (e.g., more killers involved in the drug trade), cannot be determined with these data.

In the 1980s and 1990s it was widely claimed that the shift toward semiautomatic guns and other developments in gun preferences had led to an increase in the fatality rate of gunshot wounds (Webster et al. 1992; Cook and Cole 1996; Wintemute 1996). National data, however, do not support the notion that gun violence became more lethal over this period. Among gun crimes known to the police, the share that were fatal (i.e., were homicides) declined from 4.3% in 1974 to 3.3% in 1985 and 2.9% in 1995 (Table 1.2). In short, during the 1974–1995 period, when semiautomatic guns were becoming more popular, the fatality rate of gun crimes was generally *decreasing*. Likewise, for an especially well-documented set of shootings, the fatality rate among police officers shot in the line of duty declined sharply over the period from 1988 to 1993 (Zawitz 1996:4).

Thus, even if one (1) chose to interpret the in-hospital mortality rates reported by Webster et al. for Washington, D.C., as meaningful indicators of trends in overall gunshot mortality levels, and (2) misread the highly erratic shifts in the rates as showing a generally upward trend (as Webster et al. did), the national data suggest that the Washington trends were not representative of trends in the United States as a whole. For the entire nation, the increased popularity of semiautomatic guns with larger magazines clearly could not have been responsible for an increase in the lethality of gun crime during this period [contrary to Wintemute (1996) and Cook and Cole (1996:1767)] for the simple reason that no such increase occurred. The percentage of reported gun crimes that resulted in the death of a victim steadily declined from 1974 to 1995, throughout the period of growing popularity of semiautomatic guns.

To summarize, the number of shots fired per incident and wounds inflicted per victim increased in two big cities in the 1983–1990 period, and perhaps in other big cities as well. This shift coincided with both increased popularity of semiautomatics and an increase in the share of violence linked with the drug trade. Given the evidence reviewed in this chapter, however, there is little reason to attribute the changes in gun violence patterns to the increased popularity of semiautomatic pistols. In any case, despite the increase in wounds inflicted per victim, this appar-

ently neither increased the
crease in either the total ho

**The Relative Dan**

Advocates of strict cont
rationales for their claim
useful for criminal purpos
shot, of the guns or the am
which the guns can be con
of fire of the guns even
mode, and (4) their ability
and therefore to fire mar
1997:15–18).

One conclusion about b
en models of semiautomat
group, mechanically iden
AWs, with regard to all of
is no basis for expecting
different (e.g., fewer lives
automatic guns capable
instead of mechanically
AWs. On the other hand,
ing that restricting *all* se
accepting detachable ma
might save lives or prev

AW pistols as a grou
non-AW semiautomatic
revolvers. However, ba
purportedly inflicted wi
cians have asserted tha
lethal wounds that are
ary 1989). However, sp
ammunition, experienc
claim (Fackler 1989; M
are actually *less* lethal
dard military rifles of
(1989), at that time di
Letterman Army Insti
fire smaller-than-avera
experiments that this a
ian hunting ammuniti

This is partly becau

Case: 1:13-cv-09073 Document #: 49-7 Filed: 07/21/14 Page 16 of 26 PageID #:1845
Case: 14-3091    Document: 13-8    Filed: 11/03/2014    Pages: 47

ently neither increased the GSW fatality rate nor contributed to an increase in either the total homicide or gun homicide rate.

## The Relative Dangerousness of "Assault Weapons"

Advocates of strict controls over AWs have proposed a number of rationales for their claim that these guns are especially dangerous or useful for criminal purposes: (1) the allegedly greater lethality, shot for shot, of the guns or the ammunition they use, (2) the supposed ease with which the guns can be converted to fully automatic fire, (3) the high rate of fire of the guns even when left unconverted in their semiautomatic mode, and (4) their ability to accept large-capacity detachable magazines, and therefore to fire many times without reloading (Roth and Koper 1997:15–18).

One conclusion about banning AWs seems indisputable. The few dozen models of semiautomatic guns that have been banned as AWs are, as a group, mechanically identical to the hundreds of models not banned as AWs, with regard to all of the aforementioned attributes. Therefore, there is no basis for expecting that the outcomes of *any* shootings would be different (e.g., fewer lives lost or fewer persons shot) if unbanned semiautomatic guns capable of accepting detachable magazines were used instead of mechanically identical, though cosmetically different, banned AWs. On the other hand, there might be a more rational basis for believing that restricting *all* semiautomatic guns (or at least those capable of accepting detachable magazines), or limiting the capacity of magazines might save lives or prevent injuries.

AW pistols as a group are no more lethal, shot for shot, than either non-AW semiautomatic pistols (since they differ only cosmetically) or revolvers. However, based on scattered experience in treating wounds purportedly inflicted with "assault rifles," some emergency room physicians have asserted that these guns create especially devastating and lethal wounds that are unusually hard to treat (*New York Times*, 21 February 1989). However, specialists in the wounding effects of military rifle ammunition, experienced in treating battlefield wounds, contradict this claim (Fackler 1989; Mohler 1989), reporting that modern "assault rifles" are actually *less* lethal than ordinary civilian hunting rifles and the standard military rifles of the World War II era. Doctor Martin L. Fackler (1989), at that time director of the Wound Ballistics Laboratory at the Letterman Army Institute of Research, noted that typical "assault rifles" fire smaller-than-average ammunition, and demonstrated with ballistics experiments that this ammunition has milder wounding effects than civilian hunting ammunition or regular infantry rifle cartridges.

This is partly because the military cartridges commonly used in "as-

sault rifles" have smaller, pointed bullets, which do not flatten out and expand when they hit human flesh. They therefore tend to produce smaller wounds, which are correspondingly less lethal. The more lethal hollow-point or "dumdum" bullet often used in civilian ammunition was forbidden for military use by the 1899 Hague Peace Conference.

Compared to the ammunition used in the middle-caliber *handguns* that criminals commonly use, "AR" ammunition is indeed more lethal, but only because rifle ammunition in general is more lethal than handgun ammunition. Fackler and his colleagues (1990) described "AR" ammunition as being intermediate in power between handgun ammunition and regular infantry rifle cartridges (and, by implication, civilian hunting ammunition).

Although AWs sold on the civilian market are not capable of fully automatic fire, it has been argued that this distinction is a minor one because AWs are so easily converted to fully automatic fire (e.g., *Newsweek*, 14 October 1985, pp. 48–49). The *New York Times* (2 August 1988), in an editorial, even told its readers that "many semiautomatics can be made fully automatic with a screwdriver, even a paperclip." Eight months later, in a news article about the federal ban on importation of "ARs," the *New York Times* gave its readers a rather different view of the "issue of whether or not such guns are easy to convert from semiautomatics to illegal fully automatics":

> The staff of technical experts at the [BATF] disassemble, test and examine samples of all semi-automatic weapons marketed in the United States to make formal determinations on this question. Any model found to be readily convertible to automatic fire would be declared illegal. None of the five types included in the import ban had been declared readily convertible, *nor have any domestic semi-automatics now on sale*. (3 April 1989; emphasis added)

Thus, none of the semiautomatic guns available for sale in the United States, whether AWs or not, was readily convertible to fully automatic fire as of 1989. Two semiautomatics, the MAC-10 and MAC-11, had previously been legally sold in the United States, but in 1982 were declared by the BATF to be "readily convertible" to automatic fire and were banned (Hancock 1985).

It is technically true that almost any gun can be converted to fully automatic fire, given sufficient expertise, time, tools, and added parts. Given unlimited resources, one could fabricate an entire machine gun from scratch. However, data on weapons seized by police indicate that criminals almost never have both the resources and the inclination to perform a conversion. Of over 4000 guns confiscated by the Los Angeles Police Department in a one-year period, only a half-dozen (0.15%) were

*Assault Rifles and Assault Weapons*

formerly semiautomatic guns about a dozen showed evidenc 1989).

Advocates of bans on AWs fire of which the weapons ar large magazines. Magazines fc able, and the weapons are us common magazine sizes, whe one containing thirty or mon high volume of fire is not, stri but rather of the magazine. Cc the 1994 federal ban on some sale of magazines with capac

It is unlikely that large-cap outcome of a large number c large numbers of shots fired. assaults usually involve eithe of gun assaults, and wound 1994b) or only a few shots be that ordinary revolvers hold. Washington, D.C., in the lat gunshot victims wounded s main trauma center had su 1992:696). Likewise, McGoni bullets fired per homicide gr similar period of drug-relat sixteen treated at the busiest were wounded with more t only 15% of medically treat in 1992–1994 suffered more If one included victims wh fractions would almost cer attacks on armed police off mutual combat gunfights average of only 3.7 times (

It is even less likely that gun attacks. Semiautomati shots as fast as the shooter any gun, however, is limite the bullet leaving the barr shooter and off its origin same target again until t the target. Thus the somev

formerly semiautomatic guns converted to fully automatic fire; only about a dozen showed evidence of even an attempt at conversion (Trahin 1989).

Advocates of bans on AWs have pointed to the high total volume of fire of which the weapons are capable without reloading, due to their large magazines. Magazines for these weapons are almost always detachable, and the weapons are usually capable of accepting many different common magazine sizes, whether one containing only three rounds, or one containing thirty or more (Warner 1993). Thus, the capability of a high volume of fire is not, strictly speaking, an attribute of the gun itself, but rather of the magazine. Consequently, the most significant element of the 1994 federal ban on some AWs was its ban on further production or sale of magazines with capacities over ten rounds.

It is unlikely that large-capacity magazines are currently relevant to the outcome of a large number of violent incidents, since few cases involve large numbers of shots fired. The rare mass killing notwithstanding, gun assaults usually involve either no shots (the victim is shot at in only 17% of gun assaults, and wounded in 3%; U.S. Bureau of Justice Statistics 1994b) or only a few shots being fired, typically fewer than the six rounds that ordinary revolvers hold. Even during the peak of the "crack wars" in Washington, D.C., in the late 1980s and early 1990s, less than 8% of the gunshot victims wounded seriously enough to be admitted to the city's main trauma center had suffered five or more wounds (Webster et al. 1992:696). Likewise, McGonigal et al. (1993) found an average of only 2.41 bullets fired per homicide gun in Philadelphia in 1990, near the peak of a similar period of drug-related violence. Only 7.7% of patients under age sixteen treated at the busiest trauma hospital in Los Angeles in 1973–1983 were wounded with more than two bullets (Ordog et al. 1987:1275), and only 15% of medically treated GSW assault victims in a three-city sample in 1992–1994 suffered more than one wound (Kellermann et al. 1996:1441). If one included victims who did not seek medical treatment at all, these fractions would almost certainly be still lower. Even in a sample of gun attacks on armed police officers, where the incidents are more likely to be mutual combat gunfights with many shots fired, the suspects fired an average of only 3.7 times (New York City Police Department 1994:9).

It is even less likely that rate of fire is significant in a large number of gun attacks. Semiautomatic firearms generally are capable of firing single shots as fast as the shooter can pull the trigger. The effective rate of fire of any gun, however, is limited by its recoil. When a shot is fired, the force of the bullet leaving the barrel causes the gun to move back toward the shooter and off its original aiming alignment. It cannot be fired at the same target again until the shooter puts its barrel back in line with the target. Thus the somewhat higher potential rate of fire of semiautoma-

*Assault Rifles and Assault W*

tic weapons cannot be fully exploited in practice, reducing the effective difference between these weapons and revolvers.

Ordinary revolvers can easily fire six rounds in two seconds or less without any special skill on the part of the shooter or modification to the gun. Even if a semiautomatic gun could fire at a 50% higher rate, it would only mean that a shooter could fire six rounds in 1.33 instead of 2 seconds. The issue comes down to this: How many violent incidents occur each year in which a shooter has 1.33 seconds to fire six rounds, but not 2 seconds? Close examination of mass shootings may help shed some light on the significance of high rates of fire and large-capacity magazines, since these incidents involve unusually large numbers of rounds fired and wounded victims.

### Semiautomatic Guns and Mass Shootings

Mass shootings are extreme test cases because, if one were to argue that some victims are killed or wounded who would not have been hurt had the attacker been armed with some type of gun other than a semiautomatic or one with a smaller capacity magazine, mass shootings provide the strongest evidence for the significance of rapid rates of fire and large magazine capacities. James Fox and Jack Levin have specifically based a case for "banning rapid-fire weaponry and oversized ammunition clips" on mass shootings, asserting that "the increased availability of high-powered, rapid-fire weapons like those used by James Huberty is also a *large* part of the reason why the death tolls in mass murders have climbed so dramatically in the recent past" (1994:236, emphasis added).

Oddly enough, mass killings are actually *less* likely to involve the use of guns of any kind than homicides involving small numbers of victims. For all murders and nonnegligent manslaughters covered in *Supplementary Homicide Reports* (about 90% of all U.S. killings) for the period 1976 to 1992, only 48.3% of victims killed in incidents with four or more victims were killed with guns, compared to 62.3% of those killed in incidents with three or fewer victims. This is mainly due to the large share of mass killings committed with arson, which is rarely involved in ordinary homicides.

Nevertheless, it is possible that rapid-fire guns with large magazines might have been essential to some mass murders resulting in as many deaths and injuries as they did. Table 4.2 summarizes information derived from press reports on all fifteen mass shootings known to have occurred during the period of greatest popularity of AWs among criminals, 1984–1993 [cases derived from Duwe (1996) and press reports]. A "mass shooting" is defined here, somewhat arbitrarily, as an incident in which six or more victims were shot dead with a gun, or twelve or more total were

wounded. There is usua
accounts about incidents
argue for the significanc
cases with fewer victim

Of the fifteen mass s
banned under any existi
case, which involved t
case, involving a gun lo
within the banned cate
Model 56S variant of an
involved a semiautoma
was also armed with o
how many of the woun
known if any of Huber
also used an ordinary E
munition (9 mm) as th
killed with a shotgun.
killer was armed with
known that the killers
nard, Purdy, Sherril, an
tion that in these cases
magazine to kill or wo

For those incidents v
of the shooting were be
about one round every
that. Witnesses commo
ly work in a "calm,"
taking careful aim at
*Angeles Times*, 19 July 1
September 1989, p. A1
ple, Joseph Wesbecker
over a period of thirty
. . . firing directly at l
(*Louisville Courier Jour*
maintained a sustain
maintained—even tak
ple guns or with an o
devices known as "spe
killers could not have

Inflicting the numb
did not require the l
provided by either AW
is highly unlikely tha

Case: 1:13-cv-09073 Document #: 49-7 Filed: 07/21/14 Page 20 of 26 PageID #:1849
Case: 14-3091 Document: 13-8 Filed: 11/03/2014 Pages: 47

wounded. There is usually much less information available from press accounts about incidents involving fewer victims, and it would be harder to argue for the significance of large magazine capacity in connection with cases with fewer victims, and thus presumably fewer shots fired.

Of the fifteen mass shootings, no more than four involved weapons banned under any existing federal or state AW bans: the Gian Luigi Ferri case, which involved two Intratec DC9 pistols; the Joseph Wesbecker case, involving a gun loosely described as an "AK-47," which might fall within the banned category; the Patrick Purdy case, which involved a Model 56S variant of an AKM-47; and the James Huberty incident, which involved a semiautomatic Uzi carbine. In all four of these cases the killer was also armed with other, non-AW guns, and it is therefore not clear how many of the wounds were inflicted with AWs. For example, it is not known if any of Huberty's victims were killed with the Uzi because he also used an ordinary Browning pistol, which used the same caliber ammunition (9 mm) as the Uzi and at least half of the dead victims were killed with a shotgun. In eleven of the seventeen mass shootings, the killer was armed with multiple guns, and in at least five cases it was known that the killers reloaded their guns at least once (Ferguson, Hennard, Purdy, Sherril, and Huberty). Both of these facts support the assertion that in these cases the killer did not require a single gun with a large magazine to kill or wound so many people.

For those incidents where the number of rounds fired and the duration of the shooting were both reported, the rate of fire never was faster than about one round every two seconds, and was usually much slower than that. Witnesses commonly reported that the killers went about their deadly work in a "calm," "matter-of-fact," or "almost methodical" fashion, taking careful aim at victims and seemingly taking their time (e.g., *Los Angeles Times*, 19 July 1984, p. 1, 18 January 1989, p. 3; *Washington Post*, 15 September 1989, p. A1; *Houston Post*, 17 October 1991, p. A-1). For example, Joseph Wesbecker, who killed seven people and wounded seventeen over a period of thirty minutes, "showed extreme "shooting discipline," . . . firing directly at his human targets and taking few random shots" (*Louisville Courier Journal*, 15 September 1989). None of the mass killers maintained a sustained rate of fire that could not also have been maintained—even taking reloading time into account—with either multiple guns or with an ordinary six-shot revolver and the common loading devices known as "speedloaders." Further, there is no evidence that these killers could not have taken more time than they actually did.

Inflicting the number of casualties in even these extreme and rare cases did not require the large-capacity magazines and/or high rate of fire provided by either AWs or by semiautomatic guns in general. It therefore is highly unlikely that shootings with fewer rounds fired and fewer vic-

tims would require such capabilities. At this point, there is no empirical basis for believing that any wounds, fatal or nonfatal, are inflicted with semiautomatic guns that would not also have been inflicted with shooters been armed instead with revolvers. Indeed, contrary to Fox and Levin's assertions, there is no evidence that even one death or injury in a mass shooting would have been averted had the killer been armed with guns, such as revolvers, with slower rates of fire or smaller magazines.

Fox and Levin were also mistaken in believing that the "death tolls in mass murders have climbed . . . dramatically in recent years." National *Supplementary Homicide Reports* data covering homicides for the period 1976–1992 indicate that there were seventeen gun homicide incidents with more than six victims, or one a year. It is of doubtful value to describe trends in such rare events, but there clearly was no upward trend in their rate. There were four such cases in each of 1982 and 1984, three in 1991, and zero or one in all other years. Further, the rate of killings with four or more victims was higher in 1976–1982, prior to the popularity of AWs, than in 1983–1992 (Fox 1994). Regardless of the numerical cutoff defining mass shootings, there was no increase in such incidents associated with the increased popularity of AWs after 1984.

## Assault Weapons and Killings of Police Officers

One big-city police official was quoted in the *Los Angeles Times* (25 May 1990) as saying "We're tired of passing out flags to the widows of officers killed by drug dealers with Uzis." Taken literally, the implied claim that many officers were killed by Uzi-wielding drug dealers was clearly false. According to the chief of the FBI's Uniform Crime Reporting Program, from 1980 when the Uzi was first imported into the United States, through 1989, not one police officer in the United States was killed by a drug dealer with an Uzi. Only one case in their files involved an officer killed with an Uzi under any circumstances, but this did not involve a drug dealer (letter from J. Harper Wilson, Chief, FBI Uniform Crime Reporting Program, 20 June 1990).

The police official's claim might, however, be interpreted to broadly refer to all AWs rather than just Uzis, and all criminals, not just drug dealers. For the ten-year period 1980–1989, of 810 officers feloniously killed in the United States and its territories, 33 (4%) were killed by "assault weapon" models covered by federal restrictions either passed or pending as of January 1991, or about three per year for the entire nation. For 1986–1990, of 350 killings, sixteen involved rifles and three involved handguns covered under such restrictions (U.S. Congressional Research Service 1992:11). Thus, 5% involved any kind of AW, averaging less than

four AW killings for the period 199 7% of the total (R

"Assault rifles" weapons, like civ body armor, and handguns, on the armor than ordina killed by bullets t 704 officers feloni ing body armor, b (about one per ye by the vest (e.g., a vest penetration AWs: one with a FBI 1994 (*Law En* port covering all that there was not handgun round p round penetrating neous (p. 19). Thu officer's body arr during the peak p

Have the very sault rifles" incre covering 1970–19 generally decline guns declined sli mained low and number that coul common among ' any single year) a

Another claim gunned" by crim magazines and cr reloading than po *Star-Ledger*, 18 Ju number of officer battles with more rare. FBI data in officers did not fi munition (U.S. FE who exhausted th

four AW killings of police officers in the United States per year. Likewise, for the period 1992–1996, there were 4.5 AWs killings of officers per year, 7% of the total (Roth and Koper 1997:137).

"Assault rifles" are of special concern to police because some of these weapons, like civilian hunting rifles, are capable of penetrating police body armor, and these cases all involve long guns. "Assault weapon" handguns, on the other hand, are no more capable of penetrating body armor than ordinary revolvers. It is extremely rare for police officers to be killed by bullets that penetrated their body armor. From 1984 to 1993, of 704 officers feloniously killed, 644 were killed with guns, 191 while wearing body armor, but only eleven involved bullets penetrating body armor (about one per year); the rest involved bullets hitting areas not protected by the vest (e.g., arm holes, spaces between armor panels). Of the eleven vest penetration cases, four involved guns of calibers common among AWs: one with a 9-mm handgun and three with .223-caliber rifles [U.S. FBI 1994 (*Law Enforcement Officers Killed and Assaulted 1993*):16]. In a report covering all police killings in 1985–1994, U.S. BATF (1997) reported that there was not a single instance of a police officer killed as a result of a handgun round penetrating body armor. The report of a 9-mm handgun round penetrating body armor in a 1986 shooting turned out to be erroneous (p. 19). Thus, an AW-involved killing of a police officer where the officer's body armor was penetrated occurred about once in three years during the peak period of AW use among criminals.

Have the very rare killings of police officers by assailants using "assault rifles" increased in recent years? Table 4.3 presents relevant data covering 1970–1993. The figures indicate that killings of police officers generally declined over this period, the number and fraction involving guns declined slightly, and the number and fraction involving rifles remained low and fairly stable (under 14% of the total). The maximum number that could have involved "ARs" (i.e., involved rifles with calibers common among "ARs") has always been very small (thirteen or fewer in any single year) and has shown no consistent trend.

Another claim is occasionally made that police officers are "outgunned" by criminals with AWs because the AWs have larger capacity magazines and criminals armed with them can fire more rounds without reloading than police officers armed with six-shot revolvers (e.g., *Newark Star-Ledger*, 18 July 1989, p. 15). The implication is that some significant number of officers are killed after exhausting their ammunition in gun battles with more heavily armed criminals. Such incidents are extremely rare. FBI data indicate that in 85% of police officer killings, the victim officers did not fire their guns even once, never mind exhaust their ammunition (U.S. FBI 1992a:5). The number who fired six or more rounds or who exhausted their ammunition is unknown, but would almost certainly

be a minority of the remaining 15%. Even in cases where police did fire at adversaries, the average number of rounds fired was 3.8 per incident in New York City in 1993 (New York City Police Department 1994:10). Thus, police officers rarely are killed in anything resembling a "gun battle," and almost never in one where their ammunition is exhausted in a fight with an adversary with an AW.

To summarize, "assault rifles" and assault weapons are rarely used by criminals in general or by drug dealers or youth gang members in particular, are almost never used to kill police officers, and are not readily converted to fully automatic fire. "AR"s are generally less lethal than ordinary hunting rifles, while AW pistols are no more lethal than non-AW handguns. Semiautomatic guns in general offer a rate of fire slightly higher than revolvers and can be used with magazines holding large numbers of cartridges, but there is at present no evidence that either attribute has affected the number of persons killed or wounded in any known gun crime.

## PLASTIC GUNS

An even rarer weapon type has been the focus of regulatory efforts. A federal law passed in 1988 required that all guns contain a certain minimum amount of metal, thereby banning guns made entirely of non-metallic materials such as plastic. These weapons were of concern to legislators because they would not be detectable by metal detectors such as those used at airports, outside courtrooms, and in prisons and other secure facilities. They would be ideal, for example, for use by persons intent on hijacking airplanes. Such weapons *are* detectable by the X-ray machines used to examine luggage—even a plastic squirt gun is perfectly visible if the machinery is working properly (Astrophysics Research Corporation 1986). And, of course, if the machinery is not working properly or is not monitored properly by conscientious operators, any gun can escape detection.

What was unusual about this law was that it banned a nonexistent weapon type. At the time it was proposed, no all-plastic gun had yet been manufactured. Some guns such as the Glock 17 pistol were made partly of plastic, but had ample metal to set off properly functioning metal detectors (*New York Times*, 5 May 1986, p. A15). Consequently, it is safe to say that no crime had ever been committed with an all-plastic firearm. Since production of such a gun may have been technically feasible, sponsors

*Tables*                                                                    141

*Table 4.1.*  Prevalence of "Assault Weapons" among Crime Guns

| Place "AW"** | Years | Type of Sample Covered* | % |
|---|---|---|---|
| Akron, OH | 1988[a] | Guns recovered by police | 2 |
| | 1992[b] | Guns recovered by police | <1 |
| Baltimore County | 1990[c] | Guns recovered by police | 1.53 |
| | | Guns connected with violent offenses | 1.81 |
| | 1991–1994[c] | Guns recovered by police | 3.05 |
| Bexar (San Antonio) | 1985–1992[d] | Guns recovered by police | 0.1 |
| County, TX | 1987–1992[d] | Homicides | 0.2 |
| Boston | ca. 1988[e] | Guns recovered by police | 11 |
| | 1992–1994[K] | Guns recovered by police | 2.1 |
| California | 1990[f] | Homicides, aggravated assaults | 3.7 |
| | 1990[g] | Guns recovered from drug dealers | 2.9 |
| Chicago | 1988–1989[h] | Guns recovered by police | 0.94 |
| Chicago suburbs | 1980–1989[i] | Guns recovered in drug raids | 1.6 |
| Connecticut | 1988–1993[j] | Guns recovered by police | 2.1 |
| Dade (Miami) | 1989[k] | Guns recovered by police | 3.3 |
| County | | Homicides | 1.4 |
| Florida | 1986–1989[k] | Guns recovered by police | <3.6 |
| Los Angeles | 1988[l] | Guns recovered by police | 3 |
| | 1991[m] | "Drive-by shooting" incidents involving juveniles | 0.17 |
| Maryland | 1989–1990[n] | Homicides | (0.1) |
| Massachusetts | 1985–1991[o] | Shootings | (0.7) |
| Massachusetts, excl. Boston | 1984–1988[e] | Fatal shootings | (1.0) |
| Miami | 1989–1993[p] | Guns recovered by police | 3.13 |
| Minneapolis | 1987–1989[q] | Guns recovered by police | 0.41 |
| Mobile County, AL | 1985–1987[r] | Nonfatal gunshot victims admitted to a hospital | 0 |
| Nashville | 1991–1992[s] | Gun homicides | (0) |
| New Jersey | 1988[t] | Gun homicides | 0 |
| | 1989[u] | Gun homicides | (0) |
| | 1991[v] | Murders, armed robberies, and aggravated assaults | 0.16 |
| New York City | 1988[w] | Guns recovered by police | (0.5) |
| | 1993[K] | Guns used in homicides | 4 |
| New York State | 1992[x] | Murders | (0.8) |
| Newark | 1980–1989[u] | Bullets in gunshot victims | (0.3) |
| Oakland | 1985–1990[y] | Guns recovered by police | 4.3 |
| | 1991[z] | Homicides | 3.7 |
| Orange County (Orlando), FL | 1993[A] | Guns recovered by police | 1.9 |
| Pennsylvania | 1989–1994[B] | Guns used in violent crimes | 2.5 |
| | | Guns recovered by police | 1.7 |
| St. Louis | 1992–1994[K] | Guns recovered by police | 1.4 |

*(continued)*

142                                                         Search for "Bad" Guns

*Table 4.1.   (Continued)*

| Place "AW"** | Years | Type of Sample Covered* | % |
|---|---|---|---|
| | 1992–1994 [K] | Guns linked with homicides, assaults, robberies | 1 |
| San Diego | 1988–1990 [C] | Guns recovered by police | 0.3 |
| San Francisco | 1988 [D] | Guns recovered by police | 2.2 |
| Virginia | 1989–1991 [E] | Guns used in homicides | 2.2 |
| | 1992 [F] | Guns analyzed in state forensics labs | 3.3 |
| Washington, D.C. | 1988 [G] | Guns recovered by police | (0) |
| | 1991 [H] | Guns recovered by police | 3.0 |
| United States | 1986–1990 [I] | Guns traced by BATF | 8.2*** |
| | 1991 and earlier [J] | Guns possessed in gun crimes committed by violent inmates | 2.3 |

* These are almost all samples of guns. In some cases, however, the "% AW" pertains to the share of homicides (or gun homicides) committed with AWs. There has been a deliberate effort to exclude analyses of samples that entirely or largely overlap those already covered in this table. The review does not cover a 1993 New York State study of gun homicides, because it used an eccentrically broad definition of AWs that would encompass most of the handguns sold in the U.S. since 1987 (see text).

** Figures in parentheses pertain to "assault rifles" only, rather than the broader category of "assault weapons," which also encompasses some handguns and shotguns.

*** This is neither an unselected population nor a representative sample of crime guns, and thus is not comparable with the other estimates.

[a] *Akron Beacon-Journal*, 13 March 1989, p. A1.

[b] *Akron Beacon*, 6 January 1993, p. A1.

[c] Baltimore Police Department (1991); Mount Washington Rod and Gun Club (1995).

[d] DeMaio, Kalousdian, and Loeb (1992).

[e] *Boston Globe*, 16 March 1989, p. 12. "Assault weapon" was undefined. This newspaper story's figure of 11% is dubious because it is five times higher than that yielded by a more careful study of Boston covering 1992–1994 (see source K).

[f] Johnson (1992).

[g] Helsley (1991).

[h] *Southtown Economist*, 12 June 1990.

[i] Mericle (1989).

[j] Detective Lawrence A. Laroche, memorandum to Major Kenneth H. Kirschner, Commanding Officer, Bureau of Police Support, Connecticut State Police, 29 December 1993.

[k] Florida (1990).

[l] U.S. Senate (1989).

[m] Hutson, Anglin, and Pratts (1994).

[n] Thomas E. Hickman, State's Attorney of Carroll County, Maryland, letter submitted to the Maryland Senate Judicial Proceedings Committee, 14 February 1991, pp. 1–3.

[o] Trooper M. Arnold, Massachusetts State Police, Firearms Identification Section, "Massachusetts State Police Ballistics Records."

[p] Jess I. Galan, Criminalist, Crime Laboratory Bureau, letter to Richard Gardiner, National Rifle Association; cited in Kopel (1995:180, 224).

[q] Sergeant Wes Reins, memorandum to Chief J. Laux, Minneapolis Police Department, 3 April 1989.

[r] Riddick et al. (1993).

*(continued)*

*Tables*

*Table 4.1.   (Continued)*

[s] Sergeant Brooks Harris, Crime [...] Senator Harlan Mathews, 2 [...]

[t] Testimony of Deputy Chief Jos[...] before the Maryland Senate[...]

[u] Newark *Star-Ledger*, 16 May 19[...]

[v] *New York Times*, 20 June 1993.

[w] *White Plains Reporter Dispatch*, [...]

[x] *New York Post*, 10 January 199[...]

[y] Sergeant R. Zien, Oakland Pol[...] *Report 1990.*

[z] Oakland Police Dept., *Supplem[...]*

[A] *Orlando Sentinel*, 8 February 1[...]

[B] Pennsylvania State Police, *Wea[...]* proposed Pennsylvania "[...] robberies, or aggravated a[...] also covered in proposed [...]

[C] *San Diego Union*, 29 August 1[...]

[D] *Congressional Record* 135:68, Se[...] of 1989," 8 February 1989, [...]

[E] Virginia (1994:64).

[F] *Virginia Pilot and Ledger-Star*, [...]

[G] *New York Times*, 3 April 1989 [...] "assault weapon" import [...]

[H] George Wilson, Firearms Ident[...] 1992; cited in U.S. Congre[...]

[I] U.S. Bureau of Alcohol Tobac[...] automatic firearms" ident[...] vice (1992:10).

[J] U.S. Bureau of Justice Statistic[...] an estimated 92,314 had [...] incarcerated. Of these, 2,1[...] criminals) were armed wi[...] M-16" (ibid., pp. 18, 33).

[K] Roth and Koper (1997:21, 1[...]

*Table 4.1.   (Continued)*

[s] Sergeant Brooks Harris, Crime Analysis Section, Nashville Police Department, letter to Senator Harlan Mathews, 2 June 1993, p. 2.

[t] Testimony of Deputy Chief Joseph Constance, Trenton, New Jersey, Police Department, before the Maryland Senate Judicial Proceedings Committee, 7 March 1991, p. 3.

[u] Newark *Star-Ledger*, 16 May 1990, p. 15.

[v] *New York Times*, 20 June 1993.

[w] *White Plains Reporter Dispatch*, 27 March 1989, pp. A8, A9.

[x] *New York Post*, 10 January 1994, p. 14.

[y] Sergeant R. Zien, Oakland Police Department, *Homicide Section Weapons Unit—Year End Report 1990.*

[z] Oakland Police Dept., *Supplementary Homicide Reports* (1991).

[A] *Orlando Sentinel*, 8 February 1994, p. A-8.

[B] Pennsylvania State Police, *Weapons Database Report,* Chapter II. Military-style guns listed in proposed Pennsylvania "AW" ban, as share of firearms used in homicides, rapes, robberies, or aggravated assaults (but *not* including small-caliber, low-capacity guns also covered in proposed measure) (1994).

[C] *San Diego Union*, 29 August 1991.

[D] *Congressional Record* 135:68, Senate Hearings on the "Assault Weapon Import Control Act of 1989," 8 February 1989, p. S1368.

[E] Virginia (1994:64).

[F] *Virginia Pilot and Ledger-Star*, 4 August 1993.

[G] *New York Times*, 3 April 1989, p. A14, referring to "assault rifles" covered in 1989 federal "assault weapon" import ban.

[H] George Wilson, Firearms Identification Unit, Metropolitan Police Department, 21 January 1992; cited in U.S. Congressional Research Service (1992:18).

[I] U.S. Bureau of Alcohol Tobacco and Firearms, traces of over 28 models of "certain semi-automatic firearms" identified by BATF; reported in U.S. Congressional Research Service (1992:10).

[J] U.S. Bureau of Justice Statistics (1993b). Of 307,960 inmates incarcerated for violent crimes, an estimated 92,314 had been armed with guns in the crimes for which they were incarcerated. Of these, 2,100 (0.68% of all violent criminals, 2.3% of gun-armed violent criminals) were armed with "a military-type weapon, such as an Uzi, AK-47, AR-15, or M-16" (ibid., pp. 18, 33).

[K] Roth and Koper (1997:21, 102, 104, 105).

| State of Connecticut, Department of Public Safety- Investigation Report (DPS-302-C) (Revised 12/07/04) | DPS INCIDENT NUMBER: CFS-12-00704597 |
|---|---|

| REPORT TYPE: ☐ INITIAL ☐ ASSIST ☒ SUPP ☐ RE-OPEN ☐ CLOSING | ATTACHMENTS: ☐ STATEMENTS ☐ TELETYPE ☐ PHOTOS ☐ SKETCH MAP ☐ EVIDENCE ☒ OTHER |
|---|---|

**Weapons and Ammunitions on the Shooter's Person:**
(All weapons were made safe by assigned Evidence Detective Dan Sliby #810).

➤ Left upper breast pocket of the vest were a total of three (3) magazines seized as Exhibit #41 (Two (2) "Sig Sauer" magazines each containing twenty (20) live rounds of 9 mm ammunition and one (1) "Plus 2" magazine containing eighteen (18) rounds of live 9mm ammunition). Each magazine was loaded to full capacity.

**CASE STATUS:**
X 1 ACTIVE ☐ 2 CLEARED BY ARREST ☐ 3 SUSPENDED ☐ 4 EXCEPTIONAL CLEARANCE ☐ 6 NO CRIMINAL ASPECT ☐ F FUGITIVE

**TYPE OF EXCEPTIONAL CLEARANCE:**
☐ A OFFENDER DECEASED ☐ B PROSECUTION DECLINED ☐ C EXTRADITION DENIED ☐ D DECEDENT UNCOOPERATIVE ☐ E JUVENILE-NO

THE UNDERSIGNED, AN INVESTIGATOR HAVING BEEN DULY SWORN, DEPOSES AND SAYS THAT: I AM THE WRITER OF THE ATTACHED POLICE REPORT PERTAINING TO THIS INCIDENT NUMBER. THAT THE INFORMATION CONTAINED THEREIN WAS SECURED AS A RESULT OF (1) MY PERSONAL OBSERVATION AND KNOWLEDGE; OR (2) INFORMATION RELAYED TO ME BY OTHER MEMBERS OF MY POLICE DEPARTMENT OR OF ANOTHER POLICE DEPARTMENT; OR (3) INFORMATION SECURED BY MYSELF OR ANOTHER MEMBER OF A POLICE DEPARTMENT FROM THE PERSON OR PERSONS NAMED OR IDENTIFIED THEREIN, AS INDICATED IN THE ATTACHED REPORT. THAT THE REPORT IS AN ACCURATE STATEMENT OF THE INFORMATION SO RECEIVED BY ME.

| INVESTIGATOR SIGNATURE: | INVESTIGATOR I.D.#: 533 | REPORT DATE: 11/18/2013 | SUPERVISOR SIGNATURE: | SUPERVISOR I.D.#: 167 | APPROVAL DATE: 11/19/13 |
|---|---|---|---|---|---|

Detective Karoline Keith

A. 363

| State of Connecticut, Department of Public Safety-<br>Investigation Report (DPS-302-C) (Revised 12/07/04) | DPS INCIDENT NUMBER:<br>CFS-12-00704597 | Page 2b of 54 |
|---|---|---|

| REPORT TYPE:<br>☐ INITIAL ☐ ASSIST ☒ SUPP ☐ RE-OPEN ☐ CLOSING | ATTACHMENTS: ☐ STATEMENTS ☐ TELETYPE ☐ PHOTOS<br>☐ SKETCH MAP ☐ EVIDENCE ☒ OTHER |
|---|---|

> Right upper breast pocket of the vest were a total of three (3) magazines seized as Exhibit #45 (two (2) "Sig Sauer" magazines each containing twenty (20) live rounds of 9 mm ammunition and one (1) "Glock 10mm" magazine containing fifteen (15) live rounds of 10 mm ammunition). Each magazine was loaded to full capacity.

> Right lower vest pocket were two (2) black "PMAG 30" magazines each containing thirty (30) live rounds of 5.56 mm ammunition (head stamp S&B 5.56x45). These magazines were seized as Exhibit #46. Each magazine was loaded to full capacity.

> Left front trouser pocket of pants was a Sig Sauer P226 semi-automatic 9 mm pistol that was seized as Exhibit 20 (One Sig Sauer P226 9mm, S/N UU676027 handgun with an empty chamber and a magazine of eighteen (18) "Speer 9mm Luger" live rounds). This magazine was loaded to full capacity.

> Left cargo pocket of pants contained one (1) live round of 5.56mm ammunition (head stamp S&B 5.56x45) that was seized as Exhibit #40.

> Right cargo pocket of pants contained one (1) green colored "Winchester" 12 gauge shotgun shell that was seized as Exhibit #39.

> Left rear pants pocket contained two (2) "Glock 10 mm" magazines each containing fifteen (15) live rounds of 10 mm ammunition. These magazines were seized as Exhibit #43. Each magazine was loaded to full capacity.

> Right rear pants pocket contained two (2) "Glock 10 mm" magazines each containing fifteen (15) live rounds of 10 mm ammunition. These magazines were seized as Exhibit #44. Each magazine was loaded to full capacity.

<u>253 live rounds</u> of ammunitions on the shooter's person:

|   |   |
|---|---|
| 9 mm: | 116 rounds |
| 10mm: | 75 rounds |
| 5.56 mm: | 61 rounds |
| 12 ga: | 1 round |

Located on the floor underneath the shooter was one (1) black "PMAG 30" magazine containing thirty (30) live rounds of 5.56 mm ammunition (head stamp S&B 5.56x45). This magazine was seized as Exhibit #42. This magazine was loaded to full capacity.

| CASE STATUS:<br>X 1 ACTIVE ☐ 2 CLEARED BY ARREST ☐ 3 SUSPENDED ☐ 4 EXCEPTIONAL CLEARANCE ☐ 6 NO CRIMINAL ASPECT ☐ F FUGITIVE |
|---|

| TYPE OF EXCEPTIONAL CLEARANCE:<br>☐ A OFFENDER DECEASED ☐ B PROSECUTION DECLINED ☐ C EXTRADITION DENIED ☐ D DECEDENT UNCOOPERATIVE ☐ E JUVENILE-NO |
|---|

THE UNDERSIGNED, AN INVESTIGATOR HAVING BEEN DULY SWORN, DEPOSES AND SAYS THAT: I AM THE WRITER OF THE ATTACHED POLICE REPORT PERTAINING TO THIS INCIDENT NUMBER, THAT THE INFORMATION CONTAINED THEREIN WAS SECURED AS A RESULT OF (1) MY PERSONAL OBSERVATION AND INVESTIGATION; OR (2) INFORMATION RELAYED TO ME BY OTHER MEMBERS OF MY POLICE DEPARTMENT OR OF ANOTHER POLICE DEPARTMENT; OR (3) INFORMATION SECURED BY MYSELF OR ANOTHER MEMBER OF A POLICE DEPARTMENT FROM THE PERSON OR PERSONS NAMED OR IDENTIFIED THEREIN, AS INDICATED IN THE ATTACHED REPORT. THAT THE REPORT IS AN ACCURATE STATEMENT OF THE INFORMATION SO RECEIVED BY ME.

| INVESTIGATOR SIGNATURE:<br>Det. K. Keith | INVESTIGATOR I.D.#:<br>533 | REPORT DATE:<br>11/18/2013 | SUPERVISOR SIGNATURE: | SUPERVISOR I.D.#:<br>167 | APPROVAL DATE:<br>11/19/13 |
|---|---|---|---|---|---|

Detective Karoline Keith

A. 364

| State of Connecticut, Department of Public Safety-<br>Investigation Report (DPS-302-C) (Revised 12/07/04) | DPS INCIDENT NUMBER:<br>CFS-12-00704597 | Page 27 of 54 |
|---|---|---|

| REPORT TYPE:<br>☐ INITIAL ☐ ASSIST ☒ SUPP ☐ RE-OPEN ☐ CLOSING | ATTACHMENTS: ☐ STATEMENTS ☐ TELETYPE ☐ PHOTOS<br>☐ SKETCH MAP ☐ EVIDENCE ☒ OTHER |
|---|---|

Located on the floor east of the shooter was a "Glock" 10 mm semi-automatic pistol that was seized as Exhibit #19 (one "Glock" 10 mm, S/N SMA461). One round was partially loaded in the chamber, with a magazine of eight (8) rounds remaining. I observed this pistol to be lying on its left side pointed in a southwest direction. This pistol was measured to be approximately 2 feet 6 inches north of the hallway entrance door and approximately 2 feet 8 inches east of the suspect. This pistol appeared to be jammed with a partially open ejection port and one (1) live round of "10mm Auto" ammunition partially loaded into the chamber. This pistol contained one (1) "Glock 10mm" magazine that contained eight (8) live rounds of 10mm ammunition with the head stamp "10 mm Auto". (Magazines full capacity is 15). This pistol had numerous attached hairs to the front sight area of the pistol. These hairs were consistent in color with that of the shooter's hair. I observed one expended 10 mm casing located on the west side of the hallway entrance door in the area of the shooter. This expended casing was seized as part of Exhibit #37 (from the southwest quadrant of classroom #10). There were four (4) live rounds of 10 mm ammunition all with the head stamp "10mm AUTO" on the floor in the southeastern portion of the classroom which is also the area the shooter was located. These live rounds of 10mm ammunition were seized as Exhibits #22 thru #25. **[NOTE: Four live 10 mm rounds found under the body, nine live 10 mm rounds in the pistol, and two expended 10 mm casings located = 15 rounds total, making a full capacity magazine]**

A black colored "Flexfit" canvas "boonie-styled" hat was located on the floor northeast of the suspect. This hat was seized as Exhibit #21. This hat had blood-like stains, hairs and a hole consistent with a bullet hole in the forward portion of the top of the hat. This hole was consistent with having been worn by the shooter at the time the shooter received a bullet to the right rear lower portion of his head which exited out the top forward portion of his head and hat. There was a pair of small wire framed glasses on the floor north of Exhibit #19 (Glock 10 mm). These glasses had blood-like stains on them and appeared to be small and consistent with child size glasses. There was no deceased child in close proximity to the shooter's body.

**TRAJECTORY OF SUSPECTED SUICIDE SHOT**

There was a hole consistent with a bullet hole located in the ceiling tile located approximately 8 feet 1 inch from the south wall and 5 feet 2 inches from the east wall. This hole was documented in photographs as "SBH #1 room 10". This projectile struck but did not penetrate a corrugated metal ceiling that was

| CASE STATUS: ☒ 1 ACTIVE ☐ 2 CLEARED BY ARREST ☐ 3 SUSPENDED ☐ 4 EXCEPTIONAL CLEARANCE ☐ 6 NO CRIMINAL ASPECT ☐ F FUGITIVE |
|---|
| TYPE OF EXCEPTIONAL CLEARANCE: ☐ A OFFENDER DECEASED ☐ B PROSECUTION DECLINED ☐ C EXTRADITION DENIED ☐ D DECEDENT UNCOOPERATIVE ☐ E JUVENILE-NO |

THE UNDERSIGNED, AN INVESTIGATOR HAVING BEEN DULY SWORN, DEPOSES AND SAYS THAT: I AM THE WRITER OF THE ATTACHED POLICE REPORT PERTAINING TO THIS INCIDENT NUMBER. THAT THE INFORMATION CONTAINED THEREIN WAS SECURED AS A RESULT OF (1) MY PERSONAL OBSERVATION AND KNOWLEDGE; OR (2) INFORMATION RELAYED TO ME BY OTHER MEMBERS OF MY POLICE DEPARTMENT OR OF ANOTHER POLICE DEPARTMENT; OR (3) INFORMATION SECURED BY MYSELF OR ANOTHER MEMBER OF A POLICE DEPARTMENT FROM THE PERSON OR PERSONS NAMED OR IDENTIFIED THEREIN, AS INDICATED IN THE ATTACHED REPORT. THAT THE REPORT IS AN ACCURATE STATEMENT OF THE INFORMATION SO RECEIVED BY ME.

| INVESTIGATOR SIGNATURE:<br>Det K. Keith | INVESTIGATOR I.D.#:<br>533 | REPORT DATE:<br>11/18/2013 | SUPERVISOR SIGNATURE: | SUPERVISOR I.D.#:<br>167 | APPROVAL DATE:<br>11/19/13 |
|---|---|---|---|---|---|

Detective Karoline Keith

A. 365

| State of Connecticut, Department of Public Safety-Investigation Report (DPS-302-C) (Revised 12/07/04) | DPS INCIDENT NUMBER: CFS-12-00704597 | Page 29 of 54 |
|---|---|---|
| REPORT TYPE: ☐ INITIAL ☐ ASSIST ☒ SUPP ☐ RE-OPEN ☐ CLOSING | ATTACHMENTS: ☐ STATEMENTS ☐ TELETYPE ☐ PHOTOS ☐ SKETCH MAP ☐ EVIDENCE ☒ OTHER | |

elevated and behind the ceiling tile. This strike was documented in photographs as "Strike #1 A". The projectile ricocheted and was later located above the ceiling tile in classroom 8 and seized as Exhibit # 98 (a lead and copper projectile). In the ceiling there was only a knee wall separating the two rooms. Trajectory documentation was completed on this hole with a documented horizontal angle (right (east) to left (west) of 66 degrees) and a vertical angle of 40 degrees from the floor. At a height of 5 feet along the path of this trajectory the muzzle would be located at approximately 7 feet 7 inches from the east wall and 7 feet 9 inches from the south wall.

Trajectory documentation, locations of blood-like stains, tissue, hair, and the shooter's body are all consistent with the shooter standing and facing in an east direction at the time of receiving a suspected self-inflicted gunshot wound to the right side of his head.

**"BUSHMASTER" semi-automatic rifle [Exhibit #17]**

A Bushmaster caliber .223 rifle, model XM15-E2S with associated serial number L534858 was located on the floor of classroom #10 and was seized as Exhibit #17. This rifle was located west of the southern-most cluster of desks and east of the door on the west wall that provides access to classroom #12. This rifle was lying on its right side pointed in a northeast direction. This rifle had a shoulder strap that was attached in the front to the underside of the forearm in the area under the rear attachment for the front site. The rear portion of the sling attachment had become detached when a threaded nut failed and detached from the underside of the rear portion of the stock. The black threaded nut that was consistent with the sling attachment to the rifle was located on the floor in close proximity (approximately 2 feet northeast) of the rifle (Exhibit #17). This black thread nut was seized as Exhibit #33. It could not be determined whether the sling failed during use or when it was placed, thrown or dropped on the floor.

The rifle (Exhibit #17) was observed to be lying on the floor on its right side. The rifle safety indicator was on "FIRE". There was one (1) live round of 5.56 mm ammunition in the chamber and one (1) "PMAG 30" magazine in the magazine well, containing fourteen (14) live 5.56 mm rounds of ammunition. The charging handle was observed to be in the forward position with no obvious malfunctioning issues. The barrel of the rifle had a muzzle break.

| CASE STATUS: ☒ 1 ACTIVE ☐ 2 CLEARED BY ARREST ☐ 3 SUSPENDED ☐ 4 EXCEPTIONAL CLEARANCE ☐ 6 NO CRIMINAL ASPECT ☐ F FUGITIVE |
|---|
| TYPE OF EXCEPTIONAL CLEARANCE: ☐ A OFFENDER DECEASED ☐ B PROSECUTION DECLINED ☐ C EXTRADITION DENIED ☐ D DECEDENT UNCOOPERATIVE ☐ E JUVENILE-NO |

THE UNDERSIGNED, AN INVESTIGATOR HAVING BEEN DULY SWORN, DEPOSES AND SAYS THAT: I AM THE WRITER OF THE ATTACHED POLICE REPORT PERTAINING TO THIS INCIDENT NUMBER. THAT THE INFORMATION CONTAINED THEREIN WAS SECURED AS A RESULT OF (1) MY PERSONAL OBSERVATION AND KNOWLEDGE; OR (2) INFORMATION RELAYED TO ME BY OTHER MEMBERS OF MY POLICE DEPARTMENT OR OF ANOTHER POLICE DEPARTMENT; OR (3) INFORMATION SECURED BY MYSELF OR ANOTHER MEMBER OF A POLICE DEPARTMENT FROM THE PERSON OR PERSONS NAMED OR IDENTIFIED THEREIN, AS INDICATED IN THE ATTACHED REPORT. THAT THE REPORT IS AN ACCURATE STATEMENT OF THE INFORMATION SO RECEIVED BY ME.

| INVESTIGATOR SIGNATURE: Det K. Keith | INVESTIGATOR I.D.#: 533 | REPORT DATE: 11/18/2013 | SUPERVISOR SIGNATURE: Sgt. J/mry Coralla | SUPERVISOR I.D.#: 167 | APPROVAL DATE: 11/19/13 |
|---|---|---|---|---|---|

Detective Karoline Keith

| State of Connecticut, Department of Public Safety Investigation Report (DPS-302-C) (Revised 12/07/04) | DPS INCIDENT NUMBER: CFS-12-00704597 |
|---|---|
| **REPORT TYPE:** ☐ INITIAL ☐ ASSIST ☒ SUPP ☐ RE-OPEN ☐ CLOSING | **ATTACHMENTS:** ☐ STATEMENTS ☐ TELETYPE ☐ PHOTOS ☐ SKETCH MAP ☐ EVIDENCE ☒ OTHER |

The barrel appeared to have a chalky residue on all sides of the muzzle break to, and including, the front site. This weapon was made safe by assigned Evidence Detective Dan Sliby #810 with its configuration documented.

## CLASSROOM #10 (Continued)

On the floor within inches of the barrel of Exhibit #17 (Bushmaster Rifle), there were two (2) empty "PMAG 30" magazines duct taped together in a tactical configuration. These two (2) magazines were seized as Exhibit #18. There was one (1) live round of 5.56 mm ammunition located on the floor in close proximity to the west side of the barrel of Exhibit #17 (Bushmaster rifle). This round was seized as Exhibit #34.

### Search for casings and projectiles in classroom #10

Detective Sliby #810 measured equal distances on each wall of classroom #10 and cordoned off the room into four (4) quadrants. The southeast, southwest, northeast and northwest quadrants were established for purposes of collecting expended bullet casings and projectiles.

- **NE Quadrant:** Exhibit #36 (Fifteen (15) expended 5.56 mm casings and copper jackets and lead-like fragments)
- **NW Quadrant:** Exhibit #35 (one (1) expended 5.56 mm casing)
- **SE Quadrant:** Exhibit #38 (Twenty six (26) expended 5.56 mm casings)
- **SW Quadrant:** Exhibit #37 (Seven (7) expended 5.56 mm casings and one (1) expended 10 mm casing)

Six (6) lead projectiles were seized from the northwest quadrant and seized as Exhibits #26 and # 28 thru 32. One (1) lead projectile was seized as Exhibit #27 from the southwest quadrant near the door to classroom #12. One (1) lead and copper fragment with wood particles was seized as Exhibit #84 from the west wall approximately 8 inches from the floor and 1 foot 4 ½ inches from the south edge of the bookcase on the north wall. This projectile was in an area near the semi-circular table. There was a lead and copper like fragment that was seized as Exhibit #96 from the venetian blind on the north wall approximately 6 feet 8 inches from the floor and 4 ½ inches from the east wall. There was a copper jacketed projectile (seized as Exhibit #129) lodged in the top metal portion of the north corner of this bulletin board in an area above the teacher's desk. There was a lead and copper like fragment seized as Exhibit #85 from the top metal bulletin board frame on the east wall. This

**CASE STATUS:**
X: 1 ACTIVE ☐ 2 CLEARED BY ARREST ☐ 3 SUSPENDED ☐ 4 EXCEPTIONAL CLEARANCE ☐ 6 NO CRIMINAL ASPECT ☐ F FUGITIVE

**TYPE OF EXCEPTIONAL CLEARANCE:**
☐ A OFFENDER DECEASED ☐ B PROSECUTION DECLINED ☐ C EXTRADITION DENIED ☐ D DECEDENT UNCOOPERATIVE ☐ E JUVENILE-NO

THE UNDERSIGNED, AN INVESTIGATOR HAVING BEEN DULY SWORN, DEPOSES AND SAYS THAT: I AM THE WRITER OF THE ATTACHED POLICE REPORT PERTAINING TO THIS INCIDENT NUMBER. THAT THE INFORMATION CONTAINED THEREIN WAS SECURED AS A RESULT OF (1) MY PERSONAL OBSERVATION AND KNOWLEDGE; OR (2) INFORMATION RELAYED TO ME BY OTHER MEMBERS OF MY POLICE DEPARTMENT OR OF ANOTHER POLICE DEPARTMENT; OR (3) INFORMATION SECURED BY MYSELF OR ANOTHER MEMBER OF A POLICE DEPARTMENT FROM THE PERSON OR PERSONS NAMED OR IDENTIFIED THEREIN, AS INDICATED IN THE ATTACHED REPORT. THAT THE REPORT IS AN ACCURATE STATEMENT OF THE INFORMATION SO RECEIVED BY ME.

| INVESTIGATOR SIGNATURE: D-t K. Keith | INVESTIGATOR I.D.#: 533 | REPORT DATE: 11/18/2013 | SUPERVISOR SIGNATURE: | SUPERVISOR I.D.#: 167 | APPROVAL DATE: 11/19/13 |
|---|---|---|---|---|---|

Detective Karoline Keith

| Listed in FBI SHR | City | State | Date | Year | Handgun | Assault Weapon | Other | Unknown | HCM | AW or HCM | Killed | Injured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Washington | DC | 9/16/2013 | 2013 | 1 | | 1 | | N | | 12 | 5 |
| | Crab Orchard | TN | 9/11/2013 | 2013 | 1 | | | | U | | 4 | 0 |
| | Oklahoma City | OK | 8/14/2013 | 2013 | 1 | | | | U | | 4 | 0 |
| | Dallas | TX | 8/7/2013 | 2013 | 1 | | | | U | | 4 | 4 |
| | Clarksburg | WV | 7/26/2013 | 2013 | 1 | | | | U | | 4 | 0 |
| | Hialeah | FL | 6/26/2013 | 2013 | 1 | | | | U | | 6 | 0 |
| | Santa Monica | CA | 6/7/2013 | 2013 | 1 | 1 | 3 | | Y | Y | 5 | 4 |
| | Fernley | NV | 5/13/2013 | 2013 | 1 | | | | U | | 5 | 0 |
| | Waynesville | IN | 5/11/2013 | 2013 | | | 1 | | U | | 4 | 0 |
| | Ottawa | KS | 4/28/2013 | 2013 | | | | 1 | U | | 4 | 0 |
| | Manchester | IL | 4/24/2013 | 2013 | | | 3 | | U | | 5 | 1 |
| | Federal Way | WA | 4/21/2013 | 2013 | 1 | | 1 | | U | | 4 | 0 |
| | Akron | OH | 4/18/2013 | 2013 | | | | 1 | U | | 4 | 0 |
| | Herkimer | NY | 4/13/2013 | 2013 | | | 1 | | N | | 4 | 2 |
| | Albuquerque | NM | 1/19/2013 | 2013 | | 1 | 3 | | U | Y | 5 | 0 |
| | Tulsa | OK | 1/7/2013 | 2013 | 1 | | | | U | | 4 | 0 |
| | Newtown | CT | ######## | 2012 | 2 | 1 | 1 | | Y | Y | 27 | 2 |
| | Tule River Reservation | CA | 12/8/2012 | 2012 | 1 | | | 1 | U | | 4 | 2 |
| | Detroit | MI | 12/4/2012 | 2012 | | | | | U | | 4 | 0 |
| | Northridge | CA | 12/2/2012 | 2012 | | | | | U | | 4 | 0 |
| | New Town | ND | ######## | 2012 | | | 1 | | N | | 4 | 1 |
| | Minneapolis | MN | 9/27/2012 | 2012 | 1 | | | | U | | 6 | 2 |
| | Oak Creek | WI | 8/5/2012 | 2012 | 1 | | | | Y | Y | 6 | 3 |
| | Aurora | CO | 7/20/2012 | 2012 | 2 | 1 | 1 | | Y | Y | 12 | 58 |
| | Newton Falls | OH | 7/6/2012 | 2012 | | | | 1 | U | | 4 | 0 |
| | Tempe | AZ | 6/2/2012 | 2012 | 2 | | | | U | | 4 | 0 |
| | Seattle | WA | 5/20/2012 | 2012 | 1 | | | | U | | 5 | 0 |
| | Leivasy | WV | 5/19/2012 | 2012 | | | | 1 | U | | 4 | 0 |
| N | Port St. John | FL | 5/15/2012 | 2012 | | | | | N | | 4 | 0 |

| Mark | City | State | Date | Year | N1 | N2 | N3 | N4 | Status | Flag | Sum1 | Sum2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Gilbert | AZ | 5/2/2012 | 2012 | 2 |  | 1 |  | U |  | 4 | 0 |
|  | Oakland | CA | 4/2/2012 | 2012 | 1 |  |  |  | N |  | 7 | 0 |
|  | Norcross | GA | 2/20/2012 | 2012 | 1 |  |  |  | U |  | 4 | 0 |
| Y | Villa Park | IL | 1/17/2012 | 2012 | 1 |  |  |  | U |  | 4 | 0 |
| Y | Grapevine | TX | ######## | 2011 | 2 |  |  |  | U |  | 6 | 0 |
|  | Emington | IL | ######## | 2011 | 1 |  |  |  | U |  | 4 | 0 |
| Y | Gargatha | VA | ######## | 2011 |  |  |  | 1 | U |  | 4 | 0 |
| Y | Bay City | TX | ######## | 2011 | 1 |  |  |  | U |  | 4 | 1 |
|  | Greensboro | NC | ######## | 2011 | 1 |  |  |  | U |  | 5 | 1 |
| Y | Liberty | SC | ######## | 2011 | 1 |  |  |  | U |  | 4 | 0 |
| Y | Seal Beach | CA | ######## | 2011 | 3 |  |  |  | U |  | 8 | 1 |
| Y | Laurel | IN | 9/26/2011 | 2011 | 1 |  |  |  | U |  | 5 | 0 |
| Y | Monongalia County | WV | 9/6/2011 | 2011 | 1 |  | 2 |  | U |  | 5 | 1 |
| Y | Carson City | NV | 9/6/2011 | 2011 | 1 | 2 |  |  | U | Y | 4 | 0 |
| N | Marion County | FL | 8/5/2011 | 2011 | 1 | 2 |  |  | U |  | 4 | 0 |
| Y | Wheatland | WY | 7/30/2011 | 2011 | 2 |  |  |  | U |  | 4 | 1 |
|  | Wagener | SC | 7/3/2011 | 2011 |  |  | 1 |  | N |  | 4 | 0 |
| Y | Grand Prairie | TX | 6/23/2011 | 2011 | 1 |  |  |  | U |  | 5 | 0 |
| Y | Medford | NY | 6/9/2011 | 2011 | 1 |  |  |  | U |  | 4 | 0 |
|  | Yuma | AZ | 6/2/2011 | 2011 | 1 |  |  |  | U |  | 5 | 0 |
| Y | Ammon | ID | 5/11/2011 | 2011 | 1 |  |  |  | U |  | 4 | 0 |
| Y | Oak Harbor | OH | 4/16/2011 | 2011 |  |  | 2 |  | U |  | 4 | 0 |
| Y | Willowbrook | CA | 2/11/2011 | 2011 | 1 |  |  |  | U |  | 4 | 0 |
|  | Minot | ND | 1/28/2011 | 2011 | 1 |  |  |  | U |  | 4 | 0 |
| Y | Tucson | AZ | 1/8/2011 | 2011 | 1 |  |  |  | Y | Y | 6 | 14 |
| Y | Boston | MA | 9/28/2010 | 2010 | 1 | 1 |  |  | U | Y | 4 | 1 |
| N | Riviera Beach | FL | 9/27/2010 | 2010 | 1 |  |  |  | U |  | 5 | 1 |
| Y | Jackson | KY | 9/10/2010 | 2010 |  |  | 1 |  | N |  | 5 | 0 |
| Y | Chicago | IL | 9/2/2010 | 2010 | 1 |  | 1 | 1 | U |  | 4 | 0 |
| Y | Lake Havasu | AZ | 8/29/2010 | 2010 |  |  |  | 1 | U |  | 5 | 0 |
| Y | Buffalo | NY | 8/14/2010 | 2010 |  |  |  | 1 | U |  | 4 | 4 |
| Y | Lanham | MD | 8/6/2010 | 2010 |  |  |  | 1 | U |  | 4 | 0 |

| Flag | City | State | Date | Year | A | B | C | D | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Y | Manchester | CT | 8/3/2010 | 2010 | 2 | | | | U | | 8 | 2 |
| N | Hialeah | FL | 6/6/2010 | 2010 | 1 | | | | U | | 4 | 3 |
| | Chicago | IL | 4/14/2010 | 2010 | | | 1 | | N | | 5 | 1 |
| Y | Los Angeles | CA | 4/3/2010 | 2010 | 1 | | | | U | | 4 | 2 |
| Y | Washington | DC | 3/30/2010 | 2010 | 2 | 1 | | | U | Y | 4 | 5 |
| Y | New Orleans | LA | 3/26/2010 | 2010 | 1 | | | | U | | 4 | 0 |
| Y | Appomatox | VA | 1/19/2010 | 2010 | | | 1 | | U | | 8 | 0 |
| Y | Bellville | TX | 1/16/2010 | 2010 | 1 | | 1 | | U | | 5 | 0 |
| | Madison | WI | 12/3/2009 | 2009 | 2 | | | | U | | 4 | 0 |
| Y | Lakewood | WA | ######### | 2009 | 1 | | | | U | | 4 | 0 |
| Y | Osage | KS | ######### | 2009 | | 1 | | | U | Y | 4 | 0 |
| N | Jupiter | FL | ######### | 2009 | 2 | | | | U | | 4 | 2 |
| Y | Pearcy | AR | ######### | 2009 | 2 | | | | U | | 5 | 0 |
| | Oklahoma City | OK | 11/9/2009 | 2009 | 1 | | | | U | | 4 | 0 |
| N | Fort Hood | TX | 11/5/2009 | 2009 | 2 | | 1 | | U | | 13 | 30 |
| Y | Mount Airy | NC | 11/1/2009 | 2009 | | 1 | | | U | Y | 4 | 0 |
| Y | Lawrenceville | GA | 8/27/2009 | 2009 | | | | 1 | U | | 4 | 1 |
| Y | Kansas City | KS | 6/22/2009 | 2009 | | | | 1 | U | | 4 | 0 |
| Y | Middletown | MD | 4/19/2009 | 2009 | 1 | | | | U | | 4 | 0 |
| | Green Hill | AL | 4/7/2009 | 2009 | 1 | | | | U | | 4 | 0 |
| Y | Graham | WA | 4/4/2009 | 2009 | | | 1 | | U | | 5 | 0 |
| Y | Binghamton | NY | 4/3/2009 | 2009 | 2 | | | | Y | Y | 14 | 4 |
| Y | Carthage | NC | 3/29/2009 | 2009 | 1 | | 1 | | U | | 8 | 3 |
| Y | Santa Clara | CA | 3/29/2009 | 2009 | 2 | | | | U | | 5 | 2 |
| Y | East Oakland | CA | 3/21/2009 | 2009 | 1 | 1 | | | Y | Y | 4 | 1 |
| Y | Raytown | MO | 3/16/2009 | 2009 | | | | 1 | U | | 4 | 0 |
| N | Miami | FL | 3/15/2009 | 2009 | 1 | | | | U | | 4 | 0 |
| Y | Catawba | NC | 3/12/2009 | 2009 | | | | 1 | U | | 4 | 0 |
| | Geneva County | AL | 3/10/2009 | 2009 | 2 | | 1 | | U | | 10 | 0 |
| Y | Cleveland | OH | 3/5/2009 | 2009 | 1 | | | | U | | 5 | 0 |
| | Brockport | NY | 2/14/2009 | 2009 | 1 | | | | U | | 4 | 1 |
| Y | Wilmington | CA | 1/27/2009 | 2009 | | | | 1 | U | | 6 | 0 |

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Arie S. Friedman, M.D. and the Illinois State Rifle Association, | |
| Plaintiffs, | Case No. 13-cv-9073 |
| v. | Hon. John W. Darrah |
| City Of Highland Park, | |
| Defendant. | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS

Defendant, the City of Highland Park, responds to Plaintiffs Arie S. Friedman, M.D. and the Illinois State Rifle Association Rule 56.1 Statement of Material Facts follows:

1.     Arie S. Friedman, M.D. ("Friedman is an adult resident of Highland Park, Illinois. He is a law abiding citizen, who is lawfully entitled to own and possess firearms under all applicable Federal and State laws and regulations. (Verified Complaint, Doc. 1 -1, ¶ 1.)

**RESPONSE:  Highland Park admits that Dr. Friedman is an adult resident of Highland Park, Illinois.  Plaintiff has submitted no information, other than his Verified Complaint, regarding which weapons or firearms he owns, the purpose of those weapons or firearms, nor his lawful standing to own and possess such weapons or firearms.  Highland Park, therefore, lacks information to admit or deny the remainder of the paragraph.**

2.     Prior to the effective date of Highland Park City Code § 136.001 *et seq.* (the "Ordinance"), Friedman owned and possessed firearms and ammunition magazines in his home for lawful purposes, including the defense of his home and his family.  (Verified Complaint, Doc. 1 - 1, ¶¶ 1 and 4.)  In order to comply with the Ordinance, Friedman removed firearms from his home in Highland Park.  (*Id.*)

as an expert in firearms purchasing or marketing and is unqualified to offer evidence on these issues.

35.     The popularity and common ownership of AR-type rifles in the civilian marketplace is evident to persons who are involved in or regularly observe the community of persons who own and use firearms.  (Exhibit 3 at ¶ 5.)  AR-type rifles are regularly observed on firearms ranges in Illinois and are the most commonly used rifle over the past five to ten years. (*Id*.).  Based on their substantial presence at industry trade shows where products are displayed, the market for AR-type rifles appears to be a growing firearms market segment.  (*Id*.; Exhibit 7 at p. 58-59 & 64 – Deposition of James C. Yurgealitis (Highland Park expert witness).)

**RESPONSE:  Mr. Yurgealitis agreed at his deposition that "there was a substantially greater presentation of AR-type rifles from product manufacturers" at the NSSF SHOT show from 2003 to 2010.  He further stated "I think every time I went there there was another manufacturer stepping into that market."  (Plaintiffs' Ex. 7 at pp. 58-59.)  Mr. Yurgealitis also has stated that assault weapons constitute approximately 2 to 2.5 percent of the overall firearms market.  (Yurgeaitis Decl. at 35.)**

36.     In recent years there has been an increase in the popularity and availability of semiautomatic firearms patterned after those initially designed for military purposes.  (Exhibit 7 at pp. 63-64.)  Gun stores cannot get enough AR-type rifles and they sell very quickly.  (*Id*. at pp. 64-65.)  They are popular because of reliability and functionality.  (*Id*. at p. 65.)

**RESPONSE:  Highland Park admits that there has been a recent surge in popularity of these weapons and that for a variety of reasons they appear to be selling quickly.  "A great many of these weapons end up in Mexico" as part of illegal gun trafficking.  (Yurgealitis Decl. at 35.)**

37.     An effective home defense firearm is one that will reliably incapacitate a hostile person in a life threatening situation and stop him from continuing his actions.  (Exhibit 8 at ¶ 3 – Affidavit of Dr. Gary Roberts.)

**RESPONSE:  Mr. Jones, as a retired agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives, would be exempt under Sec. 136.006(B) of the Highland Park Assault Weapons Ordinance.  He further testified that he stores his weapons safely in a manner that would comport with the Ordinance.  *Id.*  As a former federal agent, Mr. Jones also has extensive training in these firearms.**

69.    The rifle features that Highland Park has banned – pistol grips; folding; telescoping and thumbhole stocks; barrel shrouds; protruding grips; muzzle breaks; and muzzle compensators – are each integral to the safe handling of an AR-type rifle.  (Exhibit 3 at ¶ 9.)

**RESPONSE:  These features may make the weapon safer to operate.  They may also make the weapon easier to conceal (Yurgealitis Decl, at 33).  They also allow the rifle to be fired more rapidly and therefore make the rifle more lethal.  *Id.* at 45-46.**

70.    The presence of one of the individual rifle features that Highland Park has banned – pistol grips; folding, telescoping and thumbhole stocks; barrel shrouds; protruding grips; muzzle breaks; and muzzle compensators – does not make a rifle more dangerous than a rifle without them.  (Exhibit 3 at ¶ 9; Exhibit 7 at pp. 120-121.)

**RESPONSE:  Mr. Jones testified that the combination of these features make them more dangerous.  Each of these features must be coupled with the capacity to accept a "Large Capacity Magazine" in order to fall within the Ordinance.  Plaintiffs' Ex. 1, Sec. 136.001(C)(1).**

71.    Telescoping stocks on AR-type rifles are fairly common.  (Exhibit 7 at p. 104.)

**RESPONSE:  Admitted.**

72.    Telescoping or adjustable stocks are present on AR-type rifles to enable the shooter to adjust the rifle's length to fit his or her physical stature.  (Exhibit 3 at ¶ 10.)

**RESPONSE: Admitted.**

86.     The presence of a barrel shroud on an AR-type rifle does not in and of itself make the rifle more dangerous; it allows for control by the operator. (Exhibit 7 at pp. 126-127.)

**RESPONSE: Because the purpose of a barrel shroud is to provide for grip space during rapid, repeat firing without getting burned by the hot barrel, (Yurgealitis Decl. at 33), its use in mass shootings makes it inherently more dangerous.**

87.     A "protruding grip" forward of the trigger guard is sometimes present on AR-type rifles to give the shooter a more secure grip on the firearm, particularly rifles with rail-mounted accessories that the make the barrel shroud more difficult to grasp firmly. (Exhibit 3 at ¶ 11 and Exhibit E thereto (Video Demonstration).)

**RESPONSE: Admitted.**

88.     The presence of a protruding grip on an AR-type rifle provides the shooter with better stability, which aids in accuracy, and better control during recoil and safety. (Exhibit 7 at pp. 99-100.)

**RESPONSE: Admitted.**

89.     A vertical protruding fore grip potentially increases safety by allowing more accurate fire from a firearm. (Exhibit 7 at pp. 102-103.)

**RESPONSE: A protruding foregrip may increase safety. It may also provide for more accurate and lethal fire in a mass shooting event.**

90.     Both "muzzle brakes" and "muzzle compensators" serve to re-channel the gases expelled from the muzzle of a firearm. (Exhibit 3 at ¶ 14.) A muzzle brake will reduce the amount of recoil felt by the operator. (*Id*.) A muzzle compensator will redirect muzzle gases and keep the muzzle down for better acquisition of a target in the event a second shot is taken. (*Id*.) Muzzle brakes and compensators are found on a wide variety of firearms. (*Id*.)

**RESPONSE: The ultimate purpose of a muzzle brake or muzzle compensator is to allow the operator to more rapidly fire accurate additional shots if required. (Yurgealitis**

29

95.     Semi-automatic "assault weapons" make up a very small percentage of firearms used in armed assaults and homicides in Illinois and nationwide.  (Exhibit 4 at p. 160.)

**RESPONSE:  Admitted.**

96.     AR-type rifles are rarely used by criminals committing firearms related crimes. (Exhibit 4 at p. 169.)

**RESPONSE:  "Statistically, rifles and shotguns, known collectively in the**

**vernacular as 'long guns,' are less likely to be used in homicides or be recovered by law**

**enforcement authorities in other crimes.  Yet when they are used the carnage that results is**

**stunning."  (Jones Decl. at 38)**

97.     A compilation of 38 studies on the use of "assault weapons" in crime indicated that less than 2% of crime guns are "assault weapons" of all types.  (Exhibit 10 at ¶ 38.)

**RESPONSE:  Plaintiffs' Exhibit 10 cites to a report by Christopher J. Koper**

**discussing 38 separate studies of gun violence.  Mr. Koper's report and each of those**

**studies speak for themselves.  Dr. Kleck's summary is incomplete and misleading.**

98.     Nine of the 38 studies addressed the use of "assault rifles" only (as opposed to "assault pistols" and "assault shotguns").   The nine studies revealed that "assault rifles" accounted for .038% of crime guns on average.  (Exhibit 10 at ¶ 38.)

**RESPONSE:  Plaintiffs' Exhibit 10 cites to a report by Christopher J. Koper**

**discussing 38 separate studies of gun violence.  Mr. Koper's report and each of those**

**studies speak for themselves.  Dr. Kleck's summary is incomplete and misleading.**

99.     Among "assault weapons" reported by the police to the ATF in 1992 and 1993, "assault pistols" outnumbered "assault rifles" by a ratio of 3 to 1.  (Exhibit 12 – Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1993 − 2003*, pp. 16 & 43.)

31

CHAPTER 136: ASSAULT WEAPONS

SECTION

136.001    Definitions
136.005    Possession and Sale Prohibited
136.006    Exemptions
136.010    Safe Storage or Display of Weapons and Magazines
136.015    Possession or Sale in Violation of Chapter
136.020    Disposition of Weapons and Magazines
136.025    Destruction of Weapons and Magazines
136.999    Penalty

Sec. 136.001  Definitions.

Whenever the following words and phrases are used, they shall, for purposes of this Chapter, have the meanings ascribed to them in this Section 136.001, except when the context otherwise indicates.

(A)    "Ammunition" means any self-contained cartridge, shot, bullet or projectile by whatever name known, which is designed to be used, or adaptable to use, in a Firearm and shot or discharged therefrom.

(B)    "Antique Firearm" means:

(1)    Any Firearm (including any Firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

(2)    Any replica of any Firearm described in Paragraph (1) of this definition, but only if such replica;

(a)    Is not designed or redesigned for using rimfire or conventional centerfire Ammunition; or

(b)    Uses rimfire or conventional centerfire fixed Ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels or commercial trade.

(C)    "Assault Weapon" means:

(1)    A semiautomatic rifle that has the capacity to accept a Large Capacity Magazine detachable or otherwise and one or more of the following:

(a)    Only a pistol grip without a stock attached;

(b)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

A. 376

(c)   A folding, telescoping or thumbhole stock;

(d)   A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

(e)   A Muzzle Brake or Muzzle Compensator;

(2)   A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of Ammunition;

(3)   A semiautomatic pistol that has the capacity to accept a Detachable Magazine and has one or more of the following:

(a)   Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(b)   A folding, telescoping or thumbhole stock;

(c)   A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

(d)   A Muzzle Brake or Muzzle Compensator; or

(e)   The capacity to accept a Detachable Magazine at some location outside of the pistol grip;

(4)   A semiautomatic shotgun that has one or more of the following:

(a)   Only a pistol grip without a stock attached;

(b)   Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(c)   A folding, telescoping or thumbhole stock;

(d)   A fixed magazine capacity in excess of five rounds; or

(e)   An ability to accept a Detachable Magazine;

(5)   Any shotgun with a revolving cylinder;

(6)   Conversion kit, part or combination of parts, from which an Assault Weapon can be assembled if those parts are in the possession or under the control of the same person;

(7)     Shall include, but not be limited to, the Assault Weapons models identified as follows:

     (a)     The following rifles or copies or duplicates thereof:

         (i)     AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR;

         (ii)     AR-10;

         (iii)     AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR;

         (iv)     AR70;

         (v)     Calico Liberty;

         (vi)     Dragunov SVD Sniper Rifle or Dragunov SVU;

         (vii)     Fabrique National FN/FAL, FN/LAR, or FNC;

         (viii)     Hi-Point Carbine;

         (ix)     HK-91, HK-93, HK-94, or HK-PSG-1;

         (x)     Kel-Tec Sub Rifle;

         (xi)     Saiga;

         (xii)     SAR-8, SAR-4800;

         (xiii)     SKS with Detachable Magazine;

         (xiv)     SLG 95;

         (xv)     SLR 95 or 96;

         (xvi)     Steyr AUG;

         (xvii)     Sturm, Ruger Mini-14;

         (xviii)     Tavor;

         (xix)     Thompson 1927, Thompson M1, or Thompson 1927 Commando; or

         (xx)     Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).

     (b)     The following pistols or copies or duplicates thereof:

A. 378

(i)      Calico M-110;

(ii)     MAC-10, MAC-11, or MPA3;

(iii)    Olympic Arms OA;

(iv)    TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or

(v)     Uzi.

(c)     The following shotguns or copies or duplicates thereof:

(i)      Armscor 30 BG;

(ii)     SPAS 12 or LAW 12;

(iii)    Striker 12; or

(iv)    Streetsweeper.

"Assault Weapon" does not include any Firearm that has been made permanently inoperable, or weapons designed for Olympic target shooting events.

(D) "Curios or Relics" has the meaning set forth in 27 C.F.R. § 478.11, as may be amended.

(E) "Detachable Magazine" means any Ammunition feeding device, the function of which is to deliver one or more Ammunition cartridges into the firing chamber, which can be removed from the Firearm without the use of any tool, including a bullet or Ammunition cartridge.

(F) "Firearm" means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas, excluding however:

(1)    Any pneumatic gun, spring gun or B-B gun which expels a single globular projectile not exceeding .18 inches in diameter;

(2)    Any device used exclusively for signaling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission;

(3)    Any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial Ammunition; and

(4)    Model rockets used to propel a model vehicle in a vertical direction.

(G) "Large Capacity Magazine" means any Ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

(1)    A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

(2)    A 22 caliber tube Ammunition feeding device.

(3)    A tubular magazine that is contained in a lever-action Firearm.

(H) "Muzzle Brake" means a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil.

(I) "Muzzle Compensator" means a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement.

Sec. 136.005  Possession and Sale Prohibited.

No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity Magazine, unless expressly exempted in Section 136.006 of this Chapter.

Sec.  136.006  Exemptions

The prohibitions set forth in Section 136.005 of this Chapter shall not apply to:

(A)     The sale or transfer to, or possession by any officer, agent, or employee of the City or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state; or peace officers, but only to the extent that any such person named in this Section 136.006(A) is otherwise authorized to acquire or possess an Assault Weapon and/or Large Capacity Magazine and does so while acting within the scope of his or her duties;

(B)     Any qualified retired law enforcement officer, as that term is defined in 18 U.S.C. § 926C(c), but only to the extent that the Assault Weapon and/or Large Capacity Magazine is safely stored or displayed by the officer in compliance with Section 136.010 of this Chapter;

(C)     Transportation of Assault Weapons or Large Capacity Magazine if such weapons are broken down and in a nonfunctioning state and are not immediately accessible to any person;

(D)     Antique Firearms, but only to the extent that the Antique Firearm is safely stored or displayed in compliance with Section 136.010 of this Chapter; or

(E)     Curios or Relics, but only to the extent that both: (a) the owner of the Curio or relic has obtained a federal license for collectors of Curios or Relics; and (b)

A. 380

the Curio or relic is safely stored or displayed in compliance with Section 136.010 of this Chapter.

Sec. 136.010  Safe Storage or Display of Weapons and Magazines.

Any Assault Weapon or Large Capacity Magazine that is exempt from the requirements of Section 136.005 of this Chapter, and that must be safely stored or displayed pursuant to Section 136.006 of this Chapter, must be secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon or magazine inoperable by any person other than the owner or other lawfully authorized user.  Specifically, and without limitation of the foregoing, any Assault Weapon or Large Capacity Magazine that may be kept within the City pursuant to this Chapter must be secured from access by minors.  For purposes of this Section 136.010, such weapon or magazine shall not be deemed stored or kept when being carried by or under the control of the owner or other lawfully authorized user.

Sec. 136.015  Possession or Sale in Violation of Chapter.

Any Assault Weapon or Large Capacity Magazine possessed, sold or transferred in violation of Section 136.005 of this Chapter is hereby declared to be contraband and shall be seized and destroyed of in accordance with the provisions of Section 136.025 of this Chapter.

Sec. 136.020  Disposition of Weapons and Magazines.

Any person who, prior to the effective date of this Chapter, was legally in possession of an Assault Weapon or Large Capacity Magazine prohibited by this Chapter shall have 60 days from the effective date of this Chapter to do any of the following without being subject to prosecution hereunder:

(A)     Remove the Assault Weapon or Large Capacity Magazine from within the limits of the City;

(B)     Modify the Assault Weapon or Large Capacity Magazine either to render it permanently inoperable or to permanently make it a device no longer defined as an Assault Weapon or Large Capacity Magazine;

(C)     Surrender the Assault Weapon or Large Capacity Magazine to the Chief of Police or his or her designee for disposal as provided in Section 136.025 of this Chapter; or

(D)     Take the steps necessary to cause the Assault Weapon or Large Capacity Magazine to fall within one of the exemptions set forth in Section 136.006 of this Chapter.

Sec. 136.025  Destruction of Weapons and Magazines.

The Chief of Police shall cause to be destroyed each Assault Weapon or Large Capacity Magazine surrendered or confiscated pursuant to this Chapter; provided, however, that no Assault Weapon or Large Capacity Magazine shall be destroyed until such time as the Chief of Police determines that the Assault Weapon or Large Capacity Magazine is not needed as evidence in any matter.  The Chief of Police shall cause to be kept a record of the date and method of destruction of each Assault Weapon or Large Capacity Magazine destroyed pursuant to this Chapter.

Sec. 136.999  Penalty.

The violation of any provision of this Chapter is a misdemeanor, punishable by not more than six months imprisonment or a fine of not less than $500 and not more than $1000, or both.

# **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system on the 3rd day of November, 2014.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system are the following:

> Christopher J. Murdoch
> Holland & Knight, LLP
> 131 South Dearborn Street
> 30th Floor
> Chicago, IL 60603
> (312) 263-3600
> Email: chris.murdoch@hklaw.com

Participants in the case who are not registered appellate CM/ECF users will be served by U.S. mail are the following:

> Christopher B. Wilson
> Perkins & Coie LLP
> 131 S. Dearborn Street
> Suite 1700
> Chicago, IL 60603
> (312) 324- 8400
> Email:  cwilson@perkinscoie.com

> Hart M. Passman
> Holland and Knight, LLP
> 131 South Dearborn
> 30th Floor
> Chicago, IL 60603
> (312) 578-6634
> Email: hart.passman@hklaw.com

> Steven M. Elrod
> Holland & Knight, LLP
> 131 South Dearborn Street
> 30th Floor

Chicago, IL 60603
(312) 263-3600
Email: steven.elrod@hklaw.com


/s/ *James B. Vogts*
**Attorney for Appellants**