No. 14-3091

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

ARIE FRIEDMAN, M.D. and THE ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs-Appellants

v.

CITY OF HIGHLAND PARK,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 1:13-cv-09073
The Honorable John W. Darrah, Presiding Judge

---

**RESPONSE BRIEF FOR DEFENDANT-APPELLEE
CITY OF HIGHLAND PARK**

---

Steven M. Elrod
Christopher James Murdoch
Hart M. Passman
HOLLAND & KNIGHT, LLP
131 South Dearborn Street, 30th Floor
Chicago, Illinois 60603
Telephone: (312) 263-3600
Telecopier: (312) 578-6666

Christopher B. Wilson
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, IL 60603
Telephone: (312) 324-8400
Telecopier: (312) 324-9400

Attorneys for Defendant-Appellee

CIRCUIT RULE 26.1    DISCLOSURE STATEMENT

Appellate Court No: __14-3091_____

Short Caption: __Arie Friedman, et al. v. City of Highland Park_____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[       ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

__City of Highland Park_____

_____

_____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

__Perkins Coie LLP_____

_____

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

__N/A_____

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

__N/A_____

Attorney's Signature: __s/Christopher B. Wilson_____    Date: __12/04/2014_____

Attorney's Printed Name: __Christopher B. Wilson_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).  Yes __X____   No _____

Address: __Perkins Coie LLP, 131 South Dearborn Street-Suite 1700_____

__Chicago, IL  60603_____

Phone Number: __312.324.8400_____    Fax Number: __312.324.9400_____

E-Mail Address: __cwilson@perkinscoie.com_____

rev. 01/08 AK

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __14-3091_____

Short Caption: __Arie Friedman, et al. v. City of Highland Park_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

    [   ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    City of Highland Park

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Holland & Knight, LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

    N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

    N/A

Attorney's Signature: __s/Christopher J. Murdoch_____    Date: __12/04/2014__

Attorney's Printed Name: __Christopher J. Murdoch_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes __X____    No _____

Address: __Holland & Knight, LLP 131 South Dearborn Street--30th Floor_____
         __Chicago, IL 60603_____

Phone Number: __312.263.3600_____    Fax Number: __312.578.6666_____

E-Mail Address: __chris.murdoch@hklaw.com_____

rev. 01/08 AK

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT .......................................................... 1

ISSUES PRESENTED FOR REVIEW .................................................... 1

STATEMENT OF THE CASE ................................................................... 1

    A.    PROCEDURAL HISTORY .......................................................... 1

    B.    FACTUAL BACKGROUND ....................................................... 3

        1.    The Assault Weapons Ordinance .................................. 4

        2.    The Concerns Expressed by the Highland Park City Council ........................................................................... 5

        3.    Key Facts About Highland Park ................................... 6

        4.    The Laurie Dann Incident ............................................ 7

        5.    Highland Park's Law Enforcement Experts Provide Information on Assault Weapons .................................. 8

            a. Assault Weapons Are Not Designed for Civilian Use .......... 8

            b. Prevalence of Assault Weapons .......................................... 11

            c. Use of Assault Weapons in Mass Shootings ........................ 12

            d. Assault Weapons are Not Effective for Self-Defense .......... 13

        6.    Plaintiffs Rely Upon Flawed Research to Bolster Their Argument ..................................................................... 14

        7.    Multiple States and Municipalities Have Adopted Similar Bans on Assault Weapons ............................... 15

SUMMARY OF ARGUMENT .................................................................. 15

ARGUMENT .............................................................................................. 19

    I.    Standard of Review on Appeal ............................................... 19

    II.    The District Court Properly Held That The City of Highland Park's Limited Restrictions on Highly Dangerous Weapons Did Not Violate Plaintiff's Constitutional Rights ...................................... 19

        A.    Highland Park's Ordinance does not burden rights Under the Second Amendment ............................................... 22

# TABLE OF CONTENTS
(continued)

Page

       1.   Assault Weapons are not the type of commonly used weapon described in Heller .................................... 23

       2.   Assault Weapons are Dangerous and Unusual .............. 24

       3.   Assault Weapons are, by their very nature, not effective for self-defense ..................................................... 25

III.   Even if this Court Were to Find that the Ordinance Implicates the Second Amendment, the Ordinance Would Still Survive Constitutional Review ........................................................... 26

    A.   Courts have regularly applied intermediate scrutiny to Second Amendment challenges ................................... 27

    B.   The Ordinance is closely related to Highland Park's strong interest in public safety ................................. 29

CONCLUSION ........................................................................ 31

CERTIFICATE OF COMPLIANCE ........................................ 33

CIRCUIT RULE 31(e)(1) CERTIFICATION ............................ 34

CERTIFICATE OF SERVICE ................................................ 35

# TABLE OF AUTHORITIES

CASES

*Colorado Outfitters Ass'n v. Hickenlooper*,
-- F.Supp.2d --, 2014 WL 3058518 (D. Col. June 26, 2014) ................................... 30

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......................................................................passim

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992) ...................................................................... 19

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ........................................... 20, 21, 26, 27

*Fyock v. City of Sunnyvale*,
-- F.Supp.2d --, 2014 WL 984162 (N.D. Cal. March 5, 2014) ............... 30

*Fyock v. City of Sunnyvale*,
-- F. Supp.2d --, 2014 WL 984162 (N.D. Cal. March 5, 2014) ............... 29

*Fyock v. City of Sunnyvale*,
--- F.Supp.2d ---, 2014 WL 984162 (N.D. Cal. March 5, 2014) ....................... 28, 29

*Gleason v. Mesirow Financial, Inc.*,
118 F.3d 1134 (7th Cir. 1997) .............................................. 19

*Heller v. District of Columbia ("Heller II")*,
670 F.3d 1244 (D.C. Cir. 2011) .......................................................passim

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
961 F. Supp. 2d 928 (N.D. Ill. 2014) ...................................... 19

*Indiana Harbor Belt R. Co. v. Am. Cyanamid Co.*,
916 F.2d 1174 (7th Cir. 1990) .............................................. 19

*Kachalsky v. County of Westchester*,
701 F.3d 81 (2d Cir. 2012), cert. denied 133 S. Ct. 1806 (2013) .................... 27, 29

*Kampfer v. Cuomo*,
-- F. Supp. 2d --, 2014 WL 49961 (N.D.N.Y. January 7, 2014) ............................ 30

*Kampfer v. Cuomo*,
-- F. Supp.2d --, 2014 WL 49961 (W.D.N.Y. 2014) ................................ 29

*McCoy v. Harrison,*
    341 F.3d 600 (7th Cir. 2003) ................................................................. 19

*McDonald v. City of Chicago,*
    -- U.S. --, 130 S.Ct. 2030 (2010) ....................................................passim

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ................................................................. 19

*NYS Rifle and Pistol Ass'n, Inc. v. Cuomo,*
    -- F.Supp.2d --, 2013 WL 6909955 (W.D.N.Y. December 31, 2013) ..................... 30

*People v. James,*
    174 Cal.App.4th 662 (3rd Dist. 2009) ................................................... 30

*People v. Zondorak,*
    220 Cal.App.4th 829 (4th Dist. 2013) ................................................... 30

*Shew v. Malloy,*
    994 F. Supp.2d. 234 (D.Conn. 2014) ........................................... 28, 30

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ................................................................. 20

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) ............................................................... 20

*United States v. Decastro,*
    628 F.3d 160 (2d Cir. 2012) ................................................................. 20

*United States v. Marzzarella,*
    614 F.3d 85 (3rd Cir. 2010) ................................................................. 20

*United States v. Miller,*
    307 U.S. 174 (1939) ............................................................................. 22

*United States v. Reese,*
    627 F.3d 792 (10th Cir. 2010) ............................................................... 20

*Wiesmueller v. Kosobucki,*
    547 F.3d 740 (7th Cir. 2008) ................................................................. 19

## STATUTES

28 U.S.C. §1291 ........................................................................................ 1

Cal. Penal Code §§ 12275-12290 (2013) ................................................... 15

City of Highland Park's Ordinance .......................................................passim

Sunnyvale Municipal Code § 9.44.030-60 ........................................... 15

San Francisco Police Code § 619 ....................................................... 15

Conn. Gen. Stat. § 53 202a et seq. ..................................................... 15

D.C. Code Ann. §§ 7-2551.01–7-2551.03 ........................................... 15

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 (2013) .......................... 15

Highland Park Ordinance .................................................................. 28

Mass. Gen. Laws ch. 140, §§ 121-123, 131, 131M (2013) .................... 15

Md. Code Ann., Crim. Law §§ 4 301 306 (2013) ................................ 15

N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 (2013) .............. 15

N.Y Penal Law §§ 265.02(7)-(8), 265.37 ........................................... 15

§§ 54-211–54-213 New York City Admin. Code § 10-301-303 .................................. 15

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 65(a)(2) ........................................... 2

Reg. Sess. (Colo. 2013) .................................................................... 15

Rule 56.1 ....................................................................................... 2

Second Amendment ....................................................................passim

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants' jurisdictional statement is complete and correct.  Appellee agrees that this Court has jurisdiction pursuant to 28 U.S.C. §1291.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the City of Highland Park's Ordinance banning a subclass of semi-automatic assault weapons and large capacity magazines creates an unconstitutional burden on Plaintiffs' rights under the Second Amendment?

2.     Whether the City of Highland Park's Ordinance banning assault weapons and large capacity magazines is closely related to the City's strong interest in protecting the safety and well-being of the public?

## STATEMENT OF THE CASE

### A.     PROCEDURAL HISTORY

On December 12, 2013, Arie S. Friedman, a medical doctor who resides in the City of Highland Park, together with the Illinois State Rifle Association, filed their Verified Complaint for Declaratory Judgment and Injunctive Relief in the Circuit Court of Lake County, Illinois.  (Record on Appeal ("R.") Docs. 1-2) The complaint alleged that the City of Highland Park's Ordinance violated Dr. Friedman and other Highland Park residents' constitutional rights under the Second Amendment.  The Plaitiffs also filed a Motion for Preliminary Injunction on December 20, 2013. *Id.*

On December 19, 2013, the City of Highland Park removed the action to the United States District Court for the Northern District of Illinois. *Id.* The Executive Committee assigned the case to Judge John W. Darrah on December 31, 2013. R. Doc.13 On January 7, 2014, the City of Highland Park then filed its Answer to

the Verified Complaint.  (R. Doc. 16)  The parties then briefed the Plaintiffs' Motion for Preliminary Injunction which the Court set for oral argument on February 27, 2014.  (R. Docs. 17, 22, 26, 28)

Following argument on the Motion for Preliminary Injunction, the Court consolidated the motion for preliminary injunction with trial pursuant to Federal Rule of Civil Procedure 65(a)(2).  (R. Doc. 34)  On March 26, 2014, the Court directed the parties to conduct expert discovery and to file Cross-Motions for Summary Judgment by June 30, 2014.  (R. Doc. 38).

On June 30, 2014, the parties filed cross-motions for summary judgment. (R. Docs. 40, 43).  On July 21, 2014, the parties filed responses in opposition to the motions for summary judgment. (R. Docs. 50, 53)  On the same day, Plaintiffs also filed a Motion to Strike 21 of the 74 material facts submitted by Highland Park. (R. Doc. 51) On August 7, 2014, Plaintiffs filed a Motion to Strike 83 of the 121 responses to Plaintiffs Rule 56.1 Statements of Material Fact.  (R. Doc. 61) On August 20, 2014, the District Court denied Plaintiffs' Motion to Strike any of Highland Park's responses to Plaintiffs' Rule 56.1 Statement. (R. Doc. 64)

On September 12, 2014, the District Court denied Plaintiffs' Motion for Preliminary Injunction as moot, the issues having been consolidated for trial (R. Doc. 65).  On September 18, 2014, the District Court entered an order granting Highland Park's Motion for Summary Judgment, denying Plaintiffs' Motion for Summary Judgment.  (R. Doc. 67) The District Court further ordered that, having

found the Ordinance constitutional in all respects, Highland Park Ordinance 68-13 should remain in full force and effect. *Id.*

In its Memorandum Opinion, at footnote 11, the District Court granted one aspect of Plaintiffs' July 21, 2014 Motion to Strike Certain Statements of Material Fact. The court granted Plaintiffs' motion as to two statements and therefore struck Defendants' Statements of Fact Nos. 58 and 61. Those statements provided:

> 58. The recent study by Mayors Against Illegal Guns (MAIG) shows that of the 93 examples [of mass shootings] occurring between January 2009 and September 2013 at least 14 semi-automatic or fully automatic assault weapons were recovered from the suspects in those incidents, 151% more casualties resulted and 63% more deaths occurred tha[n] in incidents involving other types of guns.

> 61. According to the Federal Bureau of Investigation, the frequency of active shooter events has doubled between 2009 and 2013, as compared to the period 2000 to 2008.

The court held that these Statement of Facts were inadmissible as hearsay. (R. Doc. 68) The court did not grant any other portion of Plaintiffs' Motion to Strike.

On September 23, 2014, Plaintiffs filed their notice of appeal. (R. Doc. 69).

## B.    FACTUAL BACKGROUND

On June 24, 2013, following a series of tragic mass shooting incidents across the nation, the City Council of Highland Park adopted Ordinance No. 68-13 prohibiting the manufacture, sale and possession of assault weapons and large capacity magazines within the City. In adopting the Ordinance, the City Council stated that it had "determined that assault weapons are not traditionally used for self-defense in the City of Highland Park." (Appellee's Appendix ("A") 4) The City Council

further stated that these weapons "pose an undue threat to public safety to residents, property owners, and visitors within the City of Highland Park." (A.4)

The City Council further recognized that recent incidents of gun violence in Aurora, Colorado, Newtown, Connecticut, Tucson, Arizona and Santa Monica, California "demonstrate that gun violence is not limited to urban settings, but is also, tragically, a reality in many suburban and small town locations  as well." *Id.*

### 1.    <u>The Assault Weapons Ordinance</u>

The City of Highland Park's Ordinance defines an "Assault Weapon" as a semi-automatic rifle, pistol, or shotgun with the capacity to accept more than ten rounds of ammunition and at least one of five described features:

1.    A pistol grip without a shoulder stock;

2.    A protruding grip for the non-trigger hand;

3.    a folding, telescoping or thumbhole stock;

4.    a barrel shroud; or

5.    a muzzle break of compensator.

(A. 5) The Ordinance then lists a series of models of rifles, pistols and shotguns which exhibit these features.  These include, but are not limited to, the Bushmaster XM15 rifle, the MAC-10 and MAC-11 pistols, and the Streetsweeper shotgun.  (A. 6-7)

The Ordinance defines a "Large Capacity Magazine" as "any ammunition feeding device with the capacity to accept more than ten rounds." (A. 7)

2.     **The Concerns Expressed by the Highland Park City Council**

The City Council's prohibition on assault weapons and large capacity magazines was motived by both national and local events.  Nationally, the City Council recognized the role these weapons had played in the highly publicized, recent mass shooting events.  These included the following.  On July 20, 2012, a shooter using a Smith & Wesson M & P 15 semi-automatic weapon with a 100-round drum magazine killed 12 people and injured 58 others at a movie theater in Aurora, Colorado.  Appellate Appendix ("AX 230.") On December 4, 2012, 28 people were killed including 20 school children between the ages of 6 and 7, when a gunman using a Bushmaster XM 15- EM 25 semi-automatic rifle shot his way into the school.  The attack lasted less than ten minutes.  During that time, the gunman fired at least 130 times. (A.44 ¶12) On January 8, 2011, at a supermarket parking lot in Casas Adobes, Arizon, a single shooter, attempting to assassinate United States Representative Gabrielle Giffords, killed six people and injured 14 others including Congresswoman Giffords.  (AX. 223-24) The gunman used a Glock Model 19 9mm semi-automatic pistol with a magazine holding more than 30 rounds of ammunition.  *Id.*  Finally, on June 7, 2013, an attacker armed with an AR-15 type semi-automatic rifle killed six people at Santa Monica College in Santa Monica, California.  (AX. 232)

Since 2007, there have been at least 15 incidents in which offenders using assault-type weapons or other semi-automatics with large capacity magazines have wounded or killed eight or more people. (AX. 212-33)

### 3.   **Key Facts About Highland Park**

Highland Park is a vibrant, suburban community with four community centers, three nursing homes, numerous shopping centers, and the Ravinia Festival, an outdoor music venue attracting thousands of visitors throughout the summer.

According to the 2010 Census, there are 29,763 residents of the City.  (A. 9, ¶4) 25.9% of City residents are under age 18, and 5.3% of City residents are under age five. *Id.*  The City currently employs 57 sworn police officers, which equates to a ratio of 1.92 sworn officers per 1,000 residents.  (A. 9, ¶5).

According to City Police Department ("Department") records, the City has issued 2,930 alarm user permits for burglar alarms at private properties in the City. (A. 10, ¶6)The Department does not track how many properties have implemented gates, guards, or other security features.  (*Id.*)  Despite the high number of alarm permits, Highland Park has an extremely low crime rate and a very low incidence of violent crime.  In the six-year period from 2008 to 2013, there were 293 residential and commercial burglaries in the City that were reported to the Department. (A. 10, ¶8).  Since 2008, there have been two reported home invasions during which the residents of the home were present. In one of those invasions, there were multiple intruders.  (A. 10, ¶9).  Since 2008, there have been 16 arrests for crimes in the City involving firearms and/or ammunition.  ( A. 10, ¶10).

Notably, there has not been a homicide in the Highland Park since June 2003. (A. 10, ¶11) However, there were four homicides in the City between October 1996 and June 2003.  (*Id.*).  In 2013, the average Police Department response time

for high-priority 911 calls, which include alleged shootings and incidents involving firearms, was four minutes and 20 seconds.  (A. 12, ¶21).

There are 15 schools located within the City, including the Highland Park High School and numerous elementary schools.  (A. 10, ¶13).  In addition to the schools, community centers, and nursing homes located throughout the City, there are multiple places in which large numbers of people frequently congregate.  Among the more notable of these places are: the Ravinia Festival; the Port Clinton retail and office development in downtown Highland Park; the Renaissance Place retail and residential development in downtown Highland Park; the Crossroads Shopping Center along Skokie Valley Road; the Courtyard Marriott hotel along Lake Cook Road; and four commuter rail stations.  ( A. 11, ¶15).

### 4.    **The Laurie Dann Incident**

Despite its peaceful history, Highland Park has had at least one extremely troubling experience with gun violence.  During the morning of May 20, 1988, Laurie Dann entered the Ravinia Elementary School in the City, and attempted to detonate a bomb in the school's hallway. Nobody was injured by Dann at the Ravinia School. However, later that day, Dann would shoot six students at an elementary school in the adjacent Village of Winnetka, killing one eight-year-old boy.  (A. 10, ¶12)  As Mayor Rotering noted, given this history, the tragic incident in Newtown, Connecticut was particularly painful reminder of the dangers of gun violence at schools for the members of the Highland Park City Council. (A. 2, ¶9)

### 5.   Highland Park's Law Enforcement Experts Provide Information on Assault Weapons

In addition to providing testimony by Highland Park's Chief of Police, Paul Shafer, the City of Highland Park also provided the Court with extensive statements by two career officers of the United States Bureau of Alcohol Tobacco and Firearms ("BATF").  James Yurgealitis spent 26 years as a Federal Law Enforcement Officer. At the BATF, he was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Ammendale, Maryland.  (A. 14 para. 1).  Mark Jones worked for the BATF for more than 20 years from September 1991 until November 2011.  Mr. Jones served in many capacities with the BATF and retired as the U.S. Department of Justice's Regional Firearms Advisor to the governments of Central America.  A. 38, para. 3.  Mr. Jones is currently employed as a Law Enforcement Advisor for the University of Chicago Crime Lab.  Mr. Yurgealitis and Mr. Jones provided extensive background on design history of assault weapons, their prevalence among firearms users, the use of assault weapons in mass shootings, and the effectiveness of assault weapons for self-defense.  Notably, not one of the witnesses relied upon Plaintiffs had a background in law enforcement.

### a.   Assault Weapons Are Not Designed for Civilian Use

Assault weapons are not designed for self-defense, but are instead designed for combat situations which include rapid fire, the possibility of multiple targets, and a need for increased magazine capacity to engage multiple targets. These

factors are not typically present when a firearm is required for defense of a home. (A. 11, ¶16)

Semi-automatic rifles, such as those based on the so-called AR-15 platform are military weapons adapted for civilian use.  The primary military design characteristic of assault weapons makes them ill-suited for home defense settings. (A. 57, ¶46)  Mr. Jones notes specifically "typical self defense distances involved in scenarios envisioned by firearms industry pundits average twenty feet." *Id.* Mr. Jones also notes that assault weapons are far more likely to be used by criminals than conventional firearms.  Assault weapons are also used in a disproportionately high number of shootings of law enforcement officers.  For example, in 1994, although assault weapons represented between 1 and 8 % of guns used in crime, these weapons accounted for 16 % of gun murders of police officers. (A. 45, ¶14)

Assault weapons are also not particularly  appropriate for hunting.  Hunting strategy requires a weapon to accurately kill an animal humanely, preferably with one shot.  Accordingly, the magazine capacity is generally much smaller.  Large magazines and rapid-fire capability of assault weapons exceed these hunting requirements.  (A. 11, ¶17)

The Highland Park Chief of Police determined that residents did not need assault weapons to adequately protect themselves, their families, or their properties. If required, there were numerous other types of firearms available and legal for possession by City residents that would serve the intended self-defense purposes. (A. 12, ¶19)

The City Council also determined that the presence of assault weapons in the City would increase the risk to residents and visitors. Every firearm, when used aggressively against a person, presents a risk of great bodily harm or death.  (*Id.*) Assault weapons typically have many features that are specifically designed to allow the user to shoot multiple targets in a shorter time period than conventional firearms that are designed for self-defense.   (*Id.*) The presence of assault weapons in the City would increase the probability that shooting incidents could involve multiple victims.  (A. 12, ¶20)

Assault weapons, rifles or pistols, fully or semi-automatic, are designed to be used in an offensive role.  (A. 56, ¶44)  While there are many firearms available that are suitable for both sporting and defensive purposes, the semiautomatic assault weapon is typically a "civilianized" version of a firearm originally manufactured for military use.  (A. 53, ¶36)

Numerous assault weapons available for purchase by the public are, save the lack of select fire capability, identical copies of military firearms. As such they retain a number of features originally designed to maximize their effectiveness in battle.  (A. 28-29, ¶32)  Other firearms available to the public, which were not initially intended for sale to government or military customers, incorporate features which mimic those found on military firearms.   (A. 28, ¶32)

When comparing the rate of fire (cyclic rate) of a Federally regulated, fully automatic machine gun and an semi-automatic AR15-type rifle, the difference is minimal.  (A. 46, ¶16)

-10-

The principal difference between an AR15 semi-automatic rifle and its military sibling, the M4/M16, is the latter's selective fire capability, that is the ability to use the weapon as a fully automatic machine gun (wherein a single trigger pull can empty the magazine) and for semi-automatic fire (wherein each trigger pull results in only one cartridge being fired).  (A. 53-54, ¶37)  Ultimately, the purpose of military assault rifles and submachine guns (the analog for a civilian assault pistol) is offensive - to facilitate the assault and capture of a military objective.  (A. 54-55, ¶39)

### b.    Prevalence of Assault Weapons

As the District Court recognized, it is difficult to determine how many assault weapons Americans currently own, in large part because most firearm manufacturers refuse to release data tracking their sales.  The declarations filed in support of the plaintiffs' complaint in this matter focus on the number of semi-automatic rifles manufactured in the United States, but studies have indicated that a great many of these end up in Mexico.  (A. 33-34, ¶35)

The NRA's lobbying arm estimates that, depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S. (A. 34, ¶36).  According to a 2004 national firearms survey conducted by Hepburn, Miller, Azreal and Hemmenway, there are approximately 218 million privately owned firearms in the U.S.  Based on the NRA's statistics, therefore, there are approximately 4,905,000 assault weapons in the U.S. While this number is not

insignificant, in my opinion it does not support the claim that assault weapons are 'in common use'. (A. 34, ¶36)

### c.     Use of Assault Weapons in Mass Shootings

While there are certainly a number of questions about the prevalence of assault weapons in the general public, there is no question that when assault weapons are used in mass shooting incidents those events are far more horrible than when the shooter is limited to conventional firearms. Mass shootings incidents occur far too frequently in the United States, This type of incident resulted in at least 519 deaths and scores of injuries between 2009 and 2013. (A. 53-54, ¶37)

The terrible events at the Sandy Hook Elementary School in Newtown, Connecticut provide a painful example. There, on December 4, 2012, Adam Lanza used an assault weapon legally purchased by his mother to shoot his way into a locked elementary school building in 2012. In ten minutes, he killed 26 people and wounded two others. He discharged his weapon at least 130 times in less than eight minutes. Newtown Police responding to the first 911 call were on the scene in less than four minutes. (A. 44, ¶12)

Statistically, rifles and shotguns, known collectively in the vernacular as "long guns", are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes. Yet when they are used the carnage that results is stunning. The mass shooting in Newtown, Connecticut resulted in 29 casualties in Newtown, Connecticut; the mass shooting in Aurora, Colorado killed or injured 70. Both events lasted only a matter of minutes. (A. 54, ¶38)

-12-

### d.    <u>Assault Weapons are Not Effective for Self-Defense</u>

Experts for Highland Park established that the assault weapons banned under the Ordinance are not particularly effective for self-defense, but are instead designed for offensive capability.  As Mark Jones, a twenty-year veteran of the Bureau of Alcohol Tobacco and Firearms noted:  "To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous."  (A. 57, ¶46)  Because a responsible firearm owner will invariably keep his or her weapons under lock and key, most in a secure gun safe designed and sold for that purpose, it is difficult as a threshold matter to use an assault weapon in typical home defense situation. *Id.*

It is well known to law enforcement authorities that firearms present an attractive target for burglars, and a gun owner who secretes his or her unsecured firearm somewhere in the home is virtually delivering the weapon to the underground gun market and criminal misuse.  (A. 58, ¶47)

Long guns are also not optimal for home defense because they are challenging to manipulate in the close confines found in homes; the overall length of many rifles, even those with folding or collapsible shoulder stocks, renders them unwieldy and hard to maneuver.

Rifles are far more powerful than necessary or desirable for most home defense uses - the velocity of widely available standard military surplus ammunition for AR15 rifles is more than 3000 feet per second and the projectile contains a

steel penetrator that greatly increases the possibility of innocents being injured or killed by missed shots or ricochets.  (A. 58, ¶48)

In police involved shootings the number of shots fired is statistically very low - less than four rounds expended so the ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time and a semi-automatic pistol with a 10 round capacity magazine even more so.  (A. 55, ¶40)

Assault weapons "are designed to be used in an offensive role.  Law enforce-ment agencies deploy these firearms in an auxiliary function, generally subordinate to the primary duty weapon which is for the majority of police officers a handgun." (A. 56, ¶44)For this reason, assault weapons, when used by police officers are "typi-cally kept locked in patrol cars against the need for something more powerful than a revolver."  (*Id.*)

### 6.  **Plaintiffs Rely Upon Flawed Research to Bolster Their Argu-ment**

To bolster their contention that assault weapons are commonly used fire-arms, Plaintiffs rely on a series of flawed survey reports by the National Shooting Sports Foundation ("NSSF"). The conclusions reached, however, in the NSSF's MSR Comprehensive Consumer Report 2013, 2013 Firearms Retailer Survey Report, and Sports Shooting Participation in the United States in 2012 Report are based on a flawed research methodology and are therefore unreliable.  (A. 65, ¶12)

The NSSF failed to use methods which would allow them to extrapolate to a larger population.  Instead, the survey was designed to elicit responses only for the most engaged participants.  This, in turn, overstated the results. (A. 65, ¶13)  The

surveys also lacked proper controls and were conducted without adequate training.

(A. 66-67, ¶16)

### 7. <u>Multiple States and Municipalities Have Adopted Similar Bans on Assault Weapons</u>

Upon enacting its ban on assault weapons and large capacity magazines, Highland Park joined a multitude of states and municipalities which have enacted similar bans. These include the states of California, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, New York, and the District of Columbia. Municipalities adopting bans on assault weapons and large capacity magazines include New York City, San Francisco, Cook County, and Sunnyvale, California, among many others.[1] In all, more than a quarter of the United States population lives in areas which have adopted bans on these weapons.

### <u>SUMMARY OF ARGUMENT</u>

The District Court properly concluded that the City of Highland Park's Ordinance banning assault weapons and large capacity magazines did not violate Plaintiffs' rights under the Second Amendment. In *District of Columbia v. Heller,* 554 U.S. 570 (2008), the United States Supreme Court recognized that the Second Amendment provided an individual right to possess a handgun for self-defense of the home. The Court also recognized, however, that this right was not unlimited,

---

[1] *See* Cal. Penal Code §§ 12275-12290 (2013); 69th Gen. Assemb., Reg. Sess. (Colo. 2013); Conn. Gen. Stat. § 53 202a et seq.; H.B. 13-1224,Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 (2013); Md. Code Ann., Crim. Law §§ 4 301 306 (2013); Mass. Gen. Laws ch. 140, §§ 121-123, 131, 131M (2013); N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 (2013); N.Y Penal Law §§ 265.02(7)-(8), 265.37; D.C. Code Ann. §§ 7-2551.01–7-2551.03; Cook Cnty. Code of Ordinances §§ 54-211–54-213 New York City Admin. Code § 10-301-303; San Francisco Police Code § 619; Sunnyvale Municipal Code § 9.44.030-60.

and that there was still broad ground for permissible regulation of firearms and their use.  In *McDonald v. City of Chicago,* -- U.S. --, 130 S.Ct. 2030 (2010), the Supreme Court extended these Second Amendment rights to the States.  In doing so, however, the Supreme Court emphasized that the Second Amendment "does not imperil every law regulating firearms" and that "[s]tate and local experimentation with reasonable firearm regulations will continue under the Second Amendment." *Id.* at 3046-47.

In the wake of *Heller* and *McDonald*, this Court, and every court to have considered a statute or ordinance involving firearms regulation, has applied a two-pronged inquiry to determine whether a given regulation has placed an unconstitutional burden on individual rights under the Second Amendment.  First, the Court must determine whether the restrictions at issue implicate constitutionally permissible rights in the first instance.  If, for example, the weapons at issue are not "commonly used" or are "dangerous and unusual," no constitutional rights are implicated and the inquiry must end in favor of the regulation at issue.  If, however, the regulation does impose a burden on the rights established by *Heller* and *McDonald* -- the right to possess a commonly owned firearm for self-defense in the home -- then a second inquiry is required.  The Court must then determine whether there is a close fit between the government's asserted interest and the proposed regulation which has implicated the Second Amendment right.  If the government can establish a close fit, then the regulation survives constitutional scrutiny, even if it imposes a burden on the constitutional rights of the individual.

Here, the City of Highland Park's Ordinance banning assault weapons and large capacity magazines meets both prongs of this inquiry. First, assault weapons, other than being a form of firearm, do not meet any of the attributes of handguns which the Supreme Court found compelling in *Heller*. Assault weapons are adapted from military applications and therefore are offensive in nature. They are designed to kill human beings as quickly and efficiently as possible. All too often -- whether in Newtown, Connecticut or Aurora, Colorado -- they are part of a grisly crime scene taking the lives of dozens of innocent victims. There is no need for a "muzzle break" or a "barrel shroud" on a handgun used to defend the home. The assault weapons at issue in the Highland Park Ordinance differ from military firearms only in that they are semi-automatic rather than fully automatic. These weapons can fire as rapidly as the shooter can pull the trigger. As the District Court found, with modest alterations, these weapons can even be made to be fully automatic.

In *Heller*, the Supreme Court found that the handgun was "the quintessential weapon" for defense of home and hearth. By contrast, assault weapons, even if they have become more popular recently, are dangerous and unusual weapons which are neither designed for, nor properly used for, self-defense. Accordingly, Highland Park's ban on these weapons does not implicate the Second Amendment rights established by *Heller* and *McDonald*.

Even if the Court were to determine that the Second Amendment was implicated by Highland Park's ban on assault weapons and large capacity magazines, Plaintiffs could not satisfy the second prong of the analysis. Under even a height-

ened level of scrutiny, the Highland Park ban is closely-related to the City's strong interest in public safety. At most Highland Park's Ordinance limits a tiny percentage of the firearms available to its citizens for defense of their homes. The guns at issue -- semi-automatic weapons with military style attributes -- were designed for use in combat not self-defense. As such, they are too large, dangerous and unwieldy for typical home defense. Balanced against this, the use of these weapons in civilian populations can have devastating impacts. In a movie theater in Aurora, Colorado and the Sandy Hook elementary school in Newton, Connecticut, shooters armed with these weapons killed and injured nearly 100 people in a matter of minutes. Highland Park, and every state and municipality to have adopted a ban on these terrible weapons, has a compelling interest in limiting the availability of these firearms within their borders.

For this reason, every court to have considered a ban on assault weapons or large capacity magazines, whether it is the D.C. Circuit, or district courts in Colorado, Maryland, Connecticut, New York or California, has determined that these bans are constitutional. Bans such as the one imposed by Highland Park on assault weapons and large capacity magazines are a close fit with the strong interest in public safety and do not unnecessarily burden the rights of individual gunowners. Accordingly, the District Court correctly determined, as has every court to consider the issue, that a ban on assault weapons does not violate the Second Amendment.

## ARGUMENT

### I.   Standard of Review on Appeal

Generally, on appeal, "[a] grant of summary judgment is reviewed de novo." *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 465 n.10 (1992)).  In so doing, the court is to consider all of the available pleadings, depositions, transcripts, exhibits, and affidavits in the light most favorable to the non-moving party.  *Id.*  However, the appellate court is "not required to draw every conceivable inference from the record."  *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997). Additionally, there is a distinction between "legislative facts," which bear on the justification for legislation, and "adjudicative facts," which are those that are to be determined at a trial.  *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012); *Indiana Harbor Belt R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990); *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 932 (N.D. Ill. 2014).  "Legislative facts" are background facts, or facts "that lie outside the domain of rules of evidence yet are often essential to the decision of a case . . . ." and, on summary judgment, "can . . . be set forth in the statement of facts."  *Wiesmueller v. Kosobucki*, 547 F.3d 740, 741-42 (7th Cir. 2008).  Accordingly, on appeal, the court may take notice of the legislative facts as found by the District Court.

### II.   The District Court Properly Held That The City of Highland Park's Limited Restrictions on Highly Dangerous Weapons Did Not Violate Plaintiff's Constitutional Rights.

The Second Amendment to the United States Constitution provides:

A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held, for the first time, that the Second Amendment included "an individual right to possess and carry weapons" for the purpose of self-defense. *Id*. at 599, 628. The Court also recognized, however, that this right was not unlimited, and that there was still broad ground for permissible regulation of firearms and their use. As the Court explained: "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." *Id*. at 626. The Court reaffirmed this assurance in *McDonald* and emphasized that the Second Amendment "does not imperil every law regulating firearms" and that "[s]tate and local experimentation with reasonable firearm regulations will continue under the Second Amendment." *McDonald*, 130 S.Ct. at 3046-47. In the wake of *Heller*, the Seventh Circuit, along with most Courts of Appeals to consider the issue, has adopted a two-pronged inquiry to evaluate a claim under the Second Amendment. *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). *See also United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010); *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011); *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Decastro*, 628 F.3d 160 (2d Cir. 2012).

Under this two-pronged approach, the Court must first determine whether the regulation affects activity protected by the Second Amendment. *Ezell*, 651 F.3d at 701. If the challenged law does not burden a right or conduct protected by the Second Amendment, then the inquiry is over and the regulation is constitutional. *Id*. at 703.

If the Court determines that challenged law burdens conduct protected by the Second Amendment, the Court must then consider whether "the strength of the government's justification for restricting the exercise of Second Amendment rights" merits the burden imposed. As the Seventh Circuit explained in *Ezell* "the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." 651 F.3d at 703.

Notably, *Heller* does not guarantee an individual right to possess whatever firearm a citizen subjectively perceives to be necessary or useful. Instead, the Supreme Court expressly stated that the rights embodied by the Second Amendment have not historically been understood to be "a right to keep and carry any weapon whatsoever." 544 U.S. at 626. Read in this light, Plaintiffs' constitutional claims must fail as a matter of law. As set forth below, the Ordinance does not burden any rights under the Second Amendment but instead merely regulates a small subclass of weapons that have been demonstrated, over and over again, to be unreasonably dangerous.

### A.     Highland Park's Ordinance Does Not Burden Rights Under the Second Amendment.

The Supreme Court has identified three factors to consider in determining whether a law implicates Second Amendment rights.  First, the Second Amendment only applies to those firearms which are commonly used for lawful purposes.  *Heller*, 544 U.S. at 624-25 ("the Second Amendment's operative clause furthers the purpose announced in its preface" by guaranteeing access to the type of arms "in common use at the time for lawful purposes like self-defense"); at 627 ("the sorts of weapons protected were those in common use at the time.")  Second, while all firearms are dangerous, the Second Amendment does not protect weapons that are recognized as abnormally "dangerous and unusual."  *Id.*[2]  This includes, as the Court noted, weapons "most useful in military service" such as the M-16 military assault rifle.  *Id.*  Third, the Court recognized that the Second Amendment rights enumerated in Heller derived from the concept of self-defense, and, therefore, a nexus to "self

---

[2] Plaintiffs argue that Supreme Court in *Heller* described the firearms only in the conjunctive "dangerous and unusual" rather than the disjunctive "dangerous or unusual."  This, they contend, imposes a higher burden on municipal regulation.  Plaintiffs are not entirely accurate.  *Heller* actually relies on both terms at different places.  When first distinguishing its prior opinion in *United States v. Miller,* 307 U.S. 174 (1939), the Court noted that the government had asserted the long-accepted "prohibition on terrorizing people with dangerous or unusual weapons."  554 U.S. at 623.  A few pages later, however, the Court states "We also recognize another important limitation on the right to keep and carry arms.  *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.'  We think that limitation is fairly supported by the historical tradition prohibiting the carrying of 'dangerous and unusual weapons.'  *Id.* 627.  The Court then cites to Blackstone's Commentaries, 4 Blackstone 148-9 (1769) to support this statement.  Blackstone, however, referred to "dangerous or unusual weapons."  Specifically, Volume 4 states "The offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace by terrorizing the good people of the land;"  *Id.* at 148 (emphasis in original).  Plaintiffs' contention that the Supreme Court clearly intended to assert only the conjunctive "dangerous and unusual" is less than completely supported by either Blackstone or by the full text of *Heller.*

defense" was a "central component" of any individual Second Amendment right. *Id.* at 599.

Evaluating each of these criteria in turn demonstrates that the District Court correctly determined that the City of Highland Park was entitled to summary judgment as a matter of law.

### 1. Assault Weapons are Not the Type of Commonly Used Weapon Described in *Heller.*

In *Heller*, the Supreme Court struck down the District of Columbia's complete ban on handguns, in part because the weapons at issue had been commonly used since the nation's founding. 554 U.S. at 624, 627. Here, as a threshold matter, it is difficult to determine the number of assault weapons currently in use in the United States. This is due in large measure, as the District Court properly found, to the fact that gun manufacturers do not generally release their sales data. Beyond this, many of those manufactured are illegally trafficked in Mexico.

At most, Plaintiffs' have demonstrated that an increasing number of these weapons have been *manufactured* in the past five years. As Plaintiffs admit, many of these weapons were purchased by the Department of Homeland Security and other state and municipal law enforcement agencies. Others have been illegally trafficked. Still other assault weapons have been purchased in multiple quantities by the same end user. In short, it is difficult if not impossible to extrapolate from manufacturing data to ownership statistics.

Even accepting Plaintiffs' flawed data at face value, however, at most assault weapons have become more popular recently. The best evidence remains that

assault weapons of the type covered by the Highland Park Ordinance and other municipal bans make up only one or two percent of privately-owned firearms in the United States.  Of those, an even smaller fraction are used primarily for self-defense in the home -- the only basis for the constitutional right recognized by *Heller* and *McDonald*.  As a result, the assault weapons at issue here are far different than the handguns at issue in *Heller*.  There the Supreme Court expressly found that hand-guns were the most popular firearm in the country and one typically used for self-defense from the adoption of the Second Amendment to the present day.

In further contrast to handguns, assault weapons not only constitute a tiny fraction of guns in lawful use, but they are disproportionately represented in crimi-nal activity.  Assault weapons constitute just one to two percent of all firearms in use, however, they represent as much as eight percent of guns used in crimes and there can be no analogous account for 16 percent of guns used to murder police officers.  Accordingly, the assault weapons banned by Highland Park and the hand-guns "commonly used" in *Heller*.

### 2.    Assault Weapons are Dangerous and Unusual

AR-15 semi-automatic rifles such as the Smith & Wesson M & P 15 owned by Dr. Friedman are "the civilian version of the military's M-16 rifle."  *Heller II*, 670 F.3d at 1263.  As the D.C. Circuit noted in *Heller II*, "[a]lthough semi-automatic firearms, unlike automatic M-16s, fire only one shot with each pull of the trigger, semi-automatics still fire almost as rapidly as automatics."  *Id.* (quotations omitted). The *Heller II* court found that a fully automatic UZI machine gun that "was emptied in slightly less than two seconds on full automatic, while the same magazine was

emptied in just five seconds on semi-automatic." *Id.* Accordingly, the court con-cluded "it is difficult to draw meaningful distinctions between the AR-15 and the M-16." *Id.*

Here, the Highland Park Ordinance regulates only those semi-automatic firearms that include one of five additional features. Each of these features, such as a muzzle break, a barrel shroud, or a telescoping stock, has a military heritage and was designed for use in combat rather than self-defense in the home. When com-bined with any of these five features prohibited under the Ordinance, therefore, the firearm takes on a military characteristic and is far more dangerous and powerful than necessary for ordinary home defense.

### 3. Assault Weapons are, by their very nature, not effective for self-defense.

Given their military heritage, semi-automatic weapons are designed for use in spaces much larger than a house or apartment. AR-15 type platforms are not intended for self-defense but instead are based on military designs. As a result, they are not appropriate for use in confined spaces like a typical living room, bed-room or hallway. Beyond this, because responsible gun owners will lock their firearms and store them securely, a rifle is much less accessible in most emergency situations than a handgun.

Overwhelming firepower is also unnecessary in a community like Highland Park. In the past five years, Highland Park has encountered only two home burgla-ries in which a resident was present. Police have issued nearly 3,000 permits for burglar alarms and the average response time to a 911 emergency call is four

minutes and 20 seconds.  Further, Highland Park has not had a homicide since
June 2003 and has only had a total of four dating back to 1996.  The notion that a
homeowner would need a pistol grip, muzzle break or barrel shroud, or a large
capacity magazine, to safely defend his or her home, however sincerely held that
subjective belief might be, is incredible.  A subjective desire to possess a particular
weapon for self-defense, no matter how sincerely held, does not establish a constitu-
tional right.

### III.   Even if this Court were to find that the Ordinance implicates the Second Amendment, the Ordinance would still survive constitutional review.

Plaintiffs mistakenly contend on this appeal, as they did unsuccessfully
before the District Court, that in order to establish a constitutional violation they
must simply demonstrate that Highland Park's ban on assault weapons burdens
their rights under the Second Amendment.  But as this Court held in *Ezell*, a Plain-
tiff's ability to establish an impact on his Second Amendment right is the beginning
of the inquiry, not the end of it.  651 F.3d at 684 ("If the government cannot estab-
lish this -- if the historical evidence is inconclusive or suggests that the regulated
activity is *not* categorically unprotected -- then there must be a second inquiry into
the strength of the government's justification for restricting or regulating the exer-
cise of Second Amendment rights.")  Plaintiffs continue to ignore this second prong
of the inquiry.  Here, even if the Plaintiffs were able to convincingly argue that their
Second Amendment rights were implicated, they could not withstand the second
level of this inquiry.

**A.  Courts have regularly applied intermediate scrutiny to Second Amendment challenges.**

Because it was faced with a categorical handgun ban in *Heller* and *McDonald*, the Supreme Court did not provide guidance to lower courts on what constitutional scrutiny to apply when confronted with legislation that creates a burden upon rights implicated by the Second Amendment. *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012), cert. denied 133 S. Ct. 1806 (2013).  In *Ezell*, the Seventh Circuit joined a number of other circuits in holding that an intermediate level of scrutiny should be applied and the level of that scrutiny must depend on the nature of the impact on the Second Amendment Right.  *Ezell*, 651 F.3d at 706.[3] Thus, "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end."  651 F.3d at 708.  On the other hand, where a court considers "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, modest burdens on the right may be more easily justified."  *Id.*

*Heller II* is particularly instructive. There, the D.C. Circuit applied intermediate scrutiny to a ban on assault weapons and large capacity magazines.  670 F.3d 1244, 1261.  The court noted that "[u]nlike the law held unconstitutional in *Heller I*, the laws at issue here do not prohibit the possession of 'the quintessential self-

---

[3] *Ezell* adopts a slightly different framework than most of the other circuits which have employed intermediate scrutiny to review challenges under the Second Amendment.  Like the other circuits, *Ezell* relies upon a two-pronged inquiry.  The Court also describes a "sliding scale" that would impose a great burden on the State to the extent the regulation at issue imposes a greater burden on the Second Amendment rights at issue.

defense weapon," to wit, the handgun."  670 F.3d at 1261-62 (quoting 554 U.S. at

629).   In concluding that the District's assault weapons ban should be evaluated

under "intermediate scrutiny,"  the D.C. Circuit stated:  "we are reasonably certain

the prohibitions do not impose a substantial burden upon that [Second Amendment]

right."  Id. at 1262.

Here, at the very most, the Highland Park Ordinance marginally impacts the

ability to obtain firearms and magazines for lawful self-defense.  In *Heller II*, the

D.C. Circuit, reviewing a nearly identical statute,  concluded that these type of

restrictions did rise to the level of a "substantial burden" because they did not

"prevent a person from keeping a suitable and commonly used weapon for protec-

tion in the home or for hunting, whether a handgun or a non-automatic long gun."

670 F.3d at 1262.  District courts have repeatedly reached the identical conclusion.

*See also Shew v. Malloy*, 994 F. Supp.2d. 234 (D.Conn. 2014); *Fyock v. City of

Sunnyvale,* --- F.Supp.2d ---, 2014 WL 984162 (N.D. Cal. March 5, 2014); *Kolbe v.

O'Malley*, --- F. Supp.2d ---, 2014 WL 4243633 (D.Md. August 22, 2014).

Here, the restrictions imposed by the Highland Park Ordinance do not sub-

stantially burden any right under the Second Amendment.  At most, the Ordinance

restricts a subclass of one or two percent of privately-owned firearms.  Residents of

Highland Park have hundreds if not thousands of alternative firearms to choose

from.  The Ordinance merely regulates the choices available to residents.  To the

extent the Ordinance it imposes a burden at all, there is no credible basis upon

which to contend that these restrictions impose a "severe burden" on the exercise of

any constitutional right.  For this reason, the D.C. Circuit in *Heller II,* along with every court to consider constitutional scrutiny of prohibitions of assault weapons or large capacity magazines, has applied intermediate scrutiny rather than the strict scrutiny advocated by the Plaintiffs.  *See e.g. Kampfer v. Cuomo*, -- F. Supp.2d --, 2014 WL 49961 (W.D.N.Y. 2014) (assault weapon prohibitions "do not create a categorical ban on an entire class of weapons, and ample firearms remain available to carry out the 'central component of the Second Amendment right:  self defense"); *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, -- F. Supp.2d  --, 2013 WL 690995 (W.D.N.Y. 2013) (restrictions that impose only modest burdens (because they do leave open ample alternative channels) are judged under a mild form of intermediate scrutiny"); *Tardy v. O'Malley*, -- F.Supp.2d  --, No. 1:13-CV-02841 (D.Md. Octber 1, 2013) (ban on assault weapons subject to intermediate scrutiny); *Fyock v. City of Sunnyvale*, -- F. Supp.2d --, 2014 WL 984162 (N.D. Cal. March 5, 2014) (applying intermediate scrutiny in upholding a ban on large capacity magazines); (limitation of magazine capacity to 15 rounds "examine[d] . . . under the intermediate scrutiny test."); *Colorado Outiftters Ass'n v. Hickenlooper*, --- F.Supp.2d ---, 2014 WL 3058518 (D. Col. June 26, 2014) (involving large capacity magazines).

### B.    The Ordinance is Closely Related to Highland Park's Strong Interest in Public Safety.

Under intermediate scrutiny, the Court's task is to assess whether a law is "substantially related to the achievement of an important government objective." *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2nd Cir. 2012).  There can be

no doubt that Highland Park has an important, if not compelling interest, in the public safety of its citizens and police officers alike.

For this reason, every court to have considered a ban on assault weapons similar to the one imposed by Highland Park, in addition to apply intermediate scrutiny, has upheld the ban. *See e.g. People v. James*, 174 Cal.App.4th 662 (3rd Dist. 2009); *People v. Zondorak*, 220 Cal.App.4th 829 (4th Dist. 2013); *Fyock v. City of Sunnyvale*, -- F.Supp.2d --, 2014 WL 984162 (N.D. Cal. March 5, 2014); *Shew v. Malloy*, 994 F.Supp.2d 234, (D. Conn. 2014); *Heller II*, 670 F.3d 1244 (D.C.Cir. 2011); *Kampfer v. Cuomo*, -- F. Supp. 2d --, 2014 WL 49961 (N.D.N.Y. January 7, 2014); *NYS Rifle and Pistol Ass'n, Inc. v. Cuomo*, -- F.Supp.2d --, 2013 WL 6909955 (W.D.N.Y. December 31, 2013); *Colorado Outfitters Ass'n v. Hickenlooper*, -- F.Supp.2d --, 2014 WL 3058518 (D. Col. June 26, 2014) (upholding ban on 15 round magazines).

Again, *Heller II* is particularly instructive. There, the D.C. Circuit considered exactly this type of prohibition on semi-automatic assault weapons and large capacity magazines presented by the Highland Park Ordinance. Reviewing the District of Columbia's ban under intermediate scrutiny, the Circuit Court concluded "the military features of semi-automatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly." *Id.* at 1262. The court also noted that the Supreme Court had suggested that "M-16 rifles and the like' may be banned because they are 'dangerous and unusual.'" *Id.* (quoting 554 U.S. at 627). The D.C. circuit then found that semi-automatic assault weapons functioned

in practice nearly identically to the M-16.  The court concluded, therefore, that the District of Columbia's ban on assault weapons and large capacity magazines "is likely to promote the Government's interest in crime control."  *Id*.  The District of Columbia had met its burden under intermediate review and the court upheld the municipality's ban on assault weapons.

Here, the City of Highland Park's Ordinance must similarly clear intermediate review.  Just as the District Court did, this court must weigh Highland Park's strong interest in public safety on the one hand, against the military nature of the assault weapons at issue and the horrific consequences created by illegal use of these weapons on the other.  As the District Court found "The Ordinance limits only a tiny sliver of highly dangerous weapons which have been tragically used repeatedly in mass shooting events.  These weapons are also statistically far more likely to be used to murder police officers than their percentages in the law-abiding population would suggest.  Like the Ordinance at issue in *Heller II*, Highland Park's ordinance meets its burden under intermediate review and is closely related to the City's important interest in public safety.

## CONCLUSION

The judgment of the District Court should be affirmed.  Highland Park City Code Section 136 banning certain types of firearms and large capacity magazines is constitutional and should remain in full force and effect.

DATE:  December 3, 2014                    Respectfully Submitted,


                                           By:   /s/ Christopher B. Wilson
                                                 One of the Attorneys for De-
                                                 fendant-Appellee

Steven M. Elrod
Christopher James Murdoch
Hart M. Passman
Holland & Knight, LLP
131 South Dearborn Street
30th Floor
Chicago, Illinois 60603
Telephone:  (312) 263-3600
Telecopier:  (312) 578-6666
Steven.elrod@hklaw.com
Chris.murdoch@hklaw.com
Hart.passman@hklaw.com


Christopher B. Wilson, ARDC No. 06202139
Perkins Coie LLP
131 South Dearborn Street, Suite 1700
Chicago, IL  60603
Telephone:  (312) 324-8400
Telecopier:  (312) 324-9400
Cwilson@perkinscoie.com

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 9,252 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I further certify that the brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Seventh Circuit Rule 32(b) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point Century Schoolbook font.

*s/ Christopher B. Wilson*
Christopher B. Wilson

Dated:      December 3, 2014

## **CIRCUIT RULE 31(E)(1) CERTIFICATION**

The undersigned hereby certifies that he electronically uploaded, pursuant to

Circuit Rule 31(e), a version of the brief in non-scanned PDF format.


*s/ Christopher B. Wilson*
Christopher B. Wilson

Dated:    December 3, 2014

## CERTIFICATE OF SERVICE

I certify that on December 3, 2014, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Christopher B. Wilson*
Christopher B. Wilson

Dated:    December 3, 2014

LEGAL124357662.6