No. 14-3091

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ARIE FRIEDMAN, M.D. and THE ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs-Appellants

v.

CITY OF HIGHLAND PARK,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 1:13-cv-09073
The Honorable John W. Darrah, Presiding Judge

## APPELLEE'S APPENDIX

Christopher B. Wilson
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, IL 60603
Telephone: (312) 324-8400
Telecopier: (312) 324-9400

Attorney for Defendant-Appellee

# TABLE OF CONTENTS

PAGE

Declaration of Nancy Rottering ................................................................. A.1

Declaration of Paul S. Shafer ................................................................. A.9

Declaration of James E. Yurgealitis ....................................................... A.14

Declaration of Mark D. Jones ................................................................ A.38

Declaration of Gretchen Cusick ............................................................. A.60

U.S. Department of Justice, BJS,
   *Firearm Violence, 1993-2011* ........................................................ A.77

American Journal of Lifestyle Medicine,
   *Risks and Benefits of a Gun in the Home* ...................................... A.105

DECLARATION OF NANCY ROTERING

I, Nancy Rotering, under penalty of perjury as set forth in 28 U.S.C. § 1746 declare as follows:

1.     I serve as the Mayor of the City of Highland Park, Illinois ("*City*"). I have served the City as Mayor since May 2011. Prior to being elected as Mayor, I served as a member of the City Council from May 2009 until May 2011.

2.     I have personal knowledge of the matters set forth in this Affidavit and can testify competently to such matters.

3.     I was born in the City of Cincinnati, Ohio in 1961 and have lived in Highland Park for all but 18-years of my life.

4.     As the legislative body for the City, the City Council is responsible for making policy and enacting laws that protect and preserve the public health, safety, and welfare of City residents, businesses, and visitors. Specifically, the City Council has the duty to prevent, to the greatest extent practicable, the commission of violent crimes within the City.

5.     On June 24, 2013, the City Council adopted City Ordinance No. 68-13, prohibiting the manufacture, sale and possession of assault weapons and large capacity magazines within the City ("*Ordinance*"). A true and correct copy of the Ordinance, which bears my signature, is attached to this Affidavit as Exhibit A.

6.     The City modeled its Ordinance after Cook County's assault weapon ban; with only minor non-substantive exceptions, the City's Ordinance is identical to the County's.

A. 1

7.    The City deliberately chose Cook County's ordinance as a model because it has recently survived equal protection and vagueness challenges before the Illinois Supreme Court.

8.    As set forth in the Ordinance, the City Council believes that assault weapons pose an undue threat to public safety for the residents, property owners and visitors to the City.

9.    The City Council also expressed its concern that the recent mass shooting tragedies in Aurora, Colorado, Newtown, Connecticut, Tucson, Arizona and Santa Monica, California, could occur in Highland Park, unless proper public safety measures are taken. As Mayor, and as a mother of four, I am particularly concerned about preventing a school shooting similar to the massacre at Sandy Hook Elementary School in Newtown. That is what was on my mind throughout our consideration of the Ordinance: how unlikely an assault weapon massacre was in Newtown and how similar our communities are. I could not shake the thought that we could just as easily be those panicked and grief-stricken parents. In a similar vein, I wrote a letter to the Mayor of Aurora, Colorado, in the wake of their gun-related tragedy, empathizing with the agony his community was experiencing. Lastly, the tragedy that occurred when Laurie Dann attempted to ignite an incendiary device at one of our Highland Park elementary schools, then went on a shooting rampage at another school in nearby Winnetka was also on my mind. My concern for how vulnerable our schools and schoolchildren are played into our need to pass the Ordinance.

2

A. 2

10.     The City Council believes that the City is not immune to gun violence, particularly gun violence involving assault weapons, and that the weapons pose a dangerous threat in the City and other suburban areas.

Nancy Rotering
Mayor
City of Highland Park

#27507543_v1

3

A. 3

ORDINANCE NO. 68-13

AN ORDINANCE AMENDING CHAPTER 134 OF "THE HIGHLAND PARK
CODE OF 1968," AS AMENDED, REGARDING ASSAULT WEAPONS

WHEREAS, Chapter 134 of "The Highland Park Code of 1968," as amended ("*City Code*"), regulates the manufacture, sale, and possession of firearms in the City; and

WHEREAS, the Constitution of the United States of America and the Constitution of the State of Illinois afford certain protections related to the ownership of firearms; and

WHEREAS, in *District of Columbia v. Heller*, the United States Supreme Court recognized that the Constitutional protections related to firearm ownership is not unlimited, and can be subject to certain types of governmental regulations; and

WHEREAS, in its *Heller* decision, the United States Supreme Court specifically acknowledged that the protections afforded by the Second Amendment to the Constitution of the United States does not extend to all types of firearms; and

WHEREAS, many courts throughout the nation have upheld local regulations restricting or prohibiting the ownership or possession of assault weapons, including, without limitation, the State of Illinois Appellate Court, the United States District Court for the District of Columbia, and the Court of Appeals for the State of California; and

WHEREAS, recent incidents in Aurora, Colorado; Newtown, Connecticut; Tucson, Arizona; and Santa Monica, California demonstrate that gun violence is not limited to urban settings, but is also, tragically, a reality in many suburban and small town locations as well; and

WHEREAS, the City Council has determined that assault weapons are not traditionally used for self-defense in the City of Highland Park, and that such weapons pose an undue threat to public safety to residents, property owners, and visitors within the City of Highland Park; and

WHEREAS, the City has previously encouraged the Governor and the Illinois General Assembly to enact statewide legislation banning the sale and possession of assault weapons; and

WHEREAS, to date, the State has failed to enact a statewide ban on the sale or possession of assault weapons; and

WHEREAS, on May 31, 2013, the Illinois General Assembly approved House Bill 183, as amended, which Bill contains a provision that would preempt the home rule authority of the City to regulate the possession or ownership of assault weapons, unless the City adopts such a regulation not later than 10 days after House Bill 183 becomes law; and

WHEREAS, pursuant to the home rule powers of the City, and in order to protect both the home rule authority of the City and the public safety and welfare, the City Council desires to amend Chapter 134 of the City Code to prohibit the manufacture, sale, ownership, acquisition, or possession of assault weapons within the City; and

WHEREAS, the City Council has determined that it will serve and be in the best interest of the City and its residents to amend the City Code pursuant to this Ordinance;

NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF HIGHLAND PARK, LAKE COUNTY, STATE OF ILLINOIS, as follows:

SECTION ONE:     RECITALS.  The foregoing recitals are incorporated into, and made a part of, this Ordinance as the findings of the City Council.

SECTION TWO:     FIREARMS CONTROL.  Chapter 134, entitled "Handgun Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby re-titled "Firearms Control".

Exhibit 1

A. 4

SECTION THREE: ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES. Chapter 134, entitled "Firearms Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby amended to add a new Section 134.010, which Section 134.010 hereafter reads as follows:

"Sec. 134.010 Assault Weapons and Large Capacity Magazines.

    (A)    Whenever the following words and phrases are used, they shall, for purposes of this Section 134.010, have the meanings ascribed to them in this Section 134.010(A), except when the context otherwise indicates.

    (1)    "Assault Weapon" means

    (a)    A semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise and one or more of the following:

    (i)    Only a pistol grip without a stock attached;

    (ii)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

    (iii)    A folding, telescoping or thumbhole stock;

    (iv)    A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

    (v)    A muzzle brake or muzzle compensator;

    (b)    A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of ammunition;

    (c)    A semiautomatic pistol that has the capacity to accept a detachable magazine and has one or more of the following:

    (i)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

    (ii)    A folding, telescoping or thumbhole stock;

    (iii)    A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

    (iv)    A muzzle brake or muzzle compensator; or

    (v)    The capacity to accept a detachable magazine at some location outside of the pistol grip;

    (d)    A semiautomatic shotgun that has one or more of the following:

    (i)    Only a pistol grip without a stock attached;

    (ii)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

    (iii)    A folding, telescoping or thumbhole stock;

2

A. 5

    (iv)    A fixed magazine capacity in excess of five rounds; or

    (v)    An ability to accept a detachable magazine;

(e)    Any shotgun with a revolving cylinder;

(f)    Conversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person;

(g)    Shall include, but not be limited to, the assault weapons models identified as follows:

    (i)    The following rifles or copies or duplicates thereof:

    (A)    AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR;

    (B)    AR-10;

    (C)    AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR;

    (D)    AR70;

    (E)    Calico Liberty;

    (F)    Dragunov SVD Sniper Rifle or Dragunov SVU;

    (G)    Fabrique National FN/FAL, FN/LAR, or FNC;

    (H)    Hi-Point Carbine;

    (I)    HK-91, HK-93, HK-94, or HK-PSG-1;

    (J)    Kel-Tec Sub Rifle;

    (K)    Saiga;

    (L)    SAR-8, SAR-4800;

    (M)    SKS with detachable magazine;

    (N)    SLG 95;

    (O)    SLR 95 or 96;

    (P)    Steyr AUG;

    (Q)    Sturm, Ruger Mini-14;

    (R)    Tavor;

    (S)    Thompson 1927, Thompson M1, or Thompson 1927 Commando; or

    (T)    Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).

A. 6

    (ii)    The following pistols or copies or duplicates thereof:

    (A)    Calico M-110;

    (B)    MAC-10, MAC-11, or MPA3;

    (C)    Olympic Arms OA;

    (D)    TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or

    (E)    Uzi.

    (iii)    The following shotguns or copies or duplicates thereof:

    (A)    Armscor 30 BG;

    (B)    SPAS 12 or LAW 12;

    (C)    Striker 12; or

    (D)    Streetsweeper.

"Assault weapon" does not include any firearm that has been made permanently inoperable, or satisfies the definition of "antique firearm," stated in Section 134.001 of this Chapter, or weapons designed for Olympic target shooting events.

    (2)    "Detachable Magazine" means any ammunition feeding device, the function of which is to deliver one or more ammunition cartridges into the firing chamber, which can be removed from the firearm without the use of any tool, including a bullet or ammunition cartridge.

    (3)    "Large Capacity Magazine" means any ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

    (a)    A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

    (b)    A 22 caliber tube ammunition feeding device.

    (c)    A tubular magazine that is contained in a lever-action firearm.

    (4)    "Muzzle Brake" means a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil.

    (5)    "Muzzle Compensator" means a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement.

    (B)    No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine. This Section 134.010(B) shall not apply to:

    (1)    The sale or transfer to, or possession by any officer, agent, or employee of the City or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state; or peace officers, to the extent that any such person named in this Section 134.010(B)(1) is otherwise authorized to acquire or possess an assault weapon and/or large capacity magazine and does so while acting within the scope of his or her duties; or

4

(2)     Transportation of assault weapons or large capacity magazine if such weapons are broken down and in a nonfunctioning state and are not immediately accessible to any person.

(C)     Any assault weapon or large capacity magazine possessed, sold or transferred in violation of Section 134.010(B) of this Chapter is hereby declared to be contraband and shall be seized and destroyed of in accordance with the provisions of Section 134.010(E) of this Chapter.

(D)     Any person who, prior to the effective date of this Section 134.010, was legally in possession of an assault weapon or large capacity magazine prohibited by this Section 134.010 shall have 90 days from the effective date of this Section 134.010 to do any of the following without being subject to prosecution hereunder:

(1)     To remove the assault weapon or large capacity magazine from within the limits of the City;

(2)     To modify the assault weapon or large capacity magazine either to render it permanently inoperable or to permanently make it a device no longer defined as an assault weapon or large capacity magazine; or

(3)     To surrender the assault weapon or large capacity magazine to the Chief of Police or his or her designee for disposal as provided in Section 134.010(E) of this Chapter.

(E)     The Chief of Police shall cause to be destroyed each assault weapon or large capacity magazine surrendered or confiscated pursuant to this Section 134.010; provided, however, that no firearm or large capacity magazine shall be destroyed until such time as the Chief of Police determines that the firearm or large capacity magazine is not needed as evidence in any matter. The Chief of Police shall cause to be kept a record of the date and method of destruction of each Firearm or Large Capacity Magazine destroyed pursuant to this Chapter.

(F)     The violation of any provision of this Section 134.010 is a misdemeanor, punishable by not more than six months imprisonment or a fine of not less than $500 and not more than $1000, or both."

SECTION FOUR:  PUBLICATION.  The City Clerk shall be, and is hereby, directed to publish this Ordinance in pamphlet form pursuant to the Statutes of the State of Illinois.

SECTION FIVE:  EFFECTIVE DATE.  This Ordinance shall be in full force and effect from and after its passage, approval, and publication in the manner provided by law.

AYES:          Mayor Rotering, Councilman Stone, Kaufman, Frank, Blumberg, Knobel

NAYS:          Councilman Naftzger

ABSENT:        None

PASSED:        June 24, 2013

APPROVED:      June 24, 2013

PUBLISHED IN PAMPHLET FORM: June 25, 2013

ORDINANCE NO.:   68-13

Nancy R. Rotering, Mayor

ATTEST:

Ghida S. Neukirch, City Clerk

#23629981_v4

5

A. 8

DECLARATION OF PAUL S. SHAFER

I, Paul S. Shafer, under penalty of perjury as set forth in 28 U.S.C. § 1746, declare as
follows:

1.     I serve as the Chief of Police for the City of Highland Park, Illinois ("City").  I
have served the City as Chief of Police since July 2003.

2.     I have worked in law enforcement in the Chicago area since 1979.  I began my
career as a Patrol Officer for the Village of Bellwood, where I worked from 1979 to 1981.
Between 1981 and 2003, I worked for the City of Naperville, Illinois, beginning as a Patrol
Officer and rising to serve between 1992 and 2003 as Commander and Captain (the second-
highest ranks within the Naperville Police Department) of two different divisions of the
Naperville Police Department.  A copy of my complete resume is attached to this Affidavit as
Exhibit 1.

3.     I have personal knowledge of the matters set forth in this Affidavit and can testify
competently to such matters.

4.     According to the 2010 Census, there are 29,763 residents of the City.  25.9% of
City residents are under age 18, and 5.3% of City residents are under age five.

5.     The City currently employs 57 sworn police officers, which equates to a ratio of
1.92 sworn officers per 1,000 residents.

6.  According to City Police Department (*"Department"*) records, the City has issued 2,930 alarm user permits for burglar alarms at private properties in the City. The Department does not track how many properties have implemented gates, guards, or other security features.

7.  Since 2008, there have been 68 reported incidents of aggravated assault or aggravated battery in the City.

8.  In the six-year period from 2008 to 2013, there were 293 residential and commercial burglaries in the City that were reported to the Department.

9.  Since 2008, there have been two reported home invasions during which the residents of the home were present. In one of those invasions, there were multiple intruders.

10.  Since 2008, there have been 16 arrests for crimes in the City involving firearms and/or ammunition.

11.  There has not been a homicide in the City since June 2003. However, there were four homicides in the City between October 1996 and June 2003.

12.  During the morning of May 20, 1988, Laurie Dann entered the Ravinia Elementary School in the City, and attempted to detonate a bomb in the school's hallway. Nobody was injured by Dann at the Ravinia School. However, later that day, Dann would shoot six students at an elementary school in the adjacent Village of Winnetka, killing one eight-year-old boy.

13.  There are 15 schools located within the City, including the Highland Park High School and numerous elementary schools.

14.     There are four community centers and three nursing homes located within the City.

15.     There are multiple places in the City at which large numbers of people frequently congregate. Among the more notable of these places are: the Ravinia Festival; the Port Clinton retail and office development in downtown Highland Park; the Renaissance Place retail and residential development in downtown Highland Park; the Crossroads Shopping Center along Skokie Valley Road; the Courtyard Marriott hotel along Lake Cook Road; and four commuter rail stations.

16.     Assault weapons are not designed for self-defense, but are instead designed for combat situations which include rapid fire, the possibility of multiple targets, and a need for increased magazine capacity to engage multiple targets. These factors are not typically present when a firearm is required for defense of a home.

17.     Assault weapons are not appropriate for hunting. Hunting strategy requires a weapon to accurately kill an animal humanely, preferably with one shot. Accordingly, the magazine capacity is generally much smaller. The large magazines and rapid-fire capability of assault weapons exceed these hunting requirements.

18.     By way of example, the AR-15 assault weapon (the civilian version of the military M-16) was not designed as a hunting weapon; it was designed for use by the military in combat situations. As such, the AR-15 and other assault weapons, by their nature, allow the user to carry increased firepower (larger capacity magazines) and a weapon designed to engage multiple targets. These weapons, designed for the military, are specifically manufactured to operate in adverse situations such as mud and sand before malfunctioning. These weapons also

tend to be shorter than true sporting weapons, which aides in concealment as well as maneuverability.

19.    I do not believe that City residents need assault weapons to adequately protect themselves, their families, or their properties. If required, there are numerous other types of firearms available and legal for possession by City residents that would serve the intended self-defense purposes.

20.    The presence of assault weapons in the City would increase the risk to City residents and visitors. Every firearm, when used aggressively against a person, presents a risk of great bodily harm or death. As noted above, assault weapons typically have many features that are specifically designed to allow the user to shoot multiple targets in a shorter time period than conventional firearms that are designed for self-defense. The presence of assault weapons in the City would increase the probability that shooting incidents could involve multiple victims.

21.    In 2013, the average Department response time for high-priority 911 calls, which include alleged shootings and incidents involving firearms, is four minutes and 20 seconds.

22.    In 2013, due to the nationwide increase in active shooter incidents, I requested that the City Council approve the use of .223 rifles by members of the Department. I believe that these rifles, which are assault weapons, are necessary for law enforcement, because: (a) the rifles are more accurate at longer distances; and (b) the ammunition for these rifles can penetrate a suspect's body armor. To my knowledge, every municipal police department in the vicinity of the City deploys .223 rifles for its officers.

23.  In my opinion, the only legitimate use of an assault weapon in the City would be by the military or by law enforcement in the execution of their official duties.

Paul S. Shafer                    2/6/2014
Chief of Police
City of Highland Park

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARIE S. FRIEDMAN, M.D. and The     )
Illinois State Rifle Association,          )
                                   )
                Plaintiffs,  )
                                   )
v.                                )   No. 13-cv-09073
                                 )
THE CITY OF HIGHLAND PARK,    )
                                 )
                Defendant.  )

### DECLARATION OF JAMES E. YURGEALITIS

I, James E. Yurgealitis, declare as follows:

1.     I am currently Self Employed as a Legal and Forensic Consultant providing Criminal Case Reviews, Forensic Case Reviews and Technical Firearms Consulting, Testing and Training Services to Corporations, Legal Counsel and the Public Sector. During my previous 26 year career as a Federal Law Enforcement Officer I have been recognized, and testified as, an expert witness in numerous local, state and federal courts. I have toured numerous firearms and ammunition manufacturer's facilities both in the United States and overseas. I maintain a personal library of firearms and ammunition related books and periodicals and maintain contact with other recognized experts in the field. My final assignment in government service was as Senior Special Agent / Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, a position I held for nine (9) years. During that time I was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

2.     My credentials, training, background and experience are stated in my curriculum

A. 14

vitae, a true and correct copy of which is attached as Exhibit A. My credentials, training, background and experience as an expert witness are detailed on my Statement of Qualifications, a true and correct copy of which is attached as Exhibit B.

3.    I have been provided with, and have reviewed, a copy of the pleadings filed by the Plaintiffs in this matter. I have also been provided with, and have reviewed, a copy of The City Code of Highland Park, Municipal Ordinance 136.001 *et seq.* (the "Ordinance") wherein the possession and use of "assault weapons" and "large capacity magazines" is prohibited. I have also reviewed or relied on the materials listed in Exhibit C or referenced herein.

## GENERAL FIREARMS TERMINOLOGY, TYPES AND OPERATION

4.    In discussing modern firearms it is important to understand how they are defined under statute, how they function and the differences between types commonly found and available to the public. I have attached as Exhibit D a summary of the legal or legislative definitions of "firearm," and an explanation of the nine-step "Cycle of Fire" that describes the operation of all modern breech loading firearms.

Additional terms often used when discussing modern firearms are Semi Automatic, Full Automatic, Select Fire, Rifling, Caliber and Gauge. I define these terms as follows:

SEMIAUTOMATIC:

Semi Automatic Fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot.

FULL AUTOMATIC:

Full Automatic refers to a firearm that will continue to continuously fire successive shots when the trigger is pulled, and will only stop when the trigger is released or the supply of

2

A. 15

ammunition is exhausted. Commonly referred to as a machine gun.

SELECT FIRE:

A firearm capable of switching between and functioning in either full and semi automatic fire mode.

RIFLING:

Rifling refers to a series of grooves cut or impressed inside the barrel in a spiral pattern. The "high" portions of these patterns are called "Lands". The "lower" portion of this pattern are called "Grooves". When a projectile (or bullet) is fired in a "rifled" firearm it comes into contact with the lands as it leaves the chamber and begins to travel down the barrel. Because the lands are oriented in a spiral pattern the rifling imparts a spin to the projectile which improves stability and accuracy.

CALIBER:

Caliber is a dimensional measurement of the inside (or bore) of a rifled barrel. In the United States caliber is traditionally expressed in fractions of an inch. For example a .22 caliber firearm is designed to chamber and fire a projectile which measures .22 inches (or slightly less than a quarter of an inch). A .50 caliber firearm chambers and fires a projectile which is approximately a half inch in diameter.[1]

GAUGE:

Gauge is a dimensional measurement which is traditionally used to denote the bore of a

---

[1] In Europe, and the majority of other countries utilizing the metric system, caliber has historically been expressed in millimeters (mm). Therefore a 9mm firearm is designed to chamber and fire a projectile with a diameter of 9mm. European caliber designations may also include measurement of the length of the cartridge case (9x19mm, 7.62x39mm etc.)

A number of firearm calibers widely manufactured have two separate caliber designations, one in inch measurements and one in metric, which are equivalent and interchangeable. For example .380 ACP caliber ammunition in the US is referred to as 9x17mm caliber in Europe.

3

A. 16

non rifled or "smoothbore" firearm (i.e. a Shotgun). Shotguns were initially designed to fire a mass of round shot as opposed to one solid projectile and therefore a caliber designation is not readily applicable. Gauge refers to the number of lead spheres which will fit inside the bore and equal one pound. For example in a 12 gauge shotgun you can fit 12 spheres of lead, which are approximately 18.52mm or .73 inches in diameter, the total weight of which will equal one pound. If the diameter of the spheres are increased it will require less of them to equal one pound. Therefore the smaller the "gauge" the larger the dimension of the bore. The exception to this measurement system is the .410 gauge shotgun which is actually a caliber designation.

<u>TYPES OF MODERN FIREARMS:</u>

5.    Modern firearms as currently manufactured for civilian ownership fall into two general types. Handguns and Long Guns (or shoulder weapons).

6.    <u>Handguns</u> are generally defined as a firearm having a short stock (grip), and are designed to be held, and fired, with one hand. The term "Handgun" defines two distinct types of modern firearms, the revolver and the semi automatic pistol.

7.    A <u>revolver</u> is a handgun designed and manufactured with a revolving cylinder to contain, chamber and feed multiple rounds of ammunition. In a modern double action revolver pulling the trigger rotates the cylinder bringing an unfired cartridge of ammunition in line with the barrel and firing pin. Pulling the trigger also cocks the hammer and then releases it either directly (or indirectly via a firing pin) to strike the primer of the cartridge initiating the firing sequence as stated previously. In this type of revolver the trigger must again be pulled to rotate the cylinder in order to fire another cartridge. When all cartridges have been fired the cylinder is unlocked from the frame and swings out to facilitate removal of expended cartridge casings and insertion of unfired cartridges. The cylinder is then closed and relocked within the frame and the

handgun is again ready to fire when the trigger is pulled.

8.      A <u>semi automatic pistol</u> is a handgun designed and manufactured with the firing chamber as an integral part of the barrel and utilizes a "box" magazine to contain and feed multiple rounds of ammunition. In this type of handgun, generally, the box magazine is inserted into the firearm, the slide or bolt is pulled back and released which springs forward and feeds a cartridge into the chamber. When the trigger is pulled a filing pin or striker is released which impacts the primer of the cartridge and initiates the firing sequence of the ammunition. In most pistols a portion of the recoil or gas pressure generated by firing the cartridge is utilized to move the slide rearward, extract and eject the expended cartridge case and chamber another round from the magazine. This sequence can be repeated by pulling the trigger once for each shot. The pistol can then be reloaded by removing the empty magazine and inserting a loaded magazine.

9.      In terms of modern firearms manufacture <u>Long Guns</u> are generally of two distinct types, rifles and shotguns. A <u>rifle</u> is a firearm which is designed and intended to be fired from the shoulder. It fires a single shot through a rifled bore for each pull of the trigger. A <u>shotgun</u> is a firearm which is also designed and intended to be fired from the shoulder. It fires either a number of ball shot (commonly termed "buckshot'" or "birdshot") or a single projectile (commonly termed a "slug") through a smooth (non rifled) bore for each pull of the trigger.

10.      In terms of "types" of rifle there are numerous variations. All of these variations, generally speaking, are defined and distinguished by the way they are loaded and reloaded.

- For example <u>single shot rifles</u> fire one shot for each pull of the trigger. They have no internal or external magazine capacity and must be reloaded with a new unfired cartridge by hand for each shot. Many of these have a hinged or "break open" receiver to facilitate loading and unloading.

- A <u>Pump Action Rifle</u> requires the operator to manually manipulate a forearm piece which is traditionally found underneath the barrel. After firing the forearm is pulled backward which unlocks the bolt, extracts and ejects the fired cartridge case. Pushing the slide forward feeds an unfired cartridge from the magazine, cocks the firearm mechanism and locks the bolt for a successive shot. Pump action rifles have been manufactured with both tubular and detachable box magazines.

- <u>Bolt action rifles</u> require the operator to manually manipulate the bolt of the rifle. After firing the bolt is first unlocked from the chamber and then moved rearward. This action also extracts and ejects the expended cartridge case. The bolt is then moved forward which feeds an unfired cartridge from the magazine into the chamber. Once the bolt is then again locked by the operator it is ready to fire. Bolt action rifles usually have an internal fixed magazine or tubular magazine which will facilitate reloading via manipulation of the bolt until that capacity is exhausted. Bolt action rifles were generally the choice among hunters and military forces through the end of World War II.

- A <u>lever action rifle</u> is similar to the bolt action rifle in that the operator is required to manipulate the mechanism of the firearm. A lever at the bottom of the receiver of the rifle is manipulated in and up and down motion in order to unlock the bolt and move it rearward, extract and eject the expended cartridge case, feed an unfired cartridge into the chamber and lock it. This action is required for each shot fired through the rifle. Generally speaking lever action rifles are usually manufactured with tubular magazines which will vary in capacity depending on

6

A. 19

the caliber of the firearm.

- A <u>semi automatic rifle</u> utilizes the energy generated by the firing of the cartridge to power the cycle of fire. This is accomplished by siphoning off a portion of the gases generated by firing to operate the mechanism or by utilizing the recoil generated by firing much as in a semi automatic pistol as described previously. Once loaded the operation of this cycle of fire is not dependent on the operator to effect any portion of the process other than to pull the trigger. Semi Automatic rifles are, and have been previously, manufactured with both fixed internal magazines and a capacity to accept detachable external magazines. As such this type of rifle is capable of firing with each pull of the trigger until the supply of ammunition is exhausted. As stated previously the majority of military firearms through World War II were bolt action. The exception to this rule was the United States entering the war with the semi automatic M1 (Garand) .30-06 caliber rifle as standard issue. The Garand had a fixed internal magazine with an eight round capacity.

11.   <u>Modern shotguns</u>, as stated previously in regard to rifles, are generally classified and characterized by their operating system, (i.e. the manner in which they function, are loaded and reloaded). Additionally in the case of shotguns with multiple barrels they are defined by placement or orientation of same.

- <u>Single Shot Shotguns</u> function similarly to the single shot rifle. They may have a hinged receiver which allows the operator to open the action at chamber area to facilitate loading and unloading of the firearm. There are also single shot models that are loaded and unloaded through a bolt action mechanism and have no

additional magazine capacity.

- <u>Bolt Action shotguns</u> are manufactured, as stated above as single shot, or with internal or detachable magazines to facilitate easier and faster reloading. They function in the same way as a bolt action rifle and require manual manipulation of the bolt by the operator to unload and reload.

- <u>Lever Action Shotguns</u>, again function in the same fashion as a similarly designed rifle. Manual manipulation of the lever is required for successive shots.

- <u>Pump Action Shotguns</u> have the same general operating system as a similarly designed rifle. The "action" of the shotgun must be worked forward and back by the operator to unlock the bolt, extract and eject the expended shotgun shell, reload and relock the bolt for firing.

- <u>Semi Automatic Shotguns</u>, as with their rifle caliber counterparts, utilize energy (either recoil or gas pressure) generated by firing ammunition to "power" the operating system of the firearm. These are manufactured with a number of different magazines, both internal and fixed, as well as external and detachable. They are capable of firing a single shot with each pull of the trigger until the supply of ammunition in the magazine is exhausted.

- <u>Break Open, Double Barrel and "Tip Up" Shotguns</u> have a hinged receiver which facilitates access to the rear of the chamber for unloading and reloading. They are manufactured in single shot and double barrel variations. Double barrel variations are further delineated by the placement of their barrels. Side by Side Shotguns have two barrels situated next to one another in a horizontal arrangement. Over and Under Shotguns have two barrels superimposed upon one another in a vertical

plane. The mechanisms in each of these allow staggered firing of each of the two barrels with a separate pull of the trigger. When the hinged action is opened the expended shotgun shell hulls can be manually extracted although more complex designs with auto ejectors perform that function when "opened" without action by the operator.

12.    There are additional types and classifications of firearms not discussed at length here as they are not as numerous or popular as those discussed thus far. For example a "Drilling", a type of weapon popular in Europe consists of a shotgun barrel and a rifle mounted to the same receiver. They are neither popular nor commonly found in the United States. Other types of firearms such as smoothbore revolvers, Short Barreled Shotguns, Short Barreled Rifles and Machineguns are regulated by ATF under the auspices of the National Firearms Act (NFA). Manufacture, transfer and ownership of these "NFA Firearms" are subject to more stringent regulations to include registration in a Federal Database.

13.    In recent years there has been an increase in the popularity and availability of semi automatic rifles, pistols and shotguns with features initially designed (or patterned after those designed) for a military purpose. It is important to discuss the history of the development and evolution of firearms with these features.

14.    The Merriam Webster Dictionary defines the term "Assault Rifle" as "any of various automatic or semiautomatic rifles with large capacity magazines designed for military use". It further defines "Assault Weapon" as "any of various automatic or semiautomatic firearms".

15.    It is a generally accepted premise amongst firearms experts and historians that the first "Assault Rifle" or "Assault Weapon" is the German StG 44 (Sturmgewehr Model 1944)

A. 22

which appeared in production form late in WWII. Earlier pre production variants included the MP 42 and MP 43 (Machinenpistol 1942 and 1943 respectively). The Germans termed the rifle "Sturmgewehr", literally "Storm Rifle", and a number of the features included utilization of a portion of the gas generated by the burning cartridge propellant to operate the rifle, extensive use of steel stampings in its construction, a detachable magazine, a separate pistol style grip (not integrated with the shoulder stock), a bayonet mounting lug and a threaded barrel to facilitate the attachment of a grenade launcher. It fired a cartridge that was smaller dimensionally and less "powerful" (in terms of muzzle velocity and foot pounds of energy) than the standard 8mm Mauser cartridge in use by the German Army in their issued bolt action Mauser rifles.

16.     Following the end of the war captured StG 44's were analyzed by the Allies and although there was reluctance to move to a smaller caliber cartridge a number of the features of the StG 44 found favor in the design of successive European, American and Eastern Bloc military rifles. Noted firearm expert and historian Jim Supica wrote in his forward to the book Guns:

> "Most military establishments hesitated to "downsize" the range and power of their primary rifles in the early Cold War years. The semi-auto detachable magazine concept was an obvious success and there was something to be said for full auto capability."

He further writes:

> "However the assault rifle concept wouldn't go away. The Soviet Union accepted the lower power round idea in its fixed magazine semi-auto chambered for an intermediate power 7.62 x 39 mm round in 1945, the SKS, which saw wide distribution and production in Soviet client states"

Two years later in 1947 the USSR followed the SKS with what Supica terms "The

quintessential assault rifle - the Kalashnikov designed AK-47"[2]

17.     The design of the AK-47 carried forward a number of the features introduced on the German StG 44. These features include a gas powered operating system, use of steel stampings in its construction, a separate pistol grip, separate shoulder stock, a detachable magazine, a bayonet lug and provision for attachment of a grenade launcher. Due to the separate stock and pistol grip the AK, much like the StG 44, also utilized a barrel shroud / or foregrip on the forward third of the rifle. Some variations of the early AK-47's (AKM) also featured a compensator at the muzzle that deflected gas upward and to the right to "compensate" for the rifle's tendency to kick up and to the right with every shot.

18.     In the 1950's many countries sought to replace WWI and WWII vintage bolt action and semi automatic rifles with these newer and more effective designs. With the birth of the North Atlantic Treaty Organization (NATO) however, utilization of Soviet Bloc AK or SKS Assault Rifles was not possible. Accordingly a number of firearms manufacturers outside the Soviet sphere of influence developed military rifles which carried forward these same features to one extent or another. Fabrique Nationale (FN) of Herstal, Belgium and Heckler Koch (HK) of Oberndorf, Germany are two noteworthy examples.

19.     FN developed the FN-FAL (Fusil Automatique Leger) and HK the G3 which found a ready market amongst nations that did not favor the Soviet AK type designs. Both incorporated features which like the AK, were derived directly from the StG 44. Their designs featured some parts made from metal stampings as opposed to heavier and more expensive machined steel pieces. A separate pistol grip, shoulder stock, detachable magazine and barrel shroud followed the basic design of the StG 44. A flash hider and / or muzzle brake have

---

[2] Supica, Guns (TAJ Books 2006)

11

appeared in production variations of both rifles. These rifles were destined from inception to become widely exported as the domestic market in both countries was relatively limited. The FN-FAL and G3 have been in production since the 1950's and both FN and HK have licensed production to numerous countries in South America, Africa and the Middle East.

20.    In the United States progress in this arena moved at a significantly slower pace. The prevailing wisdom here was to stay away from lighter, smaller rifle calibers and cartridges as the .30-06 cartridge used in the M-1 Garand Rifle during WWII had proven to be more than successful during WWII. Their initial answer to the burgeoning move towards Assault Rifles was a variation of the basic M-1 Garand operating system, the T44, or M-14. Outwardly the M-14 retained a full length wood stock as did the Garand, however it featured a detachable magazine, select fire (both semi-automatic and full automatic) capability as well as a flash hider. It competed directly against the FN-FAL (designated T88) in U.S. Army trials and was selected in 1957.

21.    In the mid 1950's, ArmaLite Corporation's chief engineer, Eugene Stoner, developed a number of lightweight assault rifle designs which resulted in the AR-10 in .308 caliber. Its design closely followed what was now becoming standard assault rifle design, i.e., light weight (aluminum forged receivers as opposed to machined steel), separate pistol grip and shoulder stock, foregrip / barrel shroud, detachable magazine, and numerous flash hider / muzzle brake variations. ArmaLite continued to refine the basic design of the AR-10 which resulted in the AR-15. AR-15 was designed to chamber and fire the 5.56 x 45mm cartridge (somewhat interchangeable with .223 Remington caliber).

22.    This rifle was adopted as standard issue by the US Army in the mid 1960's. The production of the rifle had been licensed to Colt and initially the model designation was, as

12

A. 25

produced, AR-15. Later, after a series of engineering changes, the standard US military designation was changed to M-16. When first deployed as a standard issue rifle for US Military Forces, the AR-15 / M-16 platform was maligned as unreliable and prone to jamming. This was due, in part, to inadequate maintenance by the operators themselves. Once the problems were addressed and rectified the rifle proved to be as reliable and accurate as the AK type rifles deployed by the North Vietnamese and Viet Cong.

23.    Colt sought to capitalize on the military acceptance of the AR-15 / M-16 and shortly began to produce these rifles for sale on the civilian market. The only difference between the military and civilian versions was removal of select fire (both semi-automatic and full automatic) capability. The additional features on these rifles intended to enhance their capability as Military Firearms remained. As the AR-15 / M-16 gained a reputation for reliability in Military use its popularity in terms of sales to the civilian market increased. Arguably, the AR type rifle is in second place behind AK type firearms in terms of production, sale and use by military forces worldwide.

PISTOL CALIBER FIREARMS:

24.    It is important in terms of this particular case to also address the evolution and development of firearms that chamber and fire pistol caliber ammunition. A number of the handguns that are banned under the Ordinance are direct evolutionary descendants of sub machine guns initially designed and produced for military use. As such they are worthy of discussion relative to this case. A sub machine gun can generally be defined as a short "Carbine Length" or compact firearm which chambers and fires pistol caliber ammunition in select fire or fully automatic mode.

25.    Many of the construction and design features attributed to assault weapons, and

13

A. 26

the StG 44, were first utilized in the design and manufacture of mid 20th Century sub machineguns. Nazi Germany entered the war with the Innovative MP38 (Maschinenpistole 38). It was chambered in 9mm and later, after a number of engineering changes, re designated the MP40. It has design features later commonly found in assault weapons which included include an adjustable stock, separate pistol grip, a detachable magazine and use of steel stampings in its construction.

26.     While the United States initially entered World War II with a military variant of the Thompson .45 caliber sub machinegun it was heavy and expensive to manufacture because a number of the major components were machined from solid steel. Before the end of the war the Thompson had been supplemented by the M3 "Greasegun" initially produced by General Motors. The receiver was a stamped and welded sheet metal assembly with an adjustable sliding shoulder stock. Like the MP38 / MP40, it had a separate pistol grip, a sliding / adjustable shoulder stock and a detachable box magazine with a 30 round capacity. In a utilitarian sense it was as effective as the Thompson and, at approximately $20, it was less than half as expensive for the US Government to purchase.

27.     The United Kingdom produced over one million Sten Submachine guns during WWII. A rugged and reliable firearm made largely from welded steel stampings it was utility, reliability and ease of manufacture both combined and perfected. Features shared with the M3 and MP40 included an adjustable shoulder stock, separate detachable box magazine and, on some variations, a barrel shroud allowing the operator to utilize the area surrounding the barrel as an auxiliary grip point without contacting a heated barrel.

28.     Prior to and during WWII a number of other nations developed sub machineguns which followed the same design and construction philosophy. Notable examples include the

14

A. 27

Soviet PPSH41, the Italian Beretta Model 38/42, and the Swedish Carl Gustav Model 45.

29.     Following WWII most new sub machinegun designs continued the design philosophy which combined utility, ease of manufacture and the features of wartime firearms. In the early 1960's HK introduced the MP5 which became an immensely popular choice for military and law enforcement agencies worldwide due to its inherent reliability and accuracy. It was produced in multiple iterations to include a semi automatic civilian version as well as a pistol variant without a provision for a shoulder stock (HK SP89). Israeli Military Industries also successfully marketed their UZI sub machinegun for export in select fire, and in civilian semi automatic variants.

30.     Additionally, a number of sub machinegun designs proved unsuccessful in terms of Military and Government sales but nonetheless found a ready market when re engineered as a semiautomatic pistol. Notable examples include the Cobray MAC-10 (and successive variants) and the Intratec TEC-9 which began life as a Swedish designed sub machinegun, the Interdynamic MP-9.

Features of Assault Rifles / Assault Weapons under the Ordinance:

31.     Equipment designed, produced and issued to modern Military forces for utilization in the field emphasizes functionality. In terms of small arms designed and produced for military use, form follows function and features are present to maximize effectiveness. Maximizing effectiveness in terms of military small arms includes the ability to deliver reliable lethality or the ability to incapacitate the chosen target and provide increased survivability for the operator in battle.

32.     Numerous Assault Weapons available for purchase by the public are, save the lack of select fire capability, identical copies of military firearms. As such they retain a number

A. 28

of features originally designed to maximize their effectiveness in battle. Other firearms available to the public, which were not initially intended for sale to government or military customers, incorporate features which mimic those found on military firearms. There are countless accessories available to add to firearms traditionally considered "sporting firearms" (i.e. those initially designed and manufactured for target shooting or hunting) which brings their functionality more towards the military side of the spectrum and away from the sporting side.

33.    Specific defined features banned by the Ordinance, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing their effectiveness and lethality. It is worthy of note here that the Ordinance does not ban firearms, all semiautomatic firearms, or all firearms chambered in .223 / 556 (AR) or 7.62x39mm (AK). As such an examination of the definitions, banned features and their purpose / functionality under the Ordinance is relevant in addressing the objections to the regulation raised by the plaintiffs:

*Assault weapon means:*

*(1) A semiautomatic rifle that has the capacity to accept a Large Capacity Magazine detachable or otherwise and one or more of the following:*

   Discussion of magazine capacity and / or detachable magazines will be discussed at the end of the features discussed below as it is common to all classes of firearms covered under the ban.

*a) Only a pistol grip without a stock attached;*

   A semiautomatic rifle which includes only a pistol grip (or does not include a shoulder stock) increases the ability of the operator to conceal the firearm, maneuver the firearm in confined space and facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator). Rifles traditionally considered sporting firearms are generally not designed and produced as such.

*b) Any feature capable of functioning as a protruding grip that can be held by The non-trigger hand;*

16

A. 29

Protruding foregrips allow increased stability of the firearm by the operator. They allow the operator to better control recoil and muzzle climb thus increasing the hit probability of successive shots. It is not a feature found on traditional sporting firearms. It appeared on some versions of AK based rifles however it was not until the advent of Rail Attachment Systems (RAS) and acceptance by the US Military of same that foregrips for semi automatic rifles have grown in popularity.

c) *A folding, telescoping or thumbhole stock;*

Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space. It also facilitates easier or more comfortable firing from positions other than the shoulder (as with pistol grip only rifles). U.S. Military origins for this type of stock can be found on the M1 carbine in WWII when modified for paratrooper use. Thumbhole stocks have traditionally been utilized on firearms for sport and target shooting, however during the Federal Assault Weapons Ban a number of AK style firearms (amongst others) were so equipped in order to meet the requirements during the time that the law was in effect.

d) *A shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or*

Military semi automatic and select fire rifles have featured a shroud or hand guard that encircles the barrel since before the onset of WWII. The M1 "Garand" Rifle utilized by the US Military during that conflict incorporated a traditional wooden stock similar to most hunting and sporting rifles of the period however it also featured a wooden handguard which covered the top 2/3rds of the barrel. Therefore this design feature is not a recent development. Enclosing the barrel in a shroud serves multiple purposes. In a modern gas operated semi automatic Military rifle it serves to protect the gas tube / piston mechanism from inadvertent damage. It also provides additional grip space for the operator to steady and control the rifle during rapid, repeat firing without getting burned by the hot barrel. For example the handguard fitted to the M-16A1 as originally adopted by the US featured a rounded triangular cross section forward of the receiver. This shape was a natural fit for the non trigger (supporting) hand.

e) *A Muzzle Brake or Muzzle Compensator;*

A muzzle brake in a semiautomatic rifle can serve a number of purposes depending on its design and placement. Escaping gases can be vented upwards at the end of the barrel to reduce "muzzle flip" and allow the operator to control the rifle during rapid, repeat firing without taking time to reacquire the target. As stated earlier in the case of AK style rifles, a muzzle brake serves to vent gases directionally to counter the tendency of this rifle to move up and to the right after firing. The net advantage of less time required to recover control of the rifle after firing is that it allows the operator to more rapidly fire accurate additional shots if required.

17

A. 30

(2) *A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of Ammunition;*

> As stated previously magazine capacity is a common feature in all firearms subject to the Ordinance and will be addressed following the additional features discussed below.

(3) *A semiautomatic pistol that has the capacity to accept a Detachable Magazine and has one or more of the following:*

   a) *Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;*

> Handguns, including semi automatic pistols, are defined in part, under federal statute 18 U.S.C. 921(a)(29), as being "designed to be held and fired by the use of a single hand". Secondary added grips are not found on sporting pistols manufactured in the United States nor are they typically found on military pistols. This advantage of this type of arrangement is increased stability in controlling the pistol. Increased controllability can result in more effective shot placement by the operator. Addition of a foregrip to a pistol would make the firearm subject to the provisions of the National Firearms Act (NFA).

   b) *A folding, telescoping or thumbhole stock;*

> Generally the same as 3(a) to include that the addition of a stock would subject the firearms to the provisions of the NFA.

   c) *A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;*

> Modern pistols wherein the design is based on either AR, AK type receivers or based on submachine gun designs (TEC-9 etc.) usually have this feature with the same derivation and resultant effect on accuracy as described under 1(d).

   d) *A muzzle brake or muzzle compensator; or*

> Generally the same as stated under 1(e).

   e) *The capacity to accept a Detachable Magazine at some location outside of the pistol grip*

> The placement of a detachable magazine outside of the pistol grip is a feature not common to sporting pistols and can trace its origin to military pistols designed in the late 1800's. The Bergman Military Model 1897 (or No. 5) featured a detachable magazine outside the pistol grip. Further evolution of this design can be found in the Mauser C-96 or "Broom handle" pistols which were manufactured with fixed internal

18

as well as detachable magazines. Modern firearms recently or currently manufactured in this configuration are either semiautomatic pistol variants of submachine gun designs (HK SP89, Czech Scorpion, TEC-9, etc.) or pistols based upon AR and AK receivers / frames. Handguns, as stated previously, are legally defined as one handed firearms. The modern firearms manufactured with this banned feature (HK SP89 etc.) provide a second grip point due to the detachable magazine forward of the pistol grip. This increases stability, more comfortable shooting from the hip and facilitates more controlled rapid fire.

*(4) A semiautomatic shotgun that has one or more of the following:*

    *a) Only a pistol grip without a stock attached;*

    *b) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;*

    *c) A folding, telescoping or thumbhole stock;*

    *d) A fixed magazine capacity in excess of five rounds; or*

    *e) The ability to accept a detachable magazine;*

    The derivation and discussion of the features banned in regard to semi automatic shotguns are the same as those described previously in regard to semi automatic rifles under the statute.

*(5) Any shotgun with a revolving cylinder;*

    This provision refers to '"Street Sweeper" shotguns and derivations thereof. This design has not been accepted or adopted for Military or Law Enforcement use by any nation or agency that I am aware of. In terms of legitimate sporting use for either hunting or target shooting I cannot conceive of it having any utility.

*High Capacity Magazines:*

Under the Ordinance, "Large Capacity Magazine"' refers to any magazine with a capacity exceeding ten (10) rounds for both Semiautomatic Rifles and Pistols. For semiautomatic shotguns the Ordinance limits internal capacity to five (5) rounds. Generally speaking modern semiautomatic rifles that are designed, manufactured and marketed as "hunting rifles" traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example the Browning BAR in .30-06 caliber as currently manufactured has an internal

A. 32

magazine capacity of four (4) rounds. High capacity magazines are not an evolutionary firearms development initially designed or intended for the civilian marketplace. The lineage of high capacity detachable magazines can be traced directly to a military heritage. Magazine fed light machine guns developed or deployed prior to and during WWI and thereafter refined and improved the capability and reliability of this type of feeding mechanism on a large scale. Without argument the ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat or the military would not have incorporated this feature. Less time required to reload can equate to more time spent acquiring targets or shooting. As stated previously form follows function in regard to equipment designed and intended for military use.

<u>Number of Assault Weapons in the United States</u>

34.     There are hundreds if not thousands of different types and models of firearms available in the United States for self defense or sporting. The Ordinance prohibits only a few of these weapons. In fact, because the Ordinance defines "Assault Weapons" by whether or not the weapon contains one or more of specified characteristics, the Ordinance does not even prohibit all semi-automatic firearms.[3]

35.     It is difficult to determine how many Assault Weapons Americans currently own, in large part because most firearm manufacturers refuse to release data tracking their sales.[4] The declarations filed in support of the plaintiffs' complaint in this matter focus on the number of

---

[3] *See,* Christopher S. Koper, *America's Experience with the Assault Weapons Ban, in* Reducing Gun Violence in America, 161 (Daniel W. Webster & Jon S. Vernick, eds. 2013) (explaining that the universe of large-capacity magazine equipped firearms is broader than the universe of weapons satisfying the criteria for categorization as an assault weapon).

[4] Justin Peters, *How Many Assault Weapons Are There in America? How Much Would It Cost the Government To Buy Them Back?,* Slate, (Dec. 20, 2012), http://www.slate.com/blogs/crime/2012/12/20/assault_rifle_stats_how_many_assault_rifles_are_there_in_america.html

semi-automatic rifles manufactured in the United States, but we know that a great many of these end up in Mexico.[5] Mr. Curcuruto estimates that 4,796,400 AR-type rifles were manufactured in the United States over a twenty-two period from 1990 to 2012. (Curcuruto Declaration, ¶ 4). By comparison, there were approximately 98,000,000 handguns and shotguns manufactured during approximately the same period.[6]

36. The NRA's lobbying arm estimates that, depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S.[7] According to 2004 national firearms survey conducted by Hepburn, Miller, Azreal and Hemmenway, there are approximately 218 million privately owned firearms in the U.S.[8] Based on the NRA's statistics, therefore, there are approximately 4,905,000 assault weapons in the U.S. While this number is not insignificant, in my opinion it does not support the claim that assault weapons are 'In common use'.

<u>Legitimate Lawful Uses for Assault Weapons</u>

37. In my opinion, based upon my training, knowledge, experience and research assault rifles were not designed for traditional hunting purposes. Neither was the .223 caliber / 5.56 mm cartridge developed for civilian hunting applications. It is worth noting that in Illinois, amongst other States, .223 / 5.56 is too small a caliber to be legal for hunting. Another factor to consider is whether there is a need for a fully loaded 30 round detachable magazine to hunt deer, boar etc., and is such a capacity even considered "sporting"? There are numerous other traditional sporting rifles (and in fact military surplus rifles such as the M1 Garand) that are legal

---

[5] *See*, McDougal, Sherk & Muggah, The Way of the Gun: Estimating Firearms Traffic Across the U.S.-Mexican Border, p. 3 (2013) (estimating that as many as 426,000 U.S. manufactured firearms are illegally trafficked into Mexico each year, up from approximately 88,000 per year when the federal assault weapons ban was in place).
[6] McDougal, The Way of the Gun, supra, p. 6.
[7] *Top Ten Frequently Asked Questions*, NRA-ILA, http://www.gunbanfacts.com/FAQ.aspx.
[8] *Ibid*, p. 6.

A. 34

under the Ordinance and are chambered in a caliber both legal and more suitable for hunting than .223 caliber / 5.56.mm.

38.     In terms of home defense and personal protection I am of the opinion that Assault Weapons, whether in the form of a rifle or a handgun are not the best choice for either purpose. I have been asked on numerous occasions during my career what I would recommend for either or both. My recommendation is based upon my inquiry in return regarding the individual's (and their family members') personal experience and comfort level with firearms. In over 25+ years I have never recommended an AR, AK or other similar assault rifle as a home defense weapon.

39.     Home defense and / or retail robbery situations are rarely, if ever, lengthy shootouts with extensive exchanges of gunfire. I have reviewed the past three years of news clips as posted on the National Rifle Association's "Armed Citizen" WebPages.[9] None of the news clips have mentioned a situation wherein there was a protracted lengthy shootout. I am not of the opinion that an abundance of ammunition is a substitute for weapons familiarization and shot placement. Repeated practice and shooting with your chosen firearm will make you a more effective deterrent should deadly force be required.

40.     If the individual had a preference for shoulder weapons, I have recommended a pump action 12 gauge shotgun (Remington 870, Mossberg 500 etc.) loaded with 00 Buckshot and stored with the "hammer dropped" on an empty chamber, safety off. The only action required to bring the shotgun from a safe unloaded condition to a firing condition is to work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power, low probability of over penetration (as compared to rifle caliber and velocity projectiles) and zero manipulation of safety mechanisms required in a high stress

---

[9] http://www.nraila.org/gun-laws/armed-citizen.aspx

situations. The loading / chambering process itself is an audible deterrent. Training and familiarization with this type of a firearm is simple and straightforward.

41.     For a handgun, my first inclination is to recommend an eight shot revolver in .38 +P caliber / .357 Magnum (Similar to S&W Model 627, Taurus Model 608, etc.) loaded with hollow point bullets. As with my rationale for recommending a pump action shotgun there are no complicated safety mechanisms to manipulate in a high stress situation, low probability of over penetration and ease of reloading with a speed loader should more than eight shots be required. Revolvers are also easier and less complicated for other family members to learn to operate especially if they have less familiarity with firearms.

42.     In terms of a carry handgun, I value concealability over ammunition capacity. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario I believe the best course of action is to quickly extricate yourself from the "kill zone" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF we were issued a Sig Sauer P229 in .40 S&W caliber as a primary duty weapon. We were also given the choice of a Sig Sauer P239 in .40 S&W or a five shot Smith and Wesson Model 640 in .357 Magnum as a backup firearm. When off duty I carried the S&W 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that ten (10) rounds was an adequate amount of ammunition to enable me, or myself and my wife, or child, to extricate myself from a street or retail location robbery should I encounter one. Consequently I have most often recommended either a lightweight small revolver (S&W Bodyguard, Ruger LCR, Smith and Wesson Model 36, 640 or variant) carried with a speed loader or a low profile small semiautomatic pistol (Sig Sauer P236, Ruger LCP, Colt Pocketlite etc.) with a spare magazine.

A. 36

I declare under penalties of perjury pursuant to 28 U.S.C. §1447 that the foregoing is true and correct. Executed this 7th day of February, 2014.

James E. Yurgealitis

#27501399_v1

24

A. 37

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARIE S. FRIEDMAN, M.D. and The     )
Illinois State Rifle Association,       )
                                      )
              Plaintiffs, )
                                        )
v.                                   )   No. 13-cv-09073
                                        )
THE CITY OF HIGHLAND PARK,      )
                                      )
             Defendant. )

## DECLARATION OF MARK D. JONES

Pursuant to 28 U.S.C. § 1746, I, Mark D. Jones, declare and state as follows:

    1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

    2. I was retained by the City of Highland Park to provide my opinions in this matter. The views I state herein are drawn from my professional experience and training.

    3. I am currently employed by the University of Chicago Crime Lab in the capacity of Law Enforcement Advisor and have been so employed since August 2012. Prior to that I spent the majority of my career (from September 8, 1991 until November 30, 2011) with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I worked on a range of issues involving firearms. My *curriculum vita* is attached hereto. I retired from ATF as the U.S. Department of Justice's Regional Firearms Advisor to the governments of Central America; prior to that position, I served as a program manager in ATF headquarters (HQ) assigned to

the FBI Counter Terrorism and Criminal Investigations Divisions; supervisor of the Arson and Explosives Intelligence group in ATF HQ; supervisor of Washington Group II investigating firearms trafficking in the Washington, D.C. field division; Deputy Division Chief of the ATF HQ Arson and Explosives Division; the Division Operations Officer in the Chicago Field Division; supervisor of Chicago Group I investigating street gangs in the Chicago Field Division, and as a special agent in the Kansas City Field Division conducting criminal investigations. During my career with ATF, I was assigned to the District of Columbia for more than 7 years in several of the positions set forth above. I have participated in over 100 federal, state and/or local law enforcement arrests involving unlawful firearms possession, illegal firearms trafficking, misuse of firearms, and firearms-related violence. I conducted, supervised, or participated in investigations in the District of Columbia, and the states of California, Florida, Georgia, Illinois, Iowa, Kansas, Nebraska, North Carolina, Maryland, Missouri, New Jersey, New York, Ohio, South Dakota, Texas, and Virginia in the United States as well as in the countries of Barbados, Belize, Bolivia, Costa Rica, Egypt, El Salvador, Guatemala, Honduras, Lebanon, Nigeria, and Panama.

4. During my final assignment with ATF, I was responsible for developing and implementing the United States government's strategy to aid the governments of Central America in reducing firearms violence. While based in El Salvador, I led a team of experts who conducted detailed assessments of the regulatory and enforcement environments in six of the seven countries of Central America (Belize,

2

A. 39

Costa Rica, El Salvador, Guatemala, Honduras and Panama). Through those assessments I was able to formulate a training plan to help the public security agencies in each of those countries to better focus and use their resources to deter illegal small-arms trafficking.

5. In my career at ATF I worked with numerous domestic and international law-enforcement and intelligence agencies to train their personnel to conduct investigations of illicit small-arms trafficking, investigations of explosives-related crimes, and investigation of violent gangs. I was selected as a ATF representative during national-level explosives policy meetings at the White House. I also negotiated the first interagency agreement to bring the ATF's small-arms expertise to FBI-sponsored Joint Terrorism Task Forces nationwide, and drafted ATF's national policy to implement that agreement.

6. Prior to ATF, I worked for the U.S. Department of State, Diplomatic Security Service (DSS) where I conducted internal-affairs investigations and protective security operations. I also served as the Supervisory Special Agent in charge of security for the U.S. Ambassador to Lebanon; and served as supervisor of a specially trained team of agents conducting high-risk dignitary protection operations and training missions, both within the United States and abroad. During my employment with DSS, I travelled extensively, both domestically and in foreign countries, to conduct sensitive criminal and national security investigations, several involving criminal misuse of firearms.

3

7. I have provided training to law enforcement and public security officials and agencies throughout the United States, Europe, Central and South America, Africa, Asia and the Middle East, on how to recognize and interdict illicit small-arms trafficking and conduct explosives-related investigations. During my law-enforcement career, I received extensive training involving firearms, use of force, evidence collection, explosives, and many additional subjects. In 1988, I was trained as a firearms instructor by DSS and subsequently trained many public security and law enforcement personnel both in the United States and in foreign countries in the safe use, care and storage of firearms. Following my appointment by ATF, I received additional training as a firearms instructor, this time at the Federal Law Enforcement Training Center, and subsequently trained numerous federal, state and local law enforcement officers in the proper use, handling, and maintenance of firearms, and did so until I retired in 2011. I was certified as a use-of-force instructor-trainer, and conducted training for federal, state and local law enforcement officers from numerous agencies until I retired. I have read many studies on firearms possession, lawful use and criminal or negligent misuse of firearms. I make an effort to review new studies on those subjects as they are published. I have a Master of Science Degree in Management from Johns Hopkins University.

8. In preparing to present my opinions here, I reviewed the following materials:

a. Plaintiffs' Complaint; Case Number 13-cv-9073
b. Highland Park City Code of 1968, as amended, Chapter 136: Assault Weapons (the "Highland Park Ordinance")

4

A. 41

c. <u>Illinois Compiled Statutes</u>, Chapter 430. Public Safety Act, Firearms Owners Identification Card Act

d. Abrams, Daniel, 1992. <u>Ending The Arms Race, An Argument for a Ban On Assault Weapons</u>, Yale Law Review

e. Ayoob, Massad, 1980. <u>In the Gravest Extreme</u>, Police Bookshelf

f. Bureau of Justice Statistics, 2010. <u>Victimization During Household Burglary</u>, National Crime Victimization Survey

g. Bureau of Alcohol, Tobacco and Firearms, 1989 <u>Report and Recommendation on the Importability of Certain Semiautomatic Rifles</u>

h. Bureau of Alcohol, Tobacco and Firearms, 1998. <u>A Study on the Sporting Suitability of Modified Semi-Automatic Assault Rifles</u>

i. Chivers, C.J., 2011 <u>The Gun</u>. Simon and Schuster

j. Cooper, Jeff, 1989. <u>Principals of Personal Defense</u>. Paladin Press

k. Firearm & Injury Center at University of Pennsylvania, 2011. <u>Firearm Injury in the U.S.</u>

l. Grossman, David A., 1996. <u>On Killing</u>. Little, Brown & Co.

m. Hemenway, David, 2010. <u>Private Guns, Public Health</u>. University of Michigan Press

n. Hemenway, David, 2011. <u>Risks and Benefits of a Gun in the Home</u>; American Journal of Lifestyle Medicine

o. Krouse, William J., 2012. Gun Control Legislation, Congressional Research Service

p. Lizotte, Alan J; David J. Bordua and Carolyn S. White, 1981. <u>Firearms Ownership for Sport and Protection: Two Not So Divergent Models</u>. American Sociological Review, 46(4), 499-503.

q. Lott, John R. Jr., 1998. <u>More Guns, Less Crime, Understanding Crime and Gun Control Laws</u>; University of Chicago Press

r. Lott, John R. Jr., 2003. <u>The Bias Against Guns</u>. Regnery Publishing, Inc.

s. Diaz, Tom, 2013. <u>The Last Gun</u>. New Press, New York

t. Ludwig, Jens; Philip J. Cook and Tom W. Smith, 1998. <u>The Gender Gap in Reporting Household Gun Ownership</u>. American Journal of Public Health, 88(11), 1715-18.

u. McDougal, Topher; David A. Shirk; Rogert Muggah and John H. Patterson, 2013. <u>The Way of the Gun: Estimating Firearms Traffic across the U.S.-Mexico Border</u>. University of San Diego Trans-Border Institute and the Igarape Institute

v. Planty, Michael and Jennifer L Truman, 2013. <u>Firearm Violence, 1993-2011</u> Bureau of Justice Statistics, U.S. Department of Justice

w. Richardson, Erin, Hemenway, David. 2011. <u>Homicide, Suicide, and Unintentional Firearm Fatality: comparing the United States with other high-income countries</u>. Journal of Trauma and Acute Care Surgery.

5

A. 42

    x. Christopher Koper, An Updated Assessment of the Federal Assault
       Weapons Ban: Impacts on Gun Markets and Gun Violence (Jerry
       Lee Center of Criminology, University of Pennsylvania 2004).
    y. Shefey, Joseph F. and James D. Wright. 1995. In the Line of Fire:
       Youth, Guns, and Violence in Urban America Hawthorne, NY: Aldine
       de Gruyter
    z. Siddle, Bruce K. Sharpening the Warrior's Edge. 1995. PPCT Research
       Library
    aa. Spitzer, Robert J. 2012. The Politics of Gun Control. Boulder, CO:
       Paradigm.
    bb. Violence Policy Center, 2004. Illinois, Land of Post-Ban Assault
       Weapons
    cc. Blair, Martaindale & Nichols, *Active Shooter Events from 2000 to 2012*,
       Jan. 2014 (available at http://leb.fbi.gov/2014/january/active-shooter-
       events-from-2000-to-2012?utm_campaign=email-
       Immediate&utm_content=286210)
    dd. Office of the State's Attorney Judicial District of Danbury, *Report of the State's
       Attorney for the Judicial District of Danbury*, Nov. 25, 2013.
    ee. Anything otherwise referenced in this declaration.

9. In summary, based on my experience in law enforcement and my review of all

the materials cited herein, I believe that assault weapons, as defined by the

Highland Park Ordinance, are unusual and dangerous and are not appropriate for

self-defense. Additionally, Highland Park's Ordinance serves the goals of enhancing

public safety and reducing firearm-related crime.

I. Topic Background

10. The U.S. Supreme Court ruling in *Heller v District of Columbia* held that

the Second Amendment of the Constitution guarantees an individual's right to

possess a firearm unconnected with militia service, for traditionally lawful purposes

such as hunting and self-defense within the home. The court specifically stated that

the right to keep and bear arms is not unlimited, does not permit an individual to

possess any weapon whatsoever and specifically excludes unusually dangerous

6

firearms. Legislatures and bureaucracies have, respectively, the responsibility to pass laws and promulgate regulations that offer equal protection under the law to all parts of society, not just a vocal minority advocating for something that serves only their particular interests.

11. The City of Highland Park enacted Ordinance to address the potential threat of mass shootings involving a semi-automatic assault weapon. Such events are demonstrably more catastrophic when the assailant uses a semi-automatic assault weapon than when other firearms are used[i]. The recent study by Mayors Against Illegal Guns (MAIG) shows that of the 93 examples occurring between January 2009 and September 2013 at least 14 semi-automatic or fully automatic assault weapons were recovered from the suspects; in those incidents, 151% more casualties resulted and 63% more deaths occurred that in incidents involving other types of guns[ii]. The MAIG report cited does not include the September 20, 2013 mass shooting at Cornell Park in Chicago wherein a subject wielding a Kalashnikov style semi-automatic assault rifle wounded 13 victims in just a few seconds[iii].

12. For example, Adam Lanza used an assault weapon legally purchased by his mother to shoot his way into a locked elementary school building in Newtown, Connecticut in 2012. In ten minutes, he killed 26 people and wounded two others. He discharged his weapon at least 130 times in less than eight minutes. Newtown Police responding to the first 911 call were on the scene in less than four minutes. One minute later, the shooter killed himself.[iv]

7

13. According to the Federal Bureau of Investigation, the frequency of active shooter events has doubled between 2009 and 2013, as compared to the period 2000 to 2008[v]. The FBI defines an "active shooter event" as "an individual actively engaged in killing or attempting to kill people in a confined and populated area, typically through use of a firearm."[vi] The events considered in the FBI's study were limited to those where the shooter attempted to kill multiple people in an area occupied by multiple unrelated individuals where at least one victim was unrelated to the shooter[vii].

14. Moreover, assault weapons are used in a disproportionately high number of shootings of law enforcement officers. For example, although assault weapons represented somewhere between 1 and 8% of guns used in crime in 1994, they accounted for 16% of gun murders of police officers[viii].

15. The AR15 family of rifles and the various civilian versions of Kalashnikov style firearms available on the U.S. gun market are based entirely on the original selective fire versions of the same guns[ix]. The functional differences are minimal, mainly in the lack of fully automatic fire capability missing on the semi-automatic civilian versions. Conversion of semi-automatic rifles to fully automatic machineguns is possible with machine tools available in any automotive repair shop and requires a certain amount of skill and knowledge to be reliable, but many of the U.S. sourced rifles recovered from Mexican drug cartels were found to have been converted from their original, semi-automatic configuration to allow fully automatic fire[x]. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

8

A. 45

recovers hundreds of illegal machine guns annually in the United States and many of those are either AR15 or Kalashnikov style firearms originally manufactured as semi-automatic firearms.

16. When comparing the rate of fire (cyclic rate) of a Federally regulated, fully automatic machine gun and an semi-automatic AR15-type rifle, the difference is minimal. The AR15 family of rifles may be fired at virtually the same cyclic rate of fire as a fully automatic machine gun, by installing a commercially manufactured so-called "bump fire" trigger activator or by merely firing from the hip holding the barrel shroud with one hand, and pressing the trigger with the other. By using this after market device or adopting the described technique, the AR15's recoil will naturally fire the weapon at a cyclic rate equal to a fully automatic machine gun.

17. Moreover, the parts and plans for conversion of a semi-automatic firearm into a machinegun are widely available on the internet, in classified advertisements in various trade publications or at gun shows and are, in and of themselves, legal to possess under federal law as long they are not stored in proximity to a firearm that could be converted by their installation[xi].

18. Semi-automatic assault weapons and civilian sporting firearms, e.g., hunting rifles and shotguns, make up a very small percentage of firearms used in armed assaults, homicides and suicides in Illinois and nationwide[xii].

19. Many randomized, controlled case studies have demonstrated that merely bringing a firearm into the home significantly increases the residents' risk of death by gunshot,[xiii] exactly the opposite result sought by many who acquire a firearm for

9

self-defense. Alarmists cite an increase in residential burglary as the main reason to keep a firearm in the home for self-defense,[xiv] when in fact home invasion burglaries (and related murders) make up a tiny percentage of all residential burglaries in the United States[xv].

20. Two of the main rationales for acquiring a military style semi-automatic assault rifle cited in firearms industry articles and advertisements are defense of the home in the event of a natural disaster and ensuing civil insurrection and/or to fight the tyranny of an out-of-control federal government often supported by the words of the one of founding fathers of the republic, Thomas Jefferson; "The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[xvi]

21. Addressing these two concepts in reverse order: The ideation of armed resistance against a tyrannical government is part of the American legend and, while it is certainly true that colonial militia took up arms in revolt against the British during the 18th century, the concept of doing so in 2014, or for that matter of a dictatorial takeover of the United States government is laughable, as is the idea that a civilian militia armed with semi-automatic assault weapons could mount an effective campaign against the United States armed forces, even if the U.S. military were inclined to support an aspiring tyrant.

22. Natural and man-made disasters can and do occur; floods, fires, earthquakes, tornados, failures of the power grid, riots and looting have all come to pass in the United States. Taken in context, however, the most serious incidents

10

A. 47

have lasted no longer than a few days before civilian authorities restored order. During such events civilians were required to shelter in place for short periods of time, some possibly resorting to the use of force. However the idea that untrained civilians should acquire assault weapons, as a hedge against a horde of suddenly feral neighbors is firearms industry fear mongering at its most vile[xvii] that results in more unnecessary firearms in general circulation, vulnerable to theft and misuse.

## II. Human Factors Considerations

23. Firearms are clearly effective lethal tools for self-defense, both for law enforcement and civilian use. The paradox however is that many poorly or entirely untrained individuals would not be able to use a firearm to defend themselves. In his book <u>On Killing</u>, author David Grossman makes a compelling case that one person taking another's life is much more difficult in practice than is portrayed in popular culture, particularly for individuals who have not benefited from operant conditioning training methodologies employed by the military and civilian police agencies[xviii]. In my own experience as a law enforcement use-of-force instructor, countless civilians, relatives, and friends have sought my advice about acquiring a firearm for self-defense. In most of those instances, when I inquired about their intentions I was told that they intended to deter would-be criminals by merely displaying a gun hoping that the demonstration would cause the criminal to flee. When questioned about their feelings about potentially killing another human being, I was invariably met with a statement to the effect that he or she had not really considered that possibility.

11

A. 48

24. It is axiomatic among firearms enthusiasts that "Guns don't kill people, people kill people," and it is also well known within the law enforcement training community that intention and combat mind set are critical to success in lethal force encounters.[xix] As a trainer I spent countless hours helping police officers and federal agents hone the physical skills required to manipulate their firearms and less-lethal weapons, e.g. handcuffs, pepper spray, batons, and conducted energy devices (Taser), trying to ingrain the skills so that little conscious thought would be necessary to employ them. Civilians without training are clearly capable of killing one another with whatever is at hand as is borne out by the homicide statistics recorded annually by the FBI and other agencies. The question here is whether the average citizen, statistically unlikely to encounter violence in his or her lifetime, and with little or no training in self-defense disciplines, could become a killer by the mere possession of a firearm. Based on my training and experience, I believe the answer to be no.

25. Setting aside the concept of combat mindset and the ability of one person to kill another, the idea of a use-of-force continuum must be considered. In discussions about use of force, lethal force is but one option and always the least desirable even when required.

26. Police officers learn that their use of force begins with their mere presence -- their uniform, badge and other symbols of authority constitute a recognizable institution in American society and in general, citizens understand they are required to obey lawful commands from a police official or face arrest.[xx] Police

12

officers all over the United States receive empty-hand defensive tactics training, usually mandated by a state training council or a similar governing body.

27.  The amount of defensive tactics training for law enforcement officers varies from state to state, but is invariably focused on overcoming low to medium levels of resistance, e.g. verbal non-compliance to police commands, passive resistance characterized by letting one's body go limp, or active resistance like pulling or running away from an officer's attempts to restrain. That training begins in the police academy for recruits and continues throughout one's career. Police officers are issued handcuffs - the most ubiquitous use-of-force device - and other tools such as batons to ensure compliance or overcome resistance to their authority. They are trained in how to properly use these tools, and after just a few years most officers become quite adept at employing them.

28.  Research into human factors conducted by PPCT, Inc. has documented the physiological effects that come into play during a lethal force encounter and affect the outcome. The human nervous system, more specifically the sympathetic and parasympathetic nervous systems (SNS), have evolved to improve a human being's chances of surviving deadly threats.[xxi] The SNS offers tremendous support for gross motor skills like pushing, throwing and running, also known as fight or flight[xxii]. However, fine motor skills like manipulating the tiny selector lever (safety) or retracting the charging handle on a semi-automatic assault weapon often suffer during deadly force encounters.

13

A. 50

29. When a person experiences an SNS activation his or her heart rate soars almost immediately, sometimes to well over 200 beats per minute;[xxiii] blood is shunted away from the extremities leading to loss of touch sensitivity; sensory input is largely restricted to vision, normally constituting about 70% of an individual's input under normal circumstances, during a SNS activation it becomes the dominant sense. Importantly, a phenomenon known as "tunnel vision" also sets in, limiting peripheral and low light vision and thus further reducing information available to mitigate the lethal force threat perception.[xxiv]

30. One reason military and police trainers spend so much time on basic firearms drills is to instill so-called "muscle memory" in recruits whereby activities like deactivating a safety become automatic requiring no conscious thought. When suddenly confronted by a deadly force threat the automatic response ensues and the weapon may be brought into play using the gross motor skills that are complimented by the body's own evolutionary reaction. Police recruits typically fire thousands of rounds in basic training and manipulate all of their issued equipment, including their firearms, countless times.

31. ATF special agent candidates spend a full week drawing their firearms, developing a proper shooting stance, and "dry firing" with laser practice equipment before they ever actually discharge a live round.[xxv] The fact that so many police involved shootings result in a documented nationwide hit-to-rounds fired ratio of less than 50% is evidence that even well trained law enforcement personnel subject to the forces of evolution and only able to overcome their natural programming with

14

A. 51

difficulty. How much less so will untrained, unskilled, and unresolved citizens be able to effectively employ a complex, notoriously finicky rifle like the AR15?

32. It is also widely understood that physical skills deteriorate without regular practice - hence the in-service training common to all law enforcement and military agencies and elements. Regular requalification is required and many agencies require monthly practice. Even the best trained police officers and soldiers skills will degrade over time if not deliberately and regularly honed.

33. Like pilots in training, much time in law enforcement recruit and in-service firearms training is given over to handling emergencies, specifically, fixing a (semi-automatic) gun that has malfunctioned during a deadly force encounter. This type of training is known as the "immediate action drill" and is designed to instill muscle memory in a shooter so that the physical actions become rote, requiring very little conscious thought. An individual is taught to perform a series of activities in a specific sequence that will rectify the most common semiautomatic firearm malfunctions.

34. In my own experience, these drills were performed at least twice annually for untold repetitions until my colleagues and I could perform them "in our sleep." Regrettably, most civilian firearms training ignores this topic altogether leaving the novice shooter with no knowledge, skills, or abilities to overcome a malfunction at a crucial moment. For that reason when I am asked to recommend a firearm for personal defense I usually suggest the revolver, a tried and true weapon design that is widely recognized by experts as the most reliable mechanism on the market. With

15

A. 52

no external safety or bolt carrier release to manipulate, if deadly force is necessary a home defender is only required to aim the gun and press the trigger. Jeff Cooper, the well-known firearms trainer, author of innumerable articles and books and founder of the original Gun Sight Ranch firearms training facility opined that a heavy-duty handgun is the "optimum defensive arm..."[xxvi] and I am in complete agreement.

35. The modern revolver will fire under virtually any circumstances, is ergonomically ideal for the human body under stress, and available in a variety of calibers, ammunition capacities, and price points to meet virtually any personal defense need.

### III. General Suitability

36. The genre of firearm at the center of the instant case is the semi-automatic assault weapon defined under the Highland Park Ordinance[xxvii] - the essential characteristic of which is a magazine capacity well in excess of what would typically be used in for target shooting or hunting. While there are many firearms available that are suitable for both sporting and defensive purposes, the semiautomatic assault weapon is typically a "civilianized" version of a firearm originally manufactured for military use.

37. The principal difference between an AR15 semi-automatic rifle and its military sibling, the M4/M16, is the latter's selective fire capability, that is the ability to use the weapon as a fully automatic machine gun (wherein a single trigger pull can empty the magazine) and for semi-automatic fire (wherein each trigger pull

16

results in only one cartridge being fired). The federal government tightly regulates possession of machine guns, whereas the possession of semiautomatic firearms is not regulated very much at all. There have been very few crimes committed with legally registered machine guns and other firearms of the types under strict federal control and there have been many, many crimes including mass casualty shootings carried out with semi-automatic assault weapons, rifles and pistols. The mass shootings alone resulted in at least 519 deaths and scores of injuries between 2009 and 2013.[xxviii]

38. Statistically, rifles and shotguns, known collectively in the vernacular as "long guns", are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes.[xxix] Yet when they _are_ used the carnage that results is stunning, the two most recent examples being 29 casualties in Newtown, Connecticut (December 2012) and 70 in Aurora, Colorado (July 2012) for a total of 99 dead and wounded in just those two 2012 Incidents.[xxx]

39. Military assault weapons were developed to allow soldiers the ability to direct high volumes of "suppressive" fire at their enemies thus permitting their compatriots to more readily maneuver on the battlefield. The 20-30 round magazine capacity found in virtually every modern military long gun, coupled with the 7 magazine "basic load" carried by American military riflemen, gives an infantry squad the ability to maintain a sustained rate and volume of fire sufficient to dominate an enemy. Ultimately, the purpose of military assault rifles and submachine guns (the analog for a civilian assault pistol) is offensive - to facilitate

17

the assault and capture of a military objective. In terms of contemporary sporting purposes for a semi-automatic assault rifle, the only conceivable use for a high capacity magazine is during a 3-gun match. In these events participants use a pistol, rifle, and shotgun to overcome fantasy challenges presented by the match organizers. Said another way, there are a variety of human silhouette "aggressor" targets arranged to challenge a shooter who's score is based on the number of accurate hits coupled with the time it takes him or her to complete the course of fire. Each of the three firearms is used during specific phases or segments of the match and then set aside, so in most cases a 30 round magazine is superfluous - the match stage requiring a rifle might only require 5 or 10 rounds to negotiate successfully. A shooter using all 30 rounds would be considered by his or her peers as either very unskilled or profligate.

40. In police involved shootings the number of shots fired is statistically very low - less than four rounds expended[xxxi] so the ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time and a semi-automatic pistol with a 10 round capacity magazine even more so.

41. To offer a high capacity magazine as the answer to lack of training or familiarity with reloading the weapon when necessary is dangerous and irresponsible. A favorite old chestnut of police firearms trainers is, "You cannot miss fast enough," meaning that in time of need one should remain calm and rely on his or her training to make accurate, incapacitating shots against an assailant, not "spray and pray." To suggest that a novice gun owner without sufficient training

18

A. 55

and experience to reload a semi-automatic handgun under stress should equip themselves with more ammunition in high capacity magazines is ludicrous. That theory places everyone in a household, even a neighborhood, in jeopardy of being killed by stray rounds.

42. In my opinion, firearms owners should be required to attend professional training, conduct regular practice sessions, and become expert in manipulating his or her chosen weapon under a variety of circumstances and lighting conditions to gain and maintain proficiency.

43. A would-be firearms owner who cannot, or will not, train and practice should consider other security options. If that person ignores common sense and insists on buying a gun, then he or she would be best served by a revolver, for reasons previously articulated in this report.

44. Assault weapons, rifles or pistols, fully or semi-automatic, are designed to be used in an offensive role. Law enforcement agencies deploy these firearms in an auxiliary function, generally subordinate to the primary duty weapon which is for the majority of police officers a handgun. Generations of police agencies relied on revolvers as their primary duty weapon and shotguns as their auxiliary, the latter typically kept locked in patrol cars against the need for something more powerful than revolver.

45. Following a specific high profile incident in California,[xxxii] police agencies around the country began issuing semi-automatic pistols - the Illinois State Police was the first large agency to adopt the technology - which soon became ubiquitous.

19

A. 56

A similar trend may be observed in the change from shotguns to patrol rifles, which began in earnest following a specific incident in Los Angeles in 1997[xxxiii] and led to many agencies either issuing semi-automatic assault rifles or approving the private purchase of such by their personnel, to avoid being "out gunned." Nationally, law enforcement leaders perceived a need for their officers to be able to overcome deadly force assaults at a greater distance with increased accuracy, tasks that semi-automatic assault rifles may easily accomplish and a shotgun generally cannot. The design characteristics of semi-automatic assault rifles allow them to excel at long distance accuracy and penetrate common ballistic vests worn by criminals, advantages that most police were lacked in 1997. It should be noted that virtually all police agencies require their personnel to undergo additional training and qualification before being authorized to carry and use a patrol rifle. Such training is typically lengthy (on the order of 40 hours) and is supplemented by regularly scheduled in-service training and requalification.

## IV. Suitability for Home Defense

46. The design characteristics outlined above are not an advantage in home defense settings, however, since the typical self defense distances involved in scenarios envisioned by firearms industry pundits average twenty feet[xxxiv] in homes with interiors constructed from gypsum drywall/sheetrock that will not prevent over penetration by any modern firearms cartridge, rifle, pistol or shotgun. To tout the semi-automatic assault weapon as the best or even second best tool for home

20

A. 57

defense is specious and disingenuous. A widely known axiom amongst defensive tactics trainers is "the best self defense gun is the one at hand."

47. A responsible firearm owner will invariably keep his or her weapons under lock and key, most in a secure gun safe designed and sold for that purpose. Safes require time to unlock and open, obviating the rifle as the "...one at hand..." unless one anticipates an imminent home invasion, statistically very unlikely,[xxxv] or irresponsibly stores his/her long gun in a closet or under the bed, easily accessible to all members of a household including children and uninvited visitors like burglars. It is well known to law enforcement authorities that firearms present an attractive target for burglars, and a gun owner who secretes his or her unsecured firearm somewhere in the home is virtually delivering the weapon to the underground gun market and criminal misuse.

48. Long guns are also not optimal for home defense because they are challenging to manipulate in the close confines found in homes; the overall length of many rifles, even those with folding or collapsible shoulder stocks, renders them unwieldy and hard to maneuver. Additionally, rifles are far more powerful than necessary or desirable for most home defense uses - the velocity of widely available standard military surplus ammunition for AR15 rifles is more than 3000 feet per second and the projectile contains a steel penetrator that greatly increases the possibility of innocents being injured or killed by missed shots or ricochets.[xxxvi] Add to those factors the inevitable sympathetic nervous system activation coupled with a high capacity magazine and it becomes a recipe for disaster.

21

A. 58

49. Many law enforcement and security experts consider the shotgun to be the acme of home defense tools, and I agree that a shotgun is more effective than most handguns and rifles but the shotgun suffers from the same disadvantages as any long gun - they are as a genre more complicated to store safely thus time consuming to obtain in an emergency, and are too long to be easily maneuverable indoors.

50. A far more likely scenario involves a handgun kept in a compact, secure yet easily accessible storage container - available in numerous configurations and locking mechanisms[xxxvii] - from which the weapon may be quickly obtained when needed but otherwise kept from unintended or unauthorized access.

51. Finally, most homeowners are not trained in close quarters combat so attempting to "clear" their house of a possible intruder would be imprudent. A safer, more conservative course would be to gather the family together in a pre-identified secure room, barricade the door and call the police. If an intruder cannot be warned off and forces entry into the safe haven before police arrive, the homeowner has the option to use deadly force if appropriate.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 7, 2014.

Executed on _Feb 7, 2014_            MARK D. JONES