IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARIE S. FRIEDMAN, M.D. and The ) 
Illinois State Rifle Association, )
)
              Plaintiffs, )
)
v. )  No. 13-cv-09073
)
THE CITY OF HIGHLAND PARK, )
)
              Defendant. )

## DECLARATION OF GRETCHEN CUSICK

Pursuant to 28 U.S.C. § 1746, I, Gretchen Cusick, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2. I was retained by the City of Highland Park to provide my opinions in this matter. The views I state herein are drawn from my professional experience.

3. I am currently the Director of Research for the University of Chicago Crime Lab and Urban Education Lab. From 2006 to 2012, I was a Researcher and Senior Researcher for Chapin Hall, a research and policy center that develops and tests the efficacy of policies, programs, and practices across a wide range of service systems and organizations. Before working at Chapin Hall, I was a Statistical Research Consultant at the Pennsylvania State University from 2003 to 2004, a Research Assistant at the Department of Sociology/Crime, Law, and Justice at the Pennsylvania State University from 2000 to 2004, and a Research Assistant in the Department of Sociology at Cleveland State University from 1999 to 2000.

1

A. 60

4. From 2005 to 2007, I taught Data Spring Analysis for Policy and Management, a graduate-level statistics course at the University of Chicago. While at the Pennsylvania State University, I taught Sociological Research Methods in Summer 2002, and was a teaching assistant for the following courses: Multilevel Regression Models (Spring 2003), The Juvenile Justice System (Fall 2002), and Criminal Justice Research Methods (Winter 2001). While at Cleveland State University, I taught Juvenile Delinquency in Summer 2000 and was a Lab Instructor/Teaching Assistant for Quantitative Research Methods in Fall 1998 and 1999.

5. I received my PhD in Sociology from the Pennsylvania State University in 2004 and received the Department of Sociology Certificate in Statistics/Quantitative Methodology. I also received my M.A. in Sociology from Cleveland State University and a B.A. in Sociology from Miami University. I have received numerous funding research grants, fellowships, awards, and written numerous peer reviewed articles, chapters in books, reports, briefs, and discussion papers, all of which are discussed in more detail in the attached curriculum vitae.

6. In preparing to present my opinions here, I reviewed the following materials:

a. Plaintiffs' Complaint; Case Number 13-cv-9073
b. Plaintiffs' Motion and Memorandum of Law in Support of Motion for Preliminary Injunction; Case Number 13-cv-9073
c. Highland Park City Code of 1968, as amended, Chapter 136: Assault Weapons
d. Affidavit of David Lombardo, attached as Exhibit 3 to Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction; Case Number 13-cv-9073

2

    e. Discovery deposition of David Lombardo, taken on October 10, 2013 in the *Matthew J. Wilson v. County of Cook* matter (Case No. 07 CH 4848, Cook County, Illinois)

    f. Affidavit of James Curcuruto, attached as Exhibit 4 to <u>Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction</u>, Case Number 13-cv-9073, including all of the attached reports and statistical data.

    g. Discovery deposition of James Curcuruto, taken on November 7, 2013 in the *Matthew J. Wilson v. County of Cook* matter (Case No. 07 CH 4848, Cook County, Illinois)

    h. Affidavit of Gary Kleck, attached to <u>Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction</u>, Case Number 13-cv-9073, including his 1993 survey related to defensive gun use.

    i. Daniel Webster, ScD, MPH & Jens Ludwig, PhD, MYTHS ABOUT DEFENSIVE GUN USE AND PERMISSIVE GUN CARRY LAWS (Berkeley Media Studies group, 2000)

    j. David Hemenway, PhD & Vriniotis, COMPARING THE INCIDENCE OF SELF-DEFENSE GUN USE AND CRIMINAL GUN USE (Harvard Injury Control Research Center, Spring 2009, Issue 3)

    k. Philip J. Cook, et al, THE GUN DEBATE'S NEW MYTHICAL NUMBER: *HOW MANY DEFENSIVE USES PER YEAR* (Journal of Policy Analysis and Management, Col. 16, No. 3, 463-469, 1997)

    l. Philip J. Cook & Jens Ludwig, DEFENSIVE GUN USES: NEW EVIDENCE FROM A NATIONAL SURVEY (Journal of Quantitative Criminology, Vol. 14, No. 2, 1998)

    m. David Hemenway & Deborah Azrael, THE RELATIVE FREQUENCY OF OFFENSIVE AND DEFENSIVE GUN USES: RESULTS FROM A NATIONAL SURVEY (Violence and Victims, Vol. 15, No. 3, 2000)

    n. Any other documents referred to herein.

7. Plaintiffs offer the affidavits of expert witnesses David Lombardo, James Curcuruto, and Gary Kleck in support of their Motion for Preliminary Injunction. These witnesses address various topics related to the constitutionality of assault weapons; namely, that assault weapons are commonly owned for self-defense, that they are commonly owned in the United States for lawful purposes, and that guns in general were used defensively in the United States about 2.2 to 2.5 million times in 1992. These conclusions, however, rely on methods of survey and analysis that are deeply flawed and undoubtedly produced erroneous results.

I. David Lombardo

8. In his affidavit, Mr. Lombardo indicates that Chapter 136 of the Highland Park City Code bans certain firearms that are commonly owned by the residents of Illinois for a lawful purpose, including home defense, hunting, and target shooting. Specifically, Mr. Lombardo identifies rifles that are built on an AR-platform, which he claims are an "excellent and commonly made choice." The basis for these claims is a 2013 survey, titled "Survey of Firearms Owned for Personal Protection," which was prepared by Mr. Lombardo and administered to his acquaintances, people he trained in the use of firearms, and people he met at various gun-related events. The survey asked the individual to identify, among other things, what firearms they own and the purpose for which they own the firearm. Mr. Lombardo did not know where the people who took the survey lived, but believed that most lived in and around Cook County because he administered the survey in and around Cook County. Of the people he surveyed, 58.8% of them own a semi-automatic rifle with a detachable magazine for self defense.

9. This survey is deeply flawed is several respects. As an initial matter, the survey's title, "Survey of Firearms Owned for Personal Protection," explicitly states the ultimate conclusion of the survey; that people own rifles for self-defense. Potential respondents who own firearms for purposes other than self-defense may, upon viewing the title of the survey, decline to complete it since it purports to not apply to them. The survey would naturally create a self-selected group of respondents who own firearms for self-defense and, as a result, vastly exaggerate

4

the proportion of people who own rifles for personal protection. In addition, even if individuals who own firearms for purposes other than self-defense chose to complete the survey, the title may have biased their responses. By using "personal protection" in the title, the survey aids or leads the respondent in their subsequent answers to focus on self-defense. For example, if a survey is entitled "Survey of Healthy Eating Habits", respondents tend to answer questions in a way that overstates the healthiness of eating habits because healthy eating is now top of mind.

10. Further, Mr. Lombardo administered this survey to his acquaintances, people he trained in the use of firearms, and people he met at various gun-related events. Since Mr. Lombardo was personally acquainted with many, if not all, of the respondents, the respondents would likely be reluctant to admit in the survey that they owned an assault weapon for nefarious purposes. Indeed, it is highly doubtful that a respondent would confess to owning an assault rifle because he or she planned to commit mass murder at a school, or as protection for illegal drug sales. Such gun owners would likely not take the survey or, if they did, would not respond honestly for fear of legal repercussions.

11. According to Mr. Lombardo's deposition testimony, his opinion that the weapons banned by the Highland Park Ordinance are commonly owned is informed, in part, by his personal experience talking to gun owners in the Cook County area. Such personal experiences are not a proper basis for Mr. Lombardo to make sweeping statements about the ownership of assault weapons at large and more

A. 64

likely reflect little more than Mr. Lombardo's personal beliefs. Mr. Lombardo states one basis for his opinion that the AR-platform rifles are the most popular and commonly owned firearms today is that "most shooters that I'm aware of own one." This statement illustrates the lack of scientific integrity of his survey methodology. The conclusions he draws from his survey are based only on people he is "aware" of, thus calling into question whether AR-platform rifles are owned by shooters he isn't aware of. With the type of "convenience sampling" he used, Mr. Lombardo simply cannot scientifically make generalizations about assault weapons ownership.

II. James Curcuruto

12. The conclusions reached in the NSSF's MSR Comprehensive Consumer Report 2013, 2013 Firearms Retailer Survey Report, and Sports Shooting Participation in the United States in 2012 Report are based on a flawed research methodology and are therefore unreliable.

13. A first issue is that there is no evidence in the report that the sampling methodology used results in the sample being representative of the true population of MSR owners, limiting the use of inferential statistics. The survey methodology used likely resulted in the most engaged MSR owners responding. It could be that there are other groups of MSR owners, who would respond very differently to the survey questions, had they seen the survey and/or chosen to respond. As designed, this survey would not allow the authors to make any claims about the generalizability of the sample responses to a larger population of MSR owners.

14. A second methodological flaw involves the interpretations about characteristics of MSR owners. For example, the report states that multiple MSR owners are relatively more likely to be a range member, to be a frequent or avid user, and to have a military background. In other words, the report suggests that having a military background is (statistically) related to being a multiple MSR owner. Yet there are no tests provided to show relationship is anything more than chance. The survey design does not allow the authors to make such comparisons about the characteristics of multiple MSR owners.

15. A third major flaw involves the comparisons made between the 2010 and 2013 surveys. Based on the very limited information provided in the report, there are no methodological grounds for using the 2010 and 2013 surveys to make claims about changes in behavior. The surveys are likely not from comparable populations and the response rates between the two surveys are drastically different. For both reasons, one cannot make direct comparisons between the two.

16. For the first reason noted above, regarding the sampling technique and (lack of) generalizability of the surveys, there is no methodological basis for inferring that anything "changed" in the true population based on a comparison between the 2010 and 2013 survey, as Mr. Curcuruto does. For example, in response to questioning, Mr. Curcuruto states that because the average number of MSRs owned by persons who own them went up from approximately 2.6 to 3.1 from the 2010 to 2013 survey, this means that people who already own MSRs are buying more. There is no statistical basis for this interpretation. Even given proper

7

A. 66

methodology, the difference between 2.6 and 3.1 may not be statistically significant (in other words, that difference may not be big enough to be anything more than sampling error or chance; the number of MSRs owned could actually be the same or even lower in 20113 than 2010).    Mr. Curcuruto's ability to interpret the NSSF report is highly questionable given his lack of training and knowledge on statistical inference, as shown in his discussion of the relationship between gun ownership and UCR violent crime trends.

III. Gary Kleck, PhD

17.  In his affidavit, Dr. Kleck discusses a 1993 telephone survey that he conducted addressing defensive gun use in the United States.   Based on the responses to the survey, Dr. Kleck concluded that there were between 2.2 and 2.5 million gun uses by civilians in the United States in 1992.  For a variety of reasons, however, Dr. Kleck's estimates of the number of defensive uses of guns in the United States are highly exaggerated.

18.  Of the approximately 5,000 Americans who responded to Dr. Kleck's survey, 56 reported that they had used a gun in self-defense in the past year.  Dr. Kleck then multiplied the proportion of respondents who reported defensive gun use (56 / 5,000 = .0112, or 1.12%) by the number of adults in the United States (around 200 million) and the number of defensive gun uses equals 2.5 million per year.

19.  As an initial matter, however, there is no accepted understanding of what constitutes a "defensive gun use," and whether one considers oneself to be a perpetrator or defender may depend on one's perspective.  For example, criminals

8

A. 67

often believe that their use of a gun during a crime was in self-defense. Even if the criminal believed that his use of a gun was not in self-defense, he would likely not admit that on a survey for fear of criminal prosecution. Also, this information came from only one side of a hostile interaction; if Dr. Kleck was to survey the other side of that interaction, he would likely receive a different version of events.

20. Setting aside these issues, Dr. Kleck's seemingly logical methodology suffers from numerous flaws. The primary problem is that, even if Dr. Kleck's estimates were accurate, defensive gun use is a rare occurrence (only 1% of respondents reported a defensive gun use in the previous year). When such an event is so rare, inaccurate reporting by even a small number of respondents could lead to population projections that exaggerate the true number of incidents by orders of magnitude. As Daniel Webster and Jens Ludwig observe, if one-half of one percent of the survey respondents incorrectly reported that they had used a gun to defend themselves against criminal attack last year, the estimated number of gun uses would be twice as high as the true number. Such errors would likely result for a number of reasons, including the respondents misjudging the level of danger that they faced when they drew their gun.

21. Further, the phenomenon of "telescoping" and social desirability bias could also lead to an overstated incidence of reported defensive gun uses. Telescoping is the tendency of respondents to report events as happening more recently than they in fact happened. This tendency is natural and can be minimized by reducing the time period in which respondents are asked to recall whether an event occurred. In

9

A. 68

this case, the respondents were asked to recall whether an event occurred in the past year, which is a relatively long period of time and would likely result in telescoping. If, on the other hand, the survey asked respondents to estimate the number of defensive uses of a firearm in the past month, the telescoping effect would be minimized.

22. The "social desirability bias" is a tendency by respondents to over-report activities that they think would be admirable or heroic, such a successfully thwarting an attack with a gun. As Daniel Webster and Jens Ludwig point out, there is no way to definitively determine the degree to which social desirability bias may have influenced Dr. Kleck's estimates, but it is likely that nearly half of those who reported using a gun to save their life, or the life of another, probably though of their actions as heroic, and therefore susceptible to the social desirability bias.

23. Lastly, given the extremely low incidence of defensive gun use, one must also consider the small percentage of respondents whose mental illness caused them to report a defensive gun use that did not actually happen. Such incidents are rare, but when the overall incidence of defensive gun use is also extremely rare, such inaccurate reporting can have a profound effect on Dr. Kleck's subsequent estimates.

24. Taken as a whole, these issues likely mean that Dr. Kleck's estimates of defensive gun use are several orders of magnitude greater than the true number of incidents. While it is impossible to determine from Dr. Kleck's data what that true

number is, one may confidently conclude that Dr. Kleck's estimates are highly exaggerated.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 6, 2014.

Gretchen Cusick, PhD, M.A.

11

# Gretchen Cusick

gcusick@uchicago.edu | 312-479-5961 | 2237 W. Lyndale Street Chicago, IL 60647

## RESEARCH EXPERTISE

My research focuses on the developmental and educational needs of vulnerable youth during the transition to adulthood. This includes examining how public systems can support youth from disadvantaged, urban communities in developing social cognitive competencies and accumulating human capital as well as understanding what young people need in order to engage, enroll, and persist in educational pursuits and develop career readiness skills. With a particular focus on justice-involved or other at-risk youth, my work examines how educational engagement can be maximized through a combination of 1) non-traditional instructional practices and educational environments that encourage and support academic success with 2) a set of supports at the individual, family, community, and systems levels that facilitate educational engagement while also addressing other social cognitive needs. I bring a developmental framework and rigorous research methods to my work as well as a focus on informing juvenile justice practice and educational policy.

## EDUCATION

| | |
|---|---|
| 2004 | Ph.D. Sociology, The Pennsylvania State University, University Park, PA . Dissertation: "Are Violent Siblings Just Violent Youth?: A Comparison of General and Targeted Violence." *Dept. of Sociology Certificate in Statistics/Quantitative Methodology* *High Honors Comprehensive Exams and Doctoral Defense* |
| 1998 | M.A. Sociology, Cleveland State University, Cleveland, OH. Thesis: "The Effectiveness of Treatment for Substance Abusing Women with Children." |
| 1994 | B.A. Sociology (minor Criminology), Miami University, Oxford, OH. *Magna Cum Laude, College of Arts and Sciences Distinguished Student Achievement Award* |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2012 – present | Director of Research The University of Chicago Crime Lab and Urban Education Lab Urban Education Institute, University of Chicago, Chicago IL |
| 2004 – 2012 | Senior Researcher (2006-), Researcher (2004-2006) Chapin Hall, Chicago, IL |
| 2004 – present | Research Associate (Assistant Professor, 2007-; Instructor, 2004-2007) The University of Chicago, Chicago, IL |
| 2003 – 2004 | Statistical Research Consultant, EXSELS Project, The Pennsylvania State University, State College, PA |

| 2000 – 2004 | Research Assistant, Department of Sociology/Crime, Law, and Justice, The Pennsylvania State University, State College, PA |
| 1999 – 2000 | Research Assistant, Department of Sociology Cleveland State University, Cleveland, OH |

## UNIVERSITY TEACHING

| Fall 2005 - 2007 | Instructor, Social Service Administration, University of Chicago "Data Spring Analysis for Policy and Management" (graduate level statistics course) |
| Spring 2003 | Teaching Assistant, Department of Sociology, The Pennsylvania State University, "Multilevel Regression Models" (doctoral seminar) |
| Summer 2002 | Instructor, Department of Sociology, The Pennsylvania State University, "Sociological Research Methods" |
| Fall 2002 | Teaching Assistant, Department of Sociology, The Pennsylvania State University, "The Juvenile Justice System" |
| Winter 2001 | Teaching Assistant, Department of Sociology, The Pennsylvania State University, "Criminal Justice Research Methods" |
| Summer 2000 | Instructor, Department of Sociology, Cleveland State University, "Juvenile Delinquency" |
| Fall 1998 and 1999 | Lab Instructor/Teaching Assistant, Department of Sociology, Cleveland Spring State University, "Quantitative Research Methods |

## FUNDED RESEARCH GRANTS

| April 2011 – Dec. 2012 | Principal Investigator "Evaluation of the F.I.T. Program for Dually Diagnosed Incarcerated Youth" Crime Lab at the University of Chicago and Chapin Hall. $53,000 |
| October 2010 – June 2011 | Principal Investigator "Student Needs at the City Colleges of Chicago" Chapin Hall Research Grant. |
| October 2010 – Dec. 2011 | Principal Investigator "An Assessment of Child Protection Data Measurement" Jane Addams Juvenile Court Foundation. $50,000 |
| January 2008 – Aug. 2012 | Principal Investigator "Safe Schools/Healthy Students Evaluation" Chicago Public Schools. $826,420 |
| Sept. 2008 – Sept. 2011 | Principal Investigator "Accessing Counseling for Elementary Students Evaluation" Chicago Public Schools. $126,000 |
| October 2009 – April 2010 | Principal Investigator "Evaluation Planning for Regenerations |

2 , Gretchen Cusick

A. 72

Dually Involved Program" Lutheran Children and Family
Services of Illinois. $25,000

March 2009 – February 2010    Principal Investigator "Trends and Data Sharing in Juvenile Court: Jane Addams Juvenile Court Foundation Project" Jane Addams Juvenile Court Foundation. $75,000

March 2008 – October 2008    Principal Investigator "Giving Voice to the Unspeakable: Responding to Abuse in Chicago's Jewish Community" SHALVA. $56,226

October 2006 – October 2007    Principal Investigator "From Corrections to Community: The Juvenile Reentry Experience as Characterized by Multiple Systems Involvement" Illinois Criminal Justice Information Authority. $37,071

July 2005 – July 2008    Co-Investigator "Crime during the Transition to Adulthood: How Youth Fare as they Leave Out-of-Home Care" National Institute of Justice. $259,787

## FELLOWSHIPS AND AWARDS

2002 – 2004    National Consortium on Violence Research Pre-Doctoral Fellow

2001    ICPSR Summer Training Program in Quantitative Methods Fellowship

2000    The Pennsylvania State University Dept. of Sociology Scholar Award

## PROFESSIONAL SERVICE AND AFFILIATIONS

2012 – present    Affiliate Scholar, Chapin Hall

2011 – present    Member, Cook County Juvenile Probation Research Consortium

2011 – present    Board Member, Institutional Review Board (IRB), Illinois Criminal Justice Information Authority

2007 – 2012    Board Member, Institutional Review Board (IRB), University of Chicago

2007 – present    Ad hoc reviewer, *Social Service Review, Criminology, American Journal of Orthopsychiatry, Children and Youth Services Review, American Journal of Sociology*

2006 – 2007    Member, Chapin Hall Center for Children Technology Committee

2003 – 2004    Graduate Student Representative, Crime, Law, and Justice Graduate Admissions Committee, Department of Sociology/Crime, The Pennsylvania State University

2002 – 2004    Co-Chair, Department of Sociology/Crime Law and Justice Colloquia Series, The Pennsylvania State University

3 , Gretchen Cusick

| 2001 – 2003 | Member, Department of Sociology Minority Opportunities through School Transformation (MOST) Committee, The Pennsylvania State University |
| 2001 – 2002 | Student Member Editorial Board, *Law and Human Behavior* |
| 2000 – 2001 | Graduate Student Delegate, Graduate Student Association, The Pennsylvania State University |
| 1999 – 2000 | Alpha Kappa Delta International Sociology Honor Society |
| 1996 – 1998 | Golden Key National Honor Society |
| 1996 - 1997 | Phi Sigma Phi Honor Fraternity |

## PROFESSIONAL MEMBERSHIPS

American Society of Criminology
The Society for Social Work Research

## PUBLICATIONS
Peer Reviewed:

Cares, Alison and Cusick, Gretchen R. (2012). Risks and opportunities of faith and culture: The case of abused Jewish women. *Journal of Family Violence.* 27(5). 427–435.

Smithgall, Cheryl, Cusick, Gretchen R. and Griffin, Gene. (2012). Responding to students affected by trauma: Collaboration across public systems. *Keeping Kids in School and Out of Court: A Collection of Reports to Inform the National Leadership Summit on School Justice Partnership.* New York: New York State Permanent Judicial Commission on Justice for Children

Cusick, Gretchen R., Havlicek, J.R., and Courtney, Mark, E. (2012). Risk for arrest: The role of social bonds in protecting foster youth making the transition to adulthood. *American Journal of Orthopsychiatry* 82(1):19-31.

Haynes, Stacy, Ruback, R.Barry, and Cusick, Gretchen Ruth. (2010). Courtroom workgroups and sentencing: The effects of similarity, proximity, and stability. *Crime & Delinquency* 56(1): 126-161.

Keller, Thomas E., Cusick, Gretchen Ruth, and Courtney, Mark E. (2007). Approaching the Transition to Adulthood: Distinctive Profiles of Adolescents Aging Out of the Child Welfare System. *Social Service Review* 81(3): 453-484.

Ruback, R. Barry, Ruth, Gretchen R., and Shaffer, Jennifer. (2005). Assessing the impact of statutory change: A statewide, multilevel analysis of restitution orders in Pennsylvania. *Crime and Delinquency 51(3),* 318-342.

## Chapters and Books:

Osgood, D. Wayne, Foster, E. Michael, Flanagan, Constance, and Ruth, Gretchen R. (Eds.)

4 , Gretchen Cusick

(2005). *On Your Own Without a Net: The Transition to Adulthood for Vulnerable Populations.* Chicago: University of Chicago Press.

Osgood, D. Wayne, Ruth, Gretchen R., Jacobs, Janis E., Eccles, Jacquelyne S., and Barber, Bonnie L. (2005). "Six Paths Through the Transition to Adulthood: Their Predictors and Consequences" In *On the Frontier of Adulthood: Theory, Research, and Public Policy.* Frank F. Furstenberg, Jr., Rebeun G. Rumbaut, and Richard A. Settersten, Jr. (Eds.) Chicago: University of Chicago Press.

**Published Reports, Briefs, and Discussion Papers:**

Walker, Lisa, Smithgall,Cheryl, & Cusick, Gretchen Ruth. (2012). Making *community* an authentic part of school and community partnerships. Chicago: Chapin Hall at the University of Chicago

Cusick, Gretchen Ruth, Courtney, Mark.E., Havlicek, Judy., & Hess, Nathan. (2011).*Crime during the Transition to Adulthood: How Youth Fare as They Leave Out-of-Home Care.* Chicago: Chapin Hall at the University of Chicago.

Cusick, Gretchen Ruth, Goerge, Robert, and Claussen Bell, Katie. (2009). From Corrections to Community: The Juvenile Reentry Experience as Characterized by Multiple Systems Involvement. Chicago: Chapin Hall at the University of Chicago.

Goerge, Robert M., Cusick, Gretchen Ruth, and Guiltinan, Shannon. (2009). How Active Are Teens during Their Out-of-School Time? The View from Chicago. Chapin Hall Issue Brief.

Goerge, Robert, Cusick, Gretchen Ruth, Wasserman, Miriam, and Gladden, Robert Matthew (2007).After School Programs and Academic Impact: A Study of Chicago's After School Matters. Chicago, IL: Chapin Hall at the University of Chicago, Issue Brief No. 112.

Cusick, Gretchen Ruth and Courtney, Mark E. (2007). Offending During Late Adolescent: How Do Youth Aging Out of Care Compare with Their Peers? Chicago, IL: Chapin Hall Center for Children at the University of Chicago, Issue Brief No. 111.

Osgood, D.W., Foster, E.M., Flanagan, C. and Ruth, G. (2005). Programs and Policy Goals for Helping Vulnerable Youth as They Move into Adulthood. Network on Transitions to Adulthood Policy Brief, Issue 18. MacArthur Foundation Research Network on Transitions to Adulthood and Public Policy.

Courtney, Mark E., Dworsky, Amy, Bost, Noel, Ruth, Gretchen, Keller, Tom, and Havlicek, Judy. (2005) Midwest Evaluation of the Adult Functioning of Former Foster Youth. Chicago, IL: Chapin Hall Center for Children at the University of Chicago CS-116.

Butts, Jeffrey, Mayer, Susan, and Ruth, Gretchen. (2005). Focusing Juvenile Justice on PositiveYouth Development. Chicago, IL: Chapin Hall Center for Children at the University of Chicago, Issue Brief No. 105.

**Professional Papers and Presentations:**

Smithgall, Cheryl and Cusick, Gretchen R. "Responding to students affected by trauma: Collaboration across public systems" Invited plenary presented at the National Leadership Summit on School-Justice Partnerships: Keeping Kids in School and Out of Court. New York, NY, March 2012.

5 , Gretchen Cusick

Cusick, Gretchen. & Lansing, Jiffy. 2011 "Educational and Employment Outcomes for Youth Transitioning from Juvenile Justice: Implications for Student Supports." Presentation at the Juvenile Justice Research Seminar: Educating Justice System Involved Youth, February 2011.

Cusick, Gretchen R., Havlicek, Judy, and Courtney, Mark. "Foster Youth Making the Transition to Adulthood: Preparedness, Services & Supports, and Arrest" Presented at The American Society of Criminology Annual Meeting; San Francisco, CA. November 2010.

Cusick, Gretchen R. "Multiple Adversities Reflected through Involvement Across Service Systems: Implications for Children and Families, Research, and Policy and Practice." Invited Keynote Paper presented at Queens University seminar: Exploring the Connections between the Experience of Multiple Adversities in Childhood and Poor Outcomes in Later Adult Life: Linking Research to Policy and Practice. Belfast, Northern Ireland. September 2010.

Cares, Alison C., Cusick, Gretchen R., and Michels, Lisa. "A Portrait of Domestic Violence Victims in and Urban Community" Presented at The American Society of Criminology Annual Meeting; Philadelphia, PA. November 2009.

Cusick, Gretchen Ruth, Havlicek, Judy, and Courtney, Mark. "Social Connections and the Risk for Arrest Among Foster Youth." Presented at Society for Social Work Research Annual Meeting; Washington D.C. January 2008.

Cusick, Gretchen Ruth and Osgood, D. Wayne. "Addressing the Challenges for Vulnerable Youth in the Transition to Adulthood." Invited presentation at Council on Contemporary Families 10th Anniversary Conference; Chicago, IL. May 2007.

Cusick, Gretchen Ruth and Havlicek, Judy. "Crime and Child Welfare Support: Does Remaining in Care Result in Less Chance for Arrest?" Presented at Society for Social Work Research Annual Meeting; San Francisco, CA. January 2007.

Cusick, Gretchen Ruth and Courtney, Mark E. "At Risk When Aging Out: An Event History Analysis of Arrest after Exiting Child Welfare." Presented at The American Society of Criminology Annual Meeting; Los Angeles, CA. November 2006.

Cusick, Gretchen Ruth and Courtney, Mark E. "Arrests among Youth Aging out of the Child Welfare System: Are There Benefits to Staying in Care?" Presented at The American Society of Criminology Annual Meeting; Toronto, ON. November 2005.

Ruth, Gretchen. "Assessing the Impact of Statutory Change: A Statewide Multilevel Analysis of Restitution Orders in Pennsylvania." Invited presentation Workshop on Crime and Punishment, University of Chicago Law School, Chicago, IL. February 2005.

Ruth, Gretchen. "The Development of Violence: Linking Sibling and Peer Aggression." Presented at The American Society of Criminology Annual Meeting; Denver, CO. November 2003.

U.S. Department of Justice
Office of Justice Programs
*Bureau of Justice Statistics*



SPECIAL REPORT

MAY 2013 | NCJ 241730

# Firearm Violence, 1993-2011

Michael Planty, Ph.D., and Jennifer L. Truman, Ph.D., *BJS Statisticians*

In 2011, a total of 478,400 fatal and nonfatal violent crimes were committed with a firearm (table 1). Homicides made up about 2% of all firearm-related crimes. There were 11,101 firearm homicides in 2011, down by 39% from a high of 18,253 in 1993 (figure 1). The majority of the decline in firearm-related homicides occurred between 1993 and 1998. Since 1999, the number of firearm homicides increased from 10,828 to 12,791 in 2006 before declining to 11,101 in 2011.

Nonfatal firearm-related violent victimizations against persons age 12 or older declined 70%, from 1.5 million in 1993 to 456,500 in 2004 (figure 2). The number then fluctuated between about 400,000 and 600,000 through 2011.[1] While the number of firearm crimes declined over time, the percentage of all violence that involved a firearm did not change substantially, fluctuating between 6% and 9% over the same period. In 1993, 9% of all violence was committed with a firearm, compared to 8% in 2011.

[1]Many percentages and counts presented in this report are based on nonfatal firearm victimizations. Since firearm homicides accounted for about 2% of all firearm victimizations, when firearm homicides are included in the total firearm estimates, the findings do not change significantly.



**FIGURE 1**
**Firearm homicides, 1993–2011**

Note: Excludes homicides due to legal intervention and operations of war. See appendix table 1 for numbers and rates.
*Preliminary estimates retrieved from Hoyert DL, Xu JQ. (2012) Deaths: Preliminary data for 2011. *National Vital Statistics Reports*, 61(6).
Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

## HIGHLIGHTS

- Firearm-related homicides declined 39%, from 18,253 in 1993 to 11,101 in 2011.

- Nonfatal firearm crimes declined 69%, from 1.5 million victimizations in 1993 to 467,300 victimizations in 2011.

- For both fatal and nonfatal firearm victimizations, the majority of the decline occurred during the 10-year period from 1993 to 2002.

- Firearm violence accounted for about 70% of all homicides and less than 10% of all nonfatal violent crime from 1993 to 2011.

- About 70% to 80% of firearm homicides and 90% of nonfatal firearm victimizations were committed with a handgun from 1993 to 2011.

- From 1993 to 2010, males, blacks, and persons ages 18 to 24 had the highest rates of firearm homicide.

- In 2007-11, about 23% of victims of nonfatal firearm crime were injured.

- About 61% of nonfatal firearm violence was reported to the police in 2007-11.

- In 2007-11, less than 1% of victims in all nonfatal violent crimes reported using a firearm to defend themselves during the incident.

- In 2004, among state prison inmates who possessed a gun at the time of offense, less than 2% bought their firearm at a flea market or gun show and 40% obtained their firearm from an illegal source.



A. 77

The primary source of information on firearm-related homicides was obtained from mortality data based on death certificates in the National Vital Statistics System of the National Center for Health Statistics (NCHS), Centers for Disease Control and Prevention's (CDC) Web-based Injury Statistics Query and Reporting System (WISQARS). These mortality data include causes of death reported by attending physicians, medical examiners, and coroners, and demographic information about decedents reported by funeral directors who obtain that information from family members and other informants. The NCHS collects, compiles, verifies, and prepares these data for release to the public.

The estimates of nonfatal violent victimization are based on data from the Bureau of Justice Statistics' (BJS) National Crime Victimization Survey (NCVS), which collects information on nonfatal crimes against persons age 12 or older reported and not reported to the police from a nationally representative sample of U.S. households. Homicide rates are presented per 100,000 persons and the nonfatal victimization rates are presented per 1,000 persons age 12 or older. Additional information on firearm violence in this report comes from the School-Associated Violent Deaths Surveillance Study (SAVD), the FBI's Supplemental Homicide Reports (SHR), the Survey of Inmates in State

Correctional Facilities (SISCF), and the Survey of Inmates in Federal Correctional Facilities (SIFCF). Each source provides different information about victims and incident characteristics. Estimates are shown for different years based on data availability and measures of reliability. (For more information about these sources, see *Methodology*.)



**FIGURE 2**
Nonfatal firearm victimizations, 1993–2011

Note: See appendix table 2 for numbers, rates, and standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

**TABLE 1**
Criminal firearm violence, 1993–2011

| Year | Total fatal and nonfatal firearm violence | Number | | | Rate of nonfatal firearm victimization[c] | Percent | |
| | | Firearm homicides | Nonfatal firearm victimizations[a] | Nonfatal firearm incidents[b] | | All violence involving firearms | All firearm violence that was homicide |
|---|---|---|---|---|---|---|---|
| 1993 | 1,548,000 | 18,253 | 1,529,700 | 1,222,700 | 7.3 | 9.2% | 1.2% |
| 1994 | 1,585,700 | 17,527 | 1,568,200 | 1,287,200 | 7.4 | 9.3 | 1.1 |
| 1995 | 1,208,800 | 15,551 | 1,193,200 | 1,028,900 | 5.5 | 7.9 | 1.3 |
| 1996 | 1,114,800 | 14,037 | 1,100,800 | 939,500 | 5.1 | 7.9 | 1.3 |
| 1997 | 1,037,300 | 13,252 | 1,024,100 | 882,900 | 4.7 | 7.7 | 1.3 |
| 1998 | 847,200 | 11,798 | 835,400 | 673,300 | 3.8 | 7.0 | 1.4 |
| 1999 | 651,700 | 10,828 | 640,900 | 523,600 | 2.9 | 6.1 | 1.7 |
| 2000 | 621,000 | 10,801 | 610,200 | 483,700 | 2.7 | 7.3 | 1.7 |
| 2001 | 574,500 | 11,348 | 563,100 | 507,000 | 2.5 | 7.7 | 2.0 |
| 2002 | 551,800 | 11,829 | 540,000 | 450,800 | 2.3 | 7.4 | 2.1 |
| 2003 | 479,300 | 11,920 | 467,300 | 385,000 | 2.0 | 6.2 | 2.5 |
| 2004 | 468,100 | 11,624 | 456,500 | 405,800 | 1.9 | 6.9 | 2.5 |
| 2005 | 515,900 | 12,352 | 503,500 | 446,400 | 2.1 | 7.4 | 2.4 |
| 2006 | 627,200 | 12,791 | 614,400 | 552,000 | 2.5 | 7.4 | 2.0 |
| 2007 | 567,400 | 12,632 | 554,800 | 448,400 | 2.2 | 8.3 | 2.2 |
| 2008 | 383,500 | 12,179 | 371,300 | 331,600 | 1.5 | 6.0 | 3.2 |
| 2009 | 421,600 | 11,493 | 410,100 | 383,400 | 1.6 | 7.4 | 2.7 |
| 2010 | 426,100 | 11,078 | 415,000 | 378,800 | 1.6 | 8.6 | 2.6 |
| 2011[d] | 478,400 | 11,101 | 467,300 | 414,600 | 1.8 | 8.2 | 2.3 |

Note: See appendix table 3 for standard errors.
[a]A victimization refers to a single victim that experienced a criminal incident.
[b]An incident is a specific criminal act involving one or more victims or victimizations.
[c]Per 1,000 persons age 12 or older.
[d]Preliminary homicide estimates retrieved from Hoyert DL, Xu JQ. (2012) Deaths: Preliminary data for 2011. *National Vital Statistics Reports*, 61(6).
Sources: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011; and Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

Trend estimates of nonfatal firearm violence are presented as annual 1-year averages or 2-year rolling averages, as noted in each table or figure. For ease of presentation, 2-year estimates are referenced according to the most recent year. For example, estimates reported for 2011 represent the average estimates for 2010 and 2011. Other tables in this report focus on a single 5-year aggregate period from 2007 through 2011. These approaches—using rolling averages and aggregating years—increase the reliability and stability of estimates, which facilitates comparisons over time and between subgroups.

### The majority of firearm crimes were committed with a handgun

From 1993 to 2011, about 60% to 70% of homicides were committed with a firearm (table 2). Over the same period, between 6% and 9% of all nonfatal violent victimizations were committed with a firearm, with about 20% to 30% of robberies and 22% to 32% of aggravated assaults involving a firearm.

Handguns accounted for the majority of both homicide and nonfatal firearm violence (table 3). A handgun was used in about 83% of all firearm homicides in 1994, compared to 73% in 2011. Other types of firearms, such as shotguns and rifles, accounted for the remainder of firearm homicides. For nonfatal firearm violence, about 9 in 10 were committed with a handgun, and this remained stable from 1994 to 2011.

**TABLE 2**
**Percent of violence involving a firearm, by type of crime, 1993–2011**

| Year | Homicide | Nonfatal violence[a] | Robbery | Aggravated assault |
|---|---|---|---|---|
| 1993 | 71.2% | 9.1% | 22.3% | 30.7% |
| 1994 | 71.4 | 9.2 | 27.1 | 31.9 |
| 1995 | 69.0 | 7.8 | 27.3 | 28.0 |
| 1996 | 68.0 | 7.8 | 24.6 | 25.7 |
| 1997 | 68.0 | 7.6 | 19.9 | 27.0 |
| 1998 | 65.9 | 7.0 | 20.1 | 26.5 |
| 1999 | 64.1 | 6.0 | 19.2 | 22.4 |
| 2000 | 64.4 | 7.2 | 21.1 | 26.6 |
| 2001[b] | 55.9 | 7.5 | 29.5 | 26.0 |
| 2002 | 67.1 | 7.3 | 23.4 | 28.7 |
| 2003 | 67.2 | 6.1 | 22.4 | 22.2 |
| 2004 | 67.0 | 6.8 | 19.7 | 23.6 |
| 2005 | 68.2 | 7.2 | 21.8 | 25.7 |
| 2006 | 68.9 | 7.3 | 16.6 | 24.3 |
| 2007 | 68.8 | 8.1 | 20.0 | 32.6 |
| 2008 | 68.3 | 5.8 | 19.6 | 24.6 |
| 2009 | 68.4 | 7.2 | 27.0 | 23.2 |
| 2010 | 68.1 | 8.4 | 24.7 | 25.4 |
| 2011[c] | 69.6 | 8.0 | 25.7 | 30.6 |

Note: See appendix table 4 for standard errors.
[a]Nonfatal violence includes rape, sexual assault, robbery, aggravated and simple assault. A small percentage of rape and sexual assaults involved firearms but are not shown in table due to small sample sizes.
[b]The homicide estimates that occurred as a result of the events of September 11, 2001, are included in the total number of homicides.
[c]Preliminary homicide estimates retrieved from Hoyert DL, Xu JQ. (2012) Deaths: Preliminary data for 2011. *National Vital Statistics Reports*, 61(6).
Sources: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011; and Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

**TABLE 3**
**Criminal firearm violence, by type of firearm, 1994–2011**

| | Homicide | | | | Nonfatal violence | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Handgun | | Other firearm[a] | | Handgun | | Other firearm[a] | | Gun type unknown | |
| Year | Annual number | Percent | Annual number | Percent | Average annual number | Percent | Average annual number | Percent | Average annual number | Percent |
| 1994 | 13,510 | 82.7% | 2,830 | 17.3% | 1,387,100 | 89.5% | 150,200 | 9.7% | 11,700 ! | 0.8% ! |
| 1995 | 12,090 | 81.9 | 2,670 | 18.1 | 1,240,200 | 89.8 | 132,800 | 9.6 | 7,700 ! | 0.6 ! |
| 1996 | 10,800 | 81.1 | 2,510 | 18.9 | 999,600 | 87.1 | 141,000 | 12.3 | 6,400 ! | 0.6 ! |
| 1997 | 9,750 | 78.8 | 2,630 | 21.2 | 894,200 | 84.2 | 159,800 | 15.0 | 8,400 ! | 0.8 ! |
| 1998 | 8,870 | 80.4 | 2,160 | 19.6 | 783,400 | 84.3 | 141,100 | 15.2 | 5,300 ! | 0.6 ! |
| 1999 | 8,010 | 78.8 | 2,150 | 21.2 | 659,600 | 89.4 | 74,100 | 10.0 | 4,500 ! | 0.6 ! |
| 2000 | 8,020 | 78.6 | 2,190 | 21.4 | 555,800 | 88.8 | 65,300 | 10.4 | 4,500 ! | 0.7 ! |
| 2001 | 7,820 | 77.9 | 2,220 | 22.1 | 506,600 | 86.3 | 65,900 | 11.2 | 14,100 ! | 2.4 ! |
| 2002 | 8,230 | 75.8 | 2,620 | 24.2 | 471,600 | 85.5 | 63,200 | 11.5 | 16,700 ! | 3.0 ! |
| 2003 | 8,890 | 80.3 | 2,180 | 19.7 | 436,100 | 86.6 | 53,200 | 10.6 | 14,400 ! | 2.9 ! |
| 2004 | 8,330 | 78.0 | 2,350 | 22.0 | 391,700 | 84.8 | 53,400 | 11.6 | 16,900 ! | 3.7 ! |
| 2005 | 8,550 | 75.1 | 2,840 | 24.9 | 410,600 | 85.5 | 56,200 | 11.7 | 13,200 ! | 2.8 ! |
| 2006 | 9,060 | 77.0 | 2,700 | 23.0 | 497,400 | 89.0 | 47,600 | 8.5 | 14,000 ! | 2.5 ! |
| 2007 | 8,570 | 73.6 | 3,080 | 26.4 | 509,700 | 87.2 | 65,600 | 11.2 | 9,300 ! | 1.6 ! |
| 2008 | 7,930 | 71.8 | 3,120 | 28.2 | 400,700 | 86.5 | 57,400 | 12.4 | 5,000 ! | 1.1 ! |
| 2009 | 7,370 | 71.3 | 2,970 | 28.7 | 348,700 | 89.2 | 37,600 | 9.6 | 4,400 ! | 1.1 ! |
| 2010 | 6,920 | 69.6 | 3,030 | 30.4 | 382,100 | 92.6 | 26,700 | 6.5 | 3,800 ! | 0.9 ! |
| 2011 | 7,230 | 72.9 | 2,690 | 27.1 | 389,400 | 88.3 | 49,700 | 11.3 | 2,100 ! | 0.5 ! |

Note: Nonfatal violence data based on 2-year rolling averages beginning in 1993. Homicide data are presented as annual estimates. See appendix table 5 for standard errors.
[a]Includes rifle, shotgun, and other types of firearms.
! Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
Sources: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011; and FBI, Supplementary Homicide Reports, 1994–2011.

**Males, blacks, and persons ages 18 to 24 were most likely to be victims of firearm violence**

*Sex*

In 2010, the rate of firearm homicide for males was 6.2 per 100,000, compared to 1.1 for females (figure 3). Firearm homicide for males declined by 49% (from 12.0 per 100,000 males in 1993 to 6.2 in 2010), compared to a 51% decline for females (from 2.3 per 100,000 females in 1993 to 1.1 in 2010). The majority of the decline for both males and females occurred in the first part of the period (1993 to 2000). Over the more recent 10-year period from 2001 to 2010, the decline in firearm homicide for both males and females slowed, resulting in about a 10% decline each.

In 2011, the rate of nonfatal firearm violence for males (1.9 per 1,000 males) was not significantly different than the rate for females (1.6 per 1,000) (figure 4). From 1994 to 2011, the rate of nonfatal firearm violence for males declined 81%, from 10.1 to 1.9 per 1,000 males. During the same period, the rate of nonfatal firearm violence against females dropped 67%, from 4.7 to 1.6 per 1,000 females. As with fatal firearm violence, the majority of the decline occurred in the first part of the period. From 2002 to 2011, the rate of nonfatal firearm violence for males declined 35%, while there was no no statistical change in the rate for females.

**FIGURE 3**
**Firearm homicides, by sex, 1993–2010**

Rate per 100,000 persons



Note: See appendix table 6 for numbers and rates.
Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

**FIGURE 4**
**Nonfatal firearm violence, by sex, 1994–2011**

Rate per 1,000 persons age 12 or older



Note: Data based on 2-year rolling averages beginning in 1993. See appendix table 7 for rates and standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

A. 80

*Race/Hispanic origin*

In 2010, the rate of firearm homicide for blacks was 14.6 per 100,000, compared to 1.9 for whites, 2.7 for American Indians and Alaska Natives, and 1.0 for Asians and Pacific Islanders (figure 5). From 1993 to 2010, the rate of firearm homicides for blacks declined by 51%, down from 30.1 per 100,000 blacks, compared to a 48% decline for whites and a 43% decline for American Indians and Alaska Natives. Asian and Pacific Islanders declined 79% over the same period, from 4.6 to 1.0 per 100,000. Although blacks experienced a decline similar to whites and American Indians and Alaska Natives, the rate of firearm homicide for blacks was 5 to 6 times higher than every other racial group in 2010. As with other demographic groups, the majority of the decline occurred in the first part of the period and slowed from 2001 to 2010.

The rate of firearm homicide for both Hispanics and non-Hispanics was about 4 per 100,000 each in 2010 (figure 6). However, the Hispanic rate had a larger and more consistent decline over time. The Hispanic rate declined 54% from 1993 to 2001 and declined 34% since 2001. In comparison, the non-Hispanic rate declined more slowly, down 42% from 1993 to 2001 and down 5% since 2001.

In 2011, non-Hispanic blacks (2.8 per 1,000) and Hispanics (2.2 per 1,000) had higher rates of nonfatal firearm violence than non-Hispanic whites (1.4 per 1,000) (figure 7). The rate of nonfatal firearm violence for Hispanics was not statistically different from the rate for blacks. From 1994 to 2011, the rates of nonfatal firearm violence for blacks and Hispanics both declined by 83%, compared to 74% for whites.

**FIGURE 6**
Firearm homicides, by Hispanic origin, 1993–2010

Rate per 100,000 persons



Note: See appendix table 9 for numbers and rates.
Source: Bureau of Justice Statistics, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

**FIGURE 5**
Firearm homicides, by race, 1993–2010

Rate per 100,000 persons



Note: See appendix table 8 for numbers and rates.
Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

**FIGURE 7**
Nonfatal firearm violence, by race and Hispanic origin, 1994–2011

Rate per 1,000 persons age 12 or older




Note: Data based on 2-year rolling averages beginning in 1993. See appendix table 10 for rates and standard errors.
ᵃExcludes persons of Hispanic or Latino origin.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

*Age*

In 2010, the rate of firearm homicide was 10.7 per 100,000 for persons ages 18 to 24, compared to 8.1 for persons 25 to 34 and 0.3 for persons ages 11 or younger (table 4). Firearm homicide against persons ages 18 to 34 accounted for about 30% of all firearm homicides in 2010. From 1993 to 2010, the rate of homicides for persons ages 18 to 24 declined 51%, compared to a 35% decline for persons ages 25 to 34 and 50% for persons age 11 or younger.

In 2011, persons ages 18 to 24 had the highest rate of nonfatal firearm violence (5.2 per 1,000). From 1994 to 2011, the rates of nonfatal firearm violence declined for persons ages 18 to 49, with each group declining between 72% and 77%. The rate for persons ages 12 to 17 declined 88%, from 11.4 to 1.4 per 1,000.

**Persons living in urban areas had the highest rates of nonfatal firearm violence**

*Region*

In 2010, the South had the highest rate of firearm homicides at 4.4 per 100,000 persons, compared to 3.4 in the Midwest, 3.0 in the West, and 2.8 in the Northeast (figure 8).

From 1993 to 2010, the rate of firearm homicides in the South declined by 49%, compared to a 50% decline in the Northeast, a 37% decline in the Midwest, and a 59% decline in the West.

**FIGURE 8**
**Firearm homicides, by region, 1993–2011**
Rate per 100,000 persons



Note: See appendix table 13 for numbers and rates.
Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

**TABLE 4**
**Fatal and nonfatal firearm violence, by age, 1993–2011**

| Year | Firearm homicide rate per 100,000 persons | | | | | | Nonfatal firearm violence rate per 1,000 persons age 12 or older | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11 or younger | 12–17 | 18–24 | 25–34 | 35–49 | 50 or older | 12–17 | 18–24 | 25–34 | 35–49 | 50 or older |
| 1993 | 0.5 | 8.0 | 21.9 | 12.4 | 6.7 | 2.2 | ~ | ~ | ~ | ~ | ~ |
| 1994 | 0.4 | 7.8 | 21.2 | 12.0 | 6.3 | 2.1 | 11.4 | 18.1 | 8.7 | 6.3 | 1.6 |
| 1995 | 0.4 | 7.0 | 18.6 | 10.6 | 5.3 | 2.0 | 9.8 | 16.1 | 7.7 | 5.5 | 1.6 |
| 1996 | 0.4 | 5.6 | 17.2 | 9.4 | 4.9 | 1.8 | 7.6 | 12.3 | 6.8 | 4.8 | 1.4 |
| 1997 | 0.4 | 4.8 | 16.3 | 9.0 | 4.6 | 1.6 | 7.1 | 12.8 | 5.4 | 4.5 | 1.2 |
| 1998 | 0.3 | 3.7 | 14.4 | 7.9 | 4.2 | 1.5 | 5.7 | 12.4 | 4.5 | 3.8 | 1.0 |
| 1999 | 0.3 | 3.6 | 12.4 | 7.6 | 3.7 | 1.4 | 4.7 | 8.9 | 4.6 | 2.6 | 0.7 |
| 2000 | 0.2 | 2.9 | 12.4 | 7.7 | 3.8 | 1.4 | 3.2 | 7.0 | 3.6 | 2.5 | 1.0 |
| 2001 | 0.3 | 2.8 | 12.9 | 8.4 | 3.9 | 1.3 | 2.2 | 6.8 | 3.1 | 2.4 | 1.0 |
| 2002 | 0.3 | 2.9 | 13.0 | 8.8 | 4.0 | 1.4 | 2.4 | 7.3 | 3.1 | 1.8 | 0.8 |
| 2003 | 0.3 | 2.7 | 13.3 | 9.0 | 4.0 | 1.3 | 2.8 | 6.3 | 2.7 | 1.6 | 0.7 |
| 2004 | 0.2 | 3.0 | 11.9 | 8.9 | 3.9 | 1.4 | 1.9 | 3.9 | 2.5 | 2.1 | 0.8 |
| 2005 | 0.2 | 3.1 | 12.9 | 9.6 | 4.1 | 1.3 | 1.2 | 4.4 | 3.1 | 1.8 | 1.0 |
| 2006 | 0.3 | 3.6 | 13.6 | 9.6 | 4.1 | 1.4 | 2.3 | 5.6 | 3.4 | 1.8 | 1.0 |
| 2007 | 0.3 | 3.5 | 13.1 | 9.5 | 4.2 | 1.3 | 4.3 | 4.6 | 3.0 | 2.2 | 0.9 |
| 2008 | 0.3 | 3.3 | 12.1 | 9.0 | 4.1 | 1.3 | 3.5 | 3.2 | 2.7 | 1.6 | 0.7 |
| 2009 | 0.3 | 2.9 | 11.1 | 8.1 | 3.9 | 1.4 | 0.9 | 3.9 | 2.3 | 1.5 | 0.6 |
| 2010 | 0.3 | 2.8 | 10.7 | 8.1 | 3.6 | 1.4 | 0.6! | 5.8 | 2.0 | 1.3 | 0.6 |
| 2011 | ... | ... | ... | ... | ... | ... | 1.4 | 5.2 | 2.2 | 1.4 | 0.7 |

Note: Nonfatal firearm violence data based on 2-year rolling averages beginning in 1993. Homicide data are annual estimates. See appendix table 11 for firearm homicide numbers and appendix table 12 for nonfatal firearm violence standard errors.
~Not applicable.
...Not available.
! Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011; and Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

A. 82

In 2011, residents in the South (1.9 per 1,000) had higher rates of nonfatal firearm violence than those in the Northeast (1.3 per 1,000) (figure 9). Residents in the South (1.9 per 1,000), Midwest (1.7 per 1,000), and West (1.8 per 1,000) had statistically similar rates of nonfatal firearm violence.

*Urban-rural location*

The publicly available National Vital Statistics System fatal data files do not contain information about the incident's urban-rural location or population size. This information is limited to nonfatal firearm victimizations. Urban residents generally experienced the highest rate of nonfatal firearm violence (figure 10). In 2011, the rate of nonfatal firearm violence for residents in urban areas was 2.5 per 1,000,

compared to 1.4 per 1,000 for suburban residents and 1.2 for rural residents. From 1994 to 2011, the rates of nonfatal firearm violence for all three locations declined between 76% and 78%.

*Population size*

In 2011, higher rates of nonfatal violence occurred in areas with a population of more than 250,000 residents than in areas with a population under 250,000 (table 5). From 1997 to 2011, the rates of nonfatal firearm violence for populations between 250,000 and 499,999 and 1 million residents or more declined between 57% and 62%, compared to a 37% decline for residents living in populations between 500,000 and 999,999 residents.

**FIGURE 9**
Nonfatal firearm violence, by region, 1997–2011

Rate per 1,000 persons age 12 or older



Note: Data based on 2-year rolling averages beginning in 1996. Region information was not available from 1993 to 1995. See appendix table 14 for rates and standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1996–2011.

**FIGURE 10**
Nonfatal firearm violence, by urban-rural location, 1994–2011

Rate per 1,000 persons age 12 or older



Note: Data based on 2-year rolling averages beginning in 1993. See appendix table 15 for rates and standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

**TABLE 5**
Nonfatal firearm violence, by population size, 1997–2011

| | Rate per 1,000 persons age 12 or older | | | | | |
|---|---|---|---|---|---|---|
| Year | Not a place* | Less than 100,000 | 100,000–249,999 | 250,000–499,999 | 500,000–999,999 | 1 million or more |
| 1997 | 3.9 | 3.8 | 7.0 | 10.3 | 7.3 | 7.3 |
| 1998 | 3.0 | 3.9 | 4.8 | 7.0 | 9.2 | 5.7 |
| 1999 | 1.9 | 3.1 | 3.1 | 5.5 | 9.0 | 6.4 |
| 2000 | 1.5 | 2.2 | 3.9 | 6.5 | 6.3 | 5.6 |
| 2001 | 1.4 | 2.1 | 4.1 | 6.1 | 5.5 | 5.1 |
| 2002 | 1.2 | 2.3 | 2.8 | 3.9 | 4.9 | 5.3 |
| 2003 | 1.4 | 2.0 | 2.8 | 3.3 | 5.1 | 3.6 |
| 2004 | 1.4 | 1.4 | 3.0 | 4.1 | 5.5 | 2.7 |
| 2005 | 1.2 | 1.6 | 2.9 | 3.6 | 4.5 | 4.6 |
| 2006 | 1.6 | 2.1 | 2.6 | 2.6 | 3.8 | 4.9 |
| 2007 | 1.5 | 2.6 | 2.7 | 2.4 | 5.4 | 2.1 |
| 2008 | 0.8 | 2.1 | 2.1 | 3.2 | 4.9 | 1.4 |
| 2009 | 0.9 | 1.1 | 2.2 | 3.0 | 4.0 | 3.5 |
| 2010 | 0.9 | 1.2 | 1.8 | 2.8 | 5.1 | 4.0 |
| 2011 | 1.4 | 1.2 | 1.3 | 3.9 | 4.6 | 3.2 |

Note: Data based on 2-year rolling averages beginning in 1996. Population size information was not available from 1993 to 1995. See appendix table 16 for rates and standard errors.
*A concentration of population that is not either legally bounded as an incorporated place having an active government or delineated for statistical purposes as a census designated place with definite geographic boundaries, such as a city, town, or village.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1996–2011.

About 11% of nonfatal violence committed by a stranger involved a firearm

Intimate partners suffered about 4.7 million nonfatal violent victimizations in the 5-year period from 2007 through 2011, and the offender used a firearm in about 4% of these victimizations (about 195,700 incidents) (table 6). Similar to intimate partner violent victimizations, offenders who were either a relative or known to the victim (e.g., a friend or acquaintance) used a firearm in about 4% to 7% of these total victimizations. In comparison, persons

victimized by strangers experienced about 11 million violent victimizations, and the offender used a firearm in 11% of these victimizations.[2]

In 2007-11, the majority of nonfatal firearm violence occurred in or around the victim's home (42%) or in an open area, on the street, or while on public transportation (23%) (table 7). Less than 1% of all nonfatal firearm violence occurred in schools.

[2]The fatal data from the National Vital Statistics System does not have victim-offender relationship information. The SHR victim-offender relationship data are not shown due to the large amount of missing data.

**TABLE 6**
**Nonfatal firearm and nonfirearm violence, by victim-offender relationship, 2007–2011**

| Relationship to victim | Total nonfatal violence | Firearm violence | | Nonfirearm violence | |
|---|---|---|---|---|---|
| | | Number | Percent of total violence | Number | Percent of total violence |
| Total | 29,611,300 | 2,218,500 | 7.5% | 27,392,800 | 92.5% |
| Nonstranger | 15,715,900 | 738,000 | 4.7 | 14,977,900 | 95.3 |
| Intimate[a] | 4,673,600 | 195,700 | 4.2 | 4,477,900 | 95.8 |
| Other relative | 2,157,700 | 158,100 | 7.3 | 1,999,500 | 92.7 |
| Friend/acquaintance | 8,884,600 | 384,100 | 4.3 | 8,500,500 | 95.7 |
| Stranger | 10,983,100 | 1,177,900 | 10.7 | 9,805,200 | 89.3 |
| Unknown[b] | 2,912,300 | 302,600 | 10.4 | 2,609,600 | 89.6 |

Note: Detail may not sum to total due to rounding. See appendix table 17 for standard errors.
[a]Includes current or former spouses, boyfriends, or girlfriends.
[b]Includes relationships unknown and number of offenders unknown.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

**TABLE 7**
**Nonfatal firearm and nonfirearm violence, by location of crime, 2007–2011**

| Location | Total nonfatal violence | | Firearm violence | | Nonfirearm violence | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 29,618,300 | 100% | 2,218,500 | 100% | 27,399,800 | 100% |
| Victims home or lodging | 6,491,400 | 21.9 | 427,600 | 19.3 | 6,063,800 | 22.1 |
| Near victim's home | 4,804,700 | 16.2 | 504,500 | 22.7 | 4,300,200 | 15.7 |
| In, at, or near a friend, neighbor, or relative's home | 2,175,900 | 7.3 | 132,600 | 6.0 | 2,043,300 | 7.5 |
| Commercial place | 2,878,600 | 9.7 | 195,400 | 8.8 | 2,683,200 | 9.8 |
| Parking lot or garage | 1,688,400 | 5.7 | 340,600 | 15.4 | 1,347,900 | 4.9 |
| School[*] | 3,931,100 | 13.3 | 12,600! | 0.6! | 3,918,500 | 14.3 |
| Open area, on street, or public transportation | 4,636,900 | 15.7 | 508,400 | 22.9 | 4,128,500 | 15.1 |
| Other location | 3,011,200 | 10.2 | 96,800 | 4.4 | 2,914,400 | 10.6 |

! Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%. See appendix table 18 for standard errors.
*Includes inside a school building or on school property.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

School-related homicides of youth ages 5 to 18 accounted for less than 2% of all youth homicides

The number of homicides at schools declined over time, from an average of 29 per year in the 1990s (school year 1992-93 to 1999-00) to an average of 20 per year in the 2000s (school year 2000-01 to 2009-10) (table 8). Generally, homicides in schools comprised less than 2% of all homicides of youth ages 5 to 18. During the 2000s, an average of about 1,600 homicides of youth ages 5 to 18 occurred per year. The majority of homicides against youth both at school and away from school were committed with a firearm.

TABLE 8
School-associated homicides of youth ages 5 to 18, by location and school years, 1992–93 to 2009–10

| School year | Homicides of youth ages 5 to 18 | | |
|---|---|---|---|
| | Total homicides[a] | Homicides at school[b,c] | Percent of all homicides of youth at school |
| 1992–93 | 2,719 | 34 | 1.3% |
| 1993–94 | 2,911 | 29 | 1.0 |
| 1994–95 | 2,691 | 28 | 1.0 |
| 1995–96 | 2,548 | 32 | 1.3 |
| 1996–97 | 2,210 | 28 | 1.3 |
| 1997–98 | 2,104 | 34 | 1.6 |
| 1998–99 | 1,791 | 33 | 1.8 |
| 1999–00 | 1,566 | 14 | 0.9 |
| 2000–01 | 1,501 | 14 | 0.9 |
| 2001–02 | 1,494 | 16 | 1.1 |
| 2002–03 | 1,538 | 18 | 1.2 |
| 2003–04 | 1,459 | 23 | 1.6 |
| 2004–05 | 1,545 | 22 | 1.4 |
| 2005–06 | 1,687 | 21 | 1.2 |
| 2006–07 | 1,796 | 32 | 1.8 |
| 2007–08 | 1,740 | 21 | 1.2 |
| 2008–09 | 1,579 | 17 | 1.1 |
| 2009–10 | ... | 17 | ... |

Note: At school includes on school property, on the way to or from regular sessions at school, and while attending or traveling to or from a school-sponsored event.
...Not available.
[a]Youth ages 5 to 18 from July 1, 1992, through June 30, 2009.
[b]Youth ages 5 to 18 from July 1, 1992, through June 30, 2010.
[c]The data from school year 1999–00 through 2009–10 are subject to change until interviews with school and law enforcement officials have been completed. The details learned during the interviews can occasionally change the classification of a case.
Sources: Table 1.1 from Robers, S., Zhang, J., and Truman, J. (2012). *Indicators of School Crime and Safety: 2011* (NCES 2012-002/NCJ 236021), National Center for Education Statistics, U.S. Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice. Homicide data are from: Centers for Disease Control and Prevention (CDC), 1992–2010 School-Associated Violent Deaths Surveillance Study (SAVD); FBI and Supplementary Homicide Reports (SHR), 1992–2009.

In 2007-11, about 23% of all nonfatal firearm victims were injured

In 2007-11, about 23% of all nonfatal firearm victims were physically injured during the victimization (table 9). About 7% suffered serious injuries (e.g., a gunshot wound, broken bone, or internal injuries), while 16% suffered minor injuries

(e.g., bruises or cuts). Of the nonfatal firearm victims who were injured, 72% received some type of care, with about 82% receiving care in a hospital or medical office.

The victim reported that the offender had fired the weapon in 7% of all nonfatal firearm victimizations. The victim suffered a gunshot wound in 28% of these victimizations (not shown in table).

TABLE 9
Nonfatal firearm and nonfirearm violence, by injury and treatment received, 2007–2011

| Injury and treatment | Total nonfatal violence | | Firearm violence | | Nonfirearm violence | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Injury | 29,618,300 | 100% | 2,218,500 | 100% | 27,399,800 | 100% |
| Not injured | 22,187,500 | 74.9 | 1,707,800 | 77.0 | 20,479,700 | 74.7 |
| Injured | 7,430,800 | 25.1 | 510,700 | 23.0 | 6,920,100 | 25.3 |
| Serious[a] | 1,249,300 | 4.2 | 148,300 | 6.7 | 1,147,000 | 4.2 |
| Gun shot | 46,000 | 0.2 | 46,000 | 2.1 | ~ | ~ |
| Minor[b] | 5,742,700 | 19.4 | 357,100 | 16.1 | 5,385,700 | 19.7 |
| Rape without other injuries | 374,300 | 1.3 | 5,400 ! | 0.2 ! | 368,900 | 1.3 |
| Treatment for injury[c] | 7,430,800 | 100% | 510,700 | 100% | 6,920,100 | 100% |
| No treatment | 4,304,300 | 57.9 | 140,700 | 27.5 | 4,163,600 | 60.2 |
| Any treatment | 3,103,500 | 41.8 | 370,000 | 72.5 | 2,733,500 | 39.5 |
| Treatment setting[d] | 3,103,500 | 100% | 370,000 | 100% | 2,733,500 | 100% |
| At the scene/home of victim, neighbor, or friend/location | 1,078,000 | 34.7 | 68,000 | 18.4 | 1,010,000 | 36.9 |
| In doctor's office/hospital emergency room/ overnight at hospital | 2,025,600 | 65.3 | 302,000 | 81.6 | 1,723,500 | 63.1 |

Note: See appendix table 19 for standard errors.
! Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
~Not applicable.
[a]Includes injuries such as gun shots, knife wounds, internal injuries, unconsciousness, and broken bones.
[b]Includes bruises, cuts, and other minor injuries.
[c]Includes only victims who were injured.
[d]Includes only victims who were injured and received treatment.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

A. 86

## Nonfatal shooting victims

According to the NCVS, an average of about 22,000 nonfatal shooting victims occurred annually from 1993 to 2002 (not shown in table). From 2002 to 2011, the number of victims declined by about half to 12,900 per year. In the 5-year aggregate period from 2007-11, a total of 46,000 nonfatal firearm victims were wounded with a firearm and another 58,483 were victims of a firearm homicide. The total firearm nonfatal gunshot injuries and homicides accounted for 5% of all firearm violent crimes in 2007-11.

Data on nonfatal injury are also available in the National Electronic Injury Surveillance System All Injury Program (NEISS-AIP), which is operated by the U.S. Consumer Product Safety Commission (CPSC). According to these data, an average of 47,870 nonfatal assault injuries resulted from a firearm from 2001 to 2011 (figure 11). In 2007-11, the average number of nonfatal injuries from a firearm increased slightly to 51,810.

The differences noted between the NCVS and NEISS-AIP firearm injury estimates are due in part to a variety of technical issues. Both estimates are generated from samples and are subject to sampling error. The NCVS is a residential household survey that does not include the homeless, persons in institutional settings such as jails, prisons, mental health facilities, and certain other group quarters. Therefore, NCVS may miss injuries that involve persons who are homeless, victims who require lengthy stays in a hospital, and offenders who are incarcerated or placed in other institutional settings after the incident.



**FIGURE 11**
**Nonfatal firearm injuries, 2001–2011**

Note: See appendix table 20 for numbers and standard errors.
! Interpret with caution. Estimate based on fewer than 20 NEISS cases (based on unweighted data), national estimates less than 1,200 (based on weighted data), or the coefficient of variation (CV) of the estimate greater than 30%.
Source: Consumer Product Safety Commission, National Electronic Injury Surveillance System All Injury Program (NEISS-AIP), 2001–2011. Accessed from the National Center for Injury Prevention and Control, CDC.

A. 87

The majority of firearm violence is reported to the police

In 2007-11, about 61% of nonfatal firearm violence was reported to the police, compared to 46% of nonfirearm violence (table 10). Among the nonfatal firearm victimizations that went unreported in 2007-11, the most common reasons victims gave for not reporting the crime was fear of reprisal (31%) and that the police could not or would not do anything to help (27%).

In 2007-11, about 1% of nonfatal violent crime victims used a firearm in self defense

In 2007-11, there were 235,700 victimizations where the victim used a firearm to threaten or attack an offender (table 11). This amounted to approximately 1% of all nonfatal violent victimizations in the 5-year period. The percentage of nonfatal violent victimizations involving firearm use in

self defense remained stable at under 2% from 1993 to 2011 (not shown in table). In 2007-11, about 44% of victims of nonfatal violent crime offered no resistance, 1% attacked or threatened the offender with another type of weapon, 22% attacked or threatened without a weapon (e.g., hit or kicked), and 26% used nonconfrontational methods (e.g., yelling, running, hiding, or arguing).

In instances where the victim was armed with a firearm, the offender was also armed with a gun in 32% of the victimizations, compared to 63% of victimizations where the offender was armed with a lesser weapon, such as a knife, or unarmed (not shown in table). A small number of property crime victims also used a firearm in self defense (103,000 victims or about 0.1% of all property victimizations); however, the majority of victims (86%) were not present during the incident. No information was available on the number of homicide victims that attempted to defend themselves with a firearm or by other means.

**TABLE 10**
**Nonfatal firearm and nonfirearm violence reported and not reported to police, 2007–2011**

|  | Total nonfatal violence | Firearm violence | Nonfirearm violence |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Reported | 46.9% | 61.5% | 45.7% |
| Not reported | 51.7% | 37.6% | 52.9% |
| Reason not reported | 100% | 100% | 100% |
| Dealt with it another way | 35.0 | 12.1 | 36.4 |
| Not important enough to respondent | 18.4 | 6.2 | 19.1 |
| Police could not or would not help | 16.7 | 27.1 | 16.1 |
| Fear of reprisal | 6.5 | 31.3 | 5.1 |
| Did not want to get offender in trouble advised not to report | 5.1 | 4.3! | 5.1 |
| Other/unknown/not one most important reason | 18.2 | 19.0 | 18.2 |

Note: Detail may not sum to total due to rounding. Reasons for not reporting represent the reason the victim stated was most important. See appendix table 21 for standard errors.
!Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

**TABLE 11**
**Self-protective behaviors, by type of crime, 2007–2011**

| Self-protective behavior | Violent crime | | Property crime | |
|---|---|---|---|---|
|  | Number | Percent | Number | Percent |
| Total | 29,618,300 | 100% | 84,495,500 | 100% |
| Offered no resistance | 12,987,300 | 43.8 | 10,162,000 | 12.0 |
| Threatened or attacked with a firearm | 235,700 | 0.8 | 103,000 | 0.1 |
| Threatened or attacked with other weapon | 391,100 | 1.3 | 38,200 | -- |
| Threatened or attacked without a weapon | 6,552,900 | 22.1 | 421,300 | 0.5 |
| Nonconfrontational tactics[a] | 7,768,700 | 26.2 | 1,187,100 | 1.4 |
| Other | 1,641,300 | 5.5 | 223,400 | 0.3 |
| Unknown | 41,300 | 0.1 | 12,200! | -- |
| Victim was not present[b] | ~ | ~ | 72,348,200 | 85.6 |

Note: See appendix table 22 for standard errors.
!Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
--Not applicable.
~Less than 0.05%.
[a]Includes yelling, running, or arguing.
[b]Includes property crime where the victim was not present.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

## Firearm use by offenders

In 2004, an estimated 16% of state prison inmates and 18% of federal inmates reported that they used, carried, or possessed a firearm when they committed the crime for which they were serving a prison sentence (table 12). This represented a slight change from 1997, where an estimated 18% of state prison inmates and 16% of federal inmates reported having a firearm when they committed the crime for their current sentence. During the offense that brought them to prison, 13% of state inmates and 16% of federal inmates carried a handgun. In addition, about 1% had a rifle and another 2% had a shotgun. Of inmates armed with a firearm during the offense, about 7% of state inmates and 8% of federal inmates were armed with either a single shot firearm or a conventional semiautomatic, and 2% of state inmates and 3% of federal inmates were armed with a military-style semiautomatic or fully automatic firearm (table 13).

In 2004, among state prison inmates who possessed a gun at the time of offense, fewer than 2% bought their firearm at a flea market or gun show, about 10% purchased it from a retail store or pawnshop, 37% obtained it from family or friends, and another 40% obtained it from an illegal source (table 14). This was similar to the percentage distribution in 1997.

### TABLE 12
Possession of firearms by state and federal prison inmates at time of offense, by type of firearm, 1997 and 2004

| Type of firearm | 1997 | | 2004 | |
|---|---|---|---|---|
| | State | Federal | State | Federal |
| Total | 100% | 100% | 100% | 100% |
| Firearm | 18.3% | 15.8% | 15.6% | 17.8% |
| Handgun | 15.1 | 13.6 | 13.3 | 15.5 |
| Rifle | 1.3 | 1.4 | 1.3 | 1.5 |
| Shotgun | 2.3 | 2.1 | 1.7 | 2.0 |
| Other | 0.4 | 0.5 | 0.1 | 0.1 |
| No firearm | 81.7% | 84.2% | 84.2% | 82.2% |

Note: Includes only inmates with a current conviction. Estimates may differ from previously published BJS reports. To account for differences in the 1997 and 2004 inmate survey questionnaires, the analytical methodology used in 1997 was revised to ensure comparability with the 2004 survey. Detail may not sum to total as inmates may have had possessed more than one firearm.
Source: Bureau of Justice Statistics, Survey of Inmates in State and Federal Correctional Facilities, 1997 and 2004.

### TABLE 13
Possession of firearms by state and federal prison inmates at time of offense, by specific type of firearm, 1997 and 2004

| Specific type of firearm | 1997 | | 2004 | |
|---|---|---|---|---|
| | State | Federal | State | Federal |
| Single shot | 0.9% | 7.6% | 7.5% | 8.2% |
| Conventional semiautomatic | 7.8 | 8.3 | 6.6 | 7.9 |
| Military-style semiautomatic or fully automatic | 1.5 | 1.7 | 2.0 | 3.2 |
| Other | 0.1 | 0.2 | 0.1 | 0.1 |

Note: Includes only inmates with a current conviction. Estimates may differ from previously published BJS reports. To account for differences in the 1997 and 2004 inmate survey questionnaires, the analytical methodology used in 1997 was revised to ensure comparability with the 2004 survey.
Source: Bureau of Justice Statistics, Survey of Inmates in State and Federal Correctional Facilities, 1997 and 2004.

### TABLE 14
Source of firearms possessed by state prison inmates at time of offense, 1997 and 2004

| | Percent of state prison inmates |  |
|---|---|---|
| Source of firearm | 1997 | 2004 |
| Total | 100% | 100% |
| Purchased or traded from— | 14.0% | 11.3% |
| Retail store | 8.2 | 7.3 |
| Pawnshop | 4.0 | 2.6 |
| Flea market | 1.0 | 0.6 |
| Gun show | 0.8 | 0.8 |
| Family or friend | 40.1% | 37.4% |
| Purchased or traded | 12.6 | 12.2 |
| Rented or borrowed | 18.9 | 14.1 |
| Other | 8.5 | 11.1 |
| Street/illegal source | 37.3% | 40.0% |
| Theft or burglary | 9.1 | 7.5 |
| Drug dealer/off street | 20.3 | 25.2 |
| Fence/black market | 8.0 | 7.4 |
| Other | 8.7% | 11.2% |

Note: Includes only inmates with a current conviction. Estimates may differ from previously published BJS reports. To account for differences in the 1997 and 2004 inmate survey questionnaires, the analytical methodology used in 1997 was revised to ensure comparability with the 2004 survey.
Source: Bureau of Justice Statistics, Survey of Inmates in State and Federal Correctional Facilities, 1997 and 2004.

A. 89

## Methodology

Estimates in this report are based primarily on data from the Bureau of Justice Statistics' (BJS) National Crime Victimization Survey (NCVS) and the National Center for Health Statistics' (NCHS) Centers for Disease Control and Prevention Center for Disease Control's Web-based Injury Statistics Query and Reporting System (WISQARS). Additional estimates come from the School-Associated Violent Deaths Surveillance Study (SAVD), the National Electronic Injury Surveillance System All Injury Program (NEISS-AIP) data, the FBI's Supplemental Homicide Reports (SHR), the Survey of Inmates in State Correctional Facilities (SISCF), and the Survey of Inmates in Federal Correctional Facilities (SIFCF).

### The National Crime Victimization Survey (NCVS)

The NCVS is an annual data collection conducted by the U.S. Census Bureau for BJS. The NCVS is a self-report survey in which interviewed persons are asked about the number and characteristics of victimizations experienced during the prior 6 months. The NCVS collects information on nonfatal personal crimes (rape or sexual assault, robbery, aggravated assault, simple assault, and personal larceny) and household property crimes (burglary, motor vehicle theft, and other theft) both reported and not reported to police. In addition to providing annual level and change estimates on criminal victimization, the NCVS is the primary source of information on the nature of criminal victimization incidents. Survey respondents provide information about themselves (such as age, sex, race and ethnicity, marital status, education level, and income) and if they experienced a victimization. For crime victims, data are collected about each victimization incident, including information about the offender (such as age, race and ethnicity, sex, and victim-offender relationship), characteristics of the crime (including time and place of occurrence, use of weapons, nature of injury, and economic consequences), whether the crime was reported to police, reasons why the crime was or was not reported, and experiences with the criminal justice system.

The NCVS is administered to persons age 12 or older from a nationally representative sample of households in the United States. In 2011, about 143,120 persons age 12 or older from 79,800 households across the country were interviewed during the year. Once selected, households remain in the sample for 3 years, and eligible persons in these households are interviewed every 6 months for a total of seven interviews. New households rotate into the sample on an ongoing basis to replace outgoing households that have been in sample for the 3-year period. The sample includes persons living in group quarters (such as dormitories, rooming houses, and religious group dwellings) and excludes persons living in military barracks and institutional settings (such as correctional or hospital facilities) and the homeless. (For more information, see the *Survey Methodology for Criminal Victimization in the United States, 2008*, NCJ 231173, BJS website, May 2011.)

The 79,800 households that participated in the NCVS in 2011 represent a 90% household response rate. The person level response rate—the percentage of persons age 12 or older in participating households who completed an NCVS interview—was 88% in 2011.

For this report, prior to applying the weights to the data, all victimizations that occurred outside of the U.S. were excluded. From 1993 to 2011, less than 1% of the unweighted violent victimizations occurred outside of the U.S. and was excluded from the analyses.

*Weighting adjustments for estimating personal victimization*

Estimates in this report use data primarily from the 1993 to 2011 NCVS data files weighted to produce annual estimates for persons age 12 or older living in U.S. households. Because the NCVS relies on a sample rather than a census of the entire U.S. population, weights are designed to inflate sample point estimates to known population totals and to compensate for survey nonresponse and other aspects of the sample design.

The NCVS data files include both household and person weights. The household weight is commonly used to calculate estimates of property crimes, such as motor vehicle theft or burglary, which are identified with the household. Person weights provide an estimate of the population represented by each person in the sample. Person weights are most frequently used to compute estimates of crime victimizations of persons in the total population. Both household and person weights, after proper adjustment, are also used to form the denominator in calculations of crime rates.

The victimization weights used in this analysis account for the number of persons present during an incident and for repeat victims of series incidents. The weight counts series incidents as the actual number of incidents reported by the victim, up to a maximum of ten incidents. Series victimizations are victimizations that are similar in type but occur with such frequency that a victim is unable to recall each individual event or to describe each event in detail. Survey procedures allow NCVS interviewers to identify and classify these similar victimizations as series victimizations and collect detailed information on only the most recent incident in the series. In 2011, about 2% of all victimizations were series incidents. Weighting series incidents as the number of incidents up to a maximum of

ten produces more reliable estimates of crime levels, while the cap at ten minimizes the effect of extreme outliers on the rates. Additional information on the series enumeration is detailed in *Methods for Counting High Frequency Repeat Victimizations in the National Crime Victimization Survey*, NCJ 237308, BJS website, April 2012.

*Standard error computations*

When national estimates are derived from a sample, as is the case with the NCVS, caution must be taken when comparing one estimate to another estimate or when comparing estimates over time. Although one estimate may be larger than another, estimates based on a sample have some degree of sampling error. The sampling error of an estimate depends on several factors, including the amount of variation in the responses, the size of the sample, and the size of the subgroup for which the estimate is computed. When the sampling error around the estimates is taken into consideration, the estimates that appear different may, in fact, not be statistically different.

One measure of the sampling error associated with an estimate is the standard error. The standard error can vary from one estimate to the next. In general, for a given metric, an estimate with a smaller standard error provides a more reliable approximation of the true value than an estimate with a larger standard error. Estimates with relatively large standard errors are associated with less precision and reliability and should be interpreted with caution.

In order to generate standard errors around estimates from the NCVS, the Census Bureau produces generalized variance function (GVF) parameters for BJS. The GVFs take into account aspects of the NCVS complex sample design and represent the curve fitted to a selection of individual standard errors based on the Jackknife Repeated Replication technique. The GVF parameters were used to generate standard errors for each point estimate (such as counts, percentages, and rates) in the report. For average annual estimates, standard errors were based on the ratio of the sums of victimizations and respondents across years.

In this report, BJS conducted tests to determine whether differences in estimated numbers and percentages were statistically significant once sampling error was taken into account. Using statistical programs developed specifically for the NCVS, all comparisons in the text were tested for significance. The primary test procedure used was Student's t-statistic, which tests the difference between two sample estimates. To ensure that the observed differences between estimates were larger than might be expected due to sampling variation, the significance level was set at the 95% confidence level.

Data users can use the estimates and the standard errors of the estimates provided in this report to generate a confidence interval around the estimate as a measure of the margin of error. The following example illustrates how standard errors can be used to generate confidence intervals:

> According to the NCVS, in 2011, the rate of nonfatal firearm violence was 1.8 per 1,000 (see table 1). Using the GVFs, BJS determined that the estimate has a standard error of 0.2 (see appendix table 3). A confidence interval around the estimate was generated by multiplying the standard errors by ±1.96 (the t-score of a normal, two-tailed distribution that excludes 2.5% at either end of the distribution). Thus, the confidence interval around the 1.8 estimate from 2011 is 1.8 ± 0.2 (0.2 X 1.96) or (1.4 to 2.2). In other words, if different samples using the same procedures were taken from the U.S. population in 2011, 95% of the time the rate of nonfatal firearm violence was between 1.4 and 2.2 per 1,000.

In this report, BJS also calculated a coefficient of variation (CV) for all estimates, representing the ratio of the standard error to the estimate. CVs provide a measure of reliability and a means to compare the precision of estimates across measures with differing levels or metrics. If the CV was greater than 50%, or the unweighted sample had 10 or fewer cases, the estimate would have been noted with a "!" symbol (interpret data with caution; estimate is based on 10 or fewer sample cases, or the coefficient of variation exceeds 50%).

Many of the variables examined in this report may be related to one another and to other variables not included in the analyses. Complex relationships among variables were not fully explored in this report and warrant more extensive analysis. Readers are cautioned not to draw causal inferences based on the results presented.

*Methodological changes to the NCVS in 2006*

Methodological changes implemented in 2006 may have affected the crime estimates for that year to such an extent that they are not comparable to estimates from other years. Evaluation of 2007 and later data from the NCVS conducted by BJS and the Census Bureau found a high degree of confidence that estimates for 2007, 2008, 2009, and 2010 are consistent with and comparable to estimates for 2005 and previous years. The reports, *Criminal Victimization, 2006*, NCJ 219413, December 2007; *Criminal Victimization, 2007*, NCJ 224390, December 2008; *Criminal Victimization, 2008*, NCJ 227777, September 2009; *Criminal Victimization, 2009*, NCJ 231327, October 2010; *Criminal Victimization, 2010*, NCJ 235508, September 2011; and *Criminal Victimization, 2011*, NCJ 239437, October 2012, are available on the BJS website.

A. 91

Although caution is warranted when comparing data from 2006 to other years, the aggregation of multiple years of data in this report diminishes the potential variation between 2006 and other years. In general, findings do not change significantly if data for 2006 are excluded from the analyses.

## Web-based Injury Statistics Query and Reporting System Fatal (WISQARS™ Fatal)

WISQARS Fatal provides mortality data related to injury. The mortality data reported in WISQARS Fatal come from death certificate data reported to the CDC's National Center for Health Statistics (NCHS). Data include causes of death reported by attending physicians, medical examiners, and coroners. It also includes demographic information about decedents reported by funeral directors, who obtain that information from family members and other informants. NCHS collects, compiles, verifies, and prepares these data for release to the public. The data provide information about what types of injuries are leading causes of deaths, how common they are, and who they affect. These data are intended for a broad audience—the public, the media, public health practitioners and researchers, and public health officials—to increase their knowledge of injury.

WISQARS Fatal mortality reports provide tables of the total numbers of injury-related deaths and the death rates per 100,000 U.S. population. The reports list deaths according to cause (mechanism) and intent (manner) of injury by state, race, Hispanic origin, sex, and age groupings. Data in this report are provided for homicides by firearm from 1993 to 2010, including some preliminary 2011 estimates. The injury mortality data were classified based on the International Classification of Diseases (ICD)-10 classification system from 1999 and later, and the ICD-9 system for 1998 and earlier. The comparability study showed that the comparability for homicide and firearm homicide between the two systems was very high; therefore, data are shown from both periods.[3]

## National Electronic Injury Surveillance System All Injury Program (NEISS-AIP)

The NEISS-AIP is operated by the U.S. Consumer Product Safety Commission (CPSC). It is a collaborative effort by the National Center for Injury Prevention and Control (NCIPC) and CPSC. The NEISS is a national probability sample of hospitals in the U.S. and its territories. Data are collected about all types and external causes of nonfatal injuries and poisonings treated in U.S. hospital emergency departments, whether or not they are associated with consumer products. This report uses the estimates on nonfatal assault injuries from a firearm. This excludes injuries that were unintentional, by legal intervention, or self-harm.

## School-Associated Violent Deaths Surveillance Study (SAVD)

The SAVD is an epidemiological study developed by the Centers for Disease Control and Prevention in conjunction with the U.S. Department of Education and the U.S. Department of Justice. SAVD seeks to describe the epidemiology of school-associated violent deaths, identify common features of these deaths, estimate the rate of school-associated violent death in the United States, and identify potential risk factors for these deaths. The surveillance system includes descriptive data on all school-associated violent deaths in the United States, including all homicides, suicides, or legal intervention in which the fatal injury occurred on the campus of a functioning elementary or secondary school; while the victim was on the way to or from regular sessions at such a school; or while attending or on the way to or from an official school-sponsored event. Victims of such incidents include nonstudents, as well as students and staff members. SAVD includes descriptive information about the school, event, victim(s), and offender(s). The SAVD Surveillance System has collected data from July 1, 1992, through the present.

SAVD uses a four-step process to identify and collect data on school-associated violent deaths. Cases are initially identified through a search of the LexisNexis newspaper and media database. Then law enforcement officials are contacted to confirm the details of the case and to determine if the event meets the case definition. Once a case is confirmed, a law enforcement official and a school official are interviewed regarding details about the school, event, victim(s), and offender(s). A copy of the full law enforcement report is also sought for each case. The information obtained on schools includes school demographics, attendance/absentee rates, suspensions/expulsions and mobility, school history of weapon-carrying incidents, security measures, violence prevention activities, school response to the event, and school policies about weapon carrying. Event information includes the location of injury, the context of injury (e.g., while classes were being held or during break), motives for injury, method of injury, and school and community events happening around the time period. Information obtained on victim(s) and offender(s) includes demographics, circumstances of the event (date/time, alcohol or drug use, and number of persons involved), types and origins of weapons, criminal history, psychological risk factors, school-related problems, extracurricular activities, and family history, including structure and stressors.

For several reasons, all data from 1999 to the present are flagged as preliminary. For some recent data, the interviews with school and law enforcement officials to verify case details have not been completed. The details learned during the interviews can occasionally change the classification of a case. Also, new cases may be identified because of the expansion of the scope of the media files used for case identification. Sometimes other cases not identified during

---

[3]National Center for Health Statistics. (2001). Comparability of cause of death between ICD-9 and ICD-10: Preliminary estimates. Retrieved from http://www.cdc.gov/nchs/data/nvsr/nvsr49/nvsr49_02.pdf.

earlier data years using the independent case finding efforts (which focus on nonmedia sources of information) will be discovered. Also, other cases may occasionally be identified while the law enforcement and school interviews are being conducted to verify known cases.

### The FBI's Uniform Crime Reporting (UCR) Program, Supplementary Homicide Reports (SHR)

The FBI's SHR were used for information about gun type used in firearm homicides. The UCR program collects and publishes criminal offense, arrest, and law enforcement personnel statistics. Under the UCR program, law enforcement agencies submit information to the FBI monthly. Offense information is collected on the eight Part I offenses: homicide, forcible rape, robbery, aggravated assault, burglary, larceny-theft, motor vehicle theft, and arson. The UCR program collects data on only those crimes that come to the attention of law enforcement.

Homicide incident information—through SHR data—is submitted with details on location, victim, and offender characteristics. Homicide is defined as murder and non-negligent manslaughter, which is the willful killing of one human being by another. The analyses excludes deaths caused by negligence, suicide, or accident; justifiable homicides; and attempts to murder. Deaths from the terrorist attacks of September 11, 2001, are not included in any of the analyses.

Not all agencies that report offense information to the FBI also submit supplemental data on homicides. About 90 percent of homicides are included in the SHR. However, adjustments can be made to the weights to correct for missing victim reports. Estimates from the SHR used in this report were generated by BJS using a weight developed by BJS that reconciles the counts of SHR homicide victims with those in the UCR for the 1992 through 2011 data years.

### Surveys of Inmates in State and Federal Correctional Facilities (SISCF and SIFCF)

The SISCF and the SIFCF have provided nationally representative data on state prison inmates and sentenced federal inmates held in federally owned and operated facilities. The SISCF was conducted in 1974, 1979, 1986, 1991, 1997, and 2004, and the SIFCF in 1991, 1997, and 2004. The 2004 SISCF was conducted for BJS by the U.S. Census Bureau, which also conducted the SIFCF for BJS and the Federal Bureau of Prisons. Both surveys provide information about current offense and criminal history, family background and personal characteristics, prior drug and alcohol use and treatment, gun possession, and prison treatment, programs, and services. The surveys are the only national source of detailed information on criminal offenders, particularly special populations such as drug and alcohol users and offenders who have mental health problems. Systematic random sampling was used to select the inmates, and the 2004 surveys of state and federal inmates were administered through CAPI. In 2004, 14,499 state prisoners in 287 state prisons and 3,686 federal prisoners in 39 federal prisons were interviewed.

**APPENDIX TABLE 1**
Numbers and rates for figure 1: Firearm homicides, 1993–2011

| Year | Number | Rate per 100,000 persons |
|------|--------|--------------------------|
| 1993 | 18,253 | 7.0 |
| 1994 | 17,527 | 6.7 |
| 1995 | 15,551 | 5.8 |
| 1996 | 14,037 | 5.2 |
| 1997 | 13,252 | 4.9 |
| 1998 | 11,798 | 4.3 |
| 1999 | 10,828 | 3.9 |
| 2000 | 10,801 | 3.8 |
| 2001 | 11,348 | 4.0 |
| 2002 | 11,829 | 4.1 |
| 2003 | 11,920 | 4.1 |
| 2004 | 11,624 | 4.0 |
| 2005 | 12,352 | 4.2 |
| 2006 | 12,791 | 4.3 |
| 2007 | 12,632 | 4.2 |
| 2008 | 12,179 | 4.0 |
| 2009 | 11,493 | 3.8 |
| 2010 | 11,078 | 3.6 |
| 2011 | 11,101 | 3.6 |

Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/nclpc/wisqars.

**APPENDIX TABLE 2**
Numbers, rates, and standard errors for figure 2: Nonfatal firearm victimizations, 1993–2011

|      | Number | Standard error | Rate per 1,000 persons age 12 or older | Standard error |
|------|--------|----------------|----------------------------------------|----------------|
| 1993 | 1,529,700 | 104,582 | 7.3 | 0.5 |
| 1994 | 1,568,200 | 83,431 | 7.4 | 0.4 |
| 1995 | 1,193,200 | 70,572 | 5.5 | 0.3 |
| 1996 | 1,100,800 | 68,653 | 5.1 | 0.3 |
| 1997 | 1,024,100 | 72,643 | 4.7 | 0.3 |
| 1998 | 835,400 | 69,401 | 3.8 | 0.3 |
| 1999 | 640,900 | 54,713 | 2.9 | 0.2 |
| 2000 | 610,200 | 55,220 | 2.7 | 0.2 |
| 2001 | 563,100 | 53,309 | 2.5 | 0.2 |
| 2002 | 540,000 | 50,299 | 2.3 | 0.2 |
| 2003 | 467,300 | 47,783 | 2.0 | 0.2 |
| 2004 | 456,500 | 47,513 | 1.9 | 0.2 |
| 2005 | 503,500 | 55,594 | 2.1 | 0.2 |
| 2006 | 614,400 | 61,310 | 2.5 | 0.2 |
| 2007 | 554,800 | 55,886 | 2.2 | 0.2 |
| 2008 | 371,300 | 45,794 | 1.5 | 0.2 |
| 2009 | 410,100 | 48,765 | 1.6 | 0.2 |
| 2010 | 415,000 | 47,172 | 1.6 | 0.2 |
| 2011 | 467,300 | 53,197 | 1.8 | 0.2 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

A. 94

APPENDIX TABLE 3
Standard errors for table 1: Criminal firearm violence, 1993–2011

| Year | Total fatal and nonfatal firearm violence | Number | | Rate of nonfatal firearm victimization | Percent of all violence involving firearms |
|------|------|------|------|------|------|
| | | Nonfatal firearm victimizations | Nonfatal firearm incidents | | |
| 1993 | 105,349 | 104,582 | 91,169 | 0.5 | 0.6% |
| 1994 | 84,005 | 83,431 | 73,911 | 0.4 | 0.4 |
| 1995 | 71,131 | 70,572 | 64,501 | 0.3 | 0.4 |
| 1996 | 69,183 | 68,653 | 62,377 | 0.3 | 0.5 |
| 1997 | 73,220 | 72,643 | 66,331 | 0.3 | 0.5 |
| 1998 | 70,022 | 69,401 | 60,556 | 0.3 | 0.5 |
| 1999 | 55,268 | 54,713 | 48,457 | 0.2 | 0.5 |
| 2000 | 55,810 | 55,220 | 48,015 | 0.2 | 0.6 |
| 2001 | 53,967 | 53,309 | 49,987 | 0.2 | 0.7 |
| 2002 | 50,946 | 50,299 | 45,234 | 0.2 | 0.6 |
| 2003 | 48,494 | 47,783 | 42,668 | 0.2 | 0.6 |
| 2004 | 48,200 | 47,513 | 44,433 | 0.2 | 0.7 |
| 2005 | 56,378 | 55,594 | 51,864 | 0.2 | 0.8 |
| 2006 | 62,038 | 61,310 | 57,669 | 0.2 | 0.7 |
| 2007 | 56,652 | 55,886 | 49,166 | 0.2 | 0.8 |
| 2008 | 46,637 | 45,794 | 42,966 | 0.2 | 0.7 |
| 2009 | 49,561 | 48,765 | 46,881 | 0.2 | 0.8 |
| 2010 | 47,913 | 47,172 | 44,695 | 0.2 | 0.9 |
| 2011 | 53,942 | 53,197 | 49,563 | 0.2 | 0.8 |

~Not applicable.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

APPENDIX TABLE 4
Standard errors for table 2: Percent of violence involving a firearm, by type of crime, 1993–2011

| Year | Nonfatal violence | Robbery | Aggravated assault |
|------|------|------|------|
| 1993 | 0.6% | 2.2% | 1.9% |
| 1994 | 0.4 | 1.9 | 1.5 |
| 1995 | 0.4 | 2.1 | 1.5 |
| 1996 | 0.4 | 2.0 | 1.5 |
| 1997 | 0.5 | 2.2 | 1.7 |
| 1998 | 0.5 | 2.5 | 1.9 |
| 1999 | 0.5 | 2.3 | 1.8 |
| 2000 | 0.6 | 2.6 | 2.2 |
| 2001 | 0.6 | 3.4 | 2.3 |
| 2002 | 0.6 | 3.2 | 2.5 |
| 2003 | 0.6 | 3.1 | 2.3 |
| 2004 | 0.7 | 3.2 | 2.4 |
| 2005 | 0.8 | 3.3 | 2.8 |
| 2006 | 0.7 | 2.7 | 2.4 |
| 2007 | 0.8 | 2.9 | 2.9 |
| 2008 | 0.7 | 3.3 | 3.1 |
| 2009 | 0.8 | 3.8 | 2.9 |
| 2010 | 0.9 | 3.7 | 3.1 |
| 2011 | 0.8 | 4.0 | 3.2 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

A. 95

## APPENDIX TABLE 5
Standard errors for table 3: Criminal firearm violence, by type of firearm, 1994–2011

| | Nonfatal violence | | | | | |
| | Handgun | | Other firearm | | Gun type unknown | |
| Year | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| 1994 | 94,313 | 1.8% | 26,713 | 1.6% | 6,951 | 0.4% |
| 1995 | 77,109 | 1.6 | 21,832 | 1.5 | 4,899 | 0.4 |
| 1996 | 66,253 | 1.9 | 21,995 | 1.8 | 4,366 | 0.4 |
| 1997 | 68,335 | 2.3 | 25,950 | 2.2 | 5,534 | 0.5 |
| 1998 | 68,151 | 2.6 | 25,521 | 2.5 | 4,522 | 0.5 |
| 1999 | 63,909 | 2.5 | 18,379 | 2.3 | 4,189 | 0.6 |
| 2000 | 57,439 | 2.8 | 17,323 | 2.6 | 4,260 | 0.7 |
| 2001 | 53,625 | 3.1 | 17,115 | 2.7 | 7,586 | 1.3 |
| 2002 | 48,977 | 3.1 | 16,006 | 2.7 | 7,929 | 1.4 |
| 2003 | 46,655 | 3.2 | 14,670 | 2.7 | 7,392 | 1.4 |
| 2004 | 45,846 | 3.6 | 15,535 | 3.1 | 8,509 | 1.8 |
| 2005 | 50,621 | 3.8 | 17,269 | 3.3 | 8,153 | 1.7 |
| 2006 | 56,341 | 3.1 | 15,872 | 2.7 | 8,415 | 1.5 |
| 2007 | 56,630 | 3.2 | 18,308 | 2.9 | 6,598 | 1.1 |
| 2008 | 48,199 | 3.6 | 16,622 | 3.3 | 4,666 | 1.0 |
| 2009 | 47,110 | 3.7 | 14,157 | 3.4 | 4,688 | 1.2 |
| 2010 | 50,636 | 3.1 | 11,837 | 2.7 | 4,313 | 1.0 |
| 2011 | 43,185 | 3.1 | 13,868 | 2.9 | 2,676 | 0.6 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

## APPENDIX TABLE 6
Numbers and rates for figure 3: Firearm homicides, by sex, 1993–2010

| | Number | | Rate per 100,000 persons | |
| Year | Male | Female | Male | Female |
|---|---|---|---|---|
| 1993 | 15,228 | 3,025 | 12.0 | 2.3 |
| 1994 | 14,766 | 2,761 | 11.5 | 2.1 |
| 1995 | 13,021 | 2,530 | 10.0 | 1.9 |
| 1996 | 11,735 | 2,302 | 8.9 | 1.7 |
| 1997 | 11,147 | 2,105 | 8.4 | 1.5 |
| 1998 | 9,771 | 2,027 | 7.2 | 1.4 |
| 1999 | 8,944 | 1,884 | 6.5 | 1.3 |
| 2000 | 9,006 | 1,795 | 6.5 | 1.3 |
| 2001 | 9,532 | 1,816 | 6.8 | 1.3 |
| 2002 | 9,899 | 1,930 | 7.0 | 1.3 |
| 2003 | 10,126 | 1,794 | 7.1 | 1.2 |
| 2004 | 9,921 | 1,703 | 6.9 | 1.1 |
| 2005 | 10,561 | 1,791 | 7.3 | 1.2 |
| 2006 | 10,886 | 1,905 | 7.4 | 1.3 |
| 2007 | 10,767 | 1,865 | 7.3 | 1.2 |
| 2008 | 10,361 | 1,818 | 6.9 | 1.2 |
| 2009 | 9,615 | 1,878 | 6.4 | 1.2 |
| 2010 | 9,340 | 1,738 | 6.2 | 1.1 |

Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

## APPENDIX TABLE 7
Rates and standard errors for figure 4: Nonfatal firearm violence, by sex, 1994–2011

| | Male | | Female | |
| Year | Rate[a] | Standard error | Rate[a] | Standard error |
|---|---|---|---|---|
| 1994 | 10.1 | 0.6 | 4.7 | 0.4 |
| 1995 | 9.3 | 0.5 | 3.7 | 0.3 |
| 1996 | 7.6 | 0.4 | 3.1 | 0.2 |
| 1997 | 6.4 | 0.4 | 3.5 | 0.3 |
| 1998 | 5.5 | 0.4 | 3.0 | 0.3 |
| 1999 | 4.4 | 0.4 | 2.3 | 0.2 |
| 2000 | 3.7 | 0.3 | 1.9 | 0.2 |
| 2001 | 3.5 | 0.3 | 1.7 | 0.2 |
| 2002 | 2.9 | 0.3 | 1.9 | 0.2 |
| 2003 | 2.7 | 0.2 | 1.6 | 0.2 |
| 2004 | 2.5 | 0.2 | 1.4 | 0.2 |
| 2005 | 2.5 | 0.3 | 1.4 | 0.2 |
| 2006 | 2.8 | 0.3 | 1.8 | 0.2 |
| 2007 | 2.8 | 0.3 | 1.9 | 0.2 |
| 2008 | 2.2 | 0.2 | 1.5 | 0.2 |
| 2009 | 2.0 | 0.2 | 1.1 | 0.2 |
| 2010 | 2.0 | 0.2 | 1.2 | 0.2 |
| 2011 | 1.9 | 0.2 | 1.6 | 0.2 |

[a]Per 1,000 persons age 12 or older.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

APPENDIX TABLE 8
Numbers and rates for figure 5: Firearm homicides, by race, 1993–2010

| | Number | | | | Rate per 100,000 persons | | | |
|---|---|---|---|---|---|---|---|---|
| Year | White | Black | American Indian/ Alaska Native | Asian/Pacific Islander | White | Black | American Indian/ Alaska Native | Asian/Pacific Islander |
| 1993 | 7,918 | 9,824 | 106 | 405 | 3.7 | 30.1 | 4.6 | 4.6 |
| 1994 | 7,774 | 9,302 | 123 | 328 | 3.6 | 28.0 | 5.2 | 3.6 |
| 1995 | 7,144 | 7,935 | 130 | 342 | 3.2 | 23.4 | 5.3 | 3.6 |
| 1996 | 6,240 | 7,403 | 90 | 304 | 2.8 | 21.5 | 3.6 | 3.0 |
| 1997 | 6,025 | 6,841 | 96 | 290 | 2.7 | 19.5 | 3.7 | 2.8 |
| 1998 | 5,412 | 6,053 | 99 | 234 | 2.4 | 17.0 | 3.6 | 2.2 |
| 1999 | 4,918 | 5,577 | 104 | 229 | 2.2 | 15.4 | 3.7 | 2.0 |
| 2000 | 4,806 | 5,699 | 86 | 210 | 2.1 | 15.6 | 2.9 | 1.8 |
| 2001 | 5,188 | 5,885 | 87 | 188 | 2.2 | 15.8 | 2.8 | 1.5 |
| 2002 | 5,185 | 6,285 | 117 | 242 | 2.2 | 16.7 | 3.7 | 1.9 |
| 2003 | 5,173 | 6,397 | 109 | 241 | 2.2 | 16.7 | 3.3 | 1.8 |
| 2004 | 5,119 | 6,201 | 104 | 200 | 2.2 | 16.0 | 3.0 | 1.4 |
| 2005 | 5,266 | 6,703 | 117 | 266 | 2.2 | 17.1 | 3.3 | 1.8 |
| 2006 | 5,279 | 7,113 | 119 | 280 | 2.2 | 17.9 | 3.2 | 1.9 |
| 2007 | 5,380 | 6,960 | 91 | 201 | 2.2 | 17.2 | 2.4 | 1.3 |
| 2008 | 5,305 | 6,569 | 97 | 208 | 2.2 | 16.0 | 2.4 | 1.3 |
| 2009 | 4,950 | 6,216 | 112 | 215 | 2.0 | 14.9 | 2.7 | 1.3 |
| 2010 | 4,647 | 6,151 | 113 | 167 | 1.9 | 14.6 | 2.7 | 1.0 |

Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/nclpc/wisqars.

APPENDIX TABLE 9
Numbers and rates for figure 6: Firearm homicides,
by Hispanic origin, 1993–2010

| | Number | | Rate per 100,000 persons | |
|---|---|---|---|---|
| Year | Hispanic | Non-Hispanic | Hispanic | Non-Hispanic |
| 1993 | 3,192 | 14,597 | 12.4 | 6.3 |
| 1994 | 3,149 | 14,065 | 11.7 | 6.0 |
| 1995 | 3,008 | 12,260 | 10.7 | 5.2 |
| 1996 | 2,529 | 11,229 | 8.6 | 4.7 |
| 1997 | 2,298 | 10,868 | 7.4 | 4.5 |
| 1998 | 2,090 | 9,620 | 6.5 | 4.0 |
| 1999 | 1,939 | 8,821 | 5.7 | 3.6 |
| 2000 | 1,958 | 8,767 | 5.6 | 3.6 |
| 2001 | 2,123 | 9,134 | 5.7 | 3.7 |
| 2002 | 2,168 | 9,575 | 5.6 | 3.9 |
| 2003 | 2,316 | 9,536 | 5.8 | 3.8 |
| 2004 | 2,241 | 9,323 | 5.4 | 3.7 |
| 2005 | 2,453 | 9,835 | 5.7 | 3.9 |
| 2006 | 2,472 | 10,260 | 5.5 | 4.0 |
| 2007 | 2,385 | 10,193 | 5.2 | 4.0 |
| 2008 | 2,260 | 9,882 | 4.7 | 3.9 |
| 2009 | 2,115 | 9,275 | 4.3 | 3.6 |
| 2010 | 1,919 | 9,082 | 3.8 | 3.5 |

Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/nclpc/wisqars.

## APPENDIX TABLE 10
Rates and standard errors for figure 7: Nonfatal firearm violence, by race and Hispanic origin, 1994–2011

| Year | White Rate* | Standard error | Black Rate* | Standard error | Hispanic Rate* | Standard error | American Indian/Alaska Native Rate* | Standard error | Asian/Pacific Islander Rate* | Standard error | Two or more races Rate* | Standard error |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1994 | 5.2 | 0.3 | 16.3 | 1.3 | 12.7 | 1.4 | 15.3! | 5.3 | 10.3 | 2.0 | ~ | ~ |
| 1995 | 4.6 | 0.3 | 14.2 | 1.1 | 12.1 | 1.1 | 16.3 | 4.9 | 4.9 | 1.1 | ~ | ~ |
| 1996 | 3.9 | 0.2 | 11.6 | 0.9 | 9.3 | 0.9 | 13.3! | 4.4 | 3.4 | 0.9 | ~ | ~ |
| 1997 | 4.0 | 0.3 | 9.4 | 0.9 | 6.9 | 0.8 | 3.7! | 2.6 | 2.0 | 0.7 | ~ | ~ |
| 1998 | 3.4 | 0.3 | 7.4 | 0.8 | 5.6 | 0.8 | 20.9! | 6.6 | 3.9 | 1.0 | ~ | ~ |
| 1999 | 2.2 | 0.2 | 7.9 | 0.9 | 5.0 | 0.8 | 25.1! | 7.5 | 4.0 | 1.1 | ~ | ~ |
| 2000 | 1.8 | 0.2 | 7.0 | 0.8 | 4.7 | 0.7 | 4.8! | 3.2 | 1.9 | 0.7 | ~ | ~ |
| 2001 | 2.0 | 0.2 | 5.0 | 0.7 | 3.8 | 0.6 | 1.1! | 1.5 | 1.5! | 0.6 | ~ | ~ |
| 2002 | 1.7 | 0.2 | 5.6 | 0.7 | 3.7 | 0.6 | 1.1! | 1.4 | 0.9! | 0.4 | ~ | ~ |
| 2003 | 1.5 | 0.2 | 5.7 | 0.7 | 2.6 | 0.4 | -- | ~ | 1.0! | 0.5 | ~ | ~ |
| 2004 | 1.7 | 0.2 | 4.4 | 0.6 | 1.5 | 0.3 | -- | ~ | 1.1! | 0.5 | 0.9! | 1.1 |
| 2005 | 1.6 | 0.2 | 4.2 | 0.7 | 2.2 | 0.4 | -- | ~ | 1.2! | 0.5 | 2.8! | 2.0 |
| 2006 | 1.7 | 0.2 | 4.4 | 0.7 | 3.4 | 0.6 | 1.8! | 1.9 | 2.1! | 0.7 | 4.0! | 2.2 |
| 2007 | 1.4 | 0.2 | 7.1 | 0.9 | 3.0 | 0.5 | 3.3! | 2.4 | 1.7! | 0.6 | 2.7! | 1.5 |
| 2008 | 1.0 | 0.1 | 6.9 | 0.8 | 1.9 | 0.4 | 3.2! | 2.3 | 1.0! | 0.5 | 1.4! | 1.2 |
| 2009 | 0.9 | 0.1 | 5.1 | 0.7 | 1.7 | 0.4 | 2.9! | 2.3 | 0.9! | 0.4 | 5.7! | 2.5 |
| 2010 | 1.0 | 0.1 | 4.5 | 0.7 | 2.1 | 0.4 | 9.2! | 4.2 | 0.3! | 0.2 | 5.7! | 2.5 |
| 2011 | 1.4 | 0.1 | 2.8 | 0.4 | 2.2 | 0.4 | 8.6! | 3.4 | 0.6! | 0.3 | 7.6 | 2.3 |

*Per 1,000 persons age 12 or older.
! Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
~Not applicable.
--Less than 0.05.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

## APPENDIX TABLE 11
Numbers for table 4: Firearm homicides, by age, 1993–2011

| Year | 11 or younger | 12–17 | 18–24 | 25–34 | 35–49 | 50 or older |
|---|---|---|---|---|---|---|
| 1993 | 240 | 1,735 | 5,673 | 5,295 | 3,808 | 1,476 |
| 1994 | 176 | 1,736 | 5,435 | 5,059 | 3,700 | 1,399 |
| 1995 | 183 | 1,597 | 4,726 | 4,448 | 3,222 | 1,351 |
| 1996 | 178 | 1,295 | 4,334 | 3,918 | 3,030 | 1,266 |
| 1997 | 174 | 1,134 | 4,148 | 3,706 | 2,905 | 1,168 |
| 1998 | 157 | 888 | 3,753 | 3,231 | 2,669 | 1,082 |
| 1999 | 142 | 859 | 3,319 | 3,048 | 2,419 | 1,026 |
| 2000 | 110 | 709 | 3,371 | 3,074 | 2,488 | 1,037 |
| 2001 | 150 | 685 | 3,611 | 3,308 | 2,530 | 1,053 |
| 2002 | 151 | 721 | 3,708 | 3,465 | 2,646 | 1,125 |
| 2003 | 121 | 684 | 3,840 | 3,540 | 2,624 | 1,093 |
| 2004 | 105 | 763 | 3,485 | 3,503 | 2,533 | 1,214 |
| 2005 | 111 | 810 | 3,808 | 3,780 | 2,689 | 1,145 |
| 2006 | 142 | 940 | 4,030 | 3,767 | 2,688 | 1,216 |
| 2007 | 140 | 898 | 3,895 | 3,751 | 2,737 | 1,202 |
| 2008 | 140 | 844 | 3,662 | 3,612 | 2,655 | 1,264 |
| 2009 | 142 | 745 | 3,398 | 3,300 | 2,538 | 1,364 |
| 2010 | 127 | 708 | 3,273 | 3,331 | 2,294 | 1,340 |

Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

A. 98

## APPENDIX TABLE 12
Standard errors for table 4: Nonfatal firearm violence, by age, 1994–2011

| Year | 12-17 | 18-24 | 25-34 | 35-49 | 50 or older |
|------|-------|-------|-------|-------|-------------|
| 1994 | 1.2 | 1.4 | 0.8 | 0.6 | 0.2 |
| 1995 | 0.9 | 1.2 | 0.6 | 0.4 | 0.2 |
| 1996 | 0.8 | 1.0 | 0.6 | 0.4 | 0.2 |
| 1997 | 0.8 | 1.1 | 0.6 | 0.4 | 0.2 |
| 1998 | 0.8 | 1.1 | 0.5 | 0.4 | 0.2 |
| 1999 | 0.7 | 1.0 | 0.6 | 0.3 | 0.2 |
| 2000 | 0.6 | 0.8 | 0.5 | 0.3 | 0.2 |
| 2001 | 0.5 | 0.8 | 0.4 | 0.3 | 0.2 |
| 2002 | 0.5 | 0.8 | 0.4 | 0.3 | 0.1 |
| 2003 | 0.5 | 0.7 | 0.4 | 0.2 | 0.1 |
| 2004 | 0.4 | 0.6 | 0.4 | 0.3 | 0.2 |
| 2005 | 0.4 | 0.7 | 0.5 | 0.3 | 0.2 |
| 2006 | 0.5 | 0.8 | 0.5 | 0.3 | 0.2 |
| 2007 | 0.7 | 0.7 | 0.5 | 0.3 | 0.2 |
| 2008 | 0.6 | 0.5 | 0.4 | 0.3 | 0.1 |
| 2009 | 0.3 | 0.6 | 0.4 | 0.3 | 0.1 |
| 2010 | 0.2 | 0.8 | 0.4 | 0.2 | 0.1 |
| 2011 | 0.3 | 0.6 | 0.3 | 0.2 | 0.1 |

*Rate per 1,000 persons age 12 or older.

‖Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

## APPENDIX TABLE 13
Numbers and rates for figure 8: Firearm homicides, by region, 1993–2011

| Year | Number | | | | Rate per 100,000 persons | | | |
|------|-----------|-------|---------|------|-----------|-------|---------|------|
| | Northeast | South | Midwest | West | Northeast | South | Midwest | West |
| 1993 | 2,918 | 7,863 | 3,365 | 4,107 | 5.6 | 8.7 | 5.5 | 7.3 |
| 1994 | 2,489 | 7,577 | 3,391 | 4,070 | 4.8 | 8.3 | 5.5 | 7.1 |
| 1995 | 2,100 | 6,659 | 2,980 | 3,812 | 4.0 | 7.1 | 4.8 | 6.5 |
| 1996 | 1,838 | 6,248 | 2,791 | 3,160 | 3.5 | 6.6 | 4.4 | 5.3 |
| 1997 | 1,641 | 6,020 | 2,661 | 2,930 | 3.1 | 6.3 | 4.2 | 4.9 |
| 1998 | 1,347 | 5,434 | 2,490 | 2,527 | 2.5 | 5.6 | 3.9 | 4.1 |
| 1999 | 1,327 | 4,905 | 2,319 | 2,277 | 2.5 | 5.0 | 3.6 | 3.7 |
| 2000 | 1,391 | 4,846 | 2,284 | 2,280 | 2.6 | 4.8 | 3.6 | 3.6 |
| 2001 | 1,407 | 4,989 | 2,477 | 2,475 | 2.6 | 4.9 | 3.8 | 3.8 |
| 2002 | 1,406 | 5,292 | 2,381 | 2,750 | 2.6 | 5.1 | 3.7 | 4.2 |
| 2003 | 1,489 | 5,395 | 2,324 | 2,712 | 2.7 | 5.2 | 3.6 | 4.1 |
| 2004 | 1,485 | 5,164 | 2,212 | 2,763 | 2.7 | 4.9 | 3.4 | 4.1 |
| 2005 | 1,554 | 5,536 | 2,387 | 2,875 | 2.9 | 5.2 | 3.6 | 4.2 |
| 2006 | 1,715 | 5,701 | 2,505 | 2,870 | 3.2 | 5.2 | 3.8 | 4.2 |
| 2007 | 1,577 | 6,055 | 2,354 | 2,646 | 2.9 | 5.5 | 3.6 | 3.8 |
| 2008 | 1,506 | 5,778 | 2,439 | 2,456 | 2.7 | 5.2 | 3.7 | 3.5 |
| 2009 | 1,440 | 5,438 | 2,359 | 2,256 | 2.6 | 4.8 | 3.5 | 3.4 |
| 2010 | 1,552 | 5,082 | 2,296 | 2,148 | 2.8 | 4.4 | 3.4 | 3.0 |

Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

## APPENDIX TABLE 14
Rates and standard errors for figure 9: Nonfatal firearm violence, by region, 1997–2011

| Year | Northeast | | Midwest | | South | | West | |
|------|-------|----------------|-------|----------------|-------|----------------|-------|----------------|
|      | Rate* | Standard error | Rate* | Standard error | Rate* | Standard error | Rate* | Standard error |
| 1997 | 3.1 | 0.4 | 4.7 | 0.5 | 5.4 | 0.4 | 5.7 | 0.5 |
| 1998 | 2.1 | 0.3 | 3.9 | 0.4 | 5.0 | 0.4 | 5.1 | 0.5 |
| 1999 | 1.4 | 0.3 | 3.0 | 0.4 | 3.6 | 0.4 | 4.9 | 0.5 |
| 2000 | 1.3 | 0.3 | 2.5 | 0.3 | 2.8 | 0.3 | 4.5 | 0.5 |
| 2001 | 1.4 | 0.3 | 2.6 | 0.4 | 3.0 | 0.3 | 2.8 | 0.4 |
| 2002 | 1.3 | 0.3 | 2.2 | 0.3 | 3.3 | 0.3 | 2.0 | 0.3 |
| 2003 | 1.0 | 0.2 | 2.1 | 0.3 | 2.9 | 0.3 | 1.9 | 0.3 |
| 2004 | 0.8 | 0.2 | 2.6 | 0.3 | 1.9 | 0.2 | 2.2 | 0.3 |
| 2005 | 0.9 | 0.2 | 2.8 | 0.4 | 1.9 | 0.3 | 1.9 | 0.3 |
| 2006 | 1.2 | 0.3 | 2.6 | 0.4 | 2.7 | 0.3 | 2.2 | 0.3 |
| 2007 | 0.9 | 0.2 | 2.1 | 0.3 | 3.5 | 0.3 | 1.9 | 0.3 |
| 2008 | 0.7 | 0.2 | 2.1 | 0.3 | 2.8 | 0.3 | 1.1 | 0.2 |
| 2009 | 0.8 | 0.2 | 2.0 | 0.3 | 1.7 | 0.2 | 1.4 | 0.3 |
| 2010 | 0.9 | 0.2 | 1.9 | 0.3 | 1.7 | 0.2 | 1.8 | 0.3 |
| 2011 | 1.3 | 0.2 | 1.7 | 0.3 | 1.9 | 0.2 | 1.8 | 0.3 |

*Rate per 1,000 persons age 12 or older.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1996–2011.

## APPENDIX TABLE 15
Rates and standard errors for figure 10: Nonfatal firearm violence, by urban-rural location, 1994–2011

| Year | Urban | | Suburban | | Rural | |
|------|-------|----------------|-------|----------------|-------|----------------|
|      | Rate* | Standard error | Rate* | Standard error | Rate* | Standard error |
| 1994 | 10.6 | 0.7 | 6.3 | 0.4 | 5.2 | 0.5 |
| 1995 | 10.1 | 0.6 | 5.5 | 0.4 | 3.6 | 0.4 |
| 1996 | 8.4 | 0.5 | 4.4 | 0.3 | 3.1 | 0.4 |
| 1997 | 7.3 | 0.5 | 3.9 | 0.3 | 3.6 | 0.4 |
| 1998 | 6.2 | 0.5 | 3.8 | 0.3 | 2.3 | 0.3 |
| 1999 | 5.3 | 0.5 | 3.1 | 0.3 | 1.0 | 0.2 |
| 2000 | 4.8 | 0.5 | 2.3 | 0.2 | 1.0 | 0.2 |
| 2001 | 4.4 | 0.4 | 2.0 | 0.2 | 1.4 | 0.3 |
| 2002 | 4.4 | 0.4 | 1.8 | 0.2 | 1.1 | 0.2 |
| 2003 | 3.7 | 0.4 | 1.7 | 0.2 | 0.9 | 0.2 |
| 2004 | 3.0 | 0.3 | 1.7 | 0.2 | 1.0 | 0.2 |
| 2005 | 3.4 | 0.4 | 1.5 | 0.2 | 1.1 | 0.3 |
| 2006 | 3.3 | 0.4 | 1.8 | 0.2 | 1.9 | 0.4 |
| 2007 | 2.6 | 0.3 | 2.3 | 0.2 | 1.9 | 0.3 |
| 2008 | 2.2 | 0.3 | 1.8 | 0.2 | 1.2 | 0.3 |
| 2009 | 2.6 | 0.3 | 1.1 | 0.2 | 0.9 | 0.2 |
| 2010 | 2.8 | 0.3 | 1.2 | 0.2 | 0.7 | 0.2 |
| 2011 | 2.5 | 0.3 | 1.4 | 0.2 | 1.2 | 0.2 |

*Rate per 1,000 persons age 12 or older.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1993–2011.

A. 100

APPENDIX TABLE 16

Rates and standard errors for table 5: Nonfatal firearm violence, by population size, 1997–2011

| Year | Not a place | | Under 100,000 | | 100,000–249,999 | | 250,000–499,999 | | 500,000–999,999 | | 1 million or more | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rate* | Standard error | Rate* | Standard error | Rate* | Standard error | Rate* | Standard error | Rate* | Standard error | Rate* | Standard error |
| 1997 | 3.9 | 0.4 | 3.8 | 0.3 | 7.0 | 0.9 | 10.3 | 1.3 | 7.3 | 1.3 | 7.3 | 1.0 |
| 1998 | 3.0 | 0.3 | 3.9 | 0.3 | 4.8 | 0.8 | 7.0 | 1.1 | 9.2 | 1.6 | 5.7 | 0.9 |
| 1999 | 1.9 | 0.3 | 3.1 | 0.3 | 3.1 | 0.6 | 5.5 | 1.0 | 9.0 | 1.6 | 6.4 | 1.0 |
| 2000 | 1.5 | 0.2 | 2.2 | 0.2 | 3.9 | 0.7 | 6.5 | 1.1 | 6.3 | 1.3 | 5.6 | 0.9 |
| 2001 | 1.4 | 0.2 | 2.1 | 0.2 | 4.1 | 0.7 | 6.1 | 1.1 | 5.5 | 1.2 | 5.1 | 0.9 |
| 2002 | 1.2 | 0.2 | 2.3 | 0.2 | 2.8 | 0.6 | 3.9 | 0.8 | 4.9 | 1.1 | 5.3 | 0.8 |
| 2003 | 1.4 | 0.2 | 2.0 | 0.2 | 2.8 | 0.5 | 3.3 | 0.7 | 5.1 | 1.1 | 3.6 | 0.7 |
| 2004 | 1.4 | 0.2 | 1.4 | 0.2 | 3.0 | 0.6 | 4.1 | 0.9 | 5.5 | 1.2 | 2.7 | 0.6 |
| 2005 | 1.2 | 0.2 | 1.6 | 0.2 | 2.9 | 0.6 | 3.6 | 0.8 | 4.5 | 1.2 | 4.6 | 0.9 |
| 2006 | 1.6 | 0.2 | 2.1 | 0.2 | 2.6 | 0.6 | 2.6 | 0.8 | 3.8 | 1.0 | 4.9 | 0.9 |
| 2007 | 1.5 | 0.2 | 2.6 | 0.3 | 2.7 | 0.5 | 2.4 | 0.7 | 5.4 | 1.1 | 2.1 | 0.5 |
| 2008 | 0.8 | 0.2 | 2.1 | 0.2 | 2.1 | 0.5 | 3.2 | 0.8 | 4.9 | 1.0 | 1.4 | 0.4 |
| 2009 | 0.9 | 0.2 | 1.1 | 0.2 | 2.2 | 0.5 | 3.0 | 0.8 | 4.0 | 1.0 | 3.5 | 0.7 |
| 2010 | 0.9 | 0.2 | 1.2 | 0.2 | 1.8 | 0.5 | 2.8 | 0.8 | 5.1 | 1.1 | 4.0 | 0.8 |
| 2011 | 1.4 | 0.2 | 1.2 | 0.2 | 1.3 | 0.3 | 3.9 | 0.8 | 4.6 | 0.9 | 3.2 | 0.6 |

*Rate per 1,000 persons age 12 or older.

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1996–2011.

APPENDIX TABLE 17

Standard errors for table 6: Nonfatal firearm and nonfirearm violence, by victim-offender relationship, 2007–2011

| Relationship to victim | Total nonfatal violence | Firearm violence | | Nonfirearm violence | |
|---|---|---|---|---|---|
| | | Number | Percent of total violence | Number | Percent of total violence |
| Total | 520,018 | 107,331 | 0.3% | 495,683 | 0.4% |
| Nonstranger | 351,653 | 56,980 | 0.3 | 341,349 | 0.4 |
| Intimate | 167,301 | 27,453 | 0.6 | 163,040 | 0.6 |
| Other relative | 105,593 | 24,480 | 1.1 | 100,985 | 1.2 |
| Friend/acquaintance | 247,394 | 39,620 | 0.4 | 240,775 | 0.5 |
| Stranger | 281,855 | 74,319 | 0.6 | 262,843 | 0.7 |
| Unknown | 126,046 | 34,768 | 1.1 | 118,113 | 1.2 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

A. 101

APPENDIX TABLE 18

Standard errors for table 7: Nonfatal firearm and nonfirearm violence, by location of crime, 2007–2011

| Location | Total nonfatal violence | | Firearm violence | | Nonfirearm violence | |
|---|---|---|---|---|---|---|
| | Number | Percent | Total number | Percent | Total number | Percent |
| Total | 520,094 | ~ | 107,331 | ~ | 495,761 | ~ |
| Victims home or lodging | 204,185 | 0.6% | 42,032 | 1.6% | 195,889 | 0.6% |
| Near victim's home | 170,118 | 0.5 | 46,062 | 1.8 | 159,113 | 0.5 |
| In, at, or near a friend, neighbor, or relative's home | 106,117 | 0.3 | 22,283 | 1.0 | 102,275 | 0.3 |
| Commercial place | 125,178 | 0.4 | 27,429 | 1.2 | 120,070 | 0.4 |
| Parking lot or garage | 91,497 | 0.3 | 37,086 | 1.5 | 80,309 | 0.3 |
| School | 150,761 | 0.5 | 6,544 | 0.3 | 150,471 | 0.5 |
| Open area, on street, or public transportation | 166,506 | 0.5 | 46,260 | 1.8 | 155,261 | 0.5 |
| Other location | 128,572 | 0.4 | 18,853 | 0.8 | 126,101 | 0.4 |

~Not applicable.

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

APPENDIX TABLE 19

Standard errors for table 9: Nonfatal firearm and nonfirearm violence, by injury and treatment received, 2007–2011

| Injury and treatment | Total nonfatal violence | | Firearm violence | | Nonfirearm violence | |
|---|---|---|---|---|---|---|
| | Number | Percent | Total number | Percent | Total number | Percent |
| Injury | 520,094 | ~ | 107,331 | ~ | 495,761 | ~ |
| Not injured | 435,239 | 0.7% | 92,106 | 1.8% | 414,216 | 0.7% |
| Injured | 221,742 | 0.6 | 46,376 | 1.8 | 212,304 | 0.6 |
| Serious injuries | 76,874 | 0.2 | 23,654 | 1.0 | 73,196 | 0.3 |
| Gun shot | 12,758 | -- | 12,758 | 0.6 | ~ | ~ |
| Minor injuries | 189,519 | 0.5 | 38,061 | 1.5 | 182,281 | 0.6 |
| Rape without other injuries | 39,058 | 0.1 | 4,232 | 0.2 | 38,750 | 0.1 |
| Treatment for injury | 221,742 | ~ | 46,376 | ~ | 212,304 | ~ |
| No treatment | 159,205 | 1.3% | 22,999 | 3.7% | 156,054 | 1.3% |
| Any treatment | 130,902 | 1.2 | 38,813 | 3.8 | 121,399 | 1.3 |
| Treatment setting | 130,902 | ~ | 38,813 | ~ | 121,399 | ~ |
| At the scene/home of victim, neighbor, or friend/ other location | 70,643 | 1.7% | 15,653 | 3.8% | 68,065 | 1.9% |
| In doctor's office, hospital emergency room, or overnight at hospital | 101,753 | 1.8 | 34,730 | 3.8 | 92,599 | 1.9 |

--Less than 0.05%.

~Not applicable.

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

A. 102

## APPENDIX TABLE 20
Numbers and standard errors for figure 11: Nonfatal firearm injuries, 2001–2011

| Year | Number | Standard error |
|------|--------|----------------|
| 2001 | 41,044 | 10,287 |
| 2002 | 37,321 | 9,282 |
| 2003 | 42,505 | 11,558 |
| 2004 | 43,592 | 11,764 |
| 2005 | 50,320 | 14,431 |
| 2006 | 52,748 | 15,027 |
| 2007 | 48,676† | 15,139 |
| 2008 | 56,626 | 16,648 |
| 2009 | 44,466 | 11,767 |
| 2010 | 53,738 | 15,769 |
| 2011 | 55,544 | 15,671 |

† Interpret with caution. Estimate based on fewer than 20 NEISS cases (based on unweighted data), national estimates less than 1,200 (based on weighted data), or the coefficient of variation (CV) of the estimate greater than 30%.

Source: Consumer Product Safety Commission, National Electronic Injury Surveillance System All Injury Program (NEISS-AIP), 2001–2011, accessed from the National Center for Injury Prevention and Control, CDC.

## APPENDIX TABLE 21
Standard errors for table 10: Nonfatal firearm and nonfirearm violence reported and not reported to police, 2007–2011

| | Total nonfatal violence | Firearm violence | Nonfirearm violence |
|---|---|---|---|
| Total | ~ | ~ | ~ |
| Reported | 0.7% | 2.1% | 0.7% |
| Not reported | 0.7 | 2.1 | 0.8 |
| Reason not reported | ~ | ~ | ~ |
| Dealt with it another way | 0.9% | 2.1% | 0.9% |
| Not important enough to respondent | 0.7 | 1.6 | 0.7 |
| Police could not or would not do anything to help | 0.7 | 3.0 | 0.7 |
| Fear of reprisal | 0.4 | 3.1 | 0.4 |
| Did not want to get offender in trouble with law, or advised not to report | 0.4 | 1.3 | 0.4 |
| Other, unknown, or not one most important reason | 0.7 | 2.6 | 0.7 |

~Not applicable.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

## APPENDIX TABLE 22
Standard errors for table 11: Self-protective behaviors, by type of crime, 2007–2011

| | Violent crime | | Property crime | |
|---|---|---|---|---|
| Self-protective behavior | Total number | Percent | Total number | Percent |
| Total | 520,094 | ~ | 619,179 | ~ |
| Offered no resistance | 312,558 | 0.7% | 295,645 | 0.3% |
| Threatened or attacked with a firearm | 30,347 | 0.1 | 24,437 | ~ |
| Threatened or attacked with other weapon | 40,012 | 0.1 | 14,630 | ~ |
| Threatened or attacked without a weapon | 205,362 | 0.6 | 51,411 | 0.1 |
| Nonconfrontational tactics | 227,856 | 0.6 | 90,178 | 0.1 |
| Other reaction | 90,004 | 0.3 | 36,683 | ~ |
| Unknown reaction | 12,068 | ~ | 8,176 | ~ |
| Victim was not present | ~ | ~ | 641,196 | 0.4 |

~Not applicable.
—Less than 0.05%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2007–2011.

A. 103



The Bureau of Justice Statistics is the statistics agency of the U.S. Department of Justice. William J. Sabol is acting director.

This report was written by Michael Planty, PhD, and Jennifer L. Truman, PhD. Erica Smith, Tracy Snell, and Lauren Glaze provided statistical and technical assistance. Erika Harrell, Tracy Snell, Lauren Glaze, and Alexia Cooper verified the report.

Jill Thomas edited the report, and Tina Dorsey produced the report under the supervision of Doris J. James.

May 2013, NCJ 241730



Office of Justice Programs
Innovation • Partnerships • Safer Neighborhoods
www.ojp.usdoj.gov

A. 104

# American Journal of Lifestyle Medicine

http://ajl.sagepub.com/

Risks and Benefits of a Gun in the Home

David Hemenway

*AMERICAN JOURNAL OF LIFESTYLE MEDICINE* published online 2 February 2011

DOI: 10.1177/1559827610396294

The online version of this article can be found at:

http://ajl.sagepub.com/content/early/2011/02/01/1559827610396294

Published by:

⑤SAGE

http://www.sagepublications.com

Additional services and information for *American Journal of Lifestyle Medicine* can be found at:

Email Alerts: http://ajl.sagepub.com/cgi/alerts

Subscriptions: http://ajl.sagepub.com/subscriptions

Reprints: http://www.sagepub.com/journalsReprints.nav

Permissions: http://www.sagepub.com/journalsPermissions.nav

Downloaded from ajl.sagepub.com by guest on April 25, 2011

A. 105

American Journal of Lifestyle Medicine

David Hemenway, PhD

# Risks and Benefits of a Gun in the Home

Abstract: *This article summarizes the scientific literature on the health risks and benefits of having a gun in the home for the gun owner and his/her family. For most contemporary Americans, scientific studies indicate that the health risk of a gun in the home is greater than the benefit. The evidence is overwhelming for the fact that a gun in the home is a risk factor for completed suicide and that gun accidents are most likely to occur in homes with guns. There is compelling evidence that a gun in the home is a risk factor for intimidation and for killing women in their homes. On the benefit side, there are fewer studies, and there is no credible evidence of a deterrent effect of firearms or that a gun in the home reduces the likelihood or severity of injury during an altercation or break-in. Thus, groups such as the American Academy of Pediatrics urge parents not to have guns in the home.*

Keywords: guns; firearms; accidents; suicide; homicide; self-defense

## Introduction

Americans have more private guns per capita, and particularly more handguns, than citizens of other developed countries. Currently, more than one third of households in the United States contain a working firearm: slightly fewer than half of American men and 10% of women are firearm owners. Although most firearms in the United States are rifles or shotguns, handguns sales have recently been higher than long gun sales.

Compared with other Americans, gun owners are disproportionately male, married, older than 40 years, and are more likely to live in nonurban areas. Their long guns (rifles, shotguns) are owned mainly for sport (hunting and target shooting). Major predictors of sporting gun ownership include having parents who owned guns and currently having friends and neighbors with guns. Individuals surrounded by gun owners tend to want guns themselves. People who own only handguns typically own the guns for protection against crime. As a group, gun owners tend to be Conservatives, and they are less likely than nonowners to believe that public officials care about them or that police can protect them and are somewhat more likely to believe in private retribution for offenses against them.[1,4]

Gun issues are among the most contentious in America. This article summarizes the scientific evidence on the health risks and benefits of having a gun in the home for the gun owner and his/her family. The article does not examine some of the possible benefits (eg, the fun of target practice) or costs (eg, loss of hearing) of gun use nor does it directly address the

> For example, your gun may be stolen and used to commit crimes, your child may shoot a friend accidentally, or you may scare a burglar away from your neighbor's house.

literature on the effects of gun laws on public health. It focuses instead on the risks of firearm intimidation, injuries, and death and on the benefits of protection.

There are also risks and benefits to carrying a gun outside the home. And, of course, your having a gun imposes risks and provides benefits to others, just as

DOI: 10.1177/1559827610396294. Manuscript received September 9, 2010; revised November 5, 2010; accepted November 8, 2010. From the Harvard Injury Control Research Center, Harvard School of Public Health, Boston, Massachusetts. Address correspondence to David Hemenway, PhD, Director, Harvard Injury Control Research Center, Harvard School of Public Health, 677 Huntington Avenue, Boston, MA 02115, e-mail: hemenway@hsph.harvard.edu.

For reprints and permissions queries, please visit SAGE's Web site at http://www.sagepub.com/journalsPermissions.nav.

Copyright © 2011 The Author(s)

Downloaded from ... by guest on April 23, 2011

A. 106

others having guns imposes risks and provides benefits to you. For example, your gun may be stolen and used to commit crimes, your child may shoot a friend accidentally, or you may scare a burglar away from your neighbor's house. This article does not focus on such issues.

Finally, it is important to recognize that the scientific literature typically deals with averages, whereas each individual family and each individual situation is unique.

## Risks

The main risks of having a gun in the home stem from the fact that someone inappropriate can be shot or intimidated with the gun. There can be (a) accidents, (b) suicides, (c) assaults and homicides, and (d) intimidation.

### Accidents

According to death certificate data, from 2003 to 2007, more than 680 Americans per year were killed unintentionally with firearms. Data from the National Violent Death Reporting System (which has more comprehensive data on each shooting but currently is operating only in 18 states) show that two thirds of the accidental shooting deaths occurred in someone's home, about half of the victims were younger than 25 years, and half of all deaths were other inflicted—the victim was typically shot accidentally by a friend or family member (eg, brother).[3] It appears that the large majority of accidental shooting deaths in the home are from guns that were kept in the home.

Children aged 5 to 14 years in the United States have 11 times the likelihood of being killed accidentally with a gun compared with similarly aged children in other developed countries (Table 1).[1] The United States has been in this unenviable position for at least the past decade.[5] From 2003 to 2007, the yearly averages of unintentional firearm fatalities were as follows: 62 children aged 0 to 14, 89 youth aged 15 to 19, and 95 young adults aged 20 to 24 years.[4]

Not surprisingly, there are more accidental gun deaths in areas with more guns.[5,9] The differences are substan-

tial. To illustrate, we compare accidental firearm deaths among the states most extreme in terms of firearm ownership levels. States are grouped so that the populations of the high and low gun states are equal. According to the Centers for Disease Control (CDC) data, between 2003 and 2007, the typical resident from the 15 states with the most guns (WY, MT, AK, SD, AR, WV, AL, ID, MS, ND, KY, TN, LA, MO, and VT) was 6 times more likely to die in a gun accident than a typical resident from the 6 states with the fewest guns (HI, NJ, MA, RI, CT, and NY). For example, although there were virtually the same number of children aged 5 to 14 years in both groups of states, 82 had died from accidental gunshot wounds in these high gun states, compared with 8 in the low gun states (Table 2).

Fatal injuries are only the tip of the iceberg. For every fatality from an accidental shooting, there are more than 10 people injured seriously enough in gun accidents to be treated in hospital emergency departments.[10] In other words, almost 20 people a day are shot unintentionally but do not die. This number does not include any of the more than 45 people per day who are treated in emergency rooms for BB/pellet gun wounds (2003-2007) or the many others injured by firearms in other ways (eg, powder burns, struck with a firearm, injured by the recoil of a firearm), many unintentionally.

One study of nonfatal accidental shootings found that the majority were self-inflicted, most involved handguns, and more than one third of the injuries required hospitalization. Injuries often occurred during fairly routine gun handling—cleaning a gun, loading and unloading, target shooting, and so on.[11] It is important to recognize that although some people are at higher risk for unintentional shootings than others, accidents can happen to anyone. No one is completely immune, as shown anecdotally by scores of stories of police, firearms safety instructors, firearms advocates, and other experts who have accidentally shot themselves or others.[12]

Overall, the evidence indicates that a gun in the home is a risk factor for serious accidental injury. When 34 injury

### Table 1.

Violent Deaths Among 5- to 14-Year-Olds: United States Versus Other High-Income OECD Countries, 2003[a]

| | Mortality Rate Ratio |
|---|---|
| Homicides | |
| Gun homicides | 13.4 |
| Nongun homicides | 1.8 |
| Total | 3.6 |
| Suicides | |
| Gun suicides | 8.0 |
| Nongun suicides | 1.2 |
| Total | 1.6 |
| Unintentional gun deaths | 10.6 |
| Total gun deaths | 10.6 |

[a]Richardson and Hemenway.[4]

prevention experts were asked to prioritize home injury hazards for young children, based on frequency, severity, and preventability of the injury, the experts rated access to firearms in the home as the most significant hazard.[13]

### Self-Harm: Suicides

From 2003 to 2007, an average of 46 Americans committed suicide with guns each day. This includes 2 teenagers (aged 15-19) and 3.5 young adults (aged 20-24) per day. Even though suicide attempts with guns are infrequent, more Americans kill themselves with guns than with all other methods combined. That is because among methods commonly used in suicide attempts, firearms are the most lethal.

Many suicides appear to be impulsive acts. Individuals who take their own lives often do so when confronting a severe but temporary crisis. In a study of self-inflicted

Downloaded from [illegible] by guest on April 28, 2011

A. 107

Vol. XX no. X American Journal of Lifestyle Medicine

**Table 2.**

Violent Deaths Among US Children Aged 5 to 14 Years in High- and Low-Gun States, 2003-2007[2]

| | Mortality Rate | | Ratio of High Gun to Low Gun States |
|---|---|---|---|
| | High-Gun States | Low-Gun States | |
| Total population of 5- to 14-year-olds (2003-2007) | 25.5 million | 27.0 million | |
| Homicides | | | |
| Gun homicides | 139 | 59 | 2.5 |
| Nongun homicides | 94 | 94 | 1.1 |
| Total | 233 | 153 | 1.6 |
| Suicides | | | |
| Gun suicides | 80 | 7 | 12.1 |
| Nongun suicides | 120 | 86 | 1.5 |
| Total | 200 | 93 | 2.3 |
| Unintentional firearm deaths | 82 | 8 | 11.0 |

[2]Data on household gun ownership come from the CDC Behavioral Risk Factor Surveillance System, 2004. The 15 States with the highest average levels of household gun ownership were, in order, as follows: WY, MT, AK, SD, AR, WV, AL, ID, MS, ND, KY, TN, LA, MO, and VT. The 6 states with the lowest average gun levels were, in order, as follows: HI, NJ, MA, RI, CT, and NY.

gunshot wounds, which would have been fatal without emergency treatment, none of the 30 attempters had written a suicide note, and more than half reported having suicidal thoughts for less than 24 hours. In 2 years of follow-up, none of the 30 attempted suicide again.[14] Other studies that have followed survivors of serious suicide attempts find that fewer than 10% typically go on to kill themselves.[15,16]

Suicidal individuals are often ambivalent about killing themselves. One expert estimates that no more than 10% to 15% of these individuals display an unbreakable determination to kill themselves.[17] For the rest, the risk period is transient. Reducing the availability of commonly used and lethal instruments during this period can prevent suicide. Psychiatric and penal institutions have long recognized the importance of restricting access to lethal means of suicide for newly admitted and potentially suicidal inmates.

Scientific studies show that a gun in the home is a risk factor for suicide.[12,18] More than a dozen case-control studies have examined the relationship between gun ownership and suicide in the United States, and all find that firearms in the home are associated with substantially and significantly higher rates of suicide.[18-55]

These and other studies[54,55] indicate that individuals have especially high risks of suicide if they live in homes with loaded guns and unlocked guns. Having any gun in the home is a risk factor for suicide for everyone in the home—the gun owner, the gun owner's spouse, and the gun owner's children. Although most suicide decedents have some history of mental illness or substance abuse, a gun in the home increases the risk of suicide even for household members without these problems. Guns increase the risk for everyone but especially for adolescents and young adults. Although a small minority of suicidal individuals purchase firearms with the immediate intention of killing themselves,[56] excluding such cases does not change these findings.

Ecological studies try to explain varying rates of suicide across different geographical areas. Within the United States, researchers have looked across US regions,[37-39] states,[40-44] and urban areas.[42,45] The studies using validated measures of firearm ownership levels typically find a strong significant positive association between levels of gun ownership and rates of suicide because of higher rates of firearm suicide.

For example, a cross-sectional study using firearm ownership data from the large Behavioral Risk Factor Surveillance System found that in states with more guns, there were more suicides (because there were more firearm suicides), even after controlling for the percentage of the state's population with serious mental illness, alcohol dependence or abuse, illicit substance dependence or abuse, and the percentage unemployed, living below the poverty level, and in urban areas. There was no association between gun prevalence and a state's nonfirearm suicide rate. The findings held for both sexes and all age groups.[43]

A national time series study (1981-2002) also found a strong association between gun prevalence and suicide rates for men, women, youth, and the entire population, even accounting for unemployment, alcohol consumption, poverty, and region. Household gun ownership levels were largely constant in the 1980s and fell in the 1990s. Firearm suicide rates and overall suicide rates followed suit. There were no significant changes in nonfirearm suicide rates.[46] During the period when firearm and overall suicides were decreasing, the percentage of Americans thinking about suicide, planning suicide, or attempting suicide did not change.[1]

Downloaded from ajl.sagepub.com by guest on April 23, 2011

A. 108

Is it possible that gun owners are simply more suicidal—could that explain the association between guns and suicides? Recent evidence provides no support for that idea.[48] A study of older individuals in Pennsylvania found that "patients with suicidal ideation or high levels of depression or psychological distress were not significantly more or less likely to have a gun in the home than those without these emotional stressors."[49] Other studies using data from the National Co-Morbidity Surveys, the gold standard for evidence about the prevalence of mental illness in the United States, find that gun owners are not more or less likely to have depression or other mental health problems.[50,51]

The evidence linking suicide to gun availability is compelling. The American Association of Suicidology consensus statement on youth suicide concludes:

> There is a positive association between the accessibility and availability of firearms in the home and the risk of youth suicide; guns in the home, particularly loaded guns, are associated with increased risk for suicide by youth, both with and without identifiable mental health problems or suicidal risk factors.[52]

A total of 23 suicide experts from 15 countries reviewed the evidence concerning specific suicide prevention interventions. They concluded that the empirical evidence showed that "physician education in depression recognition and treatment, and restricting access to lethal methods reduce suicide rates. Other interventions need more evidence of efficacy."[53]

### Homicides

From 2003 to 2007, 33 Americans per day were murdered with guns. This includes almost 1 child (aged 0-14 years), 5 teenagers (aged 15-19 years), and more than 7 young adults (aged 20-24 years) per day. More than two thirds of all homicides in the United States during this period were firearm homicides.

The US rate of firearm homicide for children aged 5 to 14 years is 13 times higher than the firearms homicide rate of other developed nations (Table 1), and our firearms homicide rate for 15- to 24-year-olds is 43 times higher. The overall homicide rate of our youth aged 15 to 24 years is 14 times higher than the overall homicide rate for youth in other countries such as Australia, Canada, France, Germany, Italy, Japan, Spain, and the United Kingdom.[4] In US states with more guns, many more children, adolescents, young adults, older adults, and women are murdered per capita than in states with fewer guns.[54,55]

The presence of a gun makes quarrels, disputes, assaults, and robberies more deadly. Many murders are committed in a moment of rage. For example, a large percentage of homicides—and especially homicides in the home—occur during altercations over matters such as love, money, and domestic problems, involving acquaintances, neighbors, lovers, and family members; often the assailant or victim has been drinking. Only a small minority of homicides appear to be the carefully planned acts of individuals with a single-minded intention to kill. Most gun killings are indistinguishable from nonfatal gun shootings; it is just a question of the caliber of the gun, whether a vital organ is hit, and how much time passes before medical treatment arrives.[12,56]

Many ecological studies link gun prevalence with overall homicide rates because gun prevalence is associated with high gun homicide rates; there is typically no association of gun prevalence with non-gun homicide.[12,57] Articles include international studies of high-income countries[58] as well as US studies of regions,[38,54] states,[55,59-61] and counties.[63,64] The studies take into account a variety of potential confounders. For example, because urban areas typically have more gangs and crime than rural areas, studies at the state level usually control for the percentage of the state's population that lives in urban areas in order to compare urban areas with urban areas and rural areas with rural areas.

Whereas most firearm suicides shoot themselves at home with the family gun, most homicide victims—except for children and older adults—are not shot at home. And those shot outside the home are almost always shot with someone else's gun. So although the existing ecological studies provide evidence about whether more guns in the community are associated with more homicides in the community, the results have limited relevance concerning whether a gun in your own home increases or reduces your own risk of homicide. Case-control studies provide somewhat more pertinent information, but there have only been a handful of such studies, and all are far from ideal.

The case-control studies typically compare homes with homicides to homes without homicides. The problem is that the people in these 2 types of homes are often quite different—for example, the ones that have firearms may be more likely to be criminal or more likely to have reasons to fear criminals, and researchers have to try to take these factors into account.

One of the most cited studies involved approximately 400 homicide victims from 3 metropolitan areas who were killed in their homes. Half died from gunshot wounds. In 83% of the homicide cases, the perpetrator was discovered; among these cases, 95% of the time, the perpetrator was not a stranger. In only 14% of all the cases was there evidence of forced entry.[65]

Controls were matched to cases by gender, race, age range, and neighborhood of residence. Handguns were kept in 36% of case households compared with 23% of control households. After controlling for illicit drug use, fights, arrests, living alone, and whether or not the home was rented, the presence of a gun in the home remained strongly associated with an increased risk for homicide in the home.

One limitation was that the study did not provide evidence about whether a gun from the home was used in any of the homicides. Nonetheless, the findings from stratified analyses were consistent with the notion that a gun in the home increased the risk of death. First, the link between gun ownership and homicide was due entirely to a strong association

Downloaded from jrsm.rsmjournals.com by guest on April 28, 2011

between gun ownership and homicide by firearm; homicide by other means was not significantly linked to the presence or absence of a gun in the home. Second, gun ownership was most strongly associated with homicide at the hands of a family member or intimate acquaintance; guns were not significantly linked to an increased risk of homicide by other friends, unidentified persons, or strangers. Finally, there was no evidence of a protective effect of keeping a gun in the home—even in the small subgroup of cases that involved forced entry.

Other case-control studies have also found that a gun in the home is a risk for homicide in the home.[30,27,31] And results from 2 offender-based case-control homicide studies find that gun ownership is a risk for homicide perpetration.[66,67]

Whereas most men are murdered away from home, most children, older adults, and women are murdered at home. A gun in the home is a particularly strong risk factor for female homicide victimization. Women in the United States are at far greater risk of homicide victimization than women in other developed countries,[4,68] and the greatest danger for women in homicides that occur in the home comes from their intimate partners—especially partners with guns.

A subgroup analysis of female homicide victimization from a large case-control study of homicide in the home in 3 metropolitan counties found that having a gun in the home was a large and significant risk factor for homicide.[69] Most of the women were murdered by a spouse, a lover, or a close relative, and the increased risk for homicide from having a gun in the home was attributable to these homicides.

Another case-control study of women murdered by intimate partners, compared with a control group of battered women, found that a gun in the home was an important risk factor for femicide. There was easy access to a firearm (eg, a gun in the house) for 65% of case perpetrators versus 24% of perpetrators of nonfatal abuse. Access to a firearm by the battered woman had no protective effect.[70]

Overall, domestic disputes are likely to be affected by the presence of a firearm.[71] Although many spousal homicides occur following a long history of violence in the home, spousal abusers are often impulsive and volatile.[72] The availability of a firearm increases the likelihood that an attack will prove fatal.

A review of intimate partner homicides in Chicago over a 29-year period concluded that "an effective prevention strategy for intimate homicide of women . . . would be to reduce the availability of firearms in the home."[73]

## Intimidation

Guns can be used not only to wound and kill but also to intimidate and coerce. Data on intimidation with firearms are relatively scarce. The National Crime Victimization Surveys (NCVSs) provide information about crime but miss much intimate partner violence and thus much of the intimidation with guns in the home. Fortunately, some information about such intimidation has been picked up by other surveys.[74,77]

A study of battered women in emergency shelters in California (a state in which more than 600 000 women each year experience intimate partner violence) found that if there were a gun in the home, nearly two thirds of the male partners involved had used the gun to scare, threaten, or harm the women. In contrast, women rarely used the gun in self-defense; fewer than 7% of these women had used a gun in self-defense and only against batterers who had used a gun against them.[74]

Batterers use guns in a variety of ways to control their victims. Not only do they threaten to kill the women, but they also sometimes threaten to kill themselves or the children.[76] Other methods of gun intimidation include, during an argument, cleaning, holding, or loading a gun; going outside and shooting the gun; or threatening to shoot a pet.[77] A national random survey found more hostile gun displays against women in the home—primarily by intimate partners—than self-defense gun uses in the home by women or anyone else.[75]

## Benefits

The main reason people give for having a handgun in the home is protection, typically against stranger violence. However, it is important to recognize that the home is a relatively safe place, especially from strangers. For example, fewer than 30% of burglaries in the United States (2003-2007) occur when someone is at home. In the 7% of burglaries when violence does occur, the burglar is more likely to be an intimate (current or former) and also more likely to be a relative or known acquaintance than a stranger.[78] Although people typically spend most of their time at home, only 5% of all the crimes of violence perpetrated by strangers occur at home.[79]

The main health benefits of guns in the home are that they may be used to (a) deter crime and (b) thwart crimes in progress.

## Deterrence

Theoretically, knowledge that potential victims have access to firearms could increase the perceived cost of committing a crime to a potential perpetrator and thus prevent the crime from occurring. However, there does not seem to be credible evidence that higher levels of gun ownership and availability actually deter crime. A criminologist once claimed that publicized police programs to train citizens in gun use in Orlando (to prevent rape) and in Kansas City (to prevent robbery) led to reductions in crime.[80] However, a careful analysis of the data found no evidence that crime rates changed in either location after the training.[81] The deterrent effects of civilian gun ownership on burglary rates were supposedly shown by the experiences of Morton Grove, Illinois—after it banned handguns—and Kennesaw, Georgia—after it required that firearms be kept in all homes.[80] Again, a careful analysis of the data did not show that guns reduced crime.[82] Instead, in Morton Grove, the banning of handguns was actually followed by a large and statistically significant decrease in burglary reports.[81]

One study found an association between lower crime rates in states with

American Journal of Preventive Medicine

higher levels of household gun owner-ship.[23] But the gun ownership data for the analysis were not valid. The source of the data (Voter News Service) stated that the data could not justifiably be used to determine state-level gun ownership levels or changes in gun ownership rates.

Some have argued that when gun prev-alence is high, there are fewer burglar-ies[64] and fewer "hot" burglaries (when someone is at home) because burglars will seek out unoccupied dwellings to avoid being shot.[49,85] But the evidence does not show this. An international compilation of victimization surveys in 11 developed countries found that the United States (with the most guns) was average in terms of attempted and com-pleted burglary rates,[66] and there was no relationship between gun prevalence and burglary rates.[12] Studies in the United States across states and counties found that in areas with higher levels of house-hold gun ownership, there were actually more burglaries, and there were more burglaries when someone was at home, not less.[63,87] One reason may be that guns, like cash and jewelry, are attractive loot for burglars, and burglars may target houses with many guns.

### Thwarting Crimes

Unfortunately, data on self-defense gun use are not reliable. Unlike deaths or woundings, where the definitions are clear and one needs to only count the bodies, what constitutes a self-defense gun use and whether it was successful may depend on who is telling the story. For example, criminals who use a gun commonly claim that they were acting in self-defense.[84] The National Research Council, which examined the scientific literature on self-defense gun use, con-cluded that "self-defense is an ambigu-ous term," that whether one is a defender or a perpetrator may depend on perspec-tive, and that "we do not know accu-rately how often armed self-defense occurs or even how precisely to define self-defense."[63]

Data on self-defense use come from (a) police reports (eg, after the victim calls police to report a crime), (b) surveys that ask directly about self-defense gun use, and (c) surveys that ask about self-defense gun use only after respondents report that someone attempted to commit a crime against them.

1. Police reports: One study examined Atlanta police department reports of home invasions during a 4-month period. Researchers identified 198 cases of unwanted entry into a single-family dwelling when someone was at home.[89] In 32 instances, at least 1 of the offenders was known to have carried a gun. In 6 of the 198 cases, an invader obtained the victim's gun. In only 3 cases (1.5%) was a victim able to use a firearm in self-defense.

2. Many private surveys have asked questions directly about self-defense gun use. Some general conclusions from these surveys are the follow-ing: (a) more people report a self-defense gun use against an animal (eg, snakes, dogs) than against a human; (b) police report more total self-defense gun uses than all civilians combined; (c) there are far more ille-gal gun uses against people than self-reported self-defense uses by them; (d) most reported self-defense gun uses do not occur at home, and relatively few protect children; (e) most of the self-reported self-defense gun uses are either ambigu-ous or socially undesirable.[12,91] These surveys belie the notion that most reported self-defense gun uses are legal or socially beneficial.[92,93] For example, criminology students read all the stories of self-defense gun use in a national firearm survey and rated only 25% as being socially desirable.[94] Criminal court judges from across the United States read the 35 descrip-tions of the reported self-defense fire-arm uses from 2 national surveys and found that, even if description of the event was accurate, in most of the cases, the self-defense gun use was probably illegal.[95] Many were argu-ments that escalated into gun use.

3. The National Crime Victimization Surveys (NCVS) obtain information about self-defense gun use only from those respondents who first report

that a crime against them was threat-ened, attempted, or completed. This feature of the NCVS substantially reduces the problem of reporting inci-dents that were not true self-defense gun uses. Although the NCVS data are not ideal,[85] they suggest that legiti-mate self-defense use is very rare. For example, from 1992 to 2001, NCVS respondents reported 1119 incidents when they were assaulted sexually.[96] In only 1 of these sexual assaults did the victims report using a gun; in 15 incidents, the victim used a non-gun weapon in self-defense; 38 called the police or a guard; 120 attacked the assailant without a weapon; 161 ran away; 219 yelled; and 343 strug-gled. In all confrontational crimes, only 0.9% of victims reported using a gun.[96] Again, although not ideal (eg, it does not include instances of vic-tim death), the NCVS currently pro-vides the best data on the effective-ness of self-defense gun use. Since the early 1990s, the NCVS has asked victims not only whether they were injured but when they were injured—before or after they resisted. One study examined 27 000 personal con-tact crimes reported on the NCVS from 1992 to 2001. Results suggest that self-defense gun use may be the best method for preventing property loss; if borne out in other studies this is a significant, although nonhealth, benefit. However, it does not appear that self-defense gun use is more effective at preventing injury than many other methods of resistance. In terms of the likelihood of receiving an injury after adopting a particular mode of resistance, in simple compar-isons, nothing was better than calling the police—only 0.9% of the time was calling the police followed by injury. Threatening with a gun was followed by an injury 2.5% of the time; yell-ing, 2.7%; and the highest, stalling, 4.5%. In multivariate analysis, only 1 mode of resistance—"ran away, hid" (and not self-defense gun use)—was significantly better than calling the police in terms of not receiving an injury.[x]

A050

Downloaded from ajp.com by guest on June 29, 2011

Overall, the limited data on self-defense gun use suggest that (*a*) genuine self-defense gun use is rare, (*b*) there are many ways that people defend themselves without a gun, and (*c*) many of these other methods may be as effective as self-defense gun use in preventing injury. Perhaps surprisingly, the evidence does not indicate that having a gun reduces the risk of being a victim of a crime or that having a gun reduces the risk of injury during the commission of a crime.

What the data do indicate is that much of the self-defense gun use reported on private surveys is inappropriate and socially undesirable. The possibility of using a gun in a socially useful manner—for example, against a criminal during the commission of a crime—will occur, for the average person, 0 times, or perhaps once in a lifetime. At other times, the use of a gun against another human is socially undesirable. Regular citizens with guns, who are sometimes tired, angry, drunk, or afraid, and who are not trained in dispute resolution, have lots of opportunities for inappropriate gun use. People engage in innumerable annoying and somewhat hostile interactions with each other in the course of a lifetime.

In the rare instance of a real-world shooting situation, confusion, stress, and fear can become overwhelming. Heart rates skyrocket, and it is difficult to think clearly and act deliberately. This creates 2 major problems for civilians with guns, particularly those who are not well trained. The first is that they may act inappropriately. Indeed, police officers, who receive large amounts of training, are still often inadequately prepared to handle ambiguous situations, and they often make serious mistakes. Individuals without practical training do much worse.

The second problem is that the pounding heart, muscle tension, trembling, dizziness, and nausea that may accompany a real-world shooting situation will degrade the owner's ability not only to use the gun wisely but to use it effectively. Although adrenaline may enhance animal fighting skills and be useful for either flight or fighting, it creates a severe loss in the fine motor coordination needed

for the accurate shooting of a handgun as well as the ability to think rationally, reflectively, or creatively.[97]

Thus, many gun experts believe that a handgun is far from an ideal tool for home self-defense, except for a small minority of especially well-trained individuals who maintain their skills through intensive, regular practice.[97] Currently, few homeowners are sufficiently trained for that tiny chance when they may have to use their handgun to ward off an intruder.

## Shootings in the Home

Various studies have examined who typically gets shot by a gun in the home. A study in King County, Washington (which includes Seattle) examined gun deaths occurring at home from 1978 to 1983 (N = 398). There were 9 total self-protection homicides (only 2 of intruders). For every self-defense homicide involving a firearm kept in the home, there were 1.3 accidental deaths, 4.6 criminal homicides, and 37 firearm suicides.[98]

A more complete study examined all gunshot injuries (nonfatal as well as fatal) in the home occurring in Memphis, Tennessee; Seattle, Washington; and Galveston, Texas (1992-1994) in which the gun involved was known to be kept in the home. Home guns were 4 times more likely to be involved in an accident, 7 times more likely to be used in a criminal assault or homicide, and 11 times more likely to be used in an attempted or completed suicide than to be used to injure or kill in self-defense.[99]

A study of all gunshot injuries in Galveston, Texas, over a 3-year period found only 2 that were related to residential burglary or robbery. In one, the homeowner was shot and killed by a burglar; in the other, the homeowner shot the burglar. During the same interval, guns in the home were involved in the death and injury of more than 100 residents, family members, friends, or acquaintances.[100]

These studies provide useful information about who is likely to be shot with a home gun but, of course, deal with only a portion of the potential risks and benefits of having a gun in the home. For example, a drawback of these studies

is that they do not measure instances in which a gun is used to intimidate a family member or to thwart an intruder.

## Conclusion

There are real and imaginary situations when it might be beneficial to have a gun in the home. For example, in the Australian film *Mad Max*, where survivors of the apocalypse seem to have been predominantly psychopathic male bikers, having a loaded gun would seem to be very helpful for survival, and public health experts would probably advise people in that world to obtain guns.

However, for most contemporary Americans, the scientific studies suggest that the health risk of a gun in the home is greater than the benefit. There are no credible studies that indicate otherwise. The evidence is overwhelming that a gun in the home is a risk factor for completed suicide and that gun accidents are most likely to occur in homes with guns. There is compelling evidence that a gun in the home is a risk factor for intimidation and for killing women in their homes, and it appears that a gun in the home may more likely be used to threaten intimates than to protect against intruders. On the potential benefit side, there is no good evidence of a deterrent effect of firearms or that a gun in the home reduces the likelihood or severity of injury during an altercation or break-in.

That said, for the large majority of households, having a gun in the home will not provide either health benefits or costs this year. However, for those households where having a gun or not will matter this year, the evidence indicates that the costs will widely outweigh the benefits. The benefit–cost ratio is especially adverse for women and children in the household. Indeed, after weighing the scientific evidence, the American Academy of Pediatrics (AAP) decided that guns do not belong in households with children:

> The AAP recommends that pediatricians incorporate questions about guns into their patient history taking and urge parents who possess guns to remove them, especially handguns, from the home.[101] **AAP**

Downloaded from ajl.sagepub.com by guest on April 23, 2011

## References

1. Lizotte AJ, Bordua DJ. Firearms ownership for sport and protection: two divergent models. *Am Sociol Rev.* 1980;45:229-244.

2. Glaeser EL, Glendon S. Who owns guns? Criminals, victims, and the culture of violence. *Am Econ Rev.* 1998;88:458-462.

3. Hemenway D, Barber C, Miller M. Unintentional firearm deaths: a comparison of other-inflicted and self-inflicted shootings. *Accid Anal Prev.* 2010;42:1184-1188.

4. Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003 [published online ahead of print June 21, 2010]. *J Trauma.* doi: 10.1097/TA. 0b013e3181dbaddf

5. Centers for Disease Control. Rates of homicide, suicide and firearm-related death among children, 26 industrialized countries. *MMWR Morb Mortal Wkly Rep.* 1997;46:101-105. http://www.cdc.gov/mmwr/preview/mmwrhtml/00046149.htm. Accessed December 17, 2010.

6. Centers for Disease Control. WISQARS Injury Mortality Reports, 1999-2007. http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html. Accessed December 17, 2010.

7. Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths. *Accid Anal Prev.* 2001;33:477-484.

8. Price JH, Thompson AJ, Dake JA. Factors associated with state variations in homicide, suicide, and unintentional firearm deaths. *J Community Health.* 2004;29:271-283.

9. Miller M, Azrael D, Hemenway D, Vriniotis M. Firearm storage practices and rates of unintentional firearm deaths in the United States. *Accid Anal Prev.* 2005;37:661-667.

10. Vyrostek S, Annest J, Ryan G. Surveillance for fatal and nonfatal injuries-United States 2001. *MMWR Surveill Summ.* 2004;53(SS-7):1-57.

11. Sinauer N, Annest JL, Mercy JA. Unintentional, nonfatal firearm-related injuries: a preventable public health burden. *JAMA.* 1996;275:1740-1743.

12. Hemenway D. *Private Guns Public Health.* Ann Arbor, MI: University of Michigan Press, 2006.

13. Katcher ML, Meister AN, Sorkness CA, et al. Use of the modified Delphi technique to identify and rate home injury hazard risks and prevention methods for young children. *Inj Prev.* 2006;12:189-194.

14. Peterson LG, Peterson M, O'Shanick GJ, Swann A. Self-inflicted gunshot wounds: lethality of method versus intent. *Am J Psychiatry.* 1985;142:228-231.

15. Owens D, Horrocks J, House A. Fatal and non-fatal repetition of self-harm. *Br J Psychiatry.* 2002;181:193-199.

16. Gibb SJ, Beautrais AL, Fergusson DM. Mortality and further suicidal behaviour after an index suicide attempt: a 10-year study. *Aust N Z J Psychiatry.* 2005;39:95-100.

17. Jamison KR. *Night Falls Fast: Understanding Suicide.* New York, NY: Knopf; 1999.

18. Miller M, Hemenway D. The relationship between firearms and suicide: a review of the literature. *Aggress Violent Behav.* 1999;4:807-814.

19. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988;45:581-588.

20. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA.* 1991;266:2989-2995.

21. Brent DA, Perper J, Moritz G, Baugher M, Allman C. Suicide in adolescents with no apparent psychopathology. *J Am Acad Child Adolesc Psychiatry.* 1993;32:494-500.

22. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community case-control study. *Am J Dis Child.* 1993;147:1066-1071.

23. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Suicide in affectively ill adolescents: a case-control study. *J Affect Disord.* 1994;31:193-202.

24. Brent DA, Baugher M, Bridge J, Chen T, Chiappetta L. Age- and sex-related risk factors for adolescent suicide. *J Am Acad Child Adolesc Psychiatry.* 1999;38:1497-1505.

25. Conwell Y, Duberstein PR, Connor K, Eberly S, Cox C, Caine ED. Access to firearms and risk for suicide in middle-aged and older adults. *Am J Geriatr Psychiatry.* 2002;10:407-416.

26. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. *N Engl J Med.* 1992;327:467-472.

27. Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. The association between the purchase of a handgun and homicide or suicide. *Am J Public Health.* 1997;87:974-978.

28. Kung HC, Pearson JL, Liu X. Risk factors for male and female suicide decedents ages 15-64 in the United States: results from the 1993 National Mortality Followback Survey. *Soc Psychiatry Psychiatr Epidemiol.* 2003;38:419-426.

29. Kung HC, Pearson JL, Wei R. Substance use, firearm availability, depressive symptoms,

and mental health service utilization among white and African American suicide decedents aged 15 to 64 years. *Ann Epidemiol.* 2005;15:614-621.

30. Dahlberg LL, Ikeda RM, Kresnow MJ. Guns in the home and risk of a violent death in the home: findings from a national study. *Am J Epidemiol.* 2004;160:929-936.

31. Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case-control study. *Ann Emerg Med.* 2003;41:771-782.

32. Shah S, Hoffman RE, Wake L, Marine WM. Adolescent suicide and household access to firearms in Colorado: results of a case-control study. *J Adolesc Health.* 2000;26:157-163.

33. Grassel KM, Wintemute GJ, Wright MA, Romero MP. Association between handgun purchase and mortality from firearm injury. *Inj Prev.* 2003;9:48-52.

34. Shenassa ED, Rogers ML, Spalding KL, Roberts MB. Safer storage of firearms at home and risk of suicide: a study of protective factors in a nationally representative sample. *J Epidemiol Community Health.* 2004;58:841-848.

35. Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional firearm injuries. *JAMA.* 2005;293:707-714.

36. Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *N Engl J Med.* 1999;341:1583-1589.

37. Markush R, Bartolucci A. Firearms and suicide in the United States. *Am J Public Health.* 1984;64:123-127.

38. Lester D. Firearm availability and the incidence of suicide and homicide. *Acta Psychiatr Belg.* 1988;88:387-393.

39. Birkmayer J, Hemenway D. Suicide and gun prevalence: are youth disproportionately affected? *Suicide Life Threat Behav.* 2001;31:303-310.

40. Lester D. Availability of guns and the likelihood of suicide. *Sociol Soc Res.* 1987;71:287-288.

41. Lester D. Gun ownership and suicide in the United States. *Psychol Med.* 1989;19:519-521.

42. Hellsten JJ. *Motivation and Opportunity: An Ecological Investigation of U.S. Urban Suicide, 1970-1990.* Irvine, CA: University of California; 1995.

43. Miller M, Lippmann S, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 U.S. states. *J Trauma.* 2007;62:1029-1035.

44. Miller M, Azrael D, Hemenway D. Household firearm ownership levels and suicide across U.S. regions and states,

1988-1997. *Epidemiology.* 2002;13:517-524.

45. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. *J Quant Criminol.* 1993;9:249-287.

46. Miller M, Azrael D, Hepburn L, Hemenway D. The association between changes in household firearm ownership and rates of suicide in the United States, 1981-2002. *Inj Prev.* 2006;12:178-182.

47. Kessler R, Berglund P, Borges G, Nock M, Wang PS. Trends in suicide ideation, plans, gestures, and attempts in the United States, 1990-1992 to 2001-2003. *JAMA.* 2005;293:2487-2495.

48. Sorenson SB, Vittes KA. Mental health and firearms in community-based surveys: implications for suicide prevention. *Eval Rev.* 2008;32:239-256.

49. Oslin DW, Zubritsky C, Brown G, Mullahy M, Puliafico A, Ten Have T. Managing suicide risk in late life: Access to firearms as a public health risk. *Am J Geriatr Psychiatry.* 2004;12:30-36.

50. Miller M, Barber C, Azrael D, Hemenway D, Molnar BE. Recent psychopathology, suicidal thoughts and suicide attempts in households with and without firearms: findings from the National Comorbidity Study Replication. *Inj Prev.* 2009;15:183-187.

51. Ilgen M, Zivin K, McCammon R, Valenstein M. Mental illness, previous suicidality, and access to guns in the United States. *Psychiatr Serv.* 2008;59:198-200.

52. Berman A, Brown R, Diaz G, et al. Consensus statement on youth suicide by firearms. *Arch Suicide Res.* 1998;4:89-94.

53. Mann JJ, Apter A, Bertolote J; et al. Suicide prevention strategies: a systematic review. *JAMA.* 2005;294:2064-2074.

54. Miller M, Azrael D, Hemenway D. Rates of household firearm ownership and homicide across US regions and states, 1988-1997. *Am J Public Health.* 2002;92:1988-1993.

55. Miller M, Hemenway D, Azrael D. State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003. *Soc Sci Med.* 2007;64:656-664.

56. Zimring FE. The medium is the message: firearms caliber as a determinant of death from assault. *J Legal Stud.* 1972;1:97-123.

57. Hepburn L, Hemenway D. Firearm availability and homicide: a review of the literature. *Aggress Violent Behav.* 2004;9:417-440.

58. Hemenway D, Miller M. Firearm availability and homicide rates across twenty-six high-income countries. *J Trauma.* 2000;49:985-988.

59. Brady HC. *Homicide in the United States.* Chapel Hill, NC: University of North Carolina Press; 2003.

60. Seitz ST. Firearms, homicide, and gun control effectiveness. *Law Soc Rev.* 1972;6:595-614.

61. Lester D. Relationship between firearm availability and primary and secondary murder. *Psychol Rep.* 1990;67:490.

62. Ruddell R, Mays G. State background checks and firearm homicides. *J Crim Justice.* 2005;33:127-136.

63. Duggan M. More guns more crime. *J Polit Econ.* 2001;109:1086-1114.

64. Cook P, Ludwig J. The social costs of gun ownership. *J Public Econ.* 2006;90:379-391.

65. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. *N Engl J Med.* 1993;329:1084-1091.

66. Rowland J, Holtzhauer F. Homicide involving firearms between family, relatives, and friends in Ohio: an offender-based case-control study. *Am J Epidemiol.* 1989;130:825.

67. Kleck G, Hogan H. A national case control study of homicide offending and gun ownership. *Soc Probl.* 1999;46:175-193.

68. Hemenway D, Shinoda-Tagawa T, Miller M. Firearm availability and female homicide victimization rates among 25 populous high-income countries. *J Am Med Womens Assoc.* 2002;57:100-104.

69. Bailey JE, Kellermann AL, Somes GW, Banton JG, Rivara FP, Rushforth NP. Risk factors for violent death of women in the home. *Arch Int Med.* 1997;157:777-782.

70. Campbell JC, Webster D, Koziol-McLain J, et al. Risk factors for femicide in abusive relationships: results from a multi-site case control study. *Am J Public Health.* 2003;93:1089-1097.

71. Reiss AJ, Roth JA, eds. *Understanding and Preventing Violence: Panel on the Understanding and Control of Violent Behavior.* Washington, DC: National Academies Press; 1993.

72. Hastings JE, Hamberger LK. Personality characteristics of spouse abusers: a controlled comparison. *Violence Vict.* 1988;3:31-48.

73. Block C, Christakos A. Intimate partner homicide in Chicago over 29 years. *Crime Delinq.* 1995;41:496-526.

74. Hemenway D, Azrael D. *Gun Use in the United States: Results of a National Survey.* Washington, DC: National Institute of Justice; 1997.

75. Azrael D, Hemenway D. "In the safety of your own home": results from a national survey on gun use at home. *Soc Sci Med.* 2000;50:285-291.

76. Sorenson SB, Wiebe DJ. Weapons in the lives of battered women. *Am J Public Health.* 2004;94:1412-1417.

77. Rothman EF, Hemenway D, Miller M, Azrael D. Batterers' use of guns to threaten intimate partners. *J Am Med Womens Assoc.* 2005;60:62-68.

78. Catalano S. *Victimization During Household Burglary.* Washington, DC: US Department of Justice; 2010.

79. Bureau of Justice Statistics. *Criminal Victimization in the United States 2007.* Washington, DC: US Department of Justice; 2010.

80. Kleck G. Crime control through private use of armed forces. *Soc Probl.* 1988;35:1-21.

81. McDowall D, Lizotte AJ, Wiersema B. General deterrence through civilian gun ownership: an evaluation of the quasi-experimental evidence. *Criminology.* 1991;29:1085-1099.

82. McDowall D, Wiersema B, Loftin D. Did mandatory firearm ownership in Kennesaw really prevent burglary? *Sociol Soc Res.* 1989;74:48-51.

83. Lott JRJ. *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* Chicago, IL: Univeristy of Chicago Press; 1998.

84. Kopel D. *The Samurai, the Mountie, and the Cowboy: Should America Adopt the Gun Controls of Other Democracies.* Buffalo, NY: Prometheus Books; 1992.

85. Kleck G. *Targeting Guns: Firearms and Their Control.* Hawthrone, NY: Aldine de Gruyter; 1997.

86. Mayhew P, van Dijk J. *Criminal Victimization in Eleven Industrialized Countries: Key Findings From the International Crime Victimization Surveys.* London, UK: Information and Publications Group; 1997.

87. Cook P, Ludwig J. Guns and burglary. In: Ludwig J, Cook P, eds. *Evaluating Gun Policy.* Washington, DC: Brookings Institute; 2003:74-107.

88. Wright JD, Rossi PH, Daly K. *Under the Gun: Weapons, Crime, and Violence in America.* Hawthorne, NY: Aldine Publishing; 1983.

89. National Research Council. *Firearms and Violence: A Critical Review.* Washington, DC: National Academy Press; 2005:89, 106.

90. Kellermann AL, Westphal L, Fischer L, Harvard B. Weapon involvement in home invasion crimes. *JAMA.* 1995;273:1759-1762.

91. Cook P, Ludwig J. Defensive gun uses: new evidence from a national survey. *J Quant Criminol.* 1998;14:111-131.

92. McDowall D, Loftin D, Presser S. Measuring civilian defensive firearm use: a methodological experiment. *J Quant Criminol.* 2000;16:1-19.

Downloaded from ... by guest on April 28, 2011

A. 114

American Journal of Lifestyle Medicine

93. Cook P, Ludwig J. Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use. Washington, DC: Police Foundation; 1996.

94. Hemenway D, Azrael D. The relative frequency of offensive and defensive gun use: results from a national survey. Violence Vict. 2000;15:257-272.

95. Hemenway D, Miller M, Azrael D. Gun use in the United States: results from two national surveys. Inj Prev. 2000;6:263-267.

96. Tark J, Kleck G. Resisting crime: the effects of victim action on the outcomes of crimes. Criminology. 2004;42:861-909.

97. Violence Policy Center. Unintended consequences: pro-handgun experts prove that handguns are a dangerous choice for self-defense. http://vpc.org/studies/uninsum. htm. Accessed December 17, 2010.

98. Kellermann AL, Reay DT. Protection or peril? An analysis of firearm related deaths in the home. N Engl J Med. 1986;314:1557-1560.

99. Kellermann AL, Somes G, Rivara FP, Lee RK, Banton JG. Injuries and deaths due to firearms in the home. J Trauma. 1998;42:263-267.

100. Lee RK, Waxweiler RJ, Dobbins JG, Paschetag T. Incidence rates of firearm injuries in Galveston, Texas, 1979-1981. Am J Epidemiol. 1991;134:511-521.

101. Firearm-related injuries affecting the pediatric population. Committee on Injury and Poison Prevention. American Academy of Pediatrics. Pediatrics. 2000;105(4, pt 1):888-895.

Downloaded from ... by ... on April 29, 2011.

A. 115

## CERTIFICATE OF SERVICE

I certify that on December 3, 2014, I electronically filed the foregoing

APPELLEE'S APPENDIX with the Clerk of Court for the United States Court of

Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that

all participants in the case are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

*s/ Christopher B. Wilson*
Christopher B. Wilson

Dated:        December 3, 2014