# United States Court of Appeals

### *for the*

# Seventh Circuit

Case No. 14-3091

ARIE S. FRIEDMAN, *et al.*,

*Plaintiffs-Appellants,*

– v. –

CITY OF HIGHLAND PARK,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, CASE NO. 1:13-CV-09073,
THE HONORABLE JOHN W. DARRAH

## BRIEF OF *AMICUS CURIAE* THE BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF APPELLEE

ANTHONY J. DREYER
BENJAMIN S. HALPERIN
ELLIOT A. ROSS
BRETT M. EDKINS
STEFANIE E. NEALE
*Attorneys for Amicus Curiae*
Four Times Square
New York, New York 10036
(212) 735-3000

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: 14-3091

Short Caption: Friedman, et al. v. City of Highland Park

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[    ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

The Brady Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Skadden, Arps, Slate, Meagher & Flom, LLP

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

    N/A

Attorney's Signature:  /s/ Anthony J. Dreyer                    Date: 12/10/2014

Attorney's Printed Name:  Anthony J. Dreyer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☒    **No** _____

Address:  4 Times Square

New York, NY 10036

Phone Number:  (212) 735-3000                    Fax Number:  (917) 777-3097

E-Mail Address:  anthony.dreyer@skadden.com

rev. 01/08 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF THE *AMICUS CURIAE* ................................................ 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ........................................................................................ 4

I.   THE ORDINANCE'S BAN ON ASSAULT WEAPONS AND
     LARGE-CAPACITY MAGAZINES DOES NOT IMPLICATE THE
     SECOND AMENDMENT OR WARRANT HEIGHTENED
     SCRUTINY ................................................................................. 4

     A.   Assault Weapons Possessing the Regulated Characteristics and
          Large-Capacity Magazines Were Not in "Common Use at the
          Time" ................................................................................. 5

     B.   The Weapons Prohibited by the Ordinance Are Dangerous and
          Unusual ............................................................................. 9

     C.   Assault Weapons Possessing the Regulated Characteristics
          Have Not Been Shown To Be Commonly Used for Self-
          Defense ............................................................................. 12

II.  EVEN IF THE ORDINANCE IMPLICATES THE SECOND
     AMENDMENT, IT SURVIVES INTERMEDIATE SCRUTINY .............. 14

     A.   The Ordinance Easily Satisfies Any Form Of Intermediate
          Scrutiny ............................................................................. 14

     B.   Prohibiting Access to Assault Weapons and Large-Capacity
          Magazines Furthers Highland Park's Compelling Interest in
          Public Safety ...................................................................... 17

          1.   Assault Weapons Are Characterized by Military-Style
               Features and Designed To Be Efficiently Lethal in
               Combat ....................................................................... 18

2.     Assault Weapons Have Been Used in Mass Shootings in Numbers Disproportionately Large Compared to Their Proportion of Total Firearms ....................................................21

3.     The Ordinance's Means Closely Fit Its Ends ...........................23

CONCLUSION ...........................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...............................................................*passim*

*English v. State*,
    35 Tex. 473 (1871) ..............................................................10, 11

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...............................................*passim*

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.D.C. 2011) .....................................................7

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).................................................................12

*Moore v. Madigan*,
    702 F.3d 933, 942 (2012) ....................................................15, 16

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 838 (2013) .................4

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ....................................................9, 12

*United States v. Miller*,
    307 U.S. 174 (1939)...................................................................8

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) (en banc) ......................................14

STATUES

Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115 ........................26

Conn. Gen. Stat. §§ 53-202a – 53-202o .................................................26

D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01,
    7-2505.02(a), (c) ...........................................................................26

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 ........................................................26

Md. Code Ann., Crim. Law §§ 4-301 – 4-306........................................................26

Md. Code Ann., Pub. Safety § 5-101 – 5-143 ........................................................26

Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131, 131M .......................................26

N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 .................26

N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a) .........................26

Chi. Mun. Code §§ 8-20-010, 8-20-075 ...............................................................26

## OTHER AUTHORITIES

1   William Russell, *A Treatise on Crimes and Indictable Misdemeanors* (1831) .....................................................................10

3 Bird Wilson, *The Works of the Honourable James Wilson* (1804) ......................10

4 William Blackstone, *Commentaries on the Laws of England* (1769) .................10

ATF, *Report and Recommendations of the ATF Working Group on the Importability of Certain Semi-Automatic Rifles* (July 6, 1989) ....................20

ATF, U.S. Dep't of the Treasury, *Assault Weapons Profile* 19 (1994).............19, 20

Brady Center, *On Target: The Impact of the 1994 Federal Assault Weapon Ordinance*, 3 (2004) .................................................................12, 18

Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004, in Reducing Gun Violence in America* (Daniel W. Webster & Jon S. Vernick eds., 2013)...................21, 24

Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impact on Gun Markets and Gun Violence, 1994-2003, Report to the National Institute of Justice, U.S. Dep't of Justice* (2004) ......................................................................8, 20, 21

David S. Fallis, *Data indicate drop in high-capacity magazines during federal gun ban*, Washington Post, January 10, 2013, *available at* http://www.washingtonpost.com/investigations/data-point-to-drop-in-high-capacity-magazines-during-federal-gun-

ban/2013/01/10/d56d3bb6-4b91-11e2-a6a6-
aabac85e8036_story.html ...................................................................24, 25

David S. Fallis & James V. Grimaldi, *In Virginia, High-Yield Clip
Seizures Rise*, Washington Post, January 23, 2011, *available at*
http://www.washingtonpost.com/wp-
dyn/content/article/2011/01/22/AR2011012204046.html............................24

Dep't of Treasury, *Study on the Sporting Suitability of Modified
Semiautomatic Assault Rifles* 38 (1998).........................................................20

Dianne Feinstein et al., U.S. Senate, *Assault Weapons Ban of 2013* 4
(2013)                        *available*                        *at*
http://www.feinstein.senate.gov/public/index.cfm/files/serve/?F
ile_id=dd2252a0-db96-45cc-96a8-493a2e348c6d ........................................20

Everytown for Gun Safety, *Analysis of Recent Mass Shootings* 4 (July
17,                2014),                *available*                *at*
http://3gbwir1ummda16xrhf4do9d21bsx.wpengine.netdna-
cdn.com/wp-content/uploads/2014/07/analysis-of-recent-mass-
shootings.pdf.....................................................................................................23

Joanna Molloy, *Ex-NYPD top cop Bill Bratton pushing for overdue
ban on assault-weapons ammo clips*, NY Daily News, May 19,
2011,                        *available*                        *at*
http://www.nydailynews.com/news/crime/ex-nypd-top-bill-
bratton-pushing-overdue-ban..........................................................................21

Marianne W. Zawitz, U.S. Dep't of Justice, Bureau of Justice
Statistics, *Guns Used in Crime* (1995) ..........................................................8

Mark Follman, Gavin Aronsen, and Deanna Pan, *A Guide to Mass
Shootings        in        America*,        Mother        Jones,
http://www.motherjones.com/politics/2012/07/mass-shootings-
map (last updated May 24, 2014) ................................................................. 22

Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* 1
(2013),                        *available*                        *at*
http://3gbwir1ummda16xrhf4do9d21bsx.wpengine.netdna-
cdn.com/wp-content/uploads/2014/07/analysis-of-recent-mass-
shootings.pdf..................................................................................................... 22

Police Executive Research Forum, *Guns and Crime: Breaking New Ground By Focusing on the Local Impact*, May 2010, *available at* http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=40f529c9-edf2-4492-a424-348412b283c2........................................ 24

*Police Fear a Future of Armored Enemies*, USA Today, Mar. 3, 1997................ 21

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus*, Brady Center to Prevent Gun Violence, is the nation's largest, non-partisan, non-profit organization dedicated to reducing gun violence through education, research and legal advocacy. Through its Legal Action Project, the Brady Center has filed numerous *amicus curiae* briefs in cases involving firearms, including *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *United States v. Hayes*, 555 U.S. 415 (2009), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

*Amicus* brings a broad and deep perspective to the issues raised in this case and has a compelling interest in ensuring that the Second Amendment is construed properly to permit reasonable government action to prevent gun violence.

---

[1]    Pursuant to Fed. R. App. P. 29(a), *amicus* received consent from all parties to file this brief. Pursuant to Fed. R. App. P. 29(c)(5), no Party's counsel authored this brief in whole or in part. No Party, Party's counsel, or person other than *amicus*, its members, or its counsel contributed money intended to fund preparation of this brief.

## SUMMARY OF ARGUMENT

The City of Highland Park's Ordinance No. 68-13 (the "Ordinance") does *not* impinge upon the fundamental right to keep and bear arms for the lawful purpose of self-defense, principally in the home. The Ordinance does not prohibit semiautomatic weapons, but restricts the use of a narrow sub-class of semiautomatic weapons with military-style features like a folding or telescoping stock, pistol grip, muzzle brake, or barrel shroud, which enhance these weapons' lethality. To find that these restrictions implicate the Second Amendment, the Court would have to find that the Second Amendment regulates not just particular categories of guns (e.g., semiautomatic weapons), but the addition of secondary characteristics to guns that do not make the guns any more useful for self-defense than guns that are permitted. Each of these features converts the guns into weapons which, by appearance and function, terrify the general population and enhance the utility of the weapons for mass slaughter.

Not only are the Ordinance's prohibitions on assault weapons and large-capacity magazines constitutional, they are sensible. Limiting access to assault weapons and large-capacity magazines reduces the number of deaths resulting from homicides involving firearms. The facts are clear: assault weapons and large-capacity magazines are instruments of war and are designed to kill and maim multiple human beings at close range.

The Ordinance regulates dangerous and unusual weapons that have not been established to be in common use for lawful purposes at the relevant time. For this reason, the District Court erred in finding that the Ordinance implicates rights protected by the Second Amendment.

The District Court correctly concluded, however, that, to the extent the weapons and secondary characteristics are protected by the Second Amendment, the burden upon the core Second Amendment right to self-defense is at most marginal and the restrictions imposed by the Ordinance are subject to no higher than intermediate scrutiny. Having reached this conclusion, the District Court incorrectly applied the same level of scrutiny that this Court applied in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), because the Ordinance neither impinges on the core right of self-defense nor any potential corollary to that right, and as such should receive a less stringent standard of review under the principles this Court articulated in *Ezell*. Nonetheless, the District Court correctly held that the Ordinance survives such scrutiny and is consistent with the Second Amendment.

## ARGUMENT

I. **THE ORDINANCE'S BAN ON ASSAULT WEAPONS AND LARGE-CAPACITY MAGAZINES DOES NOT IMPLICATE THE SECOND AMENDMENT OR WARRANT HEIGHTENED SCRUTINY**

The Ordinance's ban on assault weapons and large-capacity magazines does not intrude upon the core protection of the Second Amendment—the right of law-abiding citizens to possess firearms for the lawful purpose of self-defense, primarily in the home—and therefore does not warrant heightened scrutiny. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (holding that the right guaranteed by the Second Amendment "is not unlimited" and is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"). Likewise, heightened scrutiny is not warranted here because the ban on assault weapons and large-capacity magazines does not substantially burden the Second Amendment rights of Appellants. *See, e.g.*, *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) ("[H]eightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)."), *cert. denied*, 133 S. Ct. 838 (2013).

The District Court incorrectly found the question of common use "far from settled," and also incorrectly found that, because of the supposedly equivocal

record, the Ordinance "implicates consideration of [Appellants'] Second Amendment rights and must be subjected to further analysis." Memorandum Opinion and Order at 15, *Friedman, et al. v. The City of Highland Park*, No. 13-cv-9073 (N.D. Ill. Sept. 18, 2014), ECF No. 68 (the "Order"). The Ordinance regulates weapons that are not in common use, are dangerous and unusual, and are not appropriate for self-defense—the "central component" of the right to keep and bear arms. *Heller*, 554 U.S. at 599. Accordingly, the inquiry should end there and this Court should uphold the Ordinance.

### A.    Assault Weapons Possessing the Regulated Characteristics and Large-Capacity Magazines Were Not in "Common Use at the Time"

As the District Court stated, "the threshold question is whether those weapons are commonly used for lawful purposes." (Order at 11.) The District Court noted that approximately 2.25% of all weapons in the United States are assault weapons and that, between 1990 and 2007, "an average of less than 100,000 AR-type rifles were manufactured domestically per year." (*Id.* at 14.) Nevertheless, the District Court concluded that "[t]he evidence submitted by the parties does not resolve the question of whether Assault Weapons and [large-capacity magazines] are 'commonly used for lawful purposes.'" (*Id.* at 15 (quoting *Heller*, 554 U.S. at 625).) The District Court further observed that "[t]he facts submitted by both parties show, at best, only how many AR-type rifles were

*manufactured* over a given period of time; and even these numbers are highly disputed. But knowing how many *people possess* an Assault Weapon, rather than how many *Assault Weapons* are in use, is far more probative in determining common use." (*Id.*) Finding "the question of common use . . . far from settled," the District Court found that "the Ordinance implicates consideration of [Appellants'] Second Amendment rights." (*Id.*) This is incorrect.

*First*, the level of use of the weapons regulated by the Ordinance is not remotely close to the level of use of the handguns that were at issue in *Heller*. According to *Heller*, it is unconstitutional to ban the possession of any and all handguns in the home because handguns are "*overwhelmingly chosen* by American society" for self-defense. *Heller*, 554 U.S. at 628 (emphasis added). According to the Supreme Court, "the American people have considered the handgun to be the *quintessential self-defense weapon*," and "[w]hatever the reason, handguns are *the most popular weapon chosen by Americans* for self-defense in the home." *Id.* at 629 (emphasis added). The Court did not explain whether any lower level of "use" could be deemed "common."

No other weapon has been shown to be as popular as handguns for self-defense in the home, and there is no evidence that the level of use of weapons regulated by the Ordinance in any way approaches the level of handgun use— certainly not for lawful purposes. "[T]he Second Amendment does not protect

those weapons not typically possessed by law-abiding citizens for lawful purposes,
such as short-barreled shotguns." *Heller*, 554 U.S. at 625. The assault weapons and
large-capacity magazines regulated by the Ordinance are not the "quintessential
self-defense weapon[s]" or "the most popular weapon[s] chosen by Americans for
self-defense in the home." *Id.* at 629; *see also Heller v. District of Columbia
(Heller II)*, 670 F.3d 1244, 1261-62 (D.D.C. 2011) ("Unlike the law held
unconstitutional in *Heller*, the laws at issue here do not prohibit the possession of
'the quintessential self-defense weapons,' to wit, the handgun." (quoting *Heller*,
554 U.S. at 629)).

Second, although *Heller* requires an examination of whether a weapon is in
common use "at the time," the District Court did not define the time period for
assessing the relevant level of use. Instead, in assessing "common use," the District
Court simply reviewed statistics of AR-type rifle manufacturing dating back to
1990 and found the evidence inconclusive. (Order at 12, 15.) However, courts
should definitively identify the relevant timeline, especially when considering
weapons—such as the dangerous weapons regulated under the Ordinance—that,
unlike handguns, have only recently become widely available.

The phrase "at the time" originated in *United States v. Miller*, where the
Court stated:

> [T]he Militia comprised all males physically capable of acting in
> concert for the common defense. "A body of citizens enrolled for

7

military discipline." And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time.*

307 U.S. 174, 179 (1939) (emphasis added). From this statement, it might be assumed that the relevant time for assessing whether a weapon is in common use is the time when the Constitution was drafted. *Heller* held that this was not the appropriate reference point, but it did not give any indication of what the relevant "time" should be. 554 U.S. at 582.

Nevertheless, assuming the District Court examined the correct time period, the evidence shows that the assault weapons at issue were not in common use during such time period. As the District Court noted, between 1990 and 2007, "an average of less than 100,000 AR-type rifles were manufactured domestically per year." (Order at 14.)[2] AR-type weapons were not in common use from 1990 to 2007 in part because their use was prohibited by the federal assault weapons ban. After the weapons ban lapsed in 2004, sales spiked.[3] However, it is inappropriate and unwise to conclude that a ban on assault weapons was constitutional in 2004,

---

[2] *See also* Marianne W. Zawitz, U.S. Dep't of Justice, Bureau of Justice Statistics, *Guns Used in Crime* 6 (1995) (stating that assault weapons constituted about 1% of guns in circulation prior to federal assault weapons ban); Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impact on Gun Markets and Gun Violence, 1994-2003, Report to the National Institute of Justice, U.S. Dep't of Justice* 10 (2004) [hereinafter *Updated Assessment*] ("Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock)[.]").

[3] (*See* Order at 14 (noting that of the 5,128,000 AR-type rifles manufactured between 1990 and 2012, 3,457,230 were manufactured between 2008 and 2012).)

but became unconstitutional shortly thereafter once sales increased. If that were so, the gun market would dictate what arms are constitutionally protected, regardless of their danger to society and whether they have a lawful purpose. The Ordinance regulates weapons that are relatively new, incorporating secondary features that, as Appellants admit, "represent the modern technological evolution of firearms." (Appellants' Opening Br. at 8, ECF No. 15.) As such, the District Court failed to consider the appropriate time for assessing whether assault weapons exhibiting the particular characteristics regulated the Ordinance were in common use "at the time."

## B.     The Weapons Prohibited by the Ordinance Are Dangerous and Unusual

The District Court focused its analysis on whether the regulated weapons were in "common use." However, it did not take adequate account of the Supreme Court's finding that the "limitation on the right to keep and carry arms" to those weapons "'in common use at the time'" is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citations omitted).[4] Thus, in assessing whether weapons are "in common use at the time" for legal purposes, it is necessary to consider whether the

---

[4] As explained in *United States v. Marzzarella*: "By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently—as exceptions to the Second Amendment guarantee." 614 F.3d 88, 91 (3d Cir. 2010).

weapons are dangerous and unusual. If they are, then the weapons are not "in common use at the time" as that phrase was understood in *Heller*. The assault weapons regulated by the Ordinance are dangerous and unusual and, therefore, are not protected by the Second Amendment.

The Supreme Court derived the "dangerous and unusual" standard from a series of older treatises and state court decisions. Two general themes emerge from these sources. First, a regulation does not infringe the right of the people to bear arms if it prohibits the possession of arms that terrify the population. The Court cited, for example, Blackstone, which states that "[t]he offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land . . . ." 4 William Blackstone, *Commentaries on the Laws of England* 148 (1769).[5] Second, as the Texas Supreme Court

---

[5]    The Court cited several other sources, including: *English v. State*, 35 Tex. 473, 476 (1871); 3 Bird Wilson, *The Works of the Honourable James Wilson* 79 (1804) ("Affrays are crimes against the personal safety of the citizens; for in their personal safety, their personal security and peace are undoubtedly comprehended . . . . In some cases, there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such manner, as will naturally diffuse a terrour among the people."); 1 William Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271 (1831) ("[W]here persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at common law, and is strictly prohibited by several statutes."); *Id.* at 272 ("[I]t has been holden, that no wearing of arms is [prohibited within the meaning of the relevant statute], unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons, or having their usual number of attendants with them for their ornament or defence, in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any Ordinance of violence, or disturbance of the peace.").

discussed in the also-cited *English v. State*, the Second Amendment does not protect certain types of weapons that are used for criminal purposes:

> To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.

35 Tex. 473, 476 (1871).

As discussed below, the weapons and features prohibited by the Ordinance are designed for military rather than ordinary use, and as such are dangerous and unusual. The Supreme Court has intimated that such weapons are not protected by the Second Amendment:

> It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. . . . [T]he fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Heller*, 554 U.S. at 627-28. For these reasons, the District Court erred by not taking proper account of the regulated weapons' dangerous and unusual nature.

### C.   Assault Weapons Possessing the Regulated Characteristics Have Not Been Shown To Be Commonly Used for Self-Defense

As the District Court recognized, "Highland Park persuasively argues that the Assault Weapon is not appropriate for home defense. The features of an Assault Weapon, as set out in the Ordinance, appear to be more valuable in an offensive capacity than a defensive one." (Order at 15.)[6] Second Amendment protection extends only to those weapons "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. The only "lawful purpose" specifically identified by the Supreme Court is self-defense. According to *Heller*, self-defense "was the *central component* of the right itself." 554 U.S. at 599.[7]

In order to determine whether the assault weapons regulated by the Ordinance are entitled to Second Amendment protection, it is necessary to determine whether the prohibited characteristics of the weapons or accessories are critical to the ability of the weapons to serve as a means of self-defense. As stated in *United States v. Marzzarella*, "*Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality [and cited]

---

[6] For example, the Ordinance specifically bans the Bushmaster XM-15, which is marketed as having "'an effective range of 300 meters and [the ability] to pierce most body armor.'" Brady Center, *On Target: The Impact of the 1994 Federal Assault Weapon Ordinance*, 4 (2004) [hereinafter *On Target*]. It is difficult to imagine any non-fanciful self-defense scenario—within the home or without—that would require the ability to shoot 300 meters and pierce body armor.

[7] *See also McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (reiterating the "central holding in *Heller* [] that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

handguns' ease in storage, access, and use in case of confrontation[]." 614 F.3d 85, 94 (3d Cir. 2010).

The only evidence the District Court cited suggesting that assault weapons are used for self-defense are: (a) two surveys showing that target shooting participants often use "modern sporting rifle[s]"; (b) Appellants' assertion that AR-type rifles are commonly used for small game hunting; and (c) a nine-study composite indicating that assault weapons account for less than a percent of guns used in the commission of crimes. (Order at 13-14.) However, these references are not probative of whether assault rifles or the accessories at issue are necessary for *self-defense*.

Moreover, the secondary features restricted under the Ordinance do not in any way facilitate a weapon's utility for self-defense. Indeed, a semiautomatic weapon with, for example, a large detachable magazine may be more dangerous (and therefore less suited for self-defense) given that the ability to fire a rapid burst of bullets in a short period of time increases the risk of accidental shootings of innocent bystanders. The Ordinance specifically bans those secondary features that enhance a firearm's usefulness for criminal activity and mass slaughter. Because the prohibited weapons do not implicate any "core" Second Amendment right, the Ordinance should be upheld.

13

## II.    EVEN IF THE ORDINANCE IMPLICATES THE SECOND AMENDMENT, IT SURVIVES INTERMEDIATE SCRUTINY

While the District Court erred in concluding that the weapons regulated by the Ordinance fall within the scope of the Second Amendment, it correctly concluded that, to the extent the Ordinance implicates the Second Amendment, an intermediate level of scrutiny applies and the Ordinance is constitutional under that standard.

### A.    The Ordinance Easily Satisfies Any Form Of Intermediate Scrutiny

As the District Court explained, this Court has set forth a version of intermediate scrutiny that operates as a "sliding scale." (Order at 16.) Under this standard, laws that impose a greater burden on the Second Amendment require proportionally greater justification than those that impose only a minor burden:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell*, 651 F.3d at 708. This approach draws from the various levels of scrutiny applied to First Amendment claims. *See id.* at 707; *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("Categorical limits on the possession of firearms

would not be a constitutional anomaly. Think of the First Amendment, which has long had categorical limits.").

In *Ezell*, this Court struck down a Chicago ordinance that "mandate[d] one hour of range training as a prerequisite to lawful gun ownership, yet at the same time prohibit[ed] all firing ranges in the city." *Id.* at 689-90 (citations omitted). This Court held the Chicago ordinance was "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708. This Court applied a standard of "not quite 'strict scrutiny'" and found that Chicago "ha[d] not come close to satisfying this standard . . . present[ing] no data or expert opinion to support the range ban." *Id.* at 708-09 (citation omitted); *see also Moore v. Madigan*, 702 F.3d 933, 942 (2012) ("Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety.").

In *Moore v. Madigan*, this Court struck down a broad restriction on carrying outside the home—an Illinois law banning the carrying of guns in public. This Court again applied a level of intermediate scrutiny proportional to the encroachment on the Second Amendment. "A blanket prohibition on carrying gun [sic] in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense

requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would." 702 F.3d at 940. The state must make a "'strong showing' that a gun ban was vital to public safety." *Id.* (citation omitted).

While the District Court did not state that the Ordinance fell at the same point along the sliding scale as the ordinance in *Ezell*, the District Court appears to have attempted to apply the same "not quite strict scrutiny" standard. (Order at 18 (Highland Park must "'establish a close fit between the [Ordinance] and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights.'").) This was in error. The Ordinance here neither impinges on the core right of self-defense nor any potential corollary to that right, *see supra* Part I.C, and therefore does not fall at the same point on the sliding scale as the ordinance considered in *Ezell*. Unlike the laws in *Ezell* and *Moore*, the Ordinance here does not interfere with citizens' ability to procure weapons training or generally carry weapons in public. Further, it does not impose conditions on the ownership of *all types of guns* for use in the home, as did the ordinance in *Ezell*, or broadly prohibit the use of arms for self-defense outside the home, as did the statute in *Moore*. Therefore, the standard here should be something less than the "not quite strict scrutiny" applied in *Ezell*. Under this Court's sliding scale approach, this means that the city need

not establish as "close [a] fit" and the public interest need not be as compelling. However, as discussed below, the Ordinance is amply justified and employs means that closely fit its ends, such that it survives any level of intermediate scrutiny, including the standard articulated in *Ezell*.

### B.     Prohibiting Access to Assault Weapons and Large-Capacity Magazines Furthers Highland Park's Compelling Interest in Public Safety

While the Ordinance here should receive a *less stringent* standard of review than the one in *Ezell*, it is eminently *more* justified than Chicago's ordinance was there. The city's justification is simple: public safety. As the District Court stated, "[t]here can be little doubt that any government's interest in public safety is important, and [Appellants] do not dispute this contention." (Order at 18 (citation omitted).) As the District Court further pointed out, the Ordinance here "was particularly intended to address the potential threat of mass shootings involving semi-automatic weapons like those in Aurora, Colorado (12 killed, 58 injured); Newtown, Connecticut (28 killed); Casas Adobes, Arizona (6 killed, 14 injured; and Santa Monica College in Santa Monica, California (6 killed, 2 injured)." (*Id.* at 2.) The District Court highlighted Highland Park's reason for this concern, noting that the city contains fifteen schools, four community centers, and three nursing

homes, as well as many places where people frequently congregate. (*Id.* at 1-2.)[8] It goes without saying that mass shootings generally require locations where numerous people gather, and Highland Park has numerous such locations.

While the City of Chicago in *Ezell* "presented no data or expert opinion to support" its ban, there is ample evidence that assault weapons and large-capacity magazines are military-style weapons, disproportionately used to inflict maximum carnage in mass shootings. 651 F.3d at 709.

### 1.    Assault Weapons Are Characterized by Military-Style Features and Designed To Be Efficiently Lethal in Combat

As the District Court recognized, "the particular features banned by the Ordinance were developed for or by militaries to increase lethality." (Order at 19.) Assault weapons are instruments of war designed to kill as many people as possible as efficiently as possible.[9] According to the Bureau of Alcohol, Tobacco,

---

[8]    Moreover, as highlighted in the Response Brief For Defendant-Appellee City of Highland Park, various events and attractions attract large crowds, including, the Ravinia Festival (an outdoor music venue that brings in thousands of visitors in the summer months), the Port Clinton retail and office development in downtown Highland Park, the Renaissance Place retail and residential development in downtown Highland Park, the Crossroads Shopping Center along Skokie Valley Road, the Courtyard Marriott hotel along Lake Cook Road; and four commuter rail stations. (Resp. Br. for Defendant-Appellee City of Highland Park at 6-7, ECF. No. 22.)

[9]    *On Target* at 3 ("[Assault weapons] were specifically designed for military use in order to kill greater numbers of people more effectively.").

Firearms and Explosives ("ATF"), "assault weapons were designed for rapid fire, close quarter shooting at human beings. . . . They are mass produced mayhem."[10]

The enumerated weapons banned by the Ordinance are civilian semiautomatic versions of military artillery and accordingly have military features useful in combat but inappropriate and unnecessary for lawful civilian purposes. (A. 14-37.) In addition to these specifically delineated firearms, the Ordinance prohibits certain features. The *amici* gun manufacturers argue that these features serve legitimate purposes,[11] but *amici's* descriptions gloss over the prohibited features' primary functions: making a firearm easier to conceal or easier to use in quickly annihilating multiple targets. These features, and the functions they support, have absolutely nothing to do with self-defense:

- *pistol grips or thumbhole stocks*. Allow a shooter to spray-fire from the hip position, whereas a sport shooter aims from the shoulder for precision;[12]

- *protruding grips that can be held by the non-trigger hand*. Control recoil and muzzle climb in order to increase accuracy across multiple, successive shots;[13]

---

[10] ATF, U.S. Dep't of the Treasury, *Assault Weapons Profile* 19 (1994) [hereinafter *Assault Weapons Profile*].

[11] (Br. of *Amici Curiae* Armalite, Inc., Colt Manufacturing Company LLC, Remington Arms Company, LLC, Sig Sauer, Inc., Smith & Wesson Corp., Stag Arms, Sturm, Ruger & Co., Inc., and the National Shooting Sports Foundation, Inc. at 11-19, ECF No. 21.)

[12] Appellee's Statutory Addendum, *Heller v. District of Columbia*, No. 10-7036 (D.C. Cir. June 21, 2013).

- *folding or telescoping stocks*. Allow a shooter to make a large and powerful weapon much more compact, and therefore more concealable;[14]

- *barrel shrouds*. Protect a shooter's hands from burns caused by the heat generated by firing multiple rounds in rapid succession and stabilizing the barrel with a free hand;[15]

- *muzzle brakes or muzzle compensators*. Reduce "muzzle flip," allowing a shooter to retain greater control during rapid, repeat fire;[16]

- *flash suppressors*. Allow a shooter to remain concealed when shooting at night.[17]

The increased firepower of assault weapons' military-style features heightens the risk of multiple gunshot wounds and severe penetrating trauma resulting in more critical injuries to targets and bystanders alike.[18] Accordingly, assault weapons, as defined in the Ordinance, have no legitimate use in recreation, sport or hunting,[19] and can wreak havoc if used for self-defense.[20]

---

*(cont'd from previous page)*
[13] (Appellee's App. ("A.") 30 ¶ 33(1)(b).)

[14] *Updated Assessment* at 8. (*See also* A. 30 ¶ 33(1)(c).)

[15] *Updated Assessment* at 7.

[16] (A. 30 ¶ 33(1)(e).)

[17] *Updated Assessment* at 8.

[18] Dianne Feinstein et al., U.S. Senate, *Assault Weapons Ban of 2013* 4 (2013) *available at* http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=dd2252a0-db96-45cc-96a8-493a2e348c6d (citing Dr. James Madara, executive vice president and CEO, American Medical Association).

[19] *Assault Weapons Profile* at 20; *see also* ATF, *Report and Recommendations of the ATF Working Group on the Importability of Certain Semi-Automatic Rifles* (July 6, 1989) (survey of 935 hunting guides found sportsmen do not use assault weapons); U.S. Dep't of Treasury, *Study*

*(cont'd)*

Similarly, large-capacity magazines make it easier for shooters to injure and kill greater numbers of people, including law enforcement personnel, in a very short period of time. Police Commissioner of the City of New York William Bratton, who has also served as chief of police of Los Angeles and Boston, described large-capacity magazines as "weapons of war," "designed to kill as many people as possible in the shortest period of time," which "simply do not belong in untrained civilian hands."[21]

### 2.   Assault Weapons Have Been Used in Mass Shootings in Numbers Disproportionately Large Compared to Their Proportion of Total Firearms

Assault weapons and large-capacity magazines have been employed in highly publicized mass shootings for decades in the United States.[22] In more than

---

*(cont'd from previous page)*

*on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998) (ATF study confirming same).

[20]   *See Police Fear a Future of Armored Enemies*, USA Today, Mar. 3, 1997. The combat-ready design of assault weapons makes them dangerous for use in self-defense. According to the executive director of the Fraternal Order of Police, Jim Pasco, "[a]n AK-47 fires a military round. In a conventional home with dry-wall walls, I wouldn't be surprised if it went through six of them." *Id.*

[21]   Joanna Molloy, *Ex-NYPD top cop Bill Bratton pushing for overdue ban on assault-weapons ammo clips*, NY Daily News, May 19, 2011, *available at* http://www.nydailynews.com/news/crime/ex-nypd-top-bill-bratton-pushing-overdue-ban.

[22]   *See Updated Assessment* at 14-19. For lists and descriptions of the mass shootings involving assault weapons and large-capacity magazines, see *id.* at 14. Since 2007, there have been at least 15 incidents in which parties armed with assault weapons have killed or wounded eight or more people. Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications*, *in* Reducing Gun Violence in America: Informing

*(cont'd)*

25% of mass shootings, defined by the FBI as incidents involving the death of four or more people, the gunmen used assault weapons; in another 48%, the gunmen used other types of semi-automatic handguns, typically also equipped with large-capacity magazines.[23]

Between 2009 and 2013, mass shooting incidents involving assault weapons resulted in an average of 14.8 people shot, compared to 6.8 people injured in incidents not involving assault weapons.[24] Mass shootings carried out with assault weapons resulted in an average of eight deaths, compared to incidents without assault weapons, which resulted in an average of 5.1 deaths.[25] Another study of all 110 mass shooting incidents between January 2009 and January 2014 found that, when assault weapons and large-capacity magazines were involved, there was a 156% increase in the number of people shot and a 63% increase in the number of

---

*(cont'd from previous page)*
Policy with Evidence and Analysis at 157-58 (Daniel W. Webster & Jon S. Vernick, eds., 2013) [hereinafter *America's Experience*].

[23]  Mark Follman, Gavin Aronsen, and Deanna Pan, *A Guide to Mass Shootings in America*, Mother Jones, http://www.motherjones.com/politics/2012/07/mass-shootings-map (last updated May 24, 2014).

[24]  Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* 1 (2013), *available at* http://3gbwir1ummda16xrhf4do9d21bsx.wpengine.netdna-cdn.com/wp-content/uploads/2014/07/analysis-of-recent-mass-shootings.pdf.

[25]  *Id.*

deaths compared to mass shooting incidents that did not involve assault weapons or large-capacity magazines.[26]

Appellants' own evidence demonstrates the outsized role assault weapons and large-capacity magazines play in mass shootings. For instance, a study by Appellants' expert, Professor Gary Kleck, identified 81 instances between 1994 and 2013 in which more than six people had been killed or injured.[27] The shooters made use of large-capacity magazines in 21 of those high-casualty attacks.[28]

### 3. The Ordinance's Means Closely Fit Its Ends

The Ordinance deploys not only reasonable, but proven means to achieve its goal of promoting public safety. By prohibiting certain weapons and military features, it takes a similar approach as the federal assault weapons ban. The federal ban was effective at promoting public safety and in fact had a real and substantial impact on the number of gun crimes involving assault weapons. Based on a study

---

[26] Everytown for Gun Safety, *Analysis of Recent Mass Shootings* 4 (July 17, 2014), *available at* http://3gbwir1ummda16xrhf4do9d21bsx.wpengine.netdna-cdn.com/wp-content/uploads/2014/07/analysis-of-recent-mass-shootings.pdf.

[27] (Appellants' App. ("AX.") 190 ¶ 29.)

[28] (AX. 192 ¶ 34; *see* AX. 210, 215 (identifying two additional incidents where, although there was no record of whether the shooter used a large-capacity magazine, it was likely they had used magazines with a capacity of at least 11 rounds.) Kleck attempts to back away from this data by arguing that the shooters who perpetrated these attacks also either had multiple weapons or reloaded. This misses the mark, since Kleck does not offer any evidence as to how long it might take a shooter to switch weapons. And that a shooter *did* reload does not mean that he or she would not have needed to do so *earlier* with a smaller magazine. During a mass killing, any pause can be crucial: Kleck's study identified at least three instances where, in the time it took the shooter to reload, that shooter was tackled by bystanders. (AX. 203, 208, 216, 224.)

of six major cities during the period the federal assault weapons ban was in place,
the proportion of gun crimes involving assault weapons decreased by at least 17%
while police recoveries of assault weapons in those cities decreased by at least
28%.[29] Local police agencies around the country reported similar experiences after
the federal assault weapons ban expired in 2004—37% of local police agencies
reported noticeable increases in criminals' use of assault weapons following the
ban's expiration.[30]

Moreover, an investigation into the types of firearms recovered by police
revealed that the federal assault weapons ban directly and substantially curbed
criminals' access to large-capacity magazines.[31] Data from the Criminal Firearms

---

[29] *America's Experience* at 163. The measurable and substantive impact of the federal assault weapons ban in curbing assault weapons crime is even more compelling when considered in light of the gun industry's response to the debate of the ban, as well as the exemptions and loopholes built into the law. For example, the gun industry responded to Congress's debate of the ban with a surge in production of assault weapons. *Id.* at 162. Importantly, the federal assault weapons ban contained an exemption for all assault weapons manufactured before the effective date of the ban. Estimates suggest that by the date the ban took effect there were more than 1.5 million privately owned assault weapons in the United States. *Id.* at 160-61. The "grandfathering" exemption meant all 1.5 million of those assault weapons could be legally owned and transferred.

[30] Police Executive Research Forum, *Guns and Crime: Breaking New Ground By Focusing on the Local Impact*, May 2010, *available at* http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=40f529c9-edf2-4492-a424-348412b283c2.

[31] David S. Fallis, *Data indicate drop in high-capacity magazines during federal gun ban*, Washington Post, January 10, 2013, *available at* http://www.washingtonpost.com/investigations/data-point-to-drop-in-high-capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-11e2-a6a6-aabac85e8036_story.html; David S. Fallis & James V. Grimaldi, *In Virginia, High-Yield Clip Seizures Rise*, Washington

*(cont'd)*

Clearinghouse in Virginia have shown that the rate at which law enforcement recovered firearms with large-capacity magazines began to drop around 1998, four years after the federal ban was instituted. The rate of recovery continued to drop to a low of 9% in 2004, the year the federal ban expired.[32] From 2005 to 2010, the rate of recovered firearms with large-capacity magazines increased steadily to 20% of all firearms recovered.[33] Garen Wintemute, head of the Violence Prevention Research Program at the University of California at Davis School of Medicine, admitted that despite his skepticism about the federal assault weapons ban's efficacy, the collected data provided "about as clear an example as we could ask for of evidence that the ban was working."[34]

Just as the federal assault weapons ban had a positive impact in decreasing the number of crimes using assault weapons during its tenure, the Ordinance's ban on assault weapons, coupled with similar bans in California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as cities like

---

Post, January 23, 2011, available at http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html.

[32]  Fallis, *supra* note 31.

[33]  *Id.*

[34]  *Id.*

Chicago, is likely to have a real impact in enhancing public safety in and around

Highland Park.[35]

---

[35] *See* Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115 (West 2012); Conn. Gen. Stat. §§ 53-202a–53-202o (2012 & Supp. 2014); D.C. Code Ann. §§ 7-2501.01(3)(A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c) (West 2014); Haw. Rev. Stat. §§ 134-1, 134-4, 134-8 (1999 & Supp. 2006); Md. Code Ann., Crim. Law §§ 4-301–4-306 (West 2010); Md. Code Ann., Pub. Safety §§ 5-101–5-143 (West 2003 & Supp. 2014); Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131, 131M (2002 & Supp. 2014); N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 (West 2005 & Supp. 2014); N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a) ( McKinney 2008 & Supp. 2014); Chi. Mun. Code §§ 8-20-010, 8-20-075.

## **CONCLUSION**

For all of the reasons set forth herein, this Court should find that the Ordinance does not restrict weapons protected by the Second Amendment; and if it does find that a ban on assault weapons and large-capacity magazines implicates the Second Amendment, this Court should nevertheless affirm the District Court's judgment that the law is subject to less than strict scrutiny and survives such scrutiny.

/s/ Anthony J. Dreyer
Anthony J. Dreyer
Benjamin S. Halperin
Elliot A. Ross
Brett M. Edkins
Stefanie E. Neale
*Counsel for Amicus Curiae*
*Brady Center to Prevent Gun Violence*
4 Times Square
New York, NY 10036
(212) 735-3000

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(a) and 29(d) because this brief contains 6,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Date: December 10, 2014

/s/ Anthony J. Dreyer
Anthony J. Dreyer

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of December, 2014, this brief of *amicus curiae* Brady Center To Prevent Gun Violence was served, via electronic delivery to all parties' counsel via CM/ECF system which will forward copies to Counsel of Record.


Date: December 10, 2014


/s/ Anthony J. Dreyer
Anthony J. Dreyer

*Counsel for Amicus Curiae*