Case 14-3091

IN THE

# United States Court of Appeals
# For the Seventh Circuit

ARIE S. FRIEDMAN, M.D., AND
THE ILLINOIS STATE RIFLE ASSOCIATION,

*Plaintiffs-Appellants,*

*v.*

THE CITY OF HIGHLAND PARK,

*Defendant-Appellee.*

On Appeal From the United States District Court for the Northern District
of Illinois, Eastern Division

Case No. 1:13-cv-09073

The Honorable John W. Darrah, Judge Presiding

**BRIEF FOR *AMICI CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE,
THE CITY OF CHICAGO, AND ANITA M. ALVAREZ, COOK COUNTY
STATE'S ATTORNEY**

Jonathan K. Baum
Thomas P. Peabody
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Phone: (312) 902-5200

Attorneys for *Amici Curiae*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No:  14-3091
Short Caption:  *Friedman v. City of Highland Park*

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable  if this form is used.

   [   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE  WHICH INFORMATION IS NEW OR REVISED.

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Law Center to Prevent Gun Violence; the City of Chicago; Anita M. Alvarez, Cook County State's Attorney

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Katten Muchin Rosenman LLP

(3)   If the party or amicus is a corporation:

   i)  identify all its parent corporations, if any; and
         N/A

   ii)  list any publicly held company that owns 10% or more of the party's or amicus's stock:
         N/A

Attorney's Signature:  /s/ Jonathan Baum          Date:  December 10, 2014
Attorney's Printed Name:  Jonathan K. Baum

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).
Yes  X    No ___

Address:  525 W. Monroe Street, Chicago, Illinois 60661
Phone Number:  (312) 902-5200                    Fax Number:  (312) 902-1061
E-Mail Address:  jonathan.baum@kattenlaw.com

                                                                        rev. 01/08 AK

i

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No:  14-3091
Short Caption:  *Friedman v. City of Highland Park*

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable  if this form is used.

[    ]     PLEASE  CHECK HERE IF  ANY INFORMATION ON THIS  FORM  IS NEW OR REVISED AND INDICATE  WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  Law Center to Prevent Gun Violence; the City of Chicago; Anita M. Alvarez, Cook County State's Attorney

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  Katten Muchin Rosenman LLP

(3)  If the party or amicus is a corporation:

  i)  identify all its parent corporations, if any; and
          N/A

  ii)  list any publicly held company that owns 10% or more of the party's or amicus's stock:
          N/A

---

Attorney's Signature:  /s/ Thomas P. Peabody            Date:  December 10, 2014
Attorney's Printed Name:  Thomas P. Peabody

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).
Yes         No  X

Address:  525 W. Monroe Street, Chicago, Illinois 60661
Phone Number:  (312) 902-5200            Fax Number:  (312) 902-1061
E-Mail Address:  thomas.peabody@kattenlaw.com

                                    rev. 01/08 AK

ii

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE* ............................................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .........................................................................................4

I.     THE ORDINANCE REGULATES CONDUCT THAT FALLS
       OUTSIDE THE SCOPE OF THE SECOND AMENDMENT......................4

       A.     Background Of The Ordinance ...........................................4

       B.     The Second Amendment Does Not Protect A Right To Possess
              LCMs.............................................................................8

              1.     LCMs Are Not "Arms."...........................................9

              2.     Even If LCMs Are "Arms," They Are "Dangerous And
                     Unusual" And Not Protected By The Second
                     Amendment. ..........................................................14

       C.     The Second Amendment Does Not Protect A Right To Possess
              Assault Weapons. ..........................................................16

              1.     Assault Weapons Are Not In "Common Use." ........................16

              2.     Assault Weapons Are "Dangerous And Unusual" And
                     Not Protected By The Second Amendment.............................18

II.    EVEN IF THE ORDINANCE IMPLICATES THE
       SECOND AMENDMENT, IT REMAINS CONSTITUTIONAL. ..............22

       A.     Appellants Are Wrong That Any Inquiry Into The Justification
              For The Ordinance Is Foreclosed.......................................23

       B.     This Court Should Make Plain That It Applies Intermediate
              Scrutiny To Regulations That Do Not Burden The Core Right..........24

       C.     Under Either Intermediate Scrutiny Or This Court's Sliding
              Scale Approach, The Ordinance Is Constitutional..............................25

1.      If The Ban On Assault Weapons And LCMs Burdens The Second Amendment At All, That Burden Is Minimal. .......................................................................26

2.      Highland Park Has A Strong Interest In Protecting Its Community From Assault Weapons And LCMs.....................27

3.      There Is A "Close Fit" Fit Between Highland Park's Interest And The Ordinance.......................................................29

CONCLUSION .........................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Colorado Outfitters Ass'n v. Hickenlooper*,
13-CV-01300-MSK-MJW, 2014 WL 3058518 (D. Colo. June 26, 2014) ..................................................................................*passim*

*District of Columbia v. Heller*,
554 U.S. 570 (2008)....................................................................*passim*

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .....................................................*passim*

*Fyock v. City of Sunnyvale*,
C-13-5807-RMW, 2014 WL 984162 (N.D. Cal. Mar. 5, 2014).........................27

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)...................................................*passim*

*Heller v. District of Columbia*,
698 F. Supp. 2d 179 (D.D.C. 2010), *aff'd in part, vacated in part,*
670 F.3d 1244 (D.C. Cir. 2011).........................................................28

*Hightower v. City of Boston*,
693 F.3d 61 (1st Cir. 2012)..............................................................15

*Jackson v. City and Cnty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ......................................................13, 23

*Kachalsky v. Cnty. of Westchester*,
701 F.3d 81 (2d Cir. 2012) ...............................................................23

*Kampfer v. Cuomo*,
993 F. Supp. 2d 188 (N.D.N.Y 2014)................................................27

*Kolbe v. O'Malley*,
2014 WL 4243633 (D. Md. Aug. 22, 2014) ...............................*passim*

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)............................................................................1

v

*Moore v. Madigan,*
  702 F.3d 933 (7th Cir. 2012) ...............................................................26

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  990 F. Supp. 2d 349 (W.D.N.Y. 2013)...............................................27

*People v. James*,
  174 Cal. App. 4th 662 (2009) ..............................................................21

*San Francisco Veteran Police Officer Ass'n v. City and Cnty. of San
  Francisco*,
  2014 WL 644395 (N.D. Cal. Feb. 19, 2014) ......................................27

*Shew v. Malloy*,
  994 F. Supp. 2d 234 (D. Conn. 2014).................................................27

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994)......................................................................25, 30

*United States v. Fincher*,
  538 F.3d 874 (8th Cir. 2008) ..............................................................19

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) ...........................................................23, 30

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011) ..............................................................23

*United States v. McCartney*,
  357 Fed. App'x. 73 (9th Cir. 2009) ....................................................13

*United States v. Miller*,
  307 U.S. 174 (1939).............................................................................14

*United States v. Reese*,
  627 F.3d 792 (10th Cir. 2010) ............................................................23

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ........................................................24, 27

*United States v. Walker*,
  709 F. Supp. 2d 460 (E.D. Va. 2010) .................................................24

*United States v. Williams*,
  616 F.3d 685 (7th Cir. 2010) ........................................................................23, 24

*Wilson v. County of Cook*,
  968 N.E.2d 641 (Ill App. 2012) ............................................................................2

*Woollard v. Gallagher*,
  712 F.3d 865 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 422 (2013) ....................29

**Statutes**

Cal. Penal Code §§ 12275–12290 (2013) ...................................................................6

Conn. Gen. Stat. § 53-202a. ........................................................................................6

Cook Cnty. Code of Ordinances §§ 54-211–54-213 .................................................6

Cook County Ord., § 54-210 *et seq.* .........................................................................2

D.C. Code Ann. §§ 7-2551.01–7-2551.03; ................................................................6

Fed. R. App. P. 29(c)(5) ..............................................................................................1

H.B. 13-1224, 69th Gen. Assemb., Reg. Sess. (Colo. 2013) .....................................6

Haw. Rev. Stat. Ann. § 134-1 (2013) ........................................................................6

Haw. Rev. Stat. Ann. § 134-4 (2013) ........................................................................6

Haw. Rev. Stat. Ann. § 134-8 (2013) ........................................................................6

Highland Park, Ill., City Code § 136.001(G) ............................................................5

Highland Park, Ill., City Code § 136.005 ..................................................................4

Highland Park, Ill., City Code § 136.020 ..................................................................5

Kan.Stat.Ann. § 50 1203(b) ......................................................................................12

Mass. Gen. Laws ch. 140, §§ 121–123 (2013) ..........................................................6

Mass. Gen. Laws ch. 140, § 131 (2013) ....................................................................6

Mass. Gen. Laws ch. 140, § 131M (2013) .................................................................6

Md. Code Ann., Crim. Law §§ 4-301–306 (2013) ....................................6

Municipal Code of Chicago, Ill. §§ 8-20-010, 8-20-075 ..........................2

N.J. Rev. Stat §§ 2C:39-1w, y, 2C:39-9h (2013) ...................................6

N.Y Penal Law § 265.02(7)–(8) ............................................................6

N.Y. Penal Law § 265.37 .......................................................................6

New York City Admin. Code §§ 10-301–303, 306 .................................6

San Francisco Police Code § 619 ...........................................................6

Sunnyvale Municipal Code § 9.44.030–60 .............................................6

U.S. Const. amend. II ......................................................................*passim*

**Other Authorities**

ArmaLite, *A Historical Review of ArmaLite*, (Jan. 4, 2010) ..................16

ATF, *Assault Weapons Profile* (1994) ...................................................19

Atlantic Firearms,
    http://www.atlanticfirearms.com/ accessories.html ...........................12

Brian J. Siebel, *Assault Weapons:  Mass Produced Mayhem*, Brady
    Center To Prevent Gun Violence, (2008) ..........................................20

Citizens Crime Commission of New York City, *Mass Shooting
    Incidents in America (1984-2012)*,
    http://www.nycrimecommission.org/mass-shooting-incidents-
    america.php ......................................................................................7

Dan Frosch and Kirk Johnson, *Gunman Kills 12 in Colorado,
    Reviving Gun Debate*, N.Y. Times, July 21, 2012 ............................7

Dep't of Treasury, *Study on the Sporting Suitability of Modified
    Semiautomatic Assault Rifles* 34 (1998) ....................................21, 22

*1 Dictionary of the English Language* 106 (4th ed.) (reprinted 1978) .....9

*Firearms Registration Amendment Act of 2008:  Hearing on Bill 17-0843 Before the Comm. on Public Safety and the Judiciary of the Council of the District of Columbia* (Oct.1, 2008) (statement of Brian J. Siebel, Brady Center To Prevent Gun Violence)..................................20

Guns America, http://www.gunsamerica.com/ BrowseSpecificCategory/Parent/Non-Guns/ViewAll.htm ................................12

Hepburn et al., "The US Gun Stock:  Results from the 2004 National Firearms Survey," Injury Prevention 2007 .........................................................18

Home Gunsmith, http://thehomegunsmith.com/pdf/fast_bunny.pdf (last visited June 7, 2013) ....................................................................................20

http://www.vpc.org/fact_sht/ VPCshootinglist.pdf ....................................................7

*Indiana man charged in standoff with Chicago cops* (Oct. 9, 2014), http://www.washingtontimes.com/news/2014/oct/9/indiana-man-charged-in-standoff-with-chicago-cops/..............................................6

John Garcia, *Guilty Verdict in Starkesia Reed Murder Trial* (Sept. 4, 2009), http://abc7chicago.com/archive/6999653/ .................................6

Justice, *An Updated Assessment of the Federal Assault Weapons Ban* 4 n.1 (2004)..........................................................................................................21

Marianne W. Zawitz, U.S. Dep't of Justice, *Guns Used in Crime*  6 (1995)..................................................................................................................17

Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings*, s3.amazonaws.com/s3.mayorsagainstillegalguns.org/images/analysis-of-recent- mass-shootings.pdf............................................................8

Mississippi Auto Arms, Inc., http://www.mississippiautoarms.com/sort-by-item-magazines-c-169_177.html .............................................................................................12

Nancy McCarthy, *10 Years After 101 California Street Shooting, Repercussions Reverberate*, Cal. Bar J., July 2003 ..............................................7

Palmetto State Armory, *available at* http://palmettostatearmory.com/index.php/accessories.html. ............................13

ix

Timothy Cunningham, *A New and Complete Law Dictionary* (2d ed. 1771) ...................................................................................................10

Trymaine Lee, *Mass shooting in Chicago caps a bloody week* (Sept. 20, 2013), http://www.msnbc.com/msnbc/mass-shooting-chicago-caps-bloody-week-0................................................................................6

Violence Policy Ctr., *Backgrounder on Glock 19 Pistol and Ammunition Magazines Used in Attack on Representative Gabrielle Giffords and Others* (Jan. 2011), *available at* http://www.vpc.org/fact_sht/AZbackgrounder.pdf. ..........................................10

Violence Policy Ctr., *Bullet Hoses: Semiautomatic Assault Weapons – What Are They? What's So Bad About Them*? Sec. 2 (May 2003), *available at* http://www.vpc.org/studies/hosetwo.htm...........................19

Violence Policy Ctr., *Mass Shootings in the United States Involving High Capacity Ammunition Magazines* (Jan. 2011)............................................7

Violence Policy Ctr., *"Officer Down" — Assault Weapons and the War on Law Enforcement, Section One: Assault Weapons, the Gun Industry, and Law Enforcement* (May 2003), *available at* http://www.vpc.org/studies/ officeone.htm ......................................................22

## INTEREST OF *AMICI CURIAE*[1]

*Amicus Curiae* Law Center to Prevent Gun Violence is a non-profit, national law center dedicated to reducing gun violence and the devastating impact it has on communities. The Law Center focuses on providing comprehensive legal expertise to promote smart gun laws. These efforts include tracking all Second Amendment litigation nationwide and providing support to jurisdictions facing legal challenges. As an *amicus*, the Law Center has provided informed analysis in a variety of firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). The Law Center has a particular interest in this litigation because it was formed in the wake of an assault weapon massacre at a San Francisco law firm in 1993. The shooter in that rampage was armed with two assault weapons and multiple large capacity ammunition magazines, some capable of holding up to 50 rounds of ammunition.

*Amicus Curiae* the City of Chicago, the third largest city in the United States, faces a serious problem of firearms violence, to which the presence of assault weapons greatly contributes. Chicago recovers about 300 assault weapons a year, and has recovered more than 3,110 weapons since the Federal Assault Weapons Ban ended in September 2004. In order to keep these

---

[1] *Amici* make the following disclosure pursuant to Fed. R. App. P. 29(c)(5): no party's counsel authored this brief in whole or in part. No party, party's counsel, nor any other person contributed any money to fund the preparation or submission of this brief, other than *Amici*.

particularly dangerous firearms out of the hands of gang members, criminals, and others who may misuse them, Chicago has enacted a ban on assault weapons and large capacity ammunition magazines similar to the Highland Park ordinance at issue in this case. *See* Municipal Code of Chicago, Ill. §§ 8-20-010, 8-20-075. These provisions play an important role in eliminating the use of these highly dangerous devices in Chicago.

*Amicus Curiae* Anita M. Alvarez ("State's Attorney Alvarez"), the State's Attorney of Cook County, Illinois, operates the second largest prosecutor's office in the United States. She is the chief legal officer for Cook County (the "County"). State's Attorney Alvarez prosecutes violent crimes within the County, including murder, and has defended against a pending challenge to the constitutionality of the County's ban on assault weapons and large capacity ammunition magazines in Illinois state courts. *See Wilson v. County of Cook*, 968 N.E.2d 641, 645 (Ill. App. 2012). To fill the gap from the expiration in 2004 of the federal ban on assault weapons and large capacity ammunition magazines and to prevent their use in violent crimes within the County, the County passed a ban on assault weapons and large capacity ammunition magazines that is similar to the Highland Park ordinance at issue in this appeal. *See* the Blair Holt Assault Weapons Ban, Cook County Ord., § 54-210 *et seq*.

All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

On December 14, 2012, a man walked into Sandy Hook Elementary School carrying an assault weapon with large capacity ammunition magazines and hundreds of rounds of ammunition.  He shot 20 children and six adults before turning the gun on himself—all *within five minutes*.  In that very short time, the gunman fired 155 bullets and shot each of his victims multiple times, including one six-year-old who was shot 11 times.  In response to this horrific incident and many others, the City of Highland Park ("Highland Park") passed an ordinance ("the Ordinance") prohibiting the possession, sale, or manufacture of assault weapons and large capacity magazines ("LCMs").

The District Court upheld the Ordinance, finding it to have a "close fit" with the "stated objective of providing for the protection and safety of its inhabitants." S.A. 20.  This Court should affirm that ruling, as the Ordinance is completely consistent with the Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment protects the right of law-abiding, responsible citizens to possess an operable handgun in the home for self-defense. The Ordinance does not conflict with this right, as residents may lawfully purchase and possess a wide array of handguns and ammunition magazines for use in self-defense.  Appellants, however, demand that this Court radically extend *Heller*

to protect the possession of assault weapons and LCMs, devices of military origin designed to kill large numbers of people quickly and efficiently. *Heller* does not support such an extension and, as courts elsewhere have uniformly ruled, the Second Amendment does not guarantee the right to possess these devices, which are frequently employed in mass shootings and attacks on law enforcement and are not suitable for self-defense.

Appellants' challenge fails because the Ordinance does not implicate the Second Amendment. However, even if it does implicate the Second Amendment, the Ordinance clearly passes constitutional muster under the applicable standard of review.

**ARGUMENT**

**I.  THE ORDINANCE REGULATES CONDUCT THAT FALLS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT.**

**A.  Background Of The Ordinance**

On June 24, 2013, Highland Park enacted the Ordinance—similar to other laws found nationwide—prohibiting the possession, sale, or manufacture of assault weapons and LCMs. Highland Park, Ill., City Code § 136.005. The Ordinance prohibits semiautomatic weapons if they have any of a number of specifically enumerated characteristics that enable the firing of hundreds of bullets per minute, aid in the commission of mass murders and assaults, or facilitate the weapon's

concealment—purposes that are inconsistent with responsible self-defense in the home. *Inter alia*, Appellants' challenge focuses on the following characteristics:

- <u>A folding or telescoping stock</u>. This feature promotes concealment and mobility.

- <u>A thumbhole stock</u>. This feature helps a shooter retain control of a firearm while holding it at the hip, facilitating the spraying of rapidly fired ammunition.

- <u>A pistol grip that protrudes conspicuously beneath the action of the weapon</u>. This allows a shooter to hold the firearm with two hands for greater control during rapid fire (when the muzzle of the gun can quickly get too hot to hold).

These features have nothing to do with lawful self-defense in the home and everything to do with enabling the shooter to unleash maximum carnage as quickly as possible.

Highland Park defines a large capacity ammunition magazine as "any Ammunition feeding device with the capacity to accept more than ten rounds." Highland Park, Ill., City Code § 136.001(G). The Ordinance requires that persons possessing such weapons or LCMs either remove the assault weapon or LCM from city limits, modify the device to make it permanently inoperable or compliant with the Ordinance, or surrender the device to the police. Highland Park, Ill., City Code § 136.020.

State and local governments across the country have adopted laws restricting civilian access to assault weapons and LCMs because of the devastating role they

repeatedly play in mass shootings.[2]  The shooting rampage at Sandy Hook is just

one example of the enormous public safety threat posed by these military-style

devices.  Recently, in the greater Chicago area, for instance:

- On October 9, 2014, a man shot two Chicago police officers, killing one and wounding the other in the head, with a legally purchased pistol equipped with an "expanded magazine."[3]

- In September 2013, two men—one armed with an "assault-style rifle with a high capacity magazine"—indiscriminately fired in Chicago's Cornell Square Park, injuring 13 people, including a three-year-old.[4]

- In September 2006, a 14-year-old girl was killed *in her home* by a stray bullet fired from an AK-47 on the street.[5]

Nationally, examples also abound:

- In July 2012, a gunman killed 12 people and wounded 58 others in a movie theater in Aurora, Colorado, armed with an AR-15 assault rifle

---

[2]  *See* Cook Cnty. Code of Ordinances §§ 54-211–54-213; N.Y. Penal Law §§ 265.02(7)–(8), 265.37; Conn. Gen. Stat. § 53-202a *et seq.*; H.B. 13-1224, 69th Gen. Assemb., Reg. Sess. (Colo. 2013); Cal. Penal Code §§ 30500–30530 (2013); Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 (2013); Md. Code Ann. Crim. Law §§ 4-301–306 (2013); Mass. Gen. Laws ch. 140, §§ 121–123, 131, 131M (2013); N.J. Rev. Stat §§ 2C:39-1w, y, 2C:39-9h (2013); D.C. Code Ann. §§ 7-2551.01–7-2551.03; New York City Admin. Code §§ 10-301–303, 306; San Francisco Police Code § 619; Sunnyvale Municipal Code § 9.44.030–60.

[3]  *Indiana man charged in standoff with Chicago cops* (Oct. 9, 2014), http://www.washingtontimes.com/news/2014/oct/9/indiana-man-charged-in-standoff-with-chicago-cops/.

[4]  Trymaine Lee, *Mass shooting in Chicago caps a bloody week* (Sept. 20, 2013), http://www.msnbc.com/msnbc/mass-shooting-chicago-caps-bloody-week-0.

[5]  John Garcia, *Guilty Verdict in Starkesia Reed Murder Trial*, (Sept. 4, 2009), http://abc7chicago.com/archive/6999653/.

with a 100-round ammunition magazine.[6]

- In January 2011, a shooter killed six people and wounded 13 others, including Congresswoman Gabrielle Giffords, in a parking lot in Tucson using an LCM holding 31 rounds.[7]

- In April 2009, a shooter armed with two semiautomatic pistols, two 30-round LCMs, and two 15-round LCMs killed 13 people and wounded four others in Binghamton, New York.[8]

- In April 2007, the shooter responsible for the Virginia Tech massacre armed himself with numerous 15-round magazines in an attack that left 33 dead and 17 injured.[9]

- In July 1993, a shooter armed with assault weapons and LCMs killed eight people and injured six others at a law firm in San Francisco.[10]

Criminals disproportionately use both assault weapons and LCMs in two categories of crimes:  those with multiple victims and those that target law enforcement.  *Kolbe v. O'Malley*, No. CCB-13-2841, 2014 WL 4243633, *11 (D. Md. Aug. 22, 2014) (finding that "assault weapons and LCMs are

---

[6]  Dan Frosch and Kirk Johnson, *Gunman Kills 12 in Colorado, Reviving Gun Debate*, N.Y. Times, July 21, 2012, at A1.

[7]  Violence Policy Ctr., *Mass Shootings in the United States Involving High Capacity Ammunition Magazines* (Jan. 2011) at 2, http://www.vpc.org/fact_sht/ VPCshootinglist.pdf.

[8]  Citizens Crime Commission of New York City, *Mass Shooting Incidents in America (1984–2012)*, http://www.nycrimecommission.org/mass-shooting-incidents-america.php.

[9]  Violence Policy Ctr., *Mass Shootings in the United States Involving High Capacity Ammunition Magazines* at 3.

[10]  Nancy McCarthy, *10 Years After 101 California Street Shooting, Repercussions Reverberate*, Cal. Bar J., July 2003, http://archive.calbar.ca.gov/Archive.aspx? articleId=50515&categoryId=50836&month=7&year=2003.  This tragedy led to the formation of *amicus* Law Center to Prevent Gun Violence.

disproportionately used in mass shootings . . . [and] murders of law enforcement officers."). On average, shooters who use assault weapons or LCMs in mass shootings shoot 151% more people and kill 63% more people than those who do not.[11]

With these facts in mind, Highland Park—a city with 15 schools and multiple retail and business development centers—banned assault weapons and LCMs to protect its community.

### B. The Second Amendment Does Not Protect A Right To Possess LCMs.

In examining a gun law's constitutionality, this Court has instructed that, first, courts must ask: "Is the restricted activity protected by the Second Amendment in the first place?" *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011). If not, the "regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* at 703.

In *Heller*, the Supreme Court held that the Second Amendment right to bear "arms" protects the right of responsible, law-abiding citizens to possess a handgun in the home for self-defense.[12] 554 U.S. at 635. However, the Court cautioned

---

[11] Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* at 3, https://s3.amazonaws.com/s3.mayorsagainstillegalguns.org/images/analysis-of-recent-mass-shootings.pdf.

[12] Appellants grievously misstate *Heller*'s holding. Appellants state that *Heller* "held that . . . a complete prohibition on the firearms that the people have chosen to keep in their homes 'is invalid.'" Appellants Br. at 30–31 (purporting

that the Second Amendment right is "not unlimited" and should not be understood as conferring a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626. Furthermore, the Court explicitly excluded certain classes of weapons from the scope of the Second Amendment, endorsing the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627. For the reasons explained below, LCMs are not protected by the Second Amendment right to bear "arms."

### 1. LCMs Are Not "Arms."

As a threshold matter, the right protected under the Second Amendment applies only to "arms." *See Heller*, 554 U.S. at 581. The *Heller* Court undertook to define "arms," looking first to the 1773 edition of Samuel Johnson's dictionary, which defined "arms" as "weapons of offence, or armour of defence." 554 U.S. at 581 (*citing* 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). An LCM is not a "weapon of offence" or "armour." Instead, it is a special type of ammunition storage device that merely enhances a firearm's ability to fire more

---

to quote *Heller*, 554 U.S. at 629). What *Heller* actually stated was: "[*H*]*andguns* are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of *their* use is invalid." *Heller*, 554 U.S. at 629 (emphasis added). While the Supreme Court has never addressed the very different issue presented in this case, every court to consider it has squarely rejected Appellants' position.

rounds without reloading; it is neither an integral nor necessary component of the vast majority of firearms.[13]

While a magazine necessary to supply a firearm with *some* number of bullets may be considered integral to its core functionality, the same cannot be said of a magazine that expands that supply beyond ten rounds, sometimes to as many as 100. This principle is grounded in America's historical experience with handguns. Prior to the 1980s, the most common type of handgun was the revolver, which typically holds five or six rounds of ammunition. It was only during the 1980s that the firearms industry began focusing on the production and aggressive marketing of semiautomatic pistols, which can accept larger ammunition magazines.[14]  As a result, for the majority of the last century and a half, an American using a handgun in the home for self-defense could fire a maximum of six rounds before needing to reload. There is no evidence to suggest this was inadequate for self-defense purposes, and there is good reason to believe that access to more rounds per magazine may actually pose an increased threat to public safety.

---

[13]  The *Heller* majority also relied on a historical legal definition of the term "arms": "Servants and labourers shall use bows and arrows on Sundays, . . . and not bear other arms." *Heller*, 554 U.S. at 581 (citing Timothy Cunningham, *A New and Complete Law Dictionary* (2d ed. 1771)). The definition is instructive here:  guns are like bows and bullets are like arrows, but the analog to an LCM—the quiver—is conspicuously *not* an "arm."

[14]  Violence Policy Ctr., *Backgrounder on Glock 19 Pistol and Ammunition Magazines Used in Attack on Representative Gabrielle Giffords and Others* (Jan. 2011) at 1, *available at* http://www.vpc.org/fact_sht/AZbackgrounder.pdf.

As non-essential items that merely enhance a feature beyond what was traditionally available, LCMs are not "arms," but, rather, firearm *accessories*. Historical sources support the conclusion that firearm accessories are separate and distinct from "arms." In Justice Stevens's *Heller* dissent, he cited The Act for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § 3, p. 2, stating: "The Virginia military law, for example, ordered that 'every one of the said officers . . . shall constantly *keep* the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for. . . .'" *Heller*, 554 U.S. at 650 (Stevens, J., dissenting) (emphasis in original). This source specifically differentiates between "arms," "ammunition," and "accoutrements." LCMs are not "arms", *nor are they ammunition*. They fall most readily into the category of accoutrements—*i.e.*, accessories, akin to today's detachable scopes or silencers. Accessories that do not affect the weapon's core functionality are not "arms" and their use falls outside of the Second Amendment.

This "functionality" principle accords with definitions of "firearms accessories" found in state law. The State of Kansas, for example, recently defined "firearms accessories" as "items that are used in conjunction with or mounted upon a firearm *but are not essential to the basic function of a firearm*, including, but not limited to, telescopic or laser sights, *magazines*, . . . collapsible or adjustable stocks

and grips, pistol grips, thumbhole stocks, speedloaders [and] ammunition carries." Kan.Stat.Ann. § 50 1203(b) (emphasis added).

As one court recently found after a full trial, prohibitions on LCMs do not deprive gun owners of the magazines they need for their weapons to function. *See Colorado Outfitters Ass'n v. Hickenlooper*, 13-CV-01300-MSK-MJW, 2014 WL 3058518, *14 (D. Colo. June 26, 2014) ("The parties agree that semiautomatic weapons that use large-capacity magazines will also accept compliant magazines and that compliant magazines can be obtained from manufacturers of large-capacity magazines. Thus, this statute does not prevent the people of Colorado from possessing semiautomatic weapons for self-defense, or from using those weapons as they are designed to function.").

The firearm industry itself categorizes magazines as accessories, not as firearms. For instance, Mississippi Auto Arms, Inc., organizes its online store by item type, differentiating between items such as "firearms" and "ammunition," and offers magazines for sale under an entirely separate category: "accessories."[15] Atlantic Firearms, Guns America, and Palmetto State Armory similarly categorize magazines as accessories or otherwise, but not as firearms.[16] Where the firearm

---

[15] *See id. available at* http://www.mississippiautoarms.com/sort-by-item-magazines-c-169_177.html.

[16] *See* Atlantic Firearms, *available at* http://www.atlanticfirearms.com/accessories.html; Guns America, *available at* http://www.gunsamerica.com/

industry itself defines a magazine as an accessory rather than an "arm," it bends credulity to assume otherwise.

*Amici* do not contend that ammunition is not within the category of "arms," nor that compliant magazines are not "arms." Rather, *amici*'s assertion is that LCMs, accessories that enhance ammunition storage above and beyond traditional functionality, are not arms. Most firearms are fully operable without LCMs and function perfectly well with compliant magazines. A prohibition on LCMs— unlike a prohibition on ammunition—has no impact whatsoever on the core functionality of the vast majority of firearms. *Compare Jackson v. City and Cnty. Of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (without the ability to obtain *ammunition* "the right to bear arms would be meaningless" by "mak[ing] it impossible to use firearms for their core purpose") (emphasis added).

Just as the Second Amendment does not protect a person's right to possess other non-essential accessories, such as silencers, it does not protect a right to possess LCMs. *See United States v. McCartney*, 357 Fed. App'x. 73, 76 (9th Cir. 2009) (silencers are "not protected by the Second Amendment").

---

BrowseSpecificCategory/Parent/Non-Guns/ViewAll.htm; Palmetto State Armory, *available at* http://palmettostatearmory.com/index.php/accessories .html.

### 2.    Even If LCMs Are "Arms," They Are "Dangerous And Unusual" And Not Protected By The Second Amendment.

Even if LCMs are "arms," they still are not protected by the Second Amendment because they are "dangerous and unusual" weapons not typically possessed for lawful purposes.  The *Heller* Court explicitly endorsed the "historical tradition of prohibiting the carrying of dangerous and unusual weapons," and held that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens *for lawful purposes*."  *Heller*, 554 U.S. at 625, *aff'g United States v. Miller*, 307 U.S. 174, 178 (1939) (short-barreled shotguns are not protected by the Second Amendment because they are dangerous and unusual) (internal quotation omitted).

LCMs, which potentially enable a shooter to fire as many as 100 rounds without having to reload, are "dangerous and unusual" and unsuitable for lawful self-defense purposes.  As the District Court noted, they "were developed to serve military goals."  S.A. 19.  After hearing evidence at a full trial, another district court recently found that "large capacity magazines are frequently used in gun violence and mass shootings . . . [and] there is a positive correlation between the firearm ammunition capacity and the average number of shots fired during criminal aggression."  *Colorado Outfitters*, 2014 WL 3058518, at *16.  That LCMs are more suitable for illegal, offensive purposes is evidenced by the fact that criminals disproportionately use such magazines in two categories of crimes:  those with

14

multiple victims and those that target law enforcement officers.  *Kolbe*, 2014 WL 4243633, at *11.

Their exceedingly dangerous nature makes LCMs a popular choice for criminals and ill-suited for self-defense.  *See, e.g.*, *Hightower v. City of Boston*, 693 F.3d 61, 66, 71–72 and n.7 (1st Cir. 2012) (noting that "large capacity weapons" are not "of the type characteristically used to protect the home").  According to a former Baltimore Police Colonel, "[t]he typical self-defense scenario in a home does not require more ammunition than is available in a standard six-shot revolver or 6-10 round semiautomatic pistol.  In fact, because of potential harm to others in the household, passersby and bystanders, too much firepower is a hazard."  *See*, *supra* n.14.  In the home, or in public, LCMs exacerbate the threat of stray bullets because "the tendency for defenders [is] to keep firing until all bullets have been expended."  *See id*.

Responsible, lawful self-defense does not require the ability to continuously spray a multitude of bullets without reloading.  The *Colorado Outfitters* court found that a limitation on magazine capacity did not meaningfully impact "a person's ability to keep and bear (use) firearms for the *purpose of self-defense*," explaining that "[e]ven in the relatively rare scenario where the conditions are 'ideal' for defensive firing, there is no showing of a severe effect [of the magazine capacity limitation] on the defensive shooter."  *Colorado Outfitters*, 2014

15

WL 3058518, at *14, *15.  LCMs are "dangerous and unusual" weapons, ill-suited for self-defense and not "typically possessed for lawful purposes," and thus fall outside of the protection of the Second Amendment.

### C.   The Second Amendment Does Not Protect A Right To Possess Assault Weapons.

The Ordinance also prohibits the possession of assault weapons.  Whether this prohibition implicates the Second Amendment at all depends on whether assault weapons are "in common use" and not "dangerous and unusual."  *Heller*, 554 U.S. at 625, 627; *see also Ezell*, 651 F.3d at 701–03.  Assault weapons are a category of dangerous and unusual firearms totally different from the handguns at issue in *Heller*.  Assault weapons are generally semiautomatic versions of fully automatic weapons designed for the battlefield.  For example, the AR-15 rifle, some versions of which are prohibited by the Ordinance, was originally designed as a military weapon and issued primarily to combat troops.  *See* ArmaLite, *A Historical Review of ArmaLite* 3, 12 (Jan. 4, 2010).  For the reasons discussed below, assault weapons fall outside the scope of Second Amendment protection.

### 1.   Assault Weapons Are Not In "Common Use."

The *Heller* Court held that the Second Amendment only protects those weapons "in common use at the time for lawful purposes like self-defense." 554 U.S. at 624 (quotations omitted).  Noting an insufficiency of evidence, the District Court, while acknowledging that "the question of common use is far from

16

settled," nevertheless assumed that assault weapons are "commonly used for lawful purposes." S.A. 15. That assumption, however, is not supported by the evidence. Indeed, after reviewing similar evidence, the *Kolbe* court expressed its "serious[ ] doubts that the banned assault long guns are commonly possessed for lawful purposes, particularly self-defense in the home." *Kolbe*, 2014 WL 4243633, at *11.

Assault weapons are not commonly used or purchased by the public. While Appellants and their *amici* offer bluster about how supposedly common these weapons are, the numbers tell a different story. These weapons have historically only comprised a trifling percentage of the total firearms in circulation. *See* Marianne W. Zawitz, U.S. Dep't of Justice, *Guns Used in Crime* 6 (1995) (assault weapons constituted about 1% of guns in circulation prior to the federal assault weapons ban). Today, as the District Court noted, only about 2.25% of privately owned firearms are assault weapons—and that is according to the National Rifle Association's own numbers. S.A. 14. As to how many people own assault weapons, despite the uncertainty (gun sellers do not track such statistics), it is likely that relatively few gun owners have assault weapons. Even though gun sales in America have risen in recent years, the percentage of households owning guns has sharply dropped, reflecting that more firearms are being sold to an ever-smaller

group of enthusiasts, concentrating gun ownership substantially.[17]   Thus, private

ownership of assault weapons is likely even less common than is suggested by the

already meager raw figures.

**2.    Assault Weapons Are "Dangerous And Unusual" And Not Protected By The Second Amendment.**

The exceedingly dangerous nature of assault weapons makes them better

suited for committing violent crime than for self-defense.  As the District Court

found, "the features of an Assault Weapon, as set out in the Ordinance, appear to

be more valuable in an offensive capacity than in a defensive one."  S.A. 15.

Further, their "military heritage [ ] makes them particularly effective for combat

situations."  *Id*. at 19.  In fact, "the particular features banned by the Ordinance

were developed *for or by the militaries to increase lethality*."  *Id.* (emphasis

added).  As the *Heller* Court indicated, weapons "most useful in military service—

such as M-16 rifles and the like" may be banned.  *Heller*, 554 U.S. at 627.  The

assault weapons banned by the Ordinance are exactly the type of weapons "most

useful" for offensive engagement, with little defensive value.

Just like fully automatic weapons, assault weapons are "designed to enhance

[the] capacity to shoot multiple human targets very rapidly."  *Heller v. District of

Columbia ("Heller II")*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) (quotations

---

[17]  *See* Hepburn et al., *The US Gun Stock:  Results from the 2004 National Firearms Survey*, Injury Prevention 13:15-19 (2007).

omitted).  "You will not find these guns in a duck blind or at the Olympics.  They are mass produced mayhem."  A-1316, ATF, *Assault Weapons Profile* 19 (1994).

The only significant difference between civilian and military assault rifles is the manner in which they fire multiple bullets (*i.e.*, whether they are "semiautomatic" or "automatic").  As the District Court found, "[m]any assault weapons differ from their military counterparts only in their lack of a setting that allows a user to fire more than one round with a single pull of the trigger."  S.A. 19.  In contrast, a fully automatic assault weapon "fires continuously as long as the trigger is held back—until it runs out of ammunition."  *See* Violence Policy Ctr., *Bullet Hoses:  Semiautomatic Assault Weapons – What Are They?  What's So Bad About Them*?  Sec. 2 (May 2003), *available at* http://www.vpc.org/studies/ hosetwo.htm.

The differences between a semiautomatic assault weapon and a fully automatic weapon are minimal, and fully automatic firearms are unquestionably "dangerous and unusual" weapons.  *See United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (machine guns are "within the category of dangerous and unusual weapons"); *Kolbe*, 2014 WL 4243633, at *11 (finding that semiautomatic assault weapons are "substantially similar—and indeed . . . possibly even more effective—in functioning, dangerousness, and killing capacity as their fully automatic counterparts").  Most notably, both can fire hundreds of bullets in a

single minute.  In a police department test, an automatic UZI with a 30-round magazine "emptied in slightly less than two seconds . . . while the same magazine was emptied in just five seconds on semiautomatic" mode.  *Firearms Registration Amendment Act of 2008:  Hearing on Bill 17-0843* (Oct. 1, 2008) (statement of Brian J. Siebel) ("Siebel Statement")).  As the District Court found, "a semi-automatic AR-15 will fire at nearly the same rate of speed as a fully automatic rifle. . . .  Because of the insubstantial differences between the military and consumer versions, Assault Weapons may be converted to the functional equivalent of a military weapon, and many such illegally converted weapons are recovered annually in the United States."  S.A. 19–20; *see also Lightning Link*, Home Gunsmith, http://thehomegunsmith.com/pdf/fast_bunny.pdf (last visited June 7, 2013) (device allows conversion of AR-15 into fully automatic weapon in ten seconds).

The already fine line between these dangerous weapons only narrows when one considers the firepower of semiautomatic assault weapons.  Ammunition shot from semiautomatic assault weapons is powerful enough to penetrate walls, increasing the already significant threat of stray bullets harming innocent family members, neighbors, and passersby.  The Executive Director of the Fraternal Order of Police explained that "[i]n a conventional home with dry-wall walls, I wouldn't be surprised if [an AK-47 round] went through six of them."  *See* Brian J. Siebel,

Brady Center To Prevent Gun Violence, *Assault Weapons:  Mass Produced Mayhem* 16   (2008),   http://www.bradycampaign.org/sites/default/files/mass-prod uced-mayhem.pdf.[18]

With such a minimal difference between civilian assault weapons and their fully automatic military equivalents, it is plain that assault weapons are "dangerous and unusual" weapons outside of the Second Amendment's scope.  *See People v. James*, 174 Cal. App. 4th 662, 676–77 (2009) (holding that assault weapons fall within the category of "dangerous and unusual" weapons).

Moreover, assault weapons like the AR-15, AK-47, and UZI models that are prohibited by the Ordinance, are frequently chosen for use in criminal activity where greater firepower is needed.  *See Heller II*, 670 F.3d at 1263 (*citing* Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 34–35, 38 (1998)) ("assault weapons are preferred by criminals . . . because of their high firepower.").  Assault weapons "account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful."  Koper, Christopher S., U.S. Dep't of Justice, *An Updated Assessment of the Federal Assault Weapons Ban* 4 n.1 (2004); *Kolbe*, 2014 WL 4243633, at *11, 16.  A study analyzing FBI data

---

[18]   The risk of errant bullets striking innocent household members or bystanders is very real.  As noted above, a 14-year-old Chicago girl was killed in her home by a stray bullet fired from an AK-47 on the street.

found that almost 20% of the law enforcement officers killed in the line of duty were killed with an assault weapon.[19]   The District Court agreed that assault weapons are ill-suited for the purpose of self-defense:   "Highland Park persuasively argues that the Assault Weapon is not appropriate for home defense." S.A. 15.   In fact, as the District Court noted, Appellants "have not provided a *single* instance of an Assault Weapon used in self-defense." *Id.*  (emphasis added). Unlike the handguns at issue in *Heller*, assault weapons simply do not have a tradition of use for lawful self-defense.  *See* Dep't of Treasury, *Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles*, 38 (1998).

For all the reasons discussed above, a prohibition on assault weapons and LCMs does not implicate the Second Amendment.

## II.   EVEN IF THE ORDINANCE IMPLICATES THE SECOND AMENDMENT, IT REMAINS CONSTITUTIONAL.

The fact that the Ordinance does not implicate the Second Amendment should end this Court's inquiry.  *See Ezell*, 651 F.3d at 703.  But even if this Court were to radically expand the limited holding of *Heller* and conclude that the Ordinance implicates the Second Amendment, the Ordinance still passes constitutional muster, regardless of which form of scrutiny is applied.

---

[19]  *See* Violence Policy Ctr., *"Officer Down" — Assault Weapons and the War on Law Enforcement, Section One:  Assault Weapons, the Gun Industry, and Law Enforcement* (May 2003), *available at* http://www.vpc.org/studies/officeone.htm.

A.    **Appellants Are Wrong That Any Inquiry Into The Justification For The Ordinance Is Foreclosed.**

Appellants assert that the Ordinance is "categorically unconstitutional" and that "*any* inquiry into the justification for the ban is foreclosed under *Heller*." Appellants' Br. at 28 (emphasis added). As this Court held in *Ezell*, only those "broadly prohibitory laws restricting core Second Amendment rights" are "categorically unconstitutional." *Ezell*, 651 F.3d at 703. For all other firearms restrictions—even those that are "not merely regulatory," but prohibitory (*e.g.*, the law at issue in *Ezell*)—an "appropriate standard of review" must be employed. *Id.* at 708, 706.

As discussed above, the "core Second Amendment right" as articulated in *Heller* is the right to possess *a* firearm for self-defense—not to possess *any* firearm. *Heller*, 554 U.S. at 635. That is why courts, including this one, have uniformly rejected not only "categorical unconstitutionality" for firearm restrictions that do not burden the core Second Amendment right, but the lesser intermediate scrutiny standard. *See, e.g.*, *United States v. Williams*, 616 F.3d 685, 691–93 (7th Cir. 2010); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012); *Heller II*, 670 F.3d at 1256–1257; *Jackson*, 746 F.3d at 964–65; *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d

85, 96–97 (3d Cir. 2010); *United States v. Walker*, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010).

**B.    This Court Should Make Plain That It Applies Intermediate Scrutiny To Regulations That Do Not Burden The Core Right.**

This Court should join its fellow federal appeals courts in expressly articulating that intermediate scrutiny applies to restrictions that, like the Ordinance here, do not substantially burden the Second Amendment.  In *Ezell*, the Court set forth a sliding scale test to determine a gun law's constitutionality:  How "easily" the government can justify a prohibition depends on "the relative severity of the burden and its proximity to the core of the [Second Amendment] right." 651 F.3d at 708.    To provide greater guidance to courts reviewing firearm regulations, this Court should make plain that where the Second Amendment is not substantially burdened, intermediate scrutiny—a standard known and understood by legislatures and district courts nationwide—applies.

To be sure, the *Ezell* standard means that something akin to intermediate scrutiny will be applied when the Second Amendment's core right is not burdened. *See Williams*, 616 F.3d at 692 (noting that Seventh Circuit has applied a standard that looks like "what some courts have called intermediate scrutiny").   Indeed, even in *Ezell*, this Court recognized that its framework was consistent with *Williams* and *Skoien*, which applied intermediate scrutiny.   *Ezell*, 651 F.3d at 703. *Ezell* also recognized that that its framework was similar to those of other circuits.

24

*Id.* ("And this general framework has been followed by the Third, Fourth, and Tenth Circuits in other Second Amendment cases.").

While akin to intermediate scrutiny, *Ezell*'s idiosyncratic sliding scale approach provides less guidance, and hence, less consistency, to district courts. Given the paucity of precedent defining what "burdens" Second Amendment rights, courts will struggle to pinpoint the "relative severity of the burden and its proximity to the core of the right." *Ezell*, 651 F.3d at 708. Therefore, this Court should clarify that when a regulation falls within the Second Amendment's scope but does not involve a "core" right, intermediate scrutiny applies.

### C.     Under Either Intermediate Scrutiny Or This Court's Sliding Scale Approach, The Ordinance Is Constitutional.

Regardless of this Court's articulation of the standard, however, the Ordinance is constitutional. Taking the *Ezell* framework, this Court must: (1) consider the "severity of the burden" the Ordinance imposes on the Second Amendment; (2) Highland Park's public-interest justification; and (3) the closeness between the Ordinance and that justification. *Ezell*, 651 F.3d at 703; *cf.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (articulating the intermediate scrutiny standard).

The District Court correctly held that any burden imposed by the Ordinance on the Second Amendment is a "marginal" one, that Highland Park has a "strong interest in protecting the public" against assault weapons and LCMs, and that

25

"Highland Park has established a close fit between the Ordinance and its stated objective for providing for the protection and safety of its inhabitants."  S.A. 18.

## 1.    If The Ban On Assault Weapons And LCMs Burdens The Second Amendment At All, That Burden Is Minimal.

The Second Amendment's core right to bear arms for self-defense, *see, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012), cannot be burdened by banning weapons that are offensive in nature and ill-suited for self-defense. Assuming, *arguendo*, that the Ordinance does impose some burden on Second Amendment rights, that burden is minimal.   The D.C. Circuit considered a regulation similar to the Ordinance in *Heller II*.  In addressing whether the law burdened the right to bear arms, the court stated that a prohibition on assault weapons and LCMs is "more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights," because such a prohibition does not "prevent a person from keeping a suitable and commonly used weapon for protection in the home."   *Heller II*, 670 F.3d at 1261-62.  Therefore, the court concluded, it was "reasonably certain" that a ban on assault weapons and LCMs does not "substantially burden" Second Amendment rights. *Id.* at 1262.

*Heller II*'s holding has been restated across the country.  *Every* court to consider an assault weapon or LCM ban has deemed the burden they place on the Second Amendment to be insubstantial.   *Kolbe*, 2014 WL 4243633, at *24;

*Colorado Outfitters*, 2014 WL 3058518, at *15; *San Francisco Veteran Police Officer Ass'n v. City and Cnty. of San Francisco*, No. C 13-05351 WHA, 2014 WL 644395, *5 (N.D. Cal. Feb. 19, 2014); *Fyock v. City of Sunnyvale*, C-13-5807-RMW, 2014 WL 984162, *7 (N.D. Cal. Mar. 5, 2014); *Shew v. Malloy*, 994 F. Supp. 2d 234, 247 (D. Conn. 2014); *Kampfer v. Cuomo*, 993 F. Supp. 2d 188, 195 (N.D.N.Y. 2014); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 371 (W.D.N.Y. 2013).

### 2. Highland Park Has A Strong Interest In Protecting Its Community From Assault Weapons And LCMs.

Even if the burden imposed on Second Amendment rights by the Ordinance were not light, however, Highland Park's interest in preventing the violence caused by assault weapons and LCMs justifies the Ordinance. Whether this Court characterizes that interest as "substantial," "compelling," "strong," or "extremely strong," Highland Park's interests should prevail. *See Ezell*, 651 F.3d at 707–08 (citing the different justifications used in intermediate scrutiny, strict scrutiny, and by this Court in *Skoien*, 614 F.3d at 641). As the District Court noted, "[t]here can be little doubt that any government's interest in public safety is important." S.A. 18.

First and foremost, Highland Park has an interest in preventing tragedies such as the mass shootings at Sandy Hook Elementary School. As discussed, assault weapons and LCMs are particularly dangerous, military-style weapons

designed for combat use, making them a significant threat to public safety.  Indeed, as detailed above, the greater Chicago area is particularly familiar with the mass destruction caused by assault weapons and LCMs.  The District Court correctly held that "Highland Park maintains a strong interest in protecting the public against this potential use."  S.A. 20.

Highland Park also has a strong interest in protecting its law enforcement officers from harm.  "[C]riminals using assault rifles pose a heightened risk to law enforcement."  *Kolbe*, 2014 WL 4243633, at *16.  The prohibition on LCMs protects these officers because gun users limited to 10-round magazines must reload more frequently.  For law enforcement confronting dangerous shootouts, "the 2 or 3 second pause to reload [ammunition] can be of critical benefit."  *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 194 (D.D.C. 2010), *aff'd in part, vacated in part,* 670 F.3d 1244 (D.C. Cir. 2011); *see also Kolbe*, 2014 WL 4243633, at *17.  As the *Colorado Outfitters* court recently found, "[a] pause, of any duration, imposed on the offensive shooter can only be beneficial, allowing some period of time for victims to escape, victims to attack, or law enforcement to intervene."[20]  *Colorado Outfitters*, 2014 WL 3058518, at *17.  Again, the greater Chicago area has intimate experience with this:  as mentioned

---

[20]  In the 1993 Long Island Rail Road massacre, Colin Ferguson was only prevented from continuing his rampage because he was subdued while attempting to reload.

above, two Chicago police officers were very recently shot by an assailant discharging a pistol with an extended magazine. Highland Park's interest in protecting its citizens and law enforcement officers is paramount.

### 3. There Is A "Close Fit" Fit Between Highland Park's Interest And The Ordinance.

This Court should affirm the District Court's conclusion that "Highland Park has established a close fit between the Ordinance and its stated objective of providing for the protection and safety of its inhabitants." S.A. 20. Given the real and immediate threats to public safety and law enforcement personnel posed by assault weapons and large capacity ammunition magazines, Highland Park has made the reasonable choice to prohibit access to these dangerous instruments of mass mayhem, while preserving access to handguns and other firearms. Because the most effective way to eliminate the danger and destruction caused by assault weapons and LCMs is to prohibit their use, possession, and sale, a substantial relationship clearly exists between the Ordinance and the government's significant interests.[21] The Ordinance places no burden on an individual's ability to possess a

---

[21] Appellants curiously argue that the Ordinance's ban on assault weapons lacks the requisite "close fit" because it does not go far enough. *See* Appellants' Br. at 47–48 ("[u]nbanned firearms . . . are easily substituted by criminals for banned firearms"; banned firearms "could easily be obtained elsewhere"). A law is not unconstitutional because it does not alone solve an entire problem. *See Woollard v. Gallagher*, 712 F.3d 865, 882 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 422 (2013) (reversing the district court for, *inter alia*, conducting "a review more reminiscent of strict scrutiny than intermediate scrutiny" by giving weight to the

firearm for self-defense. The Ordinance prohibits only a fraction of available firearms—those with military-style features which facilitate rapid devastation of human life. The Ordinance leaves common handguns—the weapons "overwhelmingly chosen" by the American people for self-defense—and standard long guns, completely untouched. *See Heller*, 554 U.S. at 628.

As a result, the Ordinance is a reasonable means of serving vital government interests that is neither overly broad nor arbitrary. *See, e.g.*, *Ezell*, 651 F.3d at 708; *Turner Broad. Sys.*, 512 U.S. at 662; *Heller II*, 670 F.3d at 1262; *Marzzarella*, 614 F.3d at 98-99.

## CONCLUSION

For all of the reasons set forth above, this Court should affirm the District Court's Order.

---

fact that a gun law did not go far enough in "ensuring that guns are kept out of the hands of those adjudged most likely to misuse them") (internal quotations omitted).

Dated:         December 10, 2014
               Chicago, Illinois

                                        Respectfully submitted,

                                        KATTEN MUCHIN ROSENMAN LLP

                                        By:   /s/Jonathan K. Baum

                                        Jonathan K. Baum
                                        Thomas P. Peabody
                                        525 W Monroe Street
                                        Chicago, Illinois 60661
                                        Tel:  (312) 902-5200

                                        *Counsel for Amici Curiae Law Center to
                                        Prevent Gun Violence, The City of
                                        Chicago, and Anita M. Alvarez, Cook
                                        County State's Attorney*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 28(e)(2)(a) because this brief contains 6,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(viii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  December 10, 2014

/s/Jonathan K. Baum
Jonathan K. Baum, Esq.

*Counsel for Amici Curiae Law Center to Prevent Gun Violence, The City of Chicago, and Anita M. Alvarez, Cook County State's Attorney*

## CERTIFICATE OF SERVCE

I hereby certify that on December 10, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/Jonathan K. Baum
Jonathan K. Baum, Esq.

*Counsel for Amici Curiae Law Center to Prevent Gun Violence, The City of Chicago, and Anita M. Alvarez, Cook County State's Attorney*