**Case No. 14-3091**

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

**ARIE S. FRIEDMAN, M.D. and**
**the Illinois State Rifle Association**
**Plaintiffs-Appellants,**

**v.**

**CITY OF HIGHLAND PARK,**
**Defendant-Appellee.**

On Appeal from the United States District Court for the Northern
District of Illinois, Eastern Division
Case No. 1:13-cv-09073
The Honorable John W. Darrah, Judge Presiding

## APPELLANTS' REPLY BRIEF

James B. Vogts
Andrew A. Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611
Telephone:  (312) 321-9100
Facsimile:   (312) 321-0990

**Attorneys for Plaintiffs-Appellants**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

ARGUMENT ........................................................................................... 1

    I.     Broadly Prohibitory Laws Banning Possession of Commonly Owned Firearms in the Home for Self-Defense Use Are Categorically Unconstitutional .................................................... 1

    II.    Highland Park's Evidence on "Common Ownership" of the Banned Firearms and Magazines Is Not Probative or Reliable ............. 4

    III.   Highland Park Has Not Presented Evidence that Law Abiding Persons Do Not Own Banned Firearms and Magazines for Lawful Purposes ......................................................................... 7

    IV.   Ammunition Magazines Holding More than Ten Rounds Are Commonly Owned for Lawful Purposes ................................. 12

    V.    The Evidence Does Not Demonstrate a Close Fit between the Ban on Firearms in the Home and Public Safety in Highland Park ..................................................................................... 15

CONCLUSION ..................................................................................... 24

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................................... 26

CIRCUIT RULE 31(E) CERTIFICATION ................................................................. 27

CERTIFICATE OF SERVICE ................................................................... 28

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    <u>Page</u>

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................passim

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).................................. 1, 2, 16, 21

*Heller v. District of Columbia ("Heller II")*,
    670 F.3d 1244 (D.C. Cir. 2011)........................................................ 21, 22

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) .............................. 16

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)........................................................ 7

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)....................................................... 22

*Staples v. United States*, 511 U.S. 600 (1994) ............................................................. 4

*United States v. Miller*, 307 U.S. 174 (1939) ............................................................... 3

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ..................................... 1, 2, 21

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010)............................................. 1

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874 (7th Cir. 2011) ............ 9


<u>Statutes and Regulations</u>

Highland Park City Code § 136.001........................................................................ 8, 24


<u>Other Authorities</u>

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND
    (St. George Tucker ed., 1803).................................................................. 14

Koper, Christopher S., *An Updated Assessment of the Federal Assault
    Weapons Ban: Impact on Gun Markets and Gun Violence, 1994-2003*,
    Report to the National Institute of Justice, U.S. Department of Justice
    (2004) ............................................................................................................ 17

## ARGUMENT

I.     **Broadly Prohibitory Laws Banning Possession of Commonly Owned Firearms in the Home for Self-Defense Use Are Categorically Unconstitutional.**

The Supreme Court in *Heller* and *McDonald* did not leave a "broad ground" open for local governments to prohibit possession of firearms by law abiding persons in their homes. (Br. Appellee, p. 16) The "ground" is quite narrow – law abiding persons may be prohibited from possessing firearms in their homes only if the prohibited firearms are *not* among those commonly owned for lawful purposes, including self-defense. While laws prohibiting possession of firearms by persons convicted of felonies[1] and domestic abuse[2] pass constitutional muster, and laws that merely impact a law abiding person's ability to exercise his or her Second Amendment rights are subject to judicial interest balancing,[3] laws that dictate the type of commonly owned firearms law abiding persons may choose to keep in their homes to protect themselves and their families are categorically unconstitutional. Any other reading of *Heller*, which permits government intrusion into the personal decision on how best to defend oneself and family, renders self-defense in the home a mere aspiration rather than a core constitutional right.

Under this framework, this Court has recognized that "[b]roadly prohibitory laws restricting the core Second Amendment right – like the handgun ban at issue in [*Heller* and *McDonald*], which prohibited handgun possession even in the home –

---

[1]     *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010).

[2]     *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010).

[3]     *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2010).

are categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) (drawing a distinction between broadly prohibitory laws and those that just encroach on the Second Amendment right). This Court has thus recognized that *Heller* is not limited to its facts. Laws banning handguns in the home and other "broadly prohibitory" laws impacting the core right of armed self-defense are to be treated similarly. As in *Heller*, courts are to ask whether the challenged law prohibits ownership of firearms that are commonly owned by law abiding persons for lawful purposes, including self-defense. If the evidence says "yes," the law is categorically unconstitutional.

The Second Amendment does not permit inquiry into whether a law abiding person's decision to keep a particular firearm in the home is wise or imprudent. The Supreme Court rejected the notion that "empirically based questions" addressing "what sort of guns are necessary for self-defense" are to be asked by the courts. *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008) ("The very enumeration of the right takes out of the hands of government – even the Third Branch of government – the power to decide in a case-by-case basis whether the right is really worth insisting upon.").

Highland Park ignores that some laws may be treated categorically under the Second Amendment. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("[S]ome categorical disqualifications are permissible"). And Highland Park and its *amici* do not address a fundamental principle articulated in *Heller*: the extent to which other common firearms are available to keep in the home is irrelevant to the

inquiry. *Heller*, 554 U.S. at 630. Instead, Highland Park argues its Ordinance does not burden "any right under the Second Amendment" because "hundreds if not thousands of alternative firearms are available." (Br. Appellee, p. 28) That other courts have based rulings on similar reasoning only reflects that those courts have misapplied *Heller*. The reasoning reflects a fundamental misunderstanding of the historical origin of the personal right to keep and bear arms.

The right extends to all types of firearms that are commonly owned for lawful purposes because, historically, the "militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624 (citing *United States v. Miller*, 307 U.S. 174 (1939)). The firearms used by the militia were the firearms typically kept in the home, and the right to keep those firearms was not to be infringed by the government. Today, the Second Amendment right extends to the same category of firearms – those commonly kept in the home by persons who would hypothetically form a modern day militia. *See Heller*, 554 U.S. at 582 (argument that the only protected firearms are those in existence in the 18th century borders on "frivolous"). As the evidence demonstrates, there is little question that hypothetical modern day militiamen would arrive from their homes with many of the more than the 10.5 million firearms and 75 million ammunition magazines that Highland Park has banned.

Highland Park's argument that the District of Columbia's handgun ban was struck down in *Heller* because handguns "had been commonly used since the nation's founding" (Br. Appellee, p. 23), is without basis. Highland Park attempts to

support its argument with references in *Heller* to the "small arms … used by militiamen" being "one in the same" with the arms kept to defend the home. (Br. Appellee, pp. 23-24 (citing to *Heller*, 554 U.S. at 624))  But "small arms" include not just handguns but any type of firearm capable of being carried by one person, including rifles and carbines, assault rifles, sub-machine guns and light machine guns.  *See*  www.smallarmssurvey.org/weapons-and-markets/definitions.html  (last visited Dec. 10, 2014). Thus, there is no basis under *Heller* to conclude that handguns were singled out for categorical protection for historical reasons, but other types of "small arms" commonly kept in the home were left unprotected.

## II.   Highland Park's Evidence on "Common Ownership" of the Banned Firearms and Magazines Is Not Probative or Reliable.

Handguns are not the only commonly owned firearms. Rifles are also commonly owned and have been since the country's founding. And the type of rifles banned in Highland Park are the most commonly produced and purchased today. Over a recent five year period, more than one out of every nine firearms produced was an AR-type rifle – just one of the many firearms banned under the Ordinance. (A.66 at ¶ 5) In 2012, more than one of every five new firearms sold at the retail level was an AR-type rifle. (A.68 at ¶ 8) And common ownership of semiautomatic rifles such as the AR-15 is not just a recent phenomenon. AR-type rifles have been commercially available for more than 50 years (A.71), and they "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600,

611-12 (1994). Highland Park's contention that it has only banned a "small subclass" (Br. Appellee, p. 21) of firearms is grossly inaccurate.[4]

Highland Park does not present probative evidence that the firearms and magazines it has banned are not commonly kept, despite having the burden on this threshold issue. It merely repeats the analysis presented in the District Court, using old data reflecting overall firearm ownership in 2004 and unsubstantiated estimates of the percentage of firearms that were at some unspecified time referred to as "assault weapons." (Br. Appellee, p. 11)  Such "evidence" is of little to no use in determining whether "assault weapons" are commonly owned "at the time"—i.e., today.  Nor does Highland Park respond to Plaintiffs' criticisms of the analysis or defend its reliability. (*See* Appellants' Opening Brief, pp. 34-36) Highland Park's failure to engage in a substantive debate on the issue of "common ownership" reflects its inability to do so in a meaningful way.

Instead, Highland Park seizes on the District Court's refusal to find historical firearm production data presented by Plaintiffs to be probative on common possession. The District Court's view of the evidence should be rejected because (a) a primary source for the data are ATF Annual Firearms Manufacturing and Export Reports which define "production" as "manufactured and disposed of in commerce," and (b) Highland Park acknowledges that manufacturer production of banned rifles

---

[4]    *Amici* Law Center to Prevent Gun Violence *et al.* characterizes evidence of modern sporting rifle production and import data as "bluster" despite the fact that the source of the data are ATF Annual Firearms Manufacturing and Export Reports and United States International Trade Commission records. (Doc. 33 at p. 19; *contra* A.73)

in recent years has been unable to keep up with buyer demand. (A.75-79) And Highland Park's blithe suggestion that AR and AK-type rifle production data should not serve as a proxy for ownership data "because studies have indicated that a great many of these end up in Mexico" should be rejected. (Br. Appellee, p. 11) Although the study cited by Highland Park attempts to estimate the number of firearms annually trafficked to Mexico, it does not provide a breakdown of those firearms by type. (Appellee Appendix at 34) Thus, Highland Park's reliance on the study is misplaced, and it should not detract from the substantial evidence that the firearms and magazines banned by Highland Park are produced, sold and owned in substantial numbers.

The District Court stated that the number of AR-type rifles "manufactured over a given period of time" was "highly disputed." (S.A.15) But Highland Park has not questioned the accuracy of the production data demonstrating that from 2008 to 2012 alone, approximately 5,128,000 AR and AK-type rifles (just two of the firearms banned by Highland Park) were produced and sold in the United States. (A.73-79) Nor has Highland Park contested evidence that more than 75 million ammunition magazines capable of holding more than nine rounds were possessed by consumers from 1990 to 2012. (A.68 at ¶10; A.104)

*Amicus* Brady Center to Prevent Gun Violence argues the banned firearms should not be found "commonly owned" because "there is no evidence that the level of use of weapons banned by the Ordinance in any way approaches the level of handgun use." (Doc. 34 at p. 6) This reasoning is seriously flawed. If Second

Amendment protection only extends to firearms owned at "the level" of handgun ownership, no firearm would be protected *except* handguns. Although the Court in *Heller* did not define what "common" means, nothing in the decision suggests that other "common" but less frequently owned firearms do not have constitutional protection.

### III.    Highland Park Has Not Presented Evidence that Law Abiding Persons Do Not Own Banned Firearms and Magazines for Lawful Purposes.

Plaintiffs produced substantial probative evidence demonstrating that firearms banned by Highland Park are not only commonly owned, they are kept for lawful purposes, including home defense. Highland Park did not present admissible evidence to the contrary, but instead argues that law abiding persons should not keep the firearms in their homes because they are not appropriately used for self-defense use. Highland Park misses the point.

The issue under *Heller* is not whether a rifle, shotgun, pistol or revolver is the best firearm to keep in the home for self-defense use. The issue is whether law abiding persons have chosen to keep banned firearms in their homes for that constitutionally-protected purpose. "Whatever the reason" citizens have chosen the banned firearms over other firearms is irrelevant. *Heller*, 554 U.S. at 629. The Court in *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010), underscored this point by rejecting Justice Breyer's argument that incorporation of the right to self-defense to the States would "require judges to assess the costs and benefits of firearms restrictions" including "what sort of guns are necessary for self-defense." 561 U.S. at 923 (Breyer, J., dissenting). If the Second Amendment right recognized

in *Heller* could be circumvented by the government with mere argument as to what types of commonly owned firearms are most appropriate to keep in the home, the right would become illusory.

There is undeniably disagreement over the relative merits of different types of commonly owned firearms for self-defense use in the home. (A.63 [Video Demonstration] 16:20-22:48) Highland Park's own experts recognize the lack of consensus. (Appellee Appendix at 35-36, 59) But Highland Park's argument that the banned firearms – specifically the AR-type rifle – are "not effective for self-defense" makes little sense. (Br. Appellee, p. 13)[5]

An "effective" self-defense firearm is one that will reliably stop a person from continuing his actions. (A.106 at ¶ 5) The "effectiveness" of any firearm in stopping a threat is primarily a function of the firearm's ammunition, not the firearm's firing mechanism or design characteristics. (*Id.*) Highland Park's argument that rifle ammunition is "more powerful than necessary or desirable for most home defense uses" is an unwitting concession that rifle ammunition is effective. While one of Highland Park's experts advocates use of a 12 gauge pump action shotgun "loaded with 00 buckshot" for home defense use (Appellee Appendix at 35, ¶ 40), a 12 gauge shotgun loaded with 00 buckshot is even more "powerful" in close quarters than a

---

[5]    *Amici* Law Center to Prevent Gun Violence *et al.* wrongly states that only "some versions" of the AR-15 rifle are banned under the Ordinance. (Doc. 33 at p.16) In truth, all versions of AR-15 rifles are banned under § 136.001(C)(7), wherein the AR-15 rifle is listed as a banned model together with "copies or duplicates thereof." (A.378).

.223 caliber round fired from an AR-type rifle. (A.63 [Video Demonstration] at 18:38-20:08)

Highland Park further contradicts its position by promoting a shotgun as an appropriate home defense firearm, but dismissing AR-type rifles because they are "long guns" and are "unwieldy and hard to maneuver" in "close confines." (Br. Appellee, p.13) But nearly all shotguns are longer than typical AR-type rifles. (A.63 at 21:37-21:55) Highland Park also incorrectly argues that long guns cannot be safely stored in the home "under lock and key" yet still be accessible in a life threatening situation. (Br. Appellee, p. 13)  But quick access safes are available for all types and sizes of firearms, including long guns. (A.63 at 22:47-23:10) Regardless, the scope of the constitutional right to keep a commonly owned firearm in the home should not be dictated by whether it is easily stored in a safe, a closet or in a nightstand.[6]

*Amicus* Brady Center also wrongly argues that the inquiry is not whether the banned firearms are commonly kept for home defense use but whether they are "appropriate for home defense." (Doc. 34 at p. 12) Compounding its incorrect reading of *Heller*, the Brady Center formulates a test to determine whether a firearm is entitled to Second Amendment protection: are the characteristics of the

---

[6]    The right should also not be limited because of the possibility that a firearm could be stolen from the home and used criminally, as Highland Park argues. (Br. Appellee, p. 13)  The Constitution does not allow "free speech [to] be stifled by the speaker's opponents mounting a riot." *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011). Similarly, the Constitution should prevent the right to keep arms in home from being restricted by the prospect that they may be stolen.

firearm "critical to the ability of the weapon to serve as a means of self-defense?" (*Id*.)  Support for this test does not exist in *Heller* or elsewhere. Indeed, such a test is at odds with *Heller*. The Court, after summarizing the "reasons why a citizen may prefer a handgun for home defense," immediately marginalized a handgun's attributes as a self-defense firearm and returned to the fact that handguns are "popular" and "chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid."). More specifically, *Heller* rejected the idea that courts should assess "the costs and benefits of firearm restrictions" in determining whether the core constitutional right of self-defense in the home has been violated. *Id*. at 634-35.

Highland Park largely ignores the other principal factor in choosing a home defense firearm: safety to innocent persons in the home. And even the little attention Highland Park devotes to the subject reflects a basic misunderstanding of terminal ballistics. All effective home defense ammunition – whether fired from a handgun, rifle or shotgun – will easily penetrate the interior walls of a typical home. The science of terminal ballistics, however, concerns how a projectile behaves after it passes through an intermediate barrier. That behavior is not dependent on muzzle velocity but on projectile momentum. (A.107) Heavier ammunition, like most effective center fire handgun ammunition, retains greater momentum after passing through interior walls than .223 ammunition fired from most AR-type rifles.  In comparison, 00 buckshot fired from a shotgun performs similarly to most

center fire handgun ammunition. (A.106 at ¶ 4)  Thus, from the perspective of safety, lightweight .223 rifle ammunition fired from an AR-type rifle is considered by many, including the FBI, to be best choice in self-defense ammunition. (A.108 at ¶ 7)

Highland Park's description of AR-type rifles as having "overwhelming firepower" (Br. Appellee, p. 25) is misleading. The so-called "firepower" of any firearm is a function of its ammunition and its ammunition capacity, not typically the firearm's firing mechanism, which only detonates a cartridge primer and sends a single bullet down the barrel. An AR-type rifle equipped with a 5 or 10 round magazine has no more "firepower" (and in many instances substantially less) than countless firearms that are not banned. Regardless, Second Amendment protection under *Heller* extends to all types of firearms that are commonly owned for lawful purposes, not just those with limited "firepower."

Finally, Highland Park argues that "assault weapons" are intended to be used in an "offensive role," not for defensive purposes. (Br. Appellee, p. 10) First of all, all firearms are capable of being used "offensively." Such a use does not depend on the firearm's firing mechanism, design characteristics or ammunition, but on the shooter's intent. Similarly, all firearms are capable of being used "defensively." Such a use depends on the circumstance confronting the shooter. Highland Park's attempt to draw distinctions among civilian firearms based on so-called "offensive" and "defensive" design characteristics is entirely spurious. The fact that law enforcement agencies equip their officers with AR-type rifles for use as "personal

defense weapons" should end any serious discussion over whether they are also effective and appropriate for civilian self-defense use. (Appellee Appendix at 12, ¶22; A.146-161; A.162-172)

Highland Park's "intended for offensive use" argument is likely a product of the longstanding effort by gun control advocates to deliberately confuse civilian semiautomatic rifles with selective-fire rifles (which have fully automatic and multiple burst functions) used by the military. *Amici* Law Center to Prevent Gun Violence *et al.* perpetuates this confusion by repeating the myth that the semiautomatic firearms banned under the Ordinance are capable of "firing hundreds of bullets per minute." (Doc. 33 at p. 4) *Amicus* Brady Center doubles down by stating that the banned firearms have the "ability to fire a rapid burst of bullets." (Doc. 34 at p. 13) But only selective-fire rifles have "rapid burst" capability and can come close to firing "hundreds of bullets per minute." (A.21)  There is no dispute that semiautomatic firearms fire just one round with each trigger pull.  And it is absurd to contend, as *amicis* do, that semiautomatic firearms of any make or model have "the ability to continuously spray a multitude of bullets." (Doc. 33 at p. 15)

## IV.    Ammunition Magazines Holding More than Ten Rounds Are Commonly Owned for Lawful Purposes.

Highland Park argues that the "ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time." (Br. Appellee, p. 14) To support its argument, Highland Park cites evidence that an average of less than four rounds are fired in shootings by police officers. (*Id.*) However, it is an

arithmetic axiom that if the average number of rounds fired in police shooting is four, there were shootings involving more than four rounds fired. Indeed, New York Police Department data indicates that 13% of police shootings in 2012 involved more than ten rounds fired. (A.263) And it is fair to conclude that the marksmanship skills of a typical police officer are likely better than those of a typical civilian, and that the share of civilian self-defense incidents in which more than ten rounds are fired is greater. (*Id.*) It would not be reassuring to a police officer or a civilian in a self-defense encounter who needs an eleventh round to be told the threat to his life is outside the statistical norm and of no consequence.

One of Highland Park's experts agrees that having more than ten rounds of ammunition available in a civilian self-defense encounter is appropriate. He personally recommends civilian use of an eight shot revolver with an additional eight shots available in a speedloader "should more than eight shots be required." (Appellee Appendix at 36, ¶ 41)[7]  For a concealed handgun, the witness recommends a "small semiautomatic pistol … with a spare magazine." (*Id.*) Thus, while Highland Park argues that six or ten rounds is enough ammunition "most of the time," its own evidence suggests otherwise.

The Second Amendment right to defend oneself in the home exists for the rare circumstance in which the right must be exercised. Even if it is true that "most of the time" a homeowner does not need more than ten rounds of ammunition in a self-defense encounter, or that a homeowner may never even have occasion to use

---

[7]    A speeedloader is a device used to load all chambers of a revolver simultaneously and quickly.

the firearm he or she keeps for self-defense, the Second Amendment right to possess the firearm remains. The right would be meaningless if it could only be exercised effectively some of the time. By analogy, it is perhaps true that most Americans have not exercised their First Amendment right to peaceably assemble and protest government action. But their constitutional freedom to do so remains, and no one would seriously consider a restriction on political expression to subjects the government deems worthy of debate to be constitutional.

The real-world need to have more ammunition than required in a life threatening situation was demonstrated recently when two Highland Park police officers fired nine rounds to kill an armed man at North Shore Highland Park Hospital.[8] If just one officer had been present to end the threat and was equipped with just ten rounds of ammunition, the story may have had an even more tragic ending.

Unfortunately, the police are not always present when civilians' lives are threatened. The core constitutional right to self-defense in the home is, in part, based on that reality. 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 145-46 n.42 (St. George Tucker ed., 1803) (An individual in civil society "retains the right of repelling force by force; because that may be absolutely necessary for self-preservation, and the intervention of the society in his behalf, may be too late to prevent an injury."). And while Hollywood routinely depicts

---

[8]    (*See* www.chicagotribune.com/suburbs/highland-park-deerfield/ct-highland-park-hospital-shooting-investigation-tl-20141111-story.html (last visited Dec. 15, 2014).

heroic characters ending threats with just one well-placed shot, reality is far different.  Civilians should have the same ability to defend themselves and their families as police officers have in defending themselves and the public.

*Amici* Law Center to Prevent Gun Violence *et al.* argues that while magazines capable of holding ten rounds of ammunition or less are "within the category of 'arms'" protected by the Second Amendment, magazines holding more than ten rounds are not protected arms "because they enhance ammunition storage above and beyond traditional functionality." (Doc. 33 at p. 13) First of all, *amici* makes up the "traditional functionality" standard from whole cloth. If "traditional functionality" were the standard by which ammunition capacity is judged, flintlock muskets would be the only constitutionally protected firearms. A "traditional functionality" standard is also contrary to the admonition in *Heller* that it is "frivolous" to suggest the only protected arms are those that existed in years past. 554 U.S. at 582. Secondly, *amici* are wrong that until the 1980's persons "using a handgun in the home for self-defense could fire a maximum of six rounds before needing to reload." (Doc. 33 at p. 10) The evidence proves otherwise. Pistols with capacities in excess of ten rounds were available in the mid-19th century, and the popular Browning P35 semi-automatic pistol with a 13 round magazine was introduced in 1935. (A.23)

### V.    The Evidence Does Not Demonstrate a Close Fit between the Ban on Firearms in the Home and Public Safety in Highland Park.

Highland Park disregards the plain import of *Heller* that some laws may be categorically unconstitutional under the Second Amendment. Instead, Highland

Park contends that all laws restricting firearms ownership and use are subject to judicial interest balancing, and it argues for application of intermediate scrutiny of the Ordinance. The standard that Highland Park asks the Court to apply was articulated by the Second Circuit in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). (Br. Appellee, p. 29) In *Kachalsky*, the Second Circuit held that a handgun licensing law requiring a showing of "proper cause" to carry a concealed firearm in public was constitutional because it was "substantially related to an important government objective." *Id*. at 96.

But in *Ezell*, this Court made clear that when a claim is made by a "law abiding responsible citizen … involv[ing] the central self-defense component" of the Second Amendment, a "more rigorous showing" than intermediate scrutiny is required "if not quite strict scrutiny." 651 F.3d at 708. In such cases, the government bears the burden of establishing a "close fit" between the law and "strong public interest." *Id*. at 708-09. "Not quite strict scrutiny" was applied in *Ezell* and the Court found the City's ban of firing ranges a "serious encroachment on the right to maintain proficiency in firearms use, an important corollary to meaningful exercise of the core right to possess firearms for self-defense." *Id*. at 708.

If the Ordinance is not found categorically unconstitutional under *Heller*, it should be evaluated under "not quite strict scrutiny," at minimum. As in *Ezell*, Plaintiffs are law abiding citizens. As in *Ezell*, their claim involves the central self-defense component of the Second Amendment right – they seek to keep commonly owned rifles in their homes for self-defense use. It is untenable to argue that a

prohibition on possession of these rifles in the home for self-defense use is less than a serious encroachment on the Second Amendment right to keep arms.

The substance of Highland Park's argument justifying its firearm ban is that the designated firearms are too dangerous for civilians to own. But as already established, Highland Park supports its argument with demonstrably misleading descriptions of the firearms' semiautomatic action (*e.g.*, capable of "firing hundreds of bullets per minute," ability to fire a "rapid burst" of bullets, ability to "continuously spray a multitude of bullets"). Compounding these myths, Highland Park and its *amici* argue that certain features (*e.g.*, telescoping stock, barrel shroud, pistol grip, etc.) found on the firearms make them any more dangerous than firearms without the features. Yet Highland Park presents no empirical evidence suggesting that presence of any one of the banned features on a firearm has had an effect on the outcome of any crime.   The lack of empirical evidence supporting Highland Park's position is understandable because the features have nothing to do with the basic operation of a firearm:

> The [1994 Federal "Assault Weapons" Ban] targets a relatively small number of weapons based on outward features or accessories that have little to do with the weapons' operation . . . . In other respects (e.g. type of firing mechanism, ammunition fired, and the ability to accept a detachable magazine), AWs do not differ from other legal semiautomatic weapons.

Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impact on Gun Markets and Gun Violence, 1994-2003*, Report to the National Institute of Justice, U.S. Department of Justice (2004).

Notably, one of Highland Park's experts agrees: "I don't think that any one of these individual features that are banned … if taken by themselves makes something more or less dangerous." (A.34 at ¶ 9) And one of Highland Park's *amici* endorses Plaintiffs' position that the features "represent the modern technological evolution of firearms" before attempting to diminish their utility. (Doc. 34 at p. 9) Yet Highland Park ignores its own evidence, as well as the evidence presented by Plaintiffs, and asks the Court to leap to the conclusion that because each of the banned features has a "military heritage" they each somehow make a firearm "more dangerous and powerful." (Br. Appellee, p. 25) Setting aside that virtually every firearm and firearm feature can be traced to a "military heritage," the design features banned by the Ordinance do not make a firearm more powerful. The so-called "power" of any firearm is primarily a function of its ammunition. A "dangerous" firearm is any firearm in the hands of a person with the intent to unlawfully harm another.

Highland Park's true complaint is that each of the five banned features contribute to the effectiveness of the firearm in terms of accuracy and ease of handling – *when used lawfully or unlawfully*. But it is backward thinking to conclude that firearms with features making them more effective for lawful purposes under *Heller* lose constitutional protection because the same features may make the firearms more effective for criminal purposes. Features enhancing a firearm's effectiveness for lawful purposes should enhance constitutional protection, not detract from it.

The Court in *Heller* implicitly rejected the notion that the attributes of a firearm which lead law abiding citizens to "prefer" them can be turned around and serve as a constitutional basis to ban them. *Heller* summarized reasons why handguns were preferred by many for self-defense use, including easy accessibility, they cannot be easily wrestled away and can be fired one-handed. 554 U.S. at 629. The Court could have added that a great many handguns are less expensive than typical long guns. Each of these and other handgun attributes are valued by law abiding persons, but are valued by criminals, too, for the same reasons. (A.274 at 169:13-170:22) And there is no dispute that criminals overwhelming prefer and use handguns in the commission of their crimes. (A.181 at ¶ 9; A.273 at 162:1-4) Yet, possession of handguns by law abiding persons in the home is constitutionally protected. The rifle design attributes banned under the Ordinance should also be protected. Under *Heller*, their presence on a firearm cannot logically serve as the basis to prevent ownership of the firearm by law abiding persons.

Highland Park and its *amici* undermine their credibility by arguing that a telescoping rifle stock "promotes concealment" (Doc. 33 at p. 5) and makes the firearm "much more compact" (Doc. 34 at p. 19). The evidence establishes that a telescoping stock will shortened a 35 inch long rifle by just a few inches, and more importantly, its purpose is to fit the rifle to a shooter, not simply to make the rifle smaller. (A.63 at 07:19-09:13) The argument that the other features "have absolutely nothing to do with self-defense" (Doc. 34 at p. 19) is further contradicted by Highland Park's own logic: how can features that make a firearm more accurate

and easy to handle not help a law abiding person in a self-defense encounter? (*See* Br. Appellee, pp. 13, 25-26)

Highland Park's *amici* expend considerable effort portraying banned rifles "spray firing" from a criminal's hip. (Doc. 33 at p. 5; Doc. 34 at pp. 19-20) Setting aside that semiautomatic rifles (as opposed to fully automatic firearms) do not "spray fire" and that any long gun can be held at the hip and fired, there is no evidence that criminals commit assaults while firing from the hip (outside of Hollywood). For good reason: firing from the hip sacrifices accuracy and anybody, criminal or otherwise, who is serious about hitting a target with a long gun of any kind will fire from the shoulder and use the firearm's sights to acquire the target. (A.63 at 13:00-13:32)

Generally speaking, rifles are considerably more accurate at longer distances than handguns. But that attribute does not make a rifle an ineffective or inappropriate firearm to use at shorter distances or in a close quarters home defense encounter. A rifle does not lose its accuracy at close range, and it is in no sense "fanciful" (as argued by *amicus* Brady Center) to imagine an AR-type rifle used in home defense encounter. (Doc. 34 at p.12 n.6) In fact, Brady Center acknowledges such a "non-fanciful self-defense scenario" later in its brief by citing to evidence that "assault weapons" were designed for "close quarter shooting." (*See* Doc. 34 at pp. 18-19) The evidence before the Court goes much farther and demonstrates that AR-type rifles are deployed across the country by law enforcement agencies as personal defense firearms for use in close quarters. (A.108

at ¶6; A.146-60; A.162-72)

Highland Park places considerable reliance on *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*), and specifically certain finding made by the court regarding "assault weapons." But the court's findings were almost exclusively based on the unsworn testimony of a Brady Center lobbyist before the D.C. Committee on Public Safety. *Id*. at 1260. No inquiry was made into the lobbyist's qualifications to present evidence regarding the semiautomatic rifles banned by the District of Columbia, including their design, uses and handling characteristics. Nor was there a critical inquiry into any support that the lobbyist had for his opinions. Rather, the court in *Heller II* gave "substantial deference" to the Committee's reliance on the lobbyist testimony, and only required the Committee to draw "reasonable inferences" that the law served the government's interest. *Id*. at 1259.

The standard of review applied in *Heller II*, although called intermediate scrutiny, looked more like rational basis review in its deference to legislative findings. Regardless, the standard applied in *Heller II* was not the "not quite strict scrutiny" standard applied by this Court in cases in which laws seriously encroach on the core Second Amendment right of law abiding citizens. Substantially more probative evidence has been required of the government by this Court to justify infringement of the Second Amendment. *See Ezell*, 651 F.3d at 708 (government must supply actual, reliable evidence to justify restricting expression based on secondary public-safety effects); *Skoien*, 614 F.3d at 643-44 ("extensive empirical

evidence" marshalled to justify law forbidding firearm possession by person convicted of misdemeanor domestic violence); *Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012) (law impacting Second Amendment right cannot "be upheld on the ground that it's not irrational"). *Heller II* is neither biding nor persuasive precedent and should not be followed.

Highland Park argues that "assault weapons are far more likely to be used by criminals than conventional firearms" but it does not cite to supporting evidence. (Br. Appellee, p. 9) For good reason. Highland Park's own witness has testified that criminals overwhelmingly use handguns. (A.273 at 162:1-4) The only empirical evidence before the Court on the prevalence of "assault weapon" use in crime is Dr. Gary Kleck's published analysis of 38 studies on the subject and the determination that the median percentage of "assault weapons" used in crime is just 1.8%. (A.194 at ¶ 8; A.360-62) Assuming the validity of Highland Park's estimate that "assault weapons" represent 2.25% of all firearms, "assault weapons" are actually underrepresented in crime. "Assault rifles" would be even more underrepresented, accounting for just 0.038% of firearms used in crime. (A.195 at ¶ 38) This conclusion is consistent with testimony from Highland Park's own witness, who has acknowledged that an AR-type rifle is an "unusual weapon in the hands of a criminal." (A.274 at 169:2-7)

Understanding of the relevant facts surrounding a shooting incident is necessary before attempting to assess the effect that a particular type of firearm may have had on the outcome of a shooting. Highland Park and its *amici* are guilty

of ignoring facts by concluding that if an "assault weapon" or a "large capacity magazine" was present at a shooting, its presence necessarily had a causal role in the number of persons killed or injured. But there is more to the analysis. For example, if a mass shooter is equipped with a "large capacity magazine" but fires less than ten rounds, the magazine's extra capacity did not affect the outcome of the incident. Similarly, if a mass shooter is equipped with an AR-type rifle, shotgun and pistols, the conclusion cannot be reached that possession of any of the firearms changed the outcome, without knowing more. At bottom, Highland Park and its *amici* are guilty of over-simplifying shooting incidents and confusing correlation with cause.

Throughout their briefs, Highland Park and its *amici* also improperly conflate use of "assault weapons" with use of "large capacity magazines." Firearms and the magazines they accept are not one in the same. As already demonstrated, the "specifically enumerated" design features present on the firearms Highland Park has banned do not "enable the firing of hundreds of bullets per minute" (Doc. 33 at p. 4). The number of rounds that can be fired from a semiautomatic firearm before reloading is a function of the size of the magazine used, not the firearm itself. This "fact" is further blurred by *amicus* Brady Center's misquoting of Christopher S. Koper.  Koper did not report that "[s]ince 2007, there have been at least 15 incidents in which parties armed with assault weapons have killed or wounded eight or more people." (Doc. 34 at p. 21) Rather, he reported "there have been 11 incidents in which offenders using assault weapons *or other semiautomatics* with

magazines larger than 10 rounds" killed or wounded eight or more people. (R. Doc. 45-11 at pp. 3-4) Notably, Koper did not report how many of the 11 incidents involved use of an "assault weapon" banned in Highland Park. Nor is *amicus* Brady Center correct on another important point:  the alleged "outsized role *assault weapons* … play in mass shootings" is not demonstrated by Dr. Kleck's study. (Doc. 34 at p. 23)  Dr. Kleck determined that shooters in 21 of 81 incidents over a 20 year period *used magazines* holding more than ten rounds, not "assault weapons."

Other errors made by Highland Park's *amici* include: (1) incorrectly stating that a Chicago Police Officer was killed in an October 9, 2014 shooting (*see* Doc. 33 at p. 6 n. 3); (2) incorrectly attributing a quotation to Christopher S. Koper that "[a]ssault weapons 'account for a larger share of guns used in mass murders and murders of police . . . .'" (*compare* Doc. 33 at p. 21 *with* R. Doc. 45-10 at p. 10); (3) incorrectly stating that "flash suppressors" are banned under the Ordinance (*compare* Doc. 34 at p. 20 *with* Br. Appellee, p. 4); and (4) incorrectly stating that a "pistol grip" allows a shooter to "hold a firearm with two hands" (*see* Doc. 33 at p. 5). Plaintiffs do not point out these examples of overreaching to minimize the occurrence of even one mass shooting but to set the record straight and call into question whether Highland Park's *amici* are truly serving as friends of the court.

## CONCLUSION

Plaintiffs respectfully request that the District Court be reversed and this case be remanded for entry of a declaration that Highland Park City Code § 136.001 *et seq*. is unconstitutional to the extent it prohibits the manufacture, sale, transfer,

24

acquisition and possession of (a) semiautomatic rifles that are capable of accepting a magazine holding more than ten rounds of ammunition and (b) magazines capable of holding more than ten rounds of ammunition. Plaintiffs also request entry of a permanent injunction against enforcement of the unconstitutional Ordinance provisions.

**December 17, 2014**               **Respectfully submitted,**

*/s/ James B. Vogts*

James B. Vogts
Andrew A. Lothson
Swanson, Martin & Bell. LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 321-9100

***Attorneys for Plaintiffs–Appellants***

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

The undersigned certifies this brief complies with the type-volume requirements set forth in Federal Rules of Appellate Procedure, Rule 32(a)(7)(B) because the brief contains 6,576 words, excluding the parts of the brief exempted by Rule 32(a)(B)(7)(iii).  I relied on my word processor to obtain the word count, and it is Microsoft Word.  I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

The undersigned certifies this brief complies with the typeface requirements of Federal Rules of Appellate Procedure, Rule 32(a)(5) and the type style requirements of Federal Rules of Appellate Procedure, Rule 32(a)(6) as the brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 12 Century Schoolbook font.

*/s/ James B. Vogts*
James B. Vogts, one of the attorneys for Plaintiffs-Appellants

## CIRCUIT RULE 31(E) CERTIFICATION

The undersigned hereby certifies that he electronically uploaded, pursuant to Circuit Rule 31(e), a version of the brief in non-scanned PDF format.

*/s/  James B. Vogts*
James B. Vogts, one of the attorneys for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system on the 17th day of December, 2014. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system are the following:

> Christopher J. Murdoch
> Holland & Knight, LLP
> 131 South Dearborn Street
> 30th Floor
> Chicago, IL 60603
> (312) 263-3600
> Email: chris.murdoch@hklaw.com

> Christopher B. Wilson
> Perkins & Coie LLP
> 131 S. Dearborn Street
> Suite 1700
> Chicago, IL 60603
> (312) 324- 8400
> Email:  cwilson@perkinscoie.com

> Jonathon K. Baum
> Katten Muchin Rosenman LLP
> 525 West Monroe
> Chicago, Illinois 60661-3693
> (312) 902-5200
> Email: jonathon.baum@kattenlaw.com

> Anthony J. Dreyer
> Skadden, Arps, Slate, Meagher & Flom, LLP
> 4 Times Square
> New York, New York 10036
> (212) 735-3000
> Email: anthony.dreyer@skadden.com

> John Parker Sweeney
> Bradley Arant Boult Cummings LLP

1615 L. Street N.W., Suite 1350
Washington D.C. 20036
(202) 719-8216
Email: jsweeney@babc.com


/s/ *James B. Vogts*
**Attorney for Appellants**