In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 14-3091

ARIE S. FRIEDMAN and ILLINOIS STATE RIFLE ASSOCIATION,

*Plaintiffs-Appellants,*

*v.*

CITY OF HIGHLAND PARK, ILLINOIS,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 9073 — **John W. Darrah**, *Judge.*

———————————

ARGUED JANUARY 22, 2015 — DECIDED APRIL 27, 2015

———————————

Before EASTERBROOK, MANION, and WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. The City of Highland Park has an ordinance (§136.005 of the City Code) that prohibits possession of assault weapons or large-capacity magazines (those that can accept more than ten rounds). The ordinance defines an assault weapon as any semi-automatic gun that can accept a large-capacity magazine and has one of five

other features: a pistol grip without a stock (for semi-automatic pistols, the capacity to accept a magazine outside the pistol grip); a folding, telescoping, or thumbhole stock; a grip for the non-trigger hand; a barrel shroud; or a muzzle brake or compensator. Some weapons, such as AR-15s and AK-47s, are prohibited by name. Arie Friedman, who lives in Highland Park, owned a banned rifle and several large-capacity magazines before the ordinance took effect, and he wants to own these items again; likewise members of the Illinois State Rifle Association, some of whom live in Highland Park. Plaintiffs asked the district court to enjoin enforcement of the ordinance, arguing that it violates the Constitution's Second Amendment, see *District of Columbia v. Heller*, 554 U.S. 570 (2008), applied to the states by the Fourteenth. See *McDonald v. Chicago*, 561 U.S. 742 (2010).

*Heller* holds that a law banning the possession of handguns in the home (or making their use in the home infeasible) violates the individual right to keep and bear arms secured by the Second Amendment. But the Court added that this is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. It cautioned against interpreting the decision to cast doubt on "longstanding prohibitions", including the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'". *Id*. at 623, 627. It observed that state militias, when called to service, often had asked members to come armed with the sort of weapons that were "in common use at the time", *id*. at 624, and it thought these kinds of weapons (which have changed over the years) are protected by the Second Amendment in private hands, while military-grade weapons (the sort that would be in a militia's armory), such as machine guns, and weapons especially at-

tractive to criminals, such as short-barreled shotguns, are not. *Id*. at 624–25.

Plaintiffs contend that there is no "historical tradition" of banning possession of semi-automatic guns and large-capacity magazines. Semi-automatic rifles have been marketed for civilian use for over a hundred years; Highland Park's ordinance was enacted in 2013. But this argument proves too much: its logic extends to bans on machine guns (which can fire more than one round with a single pull of the trigger, unlike semi-automatic weapons that chamber a new round automatically but require a new pull to fire). *Heller* deemed a ban on private possession of machine guns to be obviously valid. 554 U.S. at 624. But states didn't begin to regulate private use of machine guns until 1927. See Notes to Uniform Machine Gun Act, *Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Forty-Second Annual Conference* 427–28 (1932). The National Firearms Act, 48 Stat. 1236, regulating machine guns at the federal level, followed in 1934.

How weapons are sorted between private and military uses has changed over time. From the perspective of 2008, when *Heller* was decided, laws dating to the 1920s may seem to belong to a "historical tradition" of regulation. But they were enacted more than 130 years after the states ratified the Second Amendment. Why should regulations enacted 130 years after the Second Amendment's adoption (and nearly 60 years after the Fourteenth's) have more validity than those enacted another 90 years later? Nothing in *Heller* suggests that a constitutional challenge to bans on private possession of machine guns brought during the 1930s, soon after their enactment, should have succeeded—that the passage of time

creates an easement across the Second Amendment. See *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc). If Highland Park's ordinance stays on the books for a few years, that shouldn't make it either more or less open to challenge under the Second Amendment.

Plaintiffs ask us to distinguish machine guns from semi-automatic weapons on the ground that the latter are commonly owned for lawful purposes. Cf. *Heller*, 554 U.S. at 625. This does not track the way *Heller* distinguished *United States v. Miller*, 307 U.S. 174 (1939): The Court took from *Miller* the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service. During Prohibition the Thompson submachine gun (the "Tommy gun") was all too common in Chicago, but that popularity didn't give it a constitutional immunity from the federal prohibition enacted in 1934. (The Tommy gun is a machine gun, as defined by 18 U.S.C. §921(23) and 26 U.S.C. §5845(b), and generally forbidden by 18 U.S.C. §922(a)(4), because it fires multiple rounds with a single pull of the trigger; like the Uzi it is called a "submachine gun" to indicate that it is smaller and more mobile than other machine guns. The AK-47 and AR-15 (M16) rifles in military use also are submachine guns, though civilian versions are restricted to semi-automatic fire.) Both *Heller* and *Miller* contemplated that the weapons properly in private hands for militia use might change through legal regulation as well as innovation by firearms manufacturers.

And relying on how common a weapon is at the time of litigation would be circular to boot. Machine guns aren't

commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning that it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.

Highland Park contends that the ordinance must be valid because weapons with large-capacity magazines are "dangerous and unusual" as *Heller* used that phrase. Yet Highland Park concedes uncertainty whether the banned weapons are commonly owned; if they are (or were before it enacted the ordinance), then they are not unusual. The record shows that perhaps 9% of the nation's firearms owners have assault weapons, but what line separates "common" from "uncommon" ownership is something the Court did not say. And the record does not show whether the banned weapons are "dangerous" compared with handguns, which are responsible for the vast majority of gun violence in the United States: nearly as many people are killed annually with handguns in Chicago alone as have been killed in mass shootings (where use of a banned weapon might make a difference) nationwide in more than a decade. See Research and Development Division, *2011 Chicago Murder Analysis*, Chicago Police Department 23 (2012); J. Pete Blair & Katherine W. Schweit, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*, Federal Bureau of Investigation, United States Department of Justice 9 (2014).

The large fraction of murders committed by handguns may reflect the fact that they are much more numerous than

assault weapons. What should matter to the "danger" question is how deadly a single weapon of one kind is compared with a single weapon of a different kind. On that subject the record provides some evidence. We know, for example, that semi-automatic guns with large-capacity magazines enable shooters to fire bullets faster than handguns equipped with smaller magazines. We also know that assault weapons generally are chambered for small rounds (compared with a large-caliber handgun or rifle), which emerge from the barrel with less momentum and are lethal only at (relatively) short range. This suggests that they are less dangerous per bullet—but they can fire more bullets. And they are designed to spray fire rather than to be aimed carefully. That makes them simultaneously more dangerous to bystanders (and targets of aspiring mass murderers) yet more useful to elderly householders and others who are too frightened to draw a careful bead on an intruder or physically unable to do so. Where does the balance of danger lie?

The problems that would be created by treating such empirical issues as for the judiciary rather than the legislature—and the possibility that different judges might reach dramatically different conclusions about relative risks and their constitutional significance—illustrate why courts should not read *Heller* like a statute rather than an explanation of the Court's disposition. The language from *Heller* that we have quoted is precautionary: it warns against readings that go beyond the scope of *Heller*'s holding that "the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense." *Skoien*, 614 F.3d at 640.

*Heller* does not purport to define the full scope of the Second Amendment. The Court has not told us what other entitlements the Second Amendment creates or what kinds of gun regulations legislatures may enact. Instead the Court has alerted other judges, in *Heller* and again in *McDonald*, that the Second Amendment "does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 786 (plurality opinion); *Heller*, 554 U.S. at 626–27 & n.26. Cautionary language about what has been left open should not be read as if it were part of the Constitution or answered all possible questions. It is enough to say, as we did in *Skoien*, 614 F.3d at 641, that at least some categorical limits on the kinds of weapons that can be possessed are proper, and that they need not mirror restrictions that were on the books in 1791.

This does not imply that a law about firearms is proper if it passes the rational-basis test—that is, as long as it serves some conceivable valid function. See, e.g., *Vance v. Bradley,* 440 U.S. 93 (1979). *All* legislation requires a rational basis; if the Second Amendment imposed only a rational basis requirement, it wouldn't do anything. So far, however, the Justices have declined to specify how much substantive review the Second Amendment requires. Two courts of appeals have applied a version of "intermediate scrutiny" and sustained limits on assault weapons and large-capacity magazines. See *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (a law materially identical to Highland Park's is valid); *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) (a ban on magazines holding more than ten rounds is valid). But instead of trying to decide what "level" of scrutiny applies, and how it works, inquiries that do not resolve any concrete dispute, we think it better to ask whether a regulation bans weapons that were common at the time of ratification or

those that have "some reasonable relationship to the preservation or efficiency of a well regulated militia," see *Heller*, 554 U.S. at 622–25; *Miller*, 307 U.S. at 178–79, and whether law-abiding citizens retain adequate means of self-defense.

The features prohibited by Highland Park's ordinance were not common in 1791. Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century. Semi-automatic guns and large-capacity magazines are more recent developments. Barrel shrouds, which make guns easier to operate even if they overheat, also are new; slow-loading guns available in 1791 did not overheat. And muzzle brakes, which prevent a gun's barrel from rising in recoil, are an early 20th century innovation.

Some of the weapons prohibited by the ordinance are commonly used for military and police functions; they therefore bear a relation to the preservation and effectiveness of state militias. But states, which are in charge of militias, should be allowed to decide when civilians can possess military-grade firearms, so as to have them available when the militia is called to duty. (Recall that this is how *Heller* understood *Miller*.) And since plaintiffs do not distinguish between states and other units of local government—according to them, an identical ban enacted by the State of Illinois would also run afoul of the Second Amendment—we need not decide whether *only* states, which traditionally regulate militias, have the power to determine what kinds of weapons citizens should have available. (Such an argument might anyway have been foreclosed by Illinois' recognition that local assault-weapon bans enacted before July 19, 2013, are valid; see 430 ILCS 65/13.1(c).)

Since the banned weapons can be used for self-defense, we must consider whether the ordinance leaves residents of Highland Park ample means to exercise the "inherent right of self-defense" that the Second Amendment protects. *Heller*, 554 U.S. at 628. *Heller* held that the availability of long guns does not save a ban on handgun ownership. The Justices took note of some of the reasons, including ease of accessibility and use, that citizens might prefer handguns to long guns for self-defense. But *Heller* did not foreclose the possibility that allowing the use of most long guns plus pistols and revolvers, as Highland Park's ordinance does, gives householders adequate means of defense.

Plaintiffs argue that the ordinance substantially restricts their options for armed self-defense. But that contention is undermined by their argument, in the same breath, that the ordinance serves no purpose, because (they say) criminals will just substitute permitted firearms functionally identical to the banned guns. If criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners. Unlike the District of Columbia's ban on handguns, Highland Park's ordinance leaves residents with many self-defense options.

True enough, assault weapons can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than large-caliber pistols or revolvers. Householders too frightened or infirm to aim carefully may be able to wield them more effectively than the pistols James Bond preferred. But assault weapons with large-capacity magazines can fire more shots, faster, and thus can be more dangerous in aggregate. Why else are they the weapons of choice in mass shootings? A ban on assault weapons and

large-capacity magazines might not prevent shootings in Highland Park (where they are already rare), but it may reduce the carnage if a mass shooting occurs.

That laws similar to Highland Park's reduce the share of gun crimes involving assault weapons is established by data. See Christopher S. Koper, Daniel J. Woods & Jeffery A. Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the National Institute of Justice, United States Department of Justice 39–60 (June 2004). There is also some evidence linking the availability of assault weapons to gun-related homicides. See Arindrajit Dube, Oeindrila Dube & Omar García-Ponce, *Cross-Border Spillover: U.S. Gun Laws and Violence in Mexico*, 107 Am. Pol. Sci. Rev. 397 (2013) (finding that Mexican municipalities bordering American states without assault weapons bans experienced more gun-related homicides than those bordering California, which had a ban).

Plaintiffs nonetheless contend that the ordinance will have no effect on gun violence because the sort of firearms banned in Highland Park are available elsewhere in Illinois and in adjacent states. But data show that most criminals commit crimes close to home. See Elizabeth Groff & Tom McEwen, *Exploring the Spatial Configuration of Places Related to Homicide Events*, Report to the National Institute of Justice, United States Department of Justice 5–10, 48–56 (March 2006) (homicide); Christophe Vandeviver, Stijn Van Daele & Tom Vander Beken, *What Makes Long Crime Trips Worth Undertaking? Balancing Costs and Benefits in Burglars' Journey to Crime*, 55 Brit. J. Criminology 399, 401, 406–07 (2015) (burglary). Local crimes are most likely to be committed by local residents, who are less likely to have access to firearms

banned by a local ordinance. A ban on assault weapons won't eliminate gun violence in Highland Park, but it may reduce the overall dangerousness of crime that does occur. Plaintiffs' argument proves far too much: it would imply that no jurisdiction other than the United States as a whole can regulate firearms. But that's not what *Heller* concluded, and not what we have held for local bans on other substances. See *National Paint & Coatings Ass'n v. Chicago*, 45 F.3d 1124 (7th Cir. 1995) (spray paint).

If it has no other effect, Highland Park's ordinance may increase the public's sense of safety. Mass shootings are rare, but they are highly salient, and people tend to overestimate the likelihood of salient events. See George F. Loewenstein, Christopher K. Hsee, Elke U. Weber & Ned Welch, *Risk as Feelings*, 127 Psychological Bulletin 267, 275–76 (2001); Eric J. Johnson, John Hershey, Jacqueline Meszaros & Howard Kunreuther, *Framing, Probability Distortions, and Insurance Decisions*, 7 J. Risk & Uncertainty 35 (1993). If a ban on semi-automatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit. Cf. *Frank v. Walker*, 768 F.3d 744, 751 (7th Cir. 2014).

*McDonald* holds that the Second Amendment creates individual rights that can be asserted against state and local governments. But neither it nor *Heller* attempts to define the entire scope of the Second Amendment—to take all questions about which weapons are appropriate for self-defense out of the people's hands. *Heller* and *McDonald* set limits on the regulation of firearms; but within those limits, they leave matters open. The best way to evaluate the relation among assault weapons, crime, and self-defense is through the po-

litical process and scholarly debate, not by parsing ambiguous passages in the Supreme Court's opinions. The central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process. See *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819).

Another constitutional principle is relevant: the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity. *McDonald* circumscribes the scope of permissible experimentation by state and local governments, but it does not foreclose *all* possibility of experimentation. Within the limits established by the Justices in *Heller* and *McDonald*, federalism and diversity still have a claim. Whether those limits should be extended is in the end a question for the Justices. Given our understanding of existing limits, the judgment is

AFFIRMED.

M<span style="font-variant:small-caps">ANION</span>, *Circuit Judge*, dissenting.

By prohibiting a class of weapons commonly used throughout the country, Highland Park's ordinance infringes upon the rights of its citizens to keep weapons in their homes for the purpose of defending themselves, their families, and their property. Both the ordinance and this court's opinion upholding it are directly at odds with the central holdings of *Heller* and *McDonald*: that the Second Amendment protects a personal right to keep arms for lawful purposes, most notably for self-defense within the home. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago*, 561 U.S. 767, 780 (2010). For the following reasons, I respectfully dissent.

Unlike public life where the cities and states have broad authority to regulate, the ultimate decision for what constitutes the most effective means of defending one's home, family, and property resides in individual citizens and not in the government. The *Heller* and *McDonald* opinions could not be clearer on this matter. *Heller*, 554 U.S. at 635; *McDonald*, 561 U.S. at 780. The extent of danger—real or imagined—that a citizen faces at home is a matter only that person can assess in full.

To be sure, assault rifles and large capacity magazines are dangerous. But their ability to project large amounts of force accurately is exactly why they are an attractive means of self-defense. While most persons do not require extraordinary means to defend their homes, the fact remains that some do. Ultimately, it is up to the lawful gun owner and not the government to decide these matters. To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitu-

tion and to our political tradition. The rights contained in the Second Amendment are "fundamental" and "necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. The government recognizes these rights; it does not confer them.

Fundamentally, I disagree with the court's reading of *United States v. Miller*, 307 U.S. 174 (1939), as it pertains to the nature of the rights recognized by the Second Amendment. Long ago, in *Miller*, the Supreme Court expressly tied Second Amendment rights to one's association with a state militia. In *Heller*, the District of Columbia relied on this holding from *Miller* as justification for an ordinance restricting the rights of its citizens to keep and use handguns. 554 U.S. at 577, 587. The Supreme Court disagreed. *Id.* at 622. Indeed, the central holding of *Heller* is that citizens have an individual right to keep and bear firearms that does not depend upon any association with a militia. In so holding, *Heller* effectively laid to rest the notion of collective Second Amendment rights, and then *McDonald* placed a wreath on its grave.

Here, the court comes not to bury *Miller* but to exhume it. To that end, it surveys the landscape of firearm regulations as if *Miller* were still the controlling authority and *Heller* were a mere gloss on it. The court's reading culminates in a novel test: whether the weapons in question were "common at the time of ratification" or have "some reasonable relationship to the preservation or efficiency of a well regulated militia," and "whether law-abiding citizens retain adequate means of self-defense." *Ante* at 7–8.

The problem is *Heller* expressly disclaimed two of the three aspects of this test; and it did so not as a matter of simple housekeeping, but as an immediate consequence of its central holding. It held as "bordering on the frivolous" arguments that

recognized a right to bear only those arms in existence at the time of ratification. *Heller,* 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment."). Likewise, it expressly overruled any reading of the Second Amendment that conditioned the rights to keep and bear arms on one's association with a militia. *Id.* at 612. ("It is not possible to read this as discussing anything other than an individual right unconnected to militia service."). For this reason, there is no way to square this court's holding with the clear precedents of *Heller* and *McDonald.*

### *Heller* and *McDonald*

We turn to the controlling precedents. Although the *Heller* decision is of recent vintage, the rights recognized by it—for individual citizens to keep and bear arms lawfully—are not. *Heller* certainly did not create them in 2008, nor did the Second Amendment in 1791. These rights are "fundamental" and "deeply rooted in this Nation's history and tradition." *McDonald*, 561 U.S. at 768. They are natural rights that pre-existed the Second Amendment. *Heller*, 554 U.S. at 592 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1876) that the right to carry weapons is not "dependent upon [the Second Amendment] for its existence."); *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011). This understanding persisted and was shared by the Framers of the Fourteenth Amendment, who counted these among the "fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. These rights exist not merely in the abstract, but are exercised on a daily basis; indeed, a detailed list of the various ways in which Americans use weapons lawfully would be prohibitively long.

Which brings us to Friedman, our plaintiff. He is a resident of Highland Park who owns an AR rifle and large capacity magazines of the types prohibited by the ordinance. Friedman contends—and the city does not contest—that he keeps the weapons in his home for the defense of his family. Prior to the passage of the ordinance, he used these weapons lawfully. Now, under the terms of the ordinance, Friedman has ninety days to remove the weapons beyond Highland Park's city limits or to surrender them to the Chief of Police. §136.005 (D)(1), (3). Should he fail to do so, he faces a misdemeanor conviction punishable by up to six months in jail and a fine of between $500 and $1,000. *Id.* at § (F).

### The Framework

In *Ezell*, we stated that a court must first identify whether the regulated activity falls within the scope of the Second Amendment. 651 F.3d at 701. However, where, as here, the activity is directly tied to specific classes of weapons, we are faced with an additional threshold matter: whether the classes of weapons regulated are commonly used by law-abiding citizens. If the weapons in question (assault rifles and high-capacity magazines) are not commonly used by law-abiding citizens, then our inquiry ends as there is no Second Amendment protection and the regulation is presumed to be lawful.[1]

---

[1] This question is best viewed as a separate, threshold matter than as an aspect of the regulated activity. An example bears this out: because hand grenades have never been commonly used by law-abiding citizens for lawful purposes, it matters not whether the regulation is an ordinance prohibiting ownership of such weapons, a licensing scheme impeding access to them, or a regulation setting conditions on their manufacture or sale: the Second Amendment does not apply to such inquiry because the type of weapon is not covered by it.

If the weapons are covered by the Second Amendment, we then examine whether the asserted right (i.e., the activity affected by the regulation) is likewise covered. To do this, we examine how the asserted right was publicly understood when the Fourteenth Amendment was ratified (or Second Amendment in the case of federal regulation) to discern whether the right (or some analogue) has been exercised historically. *Id.* at 702. This answer requires a textual and historical inquiry into the original meaning of the Second Amendment. *Id.* (citing *Heller*, 554 U.S. at 634–35). Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests squarely on the government to establish that the activity has been subject to some measure of regulation. *Id.*

Finally, if we conclude that the weapons and asserted right at issue are covered by the Second Amendment, then we must assign a level of scrutiny appropriate to the right regulated and determine whether the regulation survives such scrutiny. *Ezell*, 651 F.3d at 702–03. Conversely, if the activity falls outside of the scope of the Second Amendment as understood at the relevant historical moment (1868 with the passage of the Fourteenth Amendment), the regulated activity is categorically unprotected and our inquiry ends. *Id.* at 703.

In summary, this framework involves up to three separate steps for a reviewing court. A shorthand of it runs as follows:

1. determine whether the weapon is commonly used by law-abiding citizens;

2. review the original public meaning of the asserted right (i.e. the regulated activity); and, if both the weapon and asserted right are covered;

3. assign and apply a standard of scrutiny.

Having established the appropriate framework, it is time to examine Highland Park's ordinance in light of the Second Amendment.

*Common Use*

The regulated weapons: In *Miller*, the Supreme Court upheld a prohibition against short-barreled shotguns because the Second Amendment did not protect those weapons that were not typically possessed as ordinary military equipment for use in a state militia. 307 U.S. at 178. The "common use" test is the offspring of this decision and asks whether a particular weapon is commonly used by law-abiding citizens for lawful purposes.[2] *Heller* jettisoned *Miller*'s requirement of a nexus between the weapon and military equipment, but otherwise adopted the test with a focus on whether the weapon in question has obtained common use by law abiding citizens. *Heller*, 554 U.S. 623, 627.

Here, the evidentiary record is unequivocal: a statistically significant amount of gun owners such as Friedman use semi-automatic weapons and high-capacity magazines for lawful purposes.[3] This evidence is sufficient to demonstrate that these

---

[2] It is of no significance that other courts have worded this inquiry differently, asking whether the regulated weapons are "dangerous and unusual." All weapons are presumably dangerous. To say that a weapon is unusual is to say that it is not commonly used for lawful purposes.

[3] Insofar as the evidentiary record addresses the matter, it supports the proposition that AR-rifles are commonly used by law-abiding citizens. Out of 57 million firearm owners in the United States, it is estimated that 5 million own AR-type rifles. (A. 66). Firearm industry analysts estimate that 5,128,000 AR-type rifles were produced in the United States for domestic sale, while an additional 3,415,000 were imported. (A. 65; 73). Between 2008

weapons are commonly used and are not unusual. In other words, they are covered by the Second Amendment. Whether or how people might use these weapons for illegal purposes provides a basis for a state to regulate them, but it has no bearing on whether the Second Amendment covers them. Unfortunately, the court effectively inverts this equation and considers first the potential illegal uses (here: catastrophic public shootings) and then doubles back to determine whether attendant lawful use by ordinary citizens might be sufficient to warrant some type of Second Amendment protection.

An example: At oral argument, there was much discussion about various longstanding regulations prohibiting such weapons as machine guns. The crux of this discussion was whether machine guns would have satisfied the common use test during the 1930s when they were the weapon of choice among gangsters in Chicago. But this misses the point: it matters not whether fifty or five thousand mob enforcers used a particular weapon, the question is whether a critical mass of law-abiding citizens did. In the case of machine guns, nobody has argued, before or since, that ordinary citizens used these weapons for lawful purposes, and so they have been rightly deemed not to fall within the ambit of the Second Amendment. Had there been even a small amount of citizens who used them for lawful purposes, then the Second Amendment might have covered them. The fact that gangsters used them to terrorize people might have served as ample justification to regulate

---

and 2012, approximately 11.4% of firearms manufactured in the United States were AR-type rifles. A survey of randomly selected United States residents demonstrated that an estimated 11,976,702 million persons participated in target shooting with an AR-type rifle in 2012. (A. 68; 102). The evidentiary record contains no entries disputing these estimates.

them (or even prohibit them outright), but it has no bearing on whether they are covered under the Second Amendment.[4]

The court also objected because the common-use test is a circular one.[5] Perhaps so, but the law is full of such tests, and this one is no more circular than the "reasonable expectation of privacy" or the "reasonable juror." The fact that a statistically significant number of Americans use AR-type rifles and large-size magazines demonstrates *ipso facto* that they are used for lawful purposes. Our inquiry should have ended here: the Second Amendment covers these weapons.

---

[4] Weapons can be commonly used by both criminals and law-abiding citizens. For example, the court correctly notes that handguns have long been the preferred weapon for criminals and are "responsible for the vast majority of gun violence in the United States … ." *Ante* at 5. This, of course, is the same type of weapon that *McDonald* recognized as covered under the Second Amendment because it was (and still is) "the most preferred firearm in the nation." 561 U.S. 767. In evaluating common use, *McDonald* considered as relevant only use by law-abiding citizens.

[5] Circularity results from the obvious fact that common use is aided when a weapon is legal and precluded when it is not. The argument goes that authorities are free to regulate irrespective of the Second Amendment until a weapon obtains a certain quotient of use by law-abiding citizens. After that, they are too late as Second Amendment protections obtain. Under this view, common use is the effect of law rather than the cause. But this scenario overstates the evolution of technology among weapons. Overwhelmingly, newly developed weapons are merely updated versions of weapons already in the marketplace. It is rare to have a weapon come to market in such form that it has no precursors subject to regulation. Weapon manufacturers are unlikely to expend funds to develop and bring to market variations on classes of weapons that are currently prohibited.

### Original Meaning of Asserted Rights

We follow *Heller*'s example examining the original meaning of the right asserted. 554 U.S. at 576. *Heller* examined the right to keep arms as it was understood in 1791 when the Second Amendment was ratified. Significantly, *Heller* expressly rejected the view that the Second Amendment contained a unitary right and instead noted that lawmakers of the founding period routinely grouped multiple, related, rights under a singular right. *Heller*, 554 U.S. at 591. Because the rights in the Second Amendment are many and varied, a court must identify the specific right implicated by a regulation.

To examine the scope of the right, we must first identify the regulated activity. Here, the relevant section of the ordinance provides that: "No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine." § 136.005(B). Plaintiffs do not challenge the provisions associated with the manufacture or sale of such weapons in Highland Park and so we need not address the scope of those rights. Instead, we isolate our attention on the language in the statute that forbids a citizen from acquiring or possessing any assault weapon or large-capacity magazine.

### The Right to Keep Arms v. The Right to Bear Arms

*Heller* defined the term "to keep arms" to mean to "have weapons," and "to bear arms" as to "carr[y]" weapons. 554 U.S. at 582; 589. Though similar, these activities are not identical; for instance, an ordinance that prohibits the carriage or use of weapons but not outright possession would not implicate the right to keep arms, but only the right to bear them in certain locations. Highland Park's ordinance implicates

both rights. Leaving aside the other prohibitions, the ordinance prohibits the "acqui[sition] or possess[ion of] any assault weapon or large capacity magazine." §136.005 (B). Notably absent from this provision is any qualifying language: *all* forms of possession are summarily prohibited. Other laws notwithstanding, the ordinance makes no distinction between storing large-capacity magazines in a locked safe at home and carrying a loaded assault rifle while walking down Main Street. Both constitute "possession" and are prohibited outright.

Of course, our inquiry centers on the understanding of the right to keep arms in 1868 when the Fourteenth Amendment became law. Fortunately, we need not engage in original historical analysis because the Supreme Court in *McDonald* has done so on this exact question—albeit in the context of an ordinance restricting the right to keep handguns in the home. *McDonald* concluded that the right to keep a weapon in one's home for the purposes of self-defense is the broadest right under the Second Amendment. It noted:

> Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, we held that individual self-defense is 'the *central component*' of the Second Amendment right. … Explaining that 'the need for defense of self, family, and property is most acute' in the home … we found that this right applies to handguns because they are 'the most preferred firearm in the nation to 'keep' and use for the protection of one's home and family … . Thus, we concluded, citizens must be permitted to use [handguns] for the core lawful purpose of self-defense.

*McDonald*, 561 U.S. at 767–68 (citing *Heller*, 554 U.S. at 630) (emphasis in original).

Rather than merely regulate how weapons are to be stored at home, Highland Park's ordinance goes further than the one that the Court found unconstitutional in *Heller*: it prohibits any form of possession of these weapons. It is immaterial to this inquiry that the regulations targeted different classes of weapons (handguns versus assault rifles and large-capacity magazines) because the issue at this step involves the scope of the protected activity—the right to keep arms for self-defense—not the class of weapons involved with such activity; that inquiry is relevant at the final step in examining the purpose for the regulation.

If the right to keep arms in the home for the purpose of self-defense obtains the broadest protections under the Second Amendment, it follows by implication that regulations affecting the rights to carry (bear) arms outside of the home are given greater deference. Indeed, the vast majority of the longstanding regulations deemed "presumptively lawful" by *Heller* and *McDonald* are regulations against the use and carriage of weapons. *See, e.g., Heller*, 554 U.S. at 626–27; *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*"); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009). Traditionally, these regulations limited the carriage of weapons in sensitive locations such as courthouses or banned dueling or carrying concealed weapons such as pocket pistols or bowie knives. *See* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L. J. 1587, 1601 (2014). In contrast, those regulations prohibiting ownership of weapons outright focused on the status of the regulated party as a felon or a person ill-suited for gun ownership due to mental infirmities. *Id.* In short, outside of weapons deemed dangerous or unusual, there is no historical tradition supporting wholesale prohibitions of entire classes of weapons.

No. 14-3091

*Standards of Scrutiny*

Insofar as Highland Park's ordinance implicates Friedman's right to keep assault rifles and large-capacity magazines in his home for the purposes of self-defense, it implicates a fundamental right and is subject to strict scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights are given the most exacting scrutiny") (citation omitted). Of course, other courts have applied lower standards of review even in cases where they recognized that the regulation impinged upon a fundamental right under the Second Amendment. *See, e.g., Heller II*, 670 F.3d at 1256.

The distinction here is a matter of kind and not degree; rather than limiting the terms under which a fundamental right might be exercised, Highland Park's ordinance serves as a total prohibition of a class of weapons that Friedman used to defend his home and family. The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself. For this reason, *Heller* struck down a District of Columbia ordinance requiring that firearms in the home be rendered and kept inoperable at all times because the ordinance "makes it impossible for citizens to use [the regulated weapons] for the core lawful purpose of self-defense … ." *Heller*, 554 U.S. at 630. Because Highland Park's ordinance cuts right to the heart of the Second Amendment, it deserves the highest level of scrutiny.

Under strict scrutiny, Highland Park must prove that its law furthers a compelling government interest and must employ the least restrictive means to achieve that end. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). Accordingly, Highland Park claims that the law furthers the compelling interest of preventing public shootings

such as those witnessed at the movie theater in Aurora, Colorado and at Sandy Hook Elementary School in Connecticut. No problem so far: public safety is an obvious compelling interest in this case. That the regulated weapons are capable of inflicting substantial force is no doubt relevant in forming a basis for the City to regulate their use within its public spaces.

The difficulties arise in the next prong; rather than being the least restrictive means to address these particular public safety issues, Highland Park's ordinance serves as the bluntest of instruments, banning a class of weapons outright, and restricting the rights of its citizens to select the means by which they defend their homes and families. Here, one need not parse out the various alternatives that Highland Park could have chosen to achieve these ends; *any* alternative would have been less restrictive. This can only yield one conclusion: the provisions in Highland Park's ordinance prohibiting its citizens from acquiring or possessing assault rifles or large-capacity magazines are unconstitutional insofar as they prohibit citizens from lawfully keeping such weapons in their homes.

Insofar as Highland Park's ordinance implicates the right to carry or use these weapons outside of one's property, it is subject to intermediate scrutiny. To satisfy this standard, Highland Park must show that the restrictions are "substantially related to an important government objective." *Clark*, 486 U.S. at 461. As noted earlier, restricting the use and carriage of assault rifles and large-capacity magazines in Highland Park is related to an important government objective—protecting the safety of its citizens. Unlike strict scrutiny analysis, intermediate scrutiny does not require that the ordinance be the least restrictive means, but that it serve an important

government interest in a way that is substantially related to that interest. *Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989).

As other courts have noted, restrictions against assault weapons and large capacity magazines can survive intermediate scrutiny. *Heller II*, 670 F.3d at 1244. Here, Highland Park has a legitimate interest in ensuring the safety of its citizens in schools and other public places. For this reason, there is no problem concluding that the ordinance, insofar as it regulates the possession and use of the weapons in public places, coheres with the Second Amendment.

Several other matters require attention as well.

*The rights in the Second Amendment*: The court treats these rights as unitary and undifferentiated. In so doing, it makes no distinction between the right to keep arms to defend one's home and the right to use those arms in a constitutionally permissible manner. But the Supreme Court has established clear parameters: the right to keep arms in the home for self-defense obtains the broadest protection, *McDonald*, 561 U.S. at 767 (noting that the "need for defense of self, family, and property is most acute in the home … ), while other rights under the Second Amendment are "not unlimited" but are subject to appropriate regulation. Here, the court makes no attempt to parse out the various activities prohibited by Highland Park's ordinance; instead it treats as identical activities as diverse as keeping weapons in the home and manufacturing them for sale. *Heller* requires courts to identify the specific activity regulated; the court here failed to do this.

*The effect of longstanding regulations*: It is important to note that *Heller*, for good reasons, did not seek to dismantle in whole the nexus of existing firearms regulations. Instead, it

sought to recast the focus of courts away from policy considerations and towards the original meaning of the Second Amendment. In so doing, it left intact existing regulations and stated that longstanding ones are accorded a presumption of constitutionality. *Heller*, 554 U.S. at 626–27.

But a presumption is a very different thing from an assertion: we presume that laws are constitutional until and unless the regulation is challenged and a competent court informs us otherwise. In other words, it is a very different thing to presume a statute to be constitutional than to positively assert that it is. Here the court outlines various longstanding regulations and then proceeds to use them as a navigational chart to determine the confines of permissible firearm regulation. All of this culminates in a syllogism that runs, roughly speaking, as follows: machine guns have been illegal under law; assault weapons are similar to machine guns; therefore, assault rifles may be prohibited under law. Nothing in *Heller* or *McDonald* supports this as an appropriate framework.

*The evidentiary record*: The court ignores the central piece of evidence in this case: that millions of Americans own and use AR-type rifles lawfully. (A.65–73). Instead, it adopts—as the final word on the matter and with no discussion—Highland Park's position that the evidence is inconclusive on this question; and it does this notwithstanding the fact that *all* of the relevant evidence supports defendant's contention that AR-type rifles are commonly used throughout this nation. Additionally, it posits as self-evident a comparison between semiautomatic weapons and machine guns despite the fact that the existing science is, at best, contested on this. More signifi-

cantly, the only relevant evidence in record disputes this contention.[6]

*The post-Heller framework*: The court wholly disregards the (albeit still nascent) post-*Heller* framework established in this and our sister courts in favor of its own, unique path. In so doing, it offers a methodology in direct conflict to that offered by this circuit in previous cases, s*ee, e.g.*, *Ezell*, 651 F.3d 684, and out of step with other circuits, *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010); *Heller II*, 670 F.3d 1244.

*Judicial findings:* Finally, the court justifies the ordinance as valid because it "may increase the public's sense of safety." Perhaps so, but there is no evidentiary basis for this finding. The court is not empowered to uphold a regulation as constitutional based solely on its ability to divine public sentiment about the matter.

As noted earlier, the post-*Heller* framework is very much a work in progress and will continue to be refined in subsequent litigation. Neither *Heller* nor *McDonald* purported to resolve every matter involving the regulation of weapons; but they are clear about one thing: the right to keep arms in the home for self-defense is central to the Second Amendment and is not conditioned on any association with a militia. Instead of following this clear principle, the court engages in a gerrymandered reading of those cases to hold directly contrary to their

---

[6] Plaintiffs submitted a video demonstration highlighting some of the differences between semiautomatic, AR-type rifles and automatic rifles. (A. 63). Automatic weapons are selective-fire weapons where a single pull of the trigger will fire continuously until all ammunition is exhausted. (A. 21) In contrast, a semiautomatic weapon only allows for one round per pull. (A. 19).

precedents. In so doing, it upholds an ordinance that violates the Second Amendment rights of its citizens to keep arms in their homes for the purpose of defending themselves, their families, and their property.

I respectfully dissent.